## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRIDZETTE LANE,** | |
| Plaintiff, | |
| v. | Case No. 1:12-cv-00514 (CRC) |
| **DISTRICT OF COLUMBIA, <u>et al.</u>,** | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

This case arises from the April 2011 fatal shooting of 18-year-old Ralphael Briscoe by

Washington, D.C. Metropolitan Police Department ("MPD") officer Chad Leo.  Officer Leo, a

member of the MPD's specialized Gun Recovery Unit, shot Mr. Briscoe from an unmarked Ford

Explorer as Briscoe was running away from him and other members of the unit.  Officer Leo

claims he fired because Briscoe was armed and posed a danger to him and his fellow officers.

Briscoe's mother, Bridzette Lane, who brought this action, insists her son was unarmed and

posed no harm whatsoever to the pursuing officers or anyone else when he was shot.

Lane filed a 20-count amended complaint against Officer Leo and the District of

Columbia alleging various constitutional violations and common law torts.  A number of Lane's

claims have been dismissed or withdrawn.[1]  The remaining counts consist of claims brought in

Lane's representative capacity under the District of Columbia's Survival Act, D.C. Code § 12-

101, and Wrongful Death Act, D.C. Code § 16-2701 (Counts 1 and 2); claims under 42 U.S.C. §

1983 for violations of Briscoe's Fourth Amendment rights (Counts 3 and 4) and Fifth

---

[1]  Lane voluntarily dismissed claims against two additional MPD officers.  Judge Howell, who previously presided over the case, dismissed Count 8, a Fourteenth Amendment claim against the District.  Lane conceded Counts 7, 11, 12, 13, 14, 17, and 18 in her opposition to Defendants' summary judgment motion.  <u>See</u> Pl. Opp'n Mot. Summ. J. at 1 n.1.

Amendment rights (Counts 5 and 6) against both Defendants; claims for assault, battery, false arrest, negligent infliction of emotional distress, and negligence against Officer Leo (Counts 9, 10, 15, 16, and 20 respectively), for which the District would be vicariously liable; and a claim for negligent hiring, training, supervision, and retention against the District (Count 19).  The District and Officer Leo have moved for summary judgment on all the remaining counts.  The Court held a hearing on the motion on October 14, 2014.

What distinguishes this suit from the typical excessive force case is the existence of a closed-circuit video recording of the end of the chase and the shooting.  Based on its review of the video footage, as well as other evidence in the record, the Court at the hearing denied the Defendants' motion for summary judgment on Lane's Fourth Amendment and common law assault and battery claims against Officer Leo (Counts 3, 9, and 10, respectively).  For reasons explained more fully from the bench, the Court found that Officer Leo is not immune from suit on those claims because the evidence creates a genuine question of fact as to whether his conduct was objectively reasonable under the circumstances.  See Graham v. Connor, 490 U.S. 386, 396 (1989).  The Court will now deny the Defendants' motion with respect to Lane's Survival Act and Wrongful Death Act claims (Counts 1 and 2), as well as her underlying tort claims for false arrest, negligent infliction of emotional distress, and common law negligence (Counts 15, 16, and 20, respectively).  Similar questions of fact preclude summary judgment on those counts, and Lane's expert has testified to a standard of care for use of deadly force that is sufficient to support her common law negligence claim.

The Court will, however, grant summary judgment for the District on Lane's Fourth Amendment claim against it (Count 4).  Lane has not presented sufficient evidence to enable a reasonable jury to conclude that the District was deliberately indifferent to a risk that GRU

members would violate Mr. Briscoe's constitutional rights in the manner alleged.  Nor has she

presented evidence to support a reasonable inference that a lack of additional training caused

Briscoe's death.  The District is therefore not subject to municipal liability and is entitled to

summary judgment on Count 4.  The Court will also grant summary judgment for the District on

Lane's negligent hiring, training, supervision, and retention claim (Count 19) because Lane has

not offered sufficient evidence to establish an applicable standard that the District violated.  And

the Court will grant summary judgment for the Defendants on Lane's Fifth Amendment claims

(Counts 5 and 6), as Lane did not respond in her opposition to the Defendants' argument that the

availability of adequate post-deprivation remedies precludes Lane's due process claims under the

Fifth Amendment.[2]  Finally, the Court concludes that Lane is not entitled to punitive damages

from the District, but that she has raised a triable question of fact as to whether Officer Leo is

liable for punitive damages.

## I.      Factual Background

The MPD's Gun Recovery Unit ("GRU") is a specialized patrol unit charged with

identifying and recovering illegal guns from the streets of Washington, D.C.  Police Chief Cathy

Lanier reconstituted the unit in November 2007.  See Testimony of Chief Cathy Lanier, Pl's

Opp'n Defs.' Mot. Summ. J. Ex. 20 (Oct. 1, 2008).  Given the long history of gun violence in the

city, the GRU's mission is both important and dangerous.

While many facts in this case are in dispute, this much is clear:  On the afternoon of April

26, 2011, four plainclothes GRU members were on patrol in Southeast Washington in an

---

[2]  See Antoine v. U.S. Bank Nat. Ass'n, 821 F. Supp. 2d 1, 6 (D.D.C. 2010) (deeming an
argument conceded when plaintiff did not respond to it in opposition to a summary judgment
motion); see also Crawford v. Parron, 709 F. Supp. 234, 235 (D.D.C. 1986) (holding that a
deprivation of constitutional rights does not constitute a Fifth Amendment due process violation
if a meaningful post-deprivation remedy is available (citing Hudson v. Palmer, 468 U.S. 517
(1984))).

unmarked black Ford Explorer.  They encountered Ralphael Briscoe on the sidewalk outside an

apartment complex talking on his cellphone.  Deposition of Roberto Torres at 49, Feb. 12. 2014

("Torres Dep.").  As the Explorer approached, one of the officers asked Briscoe if he had a gun.

Deposition of Jordan Katz at 52, Feb. 11, 2014 ("Katz Dep."); Deposition of Thomas Sheehan at

44, Feb. 11, 2014 ("Sheehan Dep.").  Briscoe, who was not suspected of any crime, began to

walk away and then to run.  Torres Dep. 49, 72.  Two officers—Katz and Sheehan—jumped out

of the Explorer and began to chase Briscoe on foot.  Katz Dep. 53; Sheehan Dep. 52.  Briscoe

turned left, crossed the street, and sprinted down a sidewalk along the right side of the street.

Torres Dep. 76.  Officer Leo pursued in the Explorer with the fourth officer, Torres, in the back

seat.  Id. at 83.  The vehicle passed the two officers on foot and quickly approached Briscoe.

Video 1, Pl.'s Opp'n Mot. Summ. J. Ex. 27.  As Briscoe reached and began to turn right into a

driveway, the Explorer drew parallel to him.  Id.  Officer Leo fired twice out of the passenger-

side window of the slowing vehicle, hitting Briscoe in the left side of his back and left buttock.

Deposition of Chad Leo at 81, 107–08, Feb. 19, 2014 ("Leo Dep."); Pl.'s Opp'n Mot. Summ. J.

Ex. 33.  Briscoe fell in the driveway and was handcuffed by the officers pursuing on foot.  Katz

Dep. 81.  An ambulance took Briscoe to the hospital but he died soon after he arrived.  Pl.'s

Opp'n Mot. Summ. J. Ex. 37, at 3.  At the scene, officers recovered a cell phone and a BB-pistol

broken into three pieces.  Crime Scene Evidence Report, Coker Dep. Ex. 2A.

 From there the accounts diverge.  The parties first dispute whether Briscoe was in fact

armed.  Officer Torres, who was in the back seat of the Explorer, acknowledged that Briscoe was

holding a cell phone when the officers first approached him, but testified he saw a gun in his

hand during the chase.  Torres Dep. 63, 81.  Officer Leo, the driver, also insisted he saw Briscoe

gripping a pistol in his right hand as he ran away.  Leo Dep. 95.  Defendants point to the BB-gun

recovered at the scene and Officer Sheehan's statement that Briscoe told him "It's not even real! I should have never run!" Sheehan Decl. ¶ 6. Lane retorts that the police planted the BB-gun. Pl.'s Opp'n Def. Mot. Summ. J. at 18. The officers chasing Mr. Briscoe on foot did not see a gun in his hand. Katz Dep. 61; Sheehan Dep. 59. Other eyewitnesses deny Mr. Briscoe was holding a gun.

The parties also dispute whether, even if Officer Leo observed Briscoe with what appeared to be a gun, it was reasonable for him to shoot. Officer Leo contends he feared for his safety and that of his fellow officers because, as Briscoe was running away, he turned towards the Explorer with a gun in hand. Leo Dep. 111. Other witnesses, however, including two of the officers, did not see Briscoe turn. Deposition of LaTonya Boyd at 29, Apr. 7, 2014 ("Boyd Dep."); Deposition of Caroletta Inman at 43, Apr. 7, 2014 ("Inman Dep."); Katz Dep. 67; Sheehan Dep. 80. Each side says the video supports its position on both issues. A noted above, the Court ruled at the hearing that the video footage and other evidence raise a genuine question of fact as to whether the shooting was objectively reasonable under the circumstances.

## II.   Legal Standards

The Court must grant the Defendants' summary judgment motion if they have demonstrated no genuine issue of material fact exists and they are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To defeat the motion, Lane must provide "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on a particular claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in Lane's favor and accept competent evidence presented by her as true, and may not

make credibility determinations, weigh evidence, or draw inferences from the facts.  See id. at

255; George v. Leavitt, 407 F.3d 405, 413 (D.C. Cir. 2005).

## III.    Analysis

### A.    Municipal Liability of the District of Columbia

In Count 4 of her complaint, Lane seeks to hold the District of Columbia liable for her

son's death under 42 U.S.C. § 1983, which permits suits against municipalities for policies or

practices that result in violations of constitutional rights.  See Monell v. Dep't of Soc. Servs. of

City of N.Y., 436 U.S. 658 (1978).  Lane alleges that MPD's failure to provide GRU members

with enhanced training led Officer Leo to use excessive force in shooting her son, in violation of

his Fourth Amendment rights.  Deficiencies in training police officers can constitute a "custom"

or "policy" under Section 1983 when the failure amounts to "deliberate indifference" to the

constitutional rights of persons with whom the police come into contact.  See City of Canton,

Ohio v. Harris, 489 U.S. 378, 390 (1989).  To establish municipal liability through deliberate

indifference, a plaintiff must show that the municipality disregarded a known or obvious

consequence of maintaining the status quo.  See Connick v. Thompson, 131 S. Ct. 1350, 1360

(2011).  In the law enforcement context, a municipality disregards predictable consequences if it

fails to train "its employees concerning a clear constitutional duty implicated in recurrent

situations that a particular employee is certain to face."  Dorman v. District of Columbia, 888

F.2d 159, 164 (D.C. Cir. 1989).

#### i.    Prior Pattern of Misconduct

Plaintiffs usually attempt to satisfy the "deliberate indifference" standard by establishing

a pattern of police misconduct that should have put the municipality on notice of a high risk of

constitutional violations.  Connick, 131 S. Ct. at 1360.  Following this approach, Lane asserts

that GRU members used excessive force in similar incidents prior to Briscoe's shooting.  She

contends this history should have put the District on notice that GRU members needed additional

training to prevent the unconstitutional use of deadly force alleged in this case.  She attempts to

support her allegation in two ways.

First, Lane offers evidence developed in discovery indicating that, from 2005 to 2011,

GRU members were the subject of 15 excessive-force complaints to either MPD itself or the

Office of Police Complaints, an independent police review board.[3]  These prior complaints alone,

however, do not establish a pattern of relevant misconduct.  Specifically, Lane has not shown

how the volume of complaints against GRU members compares with that of complaints against

MPD patrol officers in general.  Nor has she offered expert testimony to establish whether that

volume is abnormal compared to similar units around the country.  Moreover, the complaint

summaries presented by Lane do not support an inference that the incidents involved conduct

similar to that alleged here.  The complaints do not indicate, for example, how many incidents

involved shootings, fatal or otherwise, as opposed to less extreme uses of force.  Pl.'s Opp'n Def.

Mot. Summ. J., Ex. 38.  Indeed, Lane's own expert, former MPD officer James Bradley, refused

to opine on whether the complaints suggested a pattern of excessive use of force by the GRU.

Deposition of James Bradley at 169–70, Feb. 28, 2014 ("Bradley Dep.").  Finally, as the District

points out, only one of the 15 complaints was sustained by the MPD's internal affairs department

or the independent review board.  Defs.' Reply at 7.  While that fact certainly is not dispositive

of the validity of the complaints, it diminishes the force of Lane's assertion that MPD officials

were on notice of probable misconduct by GRU members.  In short, the number and nature of the

---

[3]  Although Lane's briefs indicate there were 25 complaints, her counsel acknowledged at the
hearing that the actual number is 15.

complaints Lane cites do not support a reasonable inference that the District knew GRU members were likely to commit the constitutional violations alleged here.

In addition to GRU complaints, Lane recounts four incidents or groups of incidents which she contends reflect a pattern of similar misconduct by GRU members.[4]  The first involved a rogue GRU officer who in 2011 was convicted of conspiracy to rob and kidnap a suspected drug dealer.  Pl.'s Opp'n Defs.' Mot. Summ. J. at 20.  Although the victim of the crime was shot in the course of the abduction, the GRU officer was not the shooter.  Id. at 21.  In the civil lawsuit that resulted from the incident, the court found that the GRU officer was acting outside the scope of his official duties.  Defs.' Reply Ex. 1.  Second, Officer Katz and a supervisory GRU officer not directly involved in this case shot a suspect in May 2009.  Katz Dep. 104–05.  The suspect pled guilty to assaulting an officer during the confrontation.  Id. at 106.  In an affidavit submitted in the suspect's criminal case, however, several GRU officers, including Officer Katz, testified that the suspect fired his gun, which was inconsistent with the forensic evidence.  Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. 18, Ex. 22.  In the third case, two citizens alleged they were assaulted by GRU officers, but did not claim that the officers used a firearm.  Id. Ex. 34.  Fourth, Lane cites deposition testimony by Officer Katz acknowledging that he has shot two other citizens (as well as three dogs) during his ten-year MPD career.  Katz Dep. 106–09.  Lane does not cite any evidence, or even allege, that Officer Katz used his weapon improperly in these instances.

These incidents, while troubling in numerous respects, do not establish a pattern of similar misconduct by GRU members sufficient to put the District on notice that the officers were likely to violate clear constitutional duties regarding use of deadly force.  In fact, other than Officer Katz's prior shootings, none of the incidents involved use of deadly force by a GRU

---

[4]  It is unclear to what extent the four specific incidents cited by Lane are included in the 15 citizen complaints discussed above.

officer in the line of duty.  And, as noted above, Lane has not presented evidence that any of the shootings by Officer Katz were unjustified.  As a result, Lane has not established a pattern of constitutional violations sufficient to warrant an inference of deliberate indifference on the part of the District.  See Connick, 131 S. Ct. at 1360; Dorman, 888 F.2d at 165.

ii.     "Patently Obvious" Need for Training

While plaintiffs typically seek to prove deliberate indifference in failure-to-train cases through a pattern of prior misconduct, they may also establish liability if the need for training is "so patently obvious" under the circumstances that failure to provide it amounts to deliberate indifference to a likely risk.  Connick, 131 S. Ct. at 1361; see also Parker v. District of Columbia, 850 F.2d 708, 708 (D.C. Cir. 1988) (finding municipal liability due to "systematic and grossly inadequate training, discipline, and supervision").  Lane posits that the need for enhanced training was clear in this case because GRU members were more likely to confront potentially armed suspects.  Indeed, as Lane emphasizes, MPD Chief Lanier appeared to recognize the necessity of enhanced training when she announced the restoration of the GRU in testimony before the D.C. City Council in 2008.  Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. 20 (promising that the GRU would be "staffed with officers with enhanced training on identifying and recovery illegal guns").  Despite Chief Lanier's commitment, three of the four GRU officers involved in this case, including Officer Leo, testified they had not received any training other than the standard weapons and use-of-force training that all MPD patrol officers receive.  Katz Dep. 107; Leo Dep. 27; Sheehan Dep. 33; Torres Dep. 18.

Although the enhanced danger of the GRU's work would appear to call for at least some specialized training—as Chief Lanier herself acknowledged—Lane has not established that the standard training received by GRU officers was so deficient as to create a "patently obvious" risk

of constitutional violations.  The record indicates that all MPD patrol officers receive, in addition

to their police academy training, biannual firearms qualification training.  See Ehrlich Decl. ¶¶

4–5.  This standard training includes "simulat[ion of] actual field conditions in which an officer

is confronted with various circumstances in which the use of his or her service weapon may not

be appropriate."  Id.  The simulation training is supplemented with classroom instruction on the

proper use of force.  Id.  Lane has not demonstrated how this training is deficient in light of

GRU's mission and responsibilities.

Relatedly, Lane has not identified what specific additional training the MPD should have

provided to GRU officers or how that training would have prevented her son's death.  In his

deposition testimony on the training of the GRU officers, Mr. Bradley opined that the GRU

officers should have been instructed on a technique called "Strong Side, Weak Side," which

purportedly helps officers identify a suspect's dominant hand, as well as the results of a

Department of Justice study called "Project Achilles" on how to handle armed individuals.

Bradley Dep. 156–57, 179–80.  He also offered that GRU officers should have been cross-

trained with federal law enforcement officers.  Id. at 135.  Other than identifying whether a

suspect is right or left-handed, Bradley did not elaborate on what the additional training

specifically would entail or what additional skills GRU officers would have acquired beyond

those taught in the standard biannual training.  Absent such detail, Lane cannot establish that it

was "patently obvious" to the District that the lack of additional training "create[d] an extremely

high risk that constitutional violations [would] ensue."  City of Canton, 489 U.S. at 396

(O'Connor, J., concurring in part and dissenting in part); see also Dorman, 888 F.2d 159

(upholding qualified immunity when officers were trained in recognizing suicide risk).

iii.　　　Causation

Finally, Lane has failed to demonstrate, as she must, how "the deficiency in training actually caused" Officer Leo's actions.  City of Canton, 489 U.S. at 391.  The only evidence Lane presents on causation is testimony by her expert that, with incremental training, Officer Leo would not have "overreacted" during his pursuit of Briscoe.  Bradley Dep. 135, 139–40, 153.  Without more, however, a reasonable jury could only speculate that the lack of some unspecified training contributed to Briscoe's death.  The absence of a causal link distinguishes this case from Parker v. District of Columbia, on which Lane primarily relies.  In Parker, the D.C. Circuit found the District's failure to provide physical training in the use of non-lethal force left an officer with no other choice but to resort to shooting a suspect while attempting to serve a warrant.  850 F.2d at 713.  Lane has offered no such causal connection here.

To sum up, "[i]n virtually every instance . . . a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."  City of Canton, 489 U.S. at 392.   More, however, is needed to establish municipal liability.  Because Lane has not presented sufficient evidence to establish that the MPD's standard use-of-force training is deficient, what specifically GRU officers should have been taught in addition to the standard training, or how the lack of additional training caused Briscoe's death, the Court must grant summary judgment for the District on Count 4.

B.　　　False Arrest

Count 15 seeks to hold Officer Leo and the District liable for false arrest of Mr. Briscoe. In order make out a claim for unlawful arrest, Lane must allege an "unlawful deprivation of freedom of locomotion for any amount of time, by actual force or a threat of force."  Marshall v. District of Columbia, 391 A.2d 1374, 1380 (D.C. 1978).  An arrest is unlawful when there is no

probable cause for that arrest.  "Generally, probable cause exists where the facts and

circumstances within the arresting officer's knowledge, of which he had reasonably trustworthy

information, are sufficient in themselves to warrant a reasonable belief that an offense has been

or is being committed."  Amobi v. D.C. Dep't of Corr., 755 F.3d 980, 990 (D.C. Cir. 2014).  The

Court draws all inferences regarding probable cause in favor of the non-moving party, but

considers the information that was available to the arresting officer from the perspective of that

officer.  Bradshaw v. District of Columbia, 43 A.3d 318, 324 (D.C. 2012).  The District may be

vicariously liable for false arrest, as with other torts committed by District employees in the

scope of their employment, under the doctrine of *respondeat superior*.  See Armbruster v. Frost,

962 F. Supp. 2d 105, 116 (D.D.C. 2013); Marshall, 391 A.2d at 1380.

The evidence does not support a conclusion that Briscoe was arrested during his initial

contact with the police:  One of the officers in the Explorer simply asked him whether he had a

gun.  But Briscoe surely was arrested when he was shot.  By shooting and then handcuffing him

where he fell, Officer Leo and the other officers quite literally deprived Briscoe of his "freedom

of locomotion."  Marshall, 391 A.2d at 1380.  Thus, the critical question is whether probable

cause existed for the arrest.  "The issue of probable cause in a false arrest case is a mixed

question of law and fact that the trial court should ordinarily leave to the jury."  See Amobi, 755

F.3d at 990.  So it is here.  The District concedes there was no probable cause to arrest Briscoe at

the time of the initial encounter:  He was not suspected of a crime and was confronted by the

officers while talking on his cell phone merely because he "looked suspicious."  Defs.' Mot.

Summ. J. at 39.  But probable cause for an arrest would have existed had Briscoe produced a gun

and threatened Officer Leo as he fled.  As discussed above, however, the evidence creates a

genuine question of fact as to whether Briscoe did so.  This factual dispute precludes the Court

from finding, at this stage of the case, that the officers had probable cause to arrest Mr. Briscoe.

The Court must therefore deny the District's summary judgment motion on Count 15.

     C.    <u>Common Law Negligence</u>

     Count 20 alleges that Officer Leo was negligent in his pursuit and shooting of Briscoe.

In a negligence action, "'[t]he plaintiff must establish by competent evidence a standard of care;

that the defendant violated that standard; and that such violation proximately caused injury to the

plaintiff.' . . . When an expert's testimony is required, the expert must articulate and refer to a

standard of care by which the defendant's actions can be measured." <u>District of Columbia v.

Carmichael</u>, 577 A.2d 312, 314 (D.C. 1990) (citations removed).  The standard of care must be

specific to the circumstances, not based on inferences from personal experience.  <u>Id.</u>  The District

is vicariously liable for any torts committed by officers in the scope of their employment.  <u>See

Armbruster</u>, 962 F. Supp. 2d at116.

     The District contends that Lane has not alleged negligence claims separate and apart from

her assault and battery claims because she has not established that Officer Leo violated a national

standard of care for the use of deadly force.  <u>See</u> <u>Rawlings v. District of Columbia</u>, 820 F. Supp.

2d 92, 109 (D.D.C. 2011) ("The duty not to use excessive force cannot serve as the standard of

care for the negligence count.").  The Court disagrees.  While Lane has not provided evidence

that it was negligent for the officers to pursue Briscoe after he began to run away—indeed, her

own expert testified in his deposition that the police did nothing wrong up to the point of the

shooting, Bradley Dep. 112—she has offered evidence that Officer Leo violated a national

standard of care by shooting Mr. Briscoe.  In his deposition, Lane's expert described national

standards of care, or "shooting protocols," that instruct officers how to escalate their use of force.

<u>Id.</u> at 75–77, 120–23.  Mr. Bradley also described how officers are supposed to calibrate force to

the precise threat they confront, and should consider other means—such as taking cover or returning to apprehend the suspect later—when faced with armed individuals. Id. at 117–19. Bradley explained as well that the standards are national: He asserted the Los Angeles police force follows the same practices, and began to discuss New York City's standard when he was cut off by Defendants' attorney. Bradley responded: "As long as you're happy with it . . . . I just don't want you to say—I don't want it to come out later that I wasn't able to articulate what an actual standard was in police shootings and use of force." Id. at 130. Finally, Bradley pointed to MPD orders and District statutes and regulations that he says reflect these national norms. Id. at 73–74, 120–25. Based on Bradley's expert testimony, the Court finds that Lane has offered evidence of a national standard of care for use of force and therefore will deny the Defendants' summary judgment motion on Count 20.

D.    Negligent Infliction of Emotional Distress

Count 16 alleges negligent infliction of emotional distress ("NIED"). A plaintiff can recover for NIED "if the defendant's actions caused the plaintiff to be 'in danger of physical injury' and if, as a result, the plaintiff 'feared for his own safety.'" Hedgepeth v. Whitman Walker Clinic, 22 A.3d 789, 796 (D.C. 2011) (citations and references removed). "[T]he alleged emotional distress must be 'serious' and 'verifiable.'" Id. at 797.

The District asserts that no reasonable jury could conclude that Mr. Briscoe feared for his safety as he ran away or after he was shot. Defs.' Reply at 22. Assuming a jury finds negligence on the part of Officer Leo, however, Lane has offered sufficient evidence to raise a question of fact as to whether that negligence caused Briscoe to be in danger of physical injury and to fear for his own safety. For example, witnesses testified that after he had been shot Briscoe looked

"terrified" as he screamed and gasped for air.  Boyd Dep. 18; Inman Dep. 44.  Due to this factual

dispute, the Court must deny the District's summary judgment motion on Count 16.

      E.    <u>Negligent Hiring, Training, Supervision, and Retention</u>

Lane alleges in Count 19 that the District is liable for the negligent hiring, training,

supervision, and retention of Officer Leo and other GRU members.  To prove this claim, Lane

must establish that the District violated a national standard of care for hiring, training,

supervising, or retaining officers with responsibilities like those of the GRU members.  Lane

attempts to meet that burden in two ways.  She first contends that Mr. Bradley's expert

testimony—that other jurisdictions provide intensive training on high-risk interactions and that

he himself received certain training some 20 years ago—establishes a national standard for use-

of-force training.  Bradley Dep. 135–37.  Lane also argues that Chief Lanier established a

standard of care by promising that GRU members would receive specialized training.  Pl.'s

Opp'n Mot. Summ. J. at 39–42.  Neither approach hits the mark.

As discussed previously in the context of Lane's municipal liability claim, Bradley fails

to explain what training the District should have provided GRU members, how that training

differed from the biannual use-of-force training all MPD patrol officers receive, and how the

lack of additional training caused the shooting.  As a result, his testimony and expert reports shed

virtually no light on whether a national training standard exists for GRU-type units or how the

District violated it.  As to Chief Lanier's statements to the City Council, general promises of

more training do not establish a specific, articulable standard of care.  <u>See</u> <u>Carmichael</u>, 577 A.2d

at 314.  Accordingly, the Court will grant summary judgment for the Defendants on Count 19.

F.  Punitive Damages

Finally, Lane seeks punitive damages against both the District and Officer Leo.  Absent an express statutory mandate or "extraordinary circumstances," punitive damages are unavailable against the District of Columbia.  Butera v. District of Columbia, 235 F.3d 637, 658 (D.C. Cir. 2001).  As relevant here, "extraordinary circumstances" exist where "a municipality or its policymakers have intentionally adopted [an] unconstitutional policy that caused the damages in question."  See Daskalea v. District of Columbia, 227 F.3d 433, 447 (D.C. Cir. 2000).  Because Lane has not offered evidence that Briscoe's death resulted from any unconstitutional policy promulgated by city officials or taxpayers, she is not entitled to receive punitive damages against the District.  See Butera, 235 F.3d at 658 (vacating a punitive damages award against the District because there was no evidence of an unconstitutional policy); Daskalea, 227 F.3d at 447 (reversing jury's award of punitive damages, even though the District was deliberately indifferent to repeated episodes of sexual violence in the prison, because the plaintiff's injury was not caused by an unconstitutional policy).

With respect to Officer Leo, Lane has raised a triable issue of fact on the availability of punitive damages if "there [is] is evidence from which a reasonable jury could find . . . malicious intent or willful disregard for another's rights."  King v. Kirlin Enters., Inc., 626 A.2d 882, 884 (D.C. 1993).  Viewing the evidence in the light most favorable to Lane, the Court concludes she has met this standard.  The Court will therefore deny the Defendants' motion for summary judgment on this issue and reserve any decision regarding the availability of punitive damages against Officer Leo until either the end of Lane's case or the close of evidence at trial.

**IV.     Conclusion**

For the reasons discussed above, the Court will grant summary judgment in favor of the

Defendants on Counts 4, 5, 6 and 19.  The Court will deny summary judgment on Counts 1, 2,

15, 16, and 20.  An appropriate order will accompany this opinion.


_____

CHRISTOPHER R. COOPER
United States District Judge


Date:  November 3, 2014

17