## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRIDZETTE LANE,**<br><br>            Plaintiff,<br><br>   v.<br><br>**DISTRICT OF COLUMBIA, <u>et al.</u>,**<br><br>            Defendants. | Case No. 1:12-cv-00514 (CRC) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Bridzette Lane brought this wrongful death suit on behalf of the estate of her son, Ralphael Briscoe, who was shot and killed by a Washington, D.C. Metropolitan Police Department ("MPD") officer. On February 12, 2015, following a six-day trial and two days of deliberation, an eight-member jury returned a unanimous verdict in favor of the officer and the District of Columbia. Lane now moves for a new trial under Federal Rule of Civil Procedure 59, contending that the jury's verdict was against the weight of the evidence. Heeding the D.C. Circuit's caution against "encroach[ing] on the jury's important fact-finding function" when deciding motions for a new trial brought on that basis, <u>Langevine v. District of Columbia</u>, 106 F.3d 1018, 1023 (D.C. Cir. 1997), the Court will deny Lane's motion.

    **I.**    **Background**[1]

Ralphael Briscoe's shooting resulted from a police operation carried out by a specialized squad of the MPD known as the Gun Recovery Unit ("GRU"). On the afternoon on April 26, 2011, as they had done many times before, a team of GRU officers wearing tactical gear pulled their unmarked Ford Explorer into the parking lot of the Forest Ridge apartments in Southeast

---

[1] The facts described are drawn from rough transcripts and the Court's recollection of the testimony presented at trial.

Washington, D.C. There they encountered 18-year-old Ralphael Briscoe talking on his cell phone. Briscoe, who was visiting friends at the complex, was not previously known to the officers and was not suspected of any crime. Seeing the officers, Briscoe began to walk away. As the Explorer moved closer, one of the officers asked Briscoe if he had a gun. Briscoe did not answer and quickened his pace. Two of the officers—Jordan Katz and Thomas Sheehan—jumped out of the vehicle. Briscoe then sprinted out of the parking lot onto an adjacent street. The two officers ran after him but did not order Briscoe to stop. Officer Chad Leo drove out of the complex in the Explorer with a fourth officer—Roberto Torres—in the back seat. Without turning on the vehicle's siren, Leo overtook the two officers on foot and sped towards Briscoe.

      A pole-mounted MDP surveillance camera captured what happened next: As Briscoe crosses the street, what appears to be a dark object can been seen in his right hand. Briscoe darts left onto the opposite sidewalk. The SUV speeds towards him from behind. Briscoe glances at least twice over his left shoulder at the approaching vehicle, arms pumping. Ahead on his right is a driveway leading to a wooded area. As Briscoe pivots to turn into the driveway and flee towards the woods, the Explorer pulls parallel with him. Officer Leo points his gun and fires it twice through the open passenger-side window of the slowing but still moving vehicle, hitting Briscoe in the left side of his back and left buttock. Briscoe sprawls to the pavement.

      Officer Sheehan testified at trial that upon reaching Briscoe after he was shot, Briscoe volunteered that the gun "[wasn't] even real." Briscoe was taken to the hospital but died of his wounds soon after arriving. On the ground near where Briscoe fell, crime scene investigators later recovered a cell phone, a shell casing, and a BB-pistol closely resembling a Walther PP handgun broken into three pieces.

Briscoe's mother, Bridzette Lane, filed a 20-count amended complaint alleging numerous constitutional violations and common law torts against Officer Leo and the District of Columbia. After the Court granted partial summary judgment to the District on certain counts and Lane voluntarily withdrew others, the case proceeded to trial on a Fourth Amendment excessive force claim against Officer Leo and claims of false arrest, assault, battery, negligence, and negligent infliction of emotional distress against both Leo and the District of Columbia.[2] Lane's counsel pursued two alternative themes in their arguments and questioning of witnesses. Their primary thrust was that Mr. Briscoe was unarmed during the encounter and that the police planted the BB-pistol next to his body to cover-up Officer Leo's wrongful conduct. A secondary theme was that, even if Briscoe was holding the BB-pistol as he ran away from the police, the shooting was unjustified because Leo could not have reasonably feared for his safety when he fired the fatal shots.

On February 12, 2015, after a six-day trial and two days of deliberation, the jury returned a unanimous defense verdict on all counts. The jury also responded "yes" to a special interrogatory on the verdict form asking: "Do you find that Ralphael Briscoe had an object in his hand that reasonably looked like a real gun to Defendant Leo at the time Defendant Leo shot Ralphael Briscoe?" Lane's motion for a new trial followed.

## II.     Standard of Review

The decision to grant or deny a motion for new trial "lies within the sound discretion of the court." Armenian Assembly of Am., Inc. v. Cafesjian, 783 F. Supp. 2d 78, 85 (D.D.C. 2011) (quotation omitted). The court may grant a motion for a new trial "where the verdict is against

---

[2] Ms. Lane voluntarily dismissed her negligent infliction of emotional distress claim at the conclusion of the evidence at trial.

the weight of the evidence . . . [or] substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions." Lee v. District of Columbia, 19 F. Supp. 3d 281, 285–86 (D.D.C. 2014) (citations and quotation marks omitted). "Generally, a new trial may only be granted when a manifest error of law or fact is presented." In re Lorazepam & Clorazepate Antitrust Litig., 467 F. Supp. 2d 74, 87 (D.D.C. 2006). In granting a motion for new trial on the grounds that the verdict was against the weight of the evidence, the trial judge risks usurping the prime function of the jury—to weigh the evidence and determine the credibility of the witnesses. Langevine, 106 F.3d at 1023. Accordingly, while appellate review of a denial of a motion for a new trial is very narrow, U.S. Indus., Inc. v. Blake Const. Co., Inc., 671 F.2d 539, 549 (D.C. Cir. 1982), the D.C. Circuit will reverse an order granting a new trial when it finds that a district judge has merely taken a view contrary to the jury on the credibility of witnesses or conclusions to draw from the evidence. Hutchinson v. Stuckey, 952 F.2d 1418, 1420–21 (D.C. Cir. 1992); Vander Zee v. Karabatsos, 589 F.2d 723, 727 (D.C. Cir. 1978).

**III.    Analysis**

Lane contends that the jury's verdict was against the weight of the evidence. With respect to her central contention that Briscoe was unarmed and police planted the BB-pistol—which dominated her counsel's trial presentation—Lane asserts that the video footage shows an object being thrown from the Explorer seconds after the shooting, which she maintains is the planted gun. She argues as well that the video shows Officer Torres scraping the ground near the scene with his foot in an effort to move the BB-pistol closer to Briscoe's body. She also points to trial testimony from one of her son's friends who said she hugged Briscoe soon before the shooting and did not feel a gun, and to her own testimony that she periodically searched her

son's belongings and never saw a gun. This evidence, Lane insists, forecloses the jury's determination that Officer Leo believed Briscoe to be armed.

The Court disagrees. The jury's conclusion that Mr. Briscoe was holding what Officer Leo reasonably believed was a gun is, in the Court's view, amply supported by evidence presented at trial. First, Officers Leo and Torres both testified that they saw Briscoe holding a gun. The jury was entitled to credit their testimony. Second, the jury was shown the BB-pistol recovered from scene, which looked almost identical to a real handgun. Third, it was reasonable for the jury to conclude that the object seen in Briscoe's hand in the video—which Lane contends is either his cell phone or simply a shadow—was in fact the BB-pistol. Fourth, the jury was entitled to credit Officer Sheehan's testimony that, upon reaching Briscoe after he was shot, he heard him say the gun wasn't real. Finally, the video is unclear as to what, if anything, emerged from the window of the SUV following the shooting. While the Court agrees with Lane that something appears to move from the vehicle in Briscoe's direction, the poor resolution of the video and the distance between the camera and the scene make it virtually impossible to discern what, if anything, it might be. Trial testimony also established that a shell casing ejected from Leo's gun was recovered from the ground outside the SUV, which could support an inference that the object noted in the video was the casing as it emerged from the window of the Explorer. The video is equally unclear as to whether the officers otherwise disturbed any evidence at the scene.

Whether the evidence supports the jury's conclusion that Officer Leo reasonably feared for his safety is a closer question. The video footage clearly shows Briscoe running away from the pursuing officers holding what, as discussed above, two officers testified and the jury reasonably concluded looked like a real gun in his right hand. But while Briscoe seems to look

5

over his left shoulder to make out the Explorer approaching fast behind him, he never appears to turn his body or raise his right arm in the direction of Officer Leo or the other officers pursuing further behind on foot.  The video depiction thus conflicts with Leo's initial account of the incident to MPD internal affairs investigators prior to the discovery of the surveillance video.  In that account, Leo asserted that Briscoe "rotated his upper body" and "aimed [the gun] in our direction."  Pl. Tr. Ex. 16.  Leo acknowledged this discrepancy under cross examination, testifying that the video does not in fact show Briscoe aiming the gun.  He also conceded that the video does not depict Briscoe raising his right hand immediately before he began to turn right into the driveway as he was shot.

     While troubling to the Court in many respects, the inconsistencies between the surveillance footage and Officer Leo's initial description of the incident do not foreclose the jury's determination that Leo reasonably feared for his safety.  The video is blurry; Briscoe's movements are somewhat obscured by shadows during part of the chase; and, as Leo emphasized in his testimony, the footage was shot from a different perspective than his vantage point closer to Briscoe.  The jury was entitled to consider that the rapidly-changing and stressful circumstances surrounding the shooting may not be fully conveyed by review of surveillance footage from the safety of a courtroom.  The defense also proffered expert testimony that an officer may fire on an armed suspect whom he fears will turn and fire on him at any moment, which the jury had a right to credit.  Based on these factors, the Court cannot fairly second-guess the jury's ultimate determination that Officer Leo's conduct was objectively reasonable.  It must therefore deny Lane's motion for a new trial.

     That having been said, the conduct of the GRU squad makes this a difficult decision for Court.  The GRU's mission—to remove handguns from the streets so they cannot be used in

crimes—is worthy. Its tactics in this case, however, were anything but. Ralphael Briscoe was not suspected of any crime and by all accounts was minding his own business when the GRU team entered the apartment complex. The officers purportedly became suspicious and approached him only because he began to walk away when he saw them, which of course he was fully entitled to do. Wishing not to be questioned, Briscoe "quickened his pace" after one officer asked if he had a gun and sprinted away when two of them jumped from the vehicle. None of the officers ordered Briscoe to stop, and Officer Leo did not blare the siren of his unmarked vehicle. Nor did Leo take any steps to avoid an armed confrontation, such as by simply letting Briscoe go and conducting a further investigation to support a warrant for a later search for a gun. Instead, without checking the field of vision beyond Briscoe to see if other citizens might be in the line of fire, he ran Briscoe down and shot him in the back from a moving vehicle as he was attempting to flee.

Did Briscoe put himself and others at risk by running away from the police with what appeared to be a real gun in his hand? Certainly. Did Officer Leo somehow feel threatened? The jury so found. But urban policing is inherently dangerous, particularly when guns are involved, and law enforcement officers often face serious risks in the course of their duties. Rather than pursuing more prudent alternatives, Officer Leo exacerbated the danger, hastened the fatal conclusion of the chase, and contributed to the needless death of a teenager. While the high standard for setting aside a jury verdict is not met here, Ralphael Briscoe's death should nonetheless give MPD pause to consider whether the provocative tactics employed by the GRU in this case best serve the citizens of the District of Columbia. This Court doubts they do.

## IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that the Plaintiff's Motion for New Trial [ECF No. 153] is DENIED.

**SO ORDERED.**

                                                CHRISTOPHER R. COOPER
                                                United States District Judge

Date: May 15, 2015