```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     BRIDZETTE LANE,
                                       CA No:  1:12-cv-00514-CRC
 4               Plaintiff,
                                       Washington, D.C.
 5     vs.                             Tuesday, February 3, 2015
                                       9:19 a.m.
 6
       DISTRICT OF COLUMBIA, ET AL.,
 7
                 Defendants.
 8     - - - - - - - - - - - - - - - x

 9     _____

10          TRANSCRIPT OF JURY TRIAL ~ AFTERNOON SESSION
        HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                 UNITED STATES DISTRICT JUDGE

12     _____

       APPEARANCES:
13
       For the Plaintiff:        BILLY L. PONDS, ESQ.
14                                PONDS LAW FIRM
                                  1250 24th Street, NW
15                                Suite 300
                                  Washington, DC 20037
16                                (202) 333-2922
                                  PLFPC@aol.com
17
                                  KIRA ANNE WEST, ESQ.
18                                LAW OFFICES OF KIRA ANNE WEST
                                  1325 G Street, NW
19                                Suite 500
                                  Washington, DC 20005
20                                (202) 236-2042
                                  kiraannewest@gmail.com
21

22     (CONTINUED ON NEXT PAGE)

23

24
       Proceedings recorded by mechanical stenography; transcript
25     produced by computer-aided transcription
```

1    APPEARANCES (CONTINUED):

2    For the Defendant:          **KERSLYN D. FEATHERSTONE, ESQ.**
                                 **ROBERT A. DeBERARDINIS, JR., ESQ.**
3                                OFFICE OF ATTORNEY GENERAL/DC
                                 441 Fourth Street, NW
4                                Washington, DC 20001
                                 (202) 724-6600
5                                kerslyn.featherstone@dc.gov
                                 robert.deberardinis@dc.gov
6

7

8

9

10   Court Reporter:            Lisa A. Moreira, RDR, CRR
                                 Official Court Reporter
11                               U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
12                               Washington, DC  20001
                                 202-354-3187
13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2

     WITNESSES                                             PAGE
3
     RICHARD EDELMAN, Ph.D.
4         (By Mr. Ponds)........................................  5
          (By Mr. DeBerardinis)................................ 21
5         (By Mr. Ponds)....................................... 37

6    RASHIDA McNEIL
          (By Ms. West)........................................ 43
7         (By Ms. Featherstone)................................ 57
          (By Ms. West)........................................ 63
8
     BRIDZETTE LANE
9         (By Ms. West)........................................ 75
          (By Ms. Featherstone)................................ 98
10        (By Ms. West).......................................110

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2              THE COURT:  Okay.  Do we need to deal with

3     anything before we call the jury?

4              MR. PONDS:  No, Your Honor.

5              MS. FEATHERSTONE:  No, Your Honor.

6              MS. WEST:  Your Honor, at times you may see me

7     working on my iPhone.  That's because I'm communicating with

8     our investigator --

9              THE COURT:  That's fine.

10             MS. WEST:  -- and other witnesses in the case.

11             THE COURT:  Just make sure it's off, or not

12    audible.

13             MS. WEST:  It's on vibrate.  I just wanted you to

14    know that I'm not just having a good time over there.  I'm

15    actually working.

16             THE COURT:  You can do that, too, as far as I'm

17    concerned.

18             MR. PONDS:  I might object to that.

19             (Jury enters courtroom)

20             THE COURT:  Okay.  Welcome back.  Did everyone

21    have a nice lunch?

22             JURY MEMBER:  Lovely.

23             THE COURT:  Good, good.

24             Mr. Ponds, are you ready for your next witness?

25             MR. PONDS:  Yes, Your Honor.  Your Honor, at this
```

1    time, the plaintiff will call Dr. Richard Edelman to the

2    stand.

3                    THE COURT:   Good afternoon, Mr. Edelman.

4                    RICHARD EDELMAN, Ph.D., Sworn

5                         DIRECT EXAMINATION

6    BY MR. PONDS:

7    Q.   Doctor, thank you for joining us today.

8    A.   Good afternoon, sir.

9    Q.   Could you state your full name for the record.

10   A.   Yes.  I'm Professor Richard Edelman.

11   Q.   And, sir, what is your current occupation?

12   A.   I am a professor emeritus in financial economics at the

13   American University, and what that means is that I'm retired

14   from active teaching, and have been for a while, but I hold

15   senior academic rank for life.  I spent about 35 years in

16   academia.

17           I also operate what's called a forensic economics

18   practice where I go into mostly litigation environments,

19   such as this, and I calculate damages and present them to

20   the court.  I've done that work for about 40 years.

21   Q.   Doctor, can you tell us about what type of degrees do

22   you have?

23   A.   Yes.  I hold a bachelor of science degree awarded with

24   high honors from the University of Maryland at College Park

25   in 1968.  That was in the area of finance.  I have an MBA in

1    the area of finance awarded in 1970 from the University of

2    Maryland at College Park; and a Ph.D., a doctor of business

3    administration, in the area of financial economics awarded

4    at College Park in 1975.

5    Q.  And, Dr. Edelman, after you received your Ph.D. degree,

6    did you teach at any university?

7    A.  Yes, I did.  I was an assistant professor of financial

8    economics at the University of Hawaii from 1975 to '77.  In

9    '77, I was promoted to associate professor, and in 1980 I

10   was awarded tenure at the University of Hawaii.

11          From 1980 through '83, I was director of financial

12   and economic research at the old Comsat, Communications

13   Satellite Corporation, when it was over here in L'Enfant

14   Plaza.

15          In 1983, I joined the faculty of the American

16   University as a full professor of financial economics.  I

17   chaired my department from 1985 to '87.

18          And in 1987 I was awarded tenure at the American

19   University.  And at the end of 2003, I was awarded emeritus

20   status by the university.

21   Q.  And while you were a professor at these various

22   universities, what subject matter did you teach?

23   A.  Well, I taught about everything in the catalog in the

24   area of financial economics:  introduction to economics,

25   introduction to finance, case courses in financial

1    management, the investments course, cash forecasting, equity

2    management course, fixed income course.  And I taught both

3    at the undergraduate and at the graduate left.

4    Q.  And taking your career as a professor as well as a

5    consultant, how many total years have you been providing

6    advice to students -- instructions to students or to other

7    business concerns concerning economic issues?

8    A.  Well, as I said, I was a professor in the academic

9    environment for a little over 30 years, and then I've done

10   the forensic economics work now going on 40 years.  So I

11   guess if you did the -- added them together, you'd be over

12   70 years.

13   Q.  And, Doctor, can you give us an example of the type of

14   business concerns or institutions that you've provided

15   economic advice to?

16   A.  Well, mostly my forensic economics practice, as I said,

17   deals with litigation economics; the determination of

18   damages in cases such as this, and other types of cases,

19   business valuation, lost profits, and the like.  But I

20   occasionally will do some pro bono work, which means for

21   gratis, for small businesses, mainly doing financial plans

22   when they want to go to the bank to borrow money to expand.

23        I do a textbook reviews for publishers.  Again,

24   most of that is pro bono work.

25   Q.  Dr. Edelman, have you ever been published in the field

1    of economics?

2    A.  Yes, I have.  During my 30-plus years in academia, I

3    published about 65 articles in the area of financial

4    economics.  They dealt with a variety of issues, ongoing

5    research.

6            I also did about 125 presentations to mostly

7    academic groups, again dealing with the research that I had

8    going on at the time.

9    Q.  And, Doctor, have you ever -- have you testified in

10   cases involving economic loss or evaluation?

11   A.  Yes, sir, I have.  Over the last six years, I've

12   testified about 145 times; and of that 145, about 50 of them

13   were trial testimonies; and of those trials, 14 have been in

14   various U.S. district courts, and three of them have been

15   here in the District Court for the District of Columbia.

16           There's a total of 50.  Seven have been wrongful

17   death cases; two in federal districts, one in Anne Arundel,

18   one in Carroll County, Maryland, one in Baltimore County,

19   and two in D.C. Superior.

20   Q.  And, sir, in terms of testifying for plaintiff or

21   defense, have you ever been -- do you consider yourself a

22   plaintiff's economist or a defendant's economist?

23   A.  Folks, neither.  I'm not a plaintiff's economist nor a

24   defense economist.  I do the numbers based on good economic

25   practice and based on the economic literature.

1          My work is probably about 55 to 60 percent

2     plaintiff's work.  The balance is defense work.

3     Q.  Have you ever been found by any court to be unqualified

4     to testify as an expert in --

5     A.  No, I have not.  I've always been found qualified.

6     Q.  The fee that you're receiving in this case, is it

7     contingent upon the outcome?

8     A.  No.  All my fees are paid prior to my doing any work.

9     The fee for my doing my original report was paid prior to

10    the report.  My fee for being here today has been paid.

11         There's absolutely no payment to me that is

12    contingent on the outcome.  Basically I produce my numbers,

13    and they take what they get.

14    Q.  Sir, do you personally know Bridzette Lane?

15    A.  No.  I know no principals in this case.

16    Q.  And when was the first time that you and I actually met

17    each other?

18    A.  Well, I think we actually met each other today.  We've

19    talked on the phone, but I was originally contacted in April

20    of 2013 and asked to participate in this case.

21         MR. PONDS:  Your Honor, at this time I'd offer

22    Dr. Edelman as an economist, and specifically on the subject

23    matter of analysis of -- Mr. Bird's vocational analysis in

24    terms of lost earnings and benefits over the course of

25    Ralphael Briscoe's life, work life; secondly, calculations

1    of life and work life expectancies for 18- to 19-year-old

2    African-American males; and number three, an analysis of the

3    lost earnings and benefits during the years -- during the

4    course of Ralphael's life.  We would be offering Dr. Edelman

5    in those three subject matters.

6              THE COURT:  Any objection?

7              MR. DeBERARDINIS:  None, Your Honor.

8              THE COURT:  Okay.  He is qualified to offer expert

9    opinion in those three areas.

10             MR. PONDS:  Thank you so much.

11   Q.  Dr. Edelman, what does an economist do in this kind of

12   case?

13   A.  Folks, basically what I do is I calculate how many

14   dollars we would have to have available today, lump sum, so

15   that if we had that lump sum available, it would immediately

16   replace any past lost income that Mr. Briscoe would have

17   earned to date.  The remainder would have been invested

18   at prevailing interest rates, and year by year over

19   Mr. Briscoe's work life we could withdraw from that

20   investment an amount that would replace his lost income,

21   less certain adjustments we'll get to.  And at the end of

22   his work life, there'd be nothing left in the investment.

23             So in financial terms, Mr. Briscoe, had he

24   survived and worked based on Mr. Bird's vocational scenario,

25   and having this lump sum amount available today are exactly

1    the same thing.

2    Q.  Dr. Edelman, what information did you use to perform

3    your analysis in this case?

4    A.  I use two elements of information when I do an analysis.

5    First, I do information that is particular to this case, and

6    the documentation that was provided was Mr. Bird's April 11,

7    2013, vocational report.  I have a copy of the complaint,

8    and I have answers to questions that I give to counsel and,

9    in turn, to survivors so that I've captured all of the

10   information that I need to do both a conservative and a

11   scientific analysis.  So that's the first element that I

12   utilize.

13          The second element of information that I utilize

14   is government information, primarily federal government

15   information.  That deals with life expectancy, work life

16   expectancy, projections of future wage growth, projections

17   of future inflation, statistics on fringe benefits and the

18   like.  All of that's incorporated into my report.

19   Q.  Dr. Edelman, did you reach a conclusion regarding the

20   value of the loss as to Ralphael Briscoe?

21   A.  Yes, I did.

22   Q.  Can you please tell us about that.

23   A.  Based on the information provided to me, the present

24   value of the lost income is $740,017.  That's seven, four,

25   zero, comma, zero, one, seven.

1           And, again, what that means is if we had that

2    $740,000 available today, a portion of it would immediately

3    replace that past loss.  The rest would be invested at

4    prevailing interest rates, and you could withdraw year by

5    year an amount to replace income out through the end of

6    Mr. Briscoe's work life expectancy.

7    Q.  Dr. Edelman, what is the value of the lost income?

8    A.  Well, the value is the $740,017.

9    Q.  And what does "value" mean?

10   A.  Basically "value" means lump sum amount, what the lump

11   sum amount is today that's required in order to replace past

12   and future income.

13   Q.  Doctor, what elements do you consider in arriving at

14   this value?

15   A.  Well, basically what I look at is three very broad

16   elements.  First, I look at life expectancy and work life

17   expectancy; and this information is derived from federal

18   tables.

19           At the time of his passing, Mr. Briscoe's life

20   expectancy was through age 72, and his work life expectancy,

21   based on gender, age, and level of education, was through

22   age 51.  That doesn't sound like a long time, but the way

23   the economics of this work is generally the less education

24   folks have, the more often it is that they are out of work

25   for economic downturns or changing jobs and the like.  So if

1       you take all of those periods out of the work force out and

2       compress the remainder together, what's left is working full

3       time from age 19 to age 51.

4               The second element I look at is Mr. Bird's

5       vocational opinion regarding Mr. Briscoe's future earnings.

6       Mr. Bird indicated to me in his report that Mr. Briscoe's

7       earnings would be that of a male less than high school

8       education, specifically between 9 to 12 years, without a

9       reasonable probability of ever attaining a GED, a high

10      school equivalency diploma.

11              Mr. Bird had indicated to me in his report

12      that over Mr. Briscoe's lifetime -- not the start, but

13      lifetime -- his average annual earnings would be about

14      $32,500.  I looked at the federal statistics for a male

15      with 9 to 12 years of education, and over lifetime, the

16      average earnings less 10 percent that Mr. Bird indicated

17      that Mr. Briscoe would have earned was nearly the same

18      amount, $31,920.

19              So based on this series of average earnings year

20      by year over Mr. Briscoe's lifetime, I can calculate what

21      his starting wage would be and how his wage would progress

22      all the way out to age 51.

23              In addition to that, I make some other

24      adjustments.  Number one, I add in fringe benefits.  Now,

25      there's lots of fringe benefits you get when you're on the

1    job.  Well, there's health insurance and vacations and paid

2    leave and all of that sort of thing.  But the value of

3    fringe benefits is the amount that the employer contributes

4    toward the funding of the fringe benefit, and the only

5    fringe benefit that varies by level of income and is

6    definitely lost when income is diminished is the employer's

7    contribution toward the funding of a retirement savings

8    account, 401(k); 403B, if you're in local government; TSP,

9    if you're a federal employee.  And the federal statistics

10   show that on the average, for private sector employees, the

11   average contribution employers make is about 5.1 percent of

12   monetary income.  That's added into the loss.

13        Next, I reduce for survival probabilities.  Even

14   though his life expectancy was out through age 72, that's an

15   average age of passing, not an absolute date of passing.

16   Some people make it to their life expectancy, some people

17   get beyond it, and some people don't get to their life

18   expectancy.

19        From the federal statistics, I know what the odds

20   are year by year of survival, and I lower all future income

21   projections by those odds.  So what that means is, for

22   example, if somebody was just using round numbers, going to

23   make, say, $100,000, and there's an 80 percent chance of

24   them being alive in that year to make that money, then what

25   goes into my analysis is not the $100,000, but the $80,000.

1     It's what statisticians call expected value.

2           I also --

3           MR. DeBERARDINIS:  Your Honor, there's no question

4     pending.  This is a lecture.

5           THE COURT:  He asked what his report was based on.

6     Q.  If you can continue, Doctor, please.

7     A.  Okay.  I also adjust for cost of living.  You know, as

8     time goes on, we get -- folks get adjustments in their wages

9     for inflation, for productivity, all of that.  The federal

10    projections of future wage growth for private sector

11    employees averages about 4 percent per year over the long

12    term, over the next 30 years or so.  So that adjustment is

13    made every year.

14          I reduce for personal consumption expenditures.

15    Personal consumption means that all of us spend a certain

16    portion of our income to maintain ourselves; you know, our

17    food, our commuting, our lunches, our clothing and all of

18    that.  And if someone has passed, then those expenses will

19    no longer need to be paid.

20          That is, had this person survived, had Mr. Briscoe

21    survived, he would have spent money on himself to, you know,

22    eat and buy clothes and all of that.  The survivors, the

23    estate, would never have seen that money, so that is

24    excluded.  Those personal consumption expenditures are

25    excluded from the loss.

```
 1              So that averages about 53 percent over
 2   Mr. Briscoe's lifetime.  We reduce the loss by about 53
 3   percent on the average.  Higher when he was younger, lower
 4   when he's older to reflect that these consumption
 5   expenditures are no longer needed.
 6              And finally, the last thing I do is look at
 7   prevailing interest rates on U.S. Treasury securities, the
 8   golden standard, the riskless investment, and calculate how
 9   many dollars would be needed today at these prevailing
10   current interest rates in order to replace this future
11   stream of lost income.
12   Q.  Now, sir, in terms of lost income -- and you may have
13   covered some of these -- what are the items that are
14   included in the loss?
15   A.  Well, again, you know, we're looking at monetary income
16   and fringe benefits.  That's all that's included in that.
17   Q.  And, Doctor, what is the major determinant of a person's
18   level of income?
19   A.  I'm sorry?  I didn't hear you.
20   Q.  The question is, what is the major determinant of a
21   person's level of income?
22   A.  Education.  That is the driver of level of income.
23              The level of education you have, in turn,
24   determines the kinds of jobs that you're typically eligible
25   to take or will take, and that, in turn, determines the
```

 1    income.

 2              So if we know the education, I can use the federal

 3    statistics, which I did, to get the income that would have

 4    been earned.  And that's consistent with Mr. Bird's

 5    analysis.

 6    Q.  Dr. Edelman, did you make any assumptions about the

 7    ultimate education as it applies to Ralphael Briscoe?

 8    A.  None other than what Mr. Bird said.  Mr. Bird said he

 9    had dropped out of school in the 10th grade.  That meant

10    that his level of education in terms of the federal

11    statistics was a male with nine to twelve years of

12    education, but no high school diploma.

13              Mr. Bird mentioned that it was not likely that

14    Mr. Briscoe would have attained a GED, a high school

15    equivalency diploma; therefore, that wasn't considered.

16              If he did, had he done that, then he would have

17    had, based on the federal statistics, a higher income, and I

18    would have had a higher loss.  But I kept it conservative.

19    Q.  And Dr. Edelman, did you make any future assumptions

20    regarding wage increases?

21    A.  Just the cost of living adjustments.  It's a little over

22    4 percent per year.  I made no assumption regarding

23    promotions or advancements to a higher level.  I simply

24    looked at the stream of federal statistics that give income

25    by gender, by age, by education.

1    Q.  And, Dr. Edelman, for wrongful death cases such as this,

2    are personal consumption expenditures eliminated from the

3    loss?

4    A.  Yes, the loss is reduced.  And, again, that was the

5    roughly 53 percent of his income that is not reflected in my

6    $740,000.

7    Q.  It's not reflected?

8    A.  It is not.  It is deducted.  Those were not -- if those

9    consumption deductions were not taken out, the loss would be

10   roughly double.

11   Q.  And Dr. Edelman, what other reductions are made in the

12   future?

13   A.  The only other reduction that's made in the future is

14   survival probabilities to reflect the odds that year by year

15   in the future, obviously, he would have had to have been

16   alive to receive income.  That's not a guarantee.  Even

17   though his life expectancy is 72, I reduced each year's

18   future income by the federal statistics that show in each

19   year what the odds are from age 19 forward being alive.

20   Q.  Is the loss that you're talking about, is that expressed

21   in present value?

22   A.  Yes, that's expressed in present value.

23   Q.  And what does that mean?

24   A.  And, again, present value means that I take a look at an

25   investment portfolio, a series of investments that are risk-

1    free that will generate interest and generate principal with

2    absolutely no risk, and I look at those interest rates and

3    invest in that portfolio.

4         Sometimes people say, "Well, Dr. Edelman, why

5    don't you use the stock market as an investment?"  And all

6    you have to do is look at the stock market the last five

7    years, and you'll know why we don't use it.  Because it goes

8    up and down; it's very volatile.

9         Here what we're doing is we want to invest in a

10   portfolio that will generate the income Mr. Briscoe would

11   have earned with absolute certainty, and at the end of his

12   work life expectancy, there's nothing left in the

13   investment.  There's no windfall and no shortfall.

14   Q.  And in that vehicle of investment, is that one of the

15   most conservative investments for the purpose of your model

16   that you've utilized?

17   A.  Oh, absolutely.  It's the gold -- U.S. Treasury

18   securities are the gold standard.

19   Q.  Dr. Edelman, for personal injury cases, suppose the loss

20   does not extend through the entire work life.  How is the

21   loss measured over a shorter period of time?

22   A.  Well, the loss -- if I have a vocational person that

23   says, well, in an injury case this person would have caught

24   up to the income that they would have been earning absent

25   injury in 10 years or 15 years, whatever it is, then I'll

```
 1    stop my table at that age.  And I always show cumulatively
 2    from the point of an injury forward what the loss is so you
 3    can always look at the table.
 4          In a death case, I don't think that applies.
 5    Q.  And finally, Dr. Edelman, have you reached these
 6    conclusions that you've testified about today to a
 7    reasonable degree of economic certainty?
 8    A.  Yes, I have.
 9    Q.  And you also reflected a 10 percent reduction?
10    A.  Yes, I did.  I took the federal statistics, reduced --
11    for income, reduced them by 10 percent, and used that as the
12    basis of the loss.
13    Q.  And Dr. Edelman, was it necessary for you to reflect
14    that 10 percent loss?
15    A.  Well, it was necessary to be consistent with the
16    vocational expert's opinion.
17    Q.  In both of them you took the most conservative approach?
18    A.  Oh, absolutely.  That's one of the basic fundamental
19    concepts in forecasting, is to be as conservative as
20    possible.  Absolutely.
21    Q.  Now, Dr. Edelman, can you -- do you recall when you
22    reached your final conclusion in terms of the amount of
23    $740,017?
24    A.  That was in my report dated June 20, 2013.
25    Q.  In fact, if you -- well, let me ask you this, Doctor:
```

```
 1    If you did your calculations yesterday, would that number be

 2    higher than the $740,000?

 3              MR. DeBERARDINIS:  Objection, Your Honor.

 4              THE COURT:  Sustained.

 5              MR. PONDS:  I have no further questions of the

 6    doctor.  Thank you so much, sir.

 7              THE WITNESS:  Thank you, sir.

 8                       CROSS-EXAMINATION

 9    BY MR. DeBERARDINIS:

10    Q.  Good afternoon, sir.

11    A.  Good afternoon.  How are you?

12    Q.  We've met before, haven't we?

13    A.  Yes, we have.

14    Q.  So I don't need to introduce myself.

15    A.  Unless you want to.

16    Q.  Should I call you "Professor Edelman" or "Dr. Edelman"?

17    A.  Professor.

18    Q.  We're not in the classroom, are we?

19    A.  That's my -- that's my title for life.

20    Q.  Okay.  Professor Edelman, you have never spoken to

21    Anthony Bird, have you?

22    A.  Have I --

23    Q.  I don't mean ever-ever.  I mean in regard to this case.

24    A.  No, he -- I did not need to.

25    Q.  I asked you whether you spoke to him.
```

1    A.  No, I did not need to.

2    Q.  Okay.

3    A.  His report spoke for itself.

4    Q.  I asked you whether you spoke to him, and your answer's

5    no?

6    A.  That's correct.

7    Q.  Okay.  And you don't need to because you rely on what he

8    gives you, correct?

9    A.  Absolutely.

10   Q.  Okay.  Now, when you went to graduate school in

11   economics, maybe even the first day that you were there, you

12   were taught a maxim, weren't you?  Junk in/junk out.  That's

13   a principle in your field, isn't it?

14   A.  Not that I remember, no.

15   Q.  Do you know what I'm talking about?

16   A.  I think you're talking about computer science.

17   Q.  Junk in means -- since you totally rely on him, if his

18   underlying data is less than adequate or it doesn't

19   represent reality, your results on the outside are going to

20   be skewed.

21   A.  Yes, that's correct.

22   Q.  So you know what I'm talking about there, don't you?

23   A.  Now I know what you're talking about, yes.

24   Q.  Okay.  Now, in your field of -- and, indeed, in this

25   particular case, if the jury chooses not -- it's not

```
1    determined that Mr. Briscoe would have found a job

2    immediately and worked steadily for the rest of his life,

3    your data is not helpful to them at all, is it?

4    A.  The conclusion would be different; that's correct.

5    Q.  Okay.  Now, are you familiar with an employment category

6    "casual labor"?

7    A.  Well, I'm not a vocational expert, so I can't offer

8    opinion on that.

9    Q.  I'm not asking you -- I'm asking you --

10   A.  Well, as a layperson, not as a vocational expert.

11   Q.  You've heard the term "casual labor," haven't you?

12   A.  Yes.

13   Q.  And you know what it is, don't you?

14   A.  Yes.

15   Q.  What is it?

16   A.  Generally I would consider it part time or infrequently.

17   Q.  Yes.  Casual laborers make a lot less than people who

18   are employed steadily.

19   A.  Well, again, I'm not a vocational expert.  I don't have

20   those statistics.

21   Q.  Okay.  Now, in running your figures, you make allowance

22   for what you consider raises that people get on average

23   every year, the average wage increase in America.

24   A.  That's true.  That's the federal projections.

25   Q.  And that's 6 percent every year?
```

1    A.  Oh, no, no, no, no.  I mentioned it's much under that.

2    The federal government is now projecting around 4 percent a

3    year.

4    Q.  Okay.  So you're projecting 4 percent?

5    A.  Yes.

6    Q.  So in your calculation, every year; 4 percent 2011; 4

7    percent 2012; 4 percent 2013; 4 percent '14; et cetera, et

8    cetera, et cetera?

9    A.  Correct.

10   Q.  And that amount is compounding the whole time, so to

11   speak?

12   A.  Correct, correct.

13   Q.  Okay.  Now, this is an average increase across America,

14   across all employment levels, is it not?

15   A.  That's correct.

16   Q.  Okay.  Now, is not income disparity a tremendous problem

17   in the United States of America as an economist?

18   A.  Yes.  I've read that, yes.

19   Q.  You've read it?

20   A.  Yes.

21   Q.  You're an economist.  You did more than read about it.

22   A.  Yes.

23   Q.  Okay.  And as a matter of fact, one of the tremendous

24   problems we have in this country is that a small percentage

25   of the people in this country are getting all the income

 1    increases.

 2    A.   Now, that's not true.   The federal statistics survey all

 3    levels of income, all levels of occupation, and all

 4    industries.   Some industries are less; some industries are

 5    more.

 6    Q.   And they come up with an average?

 7    A.   They come up with averages for industry and then

 8    overall.

 9    Q.   And the people at the top making all that money, they

10    bring the average up, don't they?   That's how averages are

11    determined.

12    A.   Yes, but that's -- that wouldn't work here because the

13    great bulk of people that the federal government surveys are

14    people who are specific to an occupation, transportation

15    workers, truck drivers, and all of that, and that's not

16    those kinds of people.

17    Q.   Sir, you testified that the average was all income level

18    increases, all workers in the United States.

19    A.   For private sector workers, yes.

20    Q.   And it's not limited to truck drivers.   It includes

21    economists at American University.   You get a nice raise.

22    Doesn't it?

23    A.   Well --

24    Q.   And it includes people working in the computer industry

25    who are making lots and lots of money, does it not?

1    A.   Certainly.

2    Q.   And it includes people in another -- the new-age glamour

3    industries that are getting a very significant percentage of

4    that income, are they not?

5    A.   That's correct.

6    Q.   And that is reflected in the average that you're talking

7    about?

8    A.   That's correct, as are people who are much lower than

9    average.

10   Q.   Okay.  So the people -- when you come up with an

11   average, that's not reflecting -- you're coming up with an

12   average of all these incomes; and so the people on the top,

13   their incomes are not indicated by that number because

14   they're up here, and the average is down here.

15   A.   There's not that many of them that are way up there.

16   Q.   Yes, because --

17   A.   There are more people in the middle, and that's how

18   these statistics are calculated.

19   Q.   Okay.  And the people at the bottom, that average

20   doesn't reflect what they're making because they're below

21   the average, and you've got to create an average.

22   A.   Perhaps that's the case.

23   Q.   That's not perhaps.  You know that's correct, don't you?

24   A.   No, I don't know that's correct, but, in fact, what I've

25   done -- that's why I use the age earnings profile from the

1    federal statistics.

2    Q.  Okay.  Why don't you use a median income?

3    A.  I'm sorry, I can't hear you.

4    Q.  What's median income?

5    A.  In what terms?

6    Q.  In terms of -- instead of using average salary for all

7    Americans, what would be median income for all Americans?

8    A.  Median income right now is about $54,000.

9    Q.  And that's -- here again, half of the people are above

10   that, half are below it?

11   A.  That's correct.

12   Q.  Okay.

13   A.  And we're well below it here.

14   Q.  Okay.  Now, as a matter of fact, what is the Bureau of

15   Labor Statistics?

16   A.  It is part of the Department of Labor.

17   Q.  And what do they do?

18   A.  They basically do what their title is.  They calculate

19   or they capture survey -- various attributes associated with

20   employment; wages, benefits, and the like.

21   Q.  And you rely upon -- it's called BLS, isn't it?

22   A.  I'm sorry?

23   Q.  It's referred to as BLS?

24   A.  Yes.

25   Q.  You refer to BLS statistics almost every day in your

1    job, don't you?

2    A.  I do.

3    Q.  And you rely upon them?

4    A.  I do.

5    Q.  And it's a reliable authority for you?

6    A.  I do, and that's -- they're generally accepted in our

7    field.

8    Q.  Yes.  You wouldn't use them otherwise, of course.

9    A.  I don't know.  I accept them, yes.

10   Q.  Yes, of course.

11         And what has the BLS said about the real wage

12   increases of individuals without a high school education

13   during the last 20 years?

14   A.  I don't have that in front of me.

15   Q.  Okay.  If I told you they found that actually reduced --

16   have been reduced in the last 20 years by 20 percent, would

17   you accept that?

18   A.  Real wages or nominal wages?

19   Q.  Real wages.

20   A.  It's possible it's gone down in the last 20.

21   Q.  Yes.  So in the last 20 years, the average working guy

22   without a college -- without a high school education, he's

23   seen his income drop?

24   A.  That's true.

25   Q.  But you've got Mr. Briscoe, a high school dropout, you

1    have him increasing 4 percent every year for the next 40

2    years.

3    A.   That's correct, and that's because the past does not

4    predict the future.  What happens in the future is not

5    necessarily a replication of the past.

6    Q.   Okay.

7    A.   And this is why the stats that I use are based on the

8    federal government stats.

9    Q.   And you're using average figures?

10   A.   Absolutely.

11   Q.   Now, when I go into the store, can I -- when I want to

12   buy something, can I say, "The average worker makes $30,000,

13   so I'm going to pay with average people's money"?  Can you

14   do that?

15   A.   No, you can't do that.

16   Q.   Of course not.  You can only pay with what you've got.

17   A.   Correct.

18   Q.   Okay.  So this average stuff is just a generality.  It

19   doesn't really reflect a particular individual's

20   circumstances, does it?

21   A.   No.  I don't agree with that.  When we're looking into

22   the future, the best estimate we have is what the

23   statisticians call central tendency.

24   Q.   Okay.  So we use that -- continue to use that average

25   that includes everyone?

1    A.  That's correct.

2    Q.  Okay.

3    A.  And, you know, my work is a guide to you folks.  If

4    there are factors that might lower it, that's certainly

5    feasible.  If there's factors that might increase that

6    value, that's certainly feasible also.  But I've given you

7    the mean value, the average value, the expected value, or

8    the central tendency.  They're all the same.

9    Q.  When you ran your figures for income, did you run

10   figures based upon studies and figures for African-Americans

11   in particular?

12   A.  No, I did not.  I used all males.

13   Q.  But didn't Mr. Bird tell you you need to run it for

14   African-Americans?

15   A.  He did, and unfortunately that data is not complete.  We

16   don't have good data for all age levels for black males, and

17   so the only thing that we can do, then, is to use all males,

18   which includes obviously everyone.

19   Q.  And doesn't that give us a skewed figure?

20   A.  It possibly could, although one might argue that the

21   change in the environment over the last -- from the last 50

22   years over the next 30 or so years that Mr. Briscoe would

23   have worked might be such that all males would be the best

24   representation of future income.

25   Q.  Might.  Is that the word?  "Might," you said?

1    A.   Yes, that's the word.  Might.

2    Q.   That's speculation, right?

3    A.   No, it's not speculation.  Things have changed from the

4    last 50 years into the future.

5    Q.   Are you suggesting that as we stand here right now black

6    males are not disadvantaged as compared to white folks?

7    A.   I did not say that.  All I simply said is that salaries

8    have tended to merge over the last 20 or 30 years, and that

9    because there is not complete data over many years in the

10   future for the black males, then what we use is all males.

11   Q.   As a matter of fact, there is a significant

12   percentage -- sadly, it's one of our biggest social

13   problems -- of black males who don't even show up in the

14   statistics because they're totally out of the labor market.

15   Isn't that correct?

16   A.   Well, that would certainly be true, but we're dealing

17   with employment, the assumption that there will be

18   employment.

19   Q.   Okay.  Now, personal consumption is what you spend to

20   get through life basically.  Is that fair to say?

21   A.   I'm sorry, say --

22   Q.   It's what you spend to get through life?

23   A.   Well, it's what you spend for your own maintenance

24   basically.

25   Q.   Yes, and maintenance is what it takes to get through

1    life?

2    A.  Correct.

3    Q.  Okay.  That's rent?

4    A.  Correct.

5    Q.  Food?

6    A.  Correct.

7    Q.  You've got to make those car payments every month.

8    A.  Correct.  Your portion of that.

9    Q.  Okay.  You've got to pay taxes?

10   A.  Yes.

11   Q.  And your personal consumption figures that you rely on,

12   do they include taxes?

13   A.  They do include all of that.

14   Q.  Okay.  Now, what you're saying here, then, is that after

15   Mr. Briscoe would have spent his get-through-life money, his

16   personal consumption money, he would have surpluses?

17   A.  That's what -- well, that's what I've calculated, what

18   the surplus is after personal consumption has been --

19   Q.  And you're saying that his surplus at the end of the

20   day, someone who dropped out of high school in the 10th

21   grade, he's going to end up with three-quarters of a million

22   dollars worth of surplus?

23   A.  And it takes over 30 years to do that.

24   Q.  Okay.

25   A.  Now, that money may not all have been in his pocket or

1    in a savings account.  It may have been spent to rent or buy

2    a house, buy automobiles, raise children.

3    Q.  That's get-through-life money, isn't it?

4         MR. PONDS:  Objection, Your Honor.  Objection,

5    Your Honor.  The witness should be allowed to finish his

6    question -- complete his answer.

7         THE COURT:  Sustained.

8    A.  It's the portion of the payment for cars and rent and

9    housing and all of that that belongs to him; not to other

10   people, not to survivors or members of the family.

11   Q.  You're speculating about members of the family, aren't

12   you?  What are you talking about there?

13   A.  No, I'm not speculating.  In fact, in my report, at the

14   bottom of Page 10, I show the federal statistics for the

15   probability of being married or partnered by age group over

16   life, and very early the probability is very small that

17   person will be married or partnered so most of their money

18   that they earn is spent on themselves.  And consequently,

19   there is no loss shown in my Table 1 for the first few years

20   after age 19.

21        But as the probability of marriage increases, then

22   less money is spent on yourself and more money goes into

23   supporting a family.  It's only that latter money that is

24   part of the loss.

25   Q.  And you have no way -- you're speculating whether

1    Mr. Briscoe would ever get married.

2    A.  No.  Again, it's not speculation.  It's based on the

3    federal statistics.

4    Q.  And what's the divorce rate in this country?  It's over

5    50 percent, isn't it?

6    A.  No, it's under 50 percent.  I haven't looked at it in a

7    year or two, but it's well -- it's well under that.

8    Q.  It's 52 -- it's at least 52 percent, isn't it?

9    A.  Well, I don't have that statistic, but the probabilities

10   show people who are partnered less the attrition from

11   divorce.

12   Q.  So you had Mr. Briscoe with a surplus of $750,000?

13   A.  That's correct.

14   Q.  I have one question for you here, and I'll have a couple

15   of others.

16          First question, what am I doing wrong?

17   A.  This is over 30 years.  It takes a long time, and,

18   again, it's not money in his pocket.

19   Q.  Okay.  If I could take a look at -- can I direct your

20   attention to Page 15 of your report?

21   A.  15?  I'm sorry, sir?

22   Q.  Yes, 15.

23   A.  Okay.  I'm there.

24   Q.  In 2017, you show a surplus for Mr. Briscoe of $7,800.

25   A.  Yes.  That's correct.

```
1    Q.   Okay.  And he would be 25 years old in that year?

2    A.   That's correct.

3    Q.   And a 25-year-old, who is a high school dropout at age

4    25, is going to have a surplus of $8,000, according to you?

5    A.   "Surplus" is a bad word.  It sounds like it's just extra

6    fund money.  That's not what that is.

7             That's basically money that would be contributed

8    toward the substance of a family, raising children, and the

9    like.  So it's not money that we're going to go out and have

10   a good time on.

11   Q.   Well, how much do you have him making in 2017?

12   A.   He would probably -- I don't have the exact number here,

13   but 73 percent of his total income is not included.  That's

14   the personal consumption deduction.  So it would probably be

15   around $40,000.

16   Q.   At 25, your ultimate number here in one of the years

17   is -- he's going to be making how much at the age of 25?

18   A.   About $20 an hour.  That's what it looks like.

19   Q.   And that comes out to how much?

20   A.   It looks like about $20 an hour, around $40 [sic].  Now

21   remember, wages are going to grow each year between now and

22   when he would have been 25 in 2017.

23   Q.   How much of the wages -- did you look at wage growth for

24   high school dropouts?

25   A.   This is based on the age earnings profile for high
```

```
 1    school dropouts, yes.

 2    Q.  The average?

 3    A.  This is the average, yes.

 4    Q.  So you have him making $40,000 when he's 25 years old?

 5    A.  That's correct.

 6    Q.  Okay.

 7    A.  And that's what the federal statistics indicate for a

 8    man that age.

 9    Q.  What about the real world?

10    A.  The federal statistics are based on the real world.  BLS

11    compiles its income statistics from the real world.

12    Q.  If I -- are you aware of any surveys of -- related to

13    black males at the age of 25 that are high school dropouts,

14    how much they're making at 25?

15    A.  Well, I have the citation that I used in my report where

16    the data came from, and it's a source that's widely accepted

17    by practitioners.  The particular source is the Census

18    Bureau.  It's called the "Current Population Survey,

19    Personal Income Table 4, Educational Attainment, People 18

20    Years Old and Over, Total Money Earnings, Work, Experience,

21    Age, Race, Origin, Sex."

22    Q.  So our social problems in this country are over?

23    A.  This is the federal government data.  This is what we

24    have.

25    Q.  Unemployed back males on average are going to end up
```

1    with a surplus of $750,000.  Our troubles are over in this

2    country.

3    A.  Over 32 years.

4               MR. PONDS:  Objection.

5               THE COURT:  Sustained.

6               MR. DeBERARDINIS:  I don't have any further

7    questions of this witness, Your Honor.

8               THE COURT:  Mr. Ponds?

9               MR. PONDS:  Yes.

10                    REDIRECT EXAMINATION

11   BY MR. PONDS:

12   Q.  Dr. Edelman, tell us about this surplus.  Is it an

13   actual surplus?  Please explain to the jury.

14   A.  That's what I said, folks.  It's not a surplus like,

15   wow, it's free money, let's all take a few years off and go

16   travel around the world.  This is money to buy food for a

17   family, to pay utilities, to pay gasoline for a family, to

18   raise children, schooling, clothing, you know, all of that

19   sort of thing.  And if you figure it's over 30-some years,

20   you know, that's only about, what, $25,000, roughly, per

21   year.  It doesn't go very far.

22   Q.  So that's about $25,000 -- give or take between $25,000

23   and $30,000 a year?

24   A.  Yes.

25   Q.  For 31 years?

1    A.   Yes.  And that's income beyond what he spends on

2    himself, and that's for everything else.

3    Q.   Would that income be considered one that falls on the

4    low end of income disparity?

5    A.   Absolutely, yes.

6    Q.   Now, Mr. DeBerardinis asked you some questions about the

7    real world.  Once again, what data did you rely upon?

8    A.   I relied on federal data that gives us income by age, by

9    education, and by gender.

10   Q.   And is this information and data that is collected by

11   the United States Government?

12   A.   Yes, it is.

13   Q.   In the commonest community, are those statistics to be

14   reliable?

15   A.   They are considered to be reliable, and they are widely

16   used.

17   Q.   And have you seen any data called "the real world data"?

18   A.   No.  I've never seen a study by -- with that on top of

19   the table.

20   Q.   Now, there was -- Mr. DeBerardinis asked you some

21   questions based on your projections at age 25 that Ralphael

22   Briscoe would have been making $40,000 a year.

23   A.   Correct.

24   Q.   And, sir, that was projected to be at what year?

25   A.   And that's in 2017.

1    Q.  And would that $40,000 be consistent with someone

2    working a job at the lower end of the economic scale?

3    A.  Based on the federal statistics, yes.

4    Q.  Would that include construction workers?

5    A.  It could -- oh, absolutely.

6    Q.  Mechanics?

7    A.  Absolutely.  Especially if they're working on

8    automobiles and the like, yes.

9    Q.  And other people who don't have high school degrees?

10   A.  Correct, yes.

11   Q.  There was also a question asked of you --

12   Mr. DeBerardinis raised this, the issue of race.  You used

13   the data for all males?

14   A.  I did.

15   Q.  Because that -- is it because that data's complete?

16   A.  Partly because it's complete, and partly because it's

17   believed, in the economic literature, that over time -- and

18   we're looking ahead 30, 35 years -- that income equality --

19   inequality will be less of a problem in the future than it

20   has been.  And it's certainly different now than it was

21   decades ago.

22   Q.  And what you mean is that in terms of determining income

23   levels for black males, in terms of the trends, the trend is

24   trending higher now than it was, say, back in the early

25   '60s?

1    A.  Oh, absolutely.

2    Q.  And your projections are 30 years out?

3    A.  Absolutely, yes.

4    Q.  And as an economist, you've seen these changes in our

5    economy?

6    A.  I've lived these changes.  I know them, yes.

7    Q.  What is the race of the man who sits in the White House?

8    A.  I'm sorry?

9    Q.  What is the race of the President of the United States?

10   A.  The President of the United States is black.  And who

11   would have ever imagined years ago?

12   Q.  And that's why it trends upward?

13   A.  Yes.  That's correct.

14   Q.  And you're using the past as a part to equate what may

15   happen in the future?

16   A.  Yes.  We're predicting into the future.

17        The past is interesting, but the mirror of the

18   future is not necessarily a mirror of the past.  Things

19   change.  You can look all over the world to see that.

20   Q.  Doctor, when you made your final conclusion in this

21   case, did you create your own data?

22   A.  Absolutely not.  I never speculate to data.  I always

23   rely on either federal data or data from scholarly journals

24   that have been refereed.

25   Q.  And did you use the most conservative form of

1    investment?

2    A.  Absolutely.  Conservative form of investment,

3    conservative life -- work life expectancy and the like.

4    Q.  Does that surplus, that $740,000-plus that

5    Mr. DeBerardinis was asking you questions about, does that

6    mean that if Ralphael Briscoe had lived, that he would have

7    that in his bank account after working 33 years?

8    A.  No.  Probably he would have none of it.  It would be --

9    it would have been passed through to family and survivors

10   for their substance and benefits.

11   Q.  Doctor, with a reasonable degree of certainty as it

12   applies to economics, based on your assessment in terms of

13   Dr. Bird's vocational report as well as your research in

14   terms of the available government data, is it possible --

15   well, strike that.

16           MR. PONDS:  No further questions, Doctor.  Thank

17   you for your time.

18           THE WITNESS:  Thank you, sir.

19           THE COURT:  Professor Edelman, you're dismissed.

20   Thank you for your testimony.

21           THE WITNESS:  Thank you, sir.

22           MS. WEST:  The plaintiff will call Ms. Rashida

23   McNeil, Your Honor.

24           THE COURT:  Very well.  Ms. West, how long do you

25   anticipate?

```
 1                    MS. WEST:  I'm hoping 10 to 15 minutes, Your

 2      Honor.

 3                    THE COURT:  Okay.

 4                    MR. PONDS:  Your Honor, may we briefly approach

 5      the bench?

 6                    THE COURT:  Sure.

 7                    (The following is a conference held at the

 8                     bench outside the hearing of the jury)

 9                    MR. PONDS:  Judge, I hate to ask this, but

10      Ms. Lane has to go to the bathroom.

11                    THE COURT:  Okay.  Can we do it without taking a

12      recess?  Can we just --

13                    MR. PONDS:  Let me talk to her.  I mean --

14                    MS. WEST:  What's wrong with her?

15                    MR. PONDS:  She has to go to the bathroom.

16                    MS. WEST:  Okay.  Let her go.

17                    MR. PONDS:  The question is, does she probably

18      want to hear the testimony?

19                    MS. WEST:  She probably does.

20                    MR. PONDS:  I would probably say she does.

21                    THE COURT:  Let's all sit in place, and let's not

22      take a recess because we're going to break in about 30

23      minutes, perhaps, for the afternoon.  So let her go out

24      quickly and come back.

25                    MR. PONDS:  Thank you.
```

```
 1              (This is the end of the bench conference)
 2              THE COURT:  Ladies and gentlemen, we had another
 3     bathroom request so we're going to just sit -- we're going
 4     to sit in place for a few minutes.  Feel free to stand up
 5     and stretch.  Not quite.  Can you wait until our break?
 6     We're going to break in about 30 minutes.  Okay.
 7              (Pause)
 8              THE COURT:  You guys doing okay?  Too hot?  Too
 9     cold?  Just fine?  Okay.  We can get you some blankets or
10     something.  We'll work on that.
11              (Pause)
12              THE COURT:  Okay.  We're back on the record.
13     Would you like to swear the witness.
14              Good afternoon, Ms. McNeil.  How are you?
15                    RASHIDA McNEIL, Sworn
16                      DIRECT EXAMINATION
17     BY MS. WEST:
18     Q.  Ms. McNeil, would you please introduce yourself to the
19     members of the jury.
20     A.  Rashida McNeil.
21     Q.  Uh-huh.  And where are you from, Ms. McNeil?
22     A.  Washington, D.C.
23     Q.  You've lived here all your life?
24     A.  Yes.
25     Q.  Was there a period of time when you lived off of Elvans
```

1    Road?

2    A.  Yes.

3    Q.  When was that?

4    A.  2002.

5    Q.  Until when?

6    A.  Until 2012 or '13.

7    Q.  You don't live there anymore?

8    A.  No.

9    Q.  All right.  And describe, if you would, please, ma'am,

10   where you lived, in what apartment complex, on April the

11   26th of 2011.

12   A.  2438 Elvans Road in People's Co-Op.

13   Q.  The People's Co-Op?

14   A.  Yes.

15   Q.  Are you familiar with The Oaks?

16   A.  Yes.

17   Q.  What's that?

18   A.  Forest Ridge.  I used to live in there, too.

19   Q.  Okay.  Where is that?

20   A.  Off Elvans Road.

21   Q.  Off Elvans Road?

22   A.  Yes.

23   Q.  So if you've lived in this area for a period of over ten

24   years, it would be fair to say that you kind of know what's

25   going on in your neighborhood.

```
1    A.  Yes.

2              MS. FEATHERSTONE:  Objection to form.

3              THE COURT:  Overruled.

4    Q.  So are you familiar, ma'am, with the term "jump-outs"?

5    A.  Yes.

6    Q.  Tell the members of the jury why it is that you're

7    familiar with this term.

8    A.  Because that's what everybody called the police

9    officers.

10   Q.  Okay.  What kind of police officers?

11   A.  People that jump out the -- the police officers that

12   jump out.

13   Q.  What do they jump out of?

14             THE COURT:  Ms. McNeil, could you keep your voice

15   up a little bit more, or talk directly into the microphone.

16             THE WITNESS:  Yes.

17             THE COURT:  Thank you.

18   Q.  Are you a little nervous, Ms. McNeil?

19   A.  Yes, I am.

20   Q.  When you say police officers, are they police officers

21   in what kind of cars?

22   A.  SUVs, any kind of cars.

23   Q.  Are they marked cars or unmarked cars?

24   A.  I guess unmarked cars because they're like regular cars

25   that you see.
```

1    Q.  Now, during the period of time that you lived in this

2    apartment complex off of Elvans Road, tell the members of

3    the jury how many times you would see these jump-outs in

4    your apartment complex, like, say, for example, during the

5    day.

6    A.  They'd be there all the time.  They come riding up,

7    riding back and forth from the end.  Because it's like an

8    intersection.  You've got to turn around.  So they'd be back

9    and forth all day.

10   Q.  So are you saying that the police officers can't drive

11   through the apartment complex and go out the other side?

12   A.  No.

13   Q.  Okay.  So describe to them what they have to do if they

14   drive into the complex.  How do they get back out?

15   A.  They've got to turn back around.

16   Q.  Sorry?

17   A.  They've got to make a U-turn and turn out to come out of

18   the complex.

19   Q.  Uh-huh.  So how many times a week would you say that

20   you'd see these jump-outs?

21   A.  Two, maybe three times a week.

22   Q.  Uh-huh.  And over the course of this ten-plus-

23   year period, were you able to observe jump-outs on a regular

24   basis?

25   A.  Sometimes, yes.

1    Q.   Okay.   Now, ma'am, turning your attention to April the

2    26th of 2011, do you remember that day?

3    A.   Yes, ma'am.

4    Q.   What were you doing that day?

5    A.   Walking, going to get cigarettes.

6    Q.   Okay.   Were you sitting on your porch that day?

7    A.   No.

8              MS. FEATHERSTONE:   Objection, Your Honor.

9    Leading.

10             THE COURT:   Sustained.

11   Q.   If you would, could you describe, to the members of the

12   jury, what floor apartment you lived on.

13   A.   The second floor.

14   Q.   And to get from the second floor down to the first

15   floor, which -- to the parking lot, what do you have to do?

16   A.   Walk down the steps.

17   Q.   Did you do that on April the 26th?

18   A.   Yes.

19   Q.   When you walked down the steps on April the 26th, what

20   did you see?

21   A.   Really not nothing.   I seen Ralph early.

22   Q.   Where did you see him?

23   A.   Standing on my porch.

24   Q.   Standing on your porch?

25   A.   Yes.

1    Q.  All right.  And why was he standing on your porch?

2    A.  He was waiting.

3              MS. FEATHERSTONE:  Objection.

4              THE COURT:  Rephrase.

5    Q.  If you know, ma'am, what was Ralphael doing on your

6    porch?

7    A.  He was waiting for someone to come out.

8    Q.  Okay.  Did you have an opportunity to speak with him?

9    A.  Yes.

10   Q.  All right.  And how did you know Ralphy?

11   A.  He came around there all the time.

12   Q.  Uh-huh.

13   A.  He hung with kids that I knew.

14   Q.  Okay.

15   A.  And that's how I knew him.

16   Q.  Uh-huh.  Do you remember how Ralph was dressed that day?

17   A.  Yes.

18   Q.  Uh-huh.  Describe, to the members of the jury, how he

19   was dressed.

20   A.  Tank top, some blue jeans; they was kind of tight-

21   fitted.

22   Q.  Uh-huh.  And when you say "tight-fitted," what do you

23   mean?

24   A.  Like skinny jeans you know all the kids wear.  They look

25   like tight-fitted jeans, so they was kind of tight.

```
 1    Q.  Uh-huh.

 2              MS. WEST:  May I approach the witness, Your Honor?

 3              THE COURT:  You may.

 4    Q.  Now, Ms. McNeil, if I am wearing a pair of skinny jeans,

 5    and I'm Ralph, are those skinny jeans -- am I going to have

 6    a waist?  Is it going to be up here?

 7    A.  No.

 8              MS. FEATHERSTONE:  Objection to all these

 9    questions, Your Honor.  They're leading.

10              THE COURT:  Overruled.

11    Q.  Describe, if you would, please, to the ladies and

12    gentlemen of the jury, how these jeans would fit Ralphy that

13    day.

14    A.  Like hanging down.  He had them like hanging down under

15    his butt, but they were kind of tight down the bottom.

16    Q.  Okay.  Now, you described earlier that that's how all

17    the kids wear them; is that right?

18    A.  Yes.

19    Q.  All right.  So when you saw him that day, did you

20    physically touch him?

21    A.  Yes.

22    Q.  Tell the members of the jury what you did.

23    A.  I hugged him.

24    Q.  You hugged him?

25    A.  Yes.
```

1      Q.  All right.

2             MS. WEST:  May I approach the witness, Your Honor?

3             THE COURT:  You may.

4      Q.  Now, Ms. McNeil, if Ralphy's wearing a pair of skinny

5      jeans, and you hugged him, would you have felt a gun in his

6      waistband?

7      A.  Yes.

8             MS. FEATHERSTONE:  Objection, Your Honor.

9             THE COURT:  Overruled.

10     A.  Yes.

11     Q.  All right.  Did you feel a gun in his waistband?

12     A.  No.

13     Q.  All right.  Did you see a gun with Ralphy that day?

14     A.  No.

15     Q.  At any time?

16     A.  No.

17     Q.  Describe, if you would, ma'am, to the members of the

18     jury, what you did after you gave him a hug.

19     A.  Walked off.  He asked me for a cigarette.

20     Q.  And...?

21     A.  And I told him I would bring one back.  He sat on the

22     porch.  I walked off to go get the cigarette.

23             I never knew that he came around because I didn't

24     see him when he came around to The Oaks.

25     Q.  All right.  And after you'd left to get a cigarette,

```
1    were you with someone?

2    A.  Yes.

3    Q.  With whom were you with?

4    A.  My old boyfriend.

5    Q.  Uh-huh.  What kind of hair did he have?

6    A.  Dreads.

7    Q.  I'm sorry, ma'am?

8    A.  Dreadlocks.

9    Q.  Dreadlocks.  And when you left the apartment complex

10   with your boyfriend, what was going through your mind at

11   that time?

12   A.  Going to get the cigarettes and come back.

13   Q.  Did you see the jump-outs at that time?

14   A.  I seen them when we were coming out.  They was coming

15   in.

16   Q.  Uh-huh.  And how did that make you feel?

17   A.  I told my boyfriend "Come on because you know they

18   always mess with people with dreads," so we started

19   proceeding to go walk out the gate.

20   Q.  I want to make sure I understand what you just said.

21   You wanted to leave because you felt they would mess with

22   your boyfriend because he had dreads?

23   A.  Yes.

24   Q.  Now, based on your experience and your many years of

25   living in this apartment complex, did you believe that would
```

```
 1    happen, perhaps, to your boyfriend that day?
 2              MS. FEATHERSTONE:  Objection, Your Honor.
 3              THE COURT:  Overruled.
 4    A.  Probably so.  That's why I told him to, "Come on, let's
 5    walk off."
 6    Q.  I'm sorry, ma'am?
 7    A.  I said probably so.  That's why I told him to, "Come on,
 8    let's walk off."
 9    Q.  Uh-huh.  Did you recognize these jump-outs that were
10    there that day?
11    A.  Probably.  I seen them probably a couple of times, but
12    not messing with me or anything.
13    Q.  All right.
14    A.  But I seen them.
15    Q.  What kind of car were they driving?
16    A.  Black SUV.
17    Q.  Ma'am, when you started to walk off with your boyfriend,
18    what happened next?
19    A.  We was walking off.  Ralph came past.  I guess he was
20    pulling up his pants, and he bumped me.  He was running
21    past.
22    Q.  I'm sorry, ma'am?  He was running past?
23    A.  He was running past me.  I guess --
24    Q.  All right.  Stop right there.  Where were you when you
25    saw Ralphy run past you?
```

1    A.   Probably halfway to the gate coming out the complex.

2    Q.   And when he ran past you, can you describe how he was

3    running?

4    A.   With his hands on his shirt and his pants.  His pants

5    was coming down, so I guess he was holding -- pulling his

6    pants up so he can keep running.

7    Q.   How fast was he running?

8    A.   He was running fast because he bumped my arm, and I was

9    turning around to see who it was, but he had already ran

10   past so I ran up -- I was running up to the gate because he

11   already ran past me.  The SUV came out, and I was running up

12   to see what was going to happen.  Before I got to the end of

13   the gate, that's when I heard the gunshot.

14   Q.   What did you do, ma'am, when you saw him or when you

15   heard the gunshots?

16   A.   I ran up -- I was actually coming out the gate at the

17   time, and I seen him laying on the ground, and I was like,

18   "That's fucked up.  You all shot that boy."  I was walking

19   up -- walked off the curve [sic] to walk towards him when

20   the police officers was like, "Get back on the curve."  And

21   I still was saying, "That's fucked up.  That's fucked up."

22   Q.   Why did you say that?

23   A.   Because they shot him.

24   Q.   Well, why did you use that terminology?

25   A.   Because I was mad.

1    Q.  Why were you mad, Ms. McNeil?

2    A.  Because they didn't have to do that.  They really didn't

3    have to do that.

4    Q.  You said the police officers were telling you to get

5    back?

6    A.  Yes, back up on the curve.

7    Q.  Did you do that when they asked you to do that?

8    A.  Yes, because they were saying they were going to Mace

9    me.

10   Q.  I'm sorry, ma'am?

11   A.  Yes, because they said that they were going to Mace me.

12   So I got back up on the curve, and I was still saying

13   whatever I was saying to the police officer.

14   Q.  Would you describe, to the members of the jury, what

15   tone of voice the police officers were using.

16   A.  He was yelling back, "Ma'am, get back up on the curve.

17   Get back up on the curve."

18          And I was yelling back at him.  I was saying,

19   "That's fucked up."

20   Q.  So --

21          MS. WEST:  May I approach the witness, Your Honor?

22          THE COURT:  You may.

23   Q.  What could you see -- strike that.

24          How far away, if you could approximate for me,

25   were you from where Ralphael was shot?

```
1    A.  Two feet.

2    Q.  You were on the same side of the sidewalk?

3    A.  No.  I was on the other side so -- I was walking across.

4    It was like two or three feet in front of him.

5    Q.  I'm going to show you what's already been admitted as

6    Plaintiff's Exhibit 93F.  Do you recognize what's in that

7    photograph?

8    A.  Yes.

9    Q.  And what day was that?

10   A.  April 26th.

11   Q.  Who is that on the ground?

12   A.  Ralph.

13   Q.  And --

14   A.  That's what I seen, Ralph and the police officer that

15   was talking to him on the ground.

16   Q.  You were talking to him?

17   A.  The police officer was.

18   Q.  Uh-huh.  Did you hear Ralphy talk at all?

19   A.  I didn't.  That's all I heard them saying.  He was

20   yelling after he got shot in the back.  He kept saying "Ah,"

21   because they got up, one of them put their knee in his back,

22   put the handcuffs on him, and they twist him over and sat

23   him up, but then they laid him back down.

24   Q.  What was Ralphy doing during this time?

25   A.  He was just yelling because I guess it hurt.
```

1    Q.  How was he yelling?

2    A.  I'm pretty sure.

3    Q.  Please describe what he was doing.

4    A.  He was like "Ah, ah," and he told one of -- he was

5    saying, "Get your knee off my back, ah."

6            But they didn't.  They just put the handcuffs on

7    him.

8    Q.  Was it loud?

9    A.  Yes.

10   Q.  How did that make you feel?

11           MS. FEATHERSTONE:  Objection, Your Honor;

12   relevance.

13           THE COURT:  Sustained.

14   Q.  After you heard those loud screams of Ralphael, ma'am,

15   what did you do?

16   A.  I couldn't do nothing.

17   Q.  And why is that?

18   A.  Because they didn't want nobody coming towards them.

19   Q.  Okay.  So you knew this young man.

20   A.  Yes.

21   Q.  Did you want to help him?

22   A.  Yes.  I called --

23   Q.  So what did you --

24   A.  I called the ambulance, but the dispatch told me that I

25   couldn't.  They only had -- they said that the police

1    officers had to call.  I didn't know nobody called the

2    police.

3    Q.  I'm sorry, ma'am?

4    A.  But they didn't call the police.

5    Q.  Nobody called the police?

6    A.  No.

7    Q.  So did the ambulance come?

8    A.  That was after the detectives and all that stuff came

9    looking around.

10   Q.  Could you estimate, ma'am, how long it took for that

11   ambulance to get there?

12   A.  30 minutes to like an hour.  He was on the ground for a

13   long time.

14             MS. WEST:  Pass the witness, Your Honor.

15             Thank you, Ms. McNeil.

16             THE COURT:  Ms. Featherstone.

17                    CROSS-EXAMINATION

18   BY MS. FEATHERSTONE:

19   Q.  Good afternoon, Ms. McNeil.

20   A.  Good afternoon.

21   Q.  Ms. McNeil, when you saw Mr. Briscoe running past you,

22   he was holding his waistband, correct?

23   A.  Yes.

24   Q.  And he was holding it over his shirt, correct?

25   A.  Yes, because he was pulling his pants up.

```
1    Q.  So you couldn't see his hand touching his pants, only

2    his hand touching his shirt?

3    A.  Yes.

4    Q.  And just one hand?

5    A.  Yes.

6              MS. FEATHERSTONE:  Sorry, Your Honor.  I lost my

7    notes.

8    Q.  The officers you saw running behind him, you recognized

9    them as the police?

10   A.  Yes.

11   Q.  Because they had police vests on?

12   A.  Yes.

13   Q.  But you had never seen those particular officers before?

14   A.  Probably, but not -- I really don't pay attention to

15   them because they ain't never messed with me, but I know

16   jump-outs come around and mess with people all the time.

17   Q.  Now, as they're pulling into the apartments, you and

18   your boyfriend were walking out of the apartments?

19   A.  Yes.

20   Q.  And your boyfriend has dreads?

21   A.  Yes.

22   Q.  And it was your belief that they messed with individuals

23   that had dreads?

24   A.  Yes.

25   Q.  Did they stop and say anything to your boyfriend?
```

```
1    A.  No.

2    Q.  You only saw one police car --

3    A.  Yes.

4    Q.  -- coming out of the parking lot, correct?

5    A.  Yes.

6    Q.  And that was a black SUV?

7    A.  Yes.

8    Q.  You didn't see a silver SUV?

9    A.  No.

10   Q.  You said that Mr. Briscoe had on a tank top --

11   A.  Yes.

12   Q.  -- with his arms out?

13   A.  Yes.

14           MS. FEATHERSTONE:  Brief indulgence, Your Honor.

15           THE COURT:  Sure.

16           (Pause)

17           MS. FEATHERSTONE:  Thank you.

18   Q.  Ms. McNeil, you testified that you gave Mr. Briscoe a

19   hug, correct?

20   A.  Yes.

21   Q.  And that was when you saw him?

22   A.  Yes.

23   Q.  And during the course of that hug, you didn't feel

24   anything on him?

25   A.  No.
```

```
1    Q.  But you weren't conducting a pat-down of him, correct?

2    A.  No.

3    Q.  You didn't actually see Mr. Briscoe get shot, correct?

4    A.  No.

5    Q.  You just heard the shots?

6    A.  I heard the shots, yes.

7    Q.  Did you actually see him fall?

8    A.  No.  I just seen him when he was on the ground.

9    Q.  You don't know where the shots came from, do you?

10   A.  No.

11   Q.  You said the officer told you to get back, correct?

12   A.  Yes.

13   Q.  And you observed the officers standing around

14   Mr. Briscoe?

15   A.  Yes.

16   Q.  You saw an officer actually kneeling down talking to

17   him, correct?

18   A.  Yes.

19   Q.  But you couldn't hear what that officer was saying?

20   A.  No, ma'am, because I was across the street.

21   Q.  You said you were two or three feet away.  Were you on

22   the sidewalk closest to Mr. Briscoe, or were you on the

23   sidewalk --

24   A.  Across.

25   Q.  -- on the other side of the SUV?
```

1   A.  Yes.

2   Q.  Were you down near the SUV?

3   A.  Yes.

4   Q.  At the time that you -- by the time you left the gate of

5   the Forest Ridge Apartments and you got down to where the

6   SUV was, approximately how many other residents had come out

7   by that time?

8   A.  A lot.

9   Q.  Was it getting rowdy outside?

10  A.  Yes, because they heard the gunshots.

11  Q.  Were people, like, yelling or screaming and saying

12  different things?

13  A.  Yes.

14  Q.  And it was only those four officers that were on the

15  scene at the time, correct?

16  A.  Yes.

17  Q.  And at some point other police -- marked police cars

18  started showing up, correct?

19  A.  Yes, ma'am.

20  Q.  And once those marked police cars came, they also

21  started standing around the perimeter where everything was

22  going on, correct?

23  A.  Yes.

24  Q.  Now, you testified that you wanted to call the ambulance

25  to come assist Mr. Briscoe, correct?

1    A.  Yes.

2    Q.  And you said the dispatcher told you only the officers

3    could call?

4    A.  Yes.

5    Q.  Were you aware of whether the officers called?

6    A.  No.

7    Q.  So you don't know if they called?

8    A.  I don't know if they called because they didn't come.

9    Q.  Did you see the officers that were chasing Mr. Briscoe?

10   A.  Yes.

11   Q.  On foot?

12   A.  Yes.

13   Q.  Did you see if whether one of those officers called or

14   was making a phone call?

15   A.  No.

16   Q.  Did you see any of the officers using their radio at any

17   time?

18   A.  They did, but that was when they was calling the other

19   back-up.

20   Q.  Do you know what they were doing when they were using

21   their radio, or are you just assuming they were calling for

22   back-up?

23   A.  I just assumed that they was calling for back-up because

24   the ambulance did not come.  It was only other police

25   officers.

1    Q.  You stayed on the scene until the ambulance did arrive,

2    correct?

3    A.  Yes.

4    Q.  And the ambulance did come?

5    A.  Yes.

6    Q.  And you don't know whose call made the ambulance come,

7    correct?

8    A.  No.

9              MS. FEATHERSTONE:  Nothing further, Your Honor.

10             THE COURT:  Okay.  Ms. West?

11             MS. WEST:  Very briefly, Your Honor.

12                      REDIRECT EXAMINATION

13   BY MS. WEST:

14   Q.  Ms. McNeil?

15   A.  Yes.

16   Q.  You testified that there were other officers there that

17   were telling you to get back.  Do you remember that?

18   A.  Yes.

19   Q.  Do you -- I'm sorry, ma'am.

20   A.  Go ahead.

21   Q.  And you also testified that there were many other

22   residents that came out of the apartment complex after they

23   heard the shots.

24   A.  Yes, and on their balconies.

25   Q.  And on their balconies?

1    A.   Yes.

2    Q.   And you testified that the crowd was becoming louder?

3    A.   Yes.

4    Q.   Uh-huh.

5    A.   Yes.

6    Q.   And would you please describe, to the members of the

7    jury, if you remember what the police officers were telling

8    you and how they were telling you to get back.

9    A.   They was just telling me that they don't -- waving me

10   back like "Move back, move back," because I was in -- about

11   to come in the street.  So he was like, "Move back, move

12   back," and I just got back up on the curve and was still

13   cussing and fussing.

14   Q.   And what made you cuss and fuss?

15   A.   Because they shot Ralph in the back.

16   Q.   Did anything they said to you upset you at that time?

17   A.   They ain't said -- no.  They didn't say anything to me

18   to make me upset.  It's just what I heard when I came out --

19   I seen.

20            So, "That's messed up.  "Why would you all do

21   that?"  That's what I was saying.

22            MS. WEST:  Thank you, ma'am.

23            THE WITNESS:  You're welcome.

24            THE COURT:  Thank you, Ms. McNeil.  You're

25   dismissed.

1          Okay.  We will take our afternoon break.  Let's

2     report back at 3:30.  Don't talk about the case.  No

3     independent research about the case.  Okay?

4          (Jury exits courtroom)

5          MS. FEATHERSTONE:  Your Honor, we have an issue

6     we'd like to address with the Court.  After the break or

7     before?

8          THE COURT:  Sure.  Let's do it now.

9          MS. FEATHERSTONE:  Your Honor, the defendants have

10    a concern that the plaintiffs raised with the Court, prior

11    to trial, that there would be testimony and evidence with

12    regard to Ms. McNeil and the planting of a weapon by the

13    officers; and the Court allowed the plaintiffs to use the

14    evidence regarding DNA and fingerprinting because of this

15    planting of the gun theory.  The District, as the Court is

16    aware, moved to eliminate -- to exclude this testimony, but

17    based on the proffer of the testimony that the witness would

18    testify to this planting, the Court allowed that testimony.

19         Now that Ms. McNeil has testified and that

20    testimony was not produced, the defendants have been

21    prejudiced with the plaintiff proffering -- or questioning

22    the officer -- questioning about fingerprinting not being

23    done, and so we think that that's an issue that we wanted to

24    raise with the Court.

25         In addition --

1        THE COURT:  That's two different things.  There's

2    fingerprinting and DNA.  Do you see a distinction?  Is there

3    a difference between the two?

4        With respect to the fingerprinting, we have the

5    report, as you know.

6        MS. FEATHERSTONE:  Correct, Your Honor, but the

7    issue of fingerprinting was coming in to support the

8    plaintiff's theory that there was a plant, and so we

9    objected to this in its totality, but with the Court's

10   ruling, we understood it was coming in solely based on this

11   theory of the planting of a weapon, and that we would be

12   able to state that there were no prints found.  If the

13   plaintiff were able to argue that Mr. Briscoe's prints

14   weren't there, we would also be able to argue that no prints

15   were on the weapon.

16       The plaintiffs have apparently abandoned this

17   theory, but the evidence of no fingerprinting has been put

18   before the jury.  I don't believe I've heard anything about

19   the DNA at this time, as the Court just ruled this morning.

20       THE COURT:  Okay.

21       MS. FEATHERSTONE:  But I know for a fact that the

22   fingerprinting issue was put out.

23       Also, during the testimony of Officer Torres, the

24   plaintiff was -- Mr. Ponds questioned Officer Torres about

25   something being thrown out of the window, and then he

1   followed up with a question with regard to whether or not

2   Officer Leo -- sorry, Officer Torres was present during a

3   conversation where it was discussed that something was

4   thrown out of the window when he and Officer Leo were in the

5   car.  And we believe that unless plaintiff has a proffer as

6   to what evidence that she intends to put forth --

7          THE COURT:  I don't believe you objected to that

8   question.  Did you object to that question?

9          MS. FEATHERSTONE:  He did not, Your Honor.

10         THE COURT:  Okay.

11         MS. FEATHERSTONE:  But we didn't know what the

12  evidence was going to show.  But the plaintiff has -- we're

13  asking the Court at this point for a proffer from the

14  plaintiff with regard to the basis for cross-examining

15  Officer Torres about a conversation that he suggested in his

16  question that Officer Torres may have been privy to that

17  discussed either he or Leo throwing something out of the

18  window.

19         THE COURT:  That cat's out of the bag, right?

20         MR. PONDS:  Yes, sir, it is.  If I can be heard?

21         THE COURT:  Okay.  Mr. Ponds, let's start with

22  Ms. McNeil's testimony and whether you still have a

23  predicate for your plant theory.

24         MR. PONDS:  Absolutely.

25         THE COURT:  Hold on one second.

```
 1                    (Pause)
 2               THE COURT:  Ms. McNeil, now that you've testified
 3      and are dismissed, if you could step out of the courtroom,
 4      please.  Thank you.
 5               Counsel, please instruct your witnesses not to
 6      enter --
 7               MR. PONDS:  I didn't know, Judge.  I assume when
 8      they're done --
 9               THE COURT:  I know.
10               MR. PONDS:  Because we've had a hard enough time
11      getting them in.
12               THE COURT:  I know.
13               MR. PONDS:  I'm so sorry, Judge.  I apologize.
14               THE COURT:  Okay.  Now, I thought that was -- I
15      thought you made a proffer that Ms. McNeil was going to give
16      testimony to that effect.
17               MR. PONDS:  I don't recall if I did, but if I said
18      that, there was a possibility.
19               THE COURT:  Okay.
20               MR. PONDS:  I had never -- you know, we spoke with
21      Ms. McNeil just, I think, about two times.  We have evidence
22      other than -- independent of Ms. McNeil in terms of this gun
23      being planted, and the reason why they're asking for a
24      proffer is because I believe that they know, and they want
25      to essentially find out what I know.
```

1          But I can make a -- I can tell the Court in good

2    faith, we will make that -- we will prove up that allegation

3    once our expert witness takes the stand.

4          THE COURT:  Okay.  What about this purported

5    conversation?  Are we going to hear anything more about

6    that?

7          MR. PONDS:  We'll hear from Defendant Leo, when he

8    takes the stand.

9          THE COURT:  Okay.

10         MR. DeBERARDINIS:  Plaintiff's expert cannot

11   testify, Your Honor, that any gun was planted.  He gave a

12   report.  He was deposed.  He was asked whether there was any

13   impropriety --

14         THE COURT:  I didn't hear him -- I didn't

15   understand him to say that his expert will testify to that.

16         MR. DeBERARDINIS:  That's what I heard, Your

17   Honor.

18         MR. PONDS:  This is what he will testify to, Your

19   Honor.  There's a couple of ways we can do it.  We can get

20   it out through Defendant Leo, who we will call --

21         THE COURT:  I'm sorry, is this the conversation

22   regarding throwing something out of the window?

23         MR. PONDS:  It relates directly to that.

24         THE COURT:  Okay.  So we're talking about two

25   different things then, Mr. DeBerardinis.

1          MR. DeBERARDINIS:  I thought I heard Mr. Ponds say

2    we will prove it up through our expert.

3          MR. PONDS:  But let me just -- let me finish, if

4    you would just not interrupt me, please.

5          The expert was asked various questions concerning

6    the videotape and what he observed, and he gave testimony on

7    that.  And as a part of his testimony --

8          THE COURT:  And this is the defendants' expert, or

9    is this your expert?

10         MR. PONDS:  Our expert.

11         THE COURT:  Okay.  Got it.

12         MR. PONDS:  And he will testify to various things

13   that he observes that are clearly identifiable on the

14   videotape, and it relates to the question that I asked

15   Officer Torres.

16         THE COURT:  Okay.  Well, I will -- last word.

17         MR. DeBERARDINIS:  Well, it would be interesting

18   if he had put it in his report.  This is not a criminal

19   case, Your Honor.  This is a civil case.  There's no ambush,

20   no surprises.

21         He gave a report, he testified at his deposition,

22   and he said no impropriety on the part of any other officer.

23   His only concern was the shooting.  That's the state of what

24   we've been informed in this case.  He can't come in here now

25   with some pie in the sky or this means that the gun must

1    have been planted.

2           And the reason I didn't object, Your Honor, is

3    because at that time I had no basis for it because we had

4    been proffered that witnesses were going to come in and talk

5    about this planting-the-gun theory, so I thought he was

6    going to prove it up, and he had a reasonable basis to ask

7    the question.  Now we find out, when these witnesses finally

8    appear and testify, that indeed there is no such foundation.

9           So please excuse me if I didn't object then,

10   because I didn't have a basis for it.  Now we do, and now

11   we're entitled to a curative instruction with the jury.

12          MR. PONDS:  I would ask the Court to reserve on

13   any type of curative instruction until we put on our last

14   witness, and I think --

15          THE COURT:  Okay.  One question, when is your

16   expert testifying?

17          MR. PONDS:  He'll testify tomorrow; latest,

18   Thursday morning.  He will be our last witness.

19          THE COURT:  Okay.  And is there anything in his

20   report that would fairly suggest to the defense that his

21   testimony would encompass this issue?

22          MR. PONDS:  This was a recently discovered issue,

23   Your Honor.

24          THE COURT:  Okay.  Well, I'll take it under

25   advisement, but you've got a high hurdle if it's not in his

1     report.  Okay?

2             MR. PONDS:  Is the Court saying that because the

3     defendants were aware that he would give testimony

4     concerning the videotape, is the Court saying that he

5     cannot -- I'm not saying he's going to make an expert

6     opinion as to what it is.  It will be very obvious as to

7     what it is.  Even a fact witness could testify to it.

8             So I'm trying to get some guidance from the Court.

9     Is the Court saying -- I'm not going to offer him as an

10    expert to say that this is this.  It's going to be clearly

11    obvious what it is.

12            THE COURT:  That's a different question,

13    Mr. DeBerardinis.  Can he say what he sees on the videotape

14    just like any other fact witness, if it's not being offered

15    as expert testimony?

16            MR. DeBERARDINIS:  He can say -- he can say what

17    he saw on that tape if we had been placed on notice that it

18    was going to lead to a suggestion of skullduggery, if that

19    is his theory.  If it's not his theory, then -- if he's just

20    testifying as somebody who sees it and it doesn't play into

21    his opinions, then he doesn't help the jury as an expert.

22            THE COURT:  Well, if he testifies to what he sees

23    on the tape without offering an opinion as to what

24    implications that has for police conduct, can't Mr. Ponds

25    then argue it in closing?

1           MR. DeBERARDINIS:  If the fair inference from what

2      he testifies to is that there was an impropriety on the part

3      of police, he cannot, because we're not on notice of that.

4           THE COURT:  Okay.  Well --

5           MR. PONDS:  If I could just --

6           THE COURT:  We're not going to decide this now,

7      okay?

8           MR. PONDS:  Yes, sir.

9           MS. WEST:  Your Honor, I just want the record to

10      be perfectly clear.

11           THE COURT:  Yes.

12           MS. WEST:  We filed, pursuant to the Court's

13      order, a pretrial statement in this case.

14           THE COURT:  Yes.

15           MS. WEST:  And I am unsure of what

16      Ms. Featherstone's talking about with regard to Ms. McNeil

17      giving testimony with regard to the planting of a gun.  In

18      the pretrial statement that was filed for our witness,

19      Rashida McNeil, we put, "She was an eyewitness to the events

20      that occurred on April 26th in the vicinity of Elvans Road

21      prior and subsequent to Defendant Leo fatally shooting

22      Ralphael Briscoe twice in the back.  Rashida McNeil will

23      testify, including but not limited to, as to the events that

24      she observed on April 26, 2011 at Elvans Road in connection

25      with Defendant Leo fatally shooting Ralphael Briscoe twice

1    in the back.  She will also verify her audiotaped statement

2    to Detective Rahman."

3              THE COURT:  I believe what she was referring to is

4    in the context of the Court's DNA ruling.  I inquired as to

5    what the predicate to that theory was, and I listed several

6    pieces of evidence, including testimony that I understood

7    Ms. McNeil would give to that issue, and I heard counsel

8    agree, at least, that that was likely to be her testimony.

9    And now that it was not her testimony, we have to figure out

10   where to go.

11             Is that fair?

12             MS. FEATHERSTONE:  Yes, Your Honor.

13             MS. WEST:  Thank you, Your Honor.

14             THE COURT:  Okay.  Thank you.

15             (Recess taken)

16             THE COURT:  Terri, hold on.  Mr. Ponds, who do we

17   have next?  Who do we have next?

18             MR. PONDS:  Oh, Ms. Lane, Your Honor.

19             THE COURT:  Ms. Lane.  And how long do you think

20   Ms. Lane is going to take?

21             MR. PONDS:  About 30 to 35 minutes.

22             THE COURT:  I'd like to knock off maybe a little

23   early today.  Do you think we can conclude with her and then

24   start up fresh tomorrow?

25             MR. PONDS:  That would be fine.

```
1            THE COURT:  Is that fine?

2            MR. PONDS:  Can I just step out in the hallway and

3      let some of the officers know so they don't have to wait

4      around?

5            THE COURT:  Okay.

6            MR. PONDS:  Thank you so much.

7            THE COURT:  That's fine.

8            MR. DeBERARDINIS:  I've just got a very brief

9      matter.  Should I wait for Mr. Ponds?

10           MS. WEST:  You don't need to wait for Mr. Ponds.

11           THE COURT:  Can it be handled in front of the

12     jury?  Can we do it afterwards?

13           MR. DeBERARDINIS:  Yes, Your Honor.  Of course.

14           (Jury enters courtroom)

15           THE COURT:  Ms. West.

16           MS. WEST:  Yes, Your Honor.  The plaintiff would

17     call Ms. Bridzette Lane.

18                      BRIDZETTE LANE, Sworn

19                      DIRECT EXAMINATION

20     BY MS. WEST:

21     Q.  Good afternoon, Ms. Lane.

22     A.  Good afternoon.

23     Q.  Would you please introduce yourself to the jury.

24     A.  Bridzette Lane.

25     Q.  How old are you, Ms. Lane?
```

1    A.   46.

2    Q.   Where are you from?

3    A.   North Carolina.

4    Q.   Where have you lived all your life?

5    A.   Washington, D.C.

6    Q.   Did you go to high school here?

7    A.   Yes.

8    Q.   Where did you go?

9    A.   McKinley Tech.

10   Q.   Tell me, ma'am, do you work?

11   A.   Yes.

12   Q.   Tell the members of the jury where it is you work.

13   A.   Department of Agriculture.

14   Q.   And how long have you done that, ma'am?

15   A.   This June will be 16 years.

16   Q.   Do you work full time?

17   A.   Yes.

18   Q.   Tell the members of the jury what it is you do for the

19   Department of Agriculture.

20   A.   Program assistant.

21   Q.   And is that what you've done the whole time?

22   A.   No.

23   Q.   What did you do before you were program assistant?

24   A.   A secretary.

25   Q.   Okay.  So you've worked your way up?

```
1    A.  Yes.

2    Q.  How old were you when you had Ralphael?

3    A.  I was 23.

4    Q.  Do you have other children?

5    A.  Yes.

6    Q.  Tell the members of the jury what other children you

7    have.

8    A.  I have three daughters:  27, 21, and 14.

9    Q.  You said you were 23 when you had Ralph.

10   A.  Yes.

11   Q.  And did you raise him?

12   A.  Yes, I did.

13   Q.  And describe, to the members of the jury, how that was.

14   Did you do it by yourself?

15           MS. FEATHERSTONE:  Objection, Your Honor.

16           THE COURT:  I'll give you a little leeway, okay?

17           MS. WEST:  Yes, Your Honor.

18   Q.  Did you raise him by yourself?

19   A.  Yes.

20   Q.  All right.  And you had your other children.  Were they

21   living with you?

22   A.  Yes.

23   Q.  Okay.  And that's here in Washington, D.C.?

24   A.  Yes.

25   Q.  So when you had Ralphael as a small baby, as an infant,
```

```
 1    did you work at that time?

 2    A.   No.  I was a stay-at-home mom.

 3    Q.   And how long were you able to stay home with him?

 4    A.   Maybe until he was like maybe 2 or 3.

 5    Q.   And then you went to work for the Department?

 6    A.   No.  Maybe it was less than 2 or 3.  I worked for -- I

 7    worked for a temp agency, and then I got hired at the

 8    Department.

 9    Q.   Okay.  How was your relationship with Ralph?

10    A.   We had a good relationship.

11    Q.   Is he your only boy?

12    A.   Yes, he is.

13    Q.   Is raising a boy different than raising girls?

14    A.   Yes, it is.

15              MS. FEATHERSTONE:  Objection.

16              THE COURT:  Sustained.

17              Counsel, approach.

18              (The following is a conference held at the

19               bench outside the hearing of the jury)

20              THE COURT:  Okay.  What's your relevance theory of

21    her relationship and upbringing and all of those questions?

22              MS. WEST:  The relevance is the cross-examinations

23    that were done of the economist and the challenge, and she

24    heard that testimony about what kind of relationship she had

25    with him.
```

1          THE COURT:  What does that have to do with his

2    earnings?

3          MS. WEST:  It has to do with him -- the economist

4    said in his expert opinion that when you have a strong

5    relationship with your mother, you're more likely to go out

6    and get a job and keep a full-time job and do those kinds of

7    things.  So I don't want the -- and he was challenged on

8    that on cross-examination.  So here's the person who did

9    that.  I think that's opened the door for the jury to know

10   what kind of relationship they had.

11         MS. FEATHERSTONE:  This is beyond the scope of

12   what she can testify about in this case, and I don't believe

13   that it goes directly to what the economist said.  I mean,

14   he said it, and he said he trusted her opinions.

15         I don't believe that in cross-examination it was

16   brought out that they didn't have a close relationship.  I

17   mean, that's where the cross would have been more effective.

18         THE COURT:  Okay.  I'll allow you to ask whether

19   she had a close relationship with her son, but let's move

20   on.

21         MS. WEST:  She's already answered that question.

22         THE COURT:  Let's move on.  What else do you want

23   to handle?

24         MS. WEST:  I want to know if we can get that juror

25   a cough drop.  I mean, she's really uncomfortable.

 1                THE COURT:  Okay.  Let's move on from this, okay?

 2                MS. WEST:  Yes, Your Honor.

 3                (This is the end of the bench conference)

 4                THE COURT:  Juror No. 6, how are you doing back

 5     there?  Are you okay?  Do you need a cough drop or anything?

 6                THE WITNESS:  I have one.  I have one.

 7                THE COURT:  If you need to take a break, just

 8     raise your hand, and we can take a break, okay?

 9                Okay.  Ms. West, please proceed.

10     BY MS. WEST:

11     Q.  Ms. Lane?

12     A.  Yes.

13     Q.  Do you have grandchildren?

14     A.  Yes.

15     Q.  How many?

16     A.  Four.

17                MS. FEATHERSTONE:  Objection.

18                MS. WEST:  I'm going to tie it up, Your Honor.

19     It's relevant.

20                THE COURT:  Overruled.

21     Q.  And Ralphy lived at home; is that right?

22     A.  Yes.

23     Q.  When he lived at home, was he able to help you?

24     A.  Yes.

25     Q.  Please describe, to the members of the jury, how it was

1      that Ralphael helped you at home.

2      A.  He would take my -- at the time my daughter was between

3      9 and 10.  He would take my daughter and my grandson, who at

4      the time was 4 or 5, to school every morning.  He caught two

5      buses; and then he would pick them up some evenings and

6      caught two buses back home.

7      Q.  So you went to work in the morning?

8      A.  Yes, I did.

9      Q.  And you left him with your five-year-old grandchild, or

10     daughter?  I'm confused.

11     A.  My five-year-old grandson and my ten-year-old daughter.

12     Q.  Okay.  Thank you.

13            And so you were gone from the house, and it was

14     his responsibility to get them to school?

15     A.  Yes.  We would leave all together.  I would go to work,

16     and he would take them to school.

17     Q.  Uh-huh.  And you said he did that on a bus?

18     A.  Yes.

19     Q.  All right.  Was that here in Washington, D.C.?

20     A.  Yes.

21     Q.  How often did he do that for you?

22     A.  Every day.

23     Q.  And for how many years did that transpire?

24     A.  It was for like six months.

25     Q.  And was this the six months previous to when he was

1    shot?

2    A.   Yes.

3    Q.   And before that, was he in school?

4    A.   No.

5    Q.   Was he living with you on April the 26th of 2011?

6    A.   Yes.

7    Q.   And he lived in your house?

8    A.   Yes.

9    Q.   How often would you see him?

10   A.   Every day and every night.

11   Q.   All right.  And why is that?

12   A.   Because he had a curfew to be in at a certain time.

13   Q.   Who gave him that curfew?

14   A.   I did.

15   Q.   And did you, as his mother, make his meals for him?

16   A.   Sometimes, or he would make his own.

17   Q.   And what about his laundry?

18   A.   He washed his own laundry.

19   Q.   He did?

20   A.   Yes, he did.

21   Q.   How is that?

22   A.   He needed responsibilities.  I wasn't washing his

23   clothes.

24   Q.   Okay.  You said he worked -- you didn't say he worked.

25   You said that he helped you in the house.

```
1     A.  Yes.

2     Q.  Was he looking for a job?

3     A.  Yes, he was.

4     Q.  And when was this, approximately, at this time?

5     A.  He would go out every day.  I'd tell him he had to find

6     a job or get a GED, so he would go out every day looking for

7     a job.

8     Q.  And was he successful?

9     A.  One of his friends was getting him a job at --

10              MS. FEATHERSTONE:  Objection.

11              THE COURT:  Overruled.

12    A.  One of his friends was getting him a job at Harris

13    Teeter.

14    Q.  All right.  So I want to understand, so he would leave

15    the house with you in the morning?

16    A.  Yes.

17    Q.  Take the kids to school on two buses?

18    A.  Yes.

19    Q.  And then what did he do after that?

20    A.  Well, he was supposed to be out looking for a job.

21    Q.  All right.  And at the time, on April 26th of 2011, was

22    he looking for a job at that time?

23    A.  Yes.

24    Q.  All right.  And this Harris Teeter that you just

25    mentioned, when did that come up?
```

1    A.  After his death, one of the young guys came to me and

2    told me that he was getting Ralphael a job at Harris Teeter.

3    Q.  And when he lived at home with you, and you saw him on a

4    daily basis, were you able to see where he slept?

5    A.  Yes.

6    Q.  And where he kept his clothing?

7    A.  Yes.

8    Q.  And although he did his own laundry, were you able to

9    see that?

10   A.  Yes.

11   Q.  Tell the members of the jury why it is that you were

12   able to observe all this.

13   A.  Because I was nosing in his stuff.

14   Q.  What does that mean?

15          MS. FEATHERSTONE:  Objection to relevance, Your

16   Honor.

17          THE COURT:  Overruled.

18   A.  I went through his stuff.  I checked his stuff and made

19   sure he didn't have anything like -- you know, kids his age,

20   they want to smoke marijuana; so I would make sure he didn't

21   have anything in my house.  So I would go through his stuff.

22   Q.  Showing you what's already been admitted into evidence

23   as Plaintiff's Exhibit No. 7, do you recognize this object?

24   A.  No, ma'am.

25   Q.  Did you see it before?

```
 1    A.  No, ma'am.

 2    Q.  Before this trial.

 3    A.  No, ma'am.

 4    Q.  All right.  And do you now know what it is?

 5    A.  From the testimonies.

 6    Q.  All right.  And what is it?

 7    A.  A BB gun.

 8    Q.  All right.  And if you had found this BB gun in his

 9    articles of clothing or when you were snooping around where

10    he slept in his room, what would you have done?

11    A.  I would have kicked his butt and called the police on

12    him.

13    Q.  And why is that?

14    A.  Because I would have thought he was out to hurt someone

15    or do something he had no business doing.

16    Q.  Did you ever see anything like this in his personal

17    articles?

18    A.  No.

19    Q.  Did you ever know him to have anything like this?

20    A.  No, ma'am.

21    Q.  In the entire 18 years that he was your boy?

22    A.  No, ma'am.

23    Q.  In the entire 18 years that he lived with you?

24    A.  No, ma'am.

25             MS. WEST:  May I approach the witness, Your Honor?
```

```
1                    THE COURT:  Yes.

2    Q.  Showing you what's been marked as Plaintiff's Exhibit

3    29B, do you recognize this photograph?

4    A.  Yes.

5    Q.  And what is it?

6    A.  It's a picture of Ralphael.

7    Q.  Ma'am, there's a Kleenex right to your left, if you need

8    one.

9    A.  Thank you.

10   Q.  How old is he in that photograph, ma'am?

11   A.  17.

12   Q.  What's he holding?

13   A.  His cell phone I bought him.

14   Q.  So is that an accurate depiction of your boy and his

15   cell phone?

16   A.  Yes.

17             MS. WEST:  At this time, Your Honor, we'd move in

18   Plaintiff's Exhibit No. 29B.  I've previously shown it to

19   the defense.

20             MS. FEATHERSTONE:  Objection.

21             THE COURT:  29B is admitted.

22   Q.  Would you, please, Ms. Lane, describe for the jury what

23   Ralphael's wearing in that photograph.

24   A.  He's wearing a polo shirt and some -- it looks like some

25   skinny jeans.
```

1    Q.  And tell the members of the jury, if you would, ma'am,

2    where do those skinny jeans fall on him?

3    A.  It fell below his waist, but I would make him pull them

4    up.  But when he got out of my sight, he would pull them

5    back down.

6    Q.  And why is that?

7    A.  I guess that was the style, so he wanted to wear his

8    pants hanging off his behind.

9    Q.  And you taught me a new word, what's that called?

10   A.  Your butt.

11   Q.  What do you call it when you wear your skinny jeans down

12   there?

13   A.  I don't know.  I guess sagging.

14   Q.  And the style of clothing, is he -- how is he dressed?

15   A.  What you mean by that?

16   Q.  How is he dressed in that photograph?

17   A.  With some skinny jeans and a polo shirt.

18   Q.  All right.  A Ralph Lauren polo shirt; is that right?

19   A.  Yes.

20   Q.  Is that generally how he dressed?

21   A.  Yes.

22   Q.  What's swag?

23   A.  I'm not sure.  I think -- I don't know.  I think they're

24   talking about --

25            MS. FEATHERSTONE:  Objection.

```
 1                    THE COURT:  Sustained.
 2     Q.  So when you saw him go out of the house, you'd make him
 3     pull them up?
 4     A.  Yes, ma'am.
 5                    MS. WEST:  Your Honor, may I approach the
 6     witness --
 7                    THE COURT:  Yes.
 8                    MS. WEST:  -- and publish this exhibit to the
 9     jury?
10                    THE COURT:  You may.
11     Q.  Now, this cell phone, ma'am, that he's holding, where
12     did he get that?
13     A.  I bought it for him.
14     Q.  And do you recognize that cell phone?
15     A.  Yes.
16     Q.  And tell the members of the jury the last time you saw
17     that cell phone.
18     A.  On April the 26th.
19     Q.  2011?
20     A.  Yes.
21     Q.  Did he have that cell phone with him when he was shot?
22                    MS. FEATHERSTONE:  Objection.
23     A.  Yes.
24                    THE COURT:  Hold on, Ms. -- foundation.  Can you
25     rephrase the question.
```

1          MS. WEST:  Yes, Your Honor.

2     Q.  Were you -- I'm getting a little bit ahead of myself.

3          When you were able to collect his personal things

4     or learned what he had with him that day, did you learn

5     anything about that particular cell phone?

6          MS. FEATHERSTONE:  Objection to the form, Your

7     Honor, again.

8          THE COURT:  Overruled.

9     Q.  You may answer.

10    A.  Repeat that again.

11    Q.  Did you learn anything about the phone that day, that

12    phone that you see in the picture?

13    A.  When they gave me his -- they only gave me his

14    underclothes and socks.  They didn't give me his personal

15    items, but I did -- I asked about his cell phone.

16    Q.  And what -- after you were -- don't tell us what you

17    were told, but was this cell phone in this photograph that

18    you testified that you bought him, was that the phone he had

19    with him that day?

20    A.  Yes, it was.

21    Q.  And how do you know that?

22    A.  Because earlier that day I talked to him on the phone.

23    I -- he called me.  His butt called me, and I called him

24    back.

25    Q.  Now, wait, did you say his butt called you?

1    A.   Yes.

2    Q.   What does that mean?

3    A.   When your -- when you're sitting on your phone, and your

4    phone -- I guess they call it a butt-call, butt-dialing,

5    when your butt dials a number.

6    Q.   All right.  So April 26th of 2011, do you remember that

7    day?

8    A.   I'll never forget it.

9    Q.   After he did this butt-dial, what did you do?

10   A.   I called him.  I called him.  I heard -- I heard noise,

11   and I didn't hear anything so -- I kept hearing all this

12   noise, so I hung up the phone.  I called him back, and he

13   answered the phone, and I asked him was he okay.  He was

14   like, "Yeah."

15           I said, "Well, what was all that noise?"

16           He said he was on the bus.

17   Q.   All right.

18   A.   He said -- oh.  I said, "Well, you called me."

19           He said, "I didn't call you."  He said, "My butt

20   dialed you."

21   Q.   Now, was that a regular day in your life with him?  Did

22   you go to work that day?

23   A.   Yes, I did.

24   Q.   And that's why you called him, because you were not with

25   him?

```
 1    A.   Yes.

 2              MS. FEATHERSTONE:  Objection.

 3              THE COURT:  Sustained.  Rephrase.

 4              MS. WEST:  Yes, Your Honor.

 5    Q.   You went to work that day?

 6    A.   Yes.

 7    Q.   What did he do?

 8    A.   He took my daughter and my grandson to school.  He came

 9    back home because I had a --

10    Q.   Did he have something special to do for you that day?

11    A.   Yes.

12    Q.   Please tell the members of the jury what it was.

13    A.   I had a package being delivered to me, so he came back

14    home to wait for a package for me.

15    Q.   And did he do that?

16    A.   Yes, he did.

17    Q.   And did the package arrive?

18    A.   Yes, it did.

19    Q.   Now, how do you know?

20    A.   He called me and told me that my package was there.

21    Q.   And then what did he do?

22    A.   Then he told me he was leaving out.

23    Q.   What happened next?

24    A.   As he told me he was leaving out, I always said to him,

25    "Make sure you go look for a job."
```

1    Q.  And did he say that he was going to do that?

2    A.  He said, "Okay, ma.  I am."

3    Q.  All right.  Did you continue to work that day?

4    A.  Yes, I did.

5    Q.  And then what happened?

6    A.  I really don't know what time, but I was in a meeting,

7    and my cell phone kept going off and kept ringing and kept

8    getting calls, and I kept sending it to voice mail because I

9    was in a meeting, and then finally I received a text from my

10   daughter stating that Ralphael had been shot.

11   Q.  And when you received that text, what did you do?

12              MS. FEATHERSTONE:  Objection.

13              THE COURT:  Sustained.  Sustained.

14              MS. WEST:  I'm asking her what she did, Your

15   Honor.

16              THE COURT:  What's the relevance?  Approach.

17              (The following is a conference held at the

18               bench outside the hearing of the jury)

19              THE COURT:  What's it go to?

20              MS. WEST:  Well, she's just received a text

21   message that her son was shot.

22              THE COURT:  Right.

23              MS. WEST:  And so my next question was:  "Based on

24   that text, what did you do?"

25              THE COURT:  Understood.  And what relevance does

1     that have to a claim or defense in this case?

2              MS. WEST:  It's relevant to prove our case with

3     pain and suffering, what happened when she went to the

4     hospital with regard to him.

5              THE COURT:  Is that what she's going to say?  Did

6     she observe him at the hospital?

7              MS. WEST:  She didn't observe him, but she spoke

8     to -- she did eventually, yes, and that's very relevant to

9     our claim for pain and suffering, but she -- and negligence,

10    but she --

11             THE COURT:  When did she see him?  Did she see him

12    alive?

13             MS. WEST:  No.

14             THE COURT:  Well, that's not relevant.  It's

15    conscious pain and suffering.

16             MS. WEST:  I understand that it's conscious pain

17    and suffering.

18             THE COURT:  And what she was told by the physician

19    is hearsay, correct?  And you're going to call the

20    physician.

21             MS. WEST:  That's correct, but the conscious pain

22    and suffering -- and that's -- and I know the Court made a

23    ruling on that.  She was told that he was alive at that

24    time, and when she went in to see him, when she learned that

25    he was gone, he was cold, and she was told that he had just

```
1    passed.  A person who is cold didn't just pass.

2              THE COURT:  That's medical testimony.  We're not

3    going to have her testify to that.  I'm sorry.  We're not

4    going to have her testify -- if she didn't see him and

5    observe his pain or suffering, she can't testify to it; and

6    unless there's some other relevance theory, I'm not going to

7    allow her to testify.  And there's a 403 issue here as well.

8              MS. WEST:  Yes, Your Honor.  I understand.

9              THE COURT:  Okay.

10             (This is the end of the bench conference)

11   BY MS. WEST:

12   Q.  Ms. Lane, did Ralphael eventually pass?

13   A.  Yes.

14   Q.  How has your life been without him?

15             MS. FEATHERSTONE:  Objection.

16             THE COURT:  Sustained.

17   Q.  Did you have a funeral for Ralphael?

18   A.  Yes.

19   Q.  Who helped you plan that?

20             MS. FEATHERSTONE:  Objection, Your Honor.  May we

21   approach, Your Honor?

22             THE COURT:  Overruled.

23   A.  My pastor, my family, my friends.

24   Q.  Were there expenses with your funeral?

25   A.  Yes.
```

1    Q.  I don't mean just financial expenses.  There were other

2    expenses, were there not?

3    A.  Yes.

4    Q.  How long were you off of work?

5          MS. FEATHERSTONE:  Objection, Your Honor.

6    A.  Four months.

7          THE COURT:  Overruled.

8    Q.  When you had his funeral, and you were not at work, did

9    you have an opportunity to again go through his things?

10   A.  Yes.

11   Q.  And amongst his items, did you find medications that he

12   was taking for his ADHD?

13         MS. FEATHERSTONE:  Objection, Your Honor.

14         MS. WEST:  They opened the door.

15         THE COURT:  Sustained.

16   Q.  Now, Ms. Lane, are you working again?

17   A.  Yes.

18   Q.  I just want to ask you about the neighborhood that

19   Ralphael was in the day he got shot.

20   A.  Okay.

21   Q.  Have you seen that videotape?

22   A.  Yes.

23   Q.  How many times have you seen it?

24   A.  A lot.

25   Q.  Did your daughter live in that neighborhood?

```
 1    A.  She used to.

 2    Q.  At this time, 2011?

 3    A.  No.

 4    Q.  Had she lived there years previous to that?

 5    A.  Yes.

 6    Q.  Many years?  Several years?

 7    A.  Yes, maybe two years, maybe.

 8    Q.  And did Ralphael make friends with some of the kids in

 9    that neighborhood?

10    A.  Yes.

11    Q.  Is that a result of him going to visit your daughter?

12    A.  Yes, and staying over there with my daughter.

13    Q.  So when you learned that that's where he was shot, was

14    that surprising?

15              MS. FEATHERSTONE:  Objection.

16              THE COURT:  Overruled.

17    Q.  When you learned, ma'am, that that's where he was shot,

18    was that surprising?  Did you expect him to be in that

19    neighborhood?

20    A.  Yes.  He calls it a neighborhood.

21    Q.  Because he has friends there?

22    A.  Yes.

23    Q.  Do you go to church, ma'am?

24    A.  Yes, I do.

25              MS. FEATHERSTONE:  Objection, Your Honor.
```

```
 1              MS. WEST:  I'm going to tie it up, Judge.

 2   Q.  Did Ralphael attend church with you at times?

 3   A.  Yes, he did.

 4   Q.  Why are you here today, Ms. Lane?

 5              MS. FEATHERSTONE:  Objection, Your Honor.

 6              THE COURT:  Sustained.

 7   A.  Can I answer?

 8   Q.  No, you can't.

 9   A.  Okay.

10   Q.  You understand the process of the trial because you've

11   been sitting here, right?

12   A.  Yes.

13   Q.  Who takes your daughter to school now?

14   A.  She's old enough.  She takes herself.

15   Q.  Are there other things that Ralphael helped you with

16   that someone else has to do?

17   A.  No.

18   Q.  Do you do those things in your own home?

19   A.  Yes.

20   Q.  Every day?

21   A.  My daughter, she does it as well.

22   Q.  Does she still live with you, the little one that goes

23   to school?

24   A.  Yes.  She's 14.

25   Q.  And she takes herself to school now?
```

 1      A.   Yes.   She takes the bus.

 2               MS. WEST:   Thank you, Ms. Lane.

 3               THE WITNESS:   You're welcome.

 4               THE COURT:   Ms. Featherstone.

 5                         CROSS-EXAMINATION

 6      BY MS. FEATHERSTONE:

 7      Q.   Good afternoon, Ms. Lane.

 8      A.   Good afternoon.

 9      Q.   The cell phone that you testified about that Mr. Briscoe

10      had was silver, correct?

11      A.   It was black and silver.

12      Q.   The base of it was silver, and the face was black,

13      correct?

14      A.   To my knowledge, I think the base was black and around

15      it was silver, I think.

16      Q.   Like the top of the -- let's look at it again.

17      A.   Okay.

18               THE COURT:   Ms. Lane, could you make sure you

19      speak into the microphone, please.

20               THE WITNESS:   Sure.

21               THE COURT:   Thank you.

22      Q.   The top of the cell phone was silver, correct?

23      A.   Yes; silver going around, and then the back part is

24      black.

25      Q.   The back part is black?

1    A.   Yes.

2    Q.   Okay.  Now, you testified that you raised Mr. Briscoe,

3    correct?

4    A.   Yes.

5    Q.   On April 26, 2011 you were still considering yourself to

6    raise him, correct?

7    A.   Yes.

8    Q.   He wasn't working, correct?

9    A.   No.

10   Q.   You took care of all his financial needs?

11   A.   Yes.

12   Q.   You purchased his clothes?

13   A.   Yes.

14   Q.   You purchased his food?

15   A.   Yes.

16   Q.   You gave him bus fare?

17   A.   Yes.

18   Q.   And you said that what he did for you was assist you in

19   taking your grandson and your daughter to school each

20   morning?

21   A.   Yes.

22   Q.   And he did that for about six months?

23   A.   Yes, or maybe longer.

24   Q.   Or maybe longer.  Since the beginning of the school year

25   that year?

```
1    A.  Probably a little bit after the school year.

2    Q.  So after the school year started, then he started

3    helping out with taking them to school?

4    A.  Or it could have been the whole entire school year, I'm

5    not sure.

6    Q.  But he did it every day, you testified?

7    A.  Yes.

8    Q.  He would take them to school?

9    A.  Uh-huh.

10   Q.  And then he would pick them up in the evenings?

11   A.  Yes.

12   Q.  And during the day, you expected that he would be out

13   looking for a job?

14   A.  Yes.

15   Q.  But he never found one?

16   A.  No.

17   Q.  During the entire six months or so that he was doing

18   this for you with the children, he never found a job,

19   correct?

20   A.  No, but for -- no.

21   Q.  And he never started working anywhere?

22   A.  No.

23   Q.  He never started earning any income?

24   A.  No.

25   Q.  You testified that you would regularly go through his
```

1    things, correct?

2    A.  Yes.

3    Q.  You would check his room, correct?

4    A.  I would check his stuff.

5    Q.  In his room?

6    A.  He didn't have a room.

7    Q.  Oh, you would just go through his stuff?

8    A.  Yes.

9    Q.  Okay.  And he knew this?

10   A.  Yes.

11   Q.  He would see you going through his stuff?

12   A.  He knew I would go through his stuff, yes.

13   Q.  So if he did have something like this BB gun in his

14   possession, he wouldn't want you to find it, correct?

15          MR. PONDS:  Objection.

16          THE COURT:  Overruled.

17   Q.  Correct?

18   A.  I'm not sure.

19   Q.  If you found something like this, you say you would call

20   the police on him, right?

21   A.  I sure enough would.

22   Q.  Because this is a serious-looking weapon?

23   A.  It sure enough is.

24   Q.  You can pull the trigger back on it and everything,

25   right?

1    A.   I guess so.

2    Q.   So you would think this would be dangerous to have in

3    the house, right?

4    A.   If I didn't know what it was.

5    Q.   Now, you testified about the skinny jeans.

6    A.   Yes.

7    Q.   How they sagged down on him.

8    A.   Uh-huh.

9    Q.   You didn't see him on that day, on April 26, 2011,

10   around 2:00 in the afternoon, correct?

11   A.   No, I did not.

12   Q.   So you can't tell this jury how his jeans were on that

13   particular day, correct?

14   A.   That's all he wore, skinny jeans.

15   Q.   Right, but you couldn't tell them how they were fitting

16   him around 2:00?

17   A.   That's all he wore was skinny jeans.

18   Q.   I'm not asking you about the skinny jeans themselves,

19   but just how he was wearing them.

20   A.   When I'm not around, he would wear his pants hanging off

21   his thigh.

22   Q.   But you don't know that because you're not around,

23   correct?

24   A.   Correct.

25   Q.   You weren't on the scene of the incident when it

1   occurred, correct?

2   A.  I was at work.

3   Q.  So you don't know what transpired prior to him

4   interacting with the police, correct?

5   A.  I wasn't there.

6   Q.  You testified that the things that Mr. Briscoe used to

7   do around the house you now do, but you didn't say what

8   things he did around the house.  What things did he do

9   around the house, Ms. Lane?

10  A.  He would cook, clean, wash his clothes.

11  Q.  Cook for the entire family?

12  A.  Sometimes.

13  Q.  Who all lived in the house with you at the time?

14  A.  Myself, my daughter, and Ralphael.

15  Q.  The 14 -- the now-14-but-then-six-year-old daughter, was

16  she?

17  A.  No, she was between 9 or 10.

18  Q.  9 or 10, you said.  Did your grandson live with you at

19  the time?

20  A.  At the time my daughter was staying there so he can --

21  Ralphael could take him to school because she was pregnant.

22  Q.  The 27-year-old?

23  A.  Yes.

24  Q.  So she was living there as well?

25  A.  Just for a little while.

1    Q.  Was she contributing to the household as well?

2    A.  No.

3    Q.  Did she share any of the responsibilities with Ralphael

4    in keeping the house clean?

5    A.  No.

6    Q.  Did she share any responsibilities in cooking for the

7    family?

8    A.  No.

9    Q.  Did she share any responsibilities in doing anything for

10   the family while she lived there?

11   A.  No.

12   Q.  So it was all --

13   A.  Because she wasn't there.  She was only there at

14   nighttime.

15   Q.  So everything fell on Ralphael?

16   A.  No, not by hisself.

17   Q.  Who else assisted him?

18   A.  I assisted him sometimes.

19   Q.  Now, who lived in the Forest Ridge Apartments that

20   Mr. Briscoe was visiting?

21   A.  When are you talking about?

22   Q.  On April 26, 2011.

23   A.  I guess his friends.

24   Q.  So you don't know?

25   A.  No.

1    Q.  Because you really didn't know what Mr. Briscoe was

2    doing during the day, correct?

3    A.  Only what he told me.

4    Q.  Because you were at work at the Department of

5    Agriculture, right?

6    A.  Yes.

7    Q.  And you would get home at, say, 5:00 or 6:00 in the

8    evening?

9    A.  Yes.

10   Q.  So from 8:00 that morning until 6:00 in the evening

11   Mr. Briscoe did basically anything he wanted?

12          MS. WEST:  Objection; mischaracterizes earlier

13   testimony.

14          THE COURT:  Overruled.  You can answer.

15   A.  Repeat that again.

16   Q.  From I'll say 8:00 in the morning until approximately

17   6:00 in the evening Mr. Briscoe pretty much did anything he

18   wanted to do, correct?

19   A.  Not necessarily.  He was looking for a job because he

20   would text me the applications.

21   Q.  Because that's what he told you, correct?

22          MS. WEST:  Objection.

23   A.  And he would text me the applications.

24          MS. WEST:  Objection.  Objection.

25          THE COURT:  Sustained.

```
1    Q.  He never went on any interviews, did he?

2    A.  I'm not sure.

3    Q.  Now, during this time Mr. Briscoe -- during the time he

4    was living with you, Mr. Briscoe had been attending school

5    at some point, correct?

6    A.  He wasn't at the time.

7    Q.  Not at the time of the incident, but at some point when

8    he was living with you he was attending school?

9    A.  Are you talking about during that six months?

10   Q.  No, no, during the time that he lived with you, the 18

11   years.

12   A.  All through the -- yes, he went to school, yes.

13   Q.  And isn't it true that Mr. Briscoe attended five

14   different high schools?

15   A.  No.

16   Q.  He didn't go to Kennedy High School in Montgomery

17   County?

18   A.  He might have.  I'm not sure.  I don't remember.

19   Q.  He went to Central High School?

20   A.  Yes, he did.

21   Q.  He went to Anacostia High School?

22   A.  He probably did.

23   Q.  He went to Forestville High School?

24   A.  Yes.

25   Q.  And isn't it true that Mr. Briscoe attended all these
```

1    different high schools because he was getting suspended from

2    school?

3    A.   No, that's not true.

4    Q.   He didn't get into a big fight and get suspended from

5    school?

6    A.   That was only -- it was a bunch of them got suspended

7    from school, from Central.

8    Q.   It was who?

9    A.   It was a lot of kids.  They had a riot, and they put all

10   the kids -- I mean, a lot of kids out of the school.

11   Q.   And he was a part of that group?

12   A.   Yes.

13   Q.   And that was at Central?

14   A.   Yes.

15   Q.   And he ended up attending some alternative school?

16   A.   Yes.

17   Q.   And ultimately he left that school?

18   A.   He was done.  He finished it.

19   Q.   And that was 10th grade?

20   A.   I think so.

21   Q.   And so he never went back to school?

22   A.   He was -- I'm not sure.

23   Q.   Now, during the time prior to his death he did not

24   obtain a GED, correct?

25   A.   No, he did not.

1    Q.  And you weren't aware of anywhere he was going to take

2    GED classes, correct?

3    A.  He did.  He was prepping for a GED class when he was in

4    a program.

5    Q.  That's based on what he told you, correct?

6    A.  No, it wasn't based on what he told me.

7    Q.  You went to the class yourself?

8    A.  No.

9    Q.  I'm sorry, what was your answer, Ms. Lane?

10   A.  I said no.

11   Q.  And you would agree that when Mr. Briscoe was in school,

12   he did miss a significant amount of school, correct?

13   A.  Yes, he did.

14   Q.  And that was all while he was living with you, correct?

15   A.  I would send him, but he wouldn't go.  I thought he was

16   at school until they called -- until I seen his report card.

17   Q.  And that concerned you, right?

18   A.  Yes, it did.

19          MS. FEATHERSTONE:  Brief indulgence, Your Honor.

20   I'm almost done.

21          (Pause)

22   Q.  Did your oldest daughter complete high school?

23   A.  Yes, she did.

24   Q.  What high school did she complete?

25          MS. WEST:  Objection, relevance.

1    THE COURT:  You're going to link this up?

2    MS. FEATHERSTONE:  It goes to testimony that's

3    already in evidence, Your Honor, with regard to the

4    vocational rehab.

5    MS. WEST:  Of the daughter?

6    THE COURT:  Overruled.

7    Q.  You can answer.

8    A.  Yes.  She went to Forestville.

9    Q.  And she graduated?

10   A.  Yes, she did.

11   Q.  And you said you have a 21-year-old daughter?

12   A.  Yes.

13   Q.  Did she graduate as well?

14   A.  Yes, she did.

15   Q.  From which high school?

16   A.  Central.

17   Q.  Ms. Lane, you learned about -- you met Ms. McNeil prior

18   to trial today, correct?

19   A.  Excuse me?

20   Q.  You met Ms. McNeil prior to trial today, correct?

21   A.  Yes.

22   Q.  And you met her at a time when you were with your

23   investigator in the neighborhood, correct?

24   A.  Yes.

25   Q.  And she was talking to you about what she saw happen

1   that day, correct?

2   A.  Yes.

3   Q.  And you asked her to come into our office and testify on

4   your behalf, correct, for her deposition?

5   A.  No.  She told me she was going to come in and testify.

6   Q.  You didn't reach out to her and ask her to make sure --

7   A.  I asked her was she still going to be a witness.

8           MS. FEATHERSTONE:  I have nothing further, Your

9   Honor.

10          THE COURT:  Ms. West.

11          MS. WEST:  Briefly, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MS. WEST:

14  Q.  Ms. Featherstone just asked you if you'd asked somebody

15  if they would still be a witness; is that right?

16  A.  Yes.

17  Q.  A lot of people saw what happened that day, didn't they?

18          MS. FEATHERSTONE:  Objection.

19          THE COURT:  Overruled.

20  A.  Yes, they did.

21  Q.  Are they all willing to come here to be witnesses?

22          MS. FEATHERSTONE:  Objection, Your Honor.  Beyond

23  the scope.

24          THE COURT:  Overruled.

25  A.  Not all.

```
 1    Q.  Why is that?

 2              MS. FEATHERSTONE:  Objection.

 3              THE COURT:  Overruled.

 4    A.  Do I answer?

 5    Q.  Yes, ma'am.

 6    A.  They said they was -- they didn't want to get involved

 7    because of the police.

 8    Q.  Are they scared?

 9              MS. FEATHERSTONE:  Objection, Your Honor.

10    A.  Yes.

11              THE COURT:  Overruled.  Let's wrap this up.

12    Q.  You've been working with me for a few weeks on this

13    case, right?

14    A.  Yes.

15    Q.  So you've seen what I've done in my office?

16    A.  Yes, ma'am.

17    Q.  You've helped me with that?

18    A.  Yes, ma'am.

19    Q.  You're trying to help me with the witnesses?

20    A.  Yes, ma'am.

21    Q.  Ms. Featherstone also asked you about your daughters and

22    if they'd graduated from high school.

23    A.  Yes.

24    Q.  They didn't have -- did they have the same disabilities

25    that Ralphael had?
```

```
1    A.   No.

2    Q.   So here's a boy that you've testified or there's earlier

3    testimony -- and you were in the courtroom when this was

4    brought out -- who had ADHD --

5            MS. FEATHERSTONE:  Objection.

6            THE COURT:   Rephrase.

7    Q.   Did your boy have some disabilities?

8    A.   Yes.

9    Q.   And do you know what those disabilities were?

10   A.   Yes.

11   Q.   How is it that you know that he had disabilities?

12           MS. FEATHERSTONE:  Objection, Your Honor.  This is

13   beyond the scope.

14           THE COURT:   Overruled.

15   Q.   How do you know, ma'am, that he had those disabilities?

16   A.   I went to the doctor, and the doctor diagnosed him with

17   them.

18   Q.   So Ms. Featherstone asked you how many different high

19   schools he went to, remember?

20   A.   Yes.

21   Q.   Did he live with his father for a time?

22   A.   Yes.

23   Q.   Was that at one of those high schools?

24   A.   Yes.

25   Q.   And then a different one; is that right?
```

1   A.  Only one.

2   Q.  All right.  And when he was in a fight with some other

3   kids or at least with those kids who got in a fight --

4   A.  Yes.

5   Q.  -- right, in the wrong place at the wrong time, you get

6   kicked out of school, right?

7   A.  Yes.

8   Q.  So was he having to go to the alternative school?

9   A.  All of them had to go to the alternative school.

10  Q.  But with these disabilities, he finished that, didn't

11  he?

12  A.  Yes.

13  Q.  And he didn't give up, did he?

14  A.  No, he did not.

15  Q.  Did you --

16          THE COURT:  She's on direct.

17          MS. WEST:  Yes, Your Honor.

18          THE COURT:  She's not on cross.

19          MS. WEST:  I understand.

20          THE COURT:  Okay.  Proceed.

21  Q.  Was he preparing for a GED class?

22  A.  Yes, he was.

23  Q.  How do you know that?

24  A.  He was in a program, and in that program he did GED

25  prep, and they told me that he was ready.  I have

1    certificates that he was ready to take the GED test.

2    Q.  So he went to these different high schools, he finished

3    his alternative program, and then he was preparing for his

4    GED course.  Is that your testimony?

5    A.  Yes.

6    Q.  Did he give up, Ms. Lane?

7          MS. FEATHERSTONE:  Objection; asked and answered,

8    Your Honor.

9          THE COURT:  Sustained.

10   Q.  Ms. Featherstone also asked you if you were at the scene

11   of the incident.

12   A.  Yes.

13   Q.  How do you describe the scene, Ms. Lane?

14         MS. FEATHERSTONE:  Objection.

15         THE COURT:  Overruled.

16   A.  The crime scene?

17   Q.  Is it an incident?

18         MS. FEATHERSTONE:  Objection, Your Honor.

19         THE COURT:  You can answer.

20   Q.  What kind of incident was it, Ms. Lane?

21   A.  It was a tragedy.

22   Q.  Ms. Lane, do you see these iPhones I'm holding?

23   A.  Yes, ma'am.

24   Q.  What color are the faces?

25   A.  Black.

 1   Q.  Uh-huh.  Now, the phone that Ralphael had that you

 2   bought him, what kind of phone was it?

 3   A.  I'm not sure.

 4   Q.  All right.  Now, kids, when they wear these skinny

 5   jeans, do they also have different cases for their phones?

 6   A.  Yes.

 7   Q.  Did Ralphael have different cases for his phone that you

 8   know of?

 9   A.  I'm not sure.

10   Q.  All right.  Now, do you know that this is the phone that

11   he had with him that day?

12   A.  He loved that phone.

13   Q.  And how do you know that?

14   A.  Because he always was in the middle of taking pictures

15   with the phone.

16   Q.  And did you have an opportunity to see those pictures?

17   A.  Yes.

18   Q.  He shared those with you?

19   A.  Yes.

20              MS. WEST:  Thank you, Ms. Lane.

21              THE WITNESS:  You're welcome.

22              THE COURT:  Okay.  Thank you, Ms. Lane.

23              THE WITNESS:  You're welcome.

24              THE COURT:  Ladies and gentlemen, you've heard

25   testimony this afternoon regarding Mr. Briscoe's school

1    record and his attendance at various schools and things like

2    that.  I'm going to instruct you, as with the ADHD evidence

3    and the juvenile record evidence earlier today, that those

4    -- that testimony is relevant to the economic damages issues

5    in the case, but not relevant to his character or his

6    conduct on the day in question.  Is that clear?

7            Okay.  We are at 4:25.  Instead of calling a new

8    witness today, we're going to wrap up for the day and let

9    you all out a little bit early.  I would admonish you not to

10   talk about the case or avoid -- and to avoid any press

11   regarding the case, and obviously not to do any research

12   about the case.  Okay?

13           So you all have a nice night, and we will see you

14   at 9:15 in the morning.  Thank you.

15           (Jury exits courtroom)

16           MR. DeBERARDINIS:  I have something briefly, Your

17   Honor.

18           THE COURT:  Okay.  One brief issue?

19           MR. DeBERARDINIS:  One brief issue.

20           Your Honor, during the breaks Mr. Ponds was out in

21   the hall having a lengthy conversation with members of the

22   press.  Of course, the press is invited to be here, they can

23   report on whatever they've seen, but you would have thought

24   that suppression would have been the better part of valor

25   and that Mr. Ponds would not have been speaking to the press

1    about matters that are not going to be -- were not in trial,

2    and this can only cause us problems.

3              We would --

4              THE COURT:  Are you suggesting the jury cannot

5    follow my instructions?

6              MR. DeBERARDINIS:  Based upon that elevator thing

7    that we heard this morning, I'm not so sure.  We'd ask that

8    the Court instruct Mr. Ponds -- there's no need for him to

9    be talking to the press -- that he not talk to the press.

10             THE COURT:  Mr. Ponds?

11             MR. PONDS:  Your Honor, I've never made any public

12   statements to the press.  I know Keith Alexander, and

13   whether Mr. DeBerardinis likes it or not, I really candidly

14   don't care.  I've not been quoted in the press.  I will not

15   be quoted in the press until this case is over, and then

16   I'll make a decision at that point.

17             Ms. Lane has made no statements to the press.

18             THE COURT:  Okay.  I'll take that under

19   advisement, and if I conclude that there's anything I need

20   to do about it, I'll do something about it.

21             MR. PONDS:  I understand.

22             THE COURT:  But, you know, we're close to the end

23   of trial already.

24             MR. PONDS:  Very happy about that.

25             MR. DeBERARDINIS:  For planning purposes, Your

1    Honor --

2               THE COURT:  Yes.

3               MR. DeBERARDINIS:  -- we have an expert who lives

4    on the Tennessee border, Your Honor.  It's very problematic,

5    and we'd like to get some idea of when plaintiff is going to

6    wrap up here.

7               THE COURT:  Okay.  Mr. Ponds, first of all, who do

8    we have on tap for tomorrow?

9               MR. PONDS:  For tomorrow we have Jordan Katz,

10   Officer Coker, Dan Bartlett.

11              THE COURT:  Who is he?

12              MR. PONDS:  Dan Bartlett is the person who

13   examined the BB gun.

14              THE COURT:  Okay.  Firearms expert?

15              MR. PONDS:  That is correct.  Sergeant Gilgeous,

16   Detective --

17              THE COURT:  And -- okay.  What's the relevance of

18   Mr. Bartlett's testimony?

19              MR. PONDS:  Well, we want to be able --

20              THE COURT:  He's not the prints guy, right?

21              MR. PONDS:  No, no, no, no, no.  No.  He examined

22   the gun.  I believe his findings were the BB gun was

23   inoperable.

24              That's what I think.  I know that Ms. West is

25   going to be handling that witness, but that's my

1    recollection.

2            THE COURT:  Why is that relevant either to whether

3    he possessed the BB gun or what Officer Leo may have thought

4    of the BB gun?

5            MR. PONDS:  Well, it becomes relevant due to some

6    testimony by the defendants' expert.

7            THE COURT:  Which is what?

8            MR. PONDS:  Defendants' expert identified the

9    weapon from the video.  Even though we never received any

10   notice of it, he testified about that in his deposition;

11   that he knew that by observing the shadows that you see when

12   Ralphael runs outside of the complex, right outside the

13   complex with the cameras over the top of him.  He's going to

14   testify that that's a weapon, and he also --

15           THE COURT:  What does it matter whether it was

16   operable or inoperable?  Based on -- does it change shape

17   based on whether -- and therefore cast a different shadow if

18   it was inoperable?

19           MR. PONDS:  No.  Just to go a little bit further,

20   he's going to say that he could see the barrel, and it's my

21   understanding, when Mr. Bartlett examined the weapon, he

22   said there was no barrel.

23           THE COURT:  We have the weapon.  Isn't that the --

24   isn't there a barrel on the weapon?

25           MR. PONDS:  No.

1          THE COURT:  What are you referring to as the

2     barrel?

3          MR. PONDS:  I'm not the expert.  I don't know.  He

4     said, "There's no barrel."  Their expert says, "I know it's

5     a weapon because it has a barrel.  I can see the barrel."

6          THE COURT:  Did the expert say what the barrel --

7     is the barrel the thing that protrudes when the gun is

8     discharged, or is the barrel simply what laymen think of the

9     as the barrel of a gun?

10         MR. PONDS:  You've got to have that barrel in the

11    gun for the gun to be a gun; otherwise it's not a gun.  It's

12    not operable.

13         THE COURT:  How does that change the shape of the

14    gun?  I don't understand.

15         MR. PONDS:  It's not the issue of the shape.  He

16    says it is a gun, and that is my understanding of his

17    testimony.  And we should be able to put on Mr. Bartlett --

18         THE COURT:  Did we not deal with this in pretrial?

19         MR. PONDS:  No, we didn't.

20         THE COURT:  Mr. DeBerardinis, address this.

21         MR. DeBERARDINIS:  At best, this is rebuttal.  At

22    best.  He can't put on evidence assuming what Mr. -- what

23    the expert's going to say, so it's going to come in after

24    rebuttal.  And we believe --

25         THE COURT:  Let's see what their expert says.  If

1    there is a factual issue as to the shape or appearance of

2    the gun that would affect a claim or defense in the case,

3    you can put him on in rebuttal, but not in your case in

4    chief.  Okay?

5              MR. PONDS:  Okay.  That's fine.

6              THE COURT:  Let's cross off Mr. Bartlett for

7    tomorrow.

8              MR. PONDS:  And then we have Sergeant Gilgeous,

9    Detective Rahman -- and they may end up being rebuttal

10   witnesses also, Your Honor.

11             THE COURT:  Okay.

12             MR. PONDS:  Dr. Street.

13             THE COURT:  Treating physician.

14             MR. PONDS:  And Defendant Leo.

15             THE COURT:  That's right.

16             MR. PONDS:  Those are the witnesses -- well,

17   obviously Defendant Leo's here.

18             THE COURT:  Okay.  So that will get you through

19   the day tomorrow?

20             MR. PONDS:  Right.  And then our intention would

21   be to end with our expert on Thursday morning.

22             THE COURT:  Thursday morning.

23             MR. PONDS:  Well, we'll start with him Thursday

24   morning, and we anticipate that he should be completed,

25   direct and cross, by 11:00/11:30.

```
1              THE COURT:  Okay.  So Mr. DeBerardinis, does that

2     give you at least some idea of when your expert may need to

3     be available?  And we have Officer Sheehan on Friday

4     morning, correct?

5              MR. DeBERARDINIS:  Yes, Your Honor.

6              THE COURT:  Okay.

7              MR. DeBERARDINIS:  We should call -- we should

8     anticipate calling our expert Friday morning then, or Friday

9     afternoon.

10             THE COURT:  How long will Officer Sheehan take?  I

11    thought -- he's Friday morning.  Will he take all morning?

12             MR. DeBERARDINIS:  I don't know.  He will be very

13    brief.

14             THE COURT:  Okay.  I would like to recess Friday

15    afternoon.

16             MR. DeBERARDINIS:  Oh, great.

17             THE COURT:  Not recess for -- I'd like to recess

18    court Friday afternoon and start up on Monday, if necessary.

19             MR. DeBERARDINIS:  That would be -- that works

20    fabulously, Your Honor.

21             THE COURT:  Okay.  Let's plan on that.

22             MR. PONDS:  Your Honor, I just missed two other

23    witnesses, actually three more witnesses we may call.  Levy

24    Harley, who would be a very brief, like ten-minute, witness.

25             THE COURT:  Okay.
```

1              MS. FEATHERSTONE:  Your Honor, we would object to

2      Mr. Harley.

3              THE COURT:  On what grounds?

4              MS. FEATHERSTONE:  It's cumulative at this point.

5      They've had three civilian witnesses come in and testify.

6      Mr. Harley is another witness that they're intending to

7      offer the same testimony that has been offered by Ms. Inman,

8      Ms. McNeil, and Mr. Tyler.

9              THE COURT:  Is he at a different vantage point?

10     Did he see different things?

11             MR. PONDS:  He lives in the house next door;

12     different vantage point, overheard certain conversations.

13             THE COURT:  We'll allow Mr. Harley.  We dealt with

14     this at pretrial.

15             MR. PONDS:  And additionally we my call LaTonya

16     Boyd and Domenic Derricotte.  They were the couple, the

17     husband and wife, that were entering the complex as Ralphael

18     Briscoe ran past the passenger door where Ms. Boyd was

19     sitting.

20             THE COURT:  They were in the car?

21             MR. PONDS:  Yes, sir.

22             THE COURT:  Do we need both, or can we do with

23     one?

24             MR. PONDS:  We'd like both, but --

25             THE COURT:  Same angle.  Let's try to use one, one

1   or the other.

2           MR. PONDS:  Yes, sir.

3           THE COURT:  Okay.

4           Okay.  We'll see you all at 9:15 -- I'm sorry,

5   9:00 for the lawyers.

6           MR. PONDS:  Your Honor, can I just ask one last

7   question?

8           THE COURT:  Sure.

9           MR. PONDS:  For planning purposes, is it the

10  Court's intention, after we finish with the testimony of

11  Officer Sheehan on Friday morning, to recess at that point

12  until --

13          THE COURT:  I'd like to go until lunch on Friday.

14  I don't know how long Officer Sheehan is going to take.  If

15  we can put in another witness before lunch, let's try to do

16  that.

17          MR. PONDS:  Okay.

18          THE COURT:  So I can't say without knowing how

19  long he's going to take.

20          MR. PONDS:  Thank you so much, Your Honor.

21              (Whereupon the hearing was

22              adjourned at 4:40 p.m.)

23

24

25

1      **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4      certify that the above and foregoing constitutes a true and

5      accurate transcript of my stenographic notes and is a full,

6      true and complete transcript of the proceedings to the best

7      of my ability.

8          Dated this 14th day of July, 2015.

9

10                                  /s/Lisa A. Moreira, RDR, CRR
                                    Official Court Reporter
11                                  United States Courthouse
                                    Room 6718
12                                  333 Constitution Avenue, NW
                                    Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

# $

**$100,000** [2] - 14:23, 14:25
**$20** [2] - 35:18, 35:20
**$25,000** [3] - 37:20, 37:22
**$30,000** [2] - 29:12, 37:23
**$31,920** [1] - 13:18
**$32,500** [1] - 13:14
**$40** [1] - 35:20
**$40,000** [4] - 35:15, 36:4, 38:22, 39:1
**$54,000** [1] - 27:8
**$7,800** [1] - 34:24
**$740,000** [3] - 12:2, 18:6, 21:2
**$740,017** [1] - 11:24, 12:8, 20:23
**$750,000** [2] - 34:12, 37:1
**$8,000** [1] - 35:4
**$80,000** [1] - 14:25

# '

**'13** [1] - 44:6
**'14** [1] - 24:7
**'60s** [1] - 39:25
**'77** [2] - 6:8, 6:9
**'83** [1] - 6:11
**'87** [1] - 6:17

# /

**/s/Lisa** [1] - 125:10

# 1

**1** [1] - 33:19
**10** [10] - 13:16, 19:25, 20:9, 20:11, 20:14, 33:14, 42:1, 81:3, 103:17, 103:18
**10th** [3] - 17:9, 32:20, 107:19
**11** [1] - 11:6
**11:00/11:30** [1] - 121:25
**12** [2] - 13:8, 13:15
**125** [1] - 8:6
**1250** [1] - 1:14
**1325** [1] - 1:18
**14** [4] - 8:13, 77:8, 97:24, 103:15
**145** [1] - 8:12
**15** [5] - 19:25, 34:20, 34:21, 34:22, 42:1
**16** [1] - 76:15
**17** [1] - 86:11

# 2

**18** [5] - 10:1, 36:19, 85:21, 85:23, 106:10
**19** [3] - 13:3, 18:19, 33:20
**19-year-old** [1] - 10:1
**1968** [1] - 5:25
**1970** [1] - 6:1
**1975** [2] - 6:4, 6:8
**1980** [2] - 6:9, 6:11
**1983** [1] - 6:15
**1985** [1] - 6:17
**1987** [1] - 6:18
**1:12-cv-00514-CRC** [1] - 1:3

# 2

**2** [2] - 78:4, 78:6
**20** [7] - 20:24, 28:13, 28:16, 28:20, 28:21, 31:8
**20001** [3] - 2:4, 2:12, 125:12
**20005** [1] - 1:19
**2002** [1] - 44:4
**2003** [1] - 6:19
**20037** [1] - 1:15
**2011** [12] - 24:6, 44:11, 47:2, 73:24, 82:5, 83:21, 88:19, 90:6, 96:2, 99:5, 102:9, 104:22
**2012** [2] - 24:7, 44:6
**2013** [4] - 9:20, 11:7, 20:24, 24:7
**2015** [2] - 1:5, 125:8
**2017** [4] - 34:24, 35:11, 35:22, 38:25
**202** [3] - 1:16, 1:20, 2:4
**202-354-3187** [1] - 2:12
**21** [2] - 3:4, 77:8
**21-year-old** [1] - 109:11
**23** [2] - 77:3, 77:9
**236-2042** [1] - 1:20
**2438** [1] - 44:12
**24th** [1] - 1:14
**25** [9] - 35:1, 35:4, 35:16, 35:17, 35:22, 36:4, 36:13, 36:14, 38:21
**25-year-old** [1] - 35:3
**26** [4] - 73:24, 99:5, 102:9, 104:22
**26th** [10] - 44:11, 47:2, 47:17, 47:19, 55:10, 73:20, 82:5, 83:21, 88:18, 90:6

# 27

**27** [1] - 77:8
**27-year-old** [1] - 103:22
**29B** [3] - 86:3, 86:18, 86:21
**2:00** [2] - 102:10, 102:16

# 3

**3** [3] - 1:5, 78:4, 78:6
**30** [12] - 7:9, 15:12, 30:22, 31:8, 32:23, 34:17, 39:18, 40:2, 42:22, 43:6, 57:12, 74:21
**30-plus** [1] - 8:2
**30-some** [1] - 37:19
**300** [1] - 1:15
**31** [1] - 37:3
**32** [1] - 37:3
**33** [1] - 41:7
**333** [2] - 2:11, 125:12
**333-2922** [1] - 1:16
**35** [3] - 5:15, 39:18, 74:21
**37** [1] - 3:5
**3:30** [1] - 65:2

# 4

**4** [11] - 15:11, 17:22, 24:2, 24:4, 24:6, 24:7, 29:1, 36:19, 81:4
**40** [3] - 5:20, 7:10, 29:1
**401(k** [1] - 14:8
**403** [1] - 94:7
**403B** [1] - 14:8
**43** [1] - 3:6
**441** [1] - 2:3
**46** [1] - 76:1
**4:25** [1] - 116:7
**4:40** [1] - 124:22

# 5

**5** [2] - 3:4, 81:4
**5.1** [1] - 14:11
**50** [6] - 8:12, 8:16, 30:21, 31:4, 34:5, 34:6
**500** [1] - 1:19
**51** [3] - 12:22, 13:3, 13:22
**52** [2] - 34:8
**53** [3] - 16:1, 16:2, 18:5
**55** [1] - 9:1
**57** [1] - 3:7

# 5:00

**5:00** [1] - 105:7

# 6

**6** [2] - 23:25, 80:4
**60** [1] - 9:1
**63** [1] - 3:7
**65** [1] - 8:3
**6718** [2] - 2:11, 125:11
**6:00** [3] - 105:7, 105:10, 105:17

# 7

**7** [1] - 84:23
**70** [1] - 7:12
**72** [3] - 12:20, 14:14, 18:17
**724-6600** [1] - 2:4
**73** [1] - 35:13
**740,000-plus** [1] - 41:4
**75** [1] - 3:9

# 8

**80** [1] - 14:23
**8:00** [2] - 105:10, 105:16

# 9

**9** [5] - 13:8, 13:15, 81:3, 103:17, 103:18
**93F** [1] - 55:6
**98** [1] - 3:9
**9:00** [1] - 124:5
**9:15** [2] - 116:14, 124:4
**9:19** [1] - 1:5

# A

**a.m** [1] - 1:5
**abandoned** [1] - 66:16
**ability** [1] - 125:7
**able** [12] - 46:23, 66:12, 66:13, 66:14, 78:3, 80:23, 84:4, 84:8, 84:12, 89:3, 118:19, 120:17
**absent** [1] - 19:24
**absolute** [2] - 14:15, 19:11
**absolutely** [15] - 9:11, 19:2, 19:17, 20:18, 20:20, 22:9, 29:10, 38:5, 39:5, 39:7, 40:1, 40:3, 40:22, 41:2, 67:24
**academia** [2] - 5:16, 8:2
**academic** [3] - 5:15,

**7:8, 8:7**
**accept** [2] - 28:9, 28:17
**accepted** [2] - 28:6, 36:16
**according** [1] - 35:4
**account** [3] - 14:8, 33:1, 41:7
**accurate** [2] - 86:14, 125:5
**active** [1] - 5:14
**actual** [1] - 37:13
**add** [1] - 13:24
**added** [2] - 7:11, 14:12
**addition** [2] - 13:23, 65:25
**additionally** [1] - 123:15
**address** [2] - 65:6, 120:20
**adequate** [1] - 22:18
**ADHD** [3] - 95:12, 112:4, 116:2
**adjourned** [1] - 124:22
**adjust** [1] - 15:7
**adjustment** [1] - 15:12
**adjustments** [4] - 10:21, 13:24, 15:8, 17:21
**administration** [1] - 6:3
**admitted** [3] - 55:5, 84:22, 86:21
**admonish** [1] - 116:9
**advancements** [1] - 17:23
**advice** [2] - 7:6, 7:15
**advisement** [2] - 71:25, 117:19
**affect** [1] - 121:2
**African** [3] - 10:2, 30:10, 30:14
**African-American** [1] - 10:2
**African-Americans** [2] - 30:10, 30:14
**afternoon** [16] - 5:3, 5:8, 21:10, 21:11, 42:23, 43:14, 57:19, 57:20, 65:1, 75:21, 75:22, 98:7, 98:8, 102:10, 115:25, 122:9, 122:15, 122:18
**AFTERNOON** [1] - 1:10
**afterwards** [1] - 75:12
**Age** [1] - 36:21
**age** [24] - 12:20, 12:21, 12:22, 13:3, 13:22,

14:14, 14:15, 17:25, 18:19, 20:1, 26:2, 26:25, 30:16, 33:15, 33:20, 35:3, 35:17, 35:25, 36:8, 36:13, 38:8, 38:21, 84:19
**agency** [1] - 78:7
**ago** [2] - 39:21, 40:11
**agree** [3] - 29:21, 74:8, 108:11
**Agriculture** [3] - 76:13, 76:19, 105:5
**ahead** [3] - 39:18, 63:20, 89:2
**aided** [1] - 1:25
**ain't** [2] - 58:15, 64:17
**AL** [1] - 1:6
**Alexander** [1] - 117:12
**alive** [5] - 14:24, 18:16, 18:19, 93:12, 93:23
**allegation** [1] - 69:2
**allow** [2] - 79:18, 94:7, 123:13
**allowance** [1] - 23:21
**allowed** [3] - 33:5, 65:13, 65:18
**almost** [2] - 27:25, 108:20
**alternative** [4] - 107:15, 113:8, 113:9, 114:3
**ambulance** [8] - 56:24, 57:7, 57:11, 61:24, 62:24, 63:1, 63:4, 63:6
**ambush** [1] - 70:19
**America** [3] - 23:23, 24:13, 24:17
**American** [5] - 5:13, 6:15, 6:18, 10:2, 25:21
**Americans** [4] - 27:7, 30:10, 30:14
**amount** [10] - 10:20, 10:25, 12:5, 12:10, 12:11, 13:18, 14:3, 20:22, 24:10, 108:12
**Anacostia** [1] - 106:21
**analysis** [8] - 9:23, 10:2, 11:3, 11:4, 11:11, 14:25, 17:5
**and..** [1] - 50:20
**angle** [1] - 123:25
**ANNE** [2] - 1:17, 1:18
**Anne** [1] - 8:17
**annual** [1] - 13:13
**answer** [8] - 33:6, 89:9, 97:7, 105:14, 108:9, 109:7, 111:4,

114:19
**answer's** [1] - 22:4
**answered** [3] - 79:21, 90:13, 114:7
**answers** [1] - 11:8
**Anthony** [1] - 21:21
**anticipate** [3] - 41:25, 121:24, 122:8
**apartment** [8] - 44:10, 46:2, 46:4, 46:11, 47:12, 51:9, 51:25, 63:22
**apartments** [2] - 58:17, 58:18
**Apartments** [2] - 61:5, 104:19
**apologize** [1] - 68:13
**appear** [1] - 71:8
**appearance** [1] - 121:1
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:12
**applications** [2] - 105:20, 105:23
**applies** [3] - 17:7, 20:4, 41:12
**approach** [10] - 20:17, 42:4, 49:2, 50:2, 54:21, 78:17, 85:25, 88:5, 92:16, 94:21
**approximate** [1] - 54:24
**April** [16] - 9:19, 11:6, 44:10, 47:1, 47:17, 47:19, 55:10, 73:20, 73:24, 82:5, 83:21, 88:18, 90:6, 99:5, 102:9, 104:22
**area** [6] - 5:25, 6:1, 6:3, 6:24, 8:3, 44:23
**areas** [1] - 10:9
**argue** [4] - 30:20, 66:13, 66:14, 72:25
**arm** [1] - 53:8
**arms** [1] - 59:12
**arrive** [2] - 63:1, 91:17
**arriving** [1] - 12:13
**articles** [3] - 8:3, 85:9, 85:17
**Arundel** [1] - 8:17
**assessment** [1] - 41:12
**assist** [2] - 61:25, 99:18
**assistant** [3] - 6:7, 76:20, 76:23
**assisted** [2] - 104:17, 104:18

**associate** [1] - 6:9
**associated** [1] - 27:19
**assume** [1] - 68:7
**assumed** [1] - 62:23
**assuming** [2] - 62:21, 120:22
**assumption** [2] - 17:22, 31:17
**assumptions** [2] - 17:6, 17:19
**attained** [1] - 17:14
**attaining** [1] - 13:9
**Attainment** [1] - 36:19
**attend** [1] - 97:2
**attendance** [1] - 116:1
**attended** [2] - 106:13, 106:25
**attending** [3] - 106:4, 106:8, 107:15
**attention** [3] - 34:20, 47:1, 58:14
**ATTORNEY** [1] - 2:3
**attributes** [1] - 27:19
**attrition** [1] - 34:10
**audible** [1] - 4:12
**audiotaped** [1] - 74:1
**authority** [1] - 28:5
**automobiles** [2] - 33:2, 39:8
**available** [6] - 10:14, 10:15, 10:25, 12:2, 41:14, 122:3
**Avenue** [2] - 2:11, 125:12
**average** [32] - 13:13, 13:16, 13:19, 14:10, 14:11, 14:15, 16:3, 23:22, 23:23, 24:13, 25:6, 25:10, 25:17, 26:6, 26:9, 26:11, 26:12, 26:14, 26:19, 26:21, 27:6, 28:21, 29:9, 29:12, 29:13, 29:18, 29:24, 30:7, 36:2, 36:3, 36:25
**averages** [4] - 15:11, 16:1, 25:7, 25:10
**avoid** [1] - 116:10
**awarded** [5] - 5:23, 6:1, 6:3, 6:10, 6:18, 6:19
**aware** [5] - 36:12, 62:5, 65:16, 72:3, 108:1

**B**

**baby** [1] - 77:25
**bachelor** [1] - 5:23
**back-up** [3] - 62:19,

62:22, 62:23
**bad** [1] - 35:5
**bag** [1] - 67:19
**balance** [1] - 9:2
**balconies** [2] - 63:24, 63:25
**Baltimore** [1] - 8:18
**bank** [2] - 7:22, 41:7
**barrel** [12] - 119:20, 119:22, 119:24, 120:2, 120:4, 120:5, 120:6, 120:7, 120:8, 120:9, 120:10
**Bartlett** [5] - 118:10, 118:12, 119:21, 120:17, 121:6
**Bartlett's** [1] - 118:18
**base** [2] - 98:12, 98:14
**based** [25] - 8:24, 8:25, 10:24, 11:23, 12:21, 13:19, 15:5, 17:17, 29:7, 30:10, 34:2, 35:25, 36:10, 38:21, 39:3, 41:12, 51:24, 65:17, 66:10, 92:23, 108:5, 108:6, 117:6, 119:16, 119:17
**basic** [1] - 20:18
**basis** [7] - 20:12, 46:24, 67:14, 71:3, 71:6, 71:10, 84:4
**bathroom** [2] - 42:10, 42:15, 43:3
**BB** [7] - 85:7, 85:8, 101:13, 118:13, 118:22, 119:3, 119:4
**becomes** [1] - 119:5
**becoming** [1] - 64:2
**BEFORE** [1] - 1:10
**beginning** [1] - 99:24
**behalf** [1] - 110:4
**behind** [2] - 58:8, 87:8
**belief** [1] - 58:22
**belongs** [1] - 33:9
**below** [4] - 26:20, 27:10, 27:13, 87:3
**bench** [7] - 42:5, 42:8, 43:1, 78:19, 80:3, 92:18, 94:10
**benefit** [2] - 14:4, 14:5
**benefits** [9] - 9:24, 10:3, 11:17, 13:24, 13:25, 14:3, 16:16, 27:20, 41:10
**best** [5] - 29:22, 30:23, 120:21, 120:22, 125:6
**better** [1] - 116:24
**between** [6] - 13:8,

62:22, 62:23
**bad** [1] - 35:5
**bag** [1] - 67:19
**balance** [1] - 9:2
**balconies** [2] - 63:24, 63:25
**Baltimore** [1] - 8:18
**bank** [2] - 7:22, 41:7
**barrel** [12] - 119:20, 119:22, 119:24, 120:2, 120:4, 120:5, 120:6, 120:7, 120:8, 120:9, 120:10
35:21, 37:22, 66:3, 81:2, 103:17
**beyond** [5] - 14:17, 38:1, 79:11, 110:22, 112:13
**big** [1] - 107:4
**biggest** [1] - 31:12
**BILLY** [1] - 1:13
**Bird** [8] - 13:6, 13:11, 13:16, 17:8, 17:13, 21:21, 30:13
**Bird's** [5] - 9:23, 10:24, 11:6, 13:4, 17:4
**bird's** [1] - 41:13
**bit** [5] - 45:15, 89:2, 100:1, 116:9, 119:19
**black** [15] - 30:16, 31:5, 31:10, 31:13, 36:13, 39:23, 40:10, 52:16, 59:6, 98:11, 98:12, 98:14, 98:24, 98:25, 114:25
**blankets** [1] - 43:9
**BLS** [5] - 27:21, 27:23, 27:25, 28:11, 36:10
**blue** [1] - 48:20
**bono** [2] - 7:20, 7:24
**border** [1] - 118:4
**borrow** [1] - 7:22
**bottom** [2] - 26:19, 33:14, 49:15
**bought** [4] - 86:13, 88:13, 89:18, 115:2
**boy** [7] - 53:18, 78:11, 78:13, 85:21, 86:14, 112:2, 112:7
**Boyd** [2] - 123:16, 123:18
**boyfriend** [9] - 51:4, 51:10, 51:17, 51:22, 52:1, 52:17, 58:18, 58:20, 58:25
**break** [7] - 42:22, 43:5, 43:6, 65:1, 65:6, 80:7, 80:8
**breaks** [1] - 116:20
**BRIDZETTE** [3] - 1:3, 3:8, 75:18
**Bridzette** [3] - 9:14, 75:17, 75:24
**brief** [7] - 59:14, 75:8, 108:19, 116:18, 116:19, 122:13, 122:24
**briefly** [4] - 42:4, 63:11, 110:11, 116:16
**bring** [2] - 25:10, 50:21

**Briscoe** [40] - 10:16, 10:23, 11:20, 13:17, 15:20, 17:7, 17:14, 19:10, 23:1, 28:25, 30:22, 32:15, 34:1, 34:12, 34:24, 38:22, 41:6, 57:21, 59:10, 59:18, 60:3, 60:14, 60:22, 61:25, 62:9, 73:22, 73:25, 98:9, 99:2, 103:6, 104:20, 105:1, 105:11, 105:17, 106:3, 106:4, 106:13, 106:25, 108:11, 123:18
**Briscoe's** [11] - 9:25, 10:19, 12:6, 12:19, 13:5, 13:6, 13:12, 13:20, 16:2, 66:13, 115:25
**broad** [1] - 12:15
**brought** [2] - 79:16, 112:4
**bulk** [1] - 25:13
**bumped** [2] - 52:20, 53:8
**bunch** [1] - 107:6
**Bureau** [2] - 27:14, 36:18
**bus** [4] - 81:17, 90:16, 98:1, 99:16
**buses** [3] - 81:5, 81:6, 83:17
**business** [5] - 6:2, 7:7, 7:14, 7:19, 85:15
**businesses** [1] - 7:21
**butt** [10] - 49:15, 85:11, 87:10, 89:23, 89:25, 90:4, 90:5, 90:9, 90:19
**butt-call** [1] - 90:4
**butt-dial** [1] - 90:9
**butt-dialing** [1] - 90:4
**buy** [5] - 29:12, 29:12, 33:1, 33:2, 37:16
**BY** [11] - 5:6, 21:9, 37:11, 43:17, 57:18, 63:13, 75:20, 80:10, 94:11, 98:6, 110:13

---

### C

**CA** [1] - 1:3
**calculate** [5] - 5:19, 10:13, 13:20, 16:8, 27:18
**calculated** [2] - 26:18, 32:17
**calculation** [1] - 24:6

**calculations** [2] - 9:25, 21:1
**cameras** [1] - 119:13
**candidly** [1] - 117:13
**cannot** [4] - 69:10, 72:5, 73:3, 117:4
**capture** [1] - 27:19
**captured** [1] - 11:9
**car** [5] - 32:7, 52:15, 59:2, 67:5, 123:20
**card** [1] - 108:16
**care** [2] - 99:10, 117:14
**career** [1] - 7:4
**Carolina** [1] - 76:3
**Carroll** [1] - 8:18
**cars** [9] - 33:8, 45:21, 45:22, 45:23, 45:24, 61:17, 61:20
**case** [31] - 4:10, 6:25, 9:6, 9:15, 9:20, 10:12, 11:3, 11:5, 19:23, 20:4, 21:23, 22:25, 26:22, 40:21, 65:2, 65:3, 70:19, 70:24, 73:13, 79:12, 93:1, 93:2, 111:13, 116:5, 116:10, 116:11, 116:12, 117:15, 121:2, 121:3
**cases** [4] - 7:18, 8:10, 8:17, 18:1, 19:19, 115:5, 115:7
**cash** [1] - 7:1
**cast** [1] - 119:17
**casual** [3] - 23:6, 23:11, 23:17
**cat's** [1] - 67:19
**catalog** [1] - 6:23
**category** [1] - 23:5
**caught** [3] - 19:23, 81:4, 81:6
**cell** [12] - 86:13, 86:15, 88:11, 88:14, 88:17, 88:21, 89:5, 89:15, 89:17, 92:7, 98:9, 98:22
**Census** [1] - 36:17
**Central** [3] - 106:19, 107:7, 107:13
**central** [3] - 29:23, 30:8, 109:16
**certain** [4] - 10:21, 15:15, 82:12, 123:12
**certainly** [5] - 26:1, 30:4, 30:6, 31:16, 39:20
**certainty** [3] - 19:11, 20:7, 41:11
**CERTIFICATE** [1] -

125:1
**certificates** [1] - 114:1
**certify** [1] - 125:4
**cetera** [3] - 24:7, 24:8
**chaired** [1] - 6:17
**challenge** [1] - 78:23
**challenged** [1] - 79:7
**chance** [1] - 14:23
**change** [4] - 30:21, 40:19, 119:16, 120:13
**changed** [1] - 31:3
**changes** [2] - 40:4, 40:6
**changing** [1] - 12:25
**character** [1] - 116:5
**chasing** [1] - 62:9
**check** [2] - 101:3, 101:4
**checked** [1] - 84:18
**chief** [1] - 121:4
**children** [7] - 33:2, 35:8, 37:18, 77:4, 77:6, 77:20, 100:18
**chooses** [1] - 22:25
**CHRISTOPHER** [1] - 1:10
**church** [2] - 96:23, 97:2
**cigarette** [3] - 50:19, 50:22, 50:25
**cigarettes** [2] - 47:5, 51:12
**circumstances** [1] - 29:20
**citation** [1] - 36:15
**civil** [1] - 70:19
**civilian** [1] - 123:5
**claim** [3] - 93:1, 93:9, 121:2
**class** [3] - 108:3, 108:7, 113:21
**classes** [1] - 108:2
**classroom** [1] - 21:18
**clean** [2] - 103:10, 104:4
**clear** [2] - 73:10, 116:6
**clearly** [2] - 70:13, 72:10
**close** [3] - 79:16, 79:19, 117:22
**closest** [1] - 60:22
**closing** [1] - 72:25
**clothes** [4] - 15:22, 82:23, 99:12, 103:10
**clothing** [5] - 15:17, 37:18, 84:6, 85:9, 87:14
**Co** [2] - 44:12, 44:13
**Co-Op** [2] - 44:12,

44:13
**Coker** [1] - 118:10
**cold** [3] - 43:9, 93:25, 94:1
**collect** [1] - 89:3
**collected** [1] - 38:10
**College** [3] - 5:24, 6:2, 6:4
**college** [1] - 28:22
**color** [1] - 114:24
**COLUMBIA** [2] - 1:1, 1:6
**Columbia** [1] - 8:15
**coming** [10] - 26:11, 51:14, 53:1, 53:5, 53:16, 56:18, 59:4, 66:7, 66:10
**comma** [1] - 11:25
**commonest** [1] - 38:13
**communicating** [1] - 4:7
**Communications** [1] - 6:12
**community** [1] - 38:13
**commuting** [1] - 15:17
**compared** [1] - 31:6
**compiles** [1] - 36:11
**complaint** [1] - 11:7
**complete** [8] - 30:15, 31:9, 33:6, 39:15, 39:16, 108:22, 108:24, 125:6
**completed** [1] - 121:24
**complex** [13] - 44:10, 46:2, 46:4, 46:11, 46:14, 46:18, 51:9, 51:25, 53:1, 63:22, 119:12, 119:13, 123:17
**compounding** [1] - 24:10
**compress** [1] - 13:2
**computer** [3] - 1:25, 22:16, 25:24
**computer-aided** [1] - 1:25
**Comsat** [1] - 6:12
**concepts** [1] - 20:19
**concern** [2] - 65:10, 70:23
**concerned** [2] - 4:17, 108:17
**concerning** [3] - 7:7, 70:5, 72:4
**concerns** [2] - 7:7, 7:14
**conclude** [2] - 74:23, 117:19

**conclusion** [4] - 11:19, 20:22, 23:4, 40:20
**conclusions** [1] - 20:6
**conduct** [2] - 72:24, 116:6
**conducting** [1] - 60:1
**conference** [6] - 42:7, 43:1, 78:18, 80:3, 92:17, 94:10
**confused** [1] - 81:10
**connection** [1] - 73:24
**conscious** [3] - 93:15, 93:16, 93:21
**consequently** [1] - 33:18
**conservative** [8] - 11:10, 17:18, 19:15, 20:17, 20:19, 40:25, 41:2, 41:3
**consider** [4] - 8:21, 12:13, 23:16, 23:22
**considered** [3] - 17:15, 38:3, 38:15
**considering** [1] - 99:5
**consistent** [3] - 17:4, 20:15, 39:1
**constitutes** [1] - 125:4
**Constitution** [2] - 2:11, 125:12
**construction** [1] - 39:4
**consultant** [1] - 7:5
**consumption** [11] - 15:14, 15:15, 15:24, 16:4, 18:2, 18:9, 31:19, 32:11, 32:16, 32:18, 35:14
**contacted** [1] - 9:19
**context** [1] - 74:4
**contingent** [2] - 9:7, 9:12
**continue** [3] - 15:6, 29:24, 92:3
**CONTINUED** [1] - 1:22, 2:1
**contributed** [1] - 35:7
**contributes** [1] - 14:3
**contributing** [1] - 104:1
**contribution** [2] - 14:7, 14:11
**conversation** [5] - 67:3, 67:15, 69:5, 69:21, 116:21
**conversations** [1] - 123:12
**cook** [2] - 103:10, 103:11
**cooking** [1] - 104:6
**COOPER** [1] - 1:10

**copy** [1] - 11:7
**Corporation** [1] - 6:13
**correct** [78] - 22:6,
22:8, 22:21, 23:4,
24:9, 24:12, 24:15,
26:5, 26:8, 26:23,
26:24, 27:11, 29:3,
29:17, 30:1, 31:15,
32:2, 32:4, 32:6,
32:8, 34:13, 34:25,
35:2, 36:5, 38:23,
39:10, 40:13, 57:22,
57:24, 59:4, 59:19,
60:1, 60:3, 60:11,
60:17, 61:15, 61:18,
61:22, 61:25, 63:2,
63:7, 66:6, 93:19,
93:21, 98:10, 98:13,
98:22, 99:3, 99:6,
99:8, 100:19, 101:1,
101:3, 101:14,
101:17, 102:10,
102:13, 102:23,
102:24, 103:1,
103:4, 105:2,
105:18, 105:21,
106:5, 107:24,
108:2, 108:5,
108:12, 108:14,
109:18, 109:20,
109:23, 110:1,
110:4, 118:15, 122:4
**cost** [2] - 15:7, 17:21
**cough** [2] - 79:25, 80:5
**counsel** [4] - 11:8,
68:5, 74:7, 78:17
**country** [5] - 24:24,
24:25, 34:4, 36:22,
37:2
**County** [3] - 8:18,
106:17
**couple** [4] - 34:14,
52:11, 69:19, 123:16
**course** [13] - 7:1, 7:2,
9:24, 10:4, 28:8,
28:10, 29:16, 46:22,
59:23, 75:13, 114:4,
116:22
**courses** [1] - 6:25
**Court** [20] - 2:10, 2:10,
8:15, 65:6, 65:10,
65:13, 65:15, 65:18,
65:24, 66:19, 67:13,
69:1, 71:12, 72:2,
72:4, 72:8, 72:9,
93:22, 117:8, 125:10
**COURT** [185] - 1:1, 4:2,
4:9, 4:11, 4:16, 4:20,
4:23, 5:3, 10:6, 10:8,
15:5, 21:4, 33:7,

37:5, 37:8, 41:19,
41:24, 42:3, 42:6,
42:11, 42:21, 43:2,
43:8, 43:12, 45:3,
45:14, 45:17, 47:10,
48:4, 49:3, 49:10,
50:3, 50:9, 52:3,
54:22, 56:13, 57:16,
59:15, 63:10, 64:24,
65:8, 66:1, 66:20,
67:7, 67:10, 67:19,
67:21, 67:25, 68:2,
68:9, 68:12, 68:14,
68:19, 69:4, 69:9,
69:14, 69:21, 69:24,
70:8, 70:11, 70:16,
71:15, 71:19, 71:24,
72:12, 72:22, 73:4,
73:6, 73:11, 73:14,
74:3, 74:14, 74:16,
74:19, 74:22, 75:1,
75:5, 75:7, 75:11,
75:15, 77:16, 78:16,
78:20, 79:1, 79:18,
79:22, 80:1, 80:4,
80:7, 80:20, 83:11,
84:17, 86:1, 86:21,
88:1, 88:7, 88:10,
88:24, 89:8, 91:3,
92:13, 92:16, 92:19,
92:22, 92:25, 93:5,
93:11, 93:14, 93:18,
94:2, 94:9, 94:16,
94:22, 95:7, 95:15,
96:16, 97:6, 98:4,
98:18, 98:21,
101:16, 105:14,
105:25, 109:1,
109:6, 110:10,
110:19, 110:24,
111:3, 111:11,
112:6, 112:14,
113:16, 113:18,
113:20, 114:9,
114:15, 114:19,
115:22, 115:24,
116:18, 117:4,
117:10, 117:18,
117:22, 118:2,
118:7, 118:11,
118:14, 118:17,
118:20, 119:2,
119:7, 119:15,
119:23, 120:1,
120:6, 120:13,
120:18, 120:20,
120:25, 121:6,
121:11, 121:13,
121:15, 121:18,
121:22, 122:1,
122:6, 122:10,

122:14, 122:17,
122:21, 122:25,
123:3, 123:9,
123:13, 123:20,
123:22, 123:25,
124:3, 124:8,
124:13, 124:18,
125:1
**court** [3] - 5:20, 9:3,
122:18
**Court's** [4] - 66:9,
73:12, 74:4, 124:10
**Courthouse** [2] - 2:11,
125:11
**courtroom** [6] - 4:19,
65:4, 68:3, 75:14,
112:3, 116:15
**courts** [1] - 8:14
**covered** [1] - 16:13
**create** [2] - 26:21,
40:21
**crime** [1] - 114:16
**criminal** [1] - 70:18
**cross** [8] - 67:14,
78:22, 79:8, 79:15,
79:17, 113:18,
121:6, 121:25
**CROSS** [2] - 21:8,
57:17, 98:5
**cross-examination** [2]
- 79:8, 79:15
**CROSS-
EXAMINATION** [3] -
21:8, 57:17, 98:5
**cross-examinations**
[1] - 78:22
**cross-examining** [1] -
67:14
**crowd** [1] - 64:2
**CRR** [3] - 2:10, 125:3,
125:10
**cumulative** [1] - 123:4
**cumulatively** [1] - 20:1
**curative** [2] - 71:11,
71:13
**curfew** [2] - 82:12,
82:13
**Current** [1] - 36:18
**current** [2] - 5:11,
16:10
**curve** [7] - 53:19,
53:20, 54:6, 54:12,
54:16, 54:17, 64:12
**cuss** [1] - 64:14
**cussing** [1] - 64:13

## D

**D.C** [6] - 1:4, 8:19,
43:22, 76:5, 77:23,

81:19
**daily** [1] - 84:4
**damages** [3] - 5:19,
7:18, 116:4
**Dan** [2] - 118:10,
118:12
**dangerous** [1] - 102:2
**data** [18] - 22:18, 23:3,
30:15, 30:16, 31:9,
36:16, 36:23, 38:7,
38:8, 38:10, 38:17,
39:13, 40:21, 40:22,
40:23, 41:14
**data's** [1] - 39:15
**date** [2] - 10:17, 14:15
**dated** [1] - 20:24
**Dated** [1] - 125:8
**daughter** [18] - 81:2,
81:3, 81:10, 81:11,
91:8, 92:10, 95:25,
96:11, 96:12, 97:13,
97:21, 99:19,
103:14, 103:15,
103:20, 108:22,
109:5, 109:11
**daughters** [2] - 77:8,
111:21
**DC** [5] - 1:15, 1:19,
2:4, 2:12, 125:12
**deal** [2] - 4:2, 120:18
**dealing** [2] - 8:7, 31:16
**deals** [2] - 7:17, 11:15
**dealt** [2] - 8:4, 123:13
**death** [5] - 8:17, 18:1,
20:4, 84:1, 107:23
**DeBerardinis** [34] -
2:2, 10:7, 15:3, 21:3,
21:9, 37:6, 38:6,
38:20, 39:12, 41:5,
69:10, 69:16, 69:25,
70:1, 70:17, 72:13,
72:16, 73:1, 75:8,
75:13, 116:16,
116:19, 117:6,
117:13, 117:25,
118:3, 120:20,
120:21, 122:1,
122:5, 122:7,
122:12, 122:16,
122:19
**DeBerardinis)............
.................** [1] - 3:4
**decades** [1] - 39:21
**decide** [1] - 73:6
**decision** [1] - 117:16
**deducted** [1] - 18:8
**deduction** [1] - 35:14
**deductions** [1] - 18:9
**Defendant** [7] - 2:2,
69:7, 69:20, 73:21,

73:25, 121:14,
121:17
**defendant's** [1] - 8:22
**defendants** [3] - 65:9,
65:20, 72:3
**Defendants** [1] - 1:7
**defendants'** [3] - 70:8,
119:6, 119:8
**defense** [7] - 8:21,
8:24, 9:2, 71:20,
86:19, 93:1, 121:2
**definitely** [1] - 14:6
**degree** [4] - 5:23, 6:5,
20:7, 41:11
**degrees** [2] - 5:21,
39:9
**delivered** [1] - 91:13
**Department** [5] -
27:16, 76:19, 78:5,
78:8, 105:4
**department** [2] - 6:17,
76:13
**depiction** [1] - 86:14
**deposed** [1] - 69:12
**deposition** [3] - 70:21,
110:4, 119:10
**derived** [1] - 12:17
**Derricotte** [1] - 48:22
**describe** [14] - 44:9,
46:13, 47:11, 48:18,
49:11, 50:17, 53:2,
54:14, 56:3, 64:6,
77:13, 80:25, 86:22,
114:13
**described** [1] - 49:16
**Detective** [3] - 74:2,
118:16, 121:9
**detectives** [1] - 57:8
**determinant** [2] -
16:17, 16:20
**determination** [1] -
7:17
**determined** [2] - 23:1,
25:11
**determines** [2] -
16:24, 16:25
**determining** [1] -
39:22
**diagnosed** [1] -
112:16
**dial** [1] - 90:9
**dialed** [1] - 90:20
**dialing** [1] - 90:4
**dials** [1] - 90:5
**difference** [1] - 66:3
**different** [18] - 23:4,
39:20, 61:12, 66:1,
69:25, 72:12, 78:13,
106:14, 107:1,
112:18, 112:25,

114:2, 115:5, 115:7,
119:17, 123:9,
123:10, 123:12
**diminished** [1] - 14:6
**diploma** [3] - 13:10,
17:12, 17:15
**DIRECT** [3] - 5:5,
43:16, 75:19
**direct** [2] - 34:19,
113:16, 121:25
**directly** [3] - 45:15,
69:23, 79:13
**director** [1] - 6:11
**disabilities** [6] -
111:24, 112:7,
112:9, 112:11,
112:15, 113:10
**disadvantaged** [1] -
31:6
**discharged** [1] - 120:8
**discovered** [1] - 71:22
**discussed** [2] - 67:3,
67:17
**dismissed** [3] - 41:19,
64:25, 68:3
**disparity** [2] - 24:16,
38:4
**dispatch** [1] - 56:24
**dispatcher** [1] - 62:2
**distinction** [1] - 66:2
**DISTRICT** [4] - 1:1,
1:1, 1:6, 1:11
**district** [1] - 8:14
**District** [3] - 8:15,
65:15
**districts** [1] - 8:17
**divorce** [2] - 34:4,
34:11
**DNA** [4] - 65:14, 66:2,
66:19, 74:4
**Doctor** [6] - 7:13, 8:9,
15:6, 16:17, 20:25,
41:16
**doctor** [9] - 5:7, 5:21,
6:2, 12:13, 21:6,
40:20, 41:11, 112:16
**documentation** [1] -
11:6
**dollars** [3] - 10:14,
16:9, 32:22
**Domenic** [1] - 123:16
**done** [13] - 5:20, 7:9,
17:16, 26:25, 65:23,
68:8, 76:14, 76:21,
78:23, 85:10,
107:18, 108:20,
111:15
**door** [4] - 79:9, 95:14,
123:11, 123:18
**double** [1] - 18:10

**down** [18] - 19:8,
26:14, 28:20, 47:14,
47:16, 47:19, 49:14,
49:15, 53:5, 55:23,
60:1, 60:16, 61:2,
61:5, 87:5, 87:11,
102:7
**downturns** [1] - 12:25
**Dr** [22] - 5:1, 6:5, 7:25,
9:22, 10:4, 10:11,
11:2, 11:19, 12:7,
17:6, 17:19, 18:1,
18:11, 19:4, 19:19,
20:5, 20:13, 20:21,
21:16, 37:12, 41:13,
121:12
**dreadlocks** [2] - 51:8,
51:9
**dreads** [5] - 51:6,
51:18, 51:22, 58:20,
58:23
**dressed** [5] - 48:16,
48:19, 87:14, 87:16,
87:20
**drive** [2] - 46:10, 46:14
**driver** [1] - 16:22
**drivers** [2] - 25:15,
25:20
**driving** [1] - 52:15
**drop** [3] - 28:23,
79:25, 80:5
**dropout** [2] - 28:25,
35:3
**dropouts** [3] - 35:24,
36:1, 36:13
**dropped** [2] - 17:9,
32:20
**due** [1] - 119:5
**during** [19] - 8:2, 10:3,
28:13, 46:1, 46:4,
55:24, 59:23, 66:23,
67:2, 100:12,
100:17, 105:2,
106:3, 106:9,
106:10, 107:23,
116:20

# E

**early** [5] - 33:16,
39:24, 47:21, 74:23,
116:9
**earn** [1] - 33:18
**earned** [4] - 10:17,
13:17, 17:4, 19:11
**earning** [2] - 19:24,
100:23
**Earnings** [1] - 36:20
**earnings** [10] - 9:24,
10:3, 13:5, 13:7,

13:13, 13:16, 13:19,
26:25, 35:25, 79:2
**eat** [1] - 15:22
**economic** [11] - 6:12,
7:7, 7:15, 8:10, 8:24,
8:25, 12:25, 20:7,
39:2, 39:17, 116:4
**economics** [5] - 5:12,
5:17, 6:3, 6:8, 6:16,
6:24, 7:10, 7:16,
7:17, 8:1, 8:4, 12:23,
22:11, 41:12
**economist** [12] - 8:22,
8:23, 8:24, 9:22,
10:11, 24:17, 24:21,
40:4, 78:23, 79:3,
79:13
**economists** [1] -
25:21
**economy** [1] - 40:5
**EDELMAN** [2] - 3:3,
5:4
**Edelman** [25] - 5:1,
5:3, 5:10, 6:5, 7:25,
9:22, 10:4, 10:11,
11:2, 11:19, 12:7,
17:6, 17:19, 18:1,
18:11, 19:4, 19:19,
20:5, 20:13, 20:21,
21:16, 21:20, 37:12,
41:19
**education** [14] - 12:21,
12:23, 13:8, 13:15,
16:22, 16:23, 17:2,
17:7, 17:10, 17:12,
17:25, 28:12, 28:22,
38:9
**Educational** [1] -
36:19
**effect** [1] - 68:16
**effective** [1] - 79:17
**either** [3] - 40:23,
67:17, 119:2
**element** [3] - 11:11,
11:13, 13:4
**elements** [3] - 11:4,
12:13, 12:16
**elevator** [1] - 117:6
**eligible** [1] - 16:24
**eliminate** [1] - 65:16
**eliminated** [1] - 18:2
**Elvans** [7] - 43:25,
44:12, 44:20, 44:21,
46:2, 73:20, 73:24
**emeritus** [2] - 5:12,
6:19
**employed** [1] - 23:18
**employee** [1] - 14:9
**employees** [2] - 14:10,
15:11

**employer** [1] - 14:3
**employer's** [1] - 14:6
**employers** [1] - 14:11
**employment** [5] -
23:5, 24:14, 27:20,
31:17, 31:18
**encompass** [1] - 71:21
**end** [17] - 6:19, 10:21,
12:5, 19:11, 32:19,
32:21, 36:25, 38:4,
39:2, 43:1, 46:7,
53:12, 80:3, 94:10,
117:22, 121:9,
121:21
**ended** [1] - 107:15
**enter** [1] - 68:6
**entering** [1] - 123:17
**enters** [2] - 4:19, 75:14
**entire** [6] - 19:20,
85:21, 85:23, 100:4,
100:17, 103:11
**entitled** [1] - 71:11
**environment** [2] - 7:9,
30:21
**environments** [1] -
5:18
**equality** [1] - 39:18
**equate** [1] - 40:14
**equity** [1] - 7:1
**equivalency** [2] -
13:10, 17:15
**especially** [1] - 39:7
**ESQ** [4] - 1:13, 1:17,
2:2, 2:2
**essentially** [1] - 68:25
**estate** [1] - 15:23
**estimate** [2] - 29:22,
57:10
**et** [2] - 24:7, 24:8
**ET** [1] - 1:6
**evaluation** [1] - 8:10
**evening** [3] - 105:8,
105:10, 105:17
**evenings** [2] - 81:5,
100:10
**events** [2] - 73:19,
73:23
**eventually** [2] - 93:8,
94:12
**ever-ever** [1] - 21:23
**evidence** [12] - 65:11,
65:14, 66:17, 67:6,
67:12, 68:21, 74:6,
84:22, 109:3, 116:2,
116:3, 120:22
**exact** [1] - 35:12
**exactly** [1] - 10:25
**EXAMINATION** [9] -
5:5, 21:8, 37:10,
43:16, 57:17, 63:12,

75:19, 98:5, 110:12
**examination** [2] -
79:8, 79:15
**examinations** [1] -
78:22
**examined** [3] - 118:13,
118:21, 119:21
**examining** [1] - 67:14
**example** [3] - 7:13,
14:22, 46:4
**exclude** [1] - 65:16
**excluded** [2] - 15:24,
15:25
**excuse** [2] - 71:9,
109:19
**Exhibit** [4] - 55:6,
84:23, 86:2, 86:18
**exhibit** [1] - 88:8
**exits** [2] - 65:4, 116:15
**expand** [1] - 7:22
**expect** [1] - 96:18
**expectancies** [1] -
10:1
**expectancy** [13] -
11:15, 11:16, 12:6,
12:16, 12:17, 12:20,
14:14, 14:16, 14:18,
18:17, 19:12, 41:3
**expected** [3] - 15:1,
30:7, 100:12
**expenditures** [4] -
15:14, 15:24, 16:5,
18:2
**expenses** [4] - 15:18,
94:24, 95:1, 95:2
**experience** [1] - 51:24
**Experience** [1] - 36:20
**expert** [30] - 9:4, 10:8,
23:7, 23:10, 23:19,
69:3, 69:10, 69:15,
70:2, 70:5, 70:8,
70:9, 70:10, 71:16,
72:5, 72:10, 72:15,
72:21, 79:4, 118:3,
118:14, 119:6,
119:8, 120:3, 120:4,
120:6, 120:25,
121:21, 122:2, 122:8
**expert's** [2] - 20:16,
120:23
**explain** [1] - 37:13
**expressed** [2] - 18:20,
18:22
**extend** [1] - 19:20
**extra** [1] - 35:5
**eyewitness** [1] - 73:19

# F

**fabulously** [1] -

122:20
**face** [1] - 98:12
**faces** [1] - 114:24
**fact** [9] - 20:25, 24:23, 26:24, 27:14, 31:11, 33:13, 66:21, 72:7, 72:14
**factors** [2] - 30:4, 30:5
**factual** [1] - 121:1
**faculty** [1] - 6:15
**fair** [4] - 31:20, 44:24, 73:1, 74:11
**fairly** [1] - 71:20
**faith** [1] - 69:2
**fall** [2] - 60:7, 87:2
**falls** [1] - 38:3
**familiar** [4] - 23:5, 44:15, 45:4, 45:7
**family** [11] - 33:10, 33:11, 33:23, 35:8, 37:17, 41:9, 94:23, 103:11, 104:7, 104:10
**far** [3] - 4:16, 37:21, 54:24
**fare** [1] - 99:16
**fast** [2] - 53:7, 53:8
**fatally** [2] - 73:21, 73:25
**father** [1] - 112:21
**feasible** [2] - 30:5, 30:6
**Featherstone** [6] - 57:16, 98:4, 110:14, 111:21, 112:18, 114:10
**FEATHERSTONE** [55] - 2:2, 4:5, 45:2, 47:8, 48:3, 49:8, 50:8, 52:2, 56:11, 57:18, 58:6, 59:14, 59:17, 63:9, 65:5, 65:9, 66:6, 66:21, 67:9, 67:11, 74:12, 77:15, 78:15, 79:11, 80:17, 83:10, 84:15, 86:20, 87:25, 88:22, 89:6, 91:2, 92:12, 94:15, 94:20, 95:5, 95:13, 96:15, 96:25, 97:5, 98:6, 108:19, 109:2, 110:8, 110:18, 110:22, 111:2, 111:9, 112:5, 112:12, 114:7, 114:14, 114:18, 123:1, 123:4
**Featherstone's** [1] - 73:16
**Featherstone**...........

.................. [2] - 3:7, 3:9
**February** [1] - 1:5
**federal** [28] - 8:17, 11:14, 12:17, 13:14, 14:9, 14:19, 15:9, 17:2, 17:10, 17:17, 17:24, 18:18, 20:10, 23:24, 24:2, 25:2, 25:13, 27:1, 29:8, 33:14, 34:3, 36:7, 36:10, 36:23, 38:8, 39:3, 40:23
**fee** [3] - 9:6, 9:9, 9:10
**fees** [1] - 9:8
**feet** [3] - 55:1, 55:4, 60:21
**fell** [2] - 87:3, 104:15
**felt** [2] - 50:5, 51:21
**few** [4] - 33:19, 37:15, 43:4, 111:12
**field** [4] - 7:25, 22:13, 22:24, 28:7
**fight** [3] - 107:4, 113:2, 113:3
**figure** [3] - 30:19, 37:19, 74:9
**figures** [6] - 23:21, 29:9, 30:9, 30:10, 32:11
**filed** [2] - 73:12, 73:18
**final** [2] - 20:22, 40:20
**finally** [4] - 16:6, 20:5, 71:7, 92:9
**finance** [3] - 5:25, 6:1, 6:25
**financial** [12] - 5:12, 6:3, 6:7, 6:11, 6:16, 6:24, 6:25, 7:21, 8:3, 10:23, 95:1, 99:10
**findings** [1] - 118:22
**fine** [6] - 4:9, 43:9, 74:25, 75:1, 75:7, 121:5
**fingerprinting** [7] - 65:14, 65:22, 66:2, 66:4, 66:7, 66:17, 66:22
**finish** [3] - 33:5, 70:3, 124:10
**finished** [3] - 107:18, 113:10, 114:2
**firearms** [1] - 118:14
**FIRM** [1] - 1:14
**first** [9] - 9:16, 11:5, 11:11, 12:16, 22:11, 33:19, 34:16, 47:14, 118:7
**fit** [1] - 49:12
**fitted** [3] - 48:21,

48:22, 48:25
**fitting** [1] - 102:15
**five** [4] - 19:6, 81:9, 81:11, 106:13
**five-year-old** [2] - 81:9, 81:11
**fixed** [1] - 7:2
**floor** [4] - 47:12, 47:13, 47:14, 47:15
**folks** [7] - 8:23, 10:13, 12:24, 15:8, 30:3, 31:6, 37:14
**follow** [1] - 117:5
**followed** [1] - 67:1
**following** [3] - 42:7, 78:18, 92:17
**food** [4] - 15:17, 32:5, 37:16, 99:14
**foot** [1] - 62:11
**FOR** [1] - 1:1
**force** [1] - 13:1
**forecasting** [2] - 7:1, 20:19
**foregoing** [1] - 125:4
**forensic** [3] - 5:17, 7:10, 7:16
**Forest** [3] - 44:18, 61:5, 104:19
**Forestville** [2] - 106:23, 109:8
**forget** [1] - 90:8
**form** [4] - 40:25, 41:2, 45:2, 89:6
**forth** [3] - 46:7, 46:9, 67:6
**forward** [2] - 18:19, 20:2
**foundation** [2] - 71:8, 88:24
**four** [4] - 11:24, 61:14, 80:16, 95:6
**Fourth** [1] - 2:3
**free** [3] - 19:1, 37:15, 43:4
**fresh** [1] - 74:24
**Friday** [5] - 122:3, 122:8, 122:11, 122:14, 122:18, 124:11, 124:13
**friends** [6] - 83:9, 83:12, 94:23, 96:8, 96:21, 104:23
**fringe** [7] - 11:17, 13:24, 13:25, 14:3, 14:4, 14:5, 16:16
**front** [3] - 28:14, 55:4, 75:11
**fucked** [4] - 53:18, 53:21, 54:19
**full** [6] - 5:9, 6:16,

13:2, 76:16, 79:6, 125:5
**full-time** [1] - 79:6
**fund** [1] - 35:6
**fundamental** [1] - 20:18
**funding** [2] - 14:4, 14:7
**funeral** [3] - 94:17, 94:24, 95:8
**fuss** [1] - 64:14
**fussing** [1] - 64:13
**future** [12] - 11:16, 11:17, 12:12, 13:5, 14:20, 15:10, 16:10, 17:19, 18:12, 18:13, 18:15, 18:18, 29:4, 29:22, 30:24, 31:4, 31:10, 39:19, 40:15, 40:16, 40:18

## G

**gasoline** [1] - 37:17
**gate** [6] - 51:19, 53:1, 53:10, 53:13, 53:16, 61:4
**GED** [10] - 13:9, 17:14, 83:6, 107:24, 108:2, 108:3, 113:21, 113:24, 114:1, 114:4
**gender** [3] - 12:21, 17:25, 38:9
**GENERAL/DC** [1] - 2:3
**generality** [1] - 29:18
**generally** [4] - 12:23, 23:16, 28:6, 87:20
**generate** [3] - 19:1, 19:10
**gentlemen** [3] - 43:2, 49:12, 115:24
**get-through-life** [2] - 32:15, 33:3
**Gilgeous** [2] - 118:15, 121:8
**girls** [1] - 78:13
**given** [1] - 30:6
**glamour** [1] - 26:2
**gold** [2] - 19:17, 19:18
**golden** [1] - 16:8
**Government** [1] - 38:11
**government** [8] - 11:14, 14:8, 24:2, 25:13, 29:8, 36:23, 41:14
**grade** [3] - 17:9, 32:21, 107:19
**graduate** [3] - 7:3, 22:10, 109:13

**graduated** [2] - 109:9, 111:22
**grandchild** [1] - 81:9
**grandchildren** [1] - 80:13
**grandson** [5] - 81:3, 81:11, 91:8, 99:19, 103:18
**gratis** [1] - 7:21
**great** [2] - 25:13, 122:16
**ground** [5] - 53:17, 55:11, 55:15, 57:12, 60:8
**grounds** [1] - 123:3
**group** [2] - 33:15, 107:11
**groups** [1] - 8:7
**grow** [1] - 35:21
**growth** [3] - 11:16, 15:10, 35:23
**guarantee** [1] - 18:16
**guess** [11] - 7:11, 45:24, 52:19, 52:23, 53:5, 55:25, 87:7, 87:13, 90:4, 102:1, 104:23
**guidance** [1] - 72:8
**guide** [1] - 30:3
**gun** [26] - 50:5, 50:11, 50:13, 65:15, 68:22, 69:11, 70:25, 71:5, 73:17, 85:7, 85:8, 101:13, 118:13, 118:22, 119:3, 119:4, 120:7, 120:9, 120:11, 120:14, 120:16, 121:2
**gunshot** [1] - 53:13
**gunshots** [2] - 53:15, 61:10
**guy** [2] - 28:21, 118:20
**guys** [2] - 43:8, 84:1

## H

**hair** [1] - 51:5
**half** [2] - 27:9, 27:10
**halfway** [1] - 53:1
**hall** [1] - 116:21
**hallway** [1] - 75:2
**hand** [4] - 58:1, 58:2, 58:4, 80:8
**handcuffs** [2] - 55:22, 56:6
**handle** [1] - 79:23
**handled** [1] - 75:11
**handling** [1] - 118:25
**hands** [1] - 53:4
**hanging** [4] - 49:14,

87:8, 102:20
**happy** [1] - 117:24
**hard** [1] - 68:10
**Harley** [4] - 122:24,
123:2, 123:6, 123:13
**Harris** [3] - 83:12,
83:24, 84:2
**hate** [1] - 42:9
**Hawaii** [2] - 6:8, 6:10
**health** [1] - 14:1
**hear** [9] - 16:19, 27:3,
42:18, 55:18, 60:19,
69:5, 69:7, 69:14,
90:11
**heard** [20] - 23:11,
53:13, 53:15, 55:19,
56:14, 60:5, 60:6,
61:10, 63:23, 64:18,
66:18, 67:20, 69:16,
70:1, 74:7, 78:24,
90:10, 115:24, 117:7
**hearing** [5] - 42:8,
78:19, 90:11, 92:18,
124:21
**hearsay** [1] - 93:19
**HELD** [1] - 1:10
**held** [3] - 42:7, 78:18,
92:17
**help** [4] - 56:21, 72:21,
80:23, 111:19
**helped** [5] - 81:1,
82:25, 94:19, 97:15,
111:17
**helpful** [1] - 23:3
**helping** [1] - 100:3
**hereby** [1] - 125:3
**herself** [2] - 97:14,
97:25
**high** [25] - 5:24, 13:7,
13:9, 17:12, 17:14,
28:12, 28:22, 28:25,
32:20, 35:3, 35:24,
35:25, 36:13, 39:9,
71:25, 76:6, 106:14,
107:1, 108:22,
108:24, 109:15,
111:22, 112:18,
112:23, 114:2
**High** [4] - 106:16,
106:19, 106:21,
106:23
**higher** [6] - 16:3,
17:17, 17:18, 17:23,
21:2, 39:24
**himself** [2] - 15:21,
38:2
**hired** [1] - 78:7
**hisself** [1] - 104:16
**hold** [5] - 5:14, 5:23,
67:25, 74:16, 88:24

**holding** [6] - 53:5,
57:22, 57:24, 86:12,
88:11, 114:22
**home** [11] - 78:2, 78:3,
80:21, 80:23, 81:1,
81:6, 84:3, 91:9,
91:14, 97:18, 105:7
**Honor** [85] - 4:4, 4:5,
4:6, 4:25, 9:21, 10:7,
15:3, 21:3, 33:4,
33:5, 37:7, 41:23,
42:2, 42:4, 47:8,
49:2, 49:9, 50:2,
50:8, 52:2, 54:21,
56:11, 57:14, 58:6,
59:14, 63:9, 63:11,
65:5, 65:9, 66:6,
67:9, 69:11, 69:17,
69:19, 70:19, 71:2,
71:23, 73:9, 74:12,
74:13, 74:18, 75:13,
75:16, 77:15, 77:17,
80:2, 80:18, 84:16,
85:25, 86:17, 88:5,
89:1, 89:7, 91:4,
92:15, 94:8, 94:20,
94:21, 95:5, 95:13,
96:25, 97:5, 108:19,
109:3, 110:9,
110:11, 110:22,
111:9, 112:12,
113:17, 114:8,
114:18, 116:17,
116:20, 117:11,
118:1, 118:4,
121:10, 122:5,
122:20, 122:22,
123:1, 124:6, 124:20
**HONORABLE** [1] -
1:10
**honors** [1] - 5:24
**hoping** [1] - 42:1
**hospital** [2] - 93:4,
93:6
**hot** [1] - 43:8
**hour** [2] - 35:18,
35:20, 57:12
**house** [14] - 33:2,
81:13, 82:7, 82:25,
83:15, 84:21, 88:2,
102:3, 103:7, 103:8,
103:9, 103:13,
104:4, 123:11
**House** [1] - 40:7
**household** [1] - 104:1
**housing** [1] - 33:9
**hug** [3] - 50:18, 59:19,
59:23
**hugged** [3] - 49:23,
49:24, 50:5

**hung** [2] - 48:13, 90:12
**hurdle** [1] - 71:25
**hurt** [2] - 55:25, 85:14
**husband** [1] - 123:17

# I

**idea** [3] - 118:5, 122:2
**identifiable** [1] - 70:13
**identified** [1] - 119:8
**imagined** [1] - 40:11
**immediately** [3] -
10:15, 12:2, 23:2
**implications** [1] -
72:24
**impropriety** [3] -
69:13, 70:22, 73:2
**IN** [1] - 1:1
**in/junk** [1] - 22:12
**incident** [5] - 102:25,
106:7, 114:11,
114:17, 114:20
**include** [3] - 32:12,
32:13, 39:4
**included** [3] - 16:14,
16:16, 35:13
**includes** [5] - 25:20,
25:24, 26:2, 29:25,
30:18
**including** [2] - 73:23,
74:6
**income** [49] - 7:2,
10:16, 10:20, 11:24,
12:5, 12:7, 12:12,
14:5, 14:6, 14:12,
14:20, 15:16, 16:11,
16:12, 16:15, 16:18,
16:21, 16:22, 17:1,
17:3, 17:17, 17:24,
18:5, 18:16, 18:18,
19:10, 19:24, 20:11,
24:16, 24:25, 25:3,
25:17, 26:4, 27:2,
27:4, 27:7, 27:8,
28:23, 30:9, 30:24,
35:13, 36:11, 38:1,
38:3, 38:4, 38:8,
39:18, 39:22, 100:23
**Income** [1] - 36:19
**incomes** [2] - 26:12,
26:13
**incorporated** [1] -
11:18
**increase** [3] - 23:23,
24:13, 30:5
**increases** [5] - 17:20,
25:1, 25:18, 28:12,
33:21
**increasing** [1] - 29:1
**indeed** [2] - 22:24,

71:8
**independent** [2] -
65:3, 68:22
**indicate** [1] - 36:7
**indicated** [4] - 13:6,
13:11, 13:16, 26:13
**individual's** [1] - 29:19
**individuals** [2] - 28:12,
58:22
**indulgence** [2] -
59:14, 108:19
**industries** [4] - 25:4,
26:3
**industry** [2] - 25:7,
25:24
**inequality** [1] - 39:19
**infant** [1] - 77:25
**inference** [1] - 73:1
**inflation** [2] - 11:17,
15:9
**information** [10] -
11:2, 11:4, 11:5,
11:10, 11:13, 11:14,
11:15, 11:23, 12:17,
38:10
**informed** [1] - 70:24
**infrequently** [1] -
23:16
**injury** [4] - 19:19,
19:23, 19:25, 20:2
**Inman** [1] - 123:7
**inoperable** [3] -
118:23, 119:16,
119:18
**inquired** [1] - 74:4
**instead** [2] - 27:6,
116:7
**institutions** [1] - 7:14
**instruct** [3] - 68:5,
116:2, 117:8
**instruction** [2] - 71:11,
71:13
**instructions** [2] - 7:6,
117:5
**insurance** [1] - 14:1
**intending** [1] - 123:6
**intends** [1] - 67:6
**intention** [2] - 121:20,
124:10
**interacting** [1] - 103:4
**interest** [6] - 10:18,
12:4, 16:7, 16:10,
19:1, 19:2
**interesting** [2] - 40:17,
70:17
**interrupt** [1] - 70:4
**intersection** [1] - 46:8
**interviews** [1] - 106:1
**introduce** [3] - 21:14,
43:18, 75:23

**introduction** [2] -
6:24, 6:25
**invest** [2] - 19:3, 19:9
**invested** [2] - 10:17,
12:3
**investigator** [2] - 4:8,
109:23
**investment** [9] -
10:20, 10:22, 16:8,
18:25, 19:5, 19:13,
19:14, 41:1, 41:2
**investments** [3] - 7:1,
18:25, 19:15
**invited** [1] - 116:22
**involved** [1] - 111:6
**involving** [1] - 8:10
**iPhone** [1] - 4:7
**iPhones** [1] - 114:22
**issue** [13] - 39:12,
65:5, 65:23, 66:7,
66:22, 71:21, 71:22,
74:7, 94:7, 116:18,
116:19, 120:15,
121:1
**issues** [3] - 7:7, 8:4,
116:4
**items** [3] - 16:13,
89:15, 95:11
**itself** [1] - 22:3

# J

**jeans** [17] - 48:20,
48:24, 48:25, 49:4,
49:5, 49:12, 50:5,
86:25, 87:2, 87:11,
87:17, 102:5,
102:12, 102:14,
102:17, 102:18,
115:5
**job** [18] - 14:1, 23:1,
28:1, 39:2, 79:6,
83:2, 83:6, 83:7,
83:9, 83:12, 83:20,
83:22, 84:2, 91:25,
100:13, 100:18,
105:19
**jobs** [2] - 12:25, 16:24
**joined** [1] - 6:15
**joining** [1] - 5:7
**Jordan** [1] - 118:9
**journals** [1] - 40:23
**JR** [1] - 2:2
**JUDGE** [1] - 1:11
**judge** [1] - 42:9
**Judge** [2] - 68:7,
68:13, 97:1
**jump** [6] - 45:4,
45:11, 45:12, 45:13,
46:3, 46:20, 46:23,

51:13, 52:9, 58:16
**jump-outs** [7] - 45:4, 46:3, 46:20, 46:23, 51:13, 52:9, 58:16
**June** [2] - 20:24, 76:15
**junk** [2] - 22:12, 22:17
**juror** [1] - 79:24
**Juror** [1] - 80:4
**JURY** [2] - 1:10, 4:22
**jury** [37] - 4:3, 4:19, 22:25, 37:13, 42:8, 43:19, 45:6, 46:3, 47:12, 48:18, 49:12, 49:22, 50:18, 54:14, 64:7, 66:18, 71:11, 72:21, 75:12, 75:23, 76:12, 76:18, 77:6, 77:13, 78:19, 79:9, 80:25, 84:11, 86:22, 87:1, 88:9, 88:16, 91:12, 92:18, 102:12, 116:15, 117:4
**Jury** [2] - 65:4, 75:14
**juvenile** [1] - 116:3

## K

**Katz** [1] - 118:9
**keep** [3] - 45:14, 53:6, 79:6
**keeping** [1] - 104:4
**Keith** [1] - 117:12
**Kennedy** [1] - 106:16
**kept** [8] - 17:18, 55:20, 84:6, 90:11, 92:7, 92:8
**KERSLYN** [1] - 2:2
**kerslyn.featherstone @dc.gov** [1] - 2:5
**kicked** [2] - 85:11, 113:6
**kids** [12] - 48:13, 48:24, 49:17, 83:17, 84:19, 96:8, 107:9, 107:10, 113:3, 115:4
**kind** [14] - 10:11, 44:24, 45:10, 45:21, 45:22, 48:20, 48:25, 49:15, 51:5, 52:15, 78:24, 79:10, 114:20, 115:2
**kinds** [3] - 16:24, 25:16, 79:6
**KIRA** [1] - 1:17, 1:18
**kiraannewest@gmail .com** [1] - 1:20
**Kleenex** [1] - 86:7
**knee** [2] - 55:21, 56:5
**kneeling** [1] - 60:16

**knock** [1] - 74:22
**knowing** [1] - 124:18
**knowledge** [1] - 98:14

## L

**L'Enfant** [1] - 6:13
**labor** [3] - 23:6, 23:11, 31:14
**Labor** [2] - 27:15, 27:16
**laborers** [1] - 23:17
**ladies** [3] - 43:2, 49:11, 115:24
**laid** [1] - 55:23
**Lane** [27] - 9:14, 42:10, 74:18, 74:19, 74:20, 75:17, 75:21, 75:24, 75:25, 80:11, 86:22, 94:12, 95:16, 97:4, 98:2, 98:7, 98:18, 103:9, 108:9, 109:17, 114:6, 114:13, 114:20, 114:22, 115:20, 115:22, 117:17
**LANE** [3] - 1:3, 3:8, 75:18
**last** [16] - 8:11, 16:6, 19:6, 28:13, 28:16, 28:20, 28:21, 30:21, 31:4, 31:8, 70:16, 71:13, 71:18, 88:16, 124:6
**latest** [1] - 71:17
**LaTonya** [1] - 123:15
**latter** [1] - 33:23
**laundry** [3] - 82:17, 82:18, 84:8
**Lauren** [1] - 87:18
**LAW** [2] - 1:14, 1:18
**lawyers** [1] - 124:5
**laying** [1] - 53:17
**laymen** [1] - 120:8
**layperson** [1] - 23:10
**lead** [1] - 72:18
**leading** [2] - 47:9, 49:9
**learn** [2] - 89:4, 89:11
**learned** [5] - 89:4, 93:24, 96:13, 96:17, 109:17
**least** [4] - 34:8, 74:8, 113:3, 122:2
**leave** [4] - 14:2, 51:21, 81:15, 83:14
**leaving** [1] - 91:22, 91:24
**lecture** [1] - 15:4
**leeway** [1] - 77:16
**left** [10] - 7:3, 10:22,

13:2, 19:12, 50:25, 51:9, 61:4, 81:9, 86:7, 107:17
**lengthy** [1] - 116:21
**Leo** [9] - 67:2, 67:4, 67:17, 69:7, 69:20, 73:21, 73:25, 119:3, 121:14
**Leo's** [1] - 121:17
**less** [11] - 10:21, 12:23, 13:7, 13:16, 22:18, 23:17, 25:4, 33:22, 34:10, 39:19, 78:6
**level** [9] - 12:21, 14:5, 16:18, 16:21, 16:22, 16:23, 17:10, 17:23, 25:17
**levels** [5] - 24:14, 25:3, 30:16, 39:23
**Levy** [1] - 122:23
**life** [35] - 5:15, 9:25, 10:1, 10:4, 10:19, 10:22, 11:15, 12:6, 12:16, 12:19, 12:20, 14:14, 14:16, 14:17, 18:17, 19:12, 19:20, 21:19, 23:2, 31:20, 31:22, 32:1, 32:15, 33:3, 33:16, 41:3, 43:23, 76:4, 90:21, 94:14
**lifetime** [5] - 13:12, 13:13, 13:15, 13:20, 16:2
**likely** [3] - 17:13, 74:8, 79:5
**limited** [2] - 25:20, 73:23
**link** [1] - 109:1
**Lisa** [1] - 2:10
**LISA** [1] - 125:3
**listed** [1] - 74:5
**literature** [2] - 8:25, 39:17
**litigation** [2] - 5:18, 7:17
**live** [6] - 44:7, 44:18, 95:25, 97:22, 103:18, 112:21
**lived** [19] - 40:6, 41:6, 43:23, 43:25, 44:10, 44:23, 46:1, 47:12, 76:4, 80:21, 80:23, 82:7, 84:3, 85:23, 96:4, 103:13, 104:10, 104:19, 106:10
**lives** [2] - 118:3, 123:11

**living** [9] - 15:7, 17:21, 51:25, 77:21, 82:5, 103:24, 106:4, 106:8, 108:14
**local** [1] - 14:8
**look** [14] - 12:15, 12:16, 13:4, 16:6, 18:24, 19:2, 19:6, 20:3, 34:19, 35:23, 40:19, 48:24, 91:25, 98:16
**looked** [3] - 13:14, 17:24, 34:6
**looking** [11] - 16:15, 29:21, 39:18, 57:9, 83:2, 83:6, 83:20, 83:22, 100:13, 101:22, 105:19
**looks** [3] - 35:18, 35:20, 86:24
**loss** [2] - 8:10, 11:20, 12:3, 14:12, 15:25, 16:2, 16:14, 17:18, 18:3, 18:4, 18:9, 18:20, 19:19, 19:21, 19:22, 20:2, 20:12, 20:14, 33:19, 33:24
**lost** [11] - 7:19, 9:24, 10:3, 10:16, 10:20, 11:24, 12:7, 14:6, 16:11, 16:12, 58:6
**loud** [2] - 56:8, 56:14
**louder** [1] - 64:2
**loved** [1] - 115:12
**lovely** [1] - 4:22
**low** [1] - 38:4
**lower** [5] - 14:20, 16:3, 26:8, 30:4, 39:2
**lump** [5] - 10:14, 10:15, 10:25, 12:10
**lunch** [3] - 4:21, 124:13, 124:15
**lunches** [1] - 15:17

## M

**ma'am** [40] - 44:9, 45:4, 47:1, 47:3, 48:5, 50:17, 51:7, 52:6, 52:17, 52:22, 53:14, 54:10, 56:14, 57:3, 57:10, 60:20, 61:19, 63:19, 64:22, 76:10, 76:14, 84:24, 85:1, 85:3, 85:20, 85:22, 85:24, 86:7, 86:10, 87:1, 88:4, 88:11, 96:17, 96:23, 111:5, 111:16, 111:18, 111:20,

112:15, 114:23
**Ma'am** [1] - 54:16
**Mace** [2] - 54:8, 54:11
**mad** [2] - 53:25, 54:1
**mail** [1] - 92:8
**maintain** [1] - 15:16
**maintenance** [2] - 31:23, 31:25
**major** [2] - 16:17, 16:20
**male** [3] - 13:7, 13:14, 17:11
**males** [13] - 10:2, 30:12, 30:16, 30:17, 30:23, 31:6, 31:10, 31:13, 36:13, 36:25, 39:13, 39:23
**man** [3] - 36:8, 40:7, 56:19
**management** [2] - 7:1, 7:2
**marijuana** [1] - 84:20
**marked** [4] - 45:23, 61:17, 61:20, 86:2
**market** [3] - 19:5, 19:6, 31:14
**marriage** [1] - 33:21
**married** [2] - 33:15, 33:17, 34:1
**Maryland** [3] - 5:24, 6:2, 8:18
**matter** [7] - 6:22, 9:23, 24:23, 27:14, 31:11, 75:9, 119:15
**matters** [2] - 10:5, 117:1
**maxim** [1] - 22:12
**MBA** [1] - 5:25
**McKinley** [1] - 76:9
**McNeil** [31] - 3:6, 41:23, 43:14, 43:15, 43:18, 43:20, 43:21, 45:14, 45:18, 49:4, 50:4, 54:1, 57:15, 57:19, 57:21, 59:18, 63:14, 64:24, 65:12, 65:19, 68:2, 68:15, 68:21, 68:22, 73:16, 73:19, 73:22, 74:7, 109:17, 109:20, 123:8
**McNeil's** [1] - 67:22
**meals** [1] - 82:15
**mean** [17] - 12:9, 18:23, 21:23, 30:7, 39:22, 41:6, 42:13, 48:23, 79:13, 79:17, 79:25, 84:14, 87:15, 90:2, 95:1, 107:10
**means** [9] - 5:13, 7:20,

12:1, 12:10, 14:21,
15:15, 18:24, 22:17,
70:25
**meant** [1] - 17:9
**measured** [1] - 19:21
**mechanical** [1] - 1:24
**mechanics** [1] - 39:6
**median** [4] - 27:2,
27:4, 27:7, 27:8
**medical** [1] - 94:2
**medications** [1] -
95:11
**meeting** [2] - 92:6,
92:9
**MEMBER** [1] - 4:22
**members** [21] - 33:10,
33:11, 43:19, 45:6,
46:2, 47:11, 48:18,
49:22, 50:17, 54:14,
64:6, 76:12, 76:18,
77:6, 77:13, 80:25,
84:11, 87:1, 88:16,
91:12, 116:21
**mentioned** [3] - 17:13,
24:1, 83:25
**merge** [1] - 31:8
**mess** [3] - 51:18,
51:21, 58:16
**message** [1] - 92:21
**messed** [3] - 58:15,
58:22, 64:20
**messing** [1] - 52:12
**met** [6] - 9:16, 9:18,
21:12, 109:17,
109:20, 109:22
**microphone** [2] -
45:15, 98:19
**middle** [2] - 26:17,
115:14
**might** [9] - 4:18, 30:4,
30:5, 30:20, 30:23,
30:25, 31:1, 106:18
**million** [1] - 32:21
**mind** [1] - 51:10
**minute** [1] - 122:24
**minutes** [6] - 42:1,
42:23, 43:4, 43:6,
57:12, 74:21
**mirror** [2] - 40:17,
40:18
**mischaracterizes** [1] -
105:12
**miss** [1] - 108:12
**missed** [1] - 122:22
**model** [1] - 19:15
**mom** [1] - 78:2
**Monday** [1] - 122:18
**monetary** [2] - 14:12,
16:15
**Money** [1] - 36:20

**money** [21] - 7:22,
14:24, 15:21, 15:23,
25:9, 25:25, 29:13,
32:15, 32:16, 32:25,
33:3, 33:17, 33:22,
33:23, 34:18, 35:6,
35:7, 35:9, 37:15,
37:16
**Montgomery** [1] -
106:16
**month** [1] - 32:7
**months** [6] - 81:24,
81:25, 95:6, 99:22,
100:17, 106:9
**Moreira** [2] - 2:10,
125:10
**MOREIRA** [1] - 125:3
**morning** [18] - 66:19,
71:18, 81:4, 81:7,
83:15, 99:20,
105:10, 105:16,
116:14, 117:7,
121:21, 121:22,
121:24, 122:4,
122:8, 122:11,
124:11
**most** [5] - 7:24, 19:15,
20:17, 33:17, 40:25
**mostly** [3] - 5:18, 7:16,
8:6
**mother** [2] - 79:5,
82:15
**Move** [2] - 64:10,
64:11
**move** [6] - 64:10,
64:11, 79:19, 79:22,
80:1, 86:17
**moved** [1] - 65:16
**MR** [101] - 4:4, 4:18,
4:25, 5:6, 9:21, 10:7,
10:10, 15:3, 21:3,
21:5, 21:9, 33:4,
37:4, 37:6, 37:9,
37:11, 41:16, 42:4,
42:9, 42:13, 42:15,
42:17, 42:20, 42:25,
67:20, 67:24, 68:7,
68:10, 68:13, 68:17,
68:20, 69:7, 69:10,
69:16, 69:18, 69:23,
70:1, 70:3, 70:10,
70:12, 70:17, 71:12,
71:17, 71:22, 72:2,
72:16, 73:1, 73:5,
73:8, 74:18, 74:21,
74:25, 75:2, 75:6,
75:8, 75:13, 101:15,
116:16, 116:19,
117:6, 117:11,
117:21, 117:24,

117:25, 118:3,
118:9, 118:12,
118:15, 118:19,
118:21, 119:5,
119:8, 119:19,
119:25, 120:3,
120:10, 120:15,
120:19, 120:21,
121:5, 121:8,
121:12, 121:14,
121:16, 121:20,
121:23, 122:5,
122:7, 122:12,
122:16, 122:19,
122:22, 123:11,
123:15, 123:21,
123:24, 124:2,
124:6, 124:9,
124:17, 124:20
**MS** [114] - 4:5, 4:6,
4:10, 4:13, 41:22,
42:1, 42:14, 42:16,
42:19, 43:17, 45:2,
47:8, 48:3, 49:2,
49:8, 50:2, 50:8,
52:2, 54:21, 56:11,
57:14, 57:18, 58:6,
59:14, 59:17, 63:9,
63:11, 63:13, 64:22,
65:5, 65:9, 66:6,
66:21, 67:9, 67:11,
73:9, 73:12, 73:15,
74:12, 74:13, 75:10,
75:16, 75:20, 77:15,
77:17, 78:15, 78:22,
79:3, 79:11, 79:21,
79:24, 80:2, 80:10,
80:17, 80:18, 83:10,
84:15, 85:25, 86:17,
86:20, 87:25, 88:5,
88:8, 88:22, 89:1,
89:6, 91:2, 91:4,
92:12, 92:14, 92:20,
92:23, 93:2, 93:7,
93:13, 93:16, 93:21,
94:8, 94:11, 94:15,
94:20, 95:5, 95:13,
95:14, 96:15, 96:25,
97:1, 97:5, 98:2,
98:6, 105:12,
105:22, 105:24,
108:19, 108:25,
109:2, 109:5, 110:8,
110:11, 110:13,
110:18, 110:22,
111:2, 111:9, 112:5,
112:12, 113:17,
113:19, 114:7,
114:14, 114:18,
115:20, 123:1, 123:4
**must** [1] - 70:25

**N**

**name** [1] - 5:9
**near** [1] - 61:2
**nearly** [1] - 13:17
**necessarily** [2] - 29:5,
40:18, 105:19
**necessary** [3] - 20:13,
20:15, 122:18
**need** [16] - 4:2, 11:10,
15:19, 21:14, 21:24,
22:1, 22:7, 30:13,
75:10, 80:5, 80:7,
86:7, 117:8, 117:19,
122:2, 123:22
**needed** [2] - 16:5,
16:9, 82:22
**needs** [1] - 99:10
**negligence** [1] - 93:9
**neighborhood** [7] -
44:25, 95:18, 95:25,
96:9, 96:19, 96:20,
109:23
**nervous** [1] - 45:18
**never** [17] - 15:23,
21:20, 38:18, 40:22,
50:23, 58:13, 58:15,
68:20, 90:8, 100:15,
100:18, 100:21,
100:23, 106:1,
107:21, 117:11,
119:9
**new** [3] - 26:2, 87:9,
116:7
**new-age** [1] - 26:2
**NEXT** [1] - 1:22
**next** [11] - 4:24, 14:13,
15:12, 29:1, 30:22,
52:18, 74:17, 91:23,
92:23, 123:11
**nice** [3] - 4:21, 25:21,
116:13
**night** [2] - 82:10,
116:13
**nighttime** [1] - 104:14
**nine** [1] - 17:11
**nobody** [3] - 56:18,
57:1, 57:5
**noise** [3] - 90:10,
90:12, 90:15
**nominal** [1] - 28:18
**none** [3] - 10:7, 17:8,
41:8
**North** [1] - 76:3
**nosing** [1] - 84:13
**notes** [2] - 58:7, 125:5
**nothing** [6] - 10:22,
19:12, 47:21, 56:16,
63:9, 110:8
**notice** [3] - 72:17,

73:3, 119:10
**now-14-but-then-six-
year-old** [1] - 103:15
**number** [7] - 10:2,
13:24, 21:1, 26:13,
35:12, 35:16, 90:5
**numbers** [3] - 8:24,
9:12, 14:22
**NW** [5] - 1:14, 1:18,
2:3, 2:11, 125:12

**O**

**Oaks** [1] - 44:15, 50:24
**object** [6] - 4:18, 67:8,
71:2, 71:9, 84:23,
123:1
**objected** [2] - 66:9,
67:7
**objection** [45] - 10:6,
21:3, 33:4, 37:4,
45:2, 47:8, 48:3,
49:8, 50:8, 52:2,
56:11, 77:15, 78:15,
80:17, 83:10, 84:15,
86:20, 87:25, 88:22,
89:6, 91:2, 92:12,
94:15, 94:20, 95:5,
95:13, 96:15, 96:25,
97:5, 101:15,
105:12, 105:22,
105:24, 108:25,
110:18, 110:22,
111:2, 111:9, 112:5,
112:12, 114:7,
114:14, 114:18
**observe** [5] - 46:23,
84:12, 93:6, 93:7,
94:5
**observed** [3] - 60:13,
70:6, 73:24
**observes** [1] - 70:13
**observing** [1] - 119:11
**obtain** [1] - 107:24
**obvious** [2] - 72:6,
72:11
**obviously** [4] - 18:15,
30:18, 116:11,
121:17
**occasionally** [1] - 7:20
**occupation** [3] - 5:11,
25:3, 25:14
**occurred** [2] - 73:20,
103:1
**odds** [4] - 14:19,
14:21, 18:14, 18:19
**OF** [6] - 1:1, 1:6, 1:10,
1:18, 2:3, 125:1
**offer** [5] - 9:21, 10:8,
23:7, 72:9, 123:7

**offered** [2] - 72:14, 123:7
**offering** [2] - 10:4, 72:23
**office** [2] - 110:3, 111:15
**OFFICE** [1] - 2:3
**Officer** [14] - 66:23, 66:24, 67:2, 67:4, 67:15, 67:16, 70:15, 118:10, 119:3, 122:3, 122:10, 124:11, 124:14
**officer** [8] - 54:13, 55:14, 55:17, 60:11, 60:16, 60:19, 65:22, 70:22
**officers** [24] - 45:9, 45:10, 45:11, 45:20, 46:10, 53:20, 54:4, 54:15, 57:1, 58:8, 58:13, 60:13, 61:14, 62:2, 62:5, 62:9, 62:13, 62:16, 62:25, 63:16, 64:7, 65:13, 75:3
**OFFICES** [1] - 1:18
**OFFICIAL** [1] - 125:1
**Official** [1] - 2:10
**official** [1] - 125:10
**often** [3] - 12:24, 81:21, 82:9
**Old** [1] - 36:20
**old** [11] - 6:12, 35:1, 36:4, 51:4, 75:25, 77:2, 81:9, 81:11, 86:10, 97:14
**older** [1] - 16:4
**oldest** [1] - 108:22
**ON** [1] - 1:22
**once** [3] - 38:7, 61:20, 69:3
**one** [38] - 8:17, 8:18, 11:25, 13:24, 19:14, 20:18, 24:23, 30:20, 31:12, 34:14, 35:16, 38:3, 50:21, 55:21, 56:4, 58:4, 59:2, 62:13, 67:25, 71:15, 80:6, 83:9, 83:12, 84:1, 86:8, 97:22, 100:15, 112:23, 112:25, 113:1, 116:18, 116:19, 123:23, 123:25, 124:6
**ongoing** [1] - 8:4
**Op** [2] - 44:12, 44:13
**opened** [2] - 79:9, 95:14

**operable** [2] - 119:16, 120:12
**operate** [1] - 5:17
**opinion** [7] - 10:9, 13:5, 20:16, 23:8, 72:6, 72:23, 79:4
**opinions** [2] - 72:21, 79:14
**opportunity** [3] - 48:8, 95:9, 115:16
**order** [3] - 12:11, 16:10, 73:13
**Origin** [1] - 36:21
**original** [1] - 9:9
**originally** [1] - 9:19
**otherwise** [2] - 28:8, 120:11
**ourselves** [1] - 15:16
**outcome** [2] - 9:7, 9:12
**outs** [7] - 45:4, 46:3, 46:20, 46:23, 51:13, 52:9, 58:16
**outside** [7] - 22:19, 42:8, 61:9, 78:19, 92:18, 119:12
**overall** [1] - 25:8
**overheard** [1] - 123:12
**overruled** [20] - 45:3, 49:10, 50:9, 52:3, 80:20, 83:11, 84:17, 89:8, 94:22, 95:7, 96:16, 101:16, 105:14, 109:6, 110:19, 110:24, 111:3, 111:11, 112:14, 114:15
**own** [6] - 31:23, 40:21, 82:16, 82:18, 84:8, 97:18

**P**

**p.m** [1] - 124:22
**package** [4] - 91:13, 91:14, 91:17, 91:20
**Page** [2] - 33:14, 34:20
**PAGE** [2] - 1:22, 3:2
**paid** [5] - 9:8, 9:9, 9:10, 14:1, 15:19
**pain** [6] - 93:3, 93:9, 93:15, 93:16, 93:21, 94:5
**pair** [2] - 49:4, 50:4
**pants** [8] - 52:20, 53:4, 53:6, 57:25, 58:1, 87:8, 102:20
**Park** [3] - 5:24, 6:2, 6:4
**parking** [2] - 47:15, 59:4

**part** [11] - 23:16, 27:16, 33:24, 40:14, 70:7, 70:22, 73:2, 98:23, 98:25, 107:11, 116:24
**participate** [1] - 9:20
**particular** [8] - 11:5, 22:25, 29:19, 30:11, 36:17, 58:13, 89:5, 102:13
**partly** [2] - 39:16
**partnered** [3] - 33:15, 33:17, 34:10
**pass** [3] - 57:14, 94:1, 94:12
**passed** [3] - 15:18, 41:9, 94:1
**passenger** [1] - 123:18
**passing** [3] - 12:19, 14:15
**past** [18] - 10:16, 12:3, 12:11, 29:3, 29:5, 40:14, 40:17, 40:18, 52:19, 52:21, 52:22, 52:23, 52:25, 53:2, 53:10, 53:11, 57:21, 123:18
**pastor** [1] - 94:23
**pat** [1] - 60:1
**pat-down** [1] - 60:1
**Pause** [5] - 43:7, 43:11, 59:16, 68:1, 108:21
**pay** [6] - 29:13, 29:16, 32:9, 37:17, 58:14
**payment** [2] - 9:11, 33:8
**payments** [1] - 32:7
**pending** [1] - 15:4
**People** [1] - 36:19
**people** [27] - 14:16, 14:17, 19:4, 23:17, 23:22, 24:25, 25:9, 25:13, 25:14, 25:16, 25:24, 26:2, 26:8, 26:10, 26:12, 26:17, 26:19, 27:9, 33:10, 34:10, 39:9, 45:11, 51:18, 58:16, 61:11, 110:17
**People's** [2] - 44:12, 44:13
**people's** [1] - 29:13
**per** [3] - 15:11, 17:22, 37:20
**percent** [25] - 9:1, 13:16, 14:11, 14:23, 15:11, 16:1, 16:3, 17:22, 18:5, 20:9,

20:11, 20:14, 23:25, 24:2, 24:4, 24:6, 24:7, 28:16, 29:1, 34:5, 34:6, 34:8, 35:13
**percentage** [3] - 24:24, 26:3, 31:12
**perfectly** [1] - 73:10
**perform** [1] - 11:2
**perhaps** [4] - 26:22, 26:23, 42:23, 52:1
**perimeter** [1] - 61:21
**period** [5] - 19:21, 43:25, 44:23, 46:1, 46:23
**periods** [1] - 13:1
**person** [7] - 15:20, 19:22, 19:23, 33:17, 79:8, 94:1, 118:12
**person's** [2] - 16:17, 16:21
**Personal** [1] - 36:19
**personal** [13] - 15:14, 15:15, 15:24, 18:2, 19:19, 31:19, 32:11, 32:16, 32:18, 35:14, 85:16, 89:3, 89:14
**personally** [1] - 9:14
**Ph.D** [4] - 3:3, 5:4, 6:2, 6:5
**phone** [28] - 9:19, 62:14, 86:13, 86:15, 88:11, 88:14, 88:17, 88:21, 89:5, 89:11, 89:12, 89:15, 89:17, 89:18, 89:22, 90:3, 90:4, 90:12, 90:13, 92:7, 98:9, 98:22, 115:1, 115:2, 115:7, 115:10, 115:12, 115:15
**phones** [1] - 115:5
**photograph** [6] - 55:7, 86:3, 86:10, 86:23, 87:16, 89:17
**physically** [1] - 49:20
**physician** [3] - 93:18, 93:20, 121:13
**pick** [2] - 81:5, 100:10
**picture** [2] - 86:6, 89:12
**pictures** [2] - 115:14, 115:16
**pie** [1] - 70:25
**pieces** [1] - 74:6
**place** [3] - 42:21, 43:4, 113:5
**placed** [1] - 72:17
**Plaintiff** [2] - 1:4, 1:13
**plaintiff** [11] - 5:1,

8:20, 41:22, 65:21, 66:13, 66:24, 67:5, 67:12, 67:14, 75:16, 118:5
**Plaintiff's** [4] - 55:6, 84:23, 86:2, 86:18
**plaintiff's** [5] - 8:22, 8:23, 9:2, 66:8, 69:10
**plaintiffs** [2] - 65:10, 65:13, 66:16
**plan** [2] - 94:19, 122:21
**planning** [2] - 117:25, 124:9
**plans** [1] - 7:21
**plant** [2] - 66:8, 67:23
**planted** [3] - 68:23, 69:11, 71:1
**planting** [6] - 65:12, 65:15, 65:18, 66:11, 71:5, 73:17
**planting-the-gun** [1] - 71:5
**play** [1] - 72:20
**Plaza** [1] - 6:14
**PLFPC@aol.com** [1] - 1:16
**plus** [1] - 46:22
**pocket** [2] - 32:25, 34:18
**point** [10] - 20:2, 61:17, 67:13, 106:5, 106:7, 117:16, 123:4, 123:9, 123:12, 124:11
**police** [30] - 45:8, 45:10, 45:11, 45:20, 46:10, 53:20, 54:4, 54:13, 54:15, 55:14, 55:17, 56:25, 57:2, 57:4, 57:5, 58:9, 58:11, 59:2, 61:17, 61:20, 62:24, 64:7, 72:24, 73:3, 85:11, 101:20, 103:4, 111:7
**polo** [3] - 86:24, 87:17, 87:18
**Ponds** [14] - 4:24, 37:8, 66:24, 67:21, 70:1, 72:24, 74:16, 75:9, 75:10, 116:20, 116:25, 117:8, 117:10, 118:7
**PONDS** [79] - 1:13, 1:14, 4:4, 4:18, 4:25, 5:6, 9:21, 10:10, 21:5, 33:4, 37:4, 37:9, 37:11, 41:16, 42:4, 42:9, 42:13,

42:15, 42:17, 42:20, 42:25, 67:20, 67:24, 68:7, 68:10, 68:13, 68:17, 68:20, 69:7, 69:18, 69:23, 70:3, 70:10, 70:12, 71:12, 71:17, 71:22, 72:2, 73:5, 73:8, 74:18, 74:21, 74:25, 75:2, 75:6, 101:15, 117:11, 117:21, 117:24, 118:9, 118:12, 118:15, 118:19, 118:21, 119:5, 119:8, 119:19, 119:25, 120:3, 120:10, 120:15, 120:19, 121:5, 121:8, 121:12, 121:14, 121:16, 121:20, 121:23, 122:22, 123:11, 123:15, 123:21, 123:24, 124:2, 124:6, 124:9, 124:17, 124:20

**Ponds**........................
.............. [2] - 3:4, 3:5

**Population** [1] - 36:18

**porch** [6] - 47:6, 47:23, 47:24, 48:1, 48:6, 50:22

**portfolio** [3] - 18:25, 19:3, 19:10

**portion** [4] - 12:2, 15:16, 32:8, 33:8

**possessed** [1] - 119:3

**possession** [1] - 101:14

**possibility** [1] - 68:18

**possible** [3] - 20:20, 28:20, 41:14

**possibly** [1] - 30:20

**practice** [3] - 5:18, 7:16, 8:25

**practitioners** [1] - 36:17

**predicate** [2] - 67:23, 74:5

**predict** [1] - 29:4

**predicting** [1] - 40:16

**pregnant** [1] - 103:21

**prejudiced** [1] - 65:21

**prep** [1] - 113:25

**preparing** [2] - 113:21, 114:3

**prepping** [1] - 108:3

**present** [6] - 5:19, 11:23, 18:21, 18:22,

18:24, 67:2

**presentations** [1] - 8:6

**President** [2] - 40:9, 40:10

**press** [10] - 116:10, 116:22, 116:25, 117:9, 117:12, 117:14, 117:15, 117:17

**pretrial** [4] - 73:13, 73:18, 120:18, 123:14

**pretty** [2] - 56:2, 105:17

**prevailing** [4] - 10:18, 12:4, 16:7, 16:9

**previous** [2] - 81:25, 96:4

**previously** [1] - 86:18

**primarily** [1] - 11:14

**principal** [1] - 19:1

**principals** [1] - 9:15

**principle** [1] - 22:13

**prints** [4] - 66:12, 66:13, 66:14, 118:20

**private** [3] - 14:10, 15:10, 25:19

**privy** [1] - 67:16

**pro** [2] - 7:20, 7:24

**probabilities** [3] - 14:13, 18:14, 34:9

**probability** [4] - 13:9, 33:15, 33:16, 33:21

**problem** [2] - 24:16, 39:19

**problematic** [1] - 118:4

**problems** [4] - 24:24, 31:13, 36:22, 117:2

**proceed** [2] - 80:9, 113:20

**proceeding** [1] - 51:19

**proceedings** [1] - 125:6

**Proceedings** [1] - 1:24

**process** [1] - 97:10

**produce** [1] - 9:12

**produced** [2] - 1:25, 65:20

**productivity** [1] - 15:9

**Professor** [3] - 5:10, 21:16, 21:20

**professor** [9] - 5:12, 6:7, 6:9, 6:16, 6:21, 7:4, 7:8, 21:17, 41:19

**proffer** [5] - 65:17, 67:5, 67:13, 68:15, 68:24

**proffered** [1] - 71:4

**proffering** [1] - 65:21

**profile** [2] - 26:25, 35:21

**profits** [1] - 7:19

**program** [6] - 76:20, 76:23, 108:4, 113:24, 114:3

**progress** [1] - 13:21

**projected** [1] - 38:24

**projecting** [2] - 24:2, 24:4

**projections** [7] - 11:16, 14:21, 15:10, 23:24, 38:21, 40:2

**promoted** [1] - 6:9

**promotions** [1] - 17:23

**protrudes** [1] - 120:7

**prove** [4] - 69:2, 70:2, 71:6, 93:2

**provided** [3] - 7:14, 11:6, 11:23

**providing** [1] - 7:5

**public** [1] - 117:11

**publish** [1] - 88:8

**published** [2] - 7:25, 8:3

**publishers** [1] - 7:23

**pull** [4] - 87:3, 87:4, 88:3, 101:24

**pulling** [1] - 52:20, 53:5, 57:25, 58:17

**purchased** [2] - 99:12, 99:14

**purported** [1] - 69:4

**purpose** [1] - 19:15

**purposes** [2] - 117:25, 124:9

**pursuant** [1] - 73:12

**put** [14] - 55:21, 55:22, 56:6, 66:17, 66:22, 67:6, 70:18, 71:13, 73:19, 107:9, 120:17, 120:22, 121:3, 124:15

## Q

**qualified** [2] - 9:5, 10:8

**quarters** [1] - 32:21

**questioned** [1] - 66:24

**questioning** [2] - 65:21, 65:22

**questions** [10] - 11:8, 21:5, 37:7, 38:6, 38:21, 41:5, 41:16, 49:9, 70:5, 78:21

**quickly** [1] - 42:24

**quite** [1] - 43:5

**quoted** [2] - 117:14,

117:15

## R

**Race** [1] - 36:21

**race** [3] - 39:12, 40:7, 40:9

**radio** [2] - 62:16, 62:21

**Rahman** [2] - 74:2, 121:9

**raise** [8] - 25:21, 33:2, 37:18, 65:24, 77:11, 77:18, 80:8, 99:6

**raised** [2] - 39:12, 65:10, 99:2

**raises** [1] - 23:22

**raising** [3] - 35:8, 78:13

**Ralph** [10] - 47:21, 48:16, 49:5, 52:19, 55:12, 55:14, 64:15, 77:9, 78:9, 87:18

**Ralphael** [31] - 9:25, 11:20, 17:7, 38:21, 41:6, 48:5, 54:25, 56:14, 73:22, 73:25, 77:2, 77:25, 81:1, 84:2, 86:6, 92:10, 94:12, 94:17, 95:19, 96:8, 97:2, 97:15, 103:14, 103:21, 104:3, 104:15, 111:25, 115:1, 115:7, 119:12, 123:17

**Ralphael's** [2] - 10:4, 86:23

**Ralphy** [7] - 48:10, 49:12, 50:13, 52:25, 55:18, 55:24, 80:21

**Ralphy's** [1] - 50:4

**ran** [7] - 30:9, 53:2, 53:9, 53:10, 53:11, 53:16, 123:18

**rank** [1] - 5:15

**Rashida** [4] - 41:22, 43:20, 73:19, 73:22

**RASHIDA** [2] - 3:6, 43:15

**rate** [1] - 34:4

**rates** [5] - 10:18, 12:4, 16:7, 16:10, 19:2

**RDR** [3] - 2:10, 125:3, 125:10

**reach** [2] - 11:19, 110:6

**reached** [2] - 20:5, 20:22

**read** [3] - 24:18, 24:19, 24:21

117:15

**ready** [3] - 4:24, 113:25, 114:1

**real** [8] - 28:11, 28:18, 28:19, 36:9, 36:10, 36:11, 38:7, 38:17

**reality** [1] - 22:19

**really** [8] - 29:19, 47:21, 54:2, 58:14, 79:25, 92:6, 105:1, 117:13

**reason** [2] - 68:23, 71:2

**reasonable** [4] - 13:9, 20:7, 41:11, 71:6

**rebuttal** [4] - 120:21, 120:24, 121:3, 121:9

**receive** [1] - 18:16

**received** [5] - 6:5, 92:9, 92:11, 92:20, 119:9

**receiving** [1] - 9:6

**recently** [1] - 71:22

**Recess** [1] - 74:15

**recess** [6] - 42:12, 42:22, 122:14, 122:17, 124:11

**recognize** [5] - 52:9, 55:6, 84:23, 86:3, 88:14

**recognized** [1] - 58:8

**recollection** [1] - 119:1

**record** [5] - 5:9, 43:12, 73:9, 116:1, 116:3

**recorded** [1] - 1:24

**REDIRECT** [3] - 37:10, 63:12, 110:12

**reduce** [3] - 14:13, 15:14, 16:2

**reduced** [6] - 18:4, 18:17, 20:10, 20:11, 28:15, 28:16

**reduction** [3] - 18:13, 20:9

**reductions** [1] - 18:11

**refer** [1] - 27:25

**refereed** [1] - 40:24

**referred** [1] - 27:23

**referring** [2] - 74:3, 120:1

**reflect** [5] - 16:4, 18:14, 20:13, 26:20, 29:19

**reflected** [4] - 18:5, 18:7, 20:9, 26:6

**reflecting** [1] - 26:11

**regard** [8] - 21:23, 65:12, 67:1, 67:14, 73:16, 73:17, 93:4, 109:3

**regarding** [8] - 11:19, 13:5, 17:20, 17:22, 65:14, 69:22, 115:25, 116:11
**regular** [3] - 45:24, 46:23, 90:21
**regularly** [1] - 100:25
**rehab** [1] - 109:4
**related** [1] - 36:12
**relates** [2] - 69:23, 70:14
**relationship** [8] - 78:9, 78:10, 78:21, 78:24, 79:5, 79:10, 79:16, 79:19
**relevance** [9] - 56:12, 78:20, 78:22, 84:15, 92:16, 92:25, 94:6, 108:25, 118:17
**relevant** [8] - 80:19, 93:2, 93:8, 93:14, 116:4, 116:5, 119:2, 119:5
**reliable** [3] - 28:5, 38:14, 38:15
**relied** [1] - 38:8
**rely** [7] - 22:7, 22:17, 27:21, 28:3, 32:11, 38:7, 40:23
**remainder** [2] - 10:17, 13:2
**remember** [9] - 22:14, 35:21, 47:2, 48:16, 63:17, 64:7, 90:6, 106:18, 112:19
**rent** [3] - 32:3, 33:1, 33:8
**repeat** [2] - 89:10, 105:15
**rephrase** [4] - 48:4, 88:25, 91:3, 112:6
**replace** [6] - 10:16, 10:20, 12:3, 12:5, 12:11, 16:10
**replication** [1] - 29:5
**report** [22] - 9:9, 9:10, 11:7, 11:18, 13:6, 13:11, 15:5, 20:24, 22:3, 33:13, 34:20, 36:15, 41:13, 65:2, 66:5, 69:12, 70:18, 70:21, 71:20, 72:1, 108:16, 116:23
**Reporter** [2] - 2:10, 2:10, 125:10
**REPORTER** [1] - 125:1
**represent** [1] - 22:19
**representation** [1] - 30:24

**request** [1] - 43:3
**required** [1] - 12:11
**research** [6] - 6:12, 8:5, 8:7, 41:13, 65:3, 116:11
**reserve** [1] - 71:12
**residents** [2] - 61:6, 63:22
**respect** [1] - 66:4
**responsibilities** [4] - 82:22, 104:3, 104:6, 104:9
**responsibility** [1] - 81:14
**rest** [2] - 12:3, 23:2
**result** [1] - 96:11
**results** [1] - 22:19
**retired** [1] - 5:13
**retirement** [1] - 14:7
**reviews** [1] - 7:23
**Richard** [2] - 5:1, 5:10
**RICHARD** [2] - 3:3, 5:4
**Ridge** [3] - 44:18, 61:5, 104:19
**riding** [2] - 46:6, 46:7
**ringing** [1] - 92:7
**riot** [1] - 107:9
**risk** [2] - 18:25, 19:2
**riskless** [1] - 16:8
**Road** [7] - 44:1, 44:12, 44:20, 44:21, 46:2, 73:20, 73:24
**ROBERT** [1] - 2:2
**robert.deberardinis @dc.gov** [1] - 2:5
**room** [4] - 85:10, 101:3, 101:5, 101:6
**Room** [2] - 2:11, 125:11
**roughly** [3] - 18:5, 18:10, 37:20
**round** [1] - 14:22
**rowdy** [1] - 61:9
**ruled** [1] - 66:19
**ruling** [3] - 66:10, 74:4, 93:23
**run** [3] - 30:9, 30:13, 52:25
**running** [12] - 23:21, 52:20, 52:22, 52:23, 53:3, 53:6, 53:7, 53:8, 53:10, 53:11, 57:21, 58:8
**runs** [1] - 119:12

**S**

**sadly** [1] - 31:12
**sagged** [1] - 102:7
**sagging** [1] - 87:13

**salaries** [1] - 31:7
**salary** [1] - 27:6
**sat** [2] - 50:21, 55:22
**Satellite** [1] - 6:13
**savings** [2] - 14:7, 33:1
**saw** [14] - 49:19, 52:25, 53:14, 57:21, 58:8, 59:2, 59:21, 60:16, 72:17, 84:3, 88:2, 88:16, 109:25, 110:17
**scale** [1] - 39:2
**scared** [1] - 111:8
**scenario** [1] - 10:24
**scene** [6] - 61:15, 63:1, 102:25, 114:10, 114:13, 114:16
**scholarly** [1] - 40:23
**School** [4] - 106:16, 106:19, 106:21, 106:23
**school** [54] - 13:7, 13:10, 17:9, 17:12, 17:14, 22:10, 28:12, 28:22, 28:25, 32:20, 35:3, 35:24, 36:1, 36:13, 39:9, 76:6, 81:4, 81:14, 81:16, 82:3, 83:17, 91:8, 97:13, 97:23, 97:25, 99:19, 99:24, 100:1, 100:2, 100:3, 100:4, 100:8, 103:21, 106:4, 106:8, 106:12, 107:2, 107:5, 107:7, 107:10, 107:15, 107:17, 107:21, 108:11, 108:12, 108:16, 108:22, 108:24, 109:15, 111:22, 113:6, 113:8, 113:9, 115:25
**schooling** [1] - 37:18
**schools** [6] - 106:14, 107:1, 112:19, 112:23, 114:2, 116:1
**science** [2] - 5:23, 22:16
**scientific** [1] - 11:11
**scope** [3] - 79:11, 110:23, 112:13
**screaming** [1] - 61:11
**screams** [1] - 56:14
**second** [5] - 11:13, 13:4, 47:13, 47:14, 67:25
**secondly** [1] - 9:25

**secretary** [1] - 76:24
**sector** [3] - 14:10, 15:10, 25:19
**securities** [2] - 16:7, 19:18
**see** [42] - 4:6, 40:19, 45:25, 46:3, 46:20, 47:20, 47:22, 50:13, 50:24, 51:13, 53:9, 53:12, 54:23, 58:1, 59:8, 60:3, 60:7, 62:9, 62:13, 62:16, 66:2, 82:9, 84:4, 84:9, 84:25, 85:16, 89:12, 93:11, 93:24, 94:4, 101:11, 102:9, 114:22, 115:16, 116:13, 119:11, 119:20, 120:5, 120:25, 123:10, 124:4
**sees** [3] - 72:13, 72:20, 72:22
**send** [1] - 108:15
**sending** [1] - 92:8
**senior** [1] - 5:15
**Sergeant** [1] - 121:8
**sergeant** [1] - 118:15
**series** [2] - 13:19, 18:25
**serious** [1] - 101:22
**serious-looking** [1] - 101:22
**SESSION** [1] - 1:10
**seven** [3] - 8:16, 11:24, 11:25
**several** [2] - 74:5, 96:6
**Sex** [1] - 36:21
**shadow** [1] - 119:17
**shadows** [1] - 119:11
**shape** [4] - 119:16, 120:13, 120:15, 121:1
**share** [3] - 104:3, 104:6, 104:9
**shared** [1] - 115:18
**Sheehan** [4] - 122:3, 122:10, 124:11, 124:14
**shirt** [6] - 53:4, 57:24, 58:2, 86:24, 87:17, 87:18
**shooting** [3] - 70:23, 73:21, 73:25
**shorter** [1] - 19:21
**shortfall** [1] - 19:13
**shot** [13] - 53:18, 53:23, 54:25, 55:20, 60:3, 64:15, 82:1, 88:21, 92:10, 92:21,

95:19, 96:13, 96:17
**shots** [4] - 60:5, 60:6, 60:9, 63:23
**show** [9] - 14:10, 18:18, 20:1, 31:13, 33:14, 34:10, 34:24, 55:5, 67:12
**showing** [3] - 61:18, 84:22, 86:2
**shown** [2] - 33:19, 86:18
**sic** [1] - 53:19
**sic]** [1] - 35:20
**side** [4] - 46:11, 55:2, 55:3, 60:25
**sidewalk** [3] - 55:2, 60:22, 60:23
**sight** [1] - 87:4
**significant** [2] - 26:3, 31:11, 108:12
**silver** [7] - 59:8, 98:10, 98:11, 98:12, 98:15, 98:22, 98:23
**simply** [3] - 17:23, 31:7, 120:8
**sit** [3] - 42:21, 43:3, 43:4
**sits** [1] - 40:7
**sitting** [4] - 47:6, 90:3, 97:11, 123:19
**six** [6] - 8:11, 81:24, 81:25, 99:22, 100:17, 106:9
**skewed** [2] - 22:20, 30:19
**skinny** [13] - 48:24, 49:4, 49:5, 50:4, 86:25, 87:2, 87:11, 87:17, 102:5, 102:14, 102:17, 102:18, 115:4
**skullduggery** [1] - 72:18
**sky** [1] - 70:25
**slept** [2] - 84:4, 85:10
**small** [4] - 7:21, 24:24, 33:16, 77:25
**smoke** [1] - 84:20
**snooping** [1] - 85:9
**social** [2] - 31:12, 36:22
**socks** [1] - 89:14
**solely** [1] - 66:10
**someone** [7] - 15:18, 32:20, 39:1, 48:7, 51:1, 85:14, 97:16
**sometimes** [5] - 19:4, 46:25, 82:16, 103:12, 104:18
**son** [2] - 79:19, 92:21

**sorry** [20] - 16:19, 27:3, 27:22, 31:21, 34:21, 40:8, 46:16, 51:7, 52:6, 52:22, 54:10, 57:3, 58:6, 63:19, 67:2, 68:13, 69:21, 94:3, 108:9, 124:4
**sort** [2] - 14:2, 37:19
**sound** [1] - 12:22
**sounds** [1] - 35:5
**source** [2] - 36:16, 36:17
**speaking** [1] - 116:25
**special** [1] - 91:10
**specific** [1] - 25:14
**specifically** [2] - 9:22, 13:8
**speculate** [1] - 40:22
**speculating** [3] - 33:11, 33:13, 33:25
**speculation** [3] - 31:2, 31:3, 34:2
**spend** [4] - 15:15, 31:19, 31:22, 31:23
**spends** [1] - 38:1
**spent** [6] - 5:15, 15:21, 32:15, 33:1, 33:18, 33:22
**spoken** [1] - 21:20
**stand** [5] - 5:2, 31:5, 43:4, 69:3, 69:8
**standard** [2] - 16:8, 19:18
**standing** [5] - 47:23, 47:24, 48:1, 60:13, 61:21
**start** [5] - 13:12, 67:21, 74:24, 121:23, 122:18
**started** [8] - 51:18, 52:17, 61:18, 61:21, 100:2, 100:21, 100:23
**starting** [1] - 13:21
**state** [3] - 5:9, 66:12, 70:23
**statement** [2] - 73:13, 73:18, 74:1
**statements** [2] - 117:12, 117:17
**STATES** [2] - 1:1, 1:11
**States** [6] - 24:17, 25:18, 38:11, 40:9, 40:10, 125:11
**stating** [1] - 92:10
**statistic** [1] - 34:9
**statisticians** [2] - 15:1, 29:23
**Statistics** [1] - 27:15

**statistics** [23] - 11:17, 13:14, 14:9, 14:19, 17:3, 17:11, 17:17, 17:24, 18:18, 20:10, 23:20, 25:2, 26:18, 27:1, 27:25, 31:14, 33:14, 34:3, 36:7, 36:10, 36:11, 38:13, 39:3
**stats** [2] - 29:7, 29:8
**status** [1] - 6:20
**stay** [2] - 78:2, 78:3
**stay-at-home** [1] - 78:2
**stayed** [1] - 63:1
**staying** [2] - 96:12, 103:20
**steadily** [2] - 23:2, 23:18
**stenographic** [1] - 125:5
**stenography** [1] - 1:24
**step** [2] - 68:3, 75:2
**steps** [2] - 47:16, 47:19
**still** [8] - 53:21, 54:12, 64:12, 67:22, 97:22, 99:5, 110:7, 110:15
**stock** [2] - 19:5, 19:6
**stop** [3] - 20:1, 52:24, 58:25
**store** [1] - 29:11
**stream** [2] - 16:11, 17:24
**Street** [4] - 1:14, 1:18, 2:3, 121:12
**street** [2] - 60:20, 64:11
**stretch** [1] - 43:5
**strike** [2] - 41:15, 54:23
**strong** [1] - 79:4
**students** [2] - 7:6
**studies** [1] - 30:10
**study** [1] - 38:18
**stuff** [10] - 29:18, 57:8, 84:13, 84:18, 84:21, 101:4, 101:7, 101:11, 101:12
**style** [2] - 87:7, 87:14
**subject** [2] - 6:22, 9:22, 10:5
**subsequent** [1] - 73:21
**substance** [2] - 35:8, 41:10
**successful** [1] - 83:8
**suffering** [6] - 93:3, 93:9, 93:15, 93:17, 93:22, 94:5

**suggest** [1] - 71:20
**suggested** [1] - 67:15
**suggesting** [2] - 31:5, 117:4
**suggestion** [1] - 72:18
**Suite** [2] - 1:15, 1:19
**sum** [5] - 10:14, 10:15, 10:25, 12:10, 12:11
**Superior** [1] - 8:19
**support** [1] - 66:7
**supporting** [1] - 33:23
**suppose** [1] - 19:19
**supposed** [1] - 83:20
**suppression** [1] - 116:24
**surplus** [12] - 32:18, 32:19, 32:22, 34:12, 34:24, 35:4, 35:5, 37:1, 37:12, 37:13, 37:14, 41:4
**surpluses** [1] - 32:16
**surprises** [1] - 70:20
**surprising** [2] - 96:14, 96:18
**survey** [2] - 25:2, 27:19
**Survey** [1] - 36:18
**surveys** [2] - 25:13, 36:12
**survival** [3] - 14:13, 14:20, 18:14
**survived** [3] - 10:24, 15:20, 15:21
**survivors** [4] - 11:9, 15:22, 33:10, 41:9
**suspended** [3] - 107:1, 107:4, 107:6
**sustained** [15] - 21:4, 33:7, 37:5, 47:10, 56:13, 78:16, 88:1, 91:3, 92:13, 94:16, 95:15, 97:6, 105:25, 114:9
**SUV** [7] - 52:16, 53:11, 59:6, 59:8, 60:25, 61:2, 61:6
**SUVs** [1] - 45:22
**swag** [1] - 87:22
**swear** [1] - 43:13
**Sworn** [3] - 5:4, 43:15, 75:18

---

## T

**table** [3] - 20:1, 20:3, 38:19
**Table** [2] - 33:19, 36:19
**tables** [1] - 12:18
**tank** [2] - 48:20, 59:10

**tap** [1] - 118:8
**tape** [2] - 72:17, 72:23
**taught** [4] - 6:23, 7:2, 22:12, 87:9
**taxes** [2] - 32:9, 32:12
**teach** [2] - 6:6, 6:22
**teaching** [1] - 5:14
**Tech** [1] - 76:9
**Teeter** [3] - 83:13, 83:24, 84:2
**temp** [1] - 78:7
**ten** [4] - 44:23, 46:22, 81:11, 122:24
**ten-minute** [1] - 122:24
**ten-plus** [1] - 46:22
**ten-year-old** [1] - 81:11
**tended** [1] - 31:8
**tendency** [2] - 29:23, 30:8
**Tennessee** [1] - 118:4
**tenure** [2] - 6:10, 6:18
**term** [4] - 15:12, 23:11, 45:4, 45:7
**terminology** [1] - 53:24
**terms** [13] - 8:20, 9:24, 10:23, 16:12, 17:10, 20:22, 27:5, 27:6, 39:22, 39:23, 41:12, 41:14, 68:22
**Terri** [1] - 74:16
**test** [1] - 114:1
**testified** [21] - 8:9, 8:12, 20:6, 25:17, 59:18, 61:24, 63:16, 63:21, 64:2, 65:19, 68:2, 70:21, 89:18, 98:9, 99:2, 100:6, 100:25, 102:5, 103:6, 112:2, 119:10
**testifies** [2] - 72:22, 73:2
**testify** [19] - 9:4, 65:18, 69:11, 69:15, 69:18, 70:12, 71:8, 71:17, 72:7, 73:23, 79:12, 94:3, 94:4, 94:5, 94:7, 110:3, 110:5, 119:14, 123:5
**testifying** [3] - 8:20, 71:16, 72:20
**testimonies** [2] - 8:13, 85:5
**testimony** [32] - 41:20, 42:18, 65:11, 65:16, 65:17, 65:18, 65:20, 66:23, 67:22, 68:16, 70:6, 70:7, 71:21,

72:3, 72:15, 73:17, 74:6, 74:8, 74:9, 78:24, 94:2, 105:13, 109:2, 112:3, 114:4, 115:25, 116:4, 118:18, 119:6, 120:17, 123:7, 124:10
**text** [6] - 92:9, 92:11, 92:20, 92:24, 105:20, 105:23
**textbook** [1] - 7:23
**THE** [196] - 1:1, 1:1, 1:10, 4:2, 4:9, 4:11, 4:16, 4:20, 4:23, 5:3, 10:6, 10:8, 15:5, 21:4, 21:7, 33:7, 37:5, 37:8, 41:18, 41:19, 41:21, 41:24, 42:3, 42:6, 42:11, 42:21, 43:2, 43:8, 43:12, 45:3, 45:14, 45:16, 45:17, 47:10, 48:4, 49:3, 49:10, 50:3, 50:9, 52:3, 54:22, 56:13, 57:16, 59:15, 63:10, 64:23, 64:24, 65:8, 66:1, 66:20, 67:7, 67:10, 67:19, 67:21, 67:25, 68:2, 68:9, 68:12, 68:14, 68:19, 69:4, 69:9, 69:14, 69:21, 69:24, 70:8, 70:11, 70:16, 71:15, 71:19, 71:24, 72:12, 72:22, 73:4, 73:6, 73:11, 73:14, 74:3, 74:14, 74:16, 74:19, 74:22, 75:1, 75:5, 75:7, 75:11, 75:15, 77:16, 78:16, 78:20, 79:1, 79:18, 79:22, 80:1, 80:4, 80:6, 80:7, 80:20, 83:11, 84:17, 86:1, 86:21, 88:1, 88:7, 88:10, 88:24, 89:8, 91:3, 92:13, 92:16, 92:19, 92:22, 92:25, 93:5, 93:11, 93:14, 93:18, 94:2, 94:9, 94:16, 94:22, 95:7, 95:15, 96:16, 97:6, 98:3, 98:4, 98:18, 98:20, 98:21, 101:16, 105:14, 105:25, 109:1, 109:6, 110:10, 110:19, 110:24, 111:3, 111:11, 112:6, 112:14,

113:16, 113:18, 113:20, 114:9, 114:15, 114:19, 115:21, 115:22, 115:23, 115:24, 116:18, 117:4, 117:10, 117:18, 117:22, 118:2, 118:7, 118:11, 118:14, 118:17, 118:20, 119:2, 119:7, 119:15, 119:23, 120:1, 120:6, 120:13, 120:18, 120:20, 120:25, 121:6, 121:11, 121:13, 121:15, 121:18, 121:22, 122:1, 122:6, 122:10, 122:14, 122:17, 122:21, 122:25, 123:3, 123:9, 123:13, 123:20, 123:22, 123:25, 124:3, 124:8, 124:13, 124:18

**themselves** [2] - 33:18, 102:18

**theory** [11] - 65:15, 66:8, 66:11, 66:17, 67:23, 71:5, 72:19, 74:5, 78:20, 94:6

**there'd** [1] - 10:22

**therefore** [2] - 17:15, 119:17

**they've** [4] - 46:15, 46:17, 116:23, 123:5

**thigh** [1] - 102:21

**three** [12] - 8:14, 10:2, 10:5, 10:9, 12:15, 32:21, 46:21, 55:4, 60:21, 77:8, 122:23, 123:5

**three-quarters** [1] - 32:21

**throwing** [2] - 67:17, 69:22

**thrown** [2] - 66:25, 67:4

**Thursday** [4] - 71:18, 121:21, 121:22, 121:23

**tie** [2] - 80:18, 97:1

**tight** [5] - 48:20, 48:22, 48:25, 49:15

**tight-fitted** [2] - 48:22, 48:25

**title** [2] - 21:19, 27:18

**today** [15] - 5:7, 9:10,

9:18, 10:14, 10:25, 12:2, 12:11, 16:9, 20:6, 74:23, 97:4, 109:18, 109:20, 116:3, 116:8

**together** [3] - 7:11, 13:2, 81:15

**tomorrow** [6] - 71:17, 74:24, 118:8, 118:9, 121:7, 121:19

**tone** [1] - 54:15

**took** [5] - 20:10, 20:17, 57:10, 91:8, 99:10

**top** [8] - 25:9, 26:12, 38:18, 48:20, 59:10, 98:16, 98:22, 119:13

**Torres** [6] - 66:23, 66:24, 67:2, 67:15, 67:16, 70:15

**Total** [1] - 36:20

**total** [3] - 7:5, 8:16, 35:13

**totality** [1] - 66:9

**totally** [2] - 22:17, 31:14

**touch** [1] - 49:20

**touching** [2] - 58:1, 58:2

**toward** [3] - 14:4, 14:7, 35:8

**towards** [2] - 53:19, 56:18

**tragedy** [1] - 114:21

**transcript** [3] - 1:24, 125:5, 125:6

**TRANSCRIPT** [1] - 1:10

**transcription** [1] - 1:25

**transpire** [1] - 81:23

**transpired** [1] - 103:3

**transportation** [1] - 25:14

**travel** [1] - 37:16

**Treasury** [2] - 16:7, 19:17

**treating** [1] - 121:13

**tremendous** [2] - 24:16, 24:23

**trend** [1] - 39:23

**trending** [1] - 39:24

**trends** [2] - 39:23, 40:12

**TRIAL** [1] - 1:10

**trial** [8] - 8:13, 65:11, 85:2, 97:10, 109:18, 109:20, 117:1, 117:23

**trials** [1] - 8:13

**trigger** [1] - 101:24

**troubles** [1] - 37:1

**truck** [2] - 25:15, 25:20

**true** [9] - 23:24, 25:2, 28:24, 31:16, 106:13, 106:25, 107:3, 125:4, 125:6

**trusted** [1] - 79:14

**try** [2] - 123:25, 124:15

**trying** [2] - 72:8, 111:19

**TSP** [1] - 14:8

**Tuesday** [1] - 1:5

**turn** [7] - 11:9, 16:23, 16:25, 46:8, 46:15, 46:17

**turning** [2] - 47:1, 53:9

**twelve** [1] - 17:11

**twice** [2] - 73:22, 73:25

**twist** [1] - 55:22

**two** [17] - 8:17, 8:19, 11:4, 34:7, 46:21, 55:1, 55:4, 60:21, 66:1, 66:3, 68:21, 69:24, 81:4, 81:6, 83:17, 96:7, 122:22

**Tyler** [1] - 123:8

**type** [3] - 5:21, 7:13, 71:13

**types** [1] - 7:18

**typically** [1] - 16:24

## U

**U-turn** [1] - 46:17

**U.S** [4] - 2:11, 8:14, 16:7, 19:17

**ultimate** [2] - 17:7, 35:16

**ultimately** [1] - 107:17

**uncomfortable** [1] - 79:25

**under** [6] - 24:1, 34:6, 34:7, 49:14, 71:24, 117:18

**underclothes** [1] - 89:14

**undergraduate** [1] - 7:3

**underlying** [1] - 22:18

**understood** [3] - 66:10, 74:6, 92:25

**unemployed** [1] - 36:25

**unfortunately** [1] - 30:15

**United** [6] - 24:17, 25:18, 38:11, 40:9, 40:10, 125:11

**UNITED** [2] - 1:1, 1:11

**universities** [1] - 6:22

**university** [2] - 6:6, 6:20

**University** [8] - 5:13, 5:24, 6:1, 6:8, 6:10, 6:16, 6:19, 25:21

**unless** [2] - 21:15, 67:5, 94:6

**unmarked** [2] - 45:23, 45:24

**unqualified** [1] - 9:3

**unsure** [1] - 73:15

**up** [63] - 19:8, 19:24, 25:6, 25:7, 25:10, 26:10, 26:11, 26:14, 26:15, 31:13, 32:21, 36:25, 43:4, 45:15, 46:6, 49:6, 52:20, 53:6, 53:10, 53:11, 53:16, 53:18, 53:19, 53:21, 54:6, 54:12, 54:16, 54:17, 54:19, 55:21, 55:23, 57:25, 61:18, 62:19, 62:22, 62:23, 64:12, 64:20, 67:1, 69:2, 70:2, 71:6, 74:24, 76:25, 80:18, 81:5, 83:25, 87:4, 88:3, 90:12, 97:1, 100:10, 107:15, 109:1, 111:11, 113:13, 114:6, 116:8, 118:6, 121:9, 122:18

**upbringing** [1] - 78:21

**upset** [2] - 64:16, 64:18

**upward** [1] - 40:12

**utilities** [1] - 37:17

**utilize** [2] - 11:12, 11:13

**utilized** [1] - 19:16

## V

**vacations** [1] - 14:1

**valor** [1] - 116:24

**valuation** [1] - 7:19

**value** [16] - 11:20, 11:24, 12:7, 12:8, 12:9, 12:10, 12:14, 14:2, 15:1, 18:21, 18:22, 18:24, 30:6, 30:7

**vantage** [2] - 123:9, 123:12

**varies** [1] - 14:5

**variety** [1] - 8:4

**various** [6] - 6:21, 8:14, 27:19, 70:5,

70:12, 116:1

**vehicle** [1] - 19:14

**verify** [1] - 74:1

**vests** [1] - 58:11

**vibrate** [1] - 4:13

**vicinity** [1] - 73:20

**video** [1] - 119:9

**videotape** [5] - 70:6, 70:14, 72:4, 72:13, 95:21

**visit** [1] - 96:11

**visiting** [1] - 104:20

**vocational** [11] - 9:23, 10:24, 11:7, 13:5, 19:22, 20:16, 23:7, 23:10, 23:19, 41:13, 109:4

**voice** [3] - 45:14, 54:15, 92:8

**volatile** [1] - 19:8

**vs** [1] - 1:5

## W

**wage** [8] - 11:16, 13:21, 15:10, 17:20, 23:23, 28:11, 35:23

**wages** [7] - 15:8, 27:20, 28:18, 28:19, 35:21, 35:23

**waist** [2] - 49:6, 87:3

**waistband** [3] - 50:6, 50:11, 57:22

**wait** [6] - 43:5, 75:3, 75:9, 75:10, 89:25, 91:14

**waiting** [2] - 48:2, 48:7

**walk** [6] - 47:16, 51:19, 52:5, 52:8, 52:17, 53:19

**walked** [4] - 47:19, 50:19, 50:22, 53:19

**walking** [5] - 47:5, 52:19, 53:18, 55:3, 58:18

**wash** [1] - 103:10

**washed** [1] - 82:18

**washing** [1] - 82:22

**Washington** [10] - 1:4, 1:15, 1:19, 2:4, 2:12, 43:22, 76:5, 77:23, 81:19, 125:12

**waving** [1] - 64:9

**ways** [1] - 69:19

**weapon** [10] - 65:12, 66:11, 66:15, 101:22, 119:9, 119:14, 119:21, 119:23, 119:24, 120:5

**wear** [6] - 48:24, 49:17, 87:7, 87:11, 102:20, 115:4
**wearing** [5] - 49:4, 50:4, 86:23, 86:24, 102:19
**week** [2] - 46:19, 46:21
**weeks** [1] - 111:12
**welcome** [5] - 4:20, 64:23, 98:3, 115:21, 115:23
**west** [6] - 41:24, 63:10, 75:15, 80:9, 110:10, 118:24
**WEST** [62] - 1:17, 1:18, 4:6, 4:10, 4:13, 41:22, 42:1, 42:14, 42:16, 42:19, 43:17, 49:2, 50:2, 54:21, 57:14, 63:11, 63:13, 64:22, 73:9, 73:12, 73:15, 74:13, 75:10, 75:16, 75:20, 77:17, 78:22, 79:3, 79:21, 79:24, 80:2, 80:10, 80:18, 85:25, 86:17, 88:5, 88:8, 89:1, 91:4, 92:14, 92:20, 92:23, 93:2, 93:7, 93:13, 93:16, 93:21, 94:8, 94:11, 95:14, 97:1, 98:2, 105:12, 105:22, 105:24, 108:25, 109:5, 110:11, 110:13, 113:17, 113:19, 115:20
**West**)........................
................ [3] - 3:6, 3:7, 3:9
**West**)........................
...............**110** [1] - 3:10
**White** [1] - 40:7
**white** [1] - 31:6
**whole** [3] - 24:10, 76:21, 100:4
**widely** [2] - 36:16, 38:15
**wife** [1] - 123:17
**willing** [1] - 110:21
**windfall** [1] - 19:13
**window** [4] - 66:25, 67:4, 67:18, 69:22
**withdraw** [2] - 10:19, 12:4
**WITNESS** [10] - 21:7, 41:18, 41:21, 45:16, 64:23, 80:6, 98:3, 98:20, 115:21,

115:23
**witness** [24] - 4:24, 33:5, 37:7, 43:13, 49:2, 50:2, 54:21, 57:14, 65:17, 69:3, 71:14, 71:18, 72:7, 72:14, 73:18, 85:25, 88:6, 110:7, 110:15, 116:8, 118:25, 122:24, 123:6, 124:15
**WITNESSES** [1] - 3:2
**witnesses** [11] - 4:10, 68:5, 71:4, 71:7, 110:21, 111:19, 121:10, 121:16, 122:23, 123:5
**word** [5] - 30:25, 31:1, 35:5, 70:16, 87:9
**wore** [2] - 102:14, 102:17
**worker** [1] - 29:12
**workers** [4] - 25:15, 25:18, 25:19, 39:4
**works** [1] - 122:19
**world** [7] - 36:9, 36:10, 36:11, 37:16, 38:7, 38:17, 40:19
**worth** [1] - 32:22
**wow** [1] - 37:15
**wrap** [3] - 111:11, 116:8, 118:6
**wrongful** [2] - 8:16, 18:1

## Y

**year** [36] - 10:18, 12:4, 12:5, 13:19, 13:20, 14:20, 14:24, 15:11, 15:13, 17:22, 18:14, 18:19, 23:23, 23:25, 24:3, 24:6, 29:1, 34:7, 35:1, 35:21, 37:21, 37:23, 38:22, 38:24, 46:23, 81:9, 81:11, 99:24, 99:25, 100:1, 100:2, 100:4
**year's** [1] - 18:17
**years** [50] - 5:15, 5:20, 7:5, 7:9, 7:10, 7:12, 8:2, 8:11, 10:3, 13:8, 13:15, 15:12, 17:11, 19:7, 19:25, 28:13, 28:16, 28:21, 29:2, 30:22, 31:4, 31:8, 31:9, 32:23, 33:19, 34:17, 35:1, 35:16, 36:4, 37:3, 37:15, 37:19, 37:25, 39:18, 40:2, 40:11, 41:7,

44:24, 51:24, 76:15, 81:23, 85:21, 85:23, 96:4, 96:6, 96:7, 106:11
**Years** [1] - 36:20
**yelling** [6] - 54:16, 54:18, 55:20, 55:25, 56:1, 61:11
**yesterday** [1] - 21:1
**young** [2] - 56:19, 84:1
**younger** [1] - 16:3
**yourself** [8] - 8:21, 33:22, 43:18, 75:23, 77:14, 77:18, 99:5, 108:7

## Z

**zero** [2] - 11:25