```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3    - - - - - - - - - - - - - - - x
      BRIDZETTE LANE,
                                         CA No:  1:12-cv-00514-CRC
 4                 Plaintiff,

 5                                       Washington, D.C.
                                         Wednesday, February 4, 2015
      vs.                                9:09 a.m.
 6

 7    DISTRICT OF COLUMBIA, ET AL.,

 8                 Defendants.
      - - - - - - - - - - - - - - - x
 9    _____

10                    TRANSCRIPT OF JURY TRIAL
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                   UNITED STATES DISTRICT JUDGE

12    _____

      APPEARANCES:
13

14    For the Plaintiff:          BILLY L. PONDS, ESQ.
                                   PONDS LAW FIRM
15                                 1250 24th Street, NW
                                   Suite 300
16                                 Washington, DC 20037
                                   (202) 333-2922
17                                 PLFPC@aol.com

18                                 KIRA ANNE WEST, ESQ.
                                   LAW OFFICES OF KIRA ANNE WEST
19                                 1325 G Street, NW
                                   Suite 500
20                                 Washington, DC 20005
                                   (202) 236-2042
21                                 kiraannewest@gmail.com

22
      (CONTINUED ON NEXT PAGE)
23

24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer-aided transcription
```

1    APPEARANCES (CONTINUED):

2    For the Defendant:        **KERSLYN D. FEATHERSTONE, ESQ.**
                               **ROBERT A. DeBERARDINIS, JR., ESQ.**
3                              OFFICE OF ATTORNEY GENERAL/DC
                               441 Fourth Street, NW
4                              Washington, DC 20001
                               (202) 724-6600
5                              kerslyn.featherstone@dc.gov
                               robert.deberardinis@dc.gov
6

7

8

9

10   Court Reporter:          Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
11                             U.S. Courthouse, Room 6718
                               333 Constitution Avenue, NW
12                             Washington, DC  20001
                               202-354-3187
13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

   <u>WITNESSES</u>                                        <u>PAGE</u>
3
   JAMES STREET, M.D.
4        (By Mr. Ponds)...................................... 34

5  JORDAN KATZ
        (By Ms. West)....................................... 40
6
   ERIC COKER
7        (By Mr. Ponds).....................................171
        (By Ms. Featherstone)..............................202
8
   CHAD LEO
9        (By Mr. Ponds).....................................216

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      P R O C E E D I N G S
```

2          MS. FEATHERSTONE:  Good morning, Your Honor.

3          THE COURT:  Good morning.  How is everyone?

4          MS. FEATHERSTONE:  Just fine, Your Honor.

5          MR. DeBERARDINIS:  Just fine, Your Honor.

6          THE COURTROOM DEPUTY:  Civil Case No. 12-514,

7    *Bridzette Lane vs. District of Columbia, et al.*  For the

8    plaintiff, we have Billy Ponds and Kira West.  For the

9    defendants, we have Kerslyn Featherstone and Robert

10   DeBerardinis.

11         THE COURT:  Ms. Featherstone, is everything okay?

12         MS. FEATHERSTONE:  Yes, Your Honor.

13         THE COURT:  Good.  Good to see you.  Okay.

14         MR. DeBERARDINIS:  Your Honor, the defense would

15   like to raise something with the Court.

16         THE COURT:  Okay.

17         MR. DeBERARDINIS:  Your Honor, yesterday, over

18   objection, the Court permitted a witness to testify that

19   there were lots of people out there, but they were afraid to

20   talk because they were afraid of the police, and I thought

21   about that last night, and I thought, with all due respect,

22   how highly improper and inflammatory that was.  It's

23   inadmissible on about five different levels, Your Honor.

24   One, the witness is not competent to testify about other

25   people's feelings; number two, if she heard people say that,

1    it's hearsay; but number three, more importantly, it's

2    highly inflammatory because it creates the inference that if

3    it weren't for the police scaring people, we'd have all

4    kinds of witnesses down here testifying for the plaintiff.

5            And we're asking for the Court to give a

6    cautionary -- not a -- a curative instruction to the jury

7    that we need to fashion this morning.

8            THE COURT:  Ms. West.

9            MS. WEST:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MS. WEST:  The plaintiff's position is, Your

12   Honor, that the defense yesterday in cross-examination

13   opened the door, and I would have to refer to my notes to

14   know exactly what the question was, and I don't want to

15   misrepresent something to the Court, but that is our

16   position, that they opened the door.  I didn't ask those

17   questions on direct examination.  That came on redirect.

18           But we don't have any problem with a curative

19   instruction.

20           THE COURT:  Okay.  Why don't you file something

21   or provide the Court something that you would propose,

22   Mr. DeBerardinis, to --

23           MR. DeBERARDINIS:  I think we need to do it right

24   away this morning, Your Honor, while -- before we take one

25   step further in this case.

```
1            THE COURT:  Well, let's do it.  If you have

2     something to propose, then propose it.

3            Let me deal with a couple of other issues first.

4            Juror No. 1 is running about ten minutes late, so

5     we have -- we probably have until about 9:25 at least before

6     we need to call the jury.

7            We raised -- an issue yesterday came up regarding

8     questioning by Mr. Ponds of Officer Torres concerning

9     testimony about the possibility that something was thrown

10    from the window of the SUV.  I asked Mr. Ponds whether --

11    how he was going to link up that testimony, and if I heard

12    you correctly, you proposed two ways:  first, your expert's

13    supposed interpretation of the video; and second, through

14    Officer Leo.  Is that correct?

15           MR. PONDS:  I think there could be a third witness

16    also, Your Honor.

17           THE COURT:  Okay.  What is that third witness?

18    Are those -- are the first two correct?

19           MR. PONDS:  That is correct, Your Honor.

20           THE COURT:  Okay.  And who is your third?

21           MR. PONDS:  Detective Rahman.

22           THE COURT:  Rahman.

23           MR. PONDS:  He was one of the investigators -- he

24    was one of the detectives that was investigating the

25    shooting for the Force Investigative Team.
```

1          THE COURT:  Okay.  With respect to anything that

2    may be shown on the video, I cannot rule without knowing

3    what it is you're actually talking about so if you want to

4    elicit any -- if you want to make any argument about the

5    video depicting something potentially being thrown, you need

6    to show me where on the video that is, and then we can talk

7    about that, hopefully today, so that we can --

8          MR. PONDS:  That's fine.

9          THE COURT:  -- clear this issue up, and then I can

10   determine whether that is a sufficient predicate for the

11   argument.  Okay?

12         MS. WEST:  May I be heard, Your Honor?

13         THE COURT:  Sure.

14         MS. WEST:  It goes along with the sufficient

15   predicate, and I wanted the record to be clear that we

16   started our predicate with Ms. Rashida McNeil, who is the

17   witness that testified right before Ms. Lane, and I was very

18   careful to use my own body as an example in front of the

19   jury asking them about where she saw Ralphy's waist when she

20   gave him a hug.

21         THE COURT:  I understand.  I understand that.  I

22   think that's a separate point, and I'll get to that.

23         MS. WEST:  Okay.  I just wanted to let you know.

24         THE COURT:  Understood.

25         MS. WEST:  As far as the plaintiffs go, that's how

1    we're laying our predicate.

2              THE COURT:  Understood.  But now I'm talking about

3    whether something was thrown out of the window or not, and

4    whether there's a predicate to argue that.  Okay?

5              MR. PONDS:  We will continue to lay the predicate

6    today, Your Honor.  We'll lay it through Officer Coker, who

7    is a crime scene officer who took various photographs of the

8    items that were laying in the driveway, some were laying on

9    the grass, and then there was one object that was laying on

10   the sidewalk near the SUV.

11             THE COURT:  Okay.  That's fine.

12             MR. PONDS:  And we can show the Court, but what we

13   would ask to do is to be able to show that to the Court in

14   camera.  It goes to part of our strategy, Your Honor.

15             THE COURT:  Do you want to object to that?

16             MS. FEATHERSTONE:  Yes, Your Honor.  This is

17   trial.  There is no strategy to us on the video.  The video

18   is in evidence.  If there's evidence that the plaintiffs are

19   pointing to which we believe is not there and that they're

20   now creating a new theory of planting of a gun, we believe

21   they should have to proffer that to the defense as well

22   because this is new.

23             They've provided to the Court earlier a different

24   planting theory to support what they were going to do in

25   this case, and now they're changing that --

1          THE COURT:  Okay.

2          MS. FEATHERSTONE:  -- mid-trial.

3          THE COURT:  If you're going to argue that the

4     video shows something being thrown from a window, you need

5     to share that with the Court and with the defense, and I

6     will determine whether there's a predicate for it.  Okay?

7          MR. PONDS:  Yes, Your Honor.

8          THE COURT:  If I determine there's a predicate for

9     it, I'll let you argue that in closing.  The video is in

10    evidence, and you can make that argument in closing.  Okay?

11          I'm not going to let you elicit expert testimony

12    or testimony from your expert on that.  It seems to me that

13    that's not an area of expert testimony.  Your expert was not

14    there.  It would simply be your expert making the same

15    argument that you're going to make from a piece of evidence,

16    the video that's already in evidence.  Okay?

17          In addition to that, it wasn't in the expert's

18    report.  They weren't able to depose the expert on that

19    particular point.  Okay?

20          So if you can establish a predicate, I'll let you

21    argue it, and then they'll argue the other side in their

22    closing.  Okay?

23          MR. PONDS:  Well, two things, if the Court can

24    just hear me briefly.  I won't belabor the Court.  I

25    understand the Court's ruling.

1        THE COURT:  Yes.

2        MR. PONDS:  Number one, the District has had this

3    video in their possession since April the 26th, 2011, and

4    it's on the videotape, so there is no sense of surprise here

5    that they're not aware of what's on the videotape.  In fact,

6    I believe that they do -- are fully aware.

7        But moving beyond that point is that Mr. Bradley

8    was noted as an expert in terms of police procedures and

9    investigations.  I don't have his notice in front of me, but

10   I think, in terms of the subject matters that we covered, it

11   would be sufficient for him in terms of a former homicide

12   detective testifying in terms of police procedures.

13       THE COURT:  Whether he's -- whether he thinks the

14   video shows something coming out of the window has nothing

15   to do with police procedures.

16       MR. PONDS:  Well, it does in terms of planting the

17   evidence at a crime scene.

18       THE COURT:  No.  I've ruled on that.

19       MR. PONDS:  Okay.  I understand, Judge.

20       THE COURT:  I'm not going to let him say, "Yes, I

21   see something coming out of a window," when a juror can make

22   that conclusion if there's a predicate for it, okay?

23       MR. PONDS:  I understand the Court's ruling.

24       Then I would make a motion in limine to exclude

25   the defendants' expert from testifying that he sees a gun in

```
 1    Ralphael Briscoe's hand at some point during the time on the
 2    videotape.
 3                  THE COURT:  Let's get to that later.  Okay?
 4                  MR. PONDS:  I understand, Judge.
 5                  THE COURT:  That's a different issue.
 6                  MR. PONDS:  Okay.
 7                  THE COURT:  Okay.  Now, you asked Officer Torres,
 8    "Did you throw anything out the window?"  Answer, "No."
 9                  "Did you see Officer Leo throw anything out the
10    window?"  Answer, "No."
11                  I believe you then asked him, "Were you a party to
12    any conversations among officers discussing having thrown --
13    whether something was thrown out of the window?"  Answer,
14    "No."
15                  Is that right?
16                  MR. PONDS:  That is correct as to one and two.  As
17    to number three --
18                  THE COURT:  What was the third question?
19                  MR. PONDS:  No, the Court's right in terms of the
20    first question the Court posed and the third question.
21                  As to whether he saw Officer Leo throwing anything
22    out the window, his response was, "I wasn't paying any
23    attention to that."
24                  THE COURT:  That's correct.
25                  MR. PONDS:  And also, to add to his statement, he
```

 1    said his window was up.

 2              THE COURT:  His window was up.  That's correct.

 3              MR. PONDS:  Which would be the right rear

 4    passenger window was up where he was seated.

 5              THE COURT:  Okay.  Now, I think the first two

 6    questions are perfectly proper in my view.  You can ask

 7    folks -- I mean, and I take it that this is what you're

 8    going to link up or attempt to link up through Officer Leo;

 9    is that correct?

10              MR. PONDS:  Absolutely.

11              THE COURT:  Okay.  Then I think those first two

12    questions are proper questions.

13              The third question, although it did not elicit an

14    objection from the Government, "Did you" -- "Were you a

15    party to a conversation where someone said they threw

16    something out the window?" to that effect, I think that

17    invites hearsay.

18              MR. PONDS:  That's fine, Judge.

19              THE COURT:  Okay.  So I don't think that's a

20    proper question, although I suppose you could ask, "Did

21    Officer Leo say or did Officer Leo tell you he threw

22    something out the window?"  That would be an exception under

23    the party's statement.

24              MR. DeBERARDINIS:  That would not be admissible

25    unless they can prove up that that's what happened because

1    you cannot suggest something in cross-examination --

2          THE COURT:  Counsel has represented that he's

3    going to prove that up or attempt to prove it up through

4    Officer Leo.

5          MR. DeBERARDINIS:  And we would submit that he

6    needs to make a proffer before he goes down that line of

7    questioning.

8          MR. PONDS:  I have no objection to making the

9    proffer at the point in time during my direct examination

10   that I'm going to ask him that question.

11         THE COURT:  Okay.  I will give you -- I will

12   accept your representation to the Court that you have a

13   factual basis for pursuing that line of questioning with

14   Officer Leo.

15         MR. PONDS:  We do.  We do, Your Honor.

16         THE COURT:  Okay.  And you can offer your proffer

17   before Officer Leo -- before you examine Officer Leo.

18         MR. PONDS:  Yes, sir.

19         THE COURT:  Okay.  Now, if you wind up not being

20   able to link that up, the District has moved for a curative

21   instruction, and I guess my question, Mr. DeBerardinis, is,

22   at this point what is there to cure?  The questions have

23   been:  "Did you see anything thrown from the window?"

24   Answer, "No."

25              "Did you throw anything from the window?"  Answer,

1      "No."

2              "Did Officer Leo tell you?"  Answer, "No."

3              At this point, that's the dog that didn't bite,

4      right?

5              MR. DeBERARDINIS:  We're not asking for a curative

6      instruction on that.

7              THE COURT:  Okay.  Okay.  Good.

8              Okay.  Now, the District also moved to exclude all

9      of the so-called plant evidence because the plaintiff

10     yesterday did not elicit direct testimony from Ms. McNeil

11     that she saw an officer do anything that would suggest

12     planting.  Despite the fact that I take it no witness is

13     going to offer direct testimony that they saw an officer

14     plant the gun, I think there is still sufficient predicate

15     for a plant argument.  Okay?

16             MR. PONDS:  Yes, Your Honor.

17             THE COURT:  You know, the negative fingerprint

18     report, which is also consistent with a theory -- not on the

19     plant theory, but that the gun was in his pocket and the

20     cell phone was in his hand, as well as the evidence

21     yesterday from Ms. McNeil, which Ms. West just referred to,

22     that she didn't feel a gun when she hugged him.

23             So I think the fingerprint report still comes in,

24     and I think you can still ask the limited questions we

25     discussed with respect to the DNA evidence, namely why no

1    testing was done, whether MPD has a policy or practice of

2    testing; and as I've previously ruled, if you cannot

3    establish any deviation from policy or practice or that no

4    testing was done in order to avoid a negative result, then

5    I'm not going to let you argue that in closing.

6              MR. PONDS:  Yes, Your Honor.

7              THE COURT:  Okay?  So I think that dispenses with

8    those two issues for now.  I will consider further your

9    request for an ex parte showing of the video evidence, but

10   in order to argue that, you're going to have to convince me

11   that there's a predicate on the video for making that

12   argument.  Okay?

13             MR. PONDS:  Yes, Your Honor.

14             THE COURT:  And I'm not inclined to do that ex

15   parte, but let me think about that, and let me get back to

16   you on that.  Okay?

17             MR. PONDS:  Yes, sir.

18             THE COURT:  So we have a number of officers this

19   morning; is that right?  Who do we have this morning?

20             MR. PONDS:  Your Honor, we have Dr. Street, who is

21   the treating physician, who is here and who will be our

22   first witness.

23             THE COURT:  Okay.

24             MR. PONDS:  Our second witness is going to be

25   Officer Katz, and our -- then we have a number of

1    eyewitnesss who are not here this morning, and Ms. West and

2    myself may ask the Court to take some action in terms of the

3    witnesses that have been subpoenaed that have not -- that

4    are not here, and we would make that request ex parte, too.

5    Okay?

6           MR. DeBERARDINIS:  Your Honor, this is not a

7    criminal case.  This is a civil case.  There's no ex parte

8    communications with the Court.  It's highly improper.

9           MS. WEST:  May I address that, Your Honor?

10          THE COURT:  Sure.

11          MS. WEST:  I understand that this is a civil case

12   and not a criminal case, but the problem is I have a

13   reasonable basis in fact, along with Mr. Ponds, after

14   speaking to our investigator that we believe that witnesses

15   who would testify in this case have been pressured not to,

16   and we -- I personally -- when I figured out that this was

17   going to be a problem, on Super Bowl Sunday I personally had

18   the investigator take me to all these people's residences so

19   that I could know and say to the Court, "I went to where

20   these people lived, and they have gone into the weeds

21   because they are afraid."

22          And how do I make this representation to the

23   Court?  I make this representation knowing that our

24   investigator talked to some of these witnesses, they were

25   happy to come to court, they were served with a subpoena,

1   and they're nowhere to be found.

2          So that's an inference, but I think it's a good

3   inference, and for these reasons, we believe that we should

4   be able to make these requests to the Court ex parte.

5          THE COURT:  Do you have any law on that?

6          MS. WEST:  No, but I'd be happy to get you some.

7          THE COURT:  Please do.

8          MS. WEST:  Yes, Your Honor.

9          MS. FEATHERSTONE:  Your Honor, may I respond

10  briefly?

11         THE COURT:  Yes.

12         MS. FEATHERSTONE:  I would ask them to proffer

13  to the Court what witnesses, because Ms. Boyd and

14  Mr. Derricotte were subpoenaed by the Government for

15  deposition.  They came in willingly.  They testified in

16  their deposition, and there's been no issue with them.

17         I don't know who the third witness they're

18  speaking of is, but there's been no issue with the witnesses

19  having appeared in this case.  Ms. McNeil was the only

20  witness that didn't appear for a deposition, and Mr. Spruill

21  didn't appear because he was somewhere in Georgia, according

22  to his mother, and he couldn't come.

23         So I'm not sure where Ms. West is getting the

24  information that these witnesses are afraid to testify now

25  when at least two of them we've taken their depositions

1    already.

2              THE COURT:  All right.  Are Boyd and Derricotte

3    two of the ones you're talking about?

4              MR. PONDS:  Yes, and if I could add to that?

5              THE COURT:  Who's the third?

6              MR. PONDS:  The third one is Carlos Spruill.

7              THE COURT:  Spruill.

8              MS. WEST:  And Levy.

9              MR. PONDS:  And Levy Harley --

10             THE COURT:  So there are four?

11             MR. PONDS:  -- who we've talked to -- the man who

12   lives in the white house.  And we've talked to him on

13   numerous occasions, and he's always been forthcoming, but

14   they're simply afraid.

15             And to add to Ms. Boyd and Mr. Derricotte, they

16   were -- prior to their depositions, they were -- an

17   investigator from the District of Columbia came to their

18   residence and advised them that he was working on behalf of

19   the mother to find out what happened, and they gave me his

20   card.  We took their information, and I just -- since they

21   came in and took the deposition, we just considered it a

22   done deal because they came in willingly and gave extremely

23   favorable testimony to the plaintiff.  It's also my

24   understanding that their vehicle is seen on the video

25   because they were coming into the parking -- into the

1    complex, and they had to back out once the SUV was going

2    through the gates to make the left on Elvans Road.

3              So it is -- it's extremely troubling.  It's

4    extremely troubling, and this is something we have

5    consistently heard from people.

6              In addition, Mr. Tyler was reluctant to come in.

7    He was a very reluctant witness to come in.  And even after

8    he was here, he was reluctant to testify because, according

9    to him, he had spoken to someone that said that there was --

10   I can't say it was the same investigator that visited

11   Mr. Derricotte and Ms. Boyd, but there was someone walking

12   around, going through the neighborhood saying, "You'd better

13   not get involved."

14             THE COURT:  And does that come from the witnesses,

15   or does that come from a third party?

16             MR. PONDS:  Well, in terms of --

17             THE COURT:  Have you spoken to the witnesses since

18   they voluntarily showed up for their depositions?

19             MR. PONDS:  We've spoken to them on one occasion.

20   We've made numerous efforts to have them come in

21   voluntarily, and they have been absolutely reluctant.

22             Other witnesses have spoken to them, and they've

23   told those other witnesses, specifically Caroletta Inman --

24   because Caroletta Inman knows Ms. Boyd and Mr. Derricotte

25   because they all lived in the complex together right around

1    2011, and she's maintained contact with them.  And she told

2    us specifically that she spoke to them, because we asked her

3    to reach out to them because they wouldn't return our calls,

4    and she told us they're just afraid to get involved.

5                THE COURT:  Ms. Featherstone?

6                MS. FEATHERSTONE:  Your Honor, Mr. -- I'm sorry,

7    the plaintiff's investigator, Mr. Bradley, the expert who is

8    testifying in this case, he went out and canvassed the

9    scene.  He spoke to these witnesses.  He spoke to

10   Mr. Spruill.  He spoke to Mr. Derricotte, Ms. Boyd,

11   Ms. McNeil.  He wrote up statements that he claimed that

12   they made.  They presented those in discovery.  Based on

13   those statements, we subpoenaed each of those witnesses, or

14   attempted to, for deposition.

15               Mr. Rembrandt, who is the District's investigator

16   who serves our subpoenas for deposition, provided his card

17   to these witnesses with "OAG" on the card, Office of the

18   Attorney General, giving my information as the attorney

19   requesting them to contact me as an Assistant Attorney

20   General.  There were no representations made.

21               Mr. Rembrandt sent me detailed information about

22   how he had the -- he couldn't contact them.  He was looking

23   for them.  He had extensive conversations with Mr. Spruill's

24   mother that he was in Georgia with some other -- on some

25   other criminal issue that was going on.

1    So we were more than forthcoming, and these

2    witnesses never expressed to me -- and I spoke to them

3    personally when they called me, because the first deposition

4    day we had set, Your Honor, was a snow day, and so each of

5    them contacted me asking what to do.  And we rescheduled the

6    depositions, and they came willingly.

7    THE COURT:  Okay.  So of the four, how many were

8    deposed?  All were deposed?

9    MS. FEATHERSTONE:  No, only Mr. Derricotte showed,

10   Ms. Boyd showed, Ms. Inman showed.  Ms. McNeil was unable to

11   come for deposition because she was down in pretrial

12   services with her son, and she couldn't get to our offices.

13   THE COURT:  But McNeil has already testified.

14   MS. FEATHERSTONE:  I'm just giving her

15   information.

16   THE COURT:  Okay.  Mr. Spruill?

17   MS. FEATHERSTONE:  Mr. Spruill, we haven't been

18   able to find him.  At least we haven't.

19   THE COURT:  Okay.  Mr. Harley?

20   MS. FEATHERSTONE:  He was never disclosed that he

21   would be a witness that would provide testimony in this

22   case.

23   THE COURT:  Okay.

24   MS. FEATHERSTONE:  And this is why the statement

25   that was made in court with regard to people are afraid to

1    come forward has such a damaging effect, because that's the

2    seed that's trying to be planted, and now they're coming

3    into court saying that we have somehow -- the defense is

4    somehow intimidating witnesses to come in, witnesses who

5    have already freely spoken to their side, given statements,

6    and some have even been deposed, Your Honor.  This is very

7    suggestive, and we object.

8         THE COURT:  Okay.  Get me a proposed instruction

9    on the issue you raise, Mr. DeBerardinis, okay, and --

10        MS. WEST:  I just want to add one thing --

11        THE COURT:  We're not going to be able to resolve

12   this issue now.

13        MR. DeBERARDINIS:  Very well.  Over lunch.

14        THE COURT:  We'll accept whatever filing you have.

15        How many witnesses will we be able to fill up the

16   morning with, witnesses who are here?

17        MR. PONDS:  Your Honor, I think that we have

18   Dr. Street, Officer Katz, Officer Coker, and possibly

19   Detective Rahman.

20        THE COURT:  Okay.  And you have --

21        MR. PONDS:  And then we also have Defendant Leo.

22        THE COURT:  So that's enough for today, it seems.

23        MR. PONDS:  Yes, sir.  And I think with these

24   witnesses -- depending on if the other witnesses appear or

25   they're brought in, if we could put those on if they come in

1    later today.

2            We're continually making calls.  Our investigator

3    has been outside their homes.  We're making all those

4    efforts --

5            THE COURT:  I understand.

6            MR. PONDS:  -- and it's been the most difficult

7    part of this case.

8            But if we can't get them until tomorrow, I'd ask

9    permission to put them on in the morning, and then we would

10   -- our last witness would be James Bradley, in addition to

11   moving in some exhibits.

12           THE COURT:  Okay.  Well, obviously that would be

13   the best course of action --

14           MR. PONDS:  Yes, sir.

15           THE COURT:  -- without having to deal with the

16   Court's intervention on an ex parte -- upon an ex parte

17   submission or not.  I'd like to avoid getting into that, if

18   we can.

19           MR. PONDS:  I understand, Judge, and that's why,

20   even with these witnesses, we avoided for a long time having

21   the Marshals serve them with subpoenas, because I hate

22   sending the Marshals to someone's home who has favorable

23   information to my client.  It just -- it smells bad.  But

24   eventually we had to do that.

25           In addition, we had our own personal investigator,

1    and I think even Ms. West was out there.  I've done it

2    myself.  So I just --

3              THE COURT:  Okay.

4              MR. PONDS:  I don't know.  I'm not going to

5    suggest I have any connection between the evidence -- I

6    mean, in terms of what we've been told and the District.

7    I'm just telling the Court what we've been told.

8              THE COURT:  Understood.

9              MS. WEST:  I just want to make two things clear

10   for the record, Your Honor.

11             First of all, Mr. King is not -- and

12   Ms. Featherstone said Mr. King was our investigator.  He is

13   not.  We have a different investigator that we've been

14   trying to get the witnesses in through that I've personally

15   gone out to the scene with.

16             And secondly, Ms. Featherstone said she never had

17   notice that Levy Harley was going to be a witness.  He's

18   listed in the pretrial statement, so at least they had it by

19   then, and as the Court knows, I came into this case late so

20   I don't know what they knew before that.  I can't make that

21   representation.  But at least they knew on January the 14th.

22             THE COURT:  And you all just waived initial

23   disclosures; is that correct?  Do I recall that?

24             MS. FEATHERSTONE:  Yes, Your Honor.

25             MR. PONDS:  And also, this was a witness that we

1    spoke to late, Your Honor.

2              THE COURT:  Okay.

3              MS. WEST:  And I know the Court knows that you

4    prepare for a case and you try to talk to every witness you

5    can, but sometimes you find out that there's a witness later

6    on.  That's just what happens.

7              THE COURT:  Yes, and sometimes you find out you

8    can't get a witness to trial.  That happens, too.

9              MS. WEST:  Correct.

10             MR. PONDS:  Judge, can I raise a brief issue

11   concerning Dr. Street so there's no objection?  I can just

12   get some guidelines from the Court.

13             THE COURT:  Yes.

14             MR. PONDS:  Based on the Court's ruling at the

15   pretrial conference, we will have Dr. Street testify, and

16   I'm going to limit his testimony to the condition that

17   Ralphael Briscoe was in when he arrived at the hospital and,

18   based on those wounds, what pain would have been associated

19   with those wounds as well as what time, if the records

20   reflect, that he was placed on anesthesia and became

21   unconscious.

22             THE COURT:  Okay.  Prior to that, will you elicit

23   the extent to which he was conscious and would have

24   experienced --

25             MR. PONDS:  I will do that, yes.

1          THE COURT:  Okay.

2          MR. PONDS:  And then I'm going to also elicit a

3    statement that's in the medical -- I'll move the medical

4    records in first.  We have them.  They're certified.

5    They're certified medical records.

6          THE COURT:  Did we exclude any portions of those

7    records, or did we admit them in toto?

8          MR. PONDS:  I think the Court did exclude anything

9    that did not -- anything that didn't have anything to do

10   with Mr. Briscoe being unconscious.  We will not be seeking

11   to move those in.

12          What I would ask the Court to do is to

13   provisionally admit them, and what we can do is before it is

14   given to the jury -- I will not publish those in front of

15   the jury, and then we can sanitize it prior to the jury

16   receiving all of the evidence in this case.

17          THE COURT:  Okay.  What exhibit number is that?

18          MR. PONDS:  The Court's indulgence.

19          THE COURT:  Sure.  22?

20          MR. PONDS:  22, yes, sir.

21          THE COURT:  Do the defendants want to be heard on

22   that?

23          MR. DeBERARDINIS:  Your Honor, we agree that those

24   records were authentic.  We didn't stipulate that they were

25   admissible, and I'm not sure what plaintiff intends to do,

```
1     put a huge stack of medical records in the lap of the jury?

2               THE COURT:  What do you intend to show?

3               MR. PONDS:  I just simply want him to review it,

4     and I don't plan on publishing or showing anything to the

5     jury so that the parties can go through and decide on what

6     should be in there.

7               I'm going to -- any questions that I ask --

8               THE COURT:  You're going to move the entire record

9     into evidence, or not?

10              MR. PONDS:  No.

11              THE COURT:  No, okay.

12              MR. PONDS:  Because then that would be in

13    violation of the Court's order --

14              THE COURT:  Okay.

15              MR. PONDS:  -- or the Court's ruling.

16              THE COURT:  And we will simply admit later those

17    that we don't -- that the Government doesn't object to or

18    that I rule are admissible --

19              MR. PONDS:  Absolutely.  Absolutely.

20              THE COURT:  -- that reflect only conscious -- the

21    period of consciousness reflected in the records.

22              MR. PONDS:  That is correct, Your Honor.

23              THE COURT:  Unless there is some other objection?

24              MR. DeBERARDINIS:  Depending on what it shows,

25    Your Honor.
```

```
1              THE COURT:  Okay.

2              MR. DeBERARDINIS:  Your Honor, one other matter,

3     if I might.  As far as the doctor testifying what the pain

4     would have been like, that is outside -- the doctor --

5     that's outside the parameters of his treatment of this

6     patient, and since he was not -- since he did not file an

7     expert report regarding what kind of pain is associated with

8     this incident, we would submit that it's not proper

9     testimony.

10             THE COURT:  Well, he can certainly ask, "Did

11    Mr. Briscoe appear to be experiencing any pain?"  Right?

12             MR. DeBERARDINIS:  Absolutely.  What he shouldn't

13    be able to say is, "Yeah, something like that would really

14    hurt."

15             THE COURT:  "Based on your experience with other

16    patients, is it your opinion -- do patients frequently

17    appear to be in pain in similar circumstances?"

18             MR. DeBERARDINIS:  But if he was going to testify

19    to that, he should have filed a report to that effect.  He's

20    a treating physician.  He's a fact witness.

21             THE COURT:  Who has observed other patients in the

22    same situation.

23             MR. DeBERARDINIS:  Yes, but he wasn't --

24             THE COURT:  That's not an expert.

25             MR. DeBERARDINIS:  That's why he was outside --
```

1    that's why he needed to be named as an expert.  If he's

2    testifying about other patients, about his experience

3    with other patients, that is outside the scope of his

4    treatment, and that should have been -- he should have filed

5    a report, an expert report, saying, "I'm going to testify

6    based upon" --

7              THE COURT:  That's percipient testimony, isn't it?

8    That's not based on any study of pain or expertise

9    necessarily.  It's what he observed other patients showed,

10   right?

11             MR. DeBERARDINIS:  Well, no, Your Honor.  He

12   needed -- we need to be on notice of that.  We weren't.

13             THE COURT:  Mr. Ponds.

14             MR. PONDS:  Judge, I believe we should be able to

15   ask the question:  "Based on your experience, was there pain

16   associated with those wounds?"

17             THE COURT:  Well, he's never had those wounds,

18   right?

19             MR. PONDS:  But in his training as a doctor, he

20   realizes that there's pain associated with them.

21             MR. DeBERARDINIS:  He's allowed to testify within

22   the parameters of his treatment.  Testifying as to pain

23   associated with certain kinds of wounds based upon his

24   experience are outside of his treatment, and he goes

25   beyond the limits of being -- of testifying as a treating

```
 1    physician --

 2              THE COURT:  Okay.

 3              MR. DeBERARDINIS:  -- and he goes into the

 4    parameters of being an expert witness.

 5              THE COURT:  Okay.  I think you can obviously ask

 6    him, "Did Mr. Briscoe exhibit any pain or express any pain?"

 7              MR. PONDS:  Thank you, Your Honor.

 8              THE COURT:  I think you can also ask him, based on

 9    his own observations of people in similar situations, have

10    they reported pain.  I'm not sure that's expert testimony.

11    That's his own experience as a doctor.

12              MR. DeBERARDINIS:  We've made our position to the

13    Court, and the Court's ruled.

14              THE COURT:  I understand, okay.

15              MR. PONDS:  Thank you, Your Honor.

16              THE COURT:  Let's take a brief five-minute recess

17    before we call the jury.  Okay?

18              MS. FEATHERSTONE:  Thank you, Your Honor.

19              (Recess taken)

20              THE COURT:  On the issue we just discussed, I

21    think this is a close call.  I've reconsidered.  I don't

22    think you can ask him, "Based on your experience, would this

23    condition cause pain?" or "How much pain would this

24    condition have caused?"  I think that is borderline expert

25    testimony, so I'm not going to let you ask him that.
```

```
 1                    MS. FEATHERSTONE:  The witness is in the

 2       courtroom.

 3                    THE COURT:  Excuse me?

 4                    MR. PONDS:  Dr. Street, if you could just step

 5       out.

 6                    THE COURT:  I'm sorry.

 7                    MS. FEATHERSTONE:  Sorry for interrupting, Your

 8       Honor.

 9                    THE COURT:  That's okay.  I appreciate it.

10                    I think it is fair to ask him, "As compared to

11       other patients you've seen, was he in more or less pain?"

12                    MR. PONDS:  Okay.

13                    THE COURT:  Or something like that, but I don't

14       think he -- excuse me.

15                    MR. DeBERARDINIS:  I'm sorry, I was waiting for

16       the Court to finish.

17                    THE COURT:  I'm finished.  Do you want to respond?

18                    MR. DeBERARDINIS:  Yes, Your Honor.  To ask

19       compared to other patients whether he was in more or less

20       pain, that's so vague and doesn't -- it doesn't provide any

21       helpful information for the jury.

22                    THE COURT:  Well, you can deal with that on cross,

23       okay?

24                    Is that clear, Mr. Ponds?

25                    MR. PONDS:  Yes, sir.
```

```
1              THE COURT:  Okay.  Do we have an instruction?

2              MR. DeBERARDINIS:  Yes, Your Honor.

3              THE COURT:  Okay.  Have you shown it -- is it

4    stipulated to?

5              MR. DeBERARDINIS:  No.

6              MR. PONDS:  I have not seen it, Your Honor.

7              THE COURT:  Okay.  Do you want to --

8              MR. PONDS:  But there's one other issue I want to

9    raise with Dr. Street briefly.

10             THE COURT:  Okay.

11             MR. PONDS:  There is also -- in the records,

12   there's a statement that Mr. Briscoe provided where he said,

13   when he came in -- I believe it was when he came into the

14   hospital, he said that -- the statement is, "I can't

15   breathe."  And I will also be eliciting that from Dr.

16   Street.  It's in the records.

17             THE COURT:  Any objection to that?

18             MR. DeBERARDINIS:  No, Your Honor.

19             THE COURT:  Okay.

20             MR. DeBERARDINIS:  That's fair game.

21             THE COURT:  That's fair game.  That's an

22   exception.

23             MR. PONDS:  And once again, as to the question I

24   can ask, is that based on his wounds compared to other

25   patients?  He can answer as to how much pain that is?  I
```

```
 1      just want to --
 2                  THE COURT:  No, whether he exhibited more pain
 3      than other patients that he's seen.
 4                  MR. PONDS:  Thank you.
 5                  THE COURT:  Focus the question on his
 6      experience --
 7                  MR. PONDS:  Okay.
 8                  THE COURT:  -- as opposed to generally based on
 9      the doctor's experience with other patients how much pain
10      would he have been in given his condition.  Okay?
11                  MR. PONDS:  Okay.
12                  THE COURT:  Focus it on what the doctor believes
13      his pain level was and suffering level was.  Okay?
14                  MR. PONDS:  Thank you.
15                  (Pause)
16                  MR. DeBERARDINIS:  Your Honor, we would prefer
17      that we do this over lunch so we craft something that's not
18      so --
19                  THE COURT:  That's fine.  And I think -- I don't
20      think there's a sense of immediacy to it that's necessary.
21                  Let's bring in the jury.  Okay?
22                  MS. FEATHERSTONE:  Thank you, Your Honor.
23                  (Jury enters courtroom)
24                  THE COURT:  Good morning, ladies and gentlemen.  I
25      apologize for the delay.  We were dealing with some
```

```
 1    evidentiary issues that hopefully will minimize the sidebars

 2    and make the presentation go a little bit more smoothly than

 3    it otherwise would have, so thank you for your patience.

 4              Mr. Ponds.

 5              MR. PONDS:  Yes, Your Honor.  The plaintiff calls

 6    Dr. James Street to the stand, if I could be allowed to get

 7    him outside?

 8              THE COURT:  Please do.

 9              (Pause)

10              THE COURT:  Good morning, Dr. Street.  Our

11    courtroom deputy just stepped out, and once she comes back,

12    she will swear you in, and then we'll get started.  Okay?

13    So just have a seat and -- there she is.

14                     JAMES STREET, M.D., Sworn

15                       DIRECT EXAMINATION

16    BY MR. PONDS:

17    Q.  Doctor, thank you for coming down today.

18    A.  Good morning.

19    Q.  Doctor, could you state your full name for the record.

20    A.  James Street.

21    Q.  And what is your current occupation?

22    A.  I'm a trauma surgeon at MedStar Washington Hospital

23    Center.

24    Q.  And, Doctor, how long have you been at MedStar Trauma

25    Center?
```

1    A.  In total, 15 years.  The first five were my surgical

2    residency training.  I did an additional year of training in

3    surgical critical care, and I was hired in 2006 as an

4    attending.

5    Q.  Okay.  And you've been there continuously since 2006?

6    A.  That's correct.

7    Q.  Doctor, I'd like to bring your attention to -- excuse me

8    for a second.

9         MR. PONDS:  Your Honor, at this time, based on the

10   Court's ruling, I'd like to move into evidence Plaintiff's

11   Exhibit 22, the medical records from the MedStar Washington

12   Hospital Center.

13        THE COURT:  Any objection?

14        MR. DeBERARDINIS:  No, Your Honor.

15        THE COURT:  22 is admitted.

16   Q.  Dr. Street, I'm going to turn your attention to April

17   26, 2011.

18   A.  Okay.

19   Q.  Were you on duty at the MedStar Trauma Center on that

20   date?

21   A.  Yes.

22   Q.  And what were your current duties that day, sir?

23   A.  I was overseeing the trauma unit and responsible for all

24   of the new trauma patients or consults that came through the

25   unit that day.

1    Q.  And can you tell us what trauma patients are, sir.  What

2    does that involve?

3    A.  Just injured patients.  So one of the unique aspects of

4    MedStar Washington Hospital Center is we have a stand-alone

5    trauma center that is separate from the emergency

6    department; and so patients who sustain injuries, be it a

7    fall, car accident, penetrating injuries, come specifically

8    to our trauma center, not through the emergency department.

9    Q.  Does that also include gunshot wounds?

10   A.  Yes.

11   Q.  Sir, do you recall treating a patient by the name of

12   Ralphael Briscoe on April the 26th, 2011?

13   A.  At the time I didn't know his name so he was entered

14   into our system as a John Doe, and so I knew -- I know him

15   as a John Doe.

16   Q.  Oh, you knew him as a John Doe?

17   A.  Yes, sir.

18   Q.  Is that because he didn't -- there was no name that was

19   associated with the patient?

20   A.  Not right away.

21   Q.  Now, Doctor, have you reviewed some records to refresh

22   your recollection --

23            MR. DeBERARDINIS:  Objection, Your Honor.

24            MR. PONDS:  Well, I will rephrase.  I'll rephrase.

25            MR. DeBERARDINIS:  He can --

```
 1              MR. PONDS:  I'll rephrase.

 2    Q.  Doctor, have you reviewed any records?

 3    A.  Yes.

 4    Q.  And are those the medical records from the MedStar

 5    Trauma Center in reference to this John Doe patient?

 6    A.  Yes.

 7    Q.  Now, sir, do you recall whether or not that patient was

 8    conscious when the patient --

 9              MR. DeBERARDINIS:  Objection, Your Honor; leading.

10              MR. PONDS:  I'll rephrase.

11              THE COURT:  Thank you.

12    Q.  Do you recall what the condition of the patient was when

13    he came to the trauma center?

14    A.  Yes.

15    Q.  Can you please explain.

16    A.  Sure.  When he arrived, he was awake.  He appeared

17    agitated.  He was interactive, so to speak.

18              As we began our evaluation, though, it was quite

19    clear that he was in severe shock, and some of the

20    manifestations of shock are confusion, agitation, and then

21    there are some physical findings as well.  I don't know if

22    you want me to go into all of those, but --

23    Q.  No, you don't have to go into all of those.

24    A.  Okay.  But it was clear he was awake, he was

25    interactive, but he displayed signs of profound shock.
```

1    Q.  Did he make any statements concerning his condition

2    before he became unconscious at any point?

3    A.  After reviewing the records, according to the nursing

4    documentation he made statements such as, "I can't breathe."

5    But I can't say that I remember hearing that.

6         Usually in those situations I'm multitasking, and

7    it took me less than two minutes to determine that he needed

8    to be in the operating room, and shortly after my

9    evaluation, I was trying to facilitate him going to the

10   operating room.  And so I can only speak to what was

11   documented in terms of his statement, which was, "I can't

12   breathe."

13   Q.  And you saw that documented in the records?

14   A.  I did.

15   Q.  And this was documented back on April 26, 2011?

16   A.  Correct.

17   Q.  Doctor, do you -- in terms of those records, do you

18   recall whether or not he said that several --

19        MR. DeBERARDINIS:  Objection, Your Honor.  That's

20   leading again.

21        THE COURT:  Sustained.

22   Q.  Doctor, do you know how many times this patient said he

23   could not breathe?

24   A.  I have no knowledge of how many times he said it, no.

25   Q.  If I showed you the records, would it refresh your

1    recollection?

2              MR. DeBERARDINIS:  Objection, Your Honor.  He said

3    he had no knowledge.

4              THE COURT:  Sustained.

5    Q.  Doctor, were you able to determine what type or the

6    level of pain that the John Doe patient was experiencing?

7    A.  Overall, he was very agitated.  In my experience as a

8    trauma surgeon, the agitation that he displayed could have

9    either been from shock or -- and/or pain.

10             So there may be some documentation or a pain scale

11   in the record that I didn't see, but given the injuries that

12   I saw and his behavior, he was more than likely in a

13   significant amount of pain.

14   Q.  Now, Doctor, do you recall what time the patient was

15   brought to MedStar Trauma Center?

16   A.  He was registered into our system at 2:59.

17   Q.  2:59.  Do you recall what time he was placed on

18   anesthesia and became unconscious?

19   A.  I don't know the specific time, but my best guess would

20   be it was less than 30 minutes.

21             MR. PONDS:  Thank you so much for your time,

22   Doctor.

23             THE WITNESS:  Yes, sir.

24             MR. DeBERARDINIS:  No questions, Your Honor.

25             THE COURT:  Okay.  Dr. Street, thank you very much

```
 1    for your testimony.  You're excused.

 2               THE WITNESS:  Thank you.

 3               MS. WEST:  The plaintiff would call Officer Jordan

 4    Katz, Your Honor.

 5               THE COURT:  Very well.

 6               MS. WEST:  I know he's here, Your Honor.  We saw

 7    him this morning.

 8               (Pause)

 9               THE COURT:  Good morning, Mr. Katz.

10               THE WITNESS:  Good morning.

11                         JORDAN KATZ, Sworn

12                         DIRECT EXAMINATION

13    BY MS. WEST:

14    Q.  Good morning, Officer Katz.

15    A.  Good morning.

16    Q.  Would you please introduce yourself to the jury.

17    A.  Hi.  My name is Jordan Katz.

18    Q.  Where do you work?

19    A.  I'm an officer with the Metropolitan Police Department.

20    Q.  How long have you done that?

21    A.  Over ten and a half years.

22    Q.  What did you do before you became a police officer?

23    A.  This is my first job.  Job-wise?

24    Q.  Yes.

25    A.  I didn't have a job before.
```

```
 1    Q.  No kind of job at all?

 2    A.  No.

 3    Q.  Not ever?

 4    A.  I worked at Blockbuster Video when I was 18.

 5    Q.  Okay.

 6    A.  17.

 7    Q.  Where was that?

 8    A.  New Jersey.

 9    Q.  Okay.  Is that where you're from?

10    A.  Yes.

11    Q.  As a young man, Officer Katz, did you grow up hunting?

12    A.  No.

13    Q.  Ever use a gun when you were a kid?

14            MR. DeBERARDINIS:  Objection, Your Honor.

15            THE COURT:  Overruled.

16    A.  A handful of times, two or three times maybe.

17    Q.  All right.  As far as a firearm, you were trained on a

18    Glock 17; is that right?

19    A.  Yes.

20    Q.  So is that the kind of gun you used as a child?

21    A.  No.

22    Q.  We're talking about a Red Ryder BB gun maybe?

23    A.  I remember going to a gun range when I was a kid maybe

24    two or three times.  I don't remember if I used a handgun.

25    It was probably a rifle.
```

1    Q.   Okay.   Probably a rifle.

2    A.   Yes.

3    Q.   Okay.   So it's your testimony that you've never hunted?

4    A.   I've never hunted.

5    Q.   Okay.   Now, this is your first job being a police

6    officer.   Tell the ladies and gentlemen of the jury what

7    education you have.

8    A.   I went four years at George Washington University.   I

9    have one credit left to do for my bachelor's.

10   Q.   George Washington here in D.C.?

11   A.   Yes.

12   Q.   And did you get a degree?

13   A.   No.   I have one class left.

14   Q.   Uh-huh.   And what were you studying?

15   A.   Criminal justice.

16   Q.   When you study criminal justice at a university, what

17   kind of courses do you take?

18   A.   Criminal law, constitutional law.   It was years ago.   I

19   can't recall them all.

20   Q.   Kind of like law school almost, criminal law and

21   constitutional law?

22   A.   Probably not, but...

23   Q.   Well, to become a police officer after college you had

24   to have training to become a member of the force, right?

25   A.   Yes.

1    Q.  All right.  Tell the ladies and gentlemen of the jury

2    where that training was.

3    A.  The MPD Police Academy in Southwest D.C.

4    Q.  All right.  And when did you have that training?

5    A.  July 2004 until February, I want to say, 25th, 2005.

6    Q.  Okay.  So how many months is that?

7    A.  Six-plus.

8    Q.  Okay.  And did you have courses there in constitutional

9    law and criminal law?

10   A.  Yes.

11   Q.  All right.  And when we're talking about constitutional

12   law and criminal law, we're talking about the Fourth and

13   Fifth Amendment; is that right?

14   A.  Yes.

15   Q.  And that encompasses Terry stops.  Are you familiar with

16   that term?

17          MR. DeBERARDINIS:  Objection, Your Honor.

18          THE COURT:  Sustained.

19   Q.  When you were at the police academy, did you have

20   training in going after suspects?

21   A.  What do you mean by "going" --

22          MR. DeBERARDINIS:  Objection to the form of the

23   question, Your Honor.

24          THE COURT:  Rephrase.

25          MS. WEST:  I'll rephrase it, Your Honor.

1    Q.  When you were training at the police academy, I'm

2    assuming -- I can't assume anything.  I know that you had

3    training in all kinds of areas; is that right?

4    A.  Yes.

5    Q.  Okay.  So did you have training, for example, in

6    testifying?

7    A.  I think so.  I think briefly, yes.

8    Q.  And how to withstand cross-examination?

9    A.  I don't know if "withstand" is the right word.  Just --

10   Q.  Do you enjoy cross-examination, Officer Katz?

11   A.  No.

12   Q.  Okay.  So I think "withstand" may be appropriate.  Did

13   you have training in that?

14           MR. DeBERARDINIS:  Objection to counsel commenting

15   on whether something's appropriate or not, Your Honor.

16           THE COURT:  Sustained.

17   Q.  Officer Katz, did you have training in fingerprinting?

18   A.  No.

19   Q.  Okay.  Did you ever discuss that in your six months at

20   the academy?

21   A.  I don't remember if we went over fingerprinting.

22   Q.  All right.  Did you learn how to use a gun?

23   A.  Yes.

24   Q.  And what kind of gun did you learn how to use?

25   A.  A Glock 17.

1    Q.  All right.  Tell the members of the jury what training

2    you received in learning how to use a gun.

3    A.  This was years ago.  You start out with the basic

4    training.  You drew from 25 yards, work your way into three

5    yards.  Sometimes you're standing; sometimes you're

6    kneeling; sometimes you're behind a barrier or a board.

7    Q.  And how long was that training with a firearm?

8    A.  It was either a week or two.  I'm not sure.  It might

9    have been two weeks.

10   Q.  Did you have to pass a test to get out of the academy

11   with that firearm?

12   A.  Yes.

13   Q.  How many tests?

14   A.  I don't remember.

15   Q.  What kind of test was it?

16   A.  You have a basic qualification.  52 rounds.  I think

17   you shoot from 25, and then you work your way in.   25

18   yards.

19   Q.  So you're behind a -- such as I am here, this podium,

20   and you're shooting at a target 25 yards away?

21   A.  It's not like the podium.  You're behind a wide object.

22   We're behind a board that's maybe this far, and then you --

23   whatever hand you are, if you're right-handed, you would

24   move around to the right; if you're left-handed, you would

25   go to the left.

1    Q.  Did they teach you to shoot with your dominant eye or

2    not?

3    A.  I'm not sure.

4    Q.  You don't remember that?

5    A.  No.

6    Q.  When they taught you how to shoot a firearm, did they

7    teach you to shoot it with both arms like this?

8    A.  I think the way that they teach it has changed over the

9    years.  I think you used to see people stand more to the

10   side when they shot or your body sideways, I want to say,

11   and now you see a lot of people shooting straight on.

12          So, I mean, it has changed over the years.  What

13   they taught back then I don't even remember, but it's

14   changed.

15   Q.  You don't remember how they taught you to shoot a Glock

16   17, is that what your testimony is?

17   A.  I remember they gave you several different choices for

18   stances.  I don't use the one that they gave now.

19          They've changed stuff over the years as to how

20   people stand.  I know the one I use now is different than

21   what I used when I didn't have training, when I was in the

22   academy while I was being trained.

23   Q.  That's interesting.  What stance do you use, sir?

24   A.  Right now?

25   Q.  Uh-huh.

```
 1    A.   Forward facing.

 2    Q.   And do you use both arms on that pistol?

 3    A.   Yes.

 4    Q.   Are you right-handed?

 5    A.   Yes.

 6    Q.   Do you grip that Glock 17 with your right hand?

 7    A.   Yes.

 8    Q.   And overlap with your left?

 9    A.   Yes.

10    Q.   All right.  When you were in the academy, did they teach

11    you about use of force?

12    A.   Yes.

13    Q.   And that goes along with your Glock 17, right?

14    A.   The Glock 17 and your OC spray, your ASP.

15    Q.   I'm sorry, sir?

16    A.   Along with your other weapons that you have, yes.

17    Q.   And what other weapons are those?

18    A.   OC or pepper spray; your ASP, which is the long metal

19    stick.

20    Q.   So you have several options that you're trained with to

21    use within a use of force situation, right?

22    A.   You do have several options, yes.

23    Q.   Uh-huh.  And I just want to make sure I've got them.  It

24    was pepper spray?

25    A.   ASP.
```

1    Q.   What's that?

2    A.   I'm not sure of what the abbreviation stands for.  It's

3    the metal baton.

4    Q.   And is it -- it's short, isn't it?

5    A.   Yes.

6    Q.   Uh-huh.  And when you go like this, does it extend?

7    A.   Yes.

8    Q.   Uh-huh.  How far does it extend?

9    A.   It depends on what size you have.  There's smaller, and

10   then there's larger.

11   Q.   Uh-huh.  Do you carry one of those with you now?

12   A.   Yes.

13   Q.   Uh-huh.  And what size do you have?

14   A.   The medium size.

15   Q.   Uh-huh.  And how long does it extend?

16   A.   I'm not sure.

17   Q.   I'm sorry?

18   A.   I'm not sure.

19   Q.   Well, do you -- what other options do you have?  Pepper

20   spray, an ASP, and what else?

21   A.   That's all you're provided.

22   Q.   Well, on the use of force continuum, you could use

23   nothing, right?

24   A.   Everything depends on the situation, how that's

25   dictated.

1    Q.  The most powerful instrument you have is your voice,

2    right?

3    A.  I wouldn't say that.

4    Q.  You wouldn't?

5    A.  No.

6    Q.  Okay.  Anyway, you're trained in all these different

7    things --

8    A.  Yes.

9    Q.  -- at the academy?

10            MS. WEST:  May I approach the witness, Your Honor?

11            THE COURT:  You may.

12            MS. WEST:  May the witness step down, Your Honor,

13   just for a moment?  I just don't know how I can get this so

14   everybody can see it unless the defense lawyers move.

15            THE COURT:  Sure.

16   Q.  So you're trained on all these different things; is that

17   right?

18   A.  Yes.

19   Q.  Okay.  So you know what I'm talking about --

20            MR. DeBERARDINIS:  I'm sorry, I can't see the

21   board.  I need to --

22   Q.  -- when I'm talking about the use of force --

23            THE COURT:  Ms. West, can you position the board

24   so that defense counsel and the defendant can see it as

25   well.

```
 1              MS. WEST:  I'm going to try, Judge.

 2    Q.  Would you be kind enough to use this pen, sir, to show

 3    me what a use of force continuum is.

 4              THE COURT:  Foundation, Counsel.

 5    Q.  You were trained on the use of force continuum in the

 6    academy; is that right?

 7    A.  Yes.

 8    Q.  All right.  And did you understand your training?

 9    A.  Yes.  Well, at the time.  I think you learn to

10    understand it more, but --

11    Q.  Through experience?

12    A.  Sure.

13    Q.  So you probably understand it better today than you did

14    when you were trained?

15    A.  I think the application in real life, probably yes.  As

16    far as drawing out the diagram, I drew it better years ago.

17    I'm sure I could have.

18    Q.  And we're not asking for exact.  It's your understanding

19    that we'd like to know.

20    A.  Sure.

21    Q.  All right.  Would you be kind enough to do that, what

22    you were trained with.

23    A.  I think it's a triangle.  It's been years.  And then you

24    could start out at the bottom, which could be just your

25    presence alone, and then you could work your way up to the
```

1      top, which could be lethal force.

2      Q.  Okay.  That's perfect.  Would you write that up there,

3      "lethal force."

4      A.  Sure.

5      Q.  And down here, what did you call this?

6      A.  Just your presence alone.

7      Q.  I mean, because you're a police officer.  It's not like

8      me walking down the street, right?

9      A.  It would depend on the person who --

10             THE COURT:  Are you finished with the board,

11     Ms. West?

12             MS. WEST:  No, Your Honor, I'm not.

13             THE COURT:  Okay.

14     Q.  Would you please put your presence down here.

15     A.  (Witness complies)

16     Q.  Now, these articles that you're talking about, an ASP,

17     where would that be on the continuum?

18     A.  Lethal force.

19     Q.  How would an ASP be lethal force?

20     A.  If I hit you in the head with it, it could kill you.

21     Q.  Okay.  Would you put that up there.  But you could hit

22     me on the side with it, too, right, just to disarm me?

23     A.  I could hit you anywhere with it, yes.

24     Q.  All right.  That wouldn't necessarily kill me?

25     A.  I mean, it could, but I don't know the full length of

 1    it.  It probably could.

 2    Q.  Okay.  So is there anywhere else on this triangle that

 3    you could use the ASP?

 4    A.  Well, obviously an ASP to the head would be up here.  I

 5    mean, I think it could be around the middle.  I'm not 100

 6    percent.

 7    Q.  Okay.  Just anywhere you want there around the middle.

 8    A.  (Witness complies)

 9    Q.  How about pepper spray?  You mentioned that.  Where

10    would you use that?

11    A.  Once again, I think it would be around the middle.

12    Q.  Would you be kind enough to write that in there.

13    A.  (Witness complies)

14    Q.  So if you said to a suspect on the street, "Freeze,

15    police," where would that go on this triangle?

16    A.  It might be a little bit above "presence."

17    Q.  All right.  Would you mind putting however you'd like to

18    say it.

19    A.  I'll put "freeze" for you.

20    Q.  All right.  "Freeze, police."  Is there anything else

21    you can think of from your training that would go on this

22    continuum of force?

23    A.  No.  Like I said, I haven't gone over this in a little

24    bit.

25    Q.  Okay.  Is that pretty much an accurate depiction of how

1    you understand it?

2    A.  Semiaccurate, yes.

3    Q.  All right.

4         MS. WEST:  At this time, Your Honor, plaintiff

5    would move in JK No. 1.

6         MR. DeBERARDINIS:  No objection.

7         THE COURT:  So moved.

8    Q.  You can take your seat, sir.

9         So you had this training at the academy.  They

10   taught you about the use of force continuum, right?

11   A.  Yes.

12   Q.  And the person who taught you at the academy was an

13   expert in this field; is that right?

14   A.  You know, it might be somebody who knows a bit.

15   Sometimes they just get -- it could have been an expert; he

16   might not be.  You'd be surprised.

17   Q.  Okay.  Did you ever go to -- have any training at

18   Quantico or FLETC, anything like that?

19   A.  I've been in FLETC, yes.

20   Q.  Did you have training there?

21   A.  Usually you go for requalification there.  I don't think

22   I had direct training there.

23   Q.  Okay.  Tell the members of the jury what FLETC is.

24   A.  It's the Federal Law Enforcement Training Center.  The

25   main one I think is in Georgia.  We have one in Cheltenham,

 1   Maryland.  Actually, I think it's Clinton, Maryland, that we

 2   go to the range and shoot at.

 3   Q.  So you've never been to the one in Glynco, Georgia?

 4   A.  No.

 5   Q.  You've been to the one in Clinton, Maryland?

 6   A.  Yes.

 7   Q.  And you said "certify."  What do you mean?

 8   A.  You go back twice a year to qualify with your Glock.

 9   Q.  How many rounds do you shoot out of that Glock?

10   A.  52 per round or per -- you'll go through two rounds, a

11   day round and then a night round, 52 rounds per.  And then

12   if you have an off-duty weapon, you'll do more, 52 more.

13   Q.  Is that an option?

14   A.  An off-duty weapon?

15   Q.  Uh-huh.

16   A.  Yes.

17   Q.  Do you have an off-duty weapon?

18   A.  Yes.

19   Q.  What is it?

20   A.  A Glock 26.

21   Q.  That's a little smaller than a 17, isn't it?

22   A.  Yes.

23   Q.  Do you have small hands?

24   A.  Decently small, I guess.

25   Q.  So when you use this Glock 17, and you qualify at the

1    range, do you have more than one clip?

2    A.  Yes.

3    Q.  Okay.  Tell the ladies and gentlemen of the jury what a

4    clip is.

5    A.  It's a magazine.  It's what goes into the well of the

6    bottom of the handgun.  It holds more bullets.

7    Q.  And on that Glock 17, you have a lever that releases

8    that clip, right?

9    A.  There's a button.

10   Q.  Okay.  And how many rounds does that clip hold?

11   A.  17.

12   Q.  So I'm trying to get to 52.

13   A.  17 -- well, you have one magazine in the well of the

14   handgun, you have two more, and then you'll have one round

15   in the chamber.  So the round -- the gun that you're holding

16   will have 18 rounds.  You'll have two magazines, 17 in each.

17   Q.  A magazine is also known as a clip; is that right?

18   A.  Yes.

19   Q.  Now, you qualify twice a year.  What's the purpose

20   behind that?

21   A.  I guess you're more -- you know, you have to shoot at

22   some point to become more familiar so...  You don't want to

23   go years without shooting your gun.

24   Q.  Uh-huh.  Do they teach you about muscle memory in the

25   academy?

1  A.  I don't remember exactly if they said "muscle memory."

2  Q.  Uh-huh.  And I mean muscle memory with regard to

3  shooting your firearm.

4  A.  I'm not 100 percent sure.

5  Q.  Do you know what muscle memory is?

6  A.  Training yourself through whatever technique you're

7  using, and then it becomes quicker than a Glock process.

8  Q.  Uh-huh.  So, for example, if I like to skeet shoot with

9  a shotgun, if I do that once every ten years, I'm not going

10  to be very good.

11          MR. DeBERARDINIS:  Your Honor, I --

12          THE COURT:  Repeat the question, I'm sorry.

13          MR. DeBERARDINIS:  It's not the question I object

14  to.  I'd like to approach the bench very quickly.

15          THE COURT:  Very well.

16          (The following is a conference held at the

17           bench outside the hearing of the jury)

18          MR. DeBERARDINIS:  Now we're going into areas of

19  expert testimony, we believe, Your Honor, and he's not here

20  as an expert witness.  He is a fact witness.

21          THE COURT:  He can testify to the training and the

22  operation of the gun.  Those are relevant issues, right?

23          MR. DeBERARDINIS:  Yes.  I'm talking about now --

24  I'm talking about muscle memory.  I think we're talking

25  about other areas.

```
 1              MS. WEST:  His testimony is going to be that he

 2     drew his gun while he was chasing the suspect, and that's

 3     really important and very relevant.

 4              THE COURT:  Tell me why.  Tell me why.

 5              MS. WEST:  Because he was chasing a fleeing

 6     suspect --

 7              THE COURT:  Right.

 8              MS. WEST:  -- and I want to know what his training

 9     was to pull his gun when he was chasing a fleeing suspect.

10     I'm going to get to that.

11              THE COURT:  That's fair.

12              MS. WEST:  I'm trying to get into it in logical

13     progression.

14              THE COURT:  That's fair.  What does muscle memory

15     have to do with it?

16              MS. WEST:  What does muscle memory have to do with

17     it?

18              THE COURT:  Yes.

19              MS. WEST:  When you use your gun several times,

20     it's a reaction.  You learn quicker if you shoot your gun

21     more frequently.

22              THE COURT:  Just root it in his own experience.

23              MS. WEST:  Yes, sir, I'd be happy to.

24              THE COURT:  Okay.

25              (This is the end of the bench conference)
```

1    BY MS. WEST:

2    Q.  Officer Katz, do you go to the range more than the twice

3    a year that you have to to qualify?

4    A.  No.  Not really, no.

5    Q.  So during those two twice-a-years, you're going to shoot

6    at least 52 rounds?

7             MR. DeBERARDINIS:  I'm sorry, I didn't hear that

8    question.  I apologize.

9             THE COURT:  Repeat the question.

10            MS. WEST:  Yes, sir.

11   Q.  During those two times a year that you go qualify, do

12   you -- you'll shoot at least 52 rounds, right?

13   A.  Yes.

14   Q.  Okay.  So if you shoot one round of 52 twice, that's

15   104?

16   A.  Yes.

17   Q.  So you're going to shoot that gun over 100 times in one

18   year?

19   A.  Yes.

20   Q.  All right.  Would you agree with me that the more

21   frequently you shoot that gun, the more trained you're going

22   to be to get that in and out of your holster?

23            MR. DeBERARDINIS:  Objection, Your Honor.

24            THE COURT:  Overruled.

25   A.  I can't agree with that, no.

1    Q.  All right.  When you have your training at the gun

2    range, do you train such that you're trained to shoot 52

3    rounds just like with your arm straight out, or are you

4    putting your gun back in your holster every time?  How are

5    you doing that?

6    A.  Sometimes --

7            MR. DeBERARDINIS:  Your Honor, now we're at --

8            THE COURT:  Overruled.

9            MR. DeBERARDINIS:  -- relevance.

10           THE COURT:  Overruled.

11   A.  Sometimes you'll shoot from the holster position and

12   draw out; sometimes they'll tell you to stay out; sometimes

13   they say to keep your gun in a tuck, which would be closer

14   to your body; sometimes you're kneeling.

15   Q.  Are you ever running and holding that gun and shooting?

16   A.  Every time you go to the range they'll have a

17   different -- you'll do your regular qualification, and then

18   they'll have something extra at the end.  We have done

19   moving and shooting, yes.

20   Q.  Uh-huh.  How often have you done moving and shooting?

21   A.  I'm not sure.  I haven't done it much.

22   Q.  Have you done it once?

23   A.  Yes.

24   Q.  Have you done it twice?

25   A.  Maybe.  I'm not 100 percent.

1    Q.  Now, when you go to this training twice a year, there's

2    somebody taking notes and making sure that you qualified,

3    right?

4    A.  Yes.

5    Q.  And they would notate what kind of training you had,

6    right?

7    A.  I'm not sure what kind of notations they make.  I don't

8    know.

9    Q.  All right.  So at this training that you had at the

10   academy, and it sounds like you have additional training at

11   the FLETC facility in Maryland, did they teach you about

12   what the rules are with regard to chasing a fleeing suspect?

13   A.  What do you mean by "rules"?

14   Q.  Well, let me ask you this:  Does MPD have rules on

15   chasing a fleeing suspect?

16   A.  I think part of our job is if people run, we're supposed

17   to chase them.

18           MS. WEST:  Objection, nonresponsive.

19           MR. DeBERARDINIS:  Objection, responsive.

20           MS. WEST:  I'll rephrase the question.

21           THE COURT:  Please rephrase.

22   Q.  Does MPD have rules that you must follow as an MPD

23   officer with regard to chasing someone who is fleeing?

24   A.  If they do, I've never heard of any rule.

25   Q.  Were you trained in it?

1    A.  Chasing people?

2    Q.  Yes.

3    A.  I'm going to say no.  No, I wasn't trained in how to

4    chase people.

5    Q.  Now, I asked you if you were trained in chasing a

6    fleeing suspect.  I could say a fleeing citizen or just a

7    person, right?

8    A.  I'm not sure of the -- I'm not sure of the question

9    you're trying to ask.

10   Q.  I mean, you didn't have training on chasing anybody, is

11   what you're telling me?

12   A.  I don't remember ever doing training where somebody was

13   running away from us, and they said, "Go chase this person."

14   I don't remember that sort of training.

15   Q.  But as a police officer, why are you going to chase

16   somebody?

17           MR. DeBERARDINIS:  Objection; form of the

18   question, Your Honor.

19           THE COURT:  Rephrase.

20   Q.  What would make you chase somebody if you're an MPD

21   police officer?  What would make you chase somebody down the

22   road?

23   A.  Me personally?

24   Q.  Yes.

25   A.  Oh, God, it could be -- I could rattle off many

1    things -- someone running from me, running from another

2    officer.  Why are they going to do it?  You know, you just

3    can't ignore certain things.

4    Q.  You're going to chase someone because someone's running

5    away from you?

6              THE COURT:  Let him finish.

7              MS. WEST:  Oh, I'm sorry.

8              THE COURT:  Were you finished, Mr. Katz?

9              THE WITNESS:  No.

10   Q.  Go ahead.  I apologize.

11   A.  I was just saying there's tons of reasons.  One is

12   somebody who is running away from us.  Why are they doing

13   it?  You know, we have to pay attention to things.

14              You know, it's paying attention to things that are

15   a little bit -- maybe the normal citizen isn't paying

16   attention to.  You might walk into an alley, and we might

17   have seen someone down there earlier.  It's paying attention

18   to things, you know.

19              You can't overlook certain things.  If somebody's

20   running from us, there's a reason for it.

21   Q.  There could be all kinds of reasons, right?

22   A.  There could be hundreds of reasons.

23   Q.  Right.  It could be that this person's committed a

24   crime?

25   A.  Yes.

1    Q.  It could be that this person is about to commit a crime?

2    A.  Yes.

3    Q.  It could be that this person's scared of you?

4    A.  Anything's possible.

5    Q.  So is the answer to that question yes or no?

6    A.  In my experience, the answer to that question is people

7    are a little less fearful of the police than they are of

8    being hurt by other people in the community.

9    Q.  Now, wouldn't you agree with me that depends upon where

10   you live?

11   A.  No.

12   Q.  No?

13   A.  I wouldn't agree with that at all.

14   Q.  You are a member of the GRU unit; is that right?

15   A.  Yes.

16   Q.  And you frequently patrol Elvans Road; is that right?

17   A.  Yes.

18   Q.  All right.  I'm getting ahead of myself.

19        When did you become a member of the GRU?

20   A.  It was, I want to say, Halloween 2007.

21   Q.  So at the time of the shooting in 2011 you'd been on

22   this unit about four years?

23   A.  Yes.

24   Q.  Uh-huh.  Now, I'm talking about your experience.  Elvans

25   Road is -- what kind of neighborhood is that?

1    A.   That one block, the 2400 block, you mean?

2    Q.   Yes, sir.

3    A.   There's a few houses as you go toward the 2500 block,

4    single-family homes.  When you first get in the 2400 block,

5    there's an apartment complex on your left.  It's long, like

6    an L-shaped driveway.  And then if you keep going, there's

7    two more apartment complexes; one straight ahead to the

8    left, and one down to the right.

9    Q.   Now, how many times do you think you've been patrolling

10   that area?

11   A.   Hundreds.

12   Q.   Hundreds.  Do you ever see anybody that looks like me

13   walking through Elvans Road?

14             MR. DeBERARDINIS:  Objection, Your Honor.

15             THE COURT:  Overruled.

16   A.   What do you mean, looks like -- a female?  A white

17   person?

18   Q.   A white female dressed in a suit?

19   A.   I have no idea.  I might have, sure.

20   Q.   Would it be unusual, in your experience, to see a woman

21   like me walking through that neighborhood?

22             MR. DeBERARDINIS:  Objection; relevancy, Your

23   Honor.

24             THE COURT:  Overruled.

25   A.   It would be unusual.

1   Q.  And why is that?

2   A.  It would be --

3           MR. DeBERARDINIS:  Objection, Your Honor.  It's

4   unusual.  The why is not relevant.

5           MS. WEST:  I'm going to tie it up, Your Honor.

6           THE COURT:  Do so quickly.

7           MS. WEST:  Yes, sir.

8   A.  It would be unusual to see a white person in a suit, a

9   white female in a suit walking down that street.  It would

10  be very unusual.

11  Q.  Wouldn't you agree with me it would be unusual to see a

12  white person in that neighborhood?

13  A.  It would be unusual.  It would be more likely you'd see

14  a man, but yes.

15  Q.  So if I'm walking away from you in that neighborhood,

16  are you going to chase me?

17  A.  You?

18  Q.  Right.

19  A.  Why are you -- maybe you did something.  Sure,

20  absolutely.  If you're running away, yes.

21  Q.  So if I'm simply running away from you, you're going to

22  chase me?

23  A.  Yes.  Yes.

24  Q.  It doesn't matter if I was about to commit a crime or

25  did commit a crime, does it?

1    A.  I'm not sure of the question.  If you were about to

2    commit a crime?

3    Q.  If I'm running away from you, you're going to chase me.

4    That was your testimony, right?

5    A.  Yes.

6    Q.  So you're going to do that regardless of whether you

7    just saw me sell somebody a nickel bag of marijuana?

8    A.  It could lead to something more.  If you're running

9    away, there's a reason.  I'll chase you to find out, sure.

10   Q.  And you can do that because you're the police?

11            MR. DeBERARDINIS:  Objection, Your Honor.

12            THE COURT:  Sustained.

13   Q.  Now, to become a member of the GRU unit did you have any

14   specialized training?

15   A.  Not initially, no.

16   Q.  Well, when did you have specialized training?

17   A.  Me personally?  Some people went through -- one of our

18   sergeants does a gun identification course.  Some people had

19   gone through it previously.  Just by happenstance, I took it

20   later or sat in on it later.

21   Q.  And what does that entail?

22   A.  He does a class on identifying people who might be

23   carrying guns.

24   Q.  And how long is that class?

25   A.  It's a few hours.

 1    Q.  A few?

 2    A.  A few hours.

 3    Q.  Three or four?  Five or six?

 4    A.  I would say more likely three or four, but I've seen it

 5    go on longer.

 6    Q.  What's the name of that sergeant?

 7    A.  Curt Sloan.

 8    Q.  Curt Sloan.  And when did you take this specialized

 9    training?

10            MR. DeBERARDINIS:  Objection, Your Honor, based on

11    prior rulings of the Court.

12            THE COURT:  Counsel's aware of the prior rulings

13    regarding Mr. Sloan, correct?

14            MS. WEST:  I am, Your Honor, but I don't want to

15    cross the line.  I'd like to approach the bench and make

16    sure I understand.

17            THE COURT:  Okay.

18            (The following is a conference held at the

19             bench outside the hearing of the jury)

20            THE COURT:  I take it you're referring to the

21    prior incidents with Mr. Sloan and Mr. Katz.  Is this the

22    Terrence Moore issue?

23            MR. DeBERARDINIS:  Yes, because the Court granted

24    summary judgment on training.  I don't know where we're

25    going with this, but the Court granted summary judgment on

1    negligence training, so anything bringing in Mr. Sloan or

2    specialized training --

3              THE COURT:  But the standards for training are

4    relevant to the negligence count.

5              MR. DeBERARDINIS:  No, they're not.

6              THE COURT:  Why not?

7              MR. DeBERARDINIS:  Because the officer -- because

8    their expert is going to testify that he was in breach of

9    the training that he received regarding the use of force

10   under circumstances that you perceive threat of serious

11   bodily injury.

12             Now we're talking about specialized training that

13   the GRU members received in doing their duties.  It's

14   nothing he is -- nothing that plaintiff's expert is going to

15   be able to relate to during his testimony.

16             THE COURT:  Okay.  I think they can get into

17   training with respect to the pursuit of suspects or

18   citizens, correct?

19             MR. DeBERARDINIS:  No, Your Honor, because their

20   expert has opined they didn't have any problem at all with

21   the conduct of any of the other police officers.

22             THE COURT:  And we're not -- and they've

23   stipulated.

24             You've stipulated that the initial stop was not

25   improper, correct?

1          MS. WEST:  Well, and that's where I really want to

2     make sure I understand the Court's ruling.  The initial stop

3     was somebody saying to Ralphy, "Do you have a gun?"  That's

4     the initial stop.  But it went -- after that, it becomes a

5     police encounter.  When they jump out, it becomes a police

6     encounter, and that initial stop is over.

7          MR. DeBERARDINIS:  Their expert testified that he

8     had no problem with the chase, and so I don't know where

9     we're going with this.  It's not going to be tied up by

10    expert testimony.

11         THE COURT:  You can ask him whether he was

12    suspected of any crime or was doing anything wrong at the

13    initial contact, but I don't want to get into whether that

14    constitutes a Terry stop or not.

15         MS. WEST:  Yes, sir, and I remember that was your

16    ruling before.

17         THE COURT:  Right.  You can establish whether he

18    was suspected of a crime.  That's relevant.

19         MS. WEST:  Which is what his deposition says, so

20    that's no surprise to you.

21         THE COURT:  And you can ask him, "Then why did you

22    chase him?"  And he can answer that question.

23         MR. DeBERARDINIS:  Absolutely, Your Honor.

24         THE COURT:  Okay.  But that's --

25         MS. WEST:  That's where I'm going.

1          THE COURT:  Okay.

2              (This is the end of the bench conference)

3     BY MS. WEST:

4     Q.  This class that you had, this three- or four-hour class,

5     did you use your gun during that class?

6     A.  No.

7     Q.  Was it a lecture?

8     A.  It was a combination of a lecture.  Sergeant Sloan would

9     take like a BB gun and put it in his waistband.  He might

10    run in a certain way; he might have a bulge a certain way;

11    he might throw it a certain way just to get you to see how

12    people carry different guns; where you carry it, in your

13    coat pocket, in your waistband, different things.

14    Q.  So I could be carrying a gun right now, and you wouldn't

15    know?

16    A.  I mean, you could have a very small gun in your

17    underwear, sure.

18    Q.  Or my waistband?

19    A.  I can't see the size of your waistband.

20    Q.  Behind my jacket I can be carrying a gun, right?

21    A.  Sure.

22    Q.  So you personally have had additional training in, from

23    what I understand your answer to be, detection of, what did

24    you say, a bulge?

25    A.  All different things.

1    Q.  Such as...?

2    A.  It could be a bulge.  It could be the way somebody

3    walks.  It could be the way somebody acts with another

4    person next to them.  It could be many different things.

5    Q.  Uh-huh.  So that three- or four-hour class was the

6    extent of your training?

7    A.  As far as in like --

8    Q.  Detecting a gun on somebody?

9    A.  Yes.

10   Q.  So you said that if I was running away from you, you'd

11   chase me?

12   A.  Yes.

13   Q.  Now, on April 26th of 2011, did you have the opportunity

14   to chase someone?

15   A.  Yes.

16   Q.  And describe how that person looked to you.

17   A.  He was a black male.  He had a T-shirt on and pants.

18   Q.  Uh-huh.  How were his pants?  Do you recall?

19   A.  I don't remember.

20   Q.  When you first saw him, what was he doing?

21   A.  He was walking to my right.

22   Q.  Well, where were you?

23   A.  I was seated in the front passenger seat of a black Ford

24   Explorer.

25           MS. WEST:  May I approach the witness, Your Honor?

1          THE COURT:  Yes.

2   Q.  So Officer Katz --

3          MS. WEST:  May the witness step down, Your Honor?

4          MR. DeBERARDINIS:  I'm sorry, I can't see it.

5          THE COURT:  Yes, you may.  Mr. Katz, you can step

6   down.

7   Q.  If you'd be so kind, I'd like you --

8          MR. DeBERARDINIS:  Counsel, I'm sorry, I need you

9   to stand on the other side.

10          MS. WEST:  Oh, sure, sure.  I apologize.

11   A.  If you'd be so kind, I'd like you to draw for the ladies

12   and gentlemen of the jury maybe -- and it doesn't have to be

13   Norman Rockwell art, but just kind of where you were on

14   Elvans Road on April the 26th of 2011.

15          MR. DeBERARDINIS:  Your Honor, objection.  We have

16   things that would be much more helpful to the jury.

17          MS. WEST:  I need to know this witness's

18   recollection.

19   A.  At which point do you want me to draw?  When I first

20   noticed him or --

21   Q.  If you would be kind enough, could you just draw a

22   little schematic here of Elvans Road and the cross street.

23   A.  Sure.  This is going to be rough.

24          (Witness complies) This is not to scale.

25   Q.  That's good.

1        MS. WEST:  Your Honor, I'm just going to turn this

2    so that you can see it so you have an idea of what he's

3    testifying about.

4    Q.  Now, thank you, Officer Katz.  If you'd be kind enough,

5    could you tell us -- I see here that you have Elvans Road

6    and Stanton Road marked.

7    A.  Yes.

8    Q.  What is this down here?

9    A.  A basketball court.

10   Q.  All right.  And were there children playing on April the

11   26th of 2011?

12   A.  I think they were doing some sort of painting on there,

13   but there were kids around, yes.

14   Q.  And what is this here that you've marked for --

15   A.  A playground.

16   Q.  A playground.  And so what would this box be here?

17   A.  That's another building, apartment building.

18   Q.  All right.  Would you just put "APT" for apartment.

19   A.  Sure.

20   Q.  Thank you.

21   A.  (Witness complies)

22   Q.  And what is this right here?

23   A.  That's another apartment building.  I think there's

24   actually others here, too.

25   Q.  Just put "APT," if you would be so kind.

1     A.   (Witness complies)

2     Q.   And the same here?

3     A.   Yes.

4     Q.   These same five boxes down here, they're all apartments?

5     A.   Yes.

6     Q.   Would you be kind enough just to put "APT" in each one

7     of those boxes.

8     A.   (Witness complies)

9           And actually, Miss, there's a little parking lot

10    right here and like a gate before you go in to the right.

11    It's actually not on the street, but it's off the street.

12    Q.   A little parking lot?

13    A.   Four or five spaces.

14    Q.   Okay.  So you said that's right here, and I'm pointing

15    underneath Elvans Road.  You said there's a gate?

16    A.   Yes.

17    Q.   Would you write "gate" there.

18    A.   (Witness complies)

19    Q.   Was that gate broken that day, do you remember?

20    A.   I think it's always broken.

21    Q.   Okay.  Now, if you'd be so kind, tell the members of the

22    jury where it was that you were with other police officers

23    on that day.

24    A.   When we first saw Mr. Briscoe, or in general?

25    Q.   Yes.

1    A.  I was in the Explorer going this way.  We had already

2    come in the parking lot.  We were then leaving, driving out

3    this way.

4              Officer Leo said something to the effect,

5    "Someone is walking quickly."  I looked to my right.  I saw

6    Mr. Briscoe walking quickly past this apartment building.

7    Q.  You got way ahead of me.

8    A.  The apartment building right here.

9    Q.  So I should ask you, who else were you with that day?

10   A.  Officer Chad Leo, Tom Sheehan, and Roberto Torres.

11   Q.  Okay.  There's four of you?

12   A.  Yes.

13   Q.  What kind of vehicle are you in?

14   A.  A black Ford Explorer.

15   Q.  And is that always the vehicle you're in?

16   A.  No.  I've had so many over the years, different Ford

17   Explorers, Chevy, different stuff.

18   Q.  Different colors?

19   A.  Yes.

20   Q.  Do you remember, sir, having your deposition taken in

21   this case?

22              MR. DeBERARDINIS:  Objection, Your Honor.

23              THE COURT:  Establish the predicate first.

24   Q.  You were in a black Ford Explorer that day?

25   A.  Yes.

1    Q.  Could it have been silver?

2    A.  I believe at the deposition I said silver, but I believe

3    I got it wrong.

4    Q.  And why is that?

5    A.  It's the color of a car.  We've had so many over the

6    years.

7    Q.  Was there a silver SUV there that day?

8    A.  Not that I remember, no.

9    Q.  So you never saw a silver SUV while you were in that

10   parking lot?

11   A.  No.

12   Q.  At any time did you see a silver SUV that day after the

13   shooting, any time?

14   A.  I don't remember a silver SUV, no.

15          THE COURT:  Ms. West, are you finished with him

16   marking?

17          MS. WEST:  No, Your Honor.  I'm sorry.  I'm just

18   getting going.

19   Q.  So if you'd be kind enough, in this lower right-hand

20   corner, sir, if you'd just make a box and show how the four

21   of you were situated in your vehicle, or -- I'm sorry, I

22   should do this.

23          Let's do it on a different piece of paper.  That

24   way you have more room?

25   A.  (Indicating) This will be the front of the car.

```
1     Q.   So is Defendant Leo the driver?

2     A.   Yes.

3     Q.   Would you mind putting a "D" there for me, sir.

4     A.   (Witness complies)

5     Q.   So the four of you were in this vehicle.  That's how you

6     were situated?

7     A.   Yes.

8     Q.   Uh-huh.  That accurately depicts how you all sat that

9     day in that vehicle?

10    A.   Yes.

11    Q.   A black Ford Explorer SUV?

12    A.   Yes.

13              MS. WEST:  At this time, Your Honor, we'd offer

14    Plaintiff's Exhibit JK2.

15              THE COURT:  Which is what?

16              MS. WEST:  I apologize, Judge.  It's just a little

17    drawing of where they were all seated in the car.

18              THE COURT:  Any objection?

19              MR. DeBERARDINIS:  This is what we're putting in?

20              MS. WEST:  Yes.

21              MR. DeBERARDINIS:  No objection.

22              THE COURT:  Okay.  So admitted.

23              MS. WEST:  Thank you, Your Honor.

24    Q.   Now, going back to our schematic, now that we know how

25    you all are situated in the vehicle, tell the ladies and
```

1    gentlemen of the jury where it was when you first were on

2    your beat that day.

3    A.   When we left the office or -- I don't know --

4    Q.   Well, I'm assuming if you were here, you left the

5    office.

6    A.   Yes.

7    Q.   And you drove to this neighborhood?

8    A.   At some point.  I don't know if -- when exactly we got

9    there.

10   Q.   Okay.  Where were you first at when you went into this

11   Elvans Road housing area?

12   A.   We went through the main gate.

13   Q.   All right.  So if you'd be kind enough, sir, to take

14   your Sharpie -- you don't have to draw -- just kind of show

15   the members of the jury where you were when you went in

16   first.

17   A.   We came through the main gate, drove down past the

18   basketball court, went around the area to the main area of

19   the parking lot, did a U-turn, and then drove back out.

20   Q.   And why did you drive back out?

21   A.   We didn't see anything down here.

22   Q.   Now, when you drove back out -- now I want you to mark

23   it for the members of the jury -- which direction did you

24   go?

25   A.   Do you want me to put it -- like an arrow?

```
1    Q.   Sure.

2    A.   (Witness complies)

3              MR. DeBERARDINIS:   Counsel, I'm sorry.

4    A.   The arrow is right here coming out of the parking lot.

5    Q.   And where did you turn?  Where did your vehicle turn?

6    A.   I don't know if we turned kind of in the middle or if we

7    went all the way to the end.  I'm not 100 percent sure of

8    that.

9    Q.   That wasn't artfully done.

10             To get out of the area of this parking lot, which

11   way did you turn onto Elvans Road?

12   A.   What do you mean?

13   Q.   When you left this area, which direction did you go?

14   When you left out of this parking lot, where did you go?

15   A.   I never made it out of the parking lot.

16   Q.   But did the car make it out?

17   A.   Yes.

18   Q.   Did you see the car make it out?

19   A.   Yes.

20   Q.   If you would, please, sir, I'd like you to, with this

21   pen, the pink one, draw where the vehicle was when you

22   jumped out, okay?

23   A.   Okay.

24             THE COURT:  Mr. DeBerardinis, do you all want to

25   stand in front of the box?  Would that make it easier for
```

1    you to see what's being drawn?

2              Mr. Leo, you may do so as well, if you'd like.

3              THE DEFENDANT:  I'm good over here.

4    A.  I'm sorry, with all that, what was the question again?

5    Q.  Where were you in the vehicle when you jumped out?

6    A.  When I got out, right around here.  In this area near

7    this building.

8    Q.  So could you draw on there what direction your car door

9    swung open as you jumped out.

10   A.  (Witness complies)

11   Q.  Now, did you just get out and walk out of the car like

12   you're walking into parties to get a hamburger, or did you

13   jump out?

14   A.  Well, do you want me to tell the larger portion of the

15   story?  Because that will explain what happened.

16   Q.  I know, but I want you to be able to do that from the

17   stand.  I'm just trying to get the picture going.

18   A.  When I started to open my door is when Mr. Briscoe ran,

19   and I actually started to run, and I jumped out.  But I did

20   jump out once he started to run.

21   Q.  Okay.  So what side of the vehicle did your door swing

22   open on?

23   A.  The passenger side.

24   Q.  Okay.  Would you put that on there, please.

25   A.  Like an arrow where I got out?

1    Q.   Yes.  That would be great.

2    A.   (Witness complies)

3    Q.   So you're directly across from Defendant Leo?

4    A.   To my left.

5    Q.   Right.  So he's in the driver's seat; you're in the

6    front passenger seat.  Right?

7    A.   Yes.

8    Q.   All right.  Please draw on here where you first saw

9    Ralphael.

10   A.   At some point it was brought to my attention somebody

11   was walking quickly.  I looked to my right.  I see him

12   walking this way to my right.

13   Q.   Okay.  Put on there where you believe you saw Ralphael

14   walking.

15   A.   I don't know if he was parallel to this at the time, but

16   going in this direction.

17   Q.   Would you be kind enough to put an "R" on there so we

18   know what we're talking about.

19   A.   (Witness complies)

20   Q.   Thank you.

21           Now, after you jumped out here, what happened to

22   this pink vehicle?

23   A.   It eventually went past me.

24   Q.   Okay.  And did you see it go past you?

25   A.   Yes.

1    Q.   Okay.  If you would take that pink marker and kind of

2    sketch where it went and describe to the members of the jury

3    what happened.

4    A.   (Witness complies) When I was chasing Mr. Briscoe, he

5    ran this way toward the gate in the lot.  I could hear the

6    engine revving behind me, and I knew that was our car, so

7    when I heard that engine revving behind me I just stopped

8    and moved to my right so I wouldn't get hit.  And ultimately

9    it drove past me and forward.

10   Q.   And if you continue, sir, with your pink -- I just want

11   the Court to see our added attraction.

12          So if you'd tell us where this car went, if you

13   continued -- you continued to run here, right?

14   A.   Yes.

15   Q.   Okay.  I'm going to give you, for you, purple.

16   A.   Thank you.

17   Q.   You're welcome.

18          So if you would put your little initials here and

19   where you went and where you --

20   A.   (Witness complies) Sure.  Like I said, when I first

21   started running, I was going this way.  I stopped and moved

22   over for a minute.  I'm not sure if it was in this area, a

23   little bit before or after, but I stopped and moved over.

24          I picked up running again.  Ran this way.  Went

25   left.

1    Q.   Now, Ralphael was to your right?

2    A.   Initially.

3    Q.   Yes.  Was he on the sidewalk?

4    A.   I'm not -- I think so.  I'm not 100 percent.

5    Q.   So he was on the sidewalk?

6    A.   I'm not 100 percent.  I think so though.

7    Q.   Would it help you refresh your recollection to see your

8    previous deposition?

9    A.   Sure.

10   Q.   We'll get to that.

11   A.   Okay.

12   Q.   If you'd be kind enough to use this green marker to draw

13   where Ralphael was running.

14   A.   (Witness complies)

15   Q.   But first here he's walking, right?  When you first see

16   him, he's walking.

17   A.   When I first see him, he's walking.

18   Q.   I want to make sure I understand that.

19   A.   When I first see him, he's walking.

20   Q.   So put a "dash W" there.

21   A.   (Witness complies)

22   Q.   Now follow along.  If you'd be kind enough to mark where

23   he went when he was running.

24   A.   Well, I'm behind him at this point so this is after he

25   ran -- I'm using green?

1    Q.  Yes, sir.

2    A.  This way, and he makes a left out of the parking lot.

3    Q.  And at the time, he's ahead of you, right?

4    A.  Yes.

5    Q.  Right.  So you're running behind him?

6    A.  Yes.

7    Q.  Okay.  Now, did you continue running, running, running,

8    running, running after him?

9    A.  Once I moved to the right, when Officer Leo's car went

10   by, then I started to run again.  Once I saw his car go by.

11   Q.  Okay.  If you'd continue to draw on our schematic here,

12   what happened after Ralphael was ahead of you running and

13   then you were behind him running?

14   A.  Am I drawing green for him or for me?

15   Q.  Green for him.  You're purple.

16   A.  What am I drawing right now?

17   Q.  Okay.  You're drawing as you turn here, and you're going

18   to continue wherever you stopped.

19   A.  Okay.  When he ran out of the parking lot, he was ahead

20   of me.  Officer Leo's car then went ahead of me, and I

21   started running again.  I got to the end of the parking lot.

22   Obviously when he made the left, I lost sight of him.

23        I get to the end of the parking lot, past the

24   gate.  I make a left in the middle of the street, and then I

25   picked him up ahead of me to the right.

1    Q.  How long do you think it was that you lost sight of him?

2    A.  A few seconds.  Just enough time for me to run from here

3    to here.

4    Q.  So if you'd be kind enough to continue the pink for the

5    vehicle.

6    A.  (Witness complies)

7            THE COURT:  Ms. West, how long do you have with

8    the map?

9            MS. WEST:  Just a couple of minutes, Judge.  I'm

10   almost certain.

11           THE COURT:  All right.  Wrap it up.

12           MS. WEST:  Yes, sir.

13   Q.  As you're running, running, running, did you hear shots?

14   A.  Yes.  Once I got onto the street, I heard shots, yes.

15   Q.  Okay.  And would you draw up here what you saw.

16   A.  What do you mean, what I saw?

17   Q.  As you heard the shots.  I apologize.

18   A.  I'm not sure what you mean, what you want me to draw.

19   Q.  Where were you when you heard the shots?

20   A.  Well, initially on that day I thought I was closer to

21   him than I was.  I think probably in hindsight, when you see

22   the video, I think I'm a little bit closer to here that day.

23   I thought I was closer to here.

24   Q.  So when you gave an initial statement, you thought you

25   were closer, but when you saw the videotape, you actually

```
 1    were farther back?

 2    A.  Exactly.

 3    Q.  Okay.  So show us, if you'd be kind enough, where you

 4    were when you heard the shots.

 5    A.  I'll draw the house.

 6    Q.  Okay.

 7    A.  (Witness complies)

 8    Q.  So would you put "driveway" right there, sir.

 9    A.  Sure.

10    Q.  Thank you.

11    A.  (Witness complies)

12    Q.  And if you'd be kind enough to label that "house."

13    A.  Sure.  (Witness complies)

14    Q.  So show us again.  My question was, where were you when

15    you heard the shots?

16    A.  That day I felt I was in this area right here, near the

17    house.

18    Q.  If you'd put your initials "dash shots," that would be

19    great.

20    A.  (Witness complies)

21    Q.  And do you know who lives at this house, sir?

22    A.  I think it's a guy, and I think he had a big dog.  I'm

23    not 100 percent though.

24    Q.  And did you eventually see where Ralphael fell after he

25    was shot?
```

```
1    A.  Yes.

2    Q.  Did you see him get shot?

3    A.  Yes.

4    Q.  You did?

5    A.  Yes.

6    Q.  All right.  Put right here where Ralphael fell --

7    A.  (Witness complies)

8    Q.  -- in his color, green.

9    A.  Green.  Thank you.

10   Q.  You're purple, so you have to underline that in purple.

11   A.  Yes.  I'll circle that in purple.

12   Q.  Thank you.

13            MS. WEST:  I'm through, Your Honor.

14            THE COURT:  Mr. Katz, do you want to resume the

15   stand?

16            Okay.  Ladies and gentlemen of the jury --

17            MS. WEST:  I'm just through with the map.

18            THE COURT:  -- we're going to take our morning

19   break, and we will reconvene at 11:15.  Okay?  And please

20   don't talk about the case.  Thank you.

21            (Jury exits courtroom)

22            THE COURT:  Okay.  Officer Katz, you're still

23   sworn.  You can exit the courtroom, but we'll need you in 15

24   minutes.

25            THE WITNESS:  All right.  Thank you.
```

1           THE COURT:  Please don't talk to anyone about your

2     testimony.

3           Okay.  Do we need to deal with anything?

4           MS. WEST:  No, Your Honor.  I know it's slow and

5     painful, but I want it to be --

6           THE COURT:  It's a little tedious.  We could have

7     used a premarked diagram, perhaps, but that's fine.

8           MS. WEST:  But as far as our case goes, Your

9     Honor, I have to know the individual thoughts of each

10    officer.

11          THE COURT:  I understand.

12          MS. WEST:  That's why I'm not doing it that way.

13          THE COURT:  I understand.

14          MS. WEST:  Thank you.

15          THE COURT:  And you all will compare notes on the

16    instruction regarding Ms. McNeil's testimony?

17          MS. FEATHERSTONE:  We will, Your Honor, yes.

18          THE COURT:  Okay.  We'll see you in 15 minutes.

19          MS. WEST:  Yes, Your Honor.

20          (Recess taken)

21          THE COURT:  Do we have an instruction, or no?

22          MS. FEATHERSTONE:  We don't, Your Honor.  We

23    drafted something and then presented it to the plaintiffs,

24    and they said they disagreed with it, but they didn't offer

25    anything.

```
 1                THE COURT:  Let's deal with it at lunch and bring
 2      it back.
 3                MS. FEATHERSTONE:  Okay.
 4                THE COURT:  Officer Katz.
 5                And I'd like to try to break for lunch as close to
 6      12:30 as we can.  How much longer --
 7                MS. WEST:  I think we'll be done with Officer
 8      Katz, certainly.
 9                THE COURT:  And done in time for cross, or --
10                MS. WEST:  I think we'll be done.
11                THE COURT:  We'll be done-done?  Okay.  Good.
12      We'll see how it goes.
13                MS. WEST:  I'm not making a promise.  I just
14      think.
15                THE COURT:  I'm sure the defense may have
16      something to say about that.
17                MS. FEATHERSTONE:  We're not examining today, Your
18      Honor, just so --
19                THE COURT:  Okay.  You're going to reserve and do
20      it on direct?
21                MS. WEST:  Okay.  I promise.
22                THE COURT:  Ms. West, could I see the diagram,
23      please.
24                MS. WEST:  Oh, yes, sir.  I have an iPhone.  You
25      could take a picture.
```

```
1                    THE COURT:  I got it.

2                    (Jury enters courtroom)

3                    THE COURT:  Okay.  Welcome back.

4                    Officer Katz, you're still under oath, okay?

5                    MS. WEST:  May I proceed, Your Honor?

6                    THE COURT:  Yes, you may.

7                    MS. WEST:  Thank you.

8         BY MS. WEST:

9         Q.  Now, Officer Katz, you've been kind enough to draw this

10        drawing for us so that we can understand where everybody

11        was, right?

12        A.  Yes.

13        Q.  All right.  And does this accurately depict the scene on

14        April the 26th of 2011?

15        A.  It's close.  It's not to scale.  I'm missing some

16        buildings.  I missed that parking lot in the beginning.  I

17        mean, it's somewhat close.

18        Q.  But it's pretty close?

19        A.  It's pretty close.

20                    MS. WEST:  At this time, Your Honor, we'd offer JK

21        No. 3.

22                    THE COURT:  Any objection?

23                    MR. DeBERARDINIS:  With the caveat that it's

24        admitted based upon the questions that counsel asked.

25                    THE COURT:  Understood.  It's admitted.
```

1          MS. WEST:  Okay.

2     Q.  Okay.  Officer Katz, I got a little bit ahead of myself

3     with drawing the map.

4          THE COURT:  Can you make sure that the jurors can

5     see the witness, please.

6          MS. WEST:  Ron, all the way to the wall, please.

7     Thank you.

8          THE COURT:  Juror No. 8, can you see the witness?

9     Can you move that back even further?

10          (Pause)

11          THE COURT:  Thank you.

12          MS. WEST:  Thank you.

13     Q.  So Officer Katz, you eventually jumped out of your

14     vehicle, and you did that because why?

15     A.  He started running away.

16     Q.  I'm sorry?

17     A.  Mr. Briscoe started to run away, or ran away.

18     Q.  Isn't it true that you first jumped out of the vehicle

19     when he first started walking fast?

20     A.  No.

21     Q.  No.  Is there any possibility that Ralphael would have

22     recognized --

23          MR. DeBERARDINIS:  Objection to form, Your Honor.

24     Anything's possible.

25          THE COURT:  Rephrase.

1            MS. WEST:  I'm happy to.

2            THE COURT:  Okay.

3    Q.  When you were in the neighborhood with your three

4    colleagues, would the general public have recognized you as

5    a police officer?

6    A.  I think so, yes.

7    Q.  And how is that?

8    A.  I had a big green tactical vest on that says "Police" in

9    the front and back.  I had all my gear on my stomach, on my

10   leg.

11   Q.  If you're seated in the vehicle, would they know?

12   A.  You can see my chest in the vehicle, yes.

13   Q.  How often do you go to the Elvans Road address as a GRU

14   member?

15   A.  If we're in that district, which is the Seventh

16   District, barring something getting in our way, like an

17   arrest or something, we'll make our way through that area

18   whenever we're there.

19   Q.  How many times a day?

20   A.  It depends.  Like I said, if we're in that area, the

21   Seventh District, we'll tend to go to Elvans Road if we're

22   there, without a doubt.

23   Q.  Two or three times a day?

24   A.  There are nights we've gone back two or three times,

25   yes.

1    Q.  Did you know Ralphael Briscoe before April 26, 2011?

2    A.  No.

3    Q.  Never seen him before?

4    A.  He doesn't stick out in my mind.  Obviously I could have

5    driven by and he saw me and I didn't see him, but in my

6    mind, I don't -- I've never spoken to him.

7    Q.  Uh-huh.  So is it your testimony today that the first

8    time you laid eyes on him he was running down the sidewalk?

9         MR. DeBERARDINIS:  Objection, Your Honor.  That's

10   not his answer.

11        THE COURT:  He can answer.

12   A.  No.

13   Q.  Okay.  What was he doing when you first saw him?

14   A.  When I first saw him, he was walking to my right.

15   Q.  Tell the members of the jury what was suspicious about

16   him walking on your right.

17   A.  Well, I didn't notice him first.  It was brought up in

18   our car.

19   Q.  Who brought it up?

20   A.  I think it was Officer Sheehan.

21   Q.  And what did he say?

22   A.  Something to the effect of, you know, "The guy over

23   there is walking quickly," something to that effect.

24   Q.  So in your mind, a person walking quickly is suspicious?

25   A.  No, not -- I mean, it can be.  It's just something to

```
1     pay attention to.  It's a small thing that could lead to

2     something else.

3     Q.  And did you notice any activity behind your SUV?

4     A.  At that time when I saw Mr. Briscoe?

5     Q.  Yes.

6     A.  No.

7     Q.  You testified earlier that you were not aware of a

8     silver SUV in the area; is that correct?

9     A.  That's correct.

10          MS. WEST:  May I approach the witness, Your Honor?

11          THE COURT:  You may.

12    Q.  I'm handing you what's already been entered into

13    evidence as 28F and 28D.  Take your time as you look at

14    those photographs.

15    A.  Okay.

16    Q.  What do those photographs depict, sir?

17    A.  This looks like Elvans Road, the 2400 block.

18          The first one, which is 28B, has a Metrobus in it.

19    There's some silver car ahead of the Metrobus.  And then

20    there's a dark SUV, it looks like maybe the door's open.

21          In 28F, it's a silver car.  It might even be a

22    minivan.  It looks like the same one that's in 28B, and it

23    goes off into -- it's like a little cut-out area on Stanton

24    and Elvans where you can park.  I don't think it's even a

25    legal parking spot, but this car is pulling into that area.
```

1    Q.  It's pulling into that area?

2    A.  Yes.

3    Q.  Uh-huh.  And what's the exhibit number there, sir?

4    A.  28F.

5    Q.  So if a car is pulling onto a public sidewalk, you

6    believe that that was a public citizen?

7    A.  You see cars parked everywhere.  It could be; it

8    couldn't.

9    Q.  Is it more likely that it was a police vehicle?

10   A.  I don't think so, no.  I don't think that's a police

11   vehicle.

12   Q.  Have you seen the videotape in this case, sir?

13   A.  Yes.

14   Q.  You testified earlier that at first you thought you were

15   closer to Ralphael, but then when you saw the video, were

16   you on the video?

17   A.  No.

18   Q.  So in that sense, when you saw the video of what

19   happened that day, and you didn't see yourself, you then

20   realized perhaps you were farther back?

21   A.  Exactly.

22   Q.  When you watched that video, did you see a silver

23   vehicle in that video?

24   A.  I don't think I watched far enough in the video for when

25   this picture was taken.  I don't remember a silver SUV.

```
1    Q.  Would it help you refresh your recollection to see the

2    video?

3    A.  I don't think it would just because I don't remember a

4    silver SUV, a silver -- this -- I mean, it could be a

5    minivan.  I don't remember any silver car that day that had

6    any dealings with us.

7    Q.  Could it be --

8           MR. DeBERARDINIS:  That's the end of the inquiry,

9    Your Honor.

10          THE COURT:  Let her ask the question, sir.

11   Q.  Could it be, sir, that -- well, let me ask it this way:

12   When was the first time that you saw this videotape?

13   A.  It's been a while.  I don't even know.

14   Q.  Was it 2012?

15   A.  It could have been.

16   Q.  2013?

17   A.  I have no idea.  I'm not sure.

18   Q.  But when you gave your recorded statement on April 26th

19   of 2011, did you know that this videotape existed?

20   A.  I did see the video before the --

21          MS. WEST:  Objection, nonresponsive.

22          THE COURT:  He can answer.

23   A.  This video?

24   Q.  Yes, sir.

25   A.  In regards to the silver car or just the video in
```

1   general?

2   Q.  The video in general.

3   A.  I noticed the video, yes.

4   Q.  On April 26, 2011?

5   A.  No, no, not on April 26th, no.

6   Q.  And you gave a recorded statement that day, right?

7   A.  Yes.

8   Q.  Who did you give that recorded statement to?

9   A.  Detective John Hendricks.

10  Q.  Uh-huh.  And when you gave that statement to Detective

11  John Hendricks, you didn't hesitate in that statement about

12  the facts in this case, did you, sir?

13  A.  No.

14  Q.  Not at all?

15  A.  No.

16  Q.  When did you first learn that there was a videotape of

17  this shooting?

18  A.  I think when I gave a second interview on the 28th I

19  knew there was a video.

20  Q.  Who took that tape from that building?

21  A.  This building?  I have no idea.

22  Q.  You don't know who took the videotape down from the

23  machine?

24  A.  The video -- I have no idea how this was obtained.  I

25  have no clue.

1    Q.  Okay.  Now, this is a neighborhood that you've worked in

2    for approximately four years before this shooting, right?

3    A.  Yes.

4    Q.  And are there cameras on poles and buildings?

5    A.  Yes.

6    Q.  And are these, like, high crime cameras?

7    A.  Yes.

8    Q.  All right.  And --

9    A.  Well --

10   Q.  Go ahead.

11   A.  Some are associated with the building, like the

12   management puts it up, and some are the MPD cameras.  So

13   there's different types of cameras.

14   Q.  And many times these cameras don't function; is that

15   right?

16   A.  I don't know.  I mean, who knows?

17   Q.  But when you gave that recorded statement on April 26,

18   2011, you did not know that there was a videotape of the

19   shooting, did you?

20          MR. DeBERARDINIS:  Asked and answered, Your Honor.

21          THE COURT:  Sustained.  You don't have to answer.

22          MS. WEST:  I'll move on, Your Honor.

23   Q.  So you just testified when you were drawing this

24   schematic that you did not see Ralphael get shot; is that

25   right?

1   A.  No, I did see him get shot.

2   Q.  You did see him get shot?

3   A.  I did, yes.

4   Q.  All right.  Describe that to the jury, please.

5   A.  When I was running down the street, I could see he was

6   ahead of me and to the right, towards the sidewalk.  There's

7   a driveway right next to that house.

8          I could see Officer Leo in the black SUV pulling

9   up.  I see Mr. Briscoe veer to the right a little bit,

10  stops, turns to the left.  I hear the shots, and then I see

11  him fall backward into the driveway.  I keep running then.

12  Q.  I want to take this a step at a time.  So I want to go

13  back to when you jumped out of your vehicle.

14  A.  Sure.

15  Q.  And before I do that, I want to ask you again, when did

16  you jump out of the vehicle?

17  A.  Once I opened the door, he started to run; then I got

18  out of the vehicle and ran after him.

19  Q.  So was he walking when you opened the door?

20  A.  When I opened the door, he was walking.  When the door

21  started to open, he started to run.

22  Q.  Did he ever look back at you?

23  A.  I don't remember him looking back.

24  Q.  So what did he do that was suspicious?

25          MR. DeBERARDINIS:  At what point, Your Honor?

1    Q.  At this point, when you jumped out of the vehicle, what

2    did you believe -- what did you believe he was doing that

3    was suspicious?

4    A.  You want me to start from the beginning or --

5    Q.  Describe when you jumped out of the vehicle.  What did

6    you see him do that -- while he was walking that was

7    suspicious?

8    A.  Sure.  Well, initially when we were driving, Officer

9    Sheehan said something like, "That guy is moving quickly to

10   your right."

11        I look to my right.  I see he's walking quickly,

12   and I also notice that he's looking all around.  So that

13   right there gives me a little bit more.  I'm looking at

14   that, and I'm thinking, "Why is he looking all around?  Why

15   is he walking quickly?  We've just come into this parking.

16   Now we're leaving.  This could be something."

17        My window was down.  I said, "Hey man, do you have

18   a gun?"

19        He didn't answer.  He kept walking even quicker

20   now.  That's when I then said, "He's going to run."  I

21   opened my door.

22   Q.  Now, if you would, please, sir, what's the purpose of

23   GRU?

24   A.  Well, we do all sorts of main -- investigations.  Our

25   main purpose is to take guns off the street in Washington,

```
 1    D.C.

 2    Q.  All guns or illegal guns?

 3    A.  Well, illegal guns, yes.

 4    Q.  So did you believe at that time that he had committed a

 5    crime?

 6    A.  At that time?

 7    Q.  Right.

 8    A.  No.  I wasn't 100 percent sure at that point, no.

 9    Q.  Well, did you believe he committed a crime at all?

10    A.  I didn't know what to think at that point.  I knew we

11    had somebody who was walking.  He was looking all around.  I

12    asked him if he had a gun; he didn't answer.  He walks

13    quicker, and now I see him running.

14    Q.  Now, if you would, please, sir, describe -- you said

15    earlier that he was wearing some pants, right?

16    A.  Yes.  He had on some sort of pants.

17    Q.  What did you see around his pants?

18    A.  I don't remember seeing anything.

19    Q.  So when you started to chase him, even though you say

20    that you didn't think that he'd committed a crime, why did

21    you chase him?

22              MR. DeBERARDINIS:  Asked and answered, Your Honor.

23              THE COURT:  You can answer.

24    Q.  Was it based on something you saw?

25    A.  Sure.  I don't think I said I didn't think -- I said I
```

1    didn't know if he had done anything.

2           Based off of what I saw, we have somebody running

3    from us; we just had this conversation; he didn't answer the

4    question about "Hey, man, do you have a gun?" So I'm

5    looking all around.  He was walking quickly, and now he's

6    running.

7    Q.  So your window was down when you asked him this

8    question?

9    A.  Yes.

10   Q.  What about all the windows in the vehicle, do you know?

11   A.  I can only speak from experience that in my car

12   everybody keeps their windows down.  That day do I know

13   everybody's window was down?  I can't say that.

14   Q.  Okay.  But that's usually how it goes?

15   A.  Even in the cold, yes.

16   Q.  So as he starts to run, that's -- I'm just trying to get

17   it -- visualize this in my mind.  He starts to run when you

18   jump out?

19   A.  When I open the door -- start to open the door.  So as

20   it's coming open, he takes off running.  And then I get out

21   and chase him.

22   Q.  Could you see his hands at that time?

23   A.  I don't remember if I saw his hands or not.  I just

24   remember him taking off running toward the gate in the

25   parking lot.

1          MS. WEST:  May I approach the witness, Your Honor?

2          THE COURT:  You may.

3    Q.  So if I'm you, and I'm in this vehicle -- which is a

4    metal SUV, right?

5    A.  A car is metal?  I don't know.  Are they aluminum?  I'm

6    not a car person.

7    Q.  Me either.

8    A.  Maybe.

9    Q.  It's not plastic.

10   A.  It could be.  You know, I don't even know.

11   Q.  Maybe the bumper.

12   A.  The bumper could be plastic.  I don't even know.  Is it

13   aluminum?

14   Q.  It's metal.

15   A.  Is it?

16   Q.  It's something.

17   A.  It's a material that's not rubber.

18   Q.  So what I want to know is, how far away are you from

19   Ralphael?

20   A.  If I'm seated right now in the car --

21   Q.  Okay.  I'll be Ralphael.

22   A.  Further.  Push down the cart.  Keep going.  That seems

23   about right.  If anything, it would be a little bit further.

24   Q.  Okay.  So maybe 15, 20 feet?

25   A.  Maybe even a little bit further.

1    Q.  All right.  So he's on the sidewalk?

2    A.  I think he's around the sidewalk, yes.

3            You could even go a little bit further.  I mean,

4    we're in this area right here.  I mean, it's a safe distance

5    to say.

6    Q.  And you're on the street in a car?

7    A.  Yes.

8    Q.  Is there anything in between us?

9    A.  There might have been parked cars.  I'm not sure.

10   Q.  But you just testified you saw him looking around?

11   A.  Yes.

12   Q.  But you couldn't see his hands?

13   A.  I don't remember his hands.

14   Q.  Now, this is somebody that you're fixing to get out of

15   the car and chase, right?

16   A.  No.

17   Q.  You just testified that you jumped out of the car after

18   you saw him quicken his pace and moving his head around.

19   Did I get that wrong?

20   A.  I was only saying no to I guess your initial comment of

21   you're fixing to.  That's what I meant.

22   Q.  Oh, let me say it this way.  You're getting ready to

23   jump out of that vehicle, right, after somebody?

24   A.  I would still say no.  It happens all the time where you

25   see somebody that interests you, and you end up not getting

1    out.

2            I would say the point where I was opening the door

3    after I said to him about the gun, that was the point where

4    we can say I was fixing to get out of the car.  But before

5    that, there's multiple things that can happen that can keep

6    you in the car.

7            It happens all the time.  You see somebody that

8    interests you for a minute, for a second, and then nothing.

9    Nothing.  So you stay where you are.

10           So to characterize it from the beginning I was

11   fixing to, I can't quite agree with that.

12   Q.  But you chased him?

13   A.  Yes.

14   Q.  This is somebody who you didn't think had committed a

15   crime?

16   A.  It's somebody who I didn't know if they committed a

17   crime.

18   Q.  All right.  But you had no reason to suspect that he

19   did.  That's my question.  What reason did you have?  Did

20   you see something in his hands?

21   A.  I'll go back to the -- well, I'll go back to no reason

22   to believe he didn't.  He's running away from us.  We're

23   here all the time.  I'm a police officer.  He's now running.

24   Q.  Can you see his hands?

25   A.  At that point?

1    Q.   Right.

2    A.   When I get out on foot and I'm running behind him is

3    when I get a better shot of his hands, yes.

4    Q.   Okay.  So I'm him.  You're behind, right?

5    A.   Yes.

6    Q.   Okay.  You can see him clearly now, right?

7    A.   Not his face.  I can see, at this point in the parking

8    lot, his back.

9    Q.   How about his hands?

10   A.   His right hand was moving around his front right

11   waistband.  I can see that from behind just based on where

12   his elbow was.  Exactly.

13   Q.   And he's not wearing a long sleeve shirt, is he?

14   A.   No.  I think it was a T-shirt.

15   Q.   So you could have seen his arm plainly, right?

16   A.   Well, I mean, what do you mean by "plainly"?

17   Q.   Could you see his arm?

18   A.   I could see his arm.

19   Q.   Okay.  How about his left arm?

20   A.   I don't remember the left arm.  I remember the right arm

21   was holding that right waistband area, and that's what I was

22   taking notice to.

23   Q.   Uh-huh.  So you begin to chase him?

24   A.   At this point I'm already chasing after him, but yes.

25   Q.   Did you run track in high school?

1    A.  No.

2    Q.  All right.  Do you -- have you ever watched track and

3    field events, the Olympics or anything like that?

4    A.  Yes.

5    Q.  All right.  So when somebody's running, like Ralphael

6    was that day, how is he running?

7    A.  He was running in the beginning of the parking lot with

8    his right hand pressed against the front right of his

9    waistband, and I could see how that was structured from

10   behind him.

11   Q.  And did he quicken his run?

12   A.  He was running quickly, yes.

13   Q.  So that you could see both his arms?

14   A.  I just don't remember the left arm as well.  I remember

15   the right arm, keeping it there and holding, and I remember

16   chasing him, and I remember moving to the right.

17   Q.  He's faster than you are, isn't he?

18   A.  I don't know.

19   Q.  Would it be fair for me to characterize his running as

20   he was smoking you?

21   A.  Oh, that day, yes.  He was smoking me that day, yes.

22   Q.  Now, when he was running, is he running like this with

23   both arms?

24   A.  No.

25   Q.  Okay.  Tell us how he's running.

1    A.  When I saw him in the parking lot when he was running

2    out, he had his right hand around his right waistband, and

3    he was running toward the gate.  And I was running before I

4    stopped to break off to the right.

5    Q.  And it's your testimony that you don't remember his left

6    hand?

7    A.  Just right now, thinking about it, I just don't remember

8    that left hand.  I remember the right hand.

9    Q.  Uh-huh.  So you said that you asked him if he had a gun?

10   A.  Something to that effect.  You know, "Hey, man, do you

11   have a gun?"

12   Q.  When you jumped out, did you say, "Stop, police"?

13   A.  No.

14   Q.  What do they teach you down there at that training

15   academy?  When you jump and you're chasing a suspect, aren't

16   you supposed to say, "Stop, police"?

17   A.  You could say it, if you want.  It never occurred to me

18   he didn't know it was the police.  It never was in my mind.

19   Q.  Did you have your gun drawn while you were chasing him?

20   A.  No.

21   Q.  How long did he fiddle with his waistband on his pants?

22   A.  I saw him -- you want to say fiddle.  I saw him fiddling

23   with it on his way out of the parking lot.

24   Q.  Okay.  So did he keep doing it during the length of the

25   time that he was running away from you?

1     A.   I thought -- well, I don't pick him up until I -- pick

2     him up again visually until I get out of the parking lot,

3     and then I look forward, and he's off to my right.  Because

4     remember, I stopped to let the car go by.

5             So when I see him again, yes, I do think that he's

6     holding his right side.

7     Q.   Uh-huh.  So you're telling me that he was smoking you.

8     And that's going fast, right?

9     A.   He was running quickly, yes.

10    Q.   All right.  So if he's running pretty quickly, it's your

11    testimony that even as he turned the corner, he's still

12    messing with his pants?

13    A.   For the entirety that I saw him, I thought he was

14    playing with his right front waistband.

15    Q.   All right.  And I want to make sure I get this right.

16    If we look at JK3, it's your testimony, sir, that where you

17    are -- you're the purple line.  You take a turn here on

18    Elvans Road.  He's the green line; he's taking a turn on

19    Elvans Road, and you see him on Elvans Road.  Right?

20    A.   Well, not exactly.  Can I stand up?

21    Q.   Please.

22            MS. WEST:  May the witness step down, Your Honor?

23            THE COURT:  Yes.

24    A.   Just as we were saying, when I started to run and I

25    heard Officer Leo's car behind me, I moved over to the right

1    and let them go by.

2            So when I see him out of the parking lot, Officer

3    Leo is following behind.  By the time I get out of the gate,

4    they're right here now, because I had to make up the ground

5    to get here to see around the corner.  So this portion of

6    this, I'm not seeing as much.

7    Q.  I thought you just testified that you saw him playing

8    with his waistband on Elvans Road.

9    A.  No.  I kept saying -- well, this is Elvans Road, but I

10   kept saying the parking lot.  He was going out of the

11   parking lot.

12   Q.  So tell us, if you would, please, sir, where is the

13   first time you see him playing with his waistband?

14   A.  Right when he started to run out of the parking lot.  In

15   the parking lot to the gate.

16   Q.  And where is the second time you said?

17   A.  When I get onto the street, and I catch him further up

18   here, I still see him holding that waistband.  And then when

19   he even gets to the sidewalk, I still think he's playing

20   with that waistband.

21   Q.  Okay.  Now, you do recall having your deposition taken

22   in this case, do you not?

23   A.  Yes.

24   Q.  Can you explain to the members of the jury when you were

25   asked questions --

```
 1              MR. DeBERARDINIS:  Page.  Page, Counsel?

 2              MS. WEST:  Sure, sure.

 3              MR. DeBERARDINIS:  Date and page, Counsel?

 4              MS. WEST:  February 11th of 2014.

 5              THE COURT:  Ms. West, wait for the Court as well.

 6              MS. WEST:  Sorry, Judge.

 7              THE COURT:  That's okay.  February 11th?

 8              MS. WEST:  Yes, sir, 2014.

 9    Q.  Do you remember, sir, at all whether or not Ralphael

10    slowed down?

11    A.  I thought he slowed down at the end, yes.

12    Q.  I'm sorry, sir?

13    A.  I thought he slowed down at the driveway area, yes.

14    Q.  Okay.  Page 56, Line 16.  Do you remember having your

15    deposition taken in this case, sir?

16    A.  I do, yes.

17    Q.  Isn't it true that you said, "I don't remember him

18    slowing down"?

19    A.  I remember him slowing down.

20    Q.  Now you remember that he slowed down?

21    A.  Well, yes, I do.  Yes.

22    Q.  Okay.

23              MS. WEST:  May I approach the witness, Your Honor?

24              THE COURT:  You may.

25    Q.  Officer Katz, I'm going to show you --
```

 1            MR. DeBERARDINIS:  Your Honor, this is improper

 2     impeachment.  I'd like to approach the bench.

 3            THE COURT:  Okay.  You may approach.

 4            (The following is a conference held at the

 5             bench outside the hearing of the jury)

 6            THE COURT:  We've got to get this right, okay?

 7     There's an inconsistent statement in the deposition.

 8            MR. DeBERARDINIS:  No, there's not, Your Honor.

 9            THE COURT:  Why isn't it inconsistent?

10            MR. DeBERARDINIS:  The previous question, Line 14,

11     "Mr. Briscoe" --

12            THE COURT:  -- "slowed down when he took the

13     left?"  "I don't remember."

14            MR. DeBERARDINIS:  This is when he was at the

15     gate.  The question is when he's at the gate slowing down.

16     That's before the Court right now.

17            THE COURT:  Didn't he take the left at the gate?

18            MR. DeBERARDINIS:  No, no, the left is at the

19     apartment complex, when he runs out in the street.

20            MS. WEST:  That's the gate.

21            MR. PONDS:  That's the gate.

22            THE COURT:  That's right outside the gate, isn't

23     it?  You can cross him on this, okay, or you can direct him

24     on this also.

25            MS. WEST:  I just want to make sure that when you

1    impeach somebody with their statement, you show them the

2    statement.

3              THE COURT:  But you have to establish that it is

4    inconsistent first.

5              MS. WEST:  Right, and I did.  Well, I think I did.

6              THE COURT:  Well, he says you didn't, but I think

7    you did.

8              MS. WEST:  Okay.  I was just making sure I didn't

9    do something wrong.

10             THE COURT:  Nope.  You're all set.

11             (This is the end of the bench conference)

12             THE COURT:  Okay.  Please proceed.  You may

13   approach.

14   BY MS. WEST:

15   Q.  Officer Katz, on February 11th of 2014, when you took a

16   deposition in this case, did somebody place you under oath?

17   A.  Yes.

18   Q.  If you'd be so kind, I want to make sure I understand

19   this.  You stated you don't remember him slowing down; isn't

20   that correct?

21   A.  I don't know the context of this, and I don't -- I would

22   have to read -- can I read before?  Because I think it's two

23   different things.

24   Q.  Sure, sure, sure, sure.  Take your time.

25   A.  Thank you.  (Witness reviews document)

1          Okay.  We're talking about two different time

2     periods right here.  This question, when you asked am I

3     slowing down, and I say, "I don't remember him slowing

4     down," that's talking about -- and I think it's pretty clear

5     in the deposition -- when he's first coming -- can I stand

6     up again?

7     Q.  Sure.  Please.

8     A.  The quote right there -- I think it's Line 16.  Line 16

9     is talking about -- when I say I don't remember him slowing

10    down is when he's coming out of here.

11          We're talking about two different things when I

12    was just talking about it over here.  This slowing down in

13    the deposition on 16, it's talking about right here, when he

14    comes out of the parking lot with Leo behind him and me over

15    here.  I didn't see him slowing down around here.

16    Q.  So at this time he was smoking you; is that fair to say?

17    A.  It's fair to say, yes.

18    Q.  Okay.  Could you see his hands there?

19    A.  I could see that right hand focused on the right

20    waistband area.

21    Q.  So what you're telling me is that he was smoking you,

22    and he had his hand in his right-hand side?

23    A.  Well, we can go back to that, sure.  I stopped right

24    here.

25          One thing is I've got a lot of gear on.  It's kind

1    of heavy.  Two is when Leo's car went, I literally stopped

2    and stood there.  He's literally ahead of me.

3              Smoking is good.  I'll go with your definition of

4    it.  He's smoking my --

5    Q.  I'm not trying to impugn your athletic ability.

6    A.  Oh.

7    Q.  Okay.  What I'm trying to say is, he didn't break his

8    stride right here, did he?

9    A.  No.

10   Q.  So he's going fast?

11   A.  He's going quickly, yes.

12   Q.  Now, if you're not breaking your stride, and you're

13   running fast, how is it that you're doing this to run and

14   you're doing -- and you're messing with your right-hand

15   side?  That's what I'm trying to understand.

16   A.  People do it all the time.  It's unbelievable what

17   people can do with a gun in their waistband.  I see crazy

18   things.  It's unbelievable what -- how fast people can go

19   holding their waistband.  Sometimes people are going fast

20   even without a belt or shoes.  It happens all the time.

21             He was going quickly.

22   Q.  So are you saying that there was a gun in his waistband

23   at that point?

24   A.  I think there was a gun in his waistband, yes.

25   Q.  Did you see a gun in his waistband?

```
 1    A.  No.

 2    Q.  You didn't see his hands?

 3    A.  I saw his hand holding his waistband.

 4    Q.  Was there anything in his hands?

 5    A.  I didn't see anything in his hands.

 6    Q.  You didn't see anything in his hands?

 7    A.  No.

 8    Q.  Now, please take your seat, sir.

 9              You're the first person that sees Ralphael --

10              MR. DeBERARDINIS:  Objection, Your Honor.  She

11    cannot testify to that.

12              THE COURT:  Sustained.  Sustained.

13              MS. WEST:  I'm sorry, Judge.  I'm sorry.

14    Q.  Are you the first person --

15              MR. DeBERARDINIS:  Objection, Your Honor.

16    Q.  Who is the first person that sees Ralphael on the ground

17    as far as police officers go?

18              MR. DeBERARDINIS:  Competency, Your Honor.

19              THE COURT:  Sustained.

20    Q.  Who first makes contact with Ralphael Briscoe?

21    A.  I get to him on foot first.

22    Q.  Was there a gun in his waistband?

23    A.  No.

24    Q.  Did you check his waistband for a gun?

25    A.  Once he was handcuffed, I did pat him, yes.
```

1     Q.  And what did you find?

2     A.  The gun was on the ground to my left.

3     Q.  Was there an imprint on his skin of a gun in the

4     waistband.

5     A.  No.  I didn't see an imprint, no.

6     Q.  Any evidence at all of a gun, him having possession of a

7     gun?

8     A.  Yes.

9     Q.  What was that?

10    A.  There was a gun maybe five-plus feet to his left.  I saw

11    a grip on the sidewalk.

12    Q.  And did you see how that gun got on the ground, Officer

13    Katz?

14    A.  No.

15    Q.  You said you saw him get shot.

16    A.  Yes.

17    Q.  When you saw that gun, what did you do?

18    A.  Handcuffed him on the ground.

19    Q.  Did you put your knee in his back?

20    A.  No.  I don't think so, no.

21    Q.  What did you do next?

22    A.  I said I would go over the main air.  We have our

23    tactical channel that we're talking to each other on, and

24    then we have the main air, which is the dispatcher.  I said,

25    "I'll go over to main air and let them know."

1    So I switched to the main air and called in what

2    we call a priority on the Seventh District air.

3    Q.   Okay.  Tell us what that is.  Give that to us in

4    layman's terms.

5    A.   Priority is obviously something serious has happened.

6    We need people to get over here.  You might need an

7    ambulance.  You need different things.  If it was something

8    that -- you would say "priority" so no one else comes on the

9    radio and says, "I found a lost dog down the street."

10   Q.   At that time, did you ask for an ambulance?

11   A.   Yes.

12   Q.   So how many seconds was that from the time you touched

13   Ralphael and handcuffed him to when you called?

14   A.   Right after he was handcuffed I said, "I'll call the

15   priority."  And then right then I said who I was.  I said,

16   "Shots fired," and I said, "We need the board," which is the

17   ambulance.

18   Q.   And how long did it take the ambulance to get there?

19   A.   I don't remember.

20   Q.   15 minutes?

21   A.   I don't know if it was that long.  I don't think it was

22   one or two minutes, but I don't know if it was 15.  I'd be

23   comfortable --

24   Q.   Could it have been 30 minutes?

25   A.   I don't think it was 30, no.

1    Q.  You just don't remember?

2    A.  I know it wasn't one or two, but I can't stretch it to

3    15.

4    Q.  Did you call for that ambulance again, or just once?

5    A.  I don't remember.  All I remember is one of the first

6    things I said was, "Can we have the board?"  I don't know if

7    I called again.

8    Q.  Did you know at that time who shot Ralphael?

9    A.  I didn't know right away.

10   Q.  Who did you think it was?

11   A.  I thought it was Officer Leo.

12   Q.  Why didn't you think it was Torres?

13   A.  Just from my vantage point, I thought it was from the

14   front seat.  I knew Leo was driving.

15   Q.  So why would the person driving the car shoot somebody

16   if there's an armed officer in the back seat?

17          MR. DeBERARDINIS:  Objection; competency.

18   Competency, Your Honor.

19          THE COURT:  Overruled.

20   A.  Is the question why would a front seat person do it?

21   Q.  Why would the driver do it?

22   A.  If you're -- whether you're driving, whether you're --

23   whatever you're doing, if you see a threat, you know, you

24   would do it.  I could be riding a horse, and I might have to

25   shoot somebody.  Who knows?

1    Q.  What was the threat?

2    A.  Are you saying what do I think he was thinking?

3    Q.  No.  I'm asking you, what was the threat?

4            MR. DeBERARDINIS:  Objection, Your Honor.

5            THE COURT:  Rephrase.

6    Q.  At the time he was shot, did you see a threat?

7    A.  Did I personally see a threat?

8    Q.  Yes.

9    A.  I saw a threat.  Did I see a gun?  I didn't see a gun,

10   no.

11   Q.  And I just asked you what was the threat?

12   A.  The threat was a gun in his hand and me being on foot

13   behind him.

14   Q.  But you just testified you didn't see anything in his

15   hand.

16   A.  No.  I didn't see the gun, but he did.

17   Q.  So I'm asking you at the time he was shot, what was the

18   threat?

19   A.  The gun in his hand.

20   Q.  Even though you didn't see it?

21   A.  I didn't see it, correct.

22   Q.  Right.  But when he was shot, you could see the black

23   SUV.  You could see him.  And you could see his hands,

24   right?

25   A.  I don't know if I could see all of his hands at that

1    point, no.

2    Q.  Which is it, Mr. Katz?  Was it in his waistband, or was

3    it in his hand?

4    A.  The gun?

5    Q.  Yes.

6    A.  Are you telling me to talk about the video or --

7    Q.  No, no, no.  I'm asking what you saw.

8    A.  What I saw was him turn and then shots happened, and

9    then Mr. Briscoe falls backwards.  I never saw a gun in his

10   hand in real life.  I saw it in the video.

11   Q.  Uh-huh.  Okay.  Would you please stand up, sir, and

12   demonstrate.  You said -- you just testified that you saw

13   him turn.

14   A.  Yes.

15   Q.  And then what?

16   A.  And then he gets -- well, the shots happen, and then he

17   gets pushed backward.

18   Q.  Okay.  So if you'd demonstrate how it was that he

19   turned?

20   A.  When he was going, I saw him veer to the right a little

21   bit, go this way, and then he gets pushed backward.

22   Q.  Okay.  So if this is the car that Leo and Torres are in,

23   and he's over here.

24   A.  Yes.

25   Q.  Smoking him, right?

1    A.   I think he's more smoking me than them, but --

2    Q.   Okay.  They eventually catch up to him?

3    A.   They catch up.  Well, Officer Leo does, yes.

4    Q.   Right.  So when you said you saw him turn, did he turn

5    towards the vehicle?

6    A.   Yes.

7    Q.   All right.  That's what I want you to show us.  How did

8    he turn towards the vehicle?

9    A.   Do you want me to use this as the vehicle?

10   Q.   That's good.

11   A.   From where I was down the street, I saw him veer to the

12   right.  He then stops, turns this way, and then falls

13   backwards.

14   Q.   So he turns this way towards the vehicle?

15   A.   Yes.

16   Q.   So really he should have been able to see Chad Leo?

17   A.   I don't know what he could see at that point.  I don't

18   know.

19   Q.   He could see that black SUV?

20   A.   It was in front of him.  I mean, it was traveling down

21   the street.  I would figure he could see it.

22   Q.   And then the shots hit him.  In the back, right?

23   A.   That day I didn't think they hit him in the back.

24   Q.   You thought they hit him here?

25   A.   I thought they hit him square.

```
1    Q.  Square on in the front?

2    A.  Yes.

3    Q.  So obviously now you think they hit him in the back?

4    A.  Based off of what I've heard, I was told that he was hit

5    in the back.

6    Q.  Okay.  All right.  You can have a seat.  Thank you,

7    Officer.

8    A.  Thank you.

9            MS. WEST:  The Court's indulgence?

10           THE COURT:  Sure.

11   Q.  So you're the first person that sees him?

12           MR. DeBERARDINIS:  Objection, Your Honor;

13   competency.

14           THE COURT:  Rephrase.

15   Q.  You're the first person -- are you the first person that

16   gets to Ralphael after he's been shot?

17   A.  Yes.

18   Q.  You handcuff him?

19   A.  Yes.

20   Q.  And then what do you do?

21   A.  I step away, and then I go on the Seventh District air

22   and call for priority, ask for the ambulance.

23   Q.  And then what happens?

24   A.  People started to come out from the neighborhood.  I

25   went on the radio again later and said, "A crowd's forming."
```

1     And I got my camera, and I started to take pictures.

2     Q.  You decided to take pictures?

3     A.  Yes.

4     Q.  Tell us why you did that.

5     A.  A few reasons.  One, our whole -- one of our jobs is to

6     preserve evidence.  We had people coming out.  A lot of

7     times, too, we talk about crime scene.  Crime scene gets

8     there when things have been moved, the body's been moved,

9     the person's been moved.  I wanted to get exactly how it

10    was.

11          The pictures I took were taken right after exactly

12    how things were.  They are the only set that shows that.

13    Q.  And do you take pictures at every scene?

14    A.  I used to years ago.  Now, if I'm involved in 20 scenes,

15    maybe I do three or four.  It depends.

16    Q.  Now, the GRU, do they have a person that takes

17    photographs of every crime scene?

18    A.  Not of every crime scene, no.

19    Q.  Why is that?

20    A.  We have crime scene officers.  It just depends on what

21    they take pictures of.  If we have a drug arrest, I'll tend

22    to take pictures.  If we have a gun in the guy's waistband,

23    and it's pressing time, let's get it out of there.  I'll

24    take a picture really quick and get it out.

25          It just depends on the scenario because the crime

1    scene people aren't always in the car with you.  They might

2    not be close.  So if you want to do something quickly,

3    you've got to do it yourself.

4    Q.  Who is Wayne David?

5    A.  The crime scene officer.

6    Q.  Isn't he the man who is supposed to take the pictures?

7    A.  Once again, he does take them.  It depends on how the

8    situation is dictating itself.  If it needs to be taken

9    quickly, my camera's there; I'm going to take it.

10   Q.  Where was your camera that day?  Did you have to go back

11   to the car and get it?

12   A.  Yes.

13   Q.  Uh-huh.  And how soon did you do that after Ralphael had

14   been shot?

15   A.  After I called the priority, the crowd started to come.

16   When I saw that it was a little bit calmer, I walked away,

17   got my camera, and started to take pictures.

18   Q.  When did you give those -- did you give those pictures

19   to the FIT people?

20   A.  Yes.

21   Q.  Who are the FIT people?

22   A.  Force Investigation Bureau.  They handle shootings,

23   police use of force.

24   Q.  And how long did it take you to get those pictures to

25   them?

1    A.  I told them about it that day.  I gave it to them on the

2    28th, so it was two days later.

3    Q.  Two days later.  What kind of camera did you use?

4    A.  I have a little Canon.  An ELPH, I think it's called.

5    Q.  I'm sorry, sir?

6    A.  I have like a Canon, like an ELPH or something like

7    that.

8    Q.  Is it a digital camera?

9    A.  It's a digital camera.

10   Q.  People don't -- you don't ever take pictures with an

11   iPhone?

12   A.  I have a camera.  I don't use the iPhone.

13   Q.  Okay.  And how many pictures did you take?

14   A.  That day?

15   Q.  Yes.

16   A.  I'm not sure.  Maybe eight or ten.  I'm not sure.

17   Q.  Is that camera given to you by the MPD?

18   A.  No.

19   Q.  Is it your personal camera?

20   A.  It's my personal camera.

21   Q.  And you just carry is along just because?

22   A.  I bought a camera right when I got in the department.  I

23   saw that nobody had them and that you needed pictures

24   quickly sometimes, so I had -- over ten years I've been

25   carrying a camera.

1    Q.   What type of cell phone do you carry?

2    A.   An iPhone?

3    Q.   Do you remember -- so, I'm sorry, I missed it.  How many

4    photos did you take?

5    A.   Maybe eight or ten.  However many were in the packet.

6    Q.   All right.  And you gave them to the FIT team?

7    A.   Yes.

8    Q.   Now, before you had your deposition taken, were you told

9    by members of the FIT team not to talk to the other officers

10   about this case?

11   A.   I don't remember him saying that, no.

12   Q.   You don't?

13   A.   No.

14   Q.   Did anybody say that to you?

15   A.   I don't remember anybody saying, "Don't say anything

16   about it," no.

17   Q.   No, that's not my question.

18        My question is, did anybody at MPD tell you not to

19   talk to the other three officers in the car about this

20   shooting?

21   A.   Nobody told me not to.

22   Q.   Nobody?

23   A.   Nobody that I remember.

24   Q.   So who have you talked to about this shooting as far as

25   the three other officers you were with?

1    A.   You mean the detail that we're going into right now?

2    Q.   No, no, just about the shooting in general.

3    A.   Nearly no one.  I didn't -- I've barely spoken about it.

4    Q.   Well, tell me who you spoke to.

5    A.   I can't say who I went into detail with.  I know I've

6    barely spoken to anyone about this shooting.  I haven't gone

7    into detail with anybody.  I've barely spoken to anybody

8    about it.

9    Q.   Okay.  I'm going to ask it this way:  Have you talked to

10   Officer and Defendant Chad Leo about this shooting?

11   A.   Particulars, no.

12   Q.   Have you talked to Officer Defendant Chad Leo about this

13   shooting?

14   A.   Other than that he had been in the shooting --

15   Q.   That's a yes or no question.

16   A.   We've spoken that he did shoot somebody.

17   Q.   Is that it?

18   A.   Yes.

19   Q.   What about Officer Sheehan?

20   A.   I've barely spoken to him about it.

21   Q.   Well, tell us what you talked to him about.

22   A.   Just in conversation.  Mainly a conversation to deal

23   with, you know, "We're doing a deposition."  "Yes, we're

24   doing a deposition."

25            "Hey, trial's coming up."  "Trial's coming up."

1        Nothing in particular, like, "Hey, remember it was

2    warm that day?"  We haven't had conversations about that.

3    We've had conversations about the ongoing case.

4    Q.  What about Torres?

5    A.  The same thing.  I've never sat down or spoken to him

6    about what I saw that day, and to this day I don't think he

7    knows what I saw.

8    Q.  How long have you worked with all these guys?

9    A.  Officer Leo, seven-plus years; Torres, six-ish; Tommy

10    maybe -- or Officer Sheehan, maybe six-ish.

11    Q.  And you're telling this jury that that's the extent of

12    your conversation with these fellows that you've been

13    working with all these years about this shooting?

14    A.  We were all there.  We all saw what happened.  There's

15    no reason to talk about what we saw.

16    Q.  One of your fellow officers just shot an unarmed black

17    male in a bad neighborhood, and you're just going to say the

18    deposition is coming up?  You're not going to talk about the

19    facts?

20            THE COURT:  Counsel.

21            MS. WEST:  Yes, sir.

22            THE COURT:  Ask your question.

23    Q.  You want this jury to believe that all you've talked to

24    with these other officers is that your deposition's coming

25    up?

1    A.  To go back to -- well, number one, he was armed.  That's

2    number one.

3          Number two, I haven't spoken to them about it.  I

4    don't really care.  I have friends who have been in the Army

5    who have killed many people; I don't speak to them about it.

6    I haven't spoken to him about what he did that day.

7          I know what he did.  I know the kid had a gun.  I

8    know he was near the car.  I know I was on foot.  I haven't

9    spoken about it; I don't need to speak about it.

10   Q.  And you're outside in the hall today talking to Officer

11   Torres, aren't you?

12   A.  Yes.

13   Q.  These people are your friends, aren't they?

14   A.  Yes.

15   Q.  You go to each other's houses?

16   A.  I've never been to Torres's house.

17   Q.  But the other two you have?

18   A.  I was at Officer Sheehan's house once for maybe five

19   minutes.  I've been in Officer Leo's house a few times.

20   It's a condo.  But combined time in his apartment or condo,

21   maybe an hour.

22   Q.  You went to his wedding, right?

23   A.  He's single.

24   Q.  Or you went to one of these guys' weddings, right?

25          MS. WEST:  Sorry.

1   A.  Officer Sheehan's single.  Officer Torres has been

2   married for a bit.

3   Q.  Oh, Mr. Leo went to your wedding.  I knew there was

4   something.  Right?

5   A.  He went to my wedding, yes.

6   Q.  You all drink beer together, right?

7   A.  We have, yes.

8   Q.  Okay.  You're friends, right?

9   A.  Yes.

10  Q.  And you're not going to talk about this very unfortunate

11  event?

12  A.  I think I said that before.  My best friend's a Green

13  Beret.  I've never asked him how many people he's killed.  I

14  know it's a lot.  It's not my business to talk about it.

15          I saw what happened.  I know he had a gun.

16  Q.  But you weren't with that Green Beret when he shot

17  somebody, were you?

18  A.  No.

19  Q.  So why would you talk to him about it?

20  A.  I think that gives me more of a reason to talk to him

21  about it.  I never -- I wasn't there to see it.

22          I was with Officer Leo.  I saw what happened.  I

23  know Mr. Briscoe had a gun, and that's it.

24  Q.  And that's all the talking?

25  A.  I have never gone into almost any detail with him about

1    this case other than this stuff happening.

2    Q.  Okay.  Then I want you to tell the members of this jury

3    why it is that you showed Tom Sheehan the photos that you

4    took right before his deposition and pointed out to him,

5    "Now, these are the" --

6              MR. DeBERARDINIS:  Objection.  She's testifying

7    now, Your Honor.

8              THE COURT:  Ask a question.  What's your

9    foundation?

10             MS. WEST:  My foundation, Your Honor, is --

11   Q.  Did you show the photographs you took to Tom Sheehan

12   right before he took his deposition?

13   A.  I did.

14   Q.  That's talking to him about this case, isn't it?

15   A.  I showed him the photos.  That is all I did, showed him

16   the photos.

17   Q.  And what you did, sir -- did you show him, "Here's where

18   the grips were found"; is that right?

19   A.  I showed him the photos.  I said, "Remember the grips

20   are right here.  The gun's right here."

21   Q.  Remember.  "Remember, the grips were right here."  Why

22   did you have to tell him that?

23   A.  Just to get a recollection.  You might look back at your

24   wedding photo and say, "Remember that cake."  It happens.

25             I was showing him where everything was.  Sometimes

1     you forget.

2     Q.  And you didn't want Tom Sheehan to forget, did you?

3     A.  I wanted him to look at the photo to remember what

4     happened that day.

5          We took it that day.  He was there.  Those are the

6     photos I took directly after the shooting.  They're exactly

7     what happened.

8     Q.  And you wanted him to remember because he's your friend;

9     is that true?

10    A.  No, that's not true.  I wanted him to look at the

11    photos.  I didn't know if he'd seen them since then.  "Look

12    at the photos."  It's not something -- the deposition was

13    coming up.  "Here you go.  Look at the photos."

14    Q.  But he didn't ask to see those photos, did he?

15    A.  No.

16    Q.  You did it, right, on your own, showed him those photos?

17    A.  I did.

18    Q.  Because he's your friend; isn't that true?

19    A.  Officer Leo or Sheehan?

20    Q.  Both of them.

21    A.  Officer Leo is a better friend, yes.

22    Q.  Okay.  And you don't want anything bad to happen to him,

23    do you?

24    A.  If he did something wrong, I have no issue with

25    something bad happening to him.  He didn't.

1          MS. WEST:  Your Honor, I'd like to play the

2     videotape, Plaintiff's Exhibit No. 13.

3               THE COURT:  Proceed.

4               (Pause)

5               THE COURT:  You all should feel free to stand up

6     and stretch if you need a stretch break.

7               (Video playing)

8     Q.  For the record, what you're watching, Officer Katz, is

9     Plaintiff's Exhibit No. 13, the videotape.

10    A.  Okay.

11    Q.  Have you seen this tape before?

12    A.  Yes.

13    Q.  All right.  Starting from this -- right here?

14    A.  Starting from when you started that I saw it, yes.

15    Q.  All right.

16              MS. WEST:  We started at 24:24 for the record.

17              MR. PONDS:  2:24.

18              MS. WEST:  2:24.

19              THE COURT:  And this is the 50 percent reduced

20    version; is that right?

21              MS. WEST:  Yes, Your Honor.  Thank you.

22              THE COURT:  Or 50 percent slowed version, I should

23    say.

24              MS. WEST:  Yes.

25    Q.  Now, Officer Katz, you were able to see the videotape;

1    is that correct?

2    A.  Yes.

3    Q.  Have you seen any more videotape other than this?

4    A.  Well, I saw the photos of that silver car.  I don't know

5    where that is in this, but...

6    Q.  Okay.  Well, we're going to play you an additional part

7    of the -- so really you didn't answer my question.  Have you

8    seen any other part of this tape than this?

9    A.  This is the only part I've seen, is right now what

10   you've just shown; and I don't even think I saw it to the

11   end where you kept going.

12          MS. WEST:  I think, Your Honor, to be fair to the

13   witness, it would be best to show him that over the break.

14          THE COURT:  To what end?

15          MS. WEST:  I'm sorry, sir?

16          THE COURT:  To what end?

17          MS. WEST:  The silver vehicle.

18          THE COURT:  Okay.  That's fine.

19          MS. WEST:  So could we break for lunch at this

20   time, Your Honor?

21          THE COURT:  Are you going to question him about

22   the portion that you've just shown him?

23          MS. WEST:  No, not until also I show him the

24   silver vehicle portion.

25          THE COURT:  And you just want to save time for the

1    jury so that he can --

2            MS. WEST:  Okay.  I can.  I can.  I can, Judge.

3    It's not a problem.

4            THE COURT:  Why don't we go until 12:30, if we

5    can.

6            MS. WEST:  Yes, sir.  I'd be happy to.

7    Q.  So, Officer Katz, you just saw that clip, right?

8    A.  Yes.

9    Q.  And you saw Ralphael get shot?

10   A.  Yes.

11   Q.  All right.  Tell the members of the jury at what point

12   on that videotape did you see Ralphael, as you described

13   yourself, turn his body toward that back SUV.  When was

14   that?

15   A.  To me, when his left foot goes out.  When he's running,

16   the left foot goes out.  When I'm on foot behind him, I

17   think that's the point where on foot that day it looked like

18   he turned.

19           And I've seen the video now.  I see what it

20   reflects.  But when that left foot goes out, from my

21   perception that day from behind him running, is what I

22   thought him turning was.  And I still think he turned.

23   Q.  So you're running behind him.  He's running, and his

24   left foot turns.

25   A.  The left foot goes out to the left, kind of what you're

1    doing.

2    Q.  Because he's cutting a hard right, isn't he?

3    A.  I don't know if he -- are we talking about the videotape

4    or my vantage point that day?

5    Q.  The videotape.

6    A.  In the videotape it looks like he does cut to the right.

7    Q.  Does he cut to the right?

8    A.  It looks like he does.

9    Q.  All right.  And where is he going when he cuts to the

10   right?

11   A.  I don't know where he was going.

12   Q.  You know the neighborhood.  You're there every day.

13   A.  I've never had anyone run behind that house so I don't

14   really know what the -- you know.

15   Q.  What's right behind that house?

16   A.  Woods.

17   Q.  Woods?

18   A.  Yes, woods.

19   Q.  Do you know it as "the cut"?

20   A.  No.

21   Q.  You've never heard that phrase?

22   A.  I've heard the phrase.  I don't know what it is in

23   reference to this.

24   Q.  If he runs into those woods, are you going to catch him?

25   A.  I've caught people in the woods before.  Down further.

1    Never in that area.

2    Q.  Now, again, I'm not impugning your athletic ability, but

3    if he's going into that woods, are you or any of those other

4    officers going to find him?

5    A.  Sure.

6    Q.  Really?

7    A.  It can happen.

8    Q.  Even with him smoking you?

9    A.  Well, I know we keep talking about the athletic ability.

10   A lot of that is moving to the right.  When people go into

11   the woods, they get slowed down, end up triangulating.

12          There were four of us in the car.  Could we have

13   trapped him in the woods?  It could have happened.  I mean,

14   I can't agree that he could have certainly gotten away.  I

15   can't say that.

16   Q.  So after he's shot, you take pictures.  What do you do?

17   A.  Say something to Officer Leo like, "Stay in the car,"

18   and then I stood around just making sure nobody got onto the

19   crime scene.  More people started to come --

20   Q.  But Officer Leo, did he stay in the car?

21   A.  I don't know if he stayed in the car or not the whole

22   time.  I don't know.

23   Q.  Did he ever get out of the car?

24   A.  Yes.  At some point after the shooting he got out of the

25   car, but at some point later I said, "Just stay in the car."

1    And I don't know if he got out again or, you know, what

2    really he did after that in the car or sitting next to it.

3    Q.  But you told him to get back in the car?

4    A.  When people started to come and afterward, I said, "Just

5    wait in the car."  Something to that effect.

6    Q.  Okay.  What are Sheehan and Torres doing?

7    A.  Officer Sheehan is on the ground talking to Mr. Briscoe.

8    Officer Torres is near me a little bit.  We just kind of

9    spread out making sure nobody came onto the crime scene.

10          Some people came, and I said, "Just bear with us."

11   You know, "Just hold on."

12   Q.  So when was it that you gave your recorded statement?

13   A.  I'm not sure how many hours after the shooting.  It was

14   on Stanton Road right next to Elvans.  It was that day, not

15   too long afterward.

16   Q.  Uh-huh.  Have you had an opportunity to listen to that

17   recorded statement since that time?

18   A.  Yes.

19   Q.  When did you last listen to it?

20   A.  In full?  Not last weekend.  Maybe in the last two and a

21   half weeks, something like that.

22   Q.  Did you review your deposition testimony as well?

23   A.  Yes.

24   Q.  And would you agree with me that your recorded statement

25   and your deposition testimony have differences?

1          MR. DeBERARDINIS:  Objection, Your Honor.  That's

2     improper.

3          THE COURT:  Sustained.

4     Q.  Eventually did you get back in your car and leave work

5     for the day?

6     A.  I think that -- I think the car we drove that day was

7     taken.  I remember getting in another car, maybe, and going

8     back.

9     Q.  And did you go with Torres and Sheehan in the same car?

10    A.  I don't even remember.  It was after we gave the

11    statement.  At some point I remember going back.  I don't

12    remember who I went with.

13    Q.  You don't.

14    A.  I don't remember at all.

15    Q.  What did you do that night?

16    A.  I'm sure I went home.

17    Q.  Do you remember?

18    A.  I didn't go out.  I know that.  I know I didn't -- I'm

19    sure I went home though.  I don't see what else I would have

20    done.

21    Q.  Just so I'm clear, I want to make sure I understand.

22    You didn't talk to any of these three officers again about

23    this case?

24         MR. DeBERARDINIS:  Objection; asked and answered

25    about ten times, Your Honor.

```
 1                  THE COURT:  Sustained.

 2                  MS. WEST:  I'll wait until he sees the part of the

 3        videotape for lunch, Your Honor.

 4                  THE COURT:  Okay.

 5                  MS. WEST:  And then I'll have two minutes with

 6        him.

 7                  THE COURT:  Okay.

 8                  MS. WEST:  That's all I have.

 9                  THE COURT:  So we'll do the video after the break?

10                  MS. WEST:  Yes, sir.

11                  THE COURT:  Okay.  We will take our lunch break a

12        little bit early.  Let's be back in an hour and 15 minutes,

13        which will be 1:35.  Is that all right?  Okay.

14                  Please don't talk about the case.  Don't do any

15        Internet research.

16                  (Jury exits courtroom)

17                  THE COURT:  Okay.  Officer Katz, you're still

18        under oath.  We will see you back here at -- what did I say?

19        1:35?

20                  THE WITNESS:  1:35?

21                  THE COURT:  Yes.

22                  THE WITNESS:  Gotcha.

23                  MR. DeBERARDINIS:  I just want to get some clarity

24        as to --

25                  THE COURT:  Let the witness leave first, okay?
```

```
1              I'm sorry, you wanted to show him --

2              MS. WEST:  There is another -- this comes as a

3    complete surprise to me, that he was not shown the entire

4    videotape in this case.

5              THE COURT:  Okay.

6              MS. WEST:  And so I made a bad assumption, Your

7    Honor.  I assumed that he would have been shown this entire

8    videotape.

9              THE COURT:  How long is the clip you want to show

10   him and ask him about?

11             MR. PONDS:  Probably about 10 to 15 seconds.

12             THE COURT:  Okay.

13             MS. WEST:  And then there's about 30 seconds after

14   that.

15             MR. PONDS:  Right, right.  So I would say no more

16   than a minute and a half.

17             THE COURT:  We'll call him back, we'll show him

18   the clip, and then we'll call the jury.  Is that fine?

19             MS. WEST:  Yes, Your Honor.

20             THE COURT:  Okay.  And how much longer after that

21   do you need?

22             MS. WEST:  I don't.

23             THE COURT:  Just a few minutes, okay.

24             Anything else?

25             MS. WEST:  No, Your Honor.
```

1          THE COURT:  Okay.  We're adjourned until 1:35.

2          (Recess taken)

3          THE COURT:  We need to go on the record.  I'll

4   call the case, Case No. 12-514, *Lane vs. District of*

5   *Columbia*.  It is 12:30.

6          Counsel?

7          MS. FEATHERSTONE:  Thank you, Your Honor.  I'm

8   sorry to bring the Court back from lunch recess, however, as

9   we were walking out near the elevator banks there was a

10  commotion, and one of the gentleman who had been sitting

11  with Ms. Lane's family was hovering with the group as the

12  officers and I were walking out, and it just became evident

13  that there was something going on; and I heard something to

14  the effect of, "Oh, I'm going to take care of mine."

15          So I, along with my supervisors, we were all

16  concerned.  We stepped back.  I immediately came back to the

17  Court because I was afraid -- I didn't understand what that

18  meant.  I didn't understand what it was in reference to, and

19  it only came out as we approached the elevator bank with the

20  officers, including Officer Katz, who just testified,

21  Officer Leo and Officer Torres.

22          So I just want to make sure that the Court is

23  aware that that transpired.  And I'm not sure what it means,

24  "I'm going to take care of mine," but I want the Court to

25  know that it was said.

1          THE COURT:  Was there a Marshal in the hall?

2          MS. FEATHERSTONE:  There was no Marshal down

3     there.  Usually there's one sitting right there at the

4     elevator bank, the court security officer, but I did not see

5     one at that very moment.

6          THE COURT:  Okay.  Mr. Ponds?

7          MR. PONDS:  Judge, I was in here working so I know

8     of nothing, and I condone nothing that may have happened out

9     there.

10          But I'll tell you what I do know.  I think there

11    were some words exchanged between Ralphael's father, who I

12    had to litigate against in a probate case.  He challenged

13    Ms. Lane from being appointed the personal representative.

14    So I've had no contact with him besides saying hi on two

15    occasions.

16          It's my understanding that he got into some type

17    of verbal dispute with Ms. Lane's brother.  That is my

18    understanding, that because there's some -- there's some --

19          THE COURT:  What's the basis of your

20    understanding?

21          MR. PONDS:  That there -- it's never been a good

22    relationship.

23          THE COURT:  I mean, what's the basis for your

24    understanding that that is what happened as opposed to

25    someone saying something to defense counsel?

1          MR. PONDS:  What I've been told by some people who

2     were in the audience.

3          THE COURT:  Okay.

4          MR. PONDS:  Because I was not out there.  I

5     certainly don't condone it, and I've advised Ms. Lane, to

6     the degree that she can tell him, and any action the Court

7     can take to bar him from the courtroom, I would appreciate.

8          I don't think that they should be here if they are

9     conducting themselves in that way.  They are taking away

10    from something that's very important and damaging.

11         THE COURT:  All right.  Well, I've seen nothing

12    disruptive in the courtroom.

13         MR. PONDS:  I would agree with that, Judge.

14         MS. FEATHERSTONE:  I agree.

15         THE COURT:  I will make sure the Marshals Service

16    is notified of this incident, whatever it is, and I will

17    direct them to have more security placed on the floor --

18         MS. FEATHERSTONE:  Thank you, Your Honor.

19         THE COURT:  -- to avoid that in the future.

20         In terms of what this gentleman may do out in the

21    hall or out on the street, I'm not sure I have a whole lot

22    of control over it unless the Marshals Service reports

23    something to me.

24         MR. PONDS:  I understand.

25         THE COURT:  Obviously, if something goes on in the

```
 1         courtroom, I will take care of it swiftly.

 2                   MS. FEATHERSTONE:  Thank you, Your Honor.

 3                   MS. WEST:  Your Honor, I just wanted you to know,

 4         I checked in the hall, and there is -- they call them Blue

 5         Coats, not a U.S. Marshal, but she's out there --

 6                   THE COURT:  Court security officer.

 7                   MS. WEST:  Court security.  Thank you, Judge.

 8         She's talking to them right now.

 9                   THE COURT:  Okay.  I'm sure I'll get a report.

10                   MS. FEATHERSTONE:  Thank you, Your Honor.

11                   THE COURT:  Thanks.

12                   (Lunch recess taken)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  A F T E R N O O N   S E S S I O N

 2              THE COURT:  Okay.  Mr. Ponds, before we get

 3     Officer Katz, any update on the witnesses we discussed this

 4     morning?

 5              MR. PONDS:  No, but I think we're going to ask for

 6     the Court to take some action specifically to -- at least I

 7     know that Carlos Spruill --

 8              THE COURT:  Now, I thought you told me that

 9     Mr. Spruill and Mr. Tyler, you were going to call either one

10     or the other, and you've now called Mr. Tyler; is that

11     right?

12              MR. PONDS:  Yes, sir.

13              THE COURT:  So I think Spruill is dispensable

14     based on what you guys told me at the pretrial.

15              MR. PONDS:  That was based on our belief that

16     Ms. Boyd would appear.

17              THE COURT:  Okay.  And Boyd and the fellow --

18              MR. PONDS:  Domenic Derricotte.

19              THE COURT:  Derricotte.  Okay.  So we need one of

20     those?

21              MR. PONDS:  One of those being LaTonya Boyd.

22              THE COURT:  Okay.  So if we get Boyd, that makes

23     Spruill dispensable as well.

24              MR. PONDS:  That is true.  I would go with either

25     one of them.  My preference would be Ms. Boyd.
```

```
1              THE COURT:  Okay.  Do you have a phone number for

2       Ms. Boyd?

3              MR. PONDS:  Yes.

4              MS. WEST:  Our investigator does.

5              MR. PONDS:  Our investigator does.

6              THE COURT:  Does she answer her phone?

7              MS. WEST:  No.

8              MR. PONDS:  No.  I've called her numerous times.

9              THE COURT:  Is there a message?

10             MR. PONDS:  Yes.

11             THE COURT:  The point of the question is if she

12      gets a call from the Court, would she be likely to --

13             MR. PONDS:  I think that would prompt her to

14      respond.

15             THE COURT:  Why don't you give the courtroom

16      deputy her cell phone number.

17             MR. PONDS:  Okay.  I appreciate that, Your Honor.

18             The other witness that also has been served who

19      has refused to come in as of last night is Levy Harley.

20             THE COURT:  Harley.  Now, he's the gentleman who

21      lived on the side of the street.

22             MR. PONDS:  He lives in the white house.

23             THE COURT:  In the white house.

24             MR. PONDS:  It was his driveway where Ralphael was

25      shot.
```

```
 1              THE COURT:  Okay.  What is he going to say if he
 2    makes it here that's different than what all the other
 3    witnesses who testified to the shooting have said?
 4              MR. PONDS:  He would testify that he saw the
 5    officer put the handcuffs on Ralphael.  He would also be --
 6              THE COURT:  That's already in evidence, right?
 7              MR. PONDS:  I understand.  That is correct, Your
 8    Honor.
 9              THE COURT:  Okay.
10              MR. PONDS:  He will testify -- and I believe also,
11    you know, I think this testimony has already come in that
12    Ralphael said that he could not breathe, and he was within
13    listening distance, and he could -- he heard Ralphael tell
14    the officers he could not breathe.  But after that, he heard
15    no further words spoken by Ralphael.
16              THE COURT:  Okay.  We have the statement that he
17    could not breathe I think from two witnesses already.
18              MR. PONDS:  That is correct, Your Honor.
19              THE COURT:  There was a lay witness, and the
20    surgeon today testified --
21              MR. PONDS:  Dr. Street, that is correct.
22              THE COURT:  -- testified that he read that in the
23    nurse's record, correct?
24              MR. PONDS:  But he would go further because the
25    defendants are going to call Officer Sheehan, and his
```

```
 1    testimony will be that the -- that Ralphael made statements

 2    to him implicating Ralphael in terms of possessing --

 3              THE COURT:  Understood.

 4              MR. PONDS:  -- the BB --

 5              THE COURT:  Would Mr. Harley say, if he's called,

 6    that he was close enough to Mr. Briscoe and Officer Sheehan

 7    to have overheard what Officer Sheehan will testify?

 8              MR. PONDS:  That is correct, Your Honor.

 9              THE COURT:  That he was close enough to overhear

10    that?

11              MR. PONDS:  Yes.

12              THE COURT:  Same question.  Does Mr. Harley have a

13    cell phone?  Is he responsive?

14              MR. PONDS:  The Court's indulgence.

15              (Pause)

16              MR. PONDS:  The investigator also has that number,

17    and we'll get that number to the deputy clerk.

18              THE COURT:  Let's take that first step, at least,

19    and we can do that this afternoon, and then we'll go from

20    there.

21              MR. PONDS:  I truly appreciate it, Your Honor.

22              THE COURT:  Okay.  But let's focus on Boyd and

23    Harley, and try to dispense, if we can, with Derricotte and

24    Spruill.

25              MR. PONDS:  I'm fine with that, Judge.
```

1          MS. FEATHERSTONE:  Your Honor?

2          THE COURT:  Do you want to be heard?

3          MS. FEATHERSTONE:  Yes.

4          THE COURT:  They are under subpoena, correct,

5     Mr. Ponds?

6          MR. PONDS:  That is correct.

7          THE COURT:  And the certificate of service of the

8     subpoena has been --

9          MR. PONDS:  Not with LaTonya Boyd.

10         THE COURT:  Well, you've got to get her under

11    subpoena, right?

12         MR. PONDS:  The Court's indulgence.

13         MS. FEATHERSTONE:  The defendants never received

14    copies of the trial subpoenas so we technically can't really

15    challenge whether they've really been properly served in

16    this case.

17         THE COURT:  That's what I'm inquiring about.

18         You have to establish that they've been properly

19    served first.  If they haven't been served, then I'm not

20    going to --

21         MR. PONDS:  Levy Harley has absolutely been

22    properly served.

23         THE COURT:  Okay.  Can we get the defense copies

24    of the trial subpoenas?

25         MR. PONDS:  We will do that.  We will do that.

1          THE COURT:  Okay.

2          MR. PONDS:  As to Ms. Boyd, Your Honor, Ms. West,

3   with the investigator, went to her residence on --

4          MS. WEST:  Sunday.

5          MR. PONDS:  -- Sunday.  They knocked on the door.

6   No one answered, which has happened repeatedly.

7          They went next door to the neighbor.  The neighbor

8   told -- they asked the neighbor, "Where does LaTonya Boyd

9   live?"  The neighbor said, "Next door," which was consistent

10  with the address that we had.

11         A woman answers the door.  Ms. West tells the

12  woman that she's looking for LaTonya Boyd.  The woman did

13  not acknowledge whether she was LaTonya Boyd or not.

14  Ms. West served the woman with the subpoena for LaTonya

15  Boyd.  It is my understanding that there are only two people

16  who live in that residence:  Domenic Derricotte and LaTonya

17  Boyd.

18         THE COURT:  Counsel?  Based on that

19  representation, do you challenge the propriety of service or

20  the adequacy of service on Ms. Boyd?

21         MS. FEATHERSTONE:  Your Honor, I haven't seen the

22  subpoena to see --

23         THE COURT:  Let's get copies of the two subpoenas

24  to defense counsel, and then we'll re-take up this issue.

25         MR. PONDS:  Thank you so much, Judge.

1           THE COURT:  But if you've perfected service, I'll

2      try to get them here.

3           MS. FEATHERSTONE:  Your Honor, with respect to

4      Mr. Harley, the proffer that was made to the Court had to do

5      with conversations -- the Court asked Mr. Ponds whether

6      Mr. Harley's going to testify as to what he heard Officer

7      Sheehan and Mr. Briscoe saying.  If it's only as to what

8      Mr. Briscoe stated, it's rebuttal testimony.  It's not

9      affirmative evidence other than what has already been in the

10     record, and to repeatedly put before this jury the

11     statements, "Oh, I can't breathe" -- we've heard that

12     before.  We've heard about the handcuffing before.

13          So if they're only coming in to rebut what Officer

14     Sheehan is saying, then it's just rebuttal testimony.  It's

15     not -- it's not cumulative affirmative evidence.

16          THE COURT:  I understand that, but they're going

17     to call -- you're calling Officer Sheehan.  They've called

18     the other officers, but you're calling Officer Sheehan.

19          MS. FEATHERSTONE:  Correct.  They're not calling

20     him as a witness.

21          THE COURT:  Okay.  Mr. Ponds, if the relevance --

22     if the noncumulative testimony that Mr. Levy will give is

23     rebutting Officer Sheehan's statements because he was close

24     enough to have overheard it, then that can come after the

25     defendants' case in your rebuttal case.

1          MR. PONDS:  I tend to agree.  Thinking about it, I

2     think it is rebuttal.

3          THE COURT:  We've still got to get him here.

4          MR. PONDS:  But we would still --

5          THE COURT:  Okay.  Let's focus on -- give them the

6     subpoenas, focus on Ms. Boyd first, and then Mr. Harley.

7          MR. PONDS:  Thank you so much, Judge.

8          THE COURT:  Okay.

9          Good.  Okay.  Are we ready for the jury?

10         I'm sorry, one more.  Do we have a stipulated

11    cautionary instruction yet, or no?

12         MR. PONDS:  No, we don't.

13         And just to give the Court -- without getting into

14    great details, in terms of the exchange between the two

15    people, Ralphael Briscoe, Sr., and Ms. Lane's brother, the

16    matter, as far as I'm concerned, has been resolved.  It was

17    directed to the two of them and no one else.  It's just old

18    bad blood between family members.

19         And I spoke to Ralphael Briscoe, Sr.  He's agreed

20    not to come back until the completion of trial.  He

21    understands that he could, if he wanted to, but out of

22    courtesy to me, he will not come back.

23         THE COURT:  Okay.

24         MR. PONDS:  And I'm understanding the same thing

25    from Ms. Lane's brother.

1          THE COURT:  Well, in an abundance of caution,

2     setting aside that incident, I appreciate the emotional

3     nature of the trial, and we've asked for some increased

4     security officer presence for the remainder of the trial.

5          MR. PONDS:  And we appreciate that.

6          THE COURT:  So that will be here.

7          MR. DeBERARDINIS:  Your Honor, as to the curative

8     instruction, we've fashioned something.  Plaintiff informed

9     us that they would not agree to anything that tells the jury

10    that the evidence is stricken so we're not going to have a

11    meeting of the minds.

12         THE COURT:  Okay.  Well, why don't you all, at the

13    next break, submit competing instructions, and I'll decide

14    which one to give.  And I would counsel you to try to get

15    together, but if you can't, you can't.  Okay?

16         MR. PONDS:  Yes, sir.

17         THE COURT:  Do you want to have Mr. Katz view the

18    video clip prior to the jury coming back, or does that

19    matter?

20         MS. WEST:  I offered that, Your Honor, but the

21    defense objected, so we'll just let him see it for the first

22    time right on the stand.

23         THE COURT:  Okay.  Let's bring the jury back.

24         (Jury enters courtroom)

25         THE COURT:  Ms. West, please continue.

```
 1                    MS. WEST:  Yes, Your Honor.

 2                        JORDAN KATZ, Resumed

 3                    DIRECT EXAMINATION, Continued

 4    BY MS. WEST:

 5    Q.  Good afternoon, Officer Katz.

 6    A.  Good afternoon.

 7    Q.  During the lunch hour we were out in the hall, is that

 8    correct, at some point?

 9    A.  Me and you?

10    Q.  Not me and you together, but people out in the hallway?

11    A.  Yes.

12    Q.  And you were speaking with Officer Torres?

13    A.  Yes.

14    Q.  Did he discuss his testimony with you?

15    A.  No.

16    Q.  Not at all?

17    A.  No.

18    Q.  Did he tell you why he's here?

19    A.  He said he was going to be hanging around all day.

20    Q.  Now, we're going to get to this videotape.  You took

21    several pictures; is that right?

22    A.  Yes.

23    Q.  All right.

24                    MS. WEST:  May I approach the witness, Your Honor?

25                    THE COURT:  You may.
```

1          MR. DeBERARDINIS:  Your Honor, we need to move

2     that easel.

3          MS. WEST:  I'm going do it right this second, Bob.

4     I agree with you.

5     Q.  I'm going to hand you what's been marked as and admitted

6     previously Plaintiff's Exhibits 93B, C, E, F, I, and H.  Do

7     you recognize those photos?

8     A.  The ones you've put down, yes.

9     Q.  Yes.  Have you looked at them all individually?

10    A.  Yes.

11    Q.  Are those photos that you took, sir?

12    A.  Yes.

13    Q.  I'm also going to hand you what's been marked for

14    admission as 93A, 93K, 93J, and 93D.  I'm going to ask you,

15    Officer Katz, if you could look at these photos and tell the

16    members of the jury if you took these as well.

17    A.  The only one I'm not 100 percent sure of is 93J.  I'm

18    not 100 percent on that.

19    Q.  Okay.  But even if you didn't take 93J, do you recognize

20    what's in that photograph?

21    A.  Yes.

22    Q.  And does it accurately depict what happened at the scene

23    on April the 26th of 2011?

24    A.  It depicts after Mr. Briscoe was removed.

25    Q.  Is it accurate?

1    A.  Yes.

2    Q.  All right.

3          MS. WEST:  At this time, Your Honor, I'd offer

4    93J, 93A, 93K, and 93D into evidence.

5          THE COURT:  Any objection?

6          MR. DeBERARDINIS:  No, Your Honor.

7          THE COURT:  They're admitted.

8    Q.  Since you're not sure about 93J, I'm not going to ask

9    you about it.

10   A.  Okay.

11   Q.  Okay.  So all these photographs, sir, that you took,

12   they all have something in common, don't they?  Every one of

13   these photographs has something in common?

14          MR. DeBERARDINIS:  Objection, Your Honor.  She

15   can't testify.

16          MS. WEST:  I'm asking him a question.

17          THE COURT:  Overruled.  Rephrase the question,

18   Ms. West.

19   Q.  Are those photographs you took?

20   A.  Yes.

21   Q.  Do they have something in common, all of them?

22   A.  Yes.

23   Q.  And what is that?

24   A.  They're all taken on April 26, 2011 on the 2400 block of

25   Elvans Road, Southeast.

1   Q.  That's a good answer.  Do all those photographs depict

2   something that's similar in every photograph?

3   A.  I mean, I'm not sure what you mean.

4   Q.  Do you see a gun in each -- parts of a gun in each one

5   of those photographs?

6   A.  No.

7   Q.  Which one doesn't have a gun?

8   A.  93K.  93C has a grip.

9   Q.  Okay.  That's part of that gun, right?

10  A.  Yes.

11  Q.  Is 93K Officer Torres standing on the curb?

12  A.  93C is Officer Torres on the curb.

13  Q.  What's 93K?

14  A.  Officer Torres's feet and a shell casing.

15  Q.  That shell casing, what gun does that come out of?

16  A.  Officer Leo's.

17  Q.  Uh-huh.  And you took those pictures?

18  A.  Yes.

19  Q.  Is there a picture of the black SUV?

20  A.  Of the passenger door.

21  Q.  Just the door?

22  A.  I mean, you can see a part of the hood.  You can see a

23  mirror.

24  Q.  Uh-huh.  Is there a picture of anybody in the crowd?

25  A.  You can see -- in 93C, you can see some people in the

1   crowd in the background.

2   Q.  But no picture of an eyewitness or such a thing?

3   A.  Yes, there's pictures of eyewitnesss.

4   Q.  Tell me where.  Who is an eyewitness?

5   A.  93C, Officer Torres.

6   Q.  Well, other than the police officers.  Sorry.

7   A.  Sorry.  I don't know who was an eyewitness or not.  I

8   didn't see anybody standing out there when this happened.

9   Q.  And these photographs have pictures of Officer Sheehan?

10  A.  Yes.

11  Q.  Officer Torres?

12  A.  Yes.

13  Q.  And as you said earlier, they all have something to do

14  with the parts of the gun, right?

15  A.  Most have pictures of either the gun or their grip or

16  their shell casing.

17  Q.  So I'm asking you in kind of an indirect fashion, there

18  are not photographs of like this nice area that you drew of

19  the apartment buildings, Elvans Road, the playground.  There

20  are no photographs of that sort, are there?

21  A.  No.  That wasn't my focus, but no.

22  Q.  No.  Your focus was this gun?

23  A.  My -- yes.  We can call it that, yes.

24  Q.  There's no photographs of any other vehicles?

25  A.  No.

1    Q.  If you would, please, sir, we're going to show you a

2    clip of the videotape that I believe you have not seen yet.

3    A.  Okay.

4              (Video playing)

5    Q.  Do you see that silver SUV?

6    A.  Yes.

7    Q.  Have you ever seen this part of the videotape before?

8    A.  No.

9    Q.  Okay.  So could you tell me who that individual is

10   that's getting out?

11   A.  I have no clue.

12   Q.  Do you remember, Officer Katz, your recorded statement

13   you gave that day, April 26, 2011?

14   A.  Yes.

15   Q.  Do you remember telling --

16              MR. DeBERARDINIS:  Objection, Your Honor.  This

17   doesn't appear to be impeachment.

18              THE COURT:  Let's see what she asks him.

19   Q.  Do you remember telling the investigator that day that

20   you saw -- you didn't say Ralphael, but you saw him make a

21   left-hand turn on Elvans Road?

22              MR. DeBERARDINIS:  Objection.  This is not

23   impeachment, Your Honor.

24              THE COURT:  Sustained.

25   Q.  Do you remember telling that investigator that you saw

1      the suspect take a left on Elvans Road?

2                  THE COURT:  Sustained.  Counsel, approach.

3                  (The following is a conference held at the

4                   bench outside the hearing of the jury)

5                  THE COURT:  So he said he saw him take a left-

6      hand.  What's the impeachment?

7                  MS. WEST:  Well, I haven't -- it's just a little

8      bit premature, Judge.  We haven't gotten to that.

9                  THE COURT:  Okay.

10                 MS. WEST:  I want to know if he remembers telling

11     the investigator that he saw him digging in his waistband

12     when he turned left on Elvans Road.  I just couldn't get to

13     that question.

14                 MR. DeBERARDINIS:  The question should be first.

15     Establish that he --

16                 THE COURT:  She established that before.

17                 Reask it.  Reask it now.  Just get it.

18                 MR. DeBERARDINIS:  She was talking about the

19     silver SUV.

20                 THE COURT:  Yes, understood.  That's where I

21     thought you were going.

22                 MS. WEST:  I'm just trying to --

23                 THE COURT:  I know.

24                 MS. WEST:  -- get it going.

25                 (This is the end of the bench conference)

```
 1                THE COURT:  Okay.  Ms. West, please proceed.

 2                MS. WEST:  Yes, sir.

 3      BY MS. WEST:

 4      Q.  If you would, Officer Katz, draw your attention to the

 5      video clip again.

 6                MS. FEATHERSTONE:  I'm sorry, the screen is not --

 7      okay.  Thank you.

 8                (Video playing)

 9      Q.  Do you see in this photograph, Officer Katz, this gray

10      SUV?

11      A.  An SUV or a minivan, yes.

12      Q.  Yes, one or the other.

13                Are you in that photograph anywhere?

14      A.  I should be amongst that mass of -- you know, the few

15      people on the sidewalk.

16      Q.  This is clearly after he's been shot.

17      A.  Yes.

18      Q.  So you were in that general vicinity, right?

19      A.  I never left.

20      Q.  And you don't know who these people are in this gray

21      SUV; is that what I understand?

22      A.  I don't even remember seeing a gray SUV at all.

23      Q.  Okay.  Now, you said earlier you remembered -- and you

24      testified earlier that Ralphy was smoking you, and running

25      real fast, and that he made a left-hand turn on Elvans Road.
```

1    Do you remember that testimony?

2    A.  He went left on Elvans, yes.

3    Q.  And when he went left on Elvans, was he digging into his

4    waistband?

5    A.  He was digging at the end, from the beginning to the

6    parking lot.

7           MR. DeBERARDINIS:  This has been asked and

8    answered a little before lunch.

9           THE COURT:  Overruled.

10          MS. WEST:  I'll make it clear, Your Honor.

11   Q.  When was he digging in his waistband?  Tell the members

12   of the jury when you remember him digging in his waistband.

13   A.  From my vantage point, at the very end toward the

14   driveway was when I thought he was digging in his waistband.

15   Q.  Do you remember giving a statement on April 26th, a

16   recorded statement?

17   A.  Yes.

18   Q.  And you gave that to a member of the FIT team?

19   A.  Yes.

20   Q.  And when I say "recorded statement," that's an oral

21   statement that -- it's like a record.  We can listen to it.

22   A.  Correct.

23   Q.  Isn't it true that during that oral statement you said

24   that Ralphy made a left-hand -- you didn't use the word

25   "Ralphy" -- made a left-hand turn on Elvans Road and was

1    still clutching his waistband?  Do you remember that?

2    A.  It sounds accurate.

3    Q.  Uh-huh.  And do you also recall that you said when he

4    was close to the house on the corner he was really digging

5    into that waistband?

6    A.  Once again, that sounds accurate.

7    Q.  Uh-huh.  So we showed you that previously, when he was

8    going around the corner.  Now that you've seen the video, is

9    he digging into his waistband on the corner of Elvans Road?

10   A.  It's hard to tell.  I think that when I see the video,

11   my initial impression was, from the street that day, that he

12   stopped.

13          I see the video.  I see he didn't stop.  It's

14   still hard to tell if he had his hand down in his waistband.

15   I think from my vantage point, that was what I thought

16   happened.

17   Q.  But as soon as you saw that video you backed off that

18   oral statement, didn't you?

19   A.  No, I never backed off it.  I said -- about the

20   statement that I gave initially, I said when I saw the

21   video -- especially about the stopping.  When I see this

22   video from this angle, I can see he didn't stop like I

23   thought he did.

24   Q.  In fact, in your deposition, you stated that you'd

25   played football.  Remember that?

```
1              MR. DeBERARDINIS:  Objection, Your Honor.

2              THE COURT:  Ask him without referring to the

3      deposition.

4              MS. WEST:  Yes, sir.  Indulgence, Your Honor?

5              THE COURT:  Sure.

6      Q.  You know what a square out is, don't you?

7      A.  We talked about that in the deposition, yes.

8      Q.  Uh-huh.  Describe to the jury, if you would, please,

9      what a square out is.

10     A.  I think that in the deposition we were talking about

11     just somebody in football running a pattern, going straight

12     out and then going to one side or the other.

13     Q.  Right.  And that's something a tight end would do,

14     right?

15     A.  Anybody running a route.

16     Q.  Vernon Davis, wouldn't he do that?

17     A.  He could do it.

18     Q.  He's the best.

19     A.  I wouldn't say that.

20     Q.  You wouldn't?

21     A.  No.

22     Q.  That's because you're not from D.C.

23     A.  Well, Rob Gronkowski and Jimmy Graham.

24     Q.  Vernon Davis is faster, just for the record.  And this

25     is why Vernon Davis is important, because he --
```

1          MR. DeBERARDINIS:  Objection to testifying, Your

2     Honor.

3          MS. WEST:  Okay, okay.  I'll strike that.

4     Q.  Ralphy was running real fast, right?

5     A.  He was running quick, yes.

6     Q.  And you've described to this jury that when he was

7     turning that corner he turned and faced that car, right?

8     A.  Yes.

9     Q.  Black SUV?

10    A.  Yes.

11    Q.  That would kind of be a square out, right?

12    A.  Kind of, yes.

13    Q.  I mean, these guys are running, running, running,

14    running, running, as fast as they can, right?

15    A.  Yes.

16    Q.  So if you're running as fast as you can, you're going to

17    do a square out.  That's kind of what we have on that

18    videotape, wouldn't you say?

19    A.  I mean, when you see the videotape, you do see that left

20    foot come out.  I can only say what I saw that day and what

21    I thought happened.

22    Q.  But now that you've seen the videotape, his body doesn't

23    turn like a square out, does it?

24    A.  I still think it turns.  I think when that left foot

25    comes out there's a turn there, and I've watched the

1    videotape several times.

2    Q.  But when you had your deposition taken, didn't you call

3    it a hitch, not a turn?

4    A.  I don't know if I said "hitch" or not.  I remember

5    talking about the Eagle.  I think somebody brought up Mike

6    Quick.  I don't remember.

7    Q.  He's good, too.

8    A.  He's older.  I don't remember the other stuff.

9    Q.  So it's your testimony, even after seeing that

10   videotape, that you believe that Ralphy turned his body

11   towards that SUV?

12   A.  No.  I'm saying that I think that there is a turn with

13   that left foot.  I don't think that he was -- you know, when

14   you see the video, what I initially thought about him

15   stopping and then facing toward it, I can see that that

16   wasn't entirely correct.  But based on where I was, that was

17   my angle.  That's what I saw happened.

18              I see the video now.  I see the foot come out, and

19   I think it is a slight turn.  But is it as much as I thought

20   originally?  No.

21   Q.  So after you've seen the video now a few times you've

22   changed your opinion; is that fair to say?

23   A.  In reference to what part?

24   Q.  When he's turning?

25   A.  I think he turns.  There is a turn.  Do I think he

1    turned as much as I thought?  No.

2    Q.  You wouldn't call it a stop, would you?

3    A.  I wouldn't call it a stop, no.

4            MS. WEST:  The Court's indulgence.

5            (Pause)

6            MS. WEST:  May I approach the witness, Your Honor?

7            THE COURT:  Yes, you may.

8    Q.  Now, you are taking those photographs; is that right?

9    A.  Yes.

10           MR. DeBERARDINIS:  Exhibit number, Your Honor,

11   please?

12           MS. WEST:  93C.

13   Q.  You took this photograph, right?

14   A.  Yes.

15   Q.  And that's Officer Torres, right?

16   A.  Yes.

17   Q.  Did you ask him to stand right there in that position?

18   A.  If I remember correctly, he was standing there to give a

19   frame of reference to where the shell casing was, just so I

20   could get the picture.  I don't remember asking him or not,

21   but that was the reason I thought he was there.

22   Q.  And you took pictures of what you thought was important?

23   A.  I took pictures of stuff that I thought could be moved

24   or something could happen to it, as opposed to the street,

25   which you can't move.

```
 1              MS. WEST:  Nothing further.  Thank you, Your
 2     Honor.  Pass the witness.
 3              MR. DeBERARDINIS:  Your Honor, we will reserve on
 4     this witness for our case in chief.
 5              THE COURT:  Okay.
 6              Thank you.  You're dismissed.
 7              THE WITNESS:  Thank you.
 8              THE COURT:  So ladies and gentlemen, you'll notice
 9     that the defense has waived their right to cross-examine
10     certain witnesses called by the plaintiff in the case
11     because they are going to call those same witnesses in their
12     case in chief, in case you're wondering why there's been no
13     cross of a couple of the witnesses, okay?  And they're
14     entitled to do that.
15              MR. PONDS:  Your Honor, plaintiff's next witness
16     will be Officer Coker.
17              THE COURT:  Officer Coker, okay.  Is he outside?
18              MR. PONDS:  Pardon?
19              THE COURT:  Is he outside the courtroom?
20              MR. PONDS:  He should be.  The Court's indulgence.
21              THE COURT:  Okay.
22              (To the jury) How's everyone?  A-okay?  Good.
23              Officer Coker, how are you?
24              THE WITNESS:  Good, sir.  How are you?
25              THE COURT:  Good.
```

1                          ERIC COKER, Sworn

2                          DIRECT EXAMINATION

3    BY MR. PONDS:

4    Q.  Thank you for joining us, Officer Coker.

5    A.  Good morning, Mr. Ponds.  Good afternoon, Mr. Ponds.

6    Q.  Officer Coker, can you state your full name for the

7    record, sir.

8    A.  Yes, sir.  It's Eric Coker, spelled E-r-i-c, C-o-k-e-r.

9    Q.  Officer Coker, where are you currently employed, sir?

10   A.  I'm currently employed by the Metropolitan Police

11   Department at the crime scene investigations division.

12   Q.  Now, how long have you been with the Metropolitan Police

13   Department?

14   A.  25 years in July.

15   Q.  Long time?

16   A.  You can say that.

17   Q.  Now, sir, when did you become a crime scene officer or a

18   crime scene technician?  You tell me what is the preferred

19   title.

20   A.  July 4, 1999.

21   Q.  And --

22              THE COURT:  Officer Coker, would you like to hand

23   me those exhibits, please.

24              THE WITNESS:  Sure.

25              MR. PONDS:  Thank you, Your Honor.

1   Q.  Sir, when you were assigned to become a crime scene

2   officer on July 4, 1990 [sic], what was your first

3   assignment?

4   A.  Second District.

5   Q.  And, sir, were you -- prior to going to the Second

6   District as a crime scene officer, did you receive any type

7   of training?

8   A.  Yes.

9   Q.  What was that training?  Can you tell us a little bit

10   about the training.

11   A.  It's a three-week -- the department gives a three-week

12   school in crime scene processing.  It encompasses

13   photography.  It encompasses latent fingerprint processing,

14   diagramming, recovery of ballistic evidence, things of that

15   nature.

16   Q.  And you've done that as a crime scene officer every day

17   that you've been on duty since 1999?

18   A.  Yes.

19   Q.  Now, sir, on April 26th of 2011, what was your

20   assignment at that time?

21   A.  I was -- at that time I had been changed to the mobile

22   crime unit, which is within the crime scene unit that was

23   stationed at 3521 V Street, Northeast.

24   Q.  And how did the mobile crime unit -- how is the mobile

25   crime unit distinguished from your first assignment in the

1    Second District?

2    A.   In the crime scene program or the forensics program of

3    the Metropolitan Police Department you have two units housed

4    within one, which is you have a crime scene search side, and

5    you have a mobile crime side.  And really the only

6    difference between the two units are -- is one, the mobile

7    crime side handles very specific crimes.  And the crimes

8    that aren't handled by mobile crime, which I'll tell you are

9    homicides, rapes, robberies, assassinations, death

10   investigations, because we handle all death investigations,

11   I think I said assassinations, child assaults, and, like I

12   said, rapes; we handle those crimes specifically.

13            The crime scene side would handle things of a

14   lesser offense, like shootings that are not fatal or without

15   serious bodily injury, meaning that we don't expect the

16   person to die.  They would handle burglaries of your home,

17   whether it was a B1, B2, a theft from your car, lesser-

18   related offenses.

19   Q.   So the mobile crime unit handles the more serious

20   offenses in the District of Columbia?

21   A.   That's correct.  It's a long-winded version.

22   Q.   And as a mobile crime scene officer -- is it an officer

23   or a technician?

24   A.   It's a technician, officer; we're both.  You can use any

25   analogy or acronym.

1   Q.  Which one do you prefer, sir?

2   A.  I really don't care.  It's officer.

3   Q.  As a crime scene officer, is your task to gather

4   forensic evidence?

5   A.  That's correct.

6   Q.  And can you explain to the jury what forensic evidence

7   is.

8   A.  Well, it's any evidence -- I actually don't remember the

9   actual definition of "forensic evidence."

10  Q.  The best of your knowledge.

11  A.  If I can remember, it's basically just forensic

12  evidence, whether it be fingerprints, items that contain

13  DNA, ballistics that would lead us -- that would be left

14  behind by a perpetrator or a victim of a crime that would

15  help us solve the crime by gathering that evidence and lead

16  us to, I would say, closure of that -- closure of the crime.

17  That's the best I can remember.

18  Q.  Okay.  So it's -- so you're gathering forensic evidence

19  to try to explain what happened when there's a serious

20  crime?

21  A.  Well, we're not only trying to explain what happened, we

22  try to document that evidence.  And, like I said, it goes to

23  support the elements of a crime and possibly helping to

24  bring somebody to justice, basically, or to lock them up.

25  Q.  And when you -- did you respond to the 2400 block of

1    Evans Road at some point in the late afternoon of April the

2    26th, 2011?

3    A.   Yes.  Elvans Road, yes.

4    Q.   And did you process a scene there?

5    A.   I did.

6    Q.   And what was your understanding as to what type of

7    incident had occurred there?

8    A.   It was a police-involved shooting that resulted in a

9    fatality.

10   Q.   And did you have other members of your team with you

11   that day?

12   A.   I did.

13   Q.   And who was the lead officer?

14   A.   I was the lead evidence technician.  I had my partner

15   with me, Stanley Rembish, and later on I was joined by a

16   technician, Ralph Nitz, Thomas Coughlin, and Grant

17   Greenwald.

18   Q.   And did you organize your team in a way that everybody

19   was assigned a specific task in gathering the forensic

20   evidence?

21   A.   At first, it was just myself and my partner.  And then

22   later other technicians -- Ralph Nitz showed up a little

23   later along with Thomas Coughlin and Grant Greenwald.  They

24   were given -- I assigned myself basically photography,

25   labeling evidence, or laying the placards for evidence.

1          I think Stan, my partner, he did the diagram.  And

2     I believe Ralph and myself, I think we processed -- did some

3     fingerprinting on the scene.

4          MR. PONDS:  Your Honor, if I could approach

5     Officer Coker?

6          THE COURT:  Sure.

7     Q.  Officer Coker, you talked about doing a diagram.  This

8     document, Plaintiff's Exhibit 9 previously admitted, do you

9     recognize that document?

10    A.  Yes, I do.

11    Q.  And is that a diagram that you completed on April the

12    26th, 2011?

13    A.  No, it's not.

14    Q.  When did you complete it, sir?

15    A.  I didn't complete it.  My partner completed it.

16    Q.  Was that Officer Rembish?

17    A.  Yes, it was.

18    Q.  Did you have an opportunity to verify his diagram?

19    A.  Yes.

20    Q.  And to check every item that's on that diagram?

21    A.  Yes.  We do -- I do look over the diagram to make sure

22    all the items are accounted for.

23    Q.  Okay.  That diagram is not drawn to scale?

24    A.  That's correct.

25    Q.  All right.  But in terms of what is depicted on the

1     diagram, is that an accurate depiction of the layout of the

2     block on the 2400 block of Elvans Road and the various

3     important items that are on there?

4     A.  As far as I can remember right off the top of my head,

5     yes.  It looks accurate.

6     Q.  All right.  Now, sir, did you -- were photographs taken?

7     A.  Yes.

8     Q.  Who took the photographs?

9     A.  I did.

10              MR. PONDS:  If I could approach, Your Honor?

11              THE COURT:  You may.

12    Q.  Officer Coker, I'm going to show you a series of

13    photographs that have been identified at Plaintiff's

14    Exhibits 4A, B, C, D, E, F, G, H, I, J as well as 93J.  If

15    you could look at the series of photographs, and once you've

16    had a chance to look through them, let me know if you

17    recognize those photographs as photographs that either you

18    or someone who was a part of your team took on April the

19    26th, 2011.

20    A.  (Witness reviews photographs) Okay.

21    Q.  Officer Coker, do you recognize the series of

22    photographs that I've identified to you?

23    A.  Yes, I do.

24    Q.  Photographs I think it's A through J, do you recognize

25    those photographs as photographs that either you or a member

1    of your team took on April the 26th, 2011?

2    A.  I'm sorry, what was that number again?

3    Q.  4A through 4J.

4    A.  (Witness reviews documents) Yes, I do.

5    Q.  Okay.  And Photographs 4A through 4J are photographs

6    either you took or members of your team that were assigned

7    to gather the forensic evidence at the 2400 block of Elvans

8    Road on April the 26th, 2011?

9    A.  I believe so, yes.

10   Q.  Okay.  Do those photographs, 4A through J, accurately

11   depict what you recall was on the scene?

12   A.  Yes.

13          MR. PONDS:  Your Honor, we would move for the

14   admissions of Plaintiff's Exhibits 4A through 4J.

15          MS. FEATHERSTONE:  No objection.

16          THE COURT:  So moved.

17   Q.  Now, Officer Coker, as to 93J, do you recognize that

18   photograph?

19   A.  No.

20   Q.  You do not?

21   A.  No.

22   Q.  Okay.  Now, sir, what are placards?

23   A.  Placards are just -- they're plastic item numbers we

24   place on the scene, Item 1 through whatever the item numbers

25   are.  It could go up to 100, whatever they are.  And all

1    they do is they just show the item number, 1 through

2    whatever.  And they're just a little piece of plastic, bent-

3    over plastic, that identifies or marks an item on the scene.

4              MR. PONDS:  Your Honor, permission to publish

5    Photographs A through J?

6              THE COURT:  You may.

7    Q.  Officer Coker, I'm showing you what has been admitted as

8    Plaintiff's Exhibit 4D.

9    A.  Uh-huh.  Yes, sir.

10   Q.  Do you see that item on the sidewalk?

11   A.  I do.

12   Q.  Do you recall what that item was that was -- what the

13   item is on the sidewalk, in the very first block of that

14   sidewalk that adjoins the driveway?

15   A.  From this photograph, no, not off the top of my head.  I

16   would need a report, probably a photograph along with the

17   diagram.  Probably the diagram would help.

18   Q.  Which report would help you, sir?

19   A.  My report, the original crime scene report.

20   Q.  Would this help you?

21   A.  It might.  I might need -- let me see here.  The only

22   thing is I might be wrong.  I'd like to see one with a

23   placard next to it.

24   Q.  A photograph?

25   A.  A photograph with a placard.

1    Q.   Okay.  Great.

2    A.   That would be -- that would work out a lot better.

3    Q.   Looking at Photograph 4A, do you recognize the item that

4    has -- well, let me ask you this:  Is that the placard, what

5    you call it, labeled No. 6?

6    A.   That is the placard, but that -- yes, that is the

7    placard.

8    Q.   Okay.  And do you recognize the item in the photograph?

9    A.   Yes.

10   Q.   And is that a cell phone?

11   A.   That is correct.

12   Q.   All right.  Did you -- as a part of the physical

13   evidence that you collected from the scene, did you take

14   possession of that cell phone?

15   A.   I did.

16        MR. PONDS:  Your Honor, if I could approach the

17   witness?

18        THE COURT:  You may.

19   Q.   Officer Coker, I'd like to show you what has been marked

20   as Plaintiff's Exhibit 99.  Do you recognize this as being

21   the item in Photograph 4A that's on the screen?

22   A.   I do.

23   Q.   Can you take it out of the package, sir.

24   A.   Sure.  (Witness complies)

25        MR. PONDS:  Your Honor, I move for the admission

1    of Plaintiff's Exhibit No. 9, the cell phone.

2              MS. FEATHERSTONE:  No objection.

3              THE COURT:  So moved.

4    Q.  All right.  Officer Coker, is that the cell phone, after

5    you photographed it, after you placed the placard on it and

6    you photographed it, that you took?

7    A.  Yes, it is.

8    Q.  And that was placed in an evidence bag and logged in as

9    evidence?

10   A.  Yes, sir.

11   Q.  All right.  Could you -- looking at that telephone, what

12   is the color of the back of that cell phone?

13   A.  Black.

14   Q.  It's black?

15   A.  With a silver trim.

16             MR. PONDS:  With the Court's permission, can

17   Officer Coker hold it up so the jury can see?

18             THE COURT:  Please.

19             MR. PONDS:  Thank you, Your Honor.

20   A.  Here's the front.  Here's the back.

21   Q.  Thank you, Officer.

22   A.  You're welcome.

23   Q.  Now, in looking at Plaintiff's Exhibit 4D --

24   A.  Okay.

25   Q.  -- do you see the cell phone midway through the driveway

1    near the shirt at the edge where the gravel and the grass

2    meet?

3    A.  If that's the cell phone, I believe I see it.  I can't

4    really -- I see something there.  I see an object.

5    Q.  Okay.  Is that location consistent, in looking at the

6    grass and the gravel, with Photograph 4A?

7    A.  Yes, it is.

8    Q.  I think I have a better photograph.

9    A.  Okay.

10   Q.  I'm going to show you what has already been moved into

11   evidence as 4H.  Do you see the -- and photograph -- I mean,

12   Plaintiff's Exhibit 4H.  Do you see the Placard 6?

13   A.  Yes.

14   Q.  That's the cell phone?

15   A.  Excuse me, yes, sir.

16   Q.  And that is located right where the shirt is located?

17   A.  That's correct.

18   Q.  All right.  And there appears to be like a puddle of

19   blood inches below the cell phone?

20   A.  Along with the clothing.

21   Q.  Or some type of -- some type of dark substance?

22   A.  It looks like it's mixed in with the clothing.  I

23   couldn't say it was inches below the cell phone or -- okay.

24   Q.  Now, looking at 4H -- and you let me know if you need to

25   see the actual photograph.  I can take it off the ELMO.

1    That black SUV --

2    A.  Yes, sir.

3    Q.  -- was that -- was that the vehicle that you came to

4    learn the shots were fired from?

5    A.  Yes, sir.

6    Q.  Okay.  Did you process that vehicle for fingerprints?

7    A.  It was.

8    Q.  Okay.  Did you change -- prior to processing that

9    vehicle for fingerprints, did you change anything about the

10   vehicle?  Did you alter the windows or anything like that?

11   A.  I don't recollect.  I don't recall.

12   Q.  But that would be not something you would do?

13   A.  Again, that's not something normally we would do.  It

14   just depends on the way we process the scene.  So I can't

15   say to any conclusion that we -- we may not have recovered

16   something out of the vehicle first, and then processed it

17   last.

18          Typically, when you process a vehicle like that,

19   when we have it in a contained area, like our office, a lot

20   of times we may remove -- we might remove the items from

21   within it that are evidence before we process.

22   Q.  Okay.

23   A.  So it may have been.  I can't say for certain.

24   Q.  Okay.  In looking at that photograph, do you see the

25   rear passenger window?

1    A.  Yes, sir.

2    Q.  The windows are rolled down.  Are they rolled down?  And

3    if you need to see the actual photograph, we can give it to

4    you.

5    A.  I can't really tell -- they're kind of dark -- if it's

6    actually rolled down or not.

7    Q.  All right.  Handing you the actual photograph, 4H.  That

8    rear passenger window?

9    A.  Yes, I'd say it's rolled down.

10   Q.  It's rolled down?

11   A.  Yes.

12   Q.  And when you processed this black SUV for fingerprints,

13   what portion of the vehicle did you dust for fingerprints?

14   A.  Let me see if I indicate it in my report.

15   Q.  Sure.

16   A.  According to the report, it lists that latent prints

17   were recovered from multiple locations on the 2010 Ford

18   Explorer.

19        MS. FEATHERSTONE:  Your Honor, I'm going to object

20   to the witness reading from the document.  The document is

21   not in evidence.

22   Q.  If you could just refresh your recollection.  Take your

23   time, refresh your recollection, and when you're ready, if

24   you can respond.

25   A.  It was taken from different locations around the

1     vehicle.

2     Q.   Different locations around the SUV?

3     A.   Right.

4     Q.   And because -- is that a part of your duties as a crime

5     scene officer, that you will dust various items for

6     fingerprints?

7     A.   Depending on the circumstances in the case, that's what

8     directs you to process certain items or how they're to be

9     processed.   That's usually why you're directed to do that.

10    Q.   Right.

11    A.   Sometimes you do; sometimes you don't.

12    Q.   Okay.   But in this case, you did utilize the scientific

13    process of dusting for fingerprints or using some type of

14    process for fingerprints?

15    A.   Yes.   We dusted the vehicle for prints.

16    Q.   All right.   And was there anybody -- well, no, strike

17    that.

18         I'm going to show you Plaintiff's Exhibit 4C.   Do

19    you recognize -- once again, do you recognize this

20    photograph?

21    A.   Yes, sir.

22    Q.   And it has Placards 6 and 7 in that photograph, that 4C.

23    A.   That's correct.

24    Q.   And 7, is that a shirt?

25    A.   I believe so.

1   Q.   Okay.   And 6 is -- a few inches beyond that is the cell

2   phone?

3   A.   That's correct.

4   Q.   I'd like to show you now, Officer Coker, Plaintiff's

5   Exhibit 4F.   Now, you have some placards there.   Is that --

6   what is that number of the placard that is actually on the

7   actual street?

8   A.   Item 2, I believe.

9   Q.   Item 2.   Can you tell us what was recovered -- what

10   was -- what item did you find at the location of Placard 2?

11   A.   A cartridge case.

12   Q.   A cartridge case?

13   A.   Correct.

14   Q.   And is that the part of the cartridge that ejects out of

15   a semiautomatic weapon?

16   A.   That's correct.

17   Q.   All right.   It's --

18   A.   It's the casing.

19   Q.   It's a casing, because a cartridge -- does a cartridge

20   contain a casing and a bullet?

21   A.   Yes.   It contains -- the cartridge contains the case,

22   primer, powder, bullet.

23   Q.   All right.   And when a weapon is fired, the bullet comes

24   out the barrel, and the cart -- casing ejects out of the

25   weapon?

1    A.  Correct.

2    Q.  And did you examine or -- did you examine the service

3    weapon of Defendant Leo from which the shots were fired?

4    A.  I did.

5    Q.  Did the ejection on his gun eject -- casings would eject

6    from the right?

7    A.  Well, yes.  The Glock 19 or 17 ejects to the right.  My

8    own ejects to the right.  All of our Glocks do.

9    Q.  There are a few that will eject to the left?

10   A.  It depends on the manufacturer.

11        MS. FEATHERSTONE:  Objection, Your Honor.

12   Q.  Now, sir --

13        THE COURT:  Hold on, Mr. Ponds.  Overruled.

14   Q.  Now, sir, in terms of Placard No. 3, do you recall what

15   was recovered -- what was the -- what did Placard No. 3

16   identify?  What object was at Placard No. 3?

17   A.  According to this, it's a left pistol grip.

18        MR. PONDS:  Your Honor, if I could approach the

19   witness?

20        THE COURT:  You may.

21   Q.  Officer Coker, I'm going to see you -- excuse me, I'm

22   going to show you --

23   A.  Yes, you are going to see me again.  Believe it or not.

24   You've seen me a little too much lately actually.

25   Q.  -- Plaintiff's Exhibit 68.  If you can look at that and

1    identify what it is, sir?

2    A.   Item 3.  Item 3 says it's a left pistol grip.

3    Q.   It's a left pistol grip?

4    A.   That's what I have it listed as.

5    Q.   Okay.  And just feeling -- can you open that up.  Is

6    that plastic?  Does it appear to be made from some type of

7    plastic substance?

8    A.   It does.

9    Q.   Okay.  And that was where you found -- that was located

10   at Placard No. 3?

11   A.   According -- yes, according to the report and diagram.

12   Q.   Right.  And that's in that first block of the sidewalk

13   that runs parallel with the actual road on Elvans Road?

14   A.   I believe so.

15   Q.   Okay.  And that Item No. 3, the left pistol grip, was

16   some distance from where you recovered the cell phone?

17   A.   Yes.

18   Q.   Okay.  Looking at your diagram, is there any indication

19   of the distance between Placard No. 3 and Placard No. 6?

20   A.   No.

21   Q.   I'm going to show you once again --

22           MR. PONDS:  Your Honor, at this time I would like

23   to move into evidence Plaintiff's Exhibit 68, the left

24   pistol grip.

25           THE COURT:  Any objection?

1          MS. FEATHERSTONE:  No, Your Honor.

2          THE COURT:  So admitted.

3     Q.  Showing you once again Plaintiff's Exhibit 4H, you can

4     see the sidewalk from where item -- from this photograph,

5     you can see Placard 6, the cell phone.  It is some distance

6     from the sidewalk where Placard No. 3 was found.

7     A.  That's correct.

8     Q.  And Placard No. 3, the left grip -- if you can hold that

9     up so that, with the Court's permission, the jury can see

10    the left grip?

11         THE COURT:  You may.

12    A.  The inside, the outside.

13    Q.  Thank you.  Thank you, Officer.

14         Was Placard No. 3 closer to the black SUV -- was

15    it closer -- was Placard No. 3 closer to the SUV or closer

16    to Placard No. 6?

17    A.  Without taking a measurement, I couldn't say for sure.

18    It appears that way in the photograph.

19    Q.  It appears -- from the photograph, it appears --

20    A.  From the photograph it appears that way, but without

21    taking an actual measurement, I can't say for sure.

22    Q.  I understand.  But it appears closer to the black SUV?

23    A.  It does.

24    Q.  And Plaintiff's Exhibit 4I is a close-up of Placard 3.

25    Is that a -- once again, is that Placard No. 3 the left

1    pistol grip?

2    A.  Yes, sir.

3    Q.  And you see those -- there are some lines that kind of

4    delineate each block of the sidewalk?

5    A.  Correct.

6    Q.  Do you see those indentations or -- they're not cracks,

7    they're indentations?

8    A.  They're expansion joints.

9    Q.  What are they called?

10   A.  I think they're expansion joints on the sidewalk.

11   Q.  Okay.  Thank you so much.

12          MR. PONDS:  Your Honor, if I could approach the

13   witness?

14          THE COURT:  You may.

15   Q.  Officer Coker, I'd like to show you what has been marked

16   as Plaintiff's 137.  If you could wait, I'll ask a question

17   concerning that.

18   A.  Okay.

19   Q.  Officer Coker, can you tell us -- do you recognize

20   Plaintiff's Exhibit 137?

21   A.  I do.

22   Q.  And what is that, sir?

23   A.  That's a pistol grip.

24   Q.  Is that a pistol grip that you recovered?

25   A.  Yes.

1          MS. FEATHERSTONE:  Objection, Your Honor.

2          THE COURT:  Overruled.

3          MS. FEATHERSTONE:  137 is a document, Your Honor.

4          THE COURT:  I have 137 as the right pistol grip.

5          MR. PONDS:  Thank you.

6          THE COURT:  Is that --

7          MR. PONDS:  That's correct.  That's my

8    understanding.

9    Q.  Does Plaintiff's Exhibit 137, the right pistol grip,

10   correspond to Placard No. 5?

11   A.  It does.

12   Q.  Okay.  And is that -- that's the right pistol grip?

13   A.  Actually, I think there's a mistake here.  Somebody

14   switched the pistol grips up.

15   Q.  What do you mean?

16   A.  This is the left pistol grip.  This right here is the

17   right pistol grip.  Somebody removed them from the bags.

18   Q.  Okay.  Let me ask you this --

19   A.  They should be reversed.

20   Q.  All right.  Is this evidence kept -- once you recover it

21   from the scene, what do you do with it?

22   A.  Once it's recovered from the scene, it is sent to the

23   latent fingerprint exam, where it will be examined for

24   latent fingerprints, and it is also sent to then DNA

25   swabbing, and then it can go on to a firearms exam from

1   there.

2   Q.  Okay.  And eventually it's all maintained within the

3   Metropolitan Police Department until there's a trial or --

4   A.  That's correct.

5   Q.  All right.  And tell me what was switched up, Officer

6   Coker.

7   A.  I just realized that Item 3 --

8   Q.  Placard 3?

9   A.  -- Placard 3, which is my Item 3 -- I don't know what it

10  is for your number -- is actually the right pistol grip; and

11  5 is actually the left pistol grip.  And it's easily

12  explainable.

13  Q.  And I understand.

14  A.  Yes.

15  Q.  So what you're saying is Placard 3 actually represents

16  the right pistol grip?

17  A.  Uh-uh.

18  Q.  It's the opposite?

19  A.  No.  Item 3 they've gotten mixed up in the bags.

20  Q.  Oh.

21  A.  You handed me Item 3, and I just looked at it and

22  realized that's the right side, not the left side.  And Item

23  5, which is listed as the right pistol grip, is actually the

24  left pistol grip.

25          More than likely what happened was, in processing,

1    somebody inadvertently stuck them in the wrong bags.

2    Q.   Just put them in the wrong bags?

3    A.   That's it.

4    Q.   So Placard 5 would represent the left pistol grip, or

5    does it represent the right pistol grip?

6    A.   5 represents the right pistol grip.

7    Q.   Right pistol grip.

8    A.   And actually what sits in the bag is actually the left

9    pistol grip.  That's all.

10   Q.   And Placard 3 represents the left pistol grip?

11   A.   That's correct, and actually what's sitting in there is

12   the right pistol grip.  That's all.

13   Q.   Let me ask you this:  Did you measure the distance

14   between Placard 3 and Placard 5?

15   A.   That -- we do not do that.

16   Q.   You don't do that?

17   A.   No, sir.

18   Q.   Officer Coker, I'm going to show you an item that's

19   already been admitted into evidence.

20   A.   Okay.

21   Q.   That's Defendants' Exhibit No. 7.

22   A.   Okay.

23   Q.   Sir, do you recognize that item?

24   A.   I do.

25   Q.   And what is that, sir?

1    A.  It's a black BB gun.  It's a replica of a Walther PPK/S,

2    I believe.

3    Q.  Sir, do you recall where you recovered that weapon?

4    A.  It says I recovered it from the grass on the west side

5    of the sidewalk, I believe.

6    Q.  Was that Placard No. 4?

7    A.  I'm sorry, left side of the driveway.

8    Q.  Do you recall what placard?

9    A.  It would be my Item 4.  It's Placard No. 4.

10   Q.  Then I will show you Plaintiff's Exhibit No. 4.  Is that

11   like a concrete post or wooden post that Placard No. 4 is

12   located by?

13   A.  I can't tell if it's wooden or concrete.  It's a post.

14   Q.  All right.  And that is where you found the Defendants'

15   Exhibit No. 7, the gun?

16   A.  Correct.

17   Q.  The BB gun?

18   A.  Correct.

19   Q.  All right.  So the pistol grips were found in a

20   different location?

21   A.  Correct.

22   Q.  And the BB gun was also found in a -- in another

23   location that represents Placard 4?

24   A.  Correct.

25               MR. PONDS:  Your Honor, at this time I'd like to

1    move into evidence Plaintiff's Exhibit 168.

2              THE COURT:  What is that?

3              MR. PONDS:  68.  The pistol grip, the other pistol

4    grip.

5              MS. FEATHERSTONE:  I thought it was already moved

6    in.  No objection to Exhibit 68.

7              THE COURT:  Both of them are in?

8              THE COURTROOM DEPUTY:  Yes.

9              THE COURT:  We're set.

10             MR. PONDS:  I received bad information from my

11   team, Judge.

12             THE COURT:  No, no, no, better safe than sorry.

13             MR. PONDS:  I agree.

14   Q.  Now, Officer Coker, when you were processing Defendants'

15   Exhibit 7, the BB pistol with the plastic grips, did you

16   notice any blood spatter on Defendants' Exhibit No. 7?

17   A.  No, I did not.  I didn't actually process it.  I

18   recovered it.  There's a little bit of a difference.

19             No, but I did not notice anything at that time.

20   Q.  Okay.  Is that something that you would have recorded as

21   being important if you would have seen blood on it?

22   A.  I may have.  Usually I would have -- in that situation,

23   I would have made a note on probably some additional

24   paperwork where I would submit it for testing such as DNA

25   testing or firearms, in that case, noting it for recovery

1    from either one of our DNA technicians possibly or from the

2    lab technician to recover it and to pay attention to that

3    area.

4    Q.  In 2011 did you have your own unit within the

5    Metropolitan Police Department that conducted DNA analysis?

6            MS. FEATHERSTONE:  Objection.

7            THE COURT:  Overruled.

8    A.  We did.

9    Q.  And in 2011 it was kind of routine practice and policy

10   to swab weapons for DNA --

11   A.  That's correct.

12   Q.  -- in homicide cases?

13   A.  That's correct.

14   Q.  And to also do the testing for that, to take the swabs

15   and to test the biological material?

16   A.  Somebody would have to make -- right, an attorney would

17   have to make a request.  A U.S. Attorney would usually make

18   a request to have it sent to -- after the swab was

19   recovered, sent down for testing, yes.

20   Q.  Now, sir, do you recall whether or not any biological

21   material, specifically any blood, was collected from

22   Ralphael Briscoe, when his body was --

23   A.  From?

24   Q.  Yes, from; from the medical examiner's office.

25   A.  I would imagine from my own experience --

1          MS. FEATHERSTONE:  Objection.

2          THE COURT:  I'm sorry?  Can you read back the

3     question, please.

4          MS. FEATHERSTONE:  It was the answer, Your Honor;

5     nonresponsive.

6          (Pause)

7          THE COURT:  Restate the question, please.

8     Q.  Officer Coker, do you recall whether or not any

9     biological material was collected from the body of Ralphael

10    Briscoe from the medical examiner's office?

11    A.  I wasn't there, so I can't say without looking at a

12    report.

13    Q.  If you could look at your report to see if there's

14    anything that refreshes your recollection?

15    A.  It's not my report.

16          MR. DeBERARDINIS:  He has no report.

17    Q.  It's not in the report?

18    A.  No, no, no, it's not my report.

19    Q.  Oh, it's not?

20    A.  I was not the evidence technician that would have gone

21    to the autopsy that day.

22    Q.  If you could just indulge me.

23    A.  Sure.

24    Q.  Thank you.

25    A.  You're welcome.

1    Q.  Well, sir, is there anything in this report -- in any of

2    your reports that refreshes your recollection whether any

3    member of your team of the Metropolitan Police Department

4    collected blood from or biological materials from Ralphael's

5    body from the medical examiner's office?

6    A.  Yes.

7    Q.  That was done?

8    A.  Yes, it was.

9    Q.  And is the purpose of that to develop a DNA profile from

10   Mr. Briscoe, based on your experience?

11   A.  It is.

12   Q.  Just a few more questions.

13   A.  Okay.

14   Q.  Officer Coker, do you recall approximately what time you

15   arrived on the scene?

16   A.  I'm looking at the wrong report.

17          MS. FEATHERSTONE:  Your Honor, may the record

18   reflect the witness is reviewing a document to refresh his

19   recollection?

20          THE COURT:  Officer Coker, if you can -- do

21   you recall what time you arrived at the scene without

22   refreshing --

23          THE WITNESS:  Not actually without looking at it.

24          THE COURT:  Ask him that.

25   Q.  Is there anything that would refresh your recollection

```
 1    as to what time you arrived?
 2    A.  My report.
 3    Q.  Go right ahead.  You can review it and see if it
 4    refreshes your recollection, sir.
 5    A.  Yes, 15:15 hours.
 6    Q.  That's 3:15?
 7    A.  Which is 3:15.
 8    Q.  Okay.  P.M., obviously?
 9    A.  Correct.
10    Q.  And your team was the team that was going to be
11    responsible for processing the crime scene?
12    A.  Correct.
13    Q.  Was it your team that was going to be responsible to
14    take the photographs?
15    A.  Correct.
16    Q.  As a crime scene officer, only on a rare occasion are
17    you an eyewitness to a criminal event or an incident.
18    A.  I would have to say that's correct.
19    Q.  All right.  And is that part of the reason why crime
20    scene officers go out and independently collect the
21    evidence, because they're not the officers involved in
22    whatever happens?
23    A.  I'd say that's probably one of the reasons.
24    Q.  And it makes you unbiased?
25    A.  We just -- we follow the evidence, yes.
```

1    Q.  Just follow the evidence?

2    A.  Correct.

3    Q.  And did you ever -- the day that -- April 26, 2011, when

4    you were on the crime scene and part of your responsibility

5    was to take the photographs that document the crime scene,

6    did anybody tell you that one of the officers involved had

7    taken photographs?

8    A.  No.

9    Q.  Were you later surprised to find out that he had done

10   that?

11   A.  I'm sorry, can you repeat that?

12   Q.  Were you later, at some point, surprised to find out

13   that one of the officers involved had taken photographs?

14   A.  I was.

15   Q.  Pardon?

16   A.  I was.

17   Q.  Now, sir, did you assign another officer to go out the

18   next day to look for some objects?

19   A.  No.  I didn't assign anybody.  My official assigned

20   myself and my partner.

21   Q.  Oh, so you went back there?

22   A.  I went back the next morning.

23   Q.  And what were you looking for that next morning?

24   A.  Additional ballistic evidence.

25   Q.  Was it actually the bullets, the bullets, the

1    projectiles?

2    A.  I believe we were looking for a bullet we couldn't

3    account for.

4    Q.  Okay.  And was that one of the bullets that entered in

5    and exited out?

6    A.  I can't say.

7    Q.  All right.  Based on -- do you recall how many shots or

8    bullets had been fired from Defendant Leo's weapon on April

9    the 26th, 2011?

10   A.  I believe it was two.

11   Q.  All right.  Did you -- where was the first bullet

12   recovered from, if you know?

13   A.  I can't recall where the bullet was.

14   Q.  Okay.  And you went out to look for the bullet or the

15   projectile, the second one, the next day?

16   A.  Correct.

17   Q.  Did you go to the woods that are in the back?

18   A.  Yes.

19   Q.  And are there apartments right on the other side?

20   There's kind of a little patch of woods.  There are

21   apartments on the other side.  Do you recall?

22   A.  I can't say.  I'm not familiar with the area.

23   Q.  While you and your partner were searching the woods for

24   that bullet, did you ever find it?

25   A.  No, no.

```
 1                    MR. PONDS:  Officer Coker, thank you for your

 2       time.

 3                    THE WITNESS:  You're welcome.

 4                    THE COURT:  Ms. Featherstone.

 5                    MS. FEATHERSTONE:  Thank you, Your Honor.

 6                         CROSS-EXAMINATION

 7       BY MS. FEATHERSTONE:

 8       Q.  Good afternoon, Officer Coker.

 9       A.  Good afternoon.

10       Q.  Just a brief moment.

11                    Officer Coker, you were asked about your

12       processing of the scene, correct?

13       A.  Correct.

14       Q.  And in the processing of the scene, you testified that

15       you send out requests for fingerprints and swabs to be

16       taken, correct?

17       A.  That's correct.

18       Q.  You don't actually do anything with those fingerprinting

19       or swabs.  You have nothing to do with that, correct?

20       A.  That's correct.  I have nothing to do with the actual

21       processing of the weapon, meaning I submit it to another

22       part of our lab that will do the actual fingerprinting and

23       the swabbing of the gun.

24       Q.  And you also testified that the United States attorneys

25       would have to make the request, correct?
```

1    A.   In 2011, if I remember correctly, I believe that's the

2    way that we conducted business at that time.

3    Q.   And the U.S. Attorney's Office, what do they have to do

4    with DNA testing?

5    A.   What do they have to do with it?

6    Q.   As far as why would they make a request for DNA testing,

7    if you know?

8    A.   Well, at that time you would compare any of the swabs

9    to, in this case, the known sample of the decedent that we

10   may have recovered from the weapon.

11   Q.   And are you aware in this case of whether the United

12   States Attorney's Office requested DNA testing?

13   A.   Actually, I'm not.

14   Q.   Now, you testified that the gun and the grips were

15   located on the scene, correct?

16   A.   That's correct.

17   Q.   I'm going to hand them to you again.  Just take another

18   look at that.

19        MS. FEATHERSTONE:  May I approach the witness,

20   Your Honor?

21        THE COURT:  You may.

22        MS. FEATHERSTONE:  Thank you.

23   Q.   I'm going to hand you these exhibits, Officer Coker.

24   Can you show the jury how the gun looks with the grips

25   intact, if they were to be intact on the weapon, and then

1    show it to the jury, please.

2    A.  (Witness complies) I'll do as best I can with the zip

3    tie on it.

4    Q.  Okay.

5    A.  This is how it kind of looks.  It has a zip tie.  Just

6    like that.

7    Q.  Okay.  And in looking at Plaintiff's Exhibit No. 4J, you

8    testified earlier that 4 is a gun, correct?

9    A.  That's correct.

10   Q.  And 3 is the left grip, correct?

11   A.  That's correct.

12   Q.  And 5 is the right grip, correct?

13   A.  That's correct.

14   Q.  And so you would agree that to the left of the gun,

15   which is No. 4, is to the left -- is the left -- the left

16   grip is to the left of the gun, correct?

17   A.  Yes, ma'am.

18   Q.  And the right grip is to the right of the gun, correct?

19   A.  That's correct.

20   Q.  Officer Coker, did you take additional photographs once

21   you got back to your office of the gun?

22   A.  I did.

23        MS. FEATHERSTONE:  Your Honor, with the Court's

24   permission, we would like to introduce documents not in the

25   plaintiff's case, but in defendants' case, as Officer Coker

1    is our witness, to not recall him simply to introduce these

2    documents.

3                THE COURT:  Any objection?

4                MR. PONDS:  If I could see the photographs.

5                MS. FEATHERSTONE:  Sure.

6                MR. PONDS:  I would object, Your Honor, because

7    the form of questioning is different.  I mean --

8                THE COURT:  Well, he's an adverse witness as to

9    you, correct?

10                MR. PONDS:  No.  I would not call him an adverse

11    witness.

12                THE COURT:  You led him on direct.

13                MS. FEATHERSTONE:  Right.

14                THE COURT:  Didn't you?

15                MR. PONDS:  If I could just talk to counsel for

16    one second.

17                THE COURT:  Okay.

18                MR. PONDS:  If we could approach, Your Honor?

19                (The following is a conference held at the

20                 bench outside the hearing of the jury)

21                THE COURT:  Do we need to call him back just to

22    introduce exhibits?  We don't want to do that.

23                MR. PONDS:  I don't want to have to call him back,

24    but I just need to have a proffer.  Number one, I would

25    object that the photographs --

1              THE COURT:  What are they?  Let me see.

2              MS. FEATHERSTONE:  Not all of them, Your Honor,

3      just some of them, but they're photographs they took of the

4      weapon once he went back to the scene.

5              MS. WEST:  Our objection would be that it's

6      cumulative testimony, Your Honor.  First off, it's not

7      relevant.  That's issue number one.

8              THE COURT:  Let's deal with relevance first.

9              MS. FEATHERSTONE:  I want to question him about

10     the way he compared it to a real Walther and the

11     measurements he took of that weapon related to a real

12     Walther.

13             The issue here is whether or not Mr. Briscoe had a

14     weapon in his hand.  The plaintiffs have made a big deal

15     about the fact that it was some toy BB gun.  We want to be

16     able to explore --

17             THE COURT:  After he holds it up and points it

18     straight at them, is there still an issue as to that?

19             MS. FEATHERSTONE:  Which?

20             MR. PONDS:  Which I was a little surprised.

21             THE COURT:  Let's do one of them, okay, and just

22     very quickly, okay.  Just very quickly.

23             I think this point has been established, but I'll

24     give you a little bit of leeway.  Okay?

25             MS. FEATHERSTONE:  Okay.  Thank you.

1          THE COURT:  You're welcome.

2              (This is the end of the bench conference)

3    BY MS. FEATHERSTONE:

4    Q.  Officer Coker, I'm going to show you what's been marked

5    as Defendants' Exhibit No. 5.

6              MS. FEATHERSTONE:  May I approach the witness,

7    Your Honor?

8              THE COURT:  Yes, you may.

9    Q.  Do you recognize this document, Officer Coker?

10   A.  I do.

11   Q.  How do you recognize it?

12   A.  It's a photograph I took at the Metropolitan Police

13   Firearms Exam Unit.

14   Q.  And this document, does this reflect an accurate

15   depiction of what was in the photograph?

16   A.  It does.

17   Q.  Okay.

18             MS. FEATHERSTONE:  I'd like to admit it into

19   evidence in defendants' case only, Your Honor, Exhibit 5A.

20             THE COURT:  So moved.

21   Q.  Officer Coker, can you tell the jury what this is,

22   please.

23   A.  Yes.  It is a picture of Item 4, which is the BB gun

24   pistol that was recovered from the scene, and it's compared

25   against an actual --

1          MS. FEATHERSTONE:  Oh, the jury couldn't see it,

2     Your Honor.  Oh, it's up now, thank you.

3     A.  Okay.  Again, what it is, it's a photograph where I went

4     to the Metropolitan Police Firearms Exam Unit.  I actually

5     had Item 4, which is the BB gun pistol that was recovered

6     from the scene, compared to a real Walther PPK pistol to

7     show the almost identical similarities to it down to the

8     name, and to show how much or how close in resemblance it is

9     to a real firearm, even though it is not.

10    Q.  Thank you.

11         Officer Coker, you testified that you arrived on

12    the scene at 3:15, correct?

13    A.  That's correct.

14    Q.  And do you know what time the incident occurred?

15    A.  No, I actually don't know the time it actually occurred.

16    Q.  And at the time you got -- at the time that you arrived,

17    Mr. Briscoe was already taken, correct?

18    A.  That's correct.

19    Q.  You were asked about photographs that were taken by one

20    of -- that one of the officers took photographs, correct?

21    A.  That's correct.

22    Q.  And is it improper for an officer to photograph their

23    own scenes?

24    A.  No.

25    Q.  And what, if anything, would be mobile crime's position

1   with regard to those photographs?

2   A.  The only position that we take as mobile crime, as a

3   unit or in any situation, whether it was crime scene or

4   mobile crime, is that -- all we ask is that the photographs

5   simply be turned over to us.

6   Q.  And if those photographs are provided to a FIT

7   investigator, is that the same thing as turning it over to

8   mobile crime?

9   A.  For the most part.  Eventually they should be forwarded

10  to us to be included in the case jacket so we have control

11  of all the evidence and photographs.  But yes, turning the

12  photographs over to a Force Investigation detective is

13  primarily the same as turning it over to us.

14  Q.  And in this case, do you know if the officer who took

15  the photographs turned them over to the FIT investigator?

16  A.  I don't know.

17  Q.  You were asked earlier about forensic evidence.  Do you

18  remember that?

19  A.  Yes.

20  Q.  Are you in any way a forensic evidence technician?

21  A.  I'm an evidence technician; that's correct.

22  Q.  But do you handle forensic evidence, such as DNA

23  swabbing in the lab or fingerprinting in the lab?

24  A.  In the past, yes.  Am I trained in the lab?  No.  I have

25  swabbed guns in the past, but what happens is protocol

1    changes, and it has changed more than once, actually a

2    couple of times, since my tenure in the unit, and therefore

3    we, as evidence technicians, no longer swab guns.

4    Q.  When you went back to the scene after the next day, you

5    didn't find any additional evidence in this case, correct?

6    A.  That's correct.

7    Q.  All the evidence that was collected was on the day of

8    the incident on 4/26/2011?

9    A.  That's correct.

10            MS. FEATHERSTONE:  I have nothing further, Your

11   Honor.

12            THE COURT:  Thank you.

13            MS. FEATHERSTONE:  The witness is excused from the

14   defense case as well, Your Honor.

15            MR. PONDS:  I have no questions for Officer Coker.

16   Thank you, sir.

17            THE COURT:  Officer Coker, you're excused.  Thank

18   you for your testimony.

19            THE WITNESS:  Thank you, sir.  Does anybody want

20   their gun back?

21            MS. FEATHERSTONE:  Yes, please.  Not pointed

22   though.

23            THE COURT:  Okay.  Should we take our afternoon

24   break?

25            MS. WEST:  Please.

1          THE COURT:  Okay.  Ladies and gentlemen of the

2     jury, we will take our 15-minute afternoon break.  We will

3     reconvene at 3:30.

4          You know what I'm going to tell you.  Don't talk

5     about the case.  Don't do any research about the case.  See

6     you in 15 minutes.

7          (Jury exits courtroom)

8          THE COURT:  Okay.  Right on time.  How are we

9     doing?

10         MS. WEST:  Yes, Your Honor.  You ordered us to

11    give the proof of services for the witnesses that we

12    subpoenaed.  I have one here for Levy Harley, which I took a

13    picture of on my iPhone and emailed it to Ms. Featherstone,

14    but she was busy with the witness.  I just want her to know

15    it's there.

16         THE COURT:  Okay.

17         MS. WEST:  Here's the original.  And the other

18    ones are coming from the office.

19         MR. PONDS:  Here we go.

20         MS. WEST:  Here we are.  Here's Carlos Spruill's

21    returns.

22         THE COURT:  Well, Spruill's off the table.  It was

23    Boyd and Harley, correct?

24         MS. WEST:  I'm sorry, sir?

25         THE COURT:  Boyd and Harley.

1           MS. FEATHERSTONE:  Harley.

2           MS. WEST:  Levy Harley.

3           THE COURT:  Levy Harley, okay.

4           MS. WEST:  The Boyd one we're still working on.

5           THE COURT:  You're still working on Boyd, okay.

6           MS. WEST:  Yes, sir.

7           THE COURT:  Any objections to service as to Levy

8      Harley?

9           MR. DeBERARDINIS:  It doesn't appear that -- I'm

10     not so sure from a fair reading of that, as I identify it,

11     that that person put it in his hand.  It appears -- there's

12     not enough information for me anyway.  The Court's going to

13     have to decide.

14          MS. WEST:  Can I hand it to the Court, Your Honor?

15          THE COURT:  You may.

16          MS. WEST:  Thank you.

17          THE COURT:  And what's your objection to it?

18          MR. DeBERARDINIS:  Well, how does this man know

19     that that's even the individual?  It doesn't say, "I

20     knocked on the door, a man appeared, identified himself as

21     Mr. Shmoe, and that -- then gave it to him."  It's a very

22     radical step, sending the Marshals out to snatch someone off

23     the street, Your Honor.

24          THE COURT:  I'm just suggesting that I simply call

25     him on a cell phone.

 1          MR. DeBERARDINIS:  That I have no problem with.

 2          THE COURT:  But as a predicate to that, he has to

 3   be under subpoena, because he has no obligation to come

 4   unless he's first under subpoena.

 5          Now that he's under subpoena, I'll try to reach

 6   him.  If I cannot, then we may take the next step.  Okay.

 7   I've been assured that this is an important witness that's

 8   going to give testimony as to an important piece of

 9   evidence.  Okay?

10          MR. DeBERARDINIS:  Is the Court of the mind to ask

11   him, "Have you received a subpoena?" or should we be present

12   for the call?

13          THE COURT:  No, you should not be present for the

14   call.

15          MS. WEST:  Your Honor, and if the Court wishes, I

16   will be happy to have our investigator here, and you can ask

17   him any question that you want, if he went to the house and

18   handed the man -- he talked to him.  As an officer of the

19   court, I'm saying that's what happened.

20          THE COURT:  Just give me his number.

21          MS. WEST:  Mr. Harley's?

22          THE COURT:  Yes.

23          MS. WEST:  Yes, sir, right now.

24          (Recess taken)

25          THE COURT:  Okay.  Before we bring the jury back,

1    I had a conversation with Mr. Harley.  He says that he did

2    receive a subpoena, but it is dated 2014 and therefore feels

3    that he is not obligated to comply with it.  He appears to

4    be a reluctant witness, but I gave him the name and phone

5    number of your investigator, and so you may give him a call

6    or you guys can proceed accordingly.

7              MS. WEST:  Can I ask what name and number you gave

8    him, Your Honor?

9              MR. PONDS:  The investigator.

10             THE COURT:  Mr. Vaughan, (703)582-6448.

11             MS. WEST:  That's it.  Thank you.

12             THE COURT:  Okay.

13             Who is your next witness?

14             MR. PONDS:  The next witness, the plaintiff will

15   call Defendant Leo.

16             THE COURT:  Okay.

17             MR. PONDS:  And Your Honor, I have a significant

18   amount of material to cover with Defendant Leo.

19             THE COURT:  I'm listening.

20             MR. PONDS:  And I don't -- the questions I'm going

21   to ask him relevant to if anything was thrown out of the

22   SUV, those will be the last series of questions.

23             THE COURT:  And will that be today or tomorrow?

24             MR. PONDS:  No, that will be tomorrow.

25             THE COURT:  Okay.  Okay.  Hold on.

1    So we'll get to your proffer tomorrow.  We don't

2    have to deal with that today.

3    MS. FEATHERSTONE:  Your Honor, before we go to the

4    jury, Mr. Ponds had indicated to me that Detective Rahman

5    would be called today.  He told me yesterday that he would

6    let me know in the morning whether he would need him, and

7    then I did not release him at lunch, and so I indicated to

8    Mr. Ponds that Detective Rahman would be on leave tomorrow

9    and that he'd be back on Monday.  If he could call him

10    today, that will be fine, but I can't tell Mr. Ponds how to

11    try his case.  But he was notified about this so...

12    THE COURT:  Okay.

13    MR. PONDS:  I'm fully aware of it.  I spoke with

14    Detective Rahman this morning.  First of all, I asked him,

15    "I'm not certain whether or not I'm going to call you

16    today," because it was going to depend on other witnesses'

17    availability, and asked him if it would be more convenient

18    for him to go back.  He said he was fine staying.

19    And I've advised Ms. Featherstone that if I did

20    not call him today, that I would call him on Monday as a

21    rebuttal witness; and after considering it, I think he's

22    more of a rebuttal witness.

23    THE COURT:  That's fine.  He won't be called in

24    your case?

25    MS. FEATHERSTONE:  Can I release him, Your Honor?

```
 1                    THE COURT:  Yes, you may.

 2               Okay.  Can we bring them in?

 3               MR. PONDS:  Yes, sir.

 4               (Jury enters courtroom)

 5               THE COURT:  Okay.  Welcome back.

 6               Mr. Ponds.

 7               MR. PONDS:  Yes, Your Honor, at this time the

 8    plaintiff will call Defendant Chad Leo to the stand.

 9               THE COURT:  Mr. Leo, how are you?

10               THE WITNESS:  Good afternoon, Your Honor.

11                    CHAD LEO, Sworn

12                    DIRECT EXAMINATION

13    BY MR. PONDS:

14    Q.  Sir, could you state your full name for the record.

15    A.  Chad Leo.

16    Q.  Sir, who is your current employer?

17    A.  Metropolitan Police Department.

18    Q.  Was that the same employer that -- were you employed by

19    the Metropolitan Police Department back on April 26, 2011?

20    A.  That's correct.

21    Q.  Now, sir, what year did you enter into the police

22    academy?

23    A.  It was -- my start date was May 17, 2004.

24    Q.  And was Roberto Torres one of your -- Officer Roberto

25    Torres, was he one of your classmates at the academy?
```

1    A.  Yes, he was.

2    Q.  So you've known Officer Torres since May of 2004?

3    A.  Yes, I have.

4    Q.  And on April the 26th, 2011, you were working with him?

5    A.  That's correct.

6    Q.  And you were occupied in a vehicle with him?

7    A.  Correct.

8    Q.  Okay.  After the shooting that occurred on April 26,

9    2011, did you meet with investigators from the Force

10   Investigative Team?

11   A.  Yes, I did.

12   Q.  Were those investigators who were investigating your

13   fatal shooting of Ralphael Briscoe?

14   A.  At first they arrived on the scene, and they were

15   investigating the shooting at that time, initially.

16   Q.  Well, they were the first investigators?

17   A.  Correct.

18   Q.  All right.  And were you advised by your officials not

19   to discuss the case with anyone?

20   A.  I was.

21   Q.  And you understood what they meant by not to discuss it,

22   with any of the other three officers?

23   A.  That's correct, yes.

24   Q.  Now, sir, who have you discussed the aspects -- as to

25   the three officers -- let's begin with Officer Katz.

1    Officer Katz is one of your best friends?

2    A.   That's correct.

3    Q.   If not your best friend?

4    A.   He's one of my -- he's one of my good friends, that's

5    correct.

6    Q.   And you went to his wedding?

7    A.   Yes, I did.

8    Q.   Where was the wedding?

9    A.   It was in Napa, Napa Valley in California.

10   Q.   So you flew all the way out to San Francisco or Los

11   Angeles?

12   A.   San Francisco.

13   Q.   And then you drove that hour and a half up to Napa?

14   A.   It's about 45 miles, but with traffic it turned into

15   about an hour and a half.  Two hours actually.

16   Q.   About an hour and a half?

17        And did you and Officer Katz, did he -- did

18   someone hold a bachelor party for him before he got married?

19   A.   There was a bachelor party a couple of months prior, but

20   I was not able to attend.

21   Q.   All right.  Now, so when you -- how many days were you

22   out in Napa, California, with Officer Katz?

23   A.   The dinner rehearsal was on a Friday, and I made it out

24   that Friday evening; and I believe the wedding itself was

25   the following Saturday.  So I was there in Napa for two

1    nights, and then -- I used it as a vacation, and then

2    afterwards I went down to San Francisco for the rest of the

3    week, for about another seven days, as a vacation

4    afterwards.

5    Q.  All right.  Did Officer Katz go -- after the wedding go

6    down to San Francisco?

7    A.  No.  He was there for one additional -- I think he was

8    there Sunday night.  I remember we had dinner because his

9    wife at that time had a restaurant in the downtown area of

10   San Francisco, so on Sunday night we met up for dinner that

11   Sunday.

12   Q.  So you met for dinner on -- did the two of you stay in

13   the same hotel when you stayed in San Francisco?

14   A.  No.  No, we did not.

15   Q.  And you go to Officer Katz's home for dinner on a

16   regular basis?

17   A.  I wouldn't say on a regular basis.  I've been over to

18   his house for dinner several times.

19   Q.  And he's been invited over to your house several times?

20   A.  Not really.  I live in a small condo so I would not be

21   hosting any meals.  I have no dining place or tables that

22   are kind of set up for that.

23   Q.  Well, the question is, have you invited him over ever --

24   have you ever invited him over to your home for dinner?

25   A.  No.

1    Q.  Have you ever gone out and had drinks with him?

2    A.  I have, yes.

3    Q.  Numerous times?

4    A.  Several times.  I can't remember any specific times, but

5    I have, yes.

6    Q.  Thomas Sheehan, do you remember Officer Thomas Sheehan

7    who used to be part of your group?

8    A.  Yes, I do.

9    Q.  He's a friend of yours, right?

10   A.  Yes, he is.

11   Q.  All right.  And you call him Tommy, don't you?

12   A.  Everybody calls him Tommy.

13   Q.  Right.  And you and Tommy have gone out drinking

14   together, right?

15   A.  We have been out several times, yes.  Not that --

16   several times.

17   Q.  Several times.  And has he ever been over to your condo?

18   A.  He's been to my condo building.  In my condo building

19   there's a couple of areas that are meant for having groups

20   or parties or whatever.  He's been in my condo building.  I

21   can't remember if he's ever actually been in my condo unit.

22   Q.  Well, in your condo building, was he there for a party

23   that you threw?

24   A.  He was.  It was actually for a work party that he was

25   there.

1    Q.  All right.  So he was at the party.  Was Officer Katz at

2    the party?

3    A.  Yes, he was.

4    Q.  Was Officer Torres there?

5    A.  Yes, he was.

6    Q.  And this was on your social time?  I mean, the question

7    is, were you on duty when you were having that party at your

8    building?

9    A.  No, we were not on duty.

10   Q.  All right.  And you've gone out with Officer Torres,

11   haven't you?

12   A.  Yes, occasionally.  Yes.

13   Q.  And you've been to his house before?

14   A.  I remember being over his house one time.  It was maybe

15   a year or two after the academy.  He was moving, and I think

16   he asked me to help him move, and I helped him move.  That

17   was the only time I remember being at his house.

18   Q.  And you've gone out drinking with him, haven't you?

19   A.  I have before.  I can't tell you specifically how many

20   times or anything, but I have before.  It wasn't -- it was

21   very infrequent.

22   Q.  All right.  Back on April the 26th, 2011, the four of

23   you were not only co-workers, but you were close friends?

24   A.  Yes, we were friends.  We established a friendship by

25   working together, yes, and --

1    Q.  Well, you were more than co-workers.  You guys went out

2    drinking together.  You went out eating together after work.

3    A.  It helps to have a good work environment when you can

4    get along with the people you work with.

5    Q.  Well, you don't fly out to Napa for everybody that you

6    work with, do you?

7    A.  No.  That's true.  It's very expensive.

8    Q.  Now, sir, going back to the police academy, were you

9    given a set of your general orders when you were at the

10   police academy?

11   A.  Yes, we were.

12   Q.  And can you tell the ladies and gentlemen of the jury

13   what the general orders are.

14   A.  The general orders are -- it's a series of guidelines.

15   At this point there's probably close to 1,000 general orders

16   that we have.  So we get a series of general orders that

17   they give us, these huge binders with every general order in

18   there, and then, you know, throughout the academy we'll

19   review some of the general orders.

20   Q.  What are the general orders?  That's my question.

21   A.  They're a series of guidelines.

22   Q.  Are they the rules and regulations that govern your

23   conduct while you're on duty?

24   A.  They're guidelines to guide us into -- I guess guide us

25   how to conduct ourselves.

1           I wouldn't say they're rules and regulations.

2     There are some -- they're guidelines, which means not

3     everything that the general orders specifically states

4     dictates how you're supposed to operate because things

5     happen -- they can't dictate how everything happens in the

6     real world.  You have to kind of adapt and modify how things

7     are going to go.  That's why it's just a guideline as to how

8     to conduct yourselves.

9     Q.  Well, let me ask you this, sir:  You're telling the jury

10    that the general orders are kind of like maybe I follow them

11    and maybe I don't.  Is that what you're saying?

12    A.  No, that's not --

13    Q.  No, it's not?

14    A.  I'm saying it's a guideline.  It's not saying that you

15    make the choice maybe I'll follow them, maybe I don't.  I

16    don't agree with that, no.

17    Q.  It's a rule and a regulation, isn't it, sir?

18    A.  Yes, and if you -- there are some rules and regulations

19    that are within the general orders, but the guidelines

20    overall or the general orders overall are a general

21    guideline as to how to conduct yourself.

22          There are some rules and regulations that are

23    placed within those general orders, and if you violate

24    them --

25    Q.  Well, if you don't follow the general orders, can you be

1    punished?

2    A.  Yes.  Yes, you can.

3    Q.  So it's a rule that has a punishment if you don't follow

4    it?

5    A.  Yes.

6    Q.  Would you agree?

7    A.  Yes.

8    Q.  So it's not something you can kind of maybe I can, maybe

9    I will?

10   A.  If it's determined that you violated a general order in

11   such effect, then yes, you can be disciplined for that

12   general order.

13   Q.  All right.  Now, when did you go to the Gun Recovery

14   Unit?

15   A.  I was detailed to the Gun Recovery Unit at the end of

16   October 2007.

17   Q.  Now, before you went to the Gun Recovery Unit in 2007,

18   at some point you were a patrol officer?

19   A.  That's correct.

20   Q.  Okay.  When you were a patrol officer, did you have

21   Officer Sheehan, who was at the academy at that time,

22   conduct his ride-along with you?

23   A.  Yes.  At some point when Officer Sheehan was still in

24   the academy we were required -- when you were in the

25   academy, there was some point when you were required to do

1   at least four ride-alongs in one of the seven districts of

2   the District of Columbia.

3   Q.  And he was required to do that before he became a

4   Metropolitan police officer, correct?

5   A.  At some point --

6          MS. FEATHERSTONE:  Objection to form.

7          THE COURT:  Rephrase.

8   Q.  Sir, let me ask you this:  When you were in the -- when

9   you were in the academy, was it required for you to conduct

10  a ride-along with an officer, with a patrol officer?

11  A.  Yes.  I had to do four ride-alongs -- at least four

12  ride-alongs in one of the -- at least one of the seven

13  districts of D.C.

14  Q.  Did Officer Sheehan do his ride-along when he was at the

15  academy with you?

16  A.  He did do one ride-along while he was in the academy

17  with me, yes.

18  Q.  All right.  Did you pass him?  Did he get a passing

19  grade for the ride-along?

20  A.  There was no -- there was no grade.  He just came and

21  observed what went on.

22  Q.  Did you give him an evaluation?  Did you tell the

23  sergeant, your supervisor, he did well on the ride-along?

24  A.  There wasn't any -- it was just -- he just kind of sat

25  in and observed.

1    Q.  So you've known Thomas Sheehan ever since he was at the

2    academy?

3    A.  That was the first time I met him, and then I didn't see

4    him again until -- I maybe saw him occasionally at court

5    after he was out of the academy, and then I didn't really

6    talk to him again until he came to the Gun Recovery Unit.

7    Q.  Now, let me ask you this, sir:  You were -- when you

8    went to the Gun Recovery Unit in 2007, from 2007 up until

9    April 26, 2011, you were a part of a squad with the GRU?

10   A.  Yes.  That's correct.

11   Q.  And what I mean by squad, it's a group of officers who

12   ride together through certain segments of the District of

13   Columbia?

14   A.  That's correct.

15   Q.  All right.  And Officer Katz was one of those officers

16   that you would ride with?

17   A.  Yes.

18   Q.  Officer Sheehan, once he got to the GRU, was one of the

19   officers that you rode with?

20   A.  Correct.

21   Q.  And Officer Torres was one of those officers that you

22   rode with once he got to the GRU?

23   A.  Yes.

24   Q.  And the four of you were together on April the 26th,

25   2011?

1    A.   Yes, we were.

2    Q.   And the four of you, on -- prior to April the 26th,

3    2011, have gone into the complex known as Forest Ridge

4    Apartments?

5    A.   That's correct.

6    Q.   As well as The Oaks?  Well, it's also known as The Oaks.

7    Would you agree?

8    A.   I just know it as the Forest Ridge Apartments.  I never

9    heard it as The Oaks until earlier this week when the other

10   individual testified to it.

11   Q.   All right.  Because when you go into that neighborhood,

12   you really don't kind of talk to the people to get to know

13   the people in the complex, do you?

14   A.   On occasion we'll try to say hi.  The people in the

15   neighborhood sometimes don't even want to engage us in any

16   kind of conversation at all either.

17   Q.   All right.  And you're aware from the smallest of

18   children to the oldest adult who lives in that complex, they

19   yell "jump-outs" when you and your group come into the

20   complex?

21   A.   I would say that's fairly common.  As soon as we sort of

22   enter the complex, you'll hear an array of people yelling

23   the word "jump-outs, jump-outs."

24   Q.   Now, does that leave you with the impression that from

25   the smallest of children to the oldest adult, that they have

1    a negative impression of you?

2    A.  Of me myself, or --

3    Q.  Yes.  Yes.

4    A.  No.  I think they have a negative impression in that

5    neighborhood of, you know -- they may have a negative

6    impression of police in general.  I don't think that's

7    directed just towards myself.

8    Q.  Well, you're a Metropolitan police officer.

9    A.  I think that's just sort of a general thing.  I don't

10   think, you know, if you showed them just a picture of me,

11   that they would say, "Oh, yes, I hate that guy."

12   Q.  Well, did you ever think that perhaps they have these

13   feelings because of the way --

14             MS. FEATHERSTONE:  Objection.

15             THE COURT:  Overruled.

16   Q.  -- of the way that you conduct yourself when you go into

17   that complex?

18   A.  Repeat the question again.

19   Q.  I said, did you ever think that they have that

20   impression of you because of the way you conduct yourself

21   when you go into the complex?

22   A.  I'm not sure how they have that impression.

23   Q.  Right.  Well, sir, do you recall, when you go into that

24   complex with your other three partners, that people will

25   immediately start pulling their shirts up?  Have you ever

1    seen that?

2    A.  Sometimes.  There are --

3    Q.  The question is, have you seen it, when you come into

4    the complex with your other three officers, that people will

5    pull their shirts up?  Have you seen that?

6    A.  I can't remember specifically if it's been directly in

7    that neighborhood, but I have seen that, where people

8    voluntarily, when they see us, they'll just lift up their

9    shirts as a sign to show that they're not carrying any guns

10   because they would recognize us immediately as the gun unit.

11   Q.  Have you ever given any thought as to why a law-abiding

12   citizen would pull their shirt up when you roll into the

13   complex?

14        MS. FEATHERSTONE:  Objection, Your Honor, to the

15   form of question.

16        THE COURT:  Overruled.

17   Q.  Have you ever thought about that?  Why?

18   A.  I would guess that it's because they want to show that

19   they're not carrying any guns.

20   Q.  Well, let me ask you this, sir:  When you're like down

21   in the area of the courthouse, and you see somebody walking

22   by walking fast, maybe they've got a bulge in their pocket,

23   do you stop that person and ask him if they have a gun?

24   A.  It depends on what they're doing.

25   Q.  They're walking fast.

1    A.   Just walking fast by the courthouse?

2    Q.   Walking fast.

3    A.   I'm not sure I understand your question.

4    Q.   It's very simple.

5    A.   Somebody walking past with a bulge.

6    Q.   You don't know me -- say if you don't know me, and I'm

7    walking fast.  I've got a bulge in my pocket.  Are you going

8    to stop me?

9    A.   Am I wearing any type of uniform?

10   Q.   You're the police.

11   A.   A lot of times when I go to court I wear a suit.

12   Q.   You're a police officer.  My question is, if I'm walking

13   down the street, and I'm walking fast, and I've got a bulge

14   in my pocket, are you going to stop me?

15   A.   It all depends on -- every circumstance is different.

16   I'm not sure I really understand.

17   Q.   I'm not in the Forest Ridge complex.  I'm walking on

18   Constitution Avenue.  Are you going to stop me?

19   A.   It depends.

20   Q.   It depends.  You ask to speak with me, and I take off

21   running.  Are you going to run and chase me down?

22   A.   Yes.

23   Q.   Are you going to shoot me?  Are you going to shoot me?

24   A.   If you pose yourself as a direct threat to myself where

25   I'm in fear for my life and for the life of other people,

1   then --

2   Q.  I'm running with a cell phone.  It looks -- it's black.

3   Are you going to shoot me?  It's a simple question.

4   A.  If I know it's a cell phone, then -- but I'm still going

5   to chase you.  If I can see that it's a cell phone in your

6   hand, I'm not going to shoot you.

7   Q.  What have I done?  What have I done?

8   A.  You could have just stolen that cell phone.

9   Q.  Could have.  Do you have any facts about what I've done

10  wrong?

11  A.  But you're running.  I don't know what's going on.

12  Q.  Do you mean I can't run down Constitution Avenue just

13  because I don't want to talk to you?

14          MS. FEATHERSTONE:  Objection; argumentative, Your

15  Honor.

16          THE COURT:  Sustained.

17  Q.  Have you ever asked those people in those neighborhoods

18  that you go to and when you come in they start lifting up

19  their shirts, have you ever asked them why they do that?

20  A.  No.  Actually, for the most part, when they do that --

21  Q.  My question is, have you ever asked them why they do

22  that?

23  A.  No.

24  Q.  Does that happen a lot of times?  You see people pull

25  their shirts up when you come into their neighborhoods or

1    come into their complex?

2    A.  In certain areas, yes, it does.

3    Q.  It happens a lot, doesn't it?

4    A.  Yes, it does.  Certain areas, yes.

5    Q.  Specifically when you and your group come -- when you

6    arrive in their neighborhood.  Isn't that a fact?

7    A.  Certain areas that we patrol that tend to be plagued by

8    gun violence that we ride through a lot, you know, that's

9    usually where we see most of the time where people are

10   lifting up their shirts.

11   Q.  But when those people pull up their shirts, they don't

12   have any weapons, do they?

13   A.  Not necessarily.

14   Q.  Well, they're law-abiding citizens, right?

15        MS. FEATHERSTONE:  Objection, Your Honor.  This

16   has been asked and answered.

17        THE COURT:  Wrap it up, Mr. Ponds.

18   Q.  Are those people law-abiding citizens when they pull up

19   their shirts?

20   A.  When they pull up their shirts, they're not breaking the

21   law, but they could -- because, you know, a lot of times

22   we'll ask people "Do you have a gun?" and sometimes people

23   will lift up their shirts.

24        We'll look for other specific behavior, too.  It

25   could be a slight nervousness or kind of taking a few steps

1   back; or even if someone's lifting up their shirt, something

2   may seem off, and we may get out and try to talk to them.

3           And we've had people who lift up their shirts, and

4   we find guns in like a -- their jacket, like an upper breast

5   jacket pocket; or they'll do something where they'll lift up

6   their shirt, and if they're wearing a jacket, move their

7   jacket to the side like that, and you can kind of -- when

8   you watch that, you can see like sometimes a weighted object

9   in their jacket, and that would sort of make us wonder or go

10  out and question them more, where we see something else.

11  And sometimes it's been another gun where they just do the

12  lifting up of the shirt as a way to say, okay, if we just

13  lift up our shirt, then the gun unit is just going to move

14  on.

15          So we're still watching for other specific

16  behavior.

17  Q.   Now, sir, when you go in that neighborhood, you see law-

18  abiding citizens.  Do you see law-abiding citizens?

19  A.   Yes.

20  Q.   Do you see people walking and talking?  Particularly

21  what I'm talking about is the Forest Ridge apartment

22  complex.  You've seen law-abiding citizens there, right?

23  A.   Yes.

24  Q.   And you've seen some of the witnesses who've testified

25  here today in that complex?

```
1    A.  I can't recall if I've seen them.  I mean, I may have

2    seen them before, but I didn't -- when they were up here, I

3    didn't recall.

4    Q.  You don't recall?

5    A.  No.  I don't remember them specifically, no.

6    Q.  Did you ever take time to meet or introduce yourself to

7    Caroletta Inman when she lived in that complex?

8    A.  I did not know her, no.

9    Q.  Okay.  Did you ever take time to try to meet her

10   daughter and her family?

11             MS. FEATHERSTONE:  Objection; relevance, Your

12   Honor.

13             THE COURT:  Sustained.

14   Q.  Now, sir, on April the 26th, 2011, approximately at 2:20

15   p.m., did you, Officer Torres, Officer Katz, and Officer

16   Sheehan enter the gates of the complex of Forest Ridge

17   Apartments?

18   A.  Yes, we did.

19   Q.  Who was driving?

20   A.  I was driving.

21   Q.  Who was sitting in the front passenger seat?

22   A.  Seated in the front passenger seat was Officer Jordan

23   Katz.

24   Q.  And where was Officer Sheehan sitting?

25   A.  Officer Sheehan was seated directly behind Officer Katz.
```

1    Q.  And where was Officer Torres?

2    A.  Officer Torres was seated directly behind me.

3    Q.  Okay.  Was there any other GRU unit in that complex at

4    any point that your vehicle was in the complex?

5    A.  No, not to my knowledge.

6    Q.  Not to your knowledge.  Is that saying you don't recall?

7    A.  I'm saying to my knowledge, I think we were the only GRU

8    unit that was in that immediate area around Elvans Road.

9    There were other GRU units around, but we were the only

10   immediate ones.

11   Q.  Okay.  Have you ever seen a GRU unit or vehicle,

12   vehicles that are used by the GRU members, that's either

13   silver or like a light gray?

14   A.  Currently the vehicle that we have now is --

15   Q.  April 26, 2011.

16   A.  At that time, I don't remember.

17   Q.  You don't remember?

18   A.  No.

19   Q.  Have you ever ridden -- during that -- prior to that

20   date, had you ever driven a silver or light gray vehicle

21   used by GRU units?

22   A.  I don't know.  They tend to switch the cars up pretty

23   frequently.  We've had -- we were using the unmarked cars

24   until about 2008 so --

25   Q.  What do you mean, you don't know?

1    A.  I don't know if I -- I can't remember if I'd been in a

2    silver vehicle prior to April 26, 2011.

3    Q.  Now, sir, when you came into the complex, did you go all

4    the way down to where the basketball courts are?  The

5    basketball courts would be on the right if you go all the

6    way down.

7    A.  Correct.  I believe we drove past the basketball courts,

8    and then it kind of --

9    Q.  Did you make that left to go down to where the other

10   apartments are?

11   A.  I believe so, yes.

12   Q.  Okay.  And you went -- that's some distance.  That's

13   about, what, 30, 40 yards from the basketball court?

14   A.  I'm not sure.  Maybe.  Maybe.  It could be a little bit

15   longer.

16   Q.  It could be a little bit longer.

17   A.  It could be 50 yards.

18   Q.  And it's about at least 50 yards from the basketball to

19   the front of the gate?

20   A.  It's possible, yes.

21   Q.  So you went to those apartments that are all the way in

22   the back on the left.  Did you make any stop when you were

23   back there?

24   A.  No.

25   Q.  Did you have any contact with any citizens?

1    A.   All the way in the back, the way back of the apartment

2    complex?

3    Q.   Yes, sir.  Yes.

4    A.   No, not that I remember.

5    Q.   All right.  So you circled around and you came back.

6    Did you make a U-turn or come back around and begin to come

7    out the entrance?

8    A.   Yes.

9    Q.   All right.  While you were by the basketball court, did

10   you or any of the members of your group that day get out of

11   the vehicle?

12   A.   While we were by the basketball court?

13   Q.   Yes.

14   A.   We were just past the basketball court when we observed

15   Mr. Briscoe.

16   Q.   So you saw him all the way back where the basketball

17   court was?

18   A.   No.  I thought you were telling me as we were driving

19   out did I stop the car and did anybody get out.

20   Q.   The question is, when you were coming in, when you went

21   past the basketball court, did you stop?

22   A.   When we were coming in?

23   Q.   Yes.

24   A.   No, we didn't stop.

25   Q.   Did you stop once you made that left to go to the other

1    apartments in the back?  Did you stop?

2    A.  No.

3    Q.  Did you double-back around and begin to exit the

4    complex?

5    A.  Yes.

6    Q.  And was it on your way towards exiting the complex that

7    you first noticed Ralphael Briscoe?

8    A.  Yes, as we were approaching the gate.

9    Q.  As you were approaching the gate?

10   A.  Yes.

11   Q.  How close to the gate was he?

12   A.  He was some distance.  Maybe 30 yards from the gate.

13   Q.  Was he on that sidewalk where the last series of

14   apartments are, which would be on the right as you're

15   exiting the complex?

16   A.  Yes.  I'd say that was fair to say.

17   Q.  And he was talking on his cell phone?

18   A.  I don't remember if he was or not.

19   Q.  You don't remember whether he was or not.

20           Did anyone say anything to Ralphael Briscoe?  Did

21   any of the officers -- did any officer in the vehicle say

22   anything to Ralphael Briscoe?

23   A.  Yes.

24   Q.  Who said something?

25   A.  Officer Katz asked Mr. Briscoe, as he was walking away,

1    if he had any guns on him.

2    Q.  And what was his response?

3    A.  I don't remember him responding at all.

4    Q.  You don't remember him responding at all.  Did Officer

5    Katz have the window down?

6    A.  Yes.

7    Q.  And based on what you observed, Ralphael Briscoe

8    walking, had he committed any type of criminal offense when

9    you first noticed him?

10   A.  No.

11   Q.  After Officer Katz asked him that question -- well,

12   prior to Officer Katz asking him, Ralphael Briscoe, if he

13   had any guns on him, did you observe Mr. Briscoe do anything

14   illegal up to that point?

15   A.  No.

16   Q.  After Officer Katz asked him if he had any guns or a gun

17   on him, did you -- what did Mr. Briscoe do -- did Ralphael

18   Briscoe do at that point?

19   A.  He started walking faster, which I thought, at that

20   time, was suspicious.

21   Q.  Well, let me ask you this:  Are you -- is it -- are you

22   saying that there was something wrong with just walking fast

23   and not talking to the police?

24   A.  No.  I honestly don't think there's anything wrong with

25   walking fast and not talking to the police.  That's fine,

1    but --

2    Q.  So as he was walking away fast, you had not seen him do

3    anything that would involve criminal activity.

4    A.  No.  Just from my experience, it just seemed suspicious.

5    Once Officer Katz asked him about the gun, and then he kind

6    of quickened his pace, to me, at that time -- I felt like he

7    was about to run at that time.

8    Q.  All right.  Well, let me ask you this, sir:  Any time a

9    citizen does not respond to you, whether or not a citizen

10   has a gun and begins to walk away fast, are you going to

11   pursue that citizen?

12   A.  If they're just walking away?

13   Q.  Yes, if they're walking away fast.

14   A.  I may get out and ask them if I can -- if they're

15   walking away in such a manner, I may get out and try to make

16   contact with that individual.

17   Q.  Okay.  But a citizen can walk away from a contact.

18   A.  Of course.

19   Q.  A citizen can run away from a contact.

20   A.  Well, when you run, that's a little -- when you run away

21   from the police, that's a little bit more -- leads us to

22   believe that something else may be going on.  If you see the

23   police -- your average person necessarily isn't going to run

24   when they see the police, and that would lead us to believe

25   that maybe something else happened, and we would have to

1    pursue them to investigate why they may have been running,

2    what may have happened.

3    Q.  Well, sir, as to Ralphael Briscoe, did you ever consider

4    he just didn't want to talk to you guys?  Did you ever

5    consider that?

6    A.  I don't know.  I don't know what he was thinking.

7    Q.  Well, my question is, did you ever consider it?

8    A.  I mean, at the time when he took off running, he was

9    grabbing his waistband, and at that time I thought he had a

10   gun.

11   Q.  Well, let me ask you this, sir:  Have you ever

12   considered, when he ran away, maybe he just didn't want to

13   be seen with you?  Did you ever think about that?

14   A.  I don't know what he was thinking.

15   Q.  Well, the question is, did you ever think about it, when

16   you were in that parking lot that day, that maybe he just

17   didn't want to be seen talking to you guys?

18   A.  Everything happened very fast.  So when he started

19   walking away, and when he started running, then Officer Katz

20   and Officer Sheehan got out of the car, I was not thinking

21   that maybe he just didn't want to be seen with us.  I was

22   thinking that he was running for a specific purpose.

23          And then when I saw him grabbing his waistband,

24   that's when I thought that he may have been -- that he may

25   have had a gun in his waistband.

1    Q.  Now, Officer Katz, this contact that Officer -- sorry,

2    Mr. Leo, the contact that Officer Katz made with Ralphael

3    Briscoe was in that same complex where people yell out

4    "jump-outs" when you guys come in, right?

5    A.  That's correct.

6    Q.  And it's your impression that's not said to be a

7    favorable term to the police.  Would you agree?

8    A.  It's just a phrase or terminology that they use to

9    describe us.  I don't take any offense to it.

10   Q.  Okay.  Did you ever consider, given those factors,

11   that's why Ralphael Briscoe wanted to get away from you

12   rather than maybe --

13           MS. FEATHERSTONE:  Objection.  Objection.

14           THE COURT:  Overruled.

15           MS. FEATHERSTONE:  Asked and answered.

16           THE COURT:  Overruled.

17   Q.  Did you ever think about that?

18   A.  Like I said, my thought process, as soon as he started

19   running away, was that he may have had a gun in his

20   waistband at that time.

21   Q.  All right.  So you were thinking the worst?

22   A.  I was thinking that he was just asked a specific

23   question, if he had a gun on him, and then his response was

24   to run.

25   Q.  Okay.

1   A.  And that led me to believe that -- because he started

2   running and grabbing his waistband, that led me to believe

3   that he had a gun in his waistband.

4   Q.  Now, back in -- you never saw the cell phone.  Is that

5   what you're telling us?

6   A.  I don't remember seeing the cell phone.

7   Q.  You don't remember.  You just don't recall, would you

8   agree with that?

9   A.  A lot of things happened that day, and there's -- I

10  don't recall seeing the cell phone.

11  Q.  So everything happened fast, you would agree?

12  A.  Correct.

13  Q.  Sir, back in 2011, in these neighborhoods that you would

14  patrol, did you ever notice that these kids would wear these

15  pants that were kind of like hanging way below their waist,

16  and the pants were -- you noticed that?

17  A.  Yes.

18  Q.  A lot of them wore that, right?

19  A.  Yes.

20  Q.  It was a stupid look, but they wore it, right?

21  A.  Yes.  I mean, I'm not a fashion consultant, so I don't

22  have any --

23  Q.  But you noticed it, right?

24  A.  Correct.

25  Q.  Now, once Ralphael began to run away, did Officer Katz

1   and Officer Sheehan immediately jump out of the vehicle?

2   A.   Yes.  Once he started running, Officer Katz and Officer

3   Sheehan got out of the car.

4   Q.   And they didn't tell you what they were going to do,

5   right?

6   A.   I knew what they were going to do because Mr. Briscoe

7   was running, and I knew that they were going to follow

8   Mr. Briscoe on foot.

9   Q.   Because that's what you guys do, isn't it?  When

10  somebody begins to run, regardless of what has happened, you

11  take after them, right?

12  A.   Look, again, it depends on the circumstances so --

13  Q.   Well, that's -- my question is this:  As soon as he took

14  off running, as you stated, you knew what they were going to

15  do.

16  A.   Yes.

17  Q.   Is that what you said?

18  A.   I knew they were going to pursue him on foot, yes.

19  Q.   Right.  Because what the four of you do is, if somebody

20  runs away from you, regardless of the facts, you're going to

21  chase them, right?

22  A.   I wouldn't say regardless of the facts.  Again, you've

23  got to look at the whole totality of the situation.

24  Q.   He's just running from you.  That's the totality.  He

25  doesn't want to talk to you, doesn't want to -- he wants to

1    get away from you.

2             MS. FEATHERSTONE:  Objection; argumentative, Your

3    Honor.

4             THE COURT:  Sustained.

5    Q.  But you knew what they were going to do.

6    A.  I knew they were going to pursue him on foot, yes.

7    Q.  Right.  And they didn't even have to communicate it to

8    you, right?

9    A.  Fortunately, that's one of the -- when you work with

10   somebody for a long time, sometimes you can -- you don't

11   have to communicate certain things.  You know what each

12   other's going to do and what actions the other person's

13   going to take without actually having to communicate it

14   directly.

15   Q.  And it also helps that you're friends, too, right?

16   A.  That had nothing to do with it at that time.

17   Q.  It doesn't have anything to do with anything?

18   A.  No.  At the time -- this is work.  This is what we're

19   doing.  We're going out there.  We're trying to get illegal

20   guns off the street.  This is work.  It has nothing to do

21   with being friends.

22   Q.  Okay.  So neither one of them said anything after

23   Officer Katz asked Ralphael if he had a gun, and Ralphael

24   started running?

25   A.  Can you repeat that question again?

1   Q.  No one else said anything once Officer Katz asked

2   Ralphael whether or not he had a gun?

3   A.  I just remember Officer Katz asking if he had the gun.

4   Q.  And then Officer Katz and Officer Sheehan took off

5   running?

6   A.  He quickened his pace, and then they got out of the car,

7   and he took off running.

8   Q.  And it wasn't Officer Sheehan who asked Ralphael Briscoe

9   if he had a gun?

10  A.  I don't remember -- I remember Officer Katz asking if he

11  had the gun.

12  Q.  You don't remember anything about Sheehan asking

13  Ralphael Briscoe?

14  A.  No.

15  Q.  Okay.  Now, at some point after Officer Katz and --

16  well, let me ask you this:  You said you saw Ralphael

17  pulling up his pants.  He was doing it with his right hand?

18          MS. FEATHERSTONE:  Objection to the form of

19  question, Your Honor.

20          MR. PONDS:  Well, I'll rephrase the question.

21  Q.  Did you see Ralphael pulling up his pants?

22  A.  I saw him grabbing his right waistband area.  I

23  didn't --

24  Q.  Like this?  You saw him grab -- you said he was grabbing

25  his waistband area?

```
1    A.   Yes.

2    Q.   Is that what you said?

3    A.   That's correct.

4    Q.   Do you see my thumb?

5    A.   I can't see your thumb because it's in your belt.

6    Q.   Is it inside my waistband?

7    A.   Yes.

8    Q.   So when Ralphael's hand was in his waistband, you

9    couldn't see what was in his hand.

10   A.   Not initially, no.

11   Q.   Okay.  You don't know if there was a cell phone or maybe

12   something else in his hand, right?

13   A.   In his right hand?

14   Q.   Yes, in his right hand, when he had his hand in his

15   waistband.

16   A.   Well, I was behind him initially, so all I could see was

17   that his right hand was moving around his right front

18   waistband area, and that's what I was -- I was focused on

19   that.

20   Q.   All right.  Now, sir, at some point you -- after Officer

21   Katz and Officer Sheehan got out of the vehicle, you pursued

22   Ralphael in the black SUV.

23   A.   That's correct.

24   Q.   Did you turn on your sirens?

25   A.   I don't remember if I did or not.
```

1    Q.  You don't remember.  That black SUV is equipped with a

2    siren?

3    A.  It's equipped with lights and sirens.

4    Q.  Lights and sirens.

5           Talking about lights, did you turn on those kind

6    of police emergency lights?

7    A.  I don't remember if I did or not.

8    Q.  You don't remember if you did or you did not.

9           Sir, did you issue any verbal commands to Ralphael

10   Briscoe?

11   A.  I don't think so.

12   Q.  And a verbal command would be "Stop, police"?

13   A.  That would be one of them, yes.

14   Q.  And you didn't do that?

15   A.  No.  Like I said, everything happened fast, and I was

16   focused on what he was doing with his right side.

17   Q.  All right.  And is there a general order that covers

18   when you pursue someone in a vehicle?

19           MS. FEATHERSTONE:  Objection, Your Honor.  May we

20   approach?

21           THE COURT:  Sure.

22           (The following is a conference held at the

23            bench outside the hearing of the jury)

24           MS. FEATHERSTONE:  Your Honor, plaintiff is going

25   down the line of questioning regarding the use of general

```
1    orders.

2              THE COURT:  Right.

3              MS. FEATHERSTONE:  It only goes to the negligence

4    claim.

5              THE COURT:  Understood.

6              MS. FEATHERSTONE:  So is the Court going to

7    instruct the jury now on that issue?

8              THE COURT:  I was planning on instructing at the

9    break and then reiterating the instruction --

10             MS. FEATHERSTONE:  Okay.

11             THE COURT:  -- in the instructions, in the final

12   instructions.

13             MR. DeBERARDINIS:  The Court should tell him --

14   the Court should tell them now that the general order

15   evidence is only going towards the negligence.

16             THE COURT:  Why don't you ask the question first,

17   and then the answer, and I'll do the instruction.

18             MS. FEATHERSTONE:  Okay.  Thank you, Your Honor.

19             (This is the end of the bench conference)

20   BY MR. PONDS:

21   Q.  Officer Leo, is there a general order that covers when

22   there is a vehicle pursuit of a person on foot?

23   A.  I'm sure there is, but I don't know the general order

24   verbatim.

25   Q.  You don't know the word verbatim.  Do you know --
```

1    A.  Did you say I don't know the word "verbatim"?

2    Q.  Is that what you're saying?  You don't know word by

3    word -- by word -- it's been a long day -- verbatim.  That's

4    the --

5    A.  Correct.  Unless, you know, you want to give me a copy

6    of the general order, I can take a look at it, but I don't

7    know it verbatim.

8    Q.  But as a Metropolitan police officer, you're supposed to

9    know all your general orders?

10   A.  Like I said, there's almost 1,000.

11   Q.  Would you agree with that?

12   A.  There are almost 1,000 general orders.  It would be

13   nearly impossible to know every single general order.

14   Q.  Did you ever pick up the phone and call Chief Lanier and

15   say, "Chief Lanier, there are too many general orders for me

16   to remember"?  I mean, you're required to know your general

17   orders, right?

18   A.  Correct.

19   Q.  And you don't remember which one that covers, that when

20   a police officer is using an official vehicle to pursue a

21   suspect -- I mean, pursue -- to pursue a person.  Do you

22   know what that general order is?

23   A.  I don't know if it actually has something specific if

24   you're pursuing somebody on foot or if it's related to more

25   of like when you're conducting a traffic stop or if a

1    vehicle takes off and those types of instances, but I don't

2    remember anything specifically actually stating somebody

3    pursuing on foot.

4    Q.  But you do believe it exists?

5    A.  It may.  Again, there's a lot to go over, but, you know,

6    if it says that if you're pursuing somebody on foot and

7    you're supposed to have your lights and sirens on, I don't

8    know.

9         I don't recall if I did; but if it says that

10   you're supposed to have your lights and sirens on, then

11   okay.

12   Q.  Now --

13        THE COURT:  Mr. Ponds, let me cut you off and

14   instruct the jury.

15        I will remind you all of this before I instruct

16   you prior to your deliberations, but you've heard some

17   testimony, and I suspect you're going to hear a lot more,

18   regarding general orders and other rules and regulations of

19   the police department.  As I explained at the outset of the

20   case, Ms. Lane has brought a variety of legal claims in the

21   case.  One of those claims is for negligence, and I think

22   I've explained to you before that some evidence is

23   admissible for one reason but may not be admissible for

24   another reason, and this is another example.

25        So evidence regarding Officer Leo or other

1    officers' compliance with general orders or other

2    regulations is admissible with respect to Ms. Lane's

3    negligence claim only.  It is not admissible, and you shall

4    not consider it for -- in connection with her constitutional

5    claim or her other claims for false arrest, negligent

6    infliction of emotional distress, and any other claims in

7    the case.

8             And I will remind you of that during final

9    deliberations, but I wanted to stress that now since we're

10   starting to get into testimony regarding general orders and

11   other rules and regulations.  Okay?

12   Q.  Now, Officer Leo, after the fatal shooting of Ralphael

13   Briscoe on April the 26th, 2011, did you ever go and look at

14   your general orders to see if you had violated any of those

15   general orders as a result of your conduct on April the

16   26th, 2011?

17   A.  I may have.  Our department did a complete

18   investigation, and if it was determined that I violated any

19   general order --

20   Q.  Sir, my question is, did you look -- just listen to my

21   question very closely.

22   A.  Okay.

23   Q.  After the fatal shooting of Ralphael Briscoe on April

24   the 26th, 2011, did you ever pull out your general orders to

25   see if you had violated any of the general orders that day?

```
 1              MS. FEATHERSTONE:  Objection, Your Honor.

 2              THE COURT:  What's your objection?

 3              MS. FEATHERSTONE:  I'm sorry.  Did you say what's

 4      the basis?

 5              THE COURT:  What's the basis?

 6              MS. FEATHERSTONE:  It's not relevant, Your Honor,

 7      and I believe it goes to the Court's prior ruling.

 8              MR. PONDS:  I can tie it up, Judge.

 9              THE COURT:  Okay.  Overruled.

10      Q.  Did you do that?

11      A.  I don't make the determination if I violated a general

12      order.  That's not my -- that's above my pay grade.

13      Q.  Were you curious as to whether or not -- you weren't

14      even interested to find out whether you did anything wrong

15      on your own, do your own research --

16              MS. FEATHERSTONE:  Objection; argumentative, Your

17      Honor.

18      Q.  -- in terms of general orders?

19              THE COURT:  Sustained.

20      Q.  Well, sir, remember you took a deposition under oath --

21      A.  Correct.

22      Q.  -- back in February?

23      A.  2014.

24      Q.  February 19, 2014.

25      A.  Correct.
```

1    Q.  And you didn't know the general order at that point,

2    remember?

3    A.  Again, it was -- I believe the question was specific

4    towards the general order toward I think pursuing somebody

5    on foot, and I don't know what the general order

6    specifically says when you're in a police vehicle and you're

7    pursuing somebody on foot.  I don't know the specific

8    verbiage of that.

9    Q.  And since February 19, 2014, when you were --

10        MS. FEATHERSTONE:  Objection; relevance, Your

11   Honor.

12        THE COURT:  Tie it up.

13        MR. PONDS:  I will.

14   Q.  You didn't know what it was -- what the general order

15   was on February the 19th, 2014?

16   A.  I didn't know what the specific verbiage was, and also I

17   didn't know if I had my lights or sirens on at the time.

18   Q.  And you haven't looked since February the 19th up

19   until -- 2014 up to the present day?

20        MS. FEATHERSTONE:  Objection; relevance, Your

21   Honor.

22        THE COURT:  Please approach.

23        (The following is a conference held at the

24         bench outside the hearing of the jury)

25        THE COURT:  Okay.

1          MS. FEATHERSTONE:  The only relevance to the

2     general orders has to do with whether -- the general orders

3     that were in place on April 26, 2011, whether he had

4     knowledge of them and whether he violated them.  The fact of

5     whether he knows about them today is irrelevant, and he's

6     making it seem like he should have gone back and learned

7     about the general orders.

8          The question is whether or not on April 26th, Your

9     Honor, 2011, if Mr. Briscoe -- I'm sorry, Officer Leo

10    violated a general order that was in place at that time.

11         THE COURT:  That seems right to me, Mr. Ponds.

12         MR. PONDS:  The relevance, number one, is that as

13    a Metropolitan Police Department officer he has a duty to

14    know his general orders.  That's number one.

15         THE COURT:  He has a duty to comply with them,

16    right?

17         MR. PONDS:  Yes, but he has to know them in order

18    to comply.

19         THE COURT:  Not necessarily.

20         MR. PONDS:  My second position on it is that it

21    goes to the questions of whether or not he deviated from

22    those general orders, and I should be allowed to ask him

23    those questions because it is relevant.

24         THE COURT:  Okay.  And you can ask him at the time

25    was he aware of the general order.

1          MR. PONDS:  Okay.  I think he's already answered

2     that question.  There are some other ones that I'll ask him,

3     and I'll pose it that way.

4          THE COURT:  Okay.

5          (This is the end of the bench conference)

6     BY MR. PONDS:

7     Q.  Officer Leo, were you aware that there was a general

8     order that existed on April the 26th, 2011, that

9     specifically addressed the issue of officers pursuing --

10    officers in a vehicle pursuing a person on foot?

11    A.  Am I aware that there is one?

12    Q.  Yes.  Back on April the 26th, 2011, were you aware?

13    A.  There could be.  Again, I don't know the specifics of

14    the general order at the time.

15    Q.  Well, were you aware back on April the 26th, 2011, that

16    there was a general order that set guidelines in terms of

17    using your emergency lights?

18    A.  I know there's general orders on using your emergency

19    lights and things to that effect.  I'm aware of that.

20    Q.  And you were aware of that back on April the 26th, 2011?

21    A.  Yes.

22    Q.  And were you also aware in terms of a general order that

23    involved using your siren when pursuing a person in your

24    vehicle?

25    A.  There could be.  I'm not -- I don't have the general

1    orders in front of me.

2    Q.  Well, the question is, were you aware of that back on

3    April the 26th, 2011?

4    A.  There could be.  Everything happened so fast.  I

5    don't -- I don't -- on that day.  I wasn't thinking of

6    specific general orders at the time.  I was trying to react

7    and trying to do my job on that day.

8    Q.  Everything happened fast?

9    A.  Correct.

10   Q.  And you were just trying to react?

11   A.  I was trying to do my job.

12   Q.  Didn't you just say you were trying to react?

13   A.  I was trying to do my job.  If I said -- I was trying to

14   react to the situation as far as seeing Mr. Briscoe and

15   seeing him run holding his waistband.

16          Should I go further?

17   Q.  No.  I think you've answered the question.

18          While you were pursuing Ralphael in that black

19   SUV, did Officer Torres say anything to you?

20   A.  No.  I remember saying something to Officer Torres,

21   though, while in the car.

22   Q.  Now, sir, was the front passenger window down?

23   A.  Yes, it was.

24   Q.  Do you know whether or not the back passenger window

25   that was behind the front passenger seat, whether or not

1    that window was open?

2    A.   I don't remember if it was or not.

3    Q.   You don't remember?

4    A.   No.

5    Q.   Now, at some point, as you're pursuing Ralphael on Evans

6    Road --

7    A.   Elvans Road.

8    Q.   -- Elvans Road, when Ralphael came out of the complex,

9    he made a left and ran across the street?

10   A.   Correct.

11   Q.   And he was on the opposite side of the apartment

12   complex?

13   A.   Correct.

14   Q.   And as he was running down that sidewalk, did you have a

15   chance to observe him?

16   A.   Yes.  I observed -- I had a visual on him as soon as he

17   started running, and then I saw him holding his waistband.

18   When he ran outside the gate, he made sort of a -- started

19   turning left, and at that point I saw him pull his right

20   hand out of his waistband, and I saw the gun in his right

21   hand, and I said -- I yelled out to Officer Torres, "He's

22   got a gun.  It's in his right hand.  He's got a gun.  It's

23   in his right hand."

24   Q.   Well, let me ask you this question, sir:  When did you

25   see this -- you allegedly saw him with a gun?

1          MS. FEATHERSTONE:  Objection.

2     Q.  Was he across the street?

3          MS. FEATHERSTONE:  Objection, Your Honor, to the

4     form of that question.

5          THE COURT:  Rephrase it.

6          MR. PONDS:  Yes, sir.

7     Q.  You've testified that you saw Ralphael with a gun at

8     some point.

9     A.  Yes.

10    Q.  When did you first see him pull this gun out of his

11    waistband?

12    A.  As soon as he was exiting out of the apartment complex,

13    he made a slight left turn, which was sort of -- basically

14    at that time I was coming out of the complex, and so he was

15    in front of the vehicle.  And as he was making that left

16    turn in front of my vehicle, that's when I saw him with the

17    gun.  As he was making that left turn, I saw -- both arms

18    were pumping, like a runner's pump, and I saw the gun in his

19    right hand.

20    Q.  So what you're saying is you saw his hands going up and

21    down?

22    A.  Yes, in a runner's pumping motion, up and down.

23    Q.  He was running like a sprinter.

24    A.  Correct.

25    Q.  He was running really fast?

```
1    A.  Yes.

2    Q.  Because you've seen the videotape?

3    A.  Yes, I have.

4    Q.  You've seen it numerous times?

5    A.  Yes.

6    Q.  When Ralphael was on Evans Road --

7    A.  Elvans.

8    Q.  -- Elvans, I'm sorry, did he ever point anything at you

9    prior to getting to the driveway?

10   A.  No.

11   Q.  Prior to the driveway?

12   A.  No.

13   Q.  Now, at some point you became even right when Ralphael

14   got to the driveway.  Your car drew parallel with him?

15   A.  Yes.

16   Q.  Do you remember Ralphael trying to make that -- as he

17   was running fast, he was attempting to make that hard right

18   into the driveway.  Remember seeing that on the video?

19   A.  It's hard to say what he's doing.  There is a point in

20   that video where I observed him make a quick motion with his

21   upper body and turn towards myself and Officer Torres in the

22   vehicle.

23   Q.  Okay.  We'll get to that.  On the video, do you see him

24   make that hard right to get into the driveway?

25   A.  It may --
```

1    Q.  Either you see it or you don't.

2    A.  It may.  I don't have the video in front of me, but I --

3    Q.  Well, you've seen the video before.

4    A.  I have, but it didn't appear that he was making a sharp

5    right turn.

6    Q.  Oh, it doesn't appear on the video that he's making this

7    sharp right turn, and he's losing his balance in his right

8    hand --

9          MS. FEATHERSTONE:  Objection.  Is he testifying,

10   Your Honor?

11         THE COURT:  Sustained.

12   Q.  Well, sir, why don't you tell me what you believe the

13   tape shows.  Tell us what the videotape shows.

14   A.  The videotape is from an angle down the street.  The

15   videotape shows him running.  When you slow it down, there's

16   a point in the video where you can see him with the gun in

17   his right hand.  As he continues to run, when you slow it

18   down, you can still see him with the gun in his right hand.

19         When he gets to the driveway, it's very quick, and

20   it's kind of when he takes a step out with his left foot and

21   he makes a quick motion with his body turning towards the

22   vehicle with the gun still in his hand, and that's the point

23   where I fired.

24   Q.  Okay.  So are you telling us that based on what's in the

25   videotape, when Ralphael's at that driveway, you can see the

1    gun in his hand on the video?  Is that what you're saying?

2    A.  When you slow it down --

3    Q.  I'm talking about at the driveway.

4    A.  At the driveway?

5    Q.  Yes, sir.  That's where he gets shot.

6    A.  I don't know if the video actually directly shows him,

7    but I can tell you my view at the time.

8    Q.  Sir, my question is very specific.

9    A.  Okay.

10   Q.  In terms of what's on the video -- and all my questions

11   will be based on the video.  When you draw a parallel with

12   Ralphael at that driveway, does the video depict a gun or a

13   BB gun in his right hand?

14   A.  At the driveway?

15   Q.  Yes, at the driveway?

16   A.  The video is such a far angle at that time --

17   Q.  My question is, does it --

18   A.  I understand you want to -- you want to use the basis of

19   your question from the video, but I'm also --

20   Q.  That's what my question's about.  It's from the video.

21   My question's very simple.

22           When he's at the driveway, seconds before he's

23   shot, do you see on that video a gun in his right hand?

24   A.  From the video, I think it's hard to see if there is

25   one.  But from my view point inside the car on that day --

1  Q.  My question is specific to the video, sir.

2          MS. FEATHERSTONE:  Asked and answered, Your Honor.

3          MR. PONDS:  He has not fully answered the

4  question, Your Honor.

5          THE COURT:  Overruled.

6  Q.  My question, for the second time, Officer Leo, is

7  specifically to the video.  When he's at the driveway, and

8  you pull parallel to him, on the video do you see a gun,

9  that BB gun, in Ralphael's right hand?

10  A.  Again, when you slow it down -- and it's been a while

11  since I've seen the video, but when you slow it down, and

12  there's an enhanced version, I don't remember if at that --

13  if the angle that the video has or the camera has, if you

14  can still see the gun in his hand.

15          But my --

16  Q.  My question is, once again --

17  A.  I answered your question.  I said I don't know if it

18  does.

19  Q.  You don't know if the video does.  And you know, sir,

20  that you've been named as a defendant in this case.

21  A.  Yes.  I'm well aware of that.

22  Q.  And you know the video is a very important piece of

23  evidence?

24          MS. FEATHERSTONE:  Objection, Your Honor.

25          THE COURT:  Sustained.

 1    Q.  Well, sir, as a police officer, you know what forensic

 2    evidence is, don't you?

 3    A.  Yes.  I'm not an expert, but I --

 4    Q.  You know what it is?

 5    A.  Yes.

 6    Q.  The videotape's forensic evidence?

 7    A.  Correct.

 8    Q.  Like fingerprints are forensic evidence?

 9    A.  Yes.

10    Q.  Talking about the video, you've seen that video going

11    back to February of 2012, now almost two years.

12    A.  The first time I saw the video?

13    Q.  Right.

14    A.  Correct.

15    Q.  Because do you remember -- and we'll get back to

16    February of 2012.  Do you remember, after Ralphael was shot,

17    that some officers from the Force Investigative Team arrived

18    on the scene to interview you?

19    A.  Yes, I do.

20    Q.  And you were aware that you had to provide them with

21    truthful information about the shooting?

22    A.  Yes.

23    Q.  And you knew that prior to speaking with the sergeant

24    and detective in charge of the investigation?

25             MS. FEATHERSTONE:  Objection.

```
1              THE COURT:  Basis?

2              MS. FEATHERSTONE:  This is improper impeachment,

3    Your Honor.  He hasn't said he didn't know something.

4              MR. PONDS:  It's not impeachment.

5              THE COURT:  It's not impeachment.  Overruled.

6              MS. FEATHERSTONE:  Thank you.

7    Q.  Now, you knew that, right?

8    A.  Yes.

9    Q.  Okay.  And who was present during the interview?  Who

10   was present during your interview on April the 26th, 2011,

11   when you were being questioned by the sergeant and the

12   detective from the Force Investigative Team?

13             MS. FEATHERSTONE:  Objection, Your Honor;

14   relevance.

15             THE COURT:  Overruled.

16   Q.  Who was present?

17   A.  It was Sergeant Gilgeous and Detective Rahman and also

18   Robert Ades.

19   Q.  Robert Ades.  Now, Robert Ades was an attorney.  He's

20   passed away.

21   A.  Correct.

22   Q.  And he was present during your interview?

23   A.  Yes.

24   Q.  Did he participate during the interview?

25   A.  I think he helped clarify some of the questions, so I
```

1   guess you can call that participation.

2   Q.  And, in fact, you gave them -- you gave the officers

3   a -- they took that -- they took -- well, that evening they

4   took an audio statement from you, correct?

5   A.  That's correct.

6   Q.  And you later have seen that audio statement transcribed

7   into a written document?

8   A.  Correct.

9   Q.  And you've had a chance to review that document as being

10  accurate, correct?

11  A.  Correct.

12  Q.  And you've been able to review that transcription of

13  your statement that you gave to the Force Investigative Team

14  investigators?

15  A.  Yes.

16  Q.  If I showed you a copy of that document, would you

17  recognize it?

18  A.  Yes, I will.

19          MR. PONDS:  I'm going to label this just for

20  identification purposes as L1.  I'll label this as

21  Plaintiff's Exhibit L1.

22          If I could approach, Your Honor?

23          THE COURT:  You may.

24  Q.  Officer Leo, if you could just look at -- let me just

25  get you a clean copy.

1            MR. PONDS:  Could I get a clean copy?

2     Q.  Sir, I'm going to show you what has been marked for

3     identification purposes only at this time as L1.  Can you

4     look through this and then look at the last page to see if

5     you recognize -- number one, to see if this is your

6     statement, see if you recognize the signature on the back.

7     Last page, on the back.  Sorry.

8     A.  (Witness reviews document) It seems to be my statement.

9     Q.  Is it accurate and correct, sir?

10    A.  Yes, as far as I know.

11    Q.  Well, do you have any reason to believe that it's been

12    altered in any way?

13    A.  Not at this time, no.

14    Q.  Okay.  Now, sir, they wanted -- when you gave that

15    statement to the FIT investigative team, they were trying to

16    find out what had happened.

17    A.  Correct.

18    Q.  And this interview occurred about two hours after the

19    shooting.  If you can look at the last page, approximately

20    two hours --

21    A.  The last page has my signature.

22    Q.  The second-to-last page.

23    A.  Yes, where they conclude the statement.

24    Q.  So it was about two hours?

25    A.  Correct.

1     Q.  All right.  And, in fact, you got to speak with the

2     investigating officers off -- not off the record, but it

3     was -- when you first spoke to them explaining to them what

4     had occurred, your first conversation with them was not

5     video -- I mean, audiotaped that day.

6     A.  Are you referring to the walk-through?

7     Q.  Yes, the walk-through.

8     A.  Yes.

9     Q.  Okay.  Because you walked through, and you kind of gave

10    them an indication of what had occurred?

11    A.  A lot of times they want to come on the scene, and they

12    want to do just a brief walk-through of the scene as far as

13    where you were, where other people were, and just kind of

14    get a visual as far as where everybody was and where the

15    events took place just to help them think about -- when

16    they're performing the questions, conducting the interview.

17    Q.  And they were trying to make you as comfortable as

18    possible?

19    A.  I don't know if that was one of their intentions or not.

20    I wasn't aware of that.

21    Q.  All right.  Well, did anybody try to coerce you or place

22    you under duress?

23    A.  No.

24    Q.  Okay.  You gave the statement voluntarily?

25    A.  Yes.

1    Q.  And was Mr. Ades there present throughout --

2              MS. FEATHERSTONE:  Objection, Your Honor.  May we

3    approach?

4              (The following is a conference held at the

5               bench outside the hearing of the jury)

6              THE COURT:  Mr. Ades is the lawyer.

7              MS. FEATHERSTONE:  He's the union lawyer, and I

8    feel like the plaintiff is trying to plant a seed that he

9    has somehow had a criminal attorney there with him in case

10   there were some criminal charges filed.  He was aware of the

11   issue.  Mr. Ades was the union attorney, and he came on the

12   scene with the police, and he was there as a union member.

13             The Court had stricken previous testimony or not

14   allowed us to discuss --

15             THE COURT:  About him not answering before his

16   lawyer got there.

17             MS. FEATHERSTONE:  Right.

18             MR. PONDS:  The lawyer participated in the

19   interview.  The lawyer -- the investigator had asked

20   questions, and the lawyer would interject, pose the question

21   to the client, and the client would answer the question.  So

22   it is relevant because he posed the question.

23             THE COURT:  They're his statements.

24             MR. PONDS:  Pardon?

25             THE COURT:  They're his statements.

1          MR. PONDS:  Right, but he provided the answers to

2     the lawyer's question.  That's essentially what happened,

3     was that the investigator would pose a question, the lawyer

4     would then call -- rephrase the question, and then Leo would

5     answer the question.  I mean, that's --

6          THE COURT:  I think that's fair.

7          MS. FEATHERSTONE:  Your Honor, we should be able

8     to, on cross-examination of Officer Leo, ask him whether or

9     not Mr. Ades -- what type of lawyer he was for him.

10          THE COURT:  Sure.

11          MS. FEATHERSTONE:  Okay.

12          THE COURT:  You're welcome to go over that.

13          Now, this is his statement?

14          MR. PONDS:  Yes, sir.

15          THE COURT:  What are we doing with this?

16          MR. PONDS:  I'm going to question from it.  It's

17     not -- that's why I only marked it for identification.

18          THE COURT:  Okay.  Because that's not on your

19     witness list.

20          MR. PONDS:  No; you know, possible impeachment,

21     but more to refresh his recollection this time.

22          THE COURT:  What's your position on that?

23          MS. FEATHERSTONE:  It's his statement.  It's a

24     party statement, yes.

25          THE COURT:  But it's not coming in.

1          MR. PONDS:  No.

2          MS. WEST:  What we do, Your Honor, is we mark it

3     for identification only.  It says "ID Only" at the bottom.

4     That kind of tells you whether it comes in or not.

5          THE COURT:  Okay.  How much longer do we have?  Is

6     there a break point?

7          MR. PONDS:  I would say I probably have about 45

8     minutes to an hour, and I wanted to see what time did the

9     Court want to break?

10          THE COURT:  I'd like to break close to 5:00.  I've

11     committed to the jury.

12          MR. PONDS:  What I'll do -- pardon?

13          THE COURT:  Is now a good time, or do you have a

14     few questions on this interview?

15          MR. PONDS:  No, this would be a good time because

16     I'm about to get into his statement.

17          THE COURT:  Okay.  Why don't we break for the day.

18          MR. PONDS:  Yes, sir.

19          THE COURT:  Okay.  While we're here, I would

20     normally instruct a witness whose testimony is going to go

21     over to the next day not to discuss his testimony with

22     anyone.

23          MR. PONDS:  Uh-huh.

24          THE COURT:  Does that apply to a defendant?

25          MS. FEATHERSTONE:  We would say no, Your Honor.

1          THE COURT:  Huh?

2          MS. FEATHERSTONE:  We would say no.  He's our

3    client.

4          THE COURT:  Is there a law on that, or is that

5    within my discretion?  They can meet with their client,

6    obviously, if he's a defendant in a case.

7          MR. PONDS:  I don't think, Judge, that any

8    witness, even particularly when the witness is a client, can

9    talk to his attorney when he's in the process of being

10   examined.  Particularly --

11         THE COURT:  Let's let the jury go, and then we

12   can -- let's let the jury go, and we'll bring that up.

13   Okay?

14         (This is the end of the bench conference)

15         THE COURT:  Okay.  Ladies and gentlemen, I

16   promised you to try to end by -- as close to 5:00 as we can,

17   so we're going to try to hold that promise today, and we're

18   going to dismiss you for the evening.

19         Please leave your notebooks on your chair, please

20   do not talk about the case, and please don't do any research

21   about the case.  And we will see you all at 9:15 in the

22   morning.

23         (Jury exits courtroom)

24         THE COURT:  Okay.  Mr. Leo, you can return to

25   defense table.

```
1                THE WITNESS:  Thank you, Your Honor.

2                THE COURT:  Okay.

3                Okay.  We're going to need a few minutes to

4    consider the issue we just raised at the bench.  Who do we

5    have tomorrow?  We have -- obviously Officer Leo will

6    resume.

7                MR. PONDS:  Officer Leo, the expert James E.

8    Bradley, and Detective Rahman is going to be a rebuttal

9    witness, and Todd Korson, we'd ask, to be available, Officer

10   Todd Korson.

11               THE COURT:  Hold on.  I know we've discussed him.

12   My memory --

13               MR. PONDS:  He was a brief witness, Your Honor.

14   He was the officer who rode with Mr. Briscoe to the

15   hospital, and one of the things that Mr. Briscoe told him,

16   he asked him if he was going to die.

17               THE COURT:  Okay.  This goes to your damages?

18               MR. PONDS:  It goes to damages, and I believe it

19   also goes to the false arrest aspect of the case.

20               THE COURT:  Okay.  And we will discuss your

21   proffer in the morning --

22               MR. PONDS:  Yes, sir.

23               THE COURT:  -- before Officer Leo resumes.

24               MR. PONDS:  Yes, sir.

25               THE COURT:  Anything else we need to deal with?
```

1          MR. PONDS:  One other issue, Your Honor, as to the

2     autopsy report.  We have the autopsy records.  They're

3     certified business records.  They've been certified by the

4     office of -- the chief examiner's office.

5          And I know the Court's ruling.  The Court ruled

6     that the report could not come in; however, the page that

7     contains essentially the exhibit of the body, that indicates

8     the entry wounds and exit wounds --

9          THE COURT:  If I recall, there was a 403 objection

10    to the entire report coming in --

11         MR. PONDS:  That is correct.

12         THE COURT:  -- which I provisionally sustained,

13    and I said I would let in -- I believe there were two pages

14    of it that shows the front and back --

15         MR. PONDS:  Right.  That is correct, Your Honor.

16         THE COURT:  -- schematic of the entry and the exit

17    wounds.

18         MR. PONDS:  Absolutely.  We're prepared to move

19    that in.  We're prepared to move that in as a business

20    record, but I believe the District has some objections to

21    it.

22         MR. DeBERARDINIS:  The problem with that exhibit,

23    Your Honor, is that, without supporting testimony, if you

24    put it in, there's nothing.  I can't cross-examine a

25    document, and there's a lot of writing on that -- on those

1   diagrams.

2           That needed to come in through Dr. Revercomb, Your

3   Honor, so I would have an opportunity to say -- to question

4   the document.

5           THE COURT:  Remind me, did we depose

6   Dr. Revercomb, or no?

7           MR. DeBERARDINIS:  Plaintiff elected not to, and

8   now they want to put in this document unaccompanied by

9   testimony, and we're not allowed -- it cuts off any

10  clarification or cross-examination that the defense might

11  want to do.  It's not appropriate, Your Honor.

12          THE COURT:  Mr. Ponds?  Is it self-authenticating?

13          MR. PONDS:  Yes, it is.

14          THE COURT:  How so?

15          MR. PONDS:  We submit it should come in as a

16  business record, Your Honor.  It's a business record like

17  any other record kept in the regular course of business.

18          THE COURT:  Don't you need a custodian to

19  authenticate a business record?

20          MR. PONDS:  Well, we'll do that.

21          THE COURT:  Who are you going to do that with?

22          MR. PONDS:  Do you mean someone -- is the Court

23  suggesting that we -- that Dr. Revercomb is the only

24  custodian of the record that could authenticate it?

25          THE COURT:  Mr. DeBerardinis?

1          MR. DeBERARDINIS:  Your Honor, to be candid with

2     the Court, authenticity is not our issue.

3          THE COURT:  Okay.

4          MR. DeBERARDINIS:  The problem is, if it had come

5     in through Dr. Revercomb, I would have the opportunity to

6     say, "Well, when you have this circle here, what does that

7     mean?  Does it mean that there's a wound there?  Does it

8     mean something else?"  There's a lot of unintelligible

9     writing on the document.

10          What plaintiff has done here is cut off our

11     opportunity to examine -- to cross-examine the document, as

12     it were, to bring out the information.  I don't know how

13     he's going to use it in his case, but there's not going to

14     be any clarification of what it is or what is meant by this

15     or does it mean this, maybe it means that.

16          Without a supporting witness --

17          THE COURT:  Can't you call a witness?

18          MR. DeBERARDINIS:  Excuse me, Your Honor?

19          THE COURT:  Can't you call a witness?

20          MR. DeBERARDINIS:  It's not our obligation, Your

21     Honor.  Plaintiffs mastered their own case.  They cannot --

22     it's not my obligation to bring in a witness later on so

23     I can cross-examine it.

24          Plaintiff made a strategic decision, for whatever

25     reason, not to call and not to depose Dr. Revercomb, and

1    that's their prerogative, but they're not allowed just to

2    put in the document without her supporting -- without her

3    being available for examination about that document.  You

4    can't just throw documents in front of a jury and expect

5    them to make something out of it.

6            THE COURT:  Ms. West?

7            MS. WEST:  First of all, Your Honor, we didn't

8    make a strategic decision to not call Dr. Revercomb.  As you

9    recall during that time, we were pushed up against coming to

10   trial, and we had another witness we had to depose, we

11   believed on the same day, and we had to actually make a

12   choice who we wanted -- that's what happened -- because of

13   time constraints.

14           My recollection of an earlier hearing, and it must

15   have been the pretrial conference that we had before this

16   Court, was that the two pages of her sketch was coming --

17   there was no objection to that, but that the rest of the

18   autopsy report would be redacted.  I would have to look

19   at --

20           THE COURT:  What's the exhibit number?

21           MS. WEST:  Can someone tell me what the exhibit

22   number is?

23           But I believe even despite -- if my recollection's

24   correct, and I'd be happy to hand this to the Court, there's

25   -- it's clear from this drawing where the wounds are, and we

1   would submit that if the defense wants to excise words or

2   something else, we'd be happy to do that.  But I think the

3   jury has a right to know that this sketch exists, and that

4   somebody made this report, Dr. Revercomb, and it's

5   Exhibit No. 35.

6            MR. DeBERARDINIS:  It's certainly clear they

7   informed the prosecutor what all this diagram means, Your

8   Honor.  We don't know what to make of this, Your Honor, and

9   I'm not going to be able to bring one thing out about what

10  it is and what it isn't.

11           THE COURT:  Okay.

12           MR. DeBERARDINIS:  And as a result, it's not

13  admissible.

14           THE COURT:  We will take this up in the morning.

15  I understand your arguments.  Okay?

16           MS. WEST:  I'm sorry, sir?

17           THE COURT:  We'll take this up in the morning, and

18  I understand the arguments on both sides.

19           MR. DeBERARDINIS:  Yes, Your Honor.  On Page 105

20  of our pretrial conference that we had on --

21           THE COURT:  Is that the transcript of the pretrial

22  conference?

23           MR. DeBERARDINIS:  The transcript of it.  On Page

24  105, the Court stated at Line 14, "I think it's fair.  It's

25  a public record.  Have the medical examiner testify and to

1    admit the diagrams of the entry and the exit."

2              So it was -- that's what the Court's ruling was.

3    That diagram needed to be supported by somebody in here who

4    could discuss it.

5              MS. WEST:  I don't have a copy of that transcript,

6    Your Honor, so I have no idea what they're referring to.

7    But, I mean, he said --

8              THE COURT:  The question is, does that comment go

9    to authentication rather than what the document says?

10             MS. WEST:  Would it be possible for me to get a

11   copy of that just so I can read it?

12             THE COURT:  Can you give her a copy?

13             MR. DeBERARDINIS:  Your Honor, that's the -- the

14   transcript is the court reporter's copyrighted material.

15   Absolutely, Your Honor, I can't.

16             THE COURT:  Give it to her to read it.

17             MS. WEST:  Thank you, Your Honor.

18             MR. DeBERARDINIS:  That's how the court reporter

19   makes her living, Your Honor.

20             THE COURT:  It's a professional courtesy.  You

21   can't make a copy of two pages of the transcript?

22             MR. DeBERARDINIS:  It's not my decision, Your

23   Honor.  I can't run afoul of the court reporter.

24             (Pause)

25             MS. WEST:  I believe, Your Honor, that I agree

1    with Mr. DeBerardinis that the Court -- it is the Court that

2    makes the decision that you don't want the whole autopsy

3    report in, but you think it's fair, if it's a public record,

4    to have the medical examiner testify and to admit diagrams

5    of the entry and the exit.  That's what you said.

6                THE COURT:  Okay.  I'll take a look at that.

7                And remind me, at that point in time the plan was

8    to have Ms. Revercomb --

9                MS. WEST:  Right, but the problem with that is --

10               THE COURT:  -- appear at trial or through a de

11   bene esse deposition; is that correct?

12               MS. WEST:  That's right, Your Honor, but we were

13   thrown a curve ball with this fingerprint report, and we

14   were scrambling to get a fingerprint expert because, quite

15   frankly, that came so late, that disclosure came so late.

16   Instead of preparing for trial and doing other things, we

17   were trying to get a handle on this newly submitted evidence

18   by the defense, and so we basically had to make a decision

19   do we want to do a fingerprint examination, or do we want to

20   do Dr. Revercomb's.  That's where we were.

21               THE COURT:  So that's not a strategic decision,

22   but that's a resource decision.

23               MS. WEST:  That's where we were.

24               THE COURT:  Okay.  Why don't you all wait here,

25   and we will consider the other issue of the day.

```
 1                MS. FEATHERSTONE:  Very well, Your Honor.

 2                (Recess taken)

 3                THE COURT:  Okay.  I'm not going to prohibit

 4     Officer Leo from talking to his lawyers overnight.  There is

 5     some case law, at least in the criminal context, that

 6     establishes that's improper -- it's a due process issue, and

 7     I think the same general considerations apply in civil cases

 8     as well, even though the Court has not found any law

 9     directly on point.

10                MR. DeBERARDINIS:  And would the Court also

11     prohibit plaintiff -- "Did you speak to your lawyer last

12     night?"

13                MR. PONDS:  I will not ask that question.

14                THE COURT:  Okay.

15                MR. DeBERARDINIS:  I just wanted to make sure.

16                THE COURT:  That's fine, okay.

17                Show me the two pages of the autopsy report.

18     Which exhibit is it?

19                MS. WEST:  It's Exhibit 35, Your Honor.

20                THE COURT:  So Ms. West or Mr. Ponds, when would

21     you move this in?  At the close of your case?

22                MS. WEST:  Yes, Your Honor.

23                THE COURT:  Okay.  And then you'd refer to it in

24     closing?

25                MS. WEST:  Yes, Your Honor.
```

1          THE COURT:  Now, Mr. DeBerardinis, is there

2     anything prejudicial about this on its face?  I mean, do

3     you -- to what extent do you dispute the accuracy of the two

4     charts?

5          MR. DeBERARDINIS:  Well, all this information down

6     there, I have no idea what that means, Your Honor, and the

7     jury's going to have to speculate as to all that language.

8          THE COURT:  And what you're going to refer to in

9     your closing, Ms. West or Mr. Ponds, is simply where the

10    bullet came in and where the bullet came out?

11         MS. WEST:  That's exactly right.

12         THE COURT:  Exit A, Exit B, Entrance A, Entrance

13    B.

14         MS. WEST:  And we'd be happy to excise those

15    words, if he wants us to.

16         THE COURT:  Okay.

17         MS. WEST:  "Redact," I think, is the appropriate

18    word.

19         THE COURT:  Okay.

20         MR. DeBERARDINIS:  What would be prejudicial is if

21    plaintiff is somehow going to argue which was the first shot

22    and which was the second shot.

23         MS. WEST:  I don't think it matters, Your Honor.

24         THE COURT:  I think the only purpose of this is to

25    get the exit and the entrance wounds.

1          MR. PONDS:  That's absolutely it.  We're not going

2     to argue --

3          THE COURT:  Frankly, I don't think there's much of

4     a dispute about that.  As I read the business records

5     exception, I think it comes in, okay, as long as there's no

6     objection to the foundation for the exception or the

7     authenticity, and I've heard no objections.

8          I think it's unfortunate that we don't have a

9     witness, but I think it's admissible.  I think it comes in

10    under that exception, and if there are portions of it that

11    are prejudicial that the defense thinks should be redacted,

12    the Court is willing to consider that; but frankly, I don't

13    think there's much prejudice to it since it only shows the

14    location of the entry and the exit wounds.  Okay?

15         MR. DeBERARDINIS:  Very well, Your Honor.

16         MS. WEST:  Yes, Your Honor.

17         THE COURT:  Okay.

18         MR. DeBERARDINIS:  So we would request that

19    everything else be redacted off of that, Your Honor, other

20    than the indication of the entrance wounds.

21         THE COURT:  Any objection to that?

22         MS. WEST:  We'll work together to do it, Your

23    Honor.

24         THE COURT:  Okay.

25         MS. WEST:  May I have the original back?  We've

 1    got a certified copy.  We'd like to use that as the exhibit.

 2            THE COURT:  Okay.  Will 15 minutes be enough

 3    tomorrow morning to deal with everything we need to, or

 4    should we convene at quarter to 9:00?

 5            MR. PONDS:  No, 15 minutes will be enough.

 6    Sometimes you have to look at it depending on how tired you

 7    are, the video, but I think less than seven minutes it'll

 8    take you.

 9            THE COURT:  So we're going to put it --

10            MR. PONDS:  It's queued up.  It's ready to go.

11            THE COURT:  Okay.

12            MS. WEST:  Have a nice evening, Your Honor.

13            THE COURT:  You all, too.

14            MR. PONDS:  Thank you, Your Honor.

15                (Whereupon the hearing was

16                adjourned at 5:30 p.m.)

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8         Dated this 14th day of July, 2015.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

## /

/s/Lisa [1] - 285:10

## 1

**1** [4] - 6:4, 53:5, 178:24, 179:1
**1,000** [3] - 222:15, 250:10, 250:12
**10** [1] - 142:11
**100** [12] - 52:5, 56:4, 58:17, 59:25, 79:7, 83:4, 83:6, 86:23, 101:8, 157:17, 157:18, 178:25
**104** [1] - 58:15
**105** [2] - 278:19, 278:24
**11:15** [1] - 87:19
**11th** [3] - 111:4, 111:7, 113:15
**12-514** [2] - 4:6, 143:4
**1250** [1] - 1:14
**12:30** [3] - 89:6, 136:4, 143:5
**13** [2] - 134:2, 134:9
**1325** [1] - 1:18
**137** [5] - 190:16, 190:20, 191:3, 191:4, 191:9
**14** [2] - 112:10, 278:24
**14th** [1] - 24:21
**15** [12] - 35:1, 87:23, 88:18, 103:24, 118:20, 118:22, 119:3, 141:12, 142:11, 211:6, 284:2, 284:5
**15-minute** [1] - 211:2
**15:15** [1] - 199:5
**16** [4] - 111:14, 114:8, 114:13
**168** [1] - 195:1
**17** [15] - 41:6, 41:18, 44:25, 46:16, 47:6, 47:13, 47:14, 54:21, 54:25, 55:7, 55:11, 55:13, 55:16, 187:7, 216:23
**18** [2] - 41:4, 55:16
**19** [3] - 187:7, 253:24, 254:9
**1990** [1] - 172:2
**1999** [2] - 171:20, 172:17
**19th** [2] - 254:15, 254:18
**1:12-cv-00514-CRC**
  [1] - 1:3

## 2

**2** [3] - 186:8, 186:9, 186:10
**20** [2] - 103:24, 124:14
**20001** [3] - 2:4, 2:12, 285:12
**20005** [1] - 1:19
**20037** [1] - 1:15
**2004** [3] - 43:5, 216:23, 217:2
**2005** [1] - 43:5
**2006** [2] - 35:3, 35:5
**2007** [5] - 63:20, 224:16, 224:17, 226:8
**2008** [1] - 235:24
**2010** [1] - 184:17
**2011** [50] - 10:3, 20:1, 35:17, 36:12, 38:15, 63:21, 71:13, 72:14, 73:11, 90:14, 93:1, 96:19, 97:4, 98:18, 157:23, 158:24, 161:13, 172:19, 175:2, 176:12, 177:19, 178:1, 178:8, 196:4, 196:9, 200:3, 201:9, 203:1, 216:19, 217:4, 217:9, 221:22, 226:9, 226:25, 227:3, 234:14, 235:15, 236:2, 243:13, 252:13, 252:16, 252:24, 255:3, 255:9, 256:8, 256:12, 256:15, 256:20, 257:3, 265:10
**2012** [3] - 96:14, 264:11, 264:16
**2013** [1] - 96:16
**2014** [9] - 111:4, 111:8, 113:15, 214:2, 253:23, 253:24, 254:9, 254:15, 254:19
**2015** [2] - 1:5, 285:8
**202** [3] - 1:16, 1:20, 2:4
**202-354-3187** [1] - 2:12
**22** [4] - 26:19, 26:20, 35:11, 35:15
**236-2042** [1] - 1:20

## 2400 (column 3)

**2400** [7] - 64:1, 64:4, 94:17, 158:24, 174:25, 177:2, 178:7
**24:24** [1] - 134:16
**24th** [1] - 1:14
**25** [5] - 45:4, 45:17, 45:20, 171:14
**2500** [1] - 64:3
**25th** [1] - 43:5
**26** [15] - 35:17, 38:15, 54:20, 93:1, 97:4, 98:17, 158:24, 161:13, 200:3, 216:19, 217:8, 226:9, 235:15, 236:2, 255:3
**26th** [32] - 10:3, 36:12, 71:13, 72:14, 73:11, 90:14, 96:18, 97:5, 157:23, 164:15, 172:19, 175:2, 176:12, 177:19, 178:1, 178:8, 201:9, 217:4, 221:22, 226:24, 227:2, 234:14, 252:13, 252:16, 252:24, 255:8, 256:8, 256:12, 256:15, 256:20, 257:3, 265:10
**28B** [2] - 94:18, 94:22
**28D** [1] - 94:13
**28F** [3] - 94:13, 94:21, 95:4
**28th** [2] - 97:18, 126:2
**2:20** [1] - 234:14
**2:24** [2] - 134:17, 134:18
**2:59** [2] - 39:16, 39:17

## 3

**3** [25] - 90:21, 187:14, 187:15, 187:16, 188:2, 188:10, 188:15, 188:19, 189:6, 189:8, 189:14, 189:15, 189:24, 189:25, 192:7, 192:8, 192:9, 192:15, 192:19, 192:21, 193:10, 193:14, 204:10
**30** [6] - 39:20, 118:24, 118:25, 142:13, 236:13, 238:12
**300** [1] - 1:15
**333** [2] - 2:11, 285:12
**333-2922** [1] - 1:16

## 34 (column 4)

**34** [1] - 3:4
**35** [2] - 278:5, 281:19
**3521** [1] - 172:23
**3:15** [3] - 199:6, 199:7, 208:12
**3:30** [1] - 211:3

## 4

**4** [13] - 1:5, 171:20, 172:2, 194:6, 194:9, 194:10, 194:11, 194:23, 204:8, 204:15, 207:23, 208:5
**4/26/2011** [1] - 210:8
**40** [2] - 3:5, 236:13
**403** [1] - 274:9
**441** [1] - 2:3
**45** [2] - 218:14, 271:7
**4A** [8] - 177:14, 178:3, 178:5, 178:10, 178:14, 180:3, 180:21, 182:6
**4C** [2] - 185:18, 185:22
**4D** [2] - 179:8, 181:23
**4F** [1] - 186:5
**4H** [5] - 182:11, 182:12, 182:24, 184:7, 189:3
**4I** [1] - 189:24
**4J** [4] - 178:3, 178:5, 178:14, 204:7

## 5

**5** [8] - 191:10, 192:11, 192:23, 193:4, 193:6, 193:14, 204:12, 207:5
**50** [4] - 134:19, 134:22, 236:17, 236:18
**500** [1] - 1:19
**52** [9] - 45:16, 54:10, 54:11, 54:12, 55:12, 58:6, 58:12, 58:14, 59:2
**56** [1] - 111:14
**5:00** [2] - 271:10, 272:16
**5:30** [1] - 284:16
**5A** [1] - 207:19

## 6

**6** [7] - 180:5, 182:12, 185:22, 186:1, 188:19, 189:5, 189:16
**6718** [2] - 2:11, 285:11

## 34 → column 5 header 68 area

**68** [4] - 187:25, 188:23, 195:3, 195:6

## 7

**7** [6] - 185:22, 185:24, 193:21, 194:15, 195:15, 195:16
**703)582-6448** [1] - 214:10
**724-6600** [1] - 2:4

## 8

**8** [1] - 91:8

## 9

**9** [2] - 176:8, 181:1
**93A** [2] - 157:14, 158:4
**93B** [1] - 157:6
**93C** [5] - 159:8, 159:12, 159:25, 160:5, 169:12
**93D** [2] - 157:14, 158:4
**93J** [7] - 157:14, 157:17, 157:19, 158:4, 158:8, 177:14, 178:7
**93K** [5] - 157:14, 158:4, 159:8, 159:11, 159:13
**99** [1] - 180:20
**9:00** [1] - 284:4
**9:09** [1] - 1:5
**9:15** [1] - 272:21
**9:25** [1] - 6:5

## A

**A-okay** [1] - 170:22
**a.m** [1] - 1:5
**abbreviation** [1] - 48:2
**abiding** [6] - 229:11, 232:14, 232:18, 233:18, 233:22
**ability** [4] - 115:5, 138:2, 138:9, 285:7
**able** [19] - 8:13, 9:18, 13:20, 17:4, 21:18, 22:11, 22:15, 28:13, 29:14, 39:5, 68:15, 80:16, 122:16, 134:25, 206:16, 218:20, 266:12, 270:7, 278:9
**absolutely** [11] - 12:10, 19:21, 27:19, 28:12, 65:20, 69:23, 151:21, 274:18, 279:15, 283:1

**abundance** [1] - 155:1
**Academy** [1] - 43:3
**academy** [27] - 43:19,
44:1, 44:20, 45:10,
46:22, 47:10, 49:9,
50:6, 53:9, 53:12,
55:25, 60:10,
108:15, 216:22,
216:25, 221:15,
222:8, 222:10,
222:18, 224:21,
224:24, 224:25,
225:9, 225:15,
225:16, 226:2, 226:5
**accept** [2] - 13:12,
22:14
**accident** [1] - 36:7
**according** [7] - 17:21,
19:8, 38:3, 184:16,
187:17, 188:11
**accordingly** [1] -
214:6
**account** [1] - 201:3
**accounted** [1] -
176:22
**accuracy** [1] - 282:3
**accurate** [10] - 52:25,
157:25, 165:2,
165:6, 177:1, 177:5,
207:14, 266:10,
267:9, 285:5
**accurately** [4] - 77:8,
90:13, 157:22,
178:10
**acknowledge** [1] -
152:13
**acronym** [1] - 173:25
**action** [4] - 16:2,
23:13, 145:6, 147:6
**actions** [1] - 245:12
**activity** [2] - 94:3,
240:3
**acts** [1] - 71:3
**actual** [10] - 174:9,
182:25, 184:3,
184:7, 186:7,
188:13, 189:21,
202:20, 202:22,
207:25
**adapt** [1] - 223:6
**add** [4] - 11:25, 18:4,
18:15, 22:10
**added** [1] - 82:11
**addition** [4] - 9:17,
19:6, 23:10, 23:25
**additional** [9] - 35:2,
60:10, 70:22, 135:6,
195:23, 200:24,
204:20, 210:5, 219:7
**address** [3] - 16:9,

92:13, 152:10
**addressed** [1] - 256:9
**adequacy** [1] - 152:20
**Ades** [7] - 265:18,
265:19, 269:1,
269:6, 269:11, 270:9
**adjoins** [1] - 179:14
**adjourned** [2] - 143:1,
284:16
**admissible** [9] - 12:24,
26:25, 27:18,
251:23, 252:2,
252:3, 278:13, 283:9
**admission** [2] -
157:14, 180:25
**admissions** [1] -
178:14
**admit** [4] - 26:7, 26:13,
27:16, 207:18,
279:1, 280:4
**admitted** [10] - 35:15,
77:22, 90:24, 90:25,
157:5, 158:7, 176:8,
179:7, 189:2, 193:19
**adult** [2] - 227:18,
227:25
**adverse** [2] - 205:8,
205:10
**advised** [4] - 18:18,
145:5, 215:19,
217:18
**afoul** [1] - 279:23
**afraid** [8] - 4:19, 4:20,
16:21, 17:24, 18:14,
20:4, 21:25, 143:17
**afternoon** [10] -
150:19, 156:5,
156:6, 171:5, 175:1,
202:8, 202:9,
210:23, 211:2,
216:10
**afterwards** [2] - 219:2,
219:4
**agitated** [2] - 37:17,
39:7
**agitation** [2] - 37:20,
39:8
**ago** [4] - 42:18, 45:3,
50:16, 124:14
**agree** [24] - 26:23,
58:20, 58:25, 63:9,
63:13, 65:11,
105:11, 138:14,
139:24, 145:13,
145:14, 154:1,
155:9, 157:4,
195:13, 204:14,
223:16, 224:6,
227:7, 242:7, 243:8,
243:11, 250:11,

279:25
**agreed** [1] - 154:19
**ahead** [15] - 62:10,
63:18, 64:7, 75:7,
84:3, 84:12, 84:19,
84:20, 84:25, 91:2,
94:19, 98:10, 99:6,
115:2, 199:3
**aided** [1] - 1:25
**air** [6] - 117:22,
117:24, 117:25,
118:1, 118:2, 123:21
**AL** [1] - 1:6
**al** [1] - 4:7
**allegedly** [1] - 258:25
**alley** [1] - 62:16
**allowed** [6] - 29:21,
34:6, 255:22,
269:14, 275:9, 277:1
**almost** [7] - 42:20,
85:10, 131:25,
208:7, 250:10,
250:12, 264:11
**alone** [3] - 36:4, 50:25,
51:6
**alongs** [3] - 225:1,
225:11, 225:12
**alter** [1] - 183:10
**altered** [1] - 267:12
**aluminum** [2] - 103:5,
103:13
**ambulance** [6] - 118:7,
118:10, 118:17,
118:18, 119:4,
123:22
**Amendment** [1] -
43:13
**amount** [2] - 39:13,
214:18
**analogy** [1] - 173:25
**analysis** [1] - 196:5
**anesthesia** [2] - 25:20,
39:18
**Angeles** [1] - 218:11
**angle** [5] - 165:22,
168:17, 261:14,
262:16, 263:13
**ANNE** [2] - 1:17, 1:18
**answer** [26] - 11:8,
11:10, 11:13, 13:24,
13:25, 14:2, 32:25,
63:5, 63:6, 69:22,
70:23, 93:10, 93:11,
96:22, 98:21,
100:19, 101:12,
101:23, 102:3,
135:7, 148:6, 159:1,
197:4, 249:17,
269:21, 270:5
**answered** [12] - 98:20,

101:22, 140:24,
152:6, 164:8,
232:16, 242:15,
256:1, 257:17,
263:2, 263:3, 263:17
**answering** [1] - 269:15
**answers** [2] - 152:11,
270:1
**anyway** [2] - 49:6,
212:12
**apartment** [14] - 64:5,
64:7, 73:17, 73:18,
73:23, 75:6, 75:8,
112:19, 130:20,
160:19, 233:21,
237:1, 258:11,
259:12
**Apartments** [3] -
227:4, 227:8, 234:17
**apartments** [7] - 74:4,
201:19, 201:21,
236:10, 236:21,
238:1, 238:14
**apologize** [6] - 33:25,
58:8, 62:10, 72:10,
77:16, 85:17
**appear** [12] - 17:20,
17:21, 22:24, 28:11,
28:17, 147:16,
161:17, 188:6,
212:9, 261:4, 261:6,
280:10
**aPPEARANCES** [1] -
1:12
**APPEARANCES** [1] -
2:1
**appeared** [3] - 17:19,
37:16, 212:20
**application** [1] - 50:15
**apply** [2] - 271:24,
281:7
**appointed** [1] - 144:13
**appreciate** [6] - 31:9,
145:7, 148:17,
150:21, 155:2, 155:5
**approach** [25] - 49:10,
56:14, 67:15, 71:25,
94:10, 103:1,
111:23, 112:2,
112:3, 113:13,
156:24, 162:2,
169:6, 176:4,
177:10, 180:16,
187:18, 190:12,
203:19, 205:18,
207:6, 248:20,
254:22, 266:22,
269:3
**approached** [1] -
143:19

**approaching** [2] -
238:8, 238:9
**appropriate** [4] -
44:12, 44:15,
275:11, 282:17
**April** [46] - 10:3, 35:16,
36:12, 38:15, 71:13,
72:14, 73:10, 90:14,
93:1, 96:18, 97:4,
97:5, 98:17, 157:23,
158:24, 161:13,
164:15, 172:19,
175:1, 176:11,
177:18, 178:1,
178:8, 200:3, 201:8,
216:19, 217:4,
217:8, 221:22,
226:9, 226:24,
227:2, 234:14,
235:15, 236:2,
252:13, 252:15,
252:23, 255:3,
255:8, 256:8,
256:12, 256:15,
256:20, 257:3,
265:10
**APT** [3] - 73:18, 73:25,
74:6
**area** [31] - 9:13, 64:10,
78:11, 78:18, 79:10,
79:13, 80:6, 82:22,
86:16, 92:17, 92:20,
94:8, 94:23, 94:25,
95:1, 104:4, 106:21,
111:13, 114:20,
138:1, 160:18,
183:19, 196:3,
201:22, 219:9,
229:21, 235:8,
246:22, 246:25,
247:18
**areas** [7] - 44:3, 56:18,
56:25, 220:19,
232:2, 232:4, 232:7
**argue** [9] - 8:4, 9:3,
9:9, 9:21, 15:5,
15:10, 282:21, 283:2
**argument** [6] - 7:4,
7:11, 9:10, 9:15,
14:15, 15:12
**argumentative** [3] -
231:14, 245:2,
253:16
**arguments** [2] -
278:15, 278:18
**arm** [9] - 59:3, 106:15,
106:17, 106:18,
106:19, 106:20,
107:14, 107:15
**armed** [2] - 119:16,

130:1
**arms** [5] - 46:7, 47:2,
107:13, 107:23,
259:17
**Army** [1] - 130:4
**array** [1] - 227:22
**arrest** [4] - 92:17,
124:21, 252:5,
273:19
**arrive** [1] - 232:6
**arrived** [9] - 25:17,
37:16, 198:15,
198:21, 199:1,
208:11, 208:16,
217:14, 264:17
**arrow** [3] - 78:25, 79:4,
80:25
**art** [1] - 72:13
**artfully** [1] - 79:9
**articles** [1] - 51:16
**as..** [1] - 71:1
**aside** [1] - 155:2
**ASP** [8] - 47:14, 47:18,
47:25, 48:20, 51:16,
51:19, 52:3, 52:4
**aspect** [1] - 273:19
**aspects** [2] - 36:3,
217:24
**assassinations** [2] -
173:9, 173:11
**assaults** [1] - 173:11
**assign** [2] - 200:17,
200:19
**assigned** [5] - 172:1,
175:19, 175:24,
178:6, 200:19
**assignment** [3] -
172:3, 172:20,
172:25
**Assistant** [1] - 20:19
**associated** [7] - 25:18,
28:7, 29:16, 29:20,
29:23, 36:19, 98:11
**assume** [1] - 44:2
**assumed** [1] - 142:7
**assuming** [2] - 44:2,
78:4
**assumption** [1] -
142:6
**assured** [1] - 213:7
**athletic** [3] - 115:5,
138:2, 138:9
**attempt** [2] - 12:8,
13:3
**attempted** [1] - 20:14
**attempting** [1] -
260:17
**attend** [1] - 218:20
**attending** [1] - 35:4
**attention** [11] - 11:23,

35:7, 35:16, 62:13,
62:14, 62:16, 62:17,
81:10, 94:1, 163:4,
196:2
**ATTORNEY** [1] - 2:3
**Attorney** [3] - 20:18,
20:19, 196:17
**attorney** [6] - 20:18,
196:16, 265:19,
269:9, 269:11, 272:9
**Attorney's** [2] - 203:3,
203:12
**attorneys** [1] - 202:24
**attraction** [1] - 82:11
**audience** [1] - 145:2
**audio** [2] - 266:4,
266:6
**audiotaped** [1] - 268:5
**authentic** [1] - 26:24
**authenticate** [2] -
275:19, 275:24
**authenticating** [1] -
275:12
**authentication** [1] -
279:9
**authenticity** [2] -
276:2, 283:7
**autopsy** [6] - 197:21,
274:2, 277:18,
280:2, 281:17
**availability** [1] -
215:17
**available** [2] - 273:9,
277:3
**Avenue** [4] - 2:11,
230:18, 231:12,
285:12
**average** [1] - 240:23
**avoid** [3] - 15:4, 23:17,
145:19
**avoided** [1] - 23:20
**awake** [2] - 37:16,
37:24
**aware** [21] - 10:5, 10:6,
67:12, 94:7, 143:23,
203:11, 215:13,
227:17, 255:25,
256:7, 256:11,
256:12, 256:15,
256:19, 256:20,
256:22, 257:2,
263:21, 264:20,
268:20, 269:10

---

**B**

**B1** [1] - 173:17
**B2** [1] - 173:17
**bachelor** [2] - 218:18,
218:19

**bachelor's** [1] - 42:9
**backed** [2] - 165:17,
165:19
**background** [1] -
160:1
**backward** [3] - 99:11,
121:17, 121:21
**backwards** [2] - 121:9,
122:13
**bad** [7] - 23:23,
129:17, 133:22,
133:25, 142:6,
154:18, 195:10
**bag** [3] - 66:7, 181:8,
193:8
**bags** [4] - 191:17,
192:19, 193:1, 193:2
**balance** [1] - 261:7
**ball** [1] - 280:13
**ballistic** [2] - 172:14,
200:24
**ballistics** [1] - 174:13
**bank** [2] - 143:19,
144:4
**banks** [1] - 143:9
**bar** [1] - 145:7
**barely** [4] - 128:3,
128:6, 128:7, 128:20
**barrel** [1] - 186:24
**barrier** [1] - 45:6
**barring** [1] - 92:16
**Based** [1] - 30:22
**based** [27] - 20:12,
25:14, 25:18, 28:15,
29:6, 29:8, 29:15,
29:23, 30:8, 32:24,
33:8, 35:9, 67:10,
90:24, 101:24,
102:2, 106:11,
123:4, 147:14,
147:15, 152:18,
168:16, 198:10,
201:7, 239:7,
261:24, 262:11
**basic** [2] - 45:3, 45:16
**basis** [10] - 13:13,
16:13, 144:19,
144:23, 219:16,
219:17, 253:4,
253:5, 262:18, 265:1
**basketball** [12] - 73:9,
78:18, 236:4, 236:5,
236:7, 236:13,
236:18, 237:9,
237:12, 237:14,
237:16, 237:21
**baton** [1] - 48:3
**BB** [12] - 41:22, 70:9,
150:4, 194:1,
194:17, 194:22,

195:15, 206:15,
207:23, 208:5,
262:13, 263:9
**bear** [1] - 139:10
**beat** [1] - 78:2
**became** [7] - 25:20,
38:2, 39:18, 40:22,
143:12, 225:3,
260:13
**become** [7] - 42:23,
42:24, 55:22, 63:19,
66:13, 171:17, 172:1
**becomes** [2] - 56:7,
69:4, 69:5
**beer** [1] - 131:6
**BEFORE** [1] - 1:10
**began** [2] - 37:18,
243:25
**begin** [4] - 106:23,
217:25, 237:6, 238:3
**beginning** [5] - 90:16,
100:4, 105:10,
107:7, 164:5
**begins** [2] - 240:10,
244:10
**behalf** [1] - 18:18
**behavior** [3] - 39:12,
232:24, 233:16
**behind** [30] - 45:6,
45:19, 45:21, 45:22,
55:20, 70:20, 82:6,
82:7, 83:24, 84:5,
84:13, 94:3, 106:2,
106:4, 106:11,
107:10, 109:25,
110:3, 114:14,
120:13, 136:16,
136:21, 136:23,
137:13, 137:15,
174:14, 234:25,
235:2, 247:16,
257:25
**belabor** [1] - 9:24
**belief** [1] - 147:15
**believes** [1] - 33:12
**below** [3] - 182:19,
182:23, 243:15
**belt** [2] - 115:20, 247:5
**bench** [20] - 56:14,
56:17, 57:25, 67:15,
67:19, 70:2, 112:2,
112:5, 113:11,
162:4, 162:25,
205:20, 207:2,
248:23, 249:19,
254:24, 256:5,
269:5, 272:14, 273:4
**bene** [1] - 280:11
**bent** [1] - 179:2
**Beret** [2] - 131:13,

131:16
**best** [11] - 23:13,
39:19, 131:12,
135:13, 166:18,
174:10, 174:17,
204:2, 218:1, 218:3,
285:6
**better** [8] - 19:12,
50:13, 50:16, 106:3,
133:21, 180:2,
182:8, 195:12
**between** [8] - 24:5,
104:8, 144:11,
154:14, 154:18,
173:6, 188:19,
193:14
**beyond** [3] - 10:7,
29:25, 186:1
**big** [3] - 86:22, 92:8,
206:14
**BILLY** [1] - 1:13
**Billy** [1] - 4:8
**binders** [1] - 222:17
**biological** [4] -
196:15, 196:20,
197:9, 198:4
**bit** [25] - 34:2, 52:16,
52:24, 53:14, 62:15,
82:23, 85:22, 91:2,
99:9, 100:13,
103:23, 103:25,
104:3, 121:21,
125:16, 131:2,
139:8, 141:12,
162:8, 172:9,
195:18, 206:24,
236:14, 236:16,
240:21
**bite** [1] - 14:3
**black** [22] - 71:17,
71:23, 75:14, 75:24,
77:11, 99:8, 120:22,
122:19, 129:16,
159:19, 167:9,
181:13, 181:14,
183:1, 184:12,
189:14, 189:22,
194:1, 231:2,
247:22, 248:1,
257:18
**block** [13] - 64:1, 64:3,
64:4, 94:17, 158:24,
174:25, 177:2,
178:7, 179:13,
188:12, 190:4
**Blockbuster** [1] - 41:4
**blood** [6] - 154:18,
182:19, 195:16,
195:21, 196:21,
198:4

**Blue** [1] - 146:4
**board** [7] - 45:6,
45:22, 49:21, 49:23,
51:10, 118:16, 119:6
**Bob** [1] - 157:3
**bodily** [2] - 68:11,
173:15
**body** [12] - 7:18,
46:10, 59:14,
136:13, 167:22,
168:10, 196:22,
197:9, 198:5,
260:21, 261:21,
274:7
**body's** [1] - 124:8
**borderline** [1] - 30:24
**bottom** [3] - 50:24,
55:6, 271:3
**bought** [1] - 126:22
**Bowl** [1] - 16:17
**box** [3] - 73:16, 76:20,
79:25
**boxes** [2] - 74:4, 74:7
**Boyd** [27] - 17:13,
18:2, 18:15, 19:11,
19:24, 20:10, 21:10,
147:16, 147:17,
147:21, 147:22,
147:25, 148:2,
150:22, 151:9,
152:2, 152:8,
152:12, 152:13,
152:15, 152:17,
152:20, 154:6,
211:23, 211:25,
212:4, 212:5
**Bradley** [4] - 10:7,
20:7, 23:10, 273:8
**breach** [1] - 68:8
**break** [17] - 87:19,
89:5, 108:4, 115:7,
134:6, 135:13,
135:19, 141:9,
141:11, 155:13,
210:24, 211:2,
249:9, 271:6, 271:9,
271:10, 271:17
**breaking** [2] - 115:12,
232:20
**breast** [1] - 233:4
**breathe** [8] - 32:15,
38:4, 38:12, 38:23,
149:12, 149:14,
149:17, 153:11
**Bridzette** [1] - 4:7
**BRIDZETTE** [1] - 1:3
**brief** [5] - 25:10, 30:16,
202:10, 268:12,
273:13
**briefly** [4] - 9:24,

17:10, 32:9, 44:7
**bring** [12] - 33:21,
35:7, 89:1, 143:8,
155:23, 174:24,
213:25, 216:2,
272:12, 276:12,
276:22, 278:9
**bringing** [1] - 68:1
**Briscoe** [55] - 25:17,
26:10, 28:11, 30:6,
32:12, 36:12, 74:24,
75:6, 80:18, 82:4,
91:17, 93:1, 94:4,
99:9, 112:11,
116:20, 121:9,
131:23, 139:7,
150:6, 153:7, 153:8,
154:15, 154:19,
157:24, 196:22,
197:10, 198:10,
206:13, 208:17,
217:13, 237:15,
238:7, 238:20,
238:22, 238:25,
239:7, 239:12,
239:13, 239:17,
239:18, 241:3,
242:3, 242:11,
244:6, 244:8, 246:8,
246:13, 248:10,
252:13, 252:23,
255:9, 257:14,
273:14, 273:15
**Briscoe's** [1] - 11:1
**broken** [2] - 74:19,
74:20
**brother** [3] - 144:17,
154:15, 154:25
**brought** [7] - 22:25,
39:15, 81:10, 93:17,
93:19, 168:5, 251:20
**building** [14] - 73:17,
73:23, 75:6, 75:8,
80:7, 97:20, 97:21,
98:11, 220:18,
220:20, 220:22,
221:8
**buildings** [3] - 90:16,
98:4, 160:19
**bulge** [7] - 70:10,
70:24, 71:2, 229:22,
230:5, 230:7, 230:13
**bullet** [10] - 186:20,
186:22, 186:23,
201:2, 201:11,
201:13, 201:14,
201:24, 282:10
**bullets** [2] - 55:6,
200:25, 201:4, 201:8
**bumper** [2] - 103:11,

103:12
**Bureau** [1] - 125:22
**burglaries** [1] - 173:16
**business** [9] - 131:14,
203:2, 274:3,
274:19, 275:16,
275:17, 275:19,
283:4
**busy** [1] - 211:14
**but..** [2] - 42:22, 135:5
**button** [1] - 55:9
**BY** [14] - 34:16, 40:13,
58:1, 70:3, 90:8,
113:14, 156:4,
163:3, 171:3, 202:7,
207:3, 216:13,
249:20, 256:6

---

## C

**C-o-k-e-r** [1] - 171:8
**CA** [1] - 1:3
**cake** [1] - 132:24
**California** [2] - 218:9,
218:22
**calmer** [1] - 125:16
**camera** [14] - 8:14,
124:1, 125:10,
125:17, 126:3,
126:8, 126:9,
126:12, 126:17,
126:19, 126:20,
126:22, 126:25,
263:13
**camera's** [1] - 125:9
**cameras** [5] - 98:4,
98:6, 98:12, 98:13,
98:14
**candid** [1] - 276:1
**cannot** [6] - 7:2, 13:1,
15:2, 116:11, 213:6,
276:21
**Canon** [2] - 126:4,
126:6
**canvassed** [1] - 20:8
**car** [62] - 36:7, 76:5,
76:25, 77:17, 79:16,
79:18, 80:8, 80:11,
82:6, 82:12, 84:9,
84:10, 84:20, 93:18,
94:19, 94:21, 94:25,
95:5, 96:5, 96:25,
102:11, 103:5,
103:6, 103:20,
104:6, 104:15,
104:17, 105:4,
105:6, 109:4,
109:25, 115:1,
119:15, 121:22,
125:1, 125:11,

127:19, 130:8,
135:4, 138:12,
138:17, 138:20,
138:21, 138:23,
138:25, 139:2,
139:3, 139:5, 140:4,
140:6, 140:7, 140:9,
167:7, 173:17,
237:19, 241:20,
244:3, 246:6,
257:21, 260:14,
262:25
**card** [3] - 18:20, 20:16,
20:17
**care** [6] - 35:3, 130:4,
143:14, 143:24,
146:1, 174:2
**careful** [1] - 7:18
**Carlos** [3] - 18:6,
147:7, 211:20
**Carletta** [3] - 19:23,
19:24, 234:7
**carry** [5] - 48:11,
70:12, 126:21, 127:1
**carrying** [6] - 66:23,
70:14, 70:20,
126:25, 229:9,
229:19
**cars** [4] - 95:7, 104:9,
235:22, 235:23
**cart** [2] - 103:22,
186:24
**cartridge** [6] - 186:11,
186:12, 186:14,
186:19, 186:21
**Case** [2] - 4:6, 143:4
**case** [71] - 5:25, 8:25,
16:7, 16:11, 16:12,
16:15, 17:19, 20:8,
21:22, 23:7, 24:19,
25:4, 26:16, 75:21,
87:20, 88:8, 95:12,
97:12, 110:22,
111:15, 113:16,
127:10, 129:3,
132:1, 132:14,
140:23, 141:14,
142:4, 143:4,
144:12, 151:16,
153:25, 170:4,
170:10, 170:12,
185:7, 185:12,
186:11, 186:12,
186:21, 195:25,
203:9, 203:11,
204:25, 207:19,
209:10, 209:14,
210:5, 210:14,
211:5, 215:11,
215:24, 217:19,

251:20, 251:21,
252:7, 263:20,
269:9, 272:6,
272:20, 272:21,
273:19, 276:13,
276:21, 281:5,
281:21
**cases** [2] - 196:12,
281:7
**casing** [8] - 159:14,
159:15, 160:16,
169:19, 186:18,
186:19, 186:20,
186:24
**casings** [1] - 187:5
**catch** [4] - 110:17,
122:2, 122:3, 137:24
**caught** [1] - 137:25
**caused** [1] - 30:24
**caution** [1] - 155:1
**cautionary** [2] - 5:6,
154:11
**caveat** [1] - 90:23
**cell** [27] - 14:20, 127:1,
148:16, 150:13,
180:10, 180:14,
181:1, 181:4,
181:12, 181:25,
182:3, 182:14,
182:19, 182:23,
186:1, 188:16,
189:5, 212:25,
231:2, 231:4, 231:5,
231:8, 238:17,
243:4, 243:6,
243:10, 247:11
**center** [3] - 36:5, 36:8,
37:13
**Center** [8] - 34:23,
34:25, 35:12, 35:19,
36:4, 37:5, 39:15,
53:24
**certain** [16] - 29:23,
62:3, 62:19, 70:10,
70:11, 85:10,
170:10, 183:23,
185:8, 215:15,
226:12, 232:2,
232:4, 232:7, 245:11
**certainly** [5] - 28:10,
89:8, 138:14, 145:5,
278:6
**CERTIFICATE** [1] -
285:1
**certificate** [1] - 151:7
**certified** [5] - 26:4,
26:5, 274:3, 284:1
**certify** [2] - 54:7, 285:4
**Chad** [6] - 75:10,
122:16, 128:10,

128:12, 216:8,
216:15
**CHAD** [2] - 3:8, 216:11
**chair** [1] - 272:19
**challenge** [2] - 151:15,
152:19
**challenged** [1] -
144:12
**chamber** [1] - 55:15
**chance** [3] - 177:16,
258:15, 266:9
**change** [2] - 183:8,
183:9
**changed** [7] - 46:8,
46:12, 46:14, 46:19,
168:22, 172:21,
210:1
**changes** [1] - 210:1
**changing** [1] - 8:25
**channel** [1] - 117:23
**characterize** [2] -
105:10, 107:19
**charge** [1] - 264:24
**charges** [1] - 269:10
**charts** [1] - 282:4
**chase** [23] - 60:17,
61:4, 61:13, 61:15,
61:20, 61:21, 62:4,
65:16, 65:22, 66:3,
66:9, 69:8, 69:22,
71:11, 71:14,
101:19, 101:21,
102:21, 104:15,
106:23, 230:21,
231:5, 244:21
**chased** [1] - 105:12
**chasing** [14] - 57:2,
57:5, 57:9, 60:12,
60:15, 60:23, 61:1,
61:5, 61:10, 82:4,
106:24, 107:16,
108:15, 108:19
**check** [2] - 116:24,
176:20
**checked** [1] - 146:4
**Cheltenham** [1] -
53:25
**chest** [1] - 92:12
**Chevy** [1] - 75:17
**chief** [3] - 170:4,
170:12, 274:4
**Chief** [2] - 250:14,
250:15
**child** [2] - 41:20,
173:11
**children** [3] - 73:10,
227:18, 227:25
**choice** [2] - 223:15,
277:12
**choices** [1] - 46:17

**CHRISTOPHER** [1] -
1:10
**circle** [2] - 87:11,
276:6
**circled** [1] - 237:5
**circumstance** [1] -
230:15
**circumstances** [4] -
28:17, 68:10, 185:7,
244:12
**citizen** [9] - 61:6,
62:15, 95:6, 229:12,
240:9, 240:11,
240:17, 240:19
**citizens** [7] - 68:18,
232:14, 232:18,
233:18, 233:22,
236:25
**civil** [4] - 4:6, 16:7,
16:11, 281:7
**claim** [3] - 249:4,
252:3, 252:5
**claimed** [1] - 20:11
**claims** [4] - 251:20,
251:21, 252:5, 252:6
**clarification** [2] -
275:10, 276:14
**clarify** [1] - 265:25
**clarity** [1] - 141:23
**class** [7] - 42:13,
66:22, 66:24, 70:4,
70:5, 71:5
**classmates** [1] -
216:25
**clean** [2] - 266:25,
267:1
**clear** [11] - 7:9, 7:15,
24:9, 31:24, 37:19,
37:24, 114:4,
140:21, 164:10,
277:25, 278:6
**clearly** [2] - 106:6,
163:16
**clerk** [1] - 150:17
**client** [6] - 23:23,
269:21, 272:3,
272:5, 272:8
**Clinton** [2] - 54:1, 54:5
**clip** [11] - 55:1, 55:4,
55:8, 55:10, 55:17,
136:7, 142:9,
142:18, 155:18,
161:2, 163:5
**close** [19] - 30:21,
89:5, 90:15, 90:17,
90:18, 90:19, 125:2,
150:6, 150:9,
153:23, 165:4,
189:24, 208:8,
221:23, 222:15,

238:11, 271:10,
272:16, 281:21
**close-up** [1] - 189:24
**closely** [1] - 252:21
**closer** [11] - 59:13,
85:20, 85:22, 85:23,
85:25, 95:15,
189:14, 189:15,
189:22
**closing** [6] - 9:9, 9:10,
9:22, 15:5, 281:24,
282:9
**closure** [2] - 174:16
**clothing** [2] - 182:20,
182:22
**clue** [2] - 97:25,
161:11
**clutching** [1] - 165:1
**co** [2] - 221:23, 222:1
**co-workers** [2] -
221:23, 222:1
**coat** [1] - 70:13
**Coats** [1] - 146:5
**coerce** [1] - 268:21
**COKER** [2] - 3:6,
171:1
**Coker** [41] - 8:6, 22:18,
170:16, 170:17,
170:23, 171:4,
171:6, 171:8, 171:9,
171:22, 176:5,
176:7, 177:12,
177:21, 178:17,
179:7, 180:19,
181:4, 181:17,
186:4, 187:21,
190:15, 190:19,
192:6, 193:18,
195:14, 197:8,
198:14, 198:20,
202:1, 202:8,
202:11, 203:23,
204:20, 204:25,
207:4, 207:9,
207:21, 208:11,
210:15, 210:17
**cold** [1] - 102:15
**colleagues** [1] - 92:4
**collect** [1] - 199:20
**collected** [5] - 180:13,
196:21, 197:9,
198:4, 210:7
**college** [1] - 42:23
**color** [3] - 76:5, 87:8,
181:12
**colors** [1] - 75:18
**COLUMBIA** [2] - 1:1,
1:6
**Columbia** [6] - 4:7,
18:17, 143:5,

173:20, 225:2,
226:13
**combination** [1] - 70:8
**combined** [1] - 130:20
**comfortable** [2] -
118:23, 268:17
**coming** [25] - 10:14,
10:21, 18:25, 22:2,
34:17, 79:4, 102:20,
114:5, 114:10,
124:6, 128:25,
129:18, 129:24,
133:13, 153:13,
155:18, 211:18,
237:20, 237:22,
259:14, 270:25,
274:10, 277:9,
277:16
**command** [1] - 248:12
**commands** [1] - 248:9
**comment** [2] - 104:20,
279:8
**commenting** [1] -
44:14
**commit** [4] - 63:1,
65:24, 65:25, 66:2
**committed** [8] - 62:23,
101:4, 101:9,
101:20, 105:14,
105:16, 239:8,
271:11
**common** [4] - 158:12,
158:13, 158:21,
227:21
**commotion** [1] -
143:10
**communicate** [3] -
245:7, 245:11,
245:13
**communications** [1] -
16:8
**community** [1] - 63:8
**compare** [2] - 88:15,
203:8
**compared** [6] - 31:10,
31:19, 32:24,
206:10, 207:24,
208:6
**competency** [4] -
116:18, 119:17,
119:18, 123:13
**competent** [1] - 4:24
**competing** [1] -
155:13
**complete** [5] - 142:3,
176:14, 176:15,
252:17, 285:6
**completed** [2] -
176:11, 176:15
**completion** [1] -

154:20
**complex** [32] - 19:1,
19:25, 64:5, 112:19,
227:3, 227:13,
227:18, 227:20,
227:22, 228:17,
228:21, 228:24,
229:4, 229:13,
230:17, 232:1,
233:22, 233:25,
234:7, 234:16,
235:3, 235:4, 236:3,
237:2, 238:4, 238:6,
238:15, 242:3,
258:8, 258:12,
259:12, 259:14
**complexes** [1] - 64:7
**compliance** [1] - 252:1
**complies** [25] - 51:15,
52:8, 52:13, 72:24,
73:21, 74:1, 74:8,
74:18, 77:4, 79:2,
80:10, 81:2, 81:19,
82:4, 82:20, 83:14,
83:21, 85:6, 86:7,
86:11, 86:13, 86:20,
87:7, 180:24, 204:2
**comply** [3] - 214:3,
255:15, 255:18
**computer** [1] - 1:25
**computer-aided** [1] -
1:25
**concerned** [2] -
143:16, 154:16
**concerning** [4] - 6:8,
25:11, 38:1, 190:17
**conclude** [1] - 267:23
**conclusion** [2] -
10:22, 183:15
**concrete** [2] - 194:11,
194:13
**condition** [6] - 25:16,
30:23, 30:24, 33:10,
37:12, 38:1
**condo** [9] - 130:20,
219:20, 220:17,
220:18, 220:20,
220:21, 220:22
**condone** [2] - 144:8,
145:5
**conduct** [10] - 68:21,
222:23, 222:25,
223:8, 223:21,
224:22, 225:9,
228:16, 228:20,
252:15
**conducted** [2] - 196:5,
203:2
**conducting** [3] -
145:9, 250:25,

268:16
**conference** [20] -
25:15, 56:16, 57:25,
67:18, 70:2, 112:4,
113:11, 162:3,
162:25, 205:19,
207:2, 248:22,
249:19, 254:23,
256:5, 269:4,
272:14, 277:15,
278:20, 278:22
**confusion** [1] - 37:20
**connection** [2] - 24:5,
252:4
**conscious** [3] - 25:23,
27:20, 37:8
**consciousness** [1] -
27:21
**consider** [9] - 15:8,
241:3, 241:5, 241:7,
242:10, 252:4,
273:4, 280:25,
283:12
**considerations** [1] -
281:7
**considered** [2] -
18:21, 241:12
**considering** [1] -
215:21
**consistent** [3] - 14:18,
152:9, 182:5
**consistently** [1] - 19:5
**constitutes** [2] -
69:14, 285:4
**Constitution** [4] -
2:11, 230:18,
231:12, 285:12
**constitutional** [5] -
42:18, 42:21, 43:8,
43:11, 252:4
**constraints** [1] -
277:13
**consultant** [1] -
243:21
**consults** [1] - 35:24
**contact** [12] - 20:1,
20:19, 20:22, 69:13,
116:20, 144:14,
236:25, 240:16,
240:17, 240:19,
242:1, 242:2
**contacted** [1] - 21:5
**contain** [2] - 174:12,
186:20
**contained** [1] - 183:19
**contains** [3] - 186:21,
274:7
**context** [2] - 113:21,
281:5
**continually** [1] - 23:2

**continue** [7] - 8:5,
82:10, 84:7, 84:11,
84:18, 85:4, 155:25
**Continued** [1] - 156:3
**continued** [2] - 82:13
**CONTINUED** [2] -
1:22, 2:1
**continues** [1] - 261:17
**continuously** [1] -
35:5
**continuum** [6] - 48:22,
50:3, 50:5, 51:17,
52:22, 53:10
**control** [2] - 145:22,
209:10
**convene** [1] - 284:4
**convenient** [1] -
215:17
**conversation** [8] -
12:15, 102:3,
128:22, 129:12,
214:1, 227:16, 268:4
**conversations** [5] -
11:12, 20:23, 129:2,
129:3, 153:5
**convince** [1] - 15:10
**COOPER** [1] - 1:10
**copies** [3] - 151:14,
151:23, 152:23
**copy** [9] - 250:5,
266:16, 266:25,
267:1, 279:5,
279:11, 279:12,
279:21, 284:1
**copyrighted** [1] -
279:14
**corner** [7] - 76:20,
109:11, 110:5,
165:4, 165:8, 165:9,
167:7
**correct** [130] - 6:14,
6:18, 6:19, 11:16,
11:24, 12:2, 12:9,
24:23, 25:9, 27:22,
35:6, 38:16, 67:13,
68:18, 68:25, 94:8,
94:9, 113:20,
120:21, 135:1,
149:7, 149:18,
149:21, 149:23,
150:8, 151:4, 151:6,
153:19, 156:8,
164:22, 168:16,
173:21, 174:5,
176:24, 180:11,
182:17, 185:23,
186:3, 186:13,
186:16, 187:1,
189:7, 190:5, 191:7,
192:4, 193:11,

194:16, 194:18,
194:21, 194:24,
196:11, 196:13,
199:9, 199:12,
199:15, 199:18,
200:2, 201:16,
202:12, 202:13,
202:16, 202:17,
202:19, 202:20,
202:25, 203:15,
203:16, 204:8,
204:9, 204:10,
204:11, 204:12,
204:13, 204:16,
204:18, 204:19,
205:9, 208:12,
208:13, 208:17,
208:18, 208:20,
208:21, 209:21,
210:5, 210:6, 210:9,
211:23, 216:20,
217:5, 217:7,
217:17, 217:23,
218:2, 218:5,
224:19, 225:4,
226:10, 226:14,
226:20, 227:5,
236:7, 242:5,
243:12, 243:24,
247:3, 247:23,
250:5, 250:18,
253:21, 253:25,
257:9, 258:10,
258:13, 259:24,
264:7, 264:14,
265:21, 266:4,
266:5, 266:8,
266:10, 266:11,
267:9, 267:17,
267:25, 274:11,
274:15, 277:24,
280:11
**correctly** [3] - 6:12,
169:18, 203:1
**correspond** [1] -
191:10
**Coughlin** [2] - 175:16,
175:23
**Counsel** [1] - 50:4,
111:1, 111:3
**counsel** [14] - 13:2,
44:14, 49:24, 72:8,
79:3, 90:24, 129:20,
143:6, 144:25,
152:18, 152:24,
155:14, 162:2,
205:15
**counsel's** [1] - 67:12
**count** [1] - 68:4
**couple** [6] - 6:3, 85:9,

170:13, 210:2,
218:19, 220:19
**course** [4] - 23:13,
66:18, 240:18,
275:17
**courses** [2] - 42:17,
43:8
**court** [20] - 16:25,
21:25, 22:3, 73:9,
78:18, 144:4, 146:6,
146:7, 213:19,
226:4, 230:11,
236:13, 237:9,
237:12, 237:14,
237:17, 237:21,
279:14, 279:18,
279:23
**Court** [65] - 2:10, 2:10,
4:15, 4:18, 5:5, 5:15,
5:21, 8:12, 8:13,
8:23, 9:5, 9:23, 9:24,
11:20, 13:12, 16:2,
16:8, 16:19, 16:23,
17:4, 17:13, 24:7,
24:19, 25:3, 25:12,
26:8, 26:12, 30:13,
31:16, 67:11, 67:23,
67:25, 82:11, 111:5,
112:16, 143:8,
143:17, 143:22,
143:24, 145:6,
147:6, 148:12,
153:4, 153:5,
154:13, 212:14,
213:10, 213:15,
249:6, 249:13,
249:14, 269:13,
271:9, 274:5,
275:22, 276:2,
277:16, 277:24,
278:24, 280:1,
281:8, 281:10,
283:12, 285:10
**COURT** [534] - 1:1, 4:3,
4:11, 4:13, 4:16, 5:8,
5:10, 5:20, 6:1, 6:17,
6:20, 6:22, 7:1, 7:9,
7:13, 7:21, 7:24, 8:2,
8:11, 8:15, 9:1, 9:3,
9:8, 10:1, 10:13,
10:18, 10:20, 11:3,
11:5, 11:7, 11:18,
11:24, 12:2, 12:5,
12:11, 12:19, 13:2,
13:11, 13:16, 13:19,
14:7, 14:17, 15:7,
15:14, 15:18, 15:23,
16:10, 17:5, 17:7,
17:11, 18:2, 18:5,
18:7, 18:10, 19:14,

19:17, 20:5, 21:7,
21:13, 21:16, 21:19,
21:23, 22:8, 22:11,
22:14, 22:20, 22:22,
23:5, 23:12, 23:15,
24:3, 24:8, 24:22,
25:2, 25:7, 25:13,
25:22, 26:1, 26:6,
26:17, 26:19, 26:21,
27:2, 27:8, 27:11,
27:14, 27:16, 27:20,
27:23, 28:1, 28:10,
28:15, 28:21, 28:24,
29:7, 29:13, 29:17,
30:2, 30:5, 30:8,
30:14, 30:16, 30:20,
31:3, 31:6, 31:9,
31:13, 31:17, 31:22,
32:1, 32:3, 32:7,
32:10, 32:17, 32:19,
32:21, 33:2, 33:5,
33:8, 33:12, 33:19,
33:24, 34:8, 34:10,
35:13, 35:15, 37:11,
38:21, 39:4, 39:25,
40:5, 40:9, 41:15,
43:18, 43:24, 44:16,
49:11, 49:15, 49:23,
50:4, 51:10, 51:13,
53:7, 56:12, 56:15,
56:21, 57:4, 57:7,
57:11, 57:14, 57:18,
57:22, 57:24, 58:9,
58:24, 59:8, 59:10,
60:21, 61:19, 62:6,
62:8, 64:15, 64:24,
65:6, 66:12, 67:12,
67:17, 67:20, 68:3,
68:6, 68:16, 68:22,
69:11, 69:17, 69:21,
69:24, 70:1, 72:1,
72:5, 75:23, 76:15,
77:15, 77:18, 77:22,
79:24, 85:7, 85:11,
87:14, 87:18, 87:22,
88:1, 88:6, 88:11,
88:13, 88:15, 88:18,
88:21, 89:1, 89:4,
89:9, 89:11, 89:15,
89:19, 89:22, 90:1,
90:3, 90:6, 90:22,
90:25, 91:4, 91:8,
91:11, 91:25, 92:2,
93:11, 94:11, 96:10,
96:22, 98:21,
101:23, 103:2,
109:23, 111:5,
111:7, 111:24,
112:3, 112:6, 112:9,
112:12, 112:17,
112:22, 113:3,

113:6, 113:10, 113:12, 116:12, 116:19, 119:19, 120:5, 123:10, 123:14, 129:20, 129:22, 132:8, 134:3, 134:5, 134:19, 134:22, 135:14, 135:16, 135:18, 135:21, 135:25, 136:4, 140:3, 141:1, 141:4, 141:7, 141:9, 141:11, 141:17, 141:21, 141:25, 142:5, 142:9, 142:12, 142:17, 142:20, 142:23, 143:1, 143:3, 144:1, 144:6, 144:19, 144:23, 145:3, 145:11, 145:15, 145:19, 145:25, 146:6, 146:9, 146:11, 147:2, 147:8, 147:13, 147:17, 147:19, 147:22, 148:1, 148:6, 148:9, 148:11, 148:15, 148:20, 148:23, 149:1, 149:6, 149:9, 149:16, 149:19, 149:22, 150:3, 150:5, 150:9, 150:12, 150:18, 150:22, 151:2, 151:4, 151:7, 151:10, 151:17, 151:23, 152:1, 152:18, 152:23, 153:1, 153:16, 153:21, 154:3, 154:5, 154:8, 154:23, 155:1, 155:6, 155:12, 155:17, 155:23, 155:25, 156:25, 158:5, 158:7, 158:17, 161:18, 161:24, 162:2, 162:5, 162:9, 162:16, 162:20, 162:23, 163:1, 164:9, 166:2, 166:5, 169:7, 170:5, 170:8, 170:17, 170:19, 170:21, 170:25, 171:22, 176:6, 177:11, 178:16, 179:6, 180:18,

181:3, 181:18, 187:13, 187:20, 188:25, 189:2, 189:11, 190:14, 191:2, 191:4, 191:6, 195:2, 195:7, 195:9, 195:12, 196:7, 197:2, 197:7, 198:20, 198:24, 202:4, 203:21, 205:3, 205:8, 205:12, 205:14, 205:17, 205:21, 206:1, 206:8, 206:17, 206:21, 207:1, 207:8, 207:20, 210:12, 210:17, 210:23, 211:1, 211:8, 211:16, 211:22, 211:25, 212:3, 212:5, 212:7, 212:15, 212:17, 212:24, 213:2, 213:13, 213:20, 213:22, 213:25, 214:10, 214:12, 214:16, 214:19, 214:23, 214:25, 215:12, 215:23, 216:1, 216:5, 216:9, 225:7, 228:15, 229:16, 231:16, 232:17, 234:13, 242:14, 242:16, 245:4, 248:21, 249:2, 249:5, 249:8, 249:11, 249:16, 251:13, 253:2, 253:5, 253:9, 253:19, 254:12, 254:22, 254:25, 255:11, 255:15, 255:19, 255:24, 256:4, 259:5, 261:11, 263:5, 263:25, 265:1, 265:5, 265:15, 266:23, 269:6, 269:15, 269:23, 269:25, 270:6, 270:10, 270:12, 270:15, 270:18, 270:22, 270:25, 271:5, 271:10, 271:13, 271:17, 271:19, 271:24, 272:1, 272:4, 272:11, 272:15, 272:24, 273:2, 273:11, 273:17,

273:20, 273:23, 273:25, 274:9, 274:12, 274:16, 275:5, 275:12, 275:14, 275:18, 275:21, 275:25, 276:3, 276:17, 276:19, 277:6, 277:20, 278:11, 278:14, 278:17, 278:21, 279:8, 279:12, 279:16, 279:20, 280:6, 280:10, 280:21, 280:24, 281:3, 281:14, 281:16, 281:20, 281:23, 282:1, 282:8, 282:12, 282:16, 282:19, 282:24, 283:3, 283:17, 283:21, 283:24, 284:2, 284:9, 284:11, 284:13, 285:1
**Court's** [23] - 9:25, 10:23, 11:19, 23:16, 25:14, 26:18, 27:13, 27:15, 30:13, 35:10, 69:2, 123:9, 150:14, 151:12, 169:4, 170:20, 181:16, 189:9, 204:23, 212:12, 253:7, 274:5, 279:2
**courtesy** [2] - 154:22, 279:20
**courthouse** [2] - 229:21, 230:1
**Courthouse** [2] - 2:11, 285:11
**COURTROOM** [2] - 4:6, 195:8
**courtroom** [16] - 31:2, 33:23, 34:11, 87:21, 87:23, 90:2, 141:16, 145:7, 145:12, 146:1, 148:15, 155:24, 170:19, 211:7, 216:4, 272:23
**courts** [3] - 236:4, 236:5, 236:7
**cover** [1] - 214:18
**covered** [1] - 10:10
**covers** [3] - 248:17, 249:21, 250:19
**cracks** [1] - 190:6
**craft** [1] - 33:17
**crazy** [1] - 115:17
**creates** [1] - 5:2

**creating** [1] - 8:20
**credit** [1] - 42:9
**crime** [60] - 8:7, 10:17, 62:24, 63:1, 65:24, 65:25, 66:2, 69:12, 69:18, 98:6, 101:5, 101:9, 101:20, 105:15, 105:17, 124:7, 124:17, 124:18, 124:20, 124:25, 125:5, 138:19, 139:9, 171:11, 171:17, 171:18, 172:1, 172:6, 172:12, 172:16, 172:22, 172:24, 172:25, 173:2, 173:4, 173:5, 173:7, 173:8, 173:13, 173:19, 173:22, 174:3, 174:14, 174:15, 174:16, 174:20, 174:23, 179:19, 185:4, 199:11, 199:16, 199:19, 200:4, 200:5, 209:2, 209:3, 209:4, 209:8
**crime's** [1] - 208:25
**crimes** [3] - 173:7, 173:12
**criminal** [15] - 16:7, 16:12, 20:25, 42:15, 42:16, 42:18, 42:20, 43:9, 43:12, 199:17, 239:8, 240:3, 269:9, 269:10, 281:5
**critical** [1] - 35:3
**CROSS** [1] - 202:6
**cross** [16] - 5:12, 13:1, 31:22, 44:8, 44:10, 67:15, 72:22, 89:9, 112:23, 170:9, 170:13, 270:8, 274:24, 275:10, 276:11, 276:23
**CROSS-EXAMINATION** [1] - 202:6
**cross-examination** [6] - 5:12, 13:1, 44:8, 44:10, 270:8, 275:10
**cross-examine** [4] - 170:9, 274:24, 276:11, 276:23
**crowd** [3] - 125:15, 159:24, 160:1
**crowd's** [1] - 123:25
**CRR** [3] - 2:10, 285:3, 285:10

**cumulative** [2] - 153:15, 206:6
**curative** [5] - 5:6, 5:18, 13:20, 14:5, 155:7
**curb** [2] - 159:11, 159:12
**cure** [1] - 13:22
**curious** [1] - 253:13
**current** [3] - 34:21, 35:22, 216:16
**curt** [2] - 67:7, 67:8
**curve** [1] - 280:13
**custodian** [2] - 275:18, 275:24
**cut** [6] - 94:23, 137:6, 137:7, 137:19, 251:13, 276:10
**cut-out** [1] - 94:23
**cuts** [2] - 137:9, 275:9
**cutting** [1] - 137:2

**D**

**D.C** [6] - 1:4, 42:10, 43:3, 101:1, 166:22, 225:13
**damages** [2] - 273:17, 273:18
**damaging** [2] - 22:1, 145:10
**dark** [3] - 94:20, 182:21, 184:5
**dash** [2] - 83:20, 86:18
**date** [4] - 35:20, 111:3, 216:23, 235:20
**dated** [1] - 214:2
**Dated** [1] - 285:8
**daughter** [1] - 234:10
**David** [1] - 125:4
**Davis** [3] - 166:16, 166:24, 166:25
**days** [4] - 126:2, 126:3, 218:21, 219:3
**DC** [5] - 1:15, 1:19, 2:4, 2:12, 285:12
**de** [1] - 280:10
**deal** [12] - 6:3, 18:22, 23:15, 31:22, 88:3, 89:1, 128:22, 206:8, 206:14, 215:2, 273:25, 284:3
**dealing** [1] - 33:25
**dealings** [1] - 96:6
**death** [2] - 173:9, 173:10
**DeBerardinis** [139] - 2:2, 4:5, 4:10, 4:14, 4:17, 5:22, 5:23, 12:24, 13:5, 13:21, 14:5, 16:6, 22:9,

22:13, 26:23, 27:24,
28:2, 28:12, 28:18,
28:23, 28:25, 29:11,
29:21, 30:3, 30:12,
31:15, 31:18, 32:2,
32:5, 32:18, 32:20,
33:16, 35:14, 36:23,
36:25, 37:9, 38:19,
39:2, 39:24, 41:14,
43:17, 43:22, 44:14,
49:20, 53:6, 56:11,
56:13, 56:18, 56:23,
58:7, 58:23, 59:7,
59:9, 60:19, 61:17,
64:14, 64:22, 65:3,
66:11, 67:10, 67:23,
68:5, 68:7, 68:19,
69:7, 69:23, 72:4,
72:8, 72:15, 75:22,
77:19, 77:21, 79:3,
79:24, 90:23, 91:23,
93:9, 96:8, 98:20,
99:25, 101:22,
111:1, 111:3, 112:1,
112:8, 112:10,
112:14, 112:18,
116:10, 116:15,
116:18, 119:17,
120:4, 123:12,
132:6, 140:1,
140:24, 141:23,
155:7, 157:1, 158:6,
158:14, 161:16,
161:22, 162:14,
162:18, 164:7,
166:1, 167:1,
169:10, 170:3,
197:16, 212:9,
212:18, 213:1,
213:10, 249:13,
274:22, 275:7,
275:25, 276:1,
276:4, 276:18,
276:20, 278:6,
278:12, 278:19,
278:23, 279:13,
279:18, 279:22,
280:1, 281:10,
281:15, 282:1,
282:5, 282:20,
283:15, 283:18
**decedent** [1] - 203:9
**decently** [1] - 54:24
**decide** [3] - 27:5,
155:13, 212:13
**decided** [1] - 124:2
**decision** [7] - 276:24,
277:8, 279:22,
280:2, 280:18,
280:21, 280:22

**DEFENDANT** [1] -
80:3
**defendant** [4] - 49:24,
263:20, 271:24,
272:6
**Defendant** [11] - 2:2,
22:21, 77:1, 81:3,
128:10, 128:12,
187:3, 201:8,
214:15, 214:18,
216:8
**defendants** [4] - 4:9,
26:21, 149:25,
151:13
**Defendants** [1] - 1:7
**Defendants'** [5] -
193:21, 194:14,
195:14, 195:16,
207:5
**defendants'** [4] -
10:25, 153:25,
204:25, 207:19
**defense** [19] - 4:14,
5:12, 8:21, 9:5, 22:3,
49:14, 49:24, 89:15,
144:25, 151:23,
152:24, 155:21,
170:9, 210:14,
272:25, 275:10,
278:1, 280:18,
283:11
**definition** [2] - 115:3,
174:9
**degree** [2] - 42:12,
145:6
**delay** [1] - 33:25
**deliberations** [2] -
251:16, 252:9
**delineate** [1] - 190:4
**demonstrate** [2] -
121:12, 121:18
**Department** [10] -
40:19, 171:11,
171:13, 173:3,
192:3, 196:5, 198:3,
216:17, 216:19,
255:13
**department** [6] - 36:6,
36:8, 126:22,
172:11, 251:19,
252:17
**depict** [6] - 90:13,
94:16, 157:22,
159:1, 178:11,
262:12
**depicted** [1] - 176:25
**depicting** [1] - 7:5
**depiction** [3] - 52:25,
177:1, 207:15
**depicts** [2] - 77:8,

157:24
**depose** [4] - 9:18,
275:5, 276:25,
277:10
**deposed** [3] - 21:8,
22:6
**deposition** [34] -
17:15, 17:16, 17:20,
18:21, 20:14, 20:16,
21:3, 21:11, 69:19,
75:20, 76:2, 83:8,
110:21, 111:15,
112:7, 113:16,
114:5, 114:13,
127:8, 128:23,
128:24, 129:18,
132:4, 132:12,
133:12, 139:22,
139:25, 165:24,
166:3, 166:7,
166:10, 168:2,
253:20, 280:11
**deposition's** [1] -
129:24
**depositions** [4] -
17:25, 18:16, 19:18,
21:6
**DEPUTY** [2] - 4:6,
195:8
**deputy** [3] - 34:11,
148:16, 150:17
**Derricotte** [11] - 17:14,
18:2, 18:15, 19:11,
19:24, 20:10, 21:9,
147:18, 147:19,
150:23, 152:16
**describe** [7] - 71:16,
82:2, 94:4, 100:5,
101:14, 166:8, 242:9
**described** [2] -
136:12, 167:6
**despite** [2] - 14:12,
277:23
**detail** [4] - 128:1,
128:5, 128:7, 131:25
**detailed** [2] - 20:21,
224:15
**details** [1] - 154:14
**detecting** [1] - 71:8
**detection** [1] - 70:23
**detective** [5] - 10:12,
97:9, 209:12,
264:24, 265:12
**Detective** [8] - 6:21,
22:19, 97:10, 215:4,
215:8, 215:14,
265:17, 273:8
**detectives** [1] - 6:24
**determination** [1] -
253:11

determine [5] - 7:10,
9:6, 9:8, 38:7, 39:5
**determined** [2] -
224:10, 252:18
**develop** [1] - 198:9
**deviated** [1] - 255:21
**deviation** [1] - 15:3
**diagram** [17] - 50:16,
88:7, 89:22, 176:1,
176:7, 176:11,
176:18, 176:20,
176:21, 176:23,
177:1, 179:17,
188:11, 188:18,
278:7, 279:3
**diagramming** [1] -
172:14
**diagrams** [3] - 275:1,
279:1, 280:4
**dictate** [1] - 223:5
**dictated** [1] - 48:25
**dictates** [1] - 223:4
**dictating** [1] - 125:8
**die** [2] - 173:16,
273:16
**difference** [2] - 173:6,
195:18
**differences** [1] -
139:25
**different** [28] - 4:23,
8:23, 11:5, 24:13,
46:17, 46:20, 49:6,
49:16, 59:17, 70:12,
70:13, 70:25, 71:4,
75:16, 75:17, 75:18,
76:23, 98:13,
113:23, 114:1,
114:11, 118:7,
149:2, 184:25,
185:2, 194:20,
205:7, 230:15
**difficult** [1] - 23:6
**digging** [8] - 162:11,
164:3, 164:5,
164:11, 164:12,
164:14, 165:4, 165:9
**digital** [2] - 126:8,
126:9
**dining** [1] - 219:21
**dinner** [7] - 218:23,
219:8, 219:10,
219:12, 219:15,
219:18, 219:24
**direct** [10] - 5:17, 13:9,
14:10, 14:13, 53:22,
89:20, 112:23,
145:17, 205:12,
230:24
**DIRECT** [5] - 34:15,
40:12, 156:3, 171:2,

216:12
**directed** [3] - 154:17,
185:9, 228:7
**direction** [4] - 78:23,
79:13, 80:8, 81:16
**directly** [8] - 81:3,
133:6, 229:6,
234:25, 235:2,
245:14, 262:6, 281:9
**directs** [1] - 185:8
**disagreed** [1] - 88:24
**disarm** [1] - 51:22
**disciplined** [1] -
224:11
**disclosed** [1] - 21:20
**disclosure** [1] -
280:15
**disclosures** [1] -
24:23
**discovery** [1] - 20:12
**discretion** [1] - 272:5
**discuss** [8] - 44:19,
156:14, 217:19,
217:21, 269:14,
271:21, 273:20,
279:4
**discussed** [5] - 14:25,
30:20, 147:3,
217:24, 273:11
**discussing** [1] - 11:12
**dismiss** [1] - 272:18
**dismissed** [1] - 170:6
**dispatcher** [1] -
117:24
**dispensable** [2] -
147:13, 147:23
**dispense** [1] - 150:23
**dispenses** [1] - 15:7
**displayed** [2] - 37:25,
39:8
**dispute** [3] - 144:17,
282:3, 283:4
**disruptive** [1] - 145:12
**distance** [8] - 104:4,
149:13, 188:16,
188:19, 189:5,
193:13, 236:12,
238:12
**distinguished** [1] -
172:25
**distress** [1] - 252:6
**DISTRICT** [4] - 1:1,
1:1, 1:6, 1:11
**District** [18] - 4:7,
10:2, 13:20, 14:8,
18:17, 24:6, 92:16,
92:21, 118:2,
123:21, 143:4,
172:4, 172:6, 173:1,
173:20, 225:2,

226:12, 274:20
**district** [1] - 92:15
**District's** [1] - 20:15
**districts** [2] - 225:1, 225:13
**division** [1] - 171:11
**DNA** [12] - 14:25, 174:13, 191:24, 195:24, 196:1, 196:5, 196:10, 198:9, 203:4, 203:6, 203:12, 209:22
**Doctor** [2] - 34:24, 36:21, 39:14, 39:22
**doctor** [12] - 28:3, 28:4, 29:19, 30:11, 33:12, 34:17, 34:19, 35:7, 37:2, 38:17, 38:22, 39:5
**doctor's** [1] - 33:9
**document** [23] - 113:25, 174:22, 176:8, 176:9, 184:20, 191:3, 198:18, 200:5, 207:9, 207:14, 266:7, 266:9, 266:16, 267:8, 274:25, 275:4, 275:8, 276:9, 276:11, 277:2, 277:3, 279:9
**documentation** [2] - 38:4, 39:10
**documented** [3] - 38:11, 38:13, 38:15
**documents** [4] - 178:4, 204:24, 205:2, 277:4
**Doe** [5] - 36:14, 36:15, 36:16, 37:5, 39:6
**dog** [3] - 14:3, 86:22, 118:9
**Domenic** [2] - 147:18, 152:16
**dominant** [1] - 46:1
**done** [25] - 15:1, 15:4, 18:22, 24:1, 40:20, 59:18, 59:20, 59:21, 59:22, 59:24, 79:9, 89:7, 89:9, 89:10, 89:11, 102:1, 140:20, 172:16, 198:7, 200:9, 231:7, 231:9, 276:10
**done-done** [1] - 89:11
**door** [20] - 5:13, 5:16, 80:8, 80:18, 80:21, 99:17, 99:19, 99:20, 100:21, 102:19,

105:2, 152:5, 152:7, 152:9, 152:11, 159:20, 159:21, 212:20
**door's** [1] - 94:20
**double** [1] - 238:3
**double-back** [1] - 238:3
**doubt** [1] - 92:22
**down** [80] - 5:4, 13:6, 21:11, 34:17, 49:12, 51:5, 51:8, 51:14, 61:21, 62:17, 64:8, 65:9, 72:3, 72:6, 73:8, 74:4, 78:17, 78:21, 93:8, 97:22, 99:5, 100:17, 102:7, 102:12, 102:13, 103:22, 108:14, 109:22, 111:10, 111:11, 111:13, 111:18, 111:19, 111:20, 112:12, 112:15, 113:19, 114:3, 114:4, 114:10, 114:12, 114:15, 118:9, 122:11, 122:20, 129:5, 137:25, 138:11, 144:2, 157:8, 165:14, 184:2, 184:6, 184:9, 184:10, 196:19, 208:7, 219:2, 219:6, 229:20, 230:13, 230:21, 231:12, 236:4, 236:6, 236:9, 239:5, 248:25, 257:22, 258:14, 259:21, 259:22, 261:14, 261:15, 261:18, 262:2, 263:10, 263:11, 282:5
**downtown** [1] - 219:9
**Dr** [20] - 15:20, 22:18, 25:11, 25:15, 31:4, 32:9, 32:15, 34:6, 34:10, 35:16, 39:25, 149:21, 275:2, 275:6, 275:23, 276:5, 276:25, 277:8, 278:4, 280:20
**drafted** [1] - 88:23
**draw** [16] - 59:12, 72:11, 72:19, 72:21, 78:14, 79:21, 80:8, 81:8, 83:12, 84:11, 85:15, 85:18, 86:5, 90:9, 163:4, 262:11

**drawing** [9] - 50:16, 77:17, 84:14, 84:16, 84:17, 90:10, 91:3, 98:23, 277:25
**drawn** [3] - 80:1, 108:19, 176:23
**dressed** [1] - 64:18
**drew** [5] - 45:4, 50:16, 57:2, 160:18, 260:14
**drink** [1] - 131:6
**drinking** [3] - 220:13, 221:18, 222:2
**drinks** [1] - 220:1
**drive** [1] - 78:20
**driven** [2] - 93:5, 235:20
**driver** [2] - 77:1, 119:21
**driver's** [1] - 81:5
**driveway** [25] - 8:8, 64:6, 86:8, 99:7, 99:11, 111:13, 148:24, 164:14, 179:14, 181:25, 194:7, 260:9, 260:11, 260:14, 260:18, 260:24, 261:19, 261:25, 262:3, 262:4, 262:12, 262:14, 262:15, 262:22, 263:7
**driving** [8] - 75:2, 100:8, 119:14, 119:15, 119:22, 234:19, 234:20, 237:18
**drove** [8] - 78:7, 78:17, 78:19, 78:22, 82:9, 140:6, 218:13, 236:7
**drug** [1] - 124:21
**due** [2] - 4:21, 281:6
**duress** [1] - 268:22
**during** [16] - 11:1, 13:9, 58:5, 58:11, 68:15, 70:5, 108:24, 156:7, 164:23, 235:19, 252:8, 265:9, 265:10, 265:22, 265:24, 277:9
**dust** [2] - 184:13, 185:5
**dusted** [1] - 185:15
**dusting** [1] - 185:13
**duties** [3] - 35:22, 68:13, 185:4
**duty** [10] - 35:19, 54:12, 54:14, 54:17, 172:17, 221:7,

221:9, 222:23, 255:13, 255:15

## E

**Eagle** [1] - 168:5
**early** [1] - 141:12
**easel** [1] - 157:2
**easier** [1] - 79:25
**easily** [1] - 192:11
**eating** [1] - 222:2
**edge** [1] - 182:1
**education** [1] - 42:7
**effect** [11] - 12:16, 22:1, 28:19, 75:4, 93:22, 93:23, 108:10, 139:5, 143:14, 224:11, 256:19
**efforts** [2] - 19:20, 23:4
**eight** [2] - 126:16, 127:5
**either** [13] - 39:9, 45:8, 103:7, 147:9, 147:24, 160:15, 177:17, 177:25, 178:6, 196:1, 227:16, 235:12, 261:1
**eject** [3] - 187:5, 187:9
**ejection** [1] - 187:5
**ejects** [4] - 186:14, 186:24, 187:7, 187:8
**elbow** [1] - 106:12
**elected** [1] - 275:7
**elements** [1] - 174:23
**elevator** [3] - 143:9, 143:19, 144:4
**elicit** [6] - 7:4, 9:11, 12:13, 14:10, 25:22, 26:2
**eliciting** [1] - 32:15
**ELMO** [1] - 182:25
**ELPH** [2] - 126:4, 126:6
**Elvans** [39] - 19:2, 63:16, 63:24, 64:13, 72:14, 72:22, 73:5, 74:15, 78:11, 79:11, 92:13, 92:21, 94:17, 94:24, 109:18, 109:19, 110:8, 110:9, 139:14, 158:25, 160:19, 161:21, 162:1, 162:12, 163:25, 164:2, 164:3, 164:25, 165:9, 175:3, 177:2, 178:7,

188:13, 235:8, 258:7, 258:8, 260:7, 260:8
**emailed** [1] - 211:13
**emergency** [5] - 36:5, 36:8, 248:6, 256:17, 256:18
**emotional** [1] - 155:2, 252:6
**employed** [3] - 171:9, 171:10, 216:18
**employer** [2] - 216:16, 216:18
**encompasses** [3] - 43:15, 172:12, 172:13
**encounter** [2] - 69:5, 69:6
**end** [24] - 57:25, 59:18, 70:2, 79:7, 84:21, 84:23, 96:8, 104:25, 111:11, 113:11, 135:11, 135:14, 135:16, 138:11, 162:25, 164:5, 164:13, 166:13, 207:2, 224:15, 249:19, 256:5, 272:14, 272:16
**Enforcement** [1] - 53:24
**engage** [1] - 227:15
**engine** [2] - 82:6, 82:7
**enhanced** [1] - 263:12
**enjoy** [1] - 44:10
**entail** [1] - 66:21
**enter** [3] - 216:21, 227:22, 234:16
**entered** [3] - 36:13, 94:12, 201:4
**enters** [4] - 33:23, 90:2, 155:24, 216:4
**entire** [4] - 27:8, 142:3, 142:7, 274:10
**entirely** [1] - 168:16
**entirety** [1] - 109:13
**entitled** [1] - 170:14
**Entrance** [2] - 282:12
**entrance** [3] - 237:7, 282:25, 283:25
**entry** [5] - 274:8, 274:16, 279:1, 280:5, 283:14
**environment** [1] - 222:3
**equipped** [2] - 248:1, 248:3
**ERIC** [3] - 3:6, 171:1, 171:8

**Eric** [1] - 171:8
**especially** [1] - 165:21
**ESQ** [4] - 1:13, 1:17, 2:2, 2:2
**esse** [1] - 280:11
**essentially** [2] - 270:2, 274:7
**establish** [6] - 9:20, 15:3, 69:17, 113:3, 151:18, 162:15
**Establish** [1] - 75:23
**established** [3] - 162:16, 206:23, 221:24
**establishes** [1] - 281:6
**et** [1] - 4:7
**ET** [1] - 1:6
**evaluation** [3] - 37:18, 38:9, 225:22
**Evans** [3] - 175:1, 258:5, 260:6
**evening** [4] - 218:24, 266:3, 272:18, 284:12
**event** [2] - 131:11, 199:17
**events** [2] - 107:3, 268:15
**eventually** [8] - 23:24, 81:23, 86:24, 91:13, 122:2, 140:4, 192:2, 209:9
**everywhere** [1] - 95:7
**evidence** [69] - 8:18, 9:10, 9:15, 9:16, 10:17, 14:9, 14:20, 14:25, 15:9, 24:5, 26:16, 27:9, 35:10, 94:13, 117:6, 124:6, 149:6, 153:9, 153:15, 155:10, 158:4, 172:14, 174:4, 174:6, 174:8, 174:9, 174:12, 174:15, 174:18, 174:22, 175:14, 175:20, 175:25, 178:7, 180:13, 181:8, 181:9, 182:11, 183:21, 184:21, 188:23, 191:20, 193:19, 195:1, 197:20, 199:21, 199:25, 200:1, 200:24, 207:19, 209:11, 209:17, 209:20, 209:21, 209:22, 210:3, 210:5, 210:7, 213:9, 249:15,

251:22, 251:25, 263:23, 264:2, 264:6, 264:8, 280:17
**evident** [1] - 143:12
**evidentiary** [1] - 34:1
**ex** [7] - 15:9, 15:14, 16:4, 16:7, 17:4, 23:16
**exact** [1] - 50:18
**exactly** [11] - 5:14, 56:1, 78:8, 86:2, 95:21, 106:12, 109:20, 124:9, 124:11, 133:6, 282:11
**exam** [2] - 191:23, 191:25
**Exam** [2] - 207:13, 208:4
**EXAMINATION** [6] - 34:15, 40:12, 156:3, 171:2, 202:6, 216:12
**examination** [10] - 5:12, 5:17, 13:1, 13:9, 44:8, 44:10, 270:8, 275:10, 277:3, 280:19
**examine** [8] - 13:17, 170:9, 187:2, 274:24, 276:11, 276:23
**examined** [2] - 191:23, 272:10
**examiner** [2] - 278:25, 280:4
**examiner's** [4] - 196:24, 197:10, 198:5, 274:4
**examining** [1] - 89:17
**example** [4] - 7:18, 44:5, 56:8, 251:24
**exception** [5] - 12:22, 32:22, 283:5, 283:6, 283:10
**exchange** [1] - 154:14
**exchanged** [1] - 144:11
**excise** [2] - 278:1, 282:14
**exclude** [4] - 10:24, 14:8, 26:6, 26:8
**excuse** [6] - 31:3, 31:14, 35:7, 182:15, 187:21, 276:18
**excused** [3] - 40:1, 210:13, 210:17
**exhibit** [9] - 26:17, 30:6, 95:3, 274:7, 274:22, 277:20, 277:21, 281:18,

284:1
**Exhibit** [32] - 35:11, 77:14, 134:2, 134:9, 169:10, 176:8, 179:8, 180:20, 181:1, 181:23, 182:12, 185:18, 186:5, 187:25, 188:23, 189:3, 189:24, 190:20, 191:9, 193:21, 194:10, 194:15, 195:1, 195:6, 195:15, 195:16, 204:7, 207:5, 207:19, 266:21, 278:5, 281:19
**exhibited** [1] - 33:2
**exhibits** [4] - 23:11, 171:23, 203:23, 205:22
**Exhibits** [3] - 157:6, 177:14, 178:14
**existed** [2] - 96:19, 256:8
**exists** [2] - 251:4, 278:3
**exit** [9] - 87:23, 238:3, 274:8, 274:16, 279:1, 280:5, 282:12, 282:25, 283:14
**Exit** [1] - 282:12
**exited** [1] - 201:5
**exiting** [3] - 238:6, 238:15, 259:12
**exits** [4] - 87:21, 141:16, 211:7, 272:23
**expansion** [2] - 190:8, 190:10
**expect** [2] - 173:15, 277:4
**expensive** [1] - 222:7
**experience** [18] - 28:15, 29:2, 29:15, 29:24, 30:11, 30:22, 33:6, 33:9, 39:7, 50:11, 57:22, 63:6, 63:24, 64:20, 102:11, 196:25, 198:10, 240:4
**experienced** [1] - 25:24
**experiencing** [2] - 28:11, 39:6
**expert** [28] - 9:11, 9:12, 9:13, 9:14, 9:18, 10:8, 10:25, 20:7, 28:7, 28:24,

29:1, 29:5, 30:4, 30:10, 30:24, 53:13, 53:15, 56:19, 56:20, 68:8, 68:14, 68:20, 69:7, 69:10, 264:3, 273:7, 280:14
**expert's** [2] - 6:12, 9:17
**expertise** [1] - 29:8
**explain** [6] - 37:15, 80:15, 110:24, 174:6, 174:19, 174:21
**explainable** [1] - 192:12
**explained** [2] - 251:19, 251:22
**explaining** [1] - 268:3
**explore** [1] - 206:16
**Explorer** [6] - 71:24, 75:1, 75:14, 75:24, 77:11, 184:18
**Explorers** [1] - 75:17
**express** [1] - 30:6
**expressed** [1] - 21:2
**extend** [4] - 48:6, 48:8, 48:15
**extensive** [1] - 20:23
**extent** [4] - 25:23, 71:6, 129:11, 282:3
**extra** [1] - 59:18
**extremely** [3] - 18:22, 19:3, 19:4
**eye** [1] - 46:1
**eyes** [1] - 93:8
**eyewitness** [4] - 160:2, 160:4, 160:7, 199:17
**eyewitnesss** [2] - 16:1, 160:3

**F**

**face** [2] - 106:7, 282:2
**faced** [1] - 167:7
**facilitate** [1] - 38:9
**facility** [1] - 60:11
**facing** [2] - 47:1, 168:15
**fact** [11] - 10:5, 14:12, 16:13, 28:20, 56:20, 165:24, 206:15, 232:6, 255:4, 266:2, 268:1
**factors** [1] - 242:10
**facts** [5] - 97:12, 129:19, 231:9, 244:20, 244:22
**factual** [1] - 13:13
**fair** [15] - 31:10, 32:20,

32:21, 57:11, 57:14, 107:19, 114:16, 114:17, 135:12, 168:22, 212:10, 238:16, 270:6, 278:24, 280:3
**fairly** [1] - 227:21
**fall** [2] - 36:7, 99:11
**falls** [2] - 121:9, 122:12
**false** [2] - 252:5, 273:19
**familiar** [3] - 43:15, 55:22, 201:22
**family** [4] - 64:4, 143:11, 154:18, 234:10
**far** [20] - 7:25, 28:3, 41:17, 45:22, 48:8, 50:16, 71:7, 88:8, 95:24, 103:18, 116:17, 127:24, 154:16, 177:4, 203:6, 257:14, 262:16, 267:10, 268:12, 268:14
**fashion** [3] - 5:7, 160:17, 243:21
**fashioned** [1] - 155:8
**fast** [28] - 91:19, 109:8, 115:10, 115:13, 115:18, 115:19, 163:25, 167:4, 167:14, 167:16, 229:22, 229:25, 230:1, 230:2, 230:7, 230:13, 239:22, 239:25, 240:2, 240:10, 240:13, 241:18, 243:11, 248:15, 257:4, 257:8, 259:25, 260:17
**faster** [3] - 107:17, 166:24, 239:19
**fatal** [4] - 173:14, 217:13, 252:12, 252:23
**fatality** [1] - 175:9
**father** [1] - 144:11
**favorable** [3] - 18:23, 23:22, 242:7
**fear** [1] - 230:25
**fearful** [1] - 63:7
**Featherston** [8] - 4:9, 4:11, 20:5, 24:12, 24:16, 202:4, 211:13, 215:19
**FEATHERSTONE** [110] - 2:2, 4:2, 4:4,

4:12, 8:16, 9:2, 17:9, 17:12, 20:6, 21:9, 21:14, 21:17, 21:20, 21:24, 24:24, 30:18, 31:1, 31:7, 33:22, 88:17, 88:22, 89:3, 89:17, 143:7, 144:2, 145:14, 145:18, 146:2, 146:10, 151:1, 151:3, 151:13, 152:21, 153:3, 153:19, 163:6, 178:15, 181:2, 184:19, 187:11, 189:1, 191:1, 191:3, 195:5, 196:6, 197:1, 197:4, 198:17, 202:5, 202:7, 203:19, 203:22, 204:23, 205:5, 205:13, 206:2, 206:9, 206:19, 206:25, 207:3, 207:6, 207:18, 208:1, 210:10, 210:13, 210:21, 212:1, 215:3, 215:25, 225:6, 228:14, 229:14, 231:14, 232:15, 234:11, 242:13, 242:15, 245:2, 246:18, 248:19, 248:24, 249:3, 249:6, 249:10, 249:18, 253:1, 253:3, 253:6, 253:16, 254:10, 254:20, 255:1, 259:1, 259:3, 261:9, 263:2, 263:24, 264:25, 265:2, 265:6, 265:13, 269:2, 269:7, 269:17, 270:7, 270:11, 270:23, 271:25, 272:2, 281:1
Featherstone)...........
.....................202 [1] - 3:7
February [12] - 1:5, 43:5, 111:4, 111:7, 113:15, 253:22, 253:24, 254:9, 254:15, 254:18, 264:11, 264:16
Federal [1] - 53:24
feelings [2] - 4:25, 228:13
feet [3] - 103:24,

117:10, 159:14
fell [2] - 86:24, 87:6
fellow [2] - 129:16, 147:17
fellows [1] - 129:12
felt [2] - 86:16, 240:6
female [3] - 64:16, 64:18, 65:9
few [16] - 64:3, 66:25, 67:1, 67:2, 85:2, 124:5, 130:19, 142:23, 163:14, 168:21, 186:1, 187:9, 198:12, 232:25, 271:14, 273:3
fiddle [2] - 108:21, 108:22
fiddling [1] - 108:22
field [2] - 53:13, 107:3
Fifth [1] - 43:13
figure [1] - 122:21
figured [1] - 16:16
file [2] - 5:20, 28:6
filed [3] - 28:19, 29:4, 269:10
filing [1] - 22:14
fill [1] - 22:15
final [2] - 249:11, 252:8
findings [1] - 37:21
fine [15] - 4:4, 4:5, 7:8, 8:11, 12:18, 33:19, 88:7, 135:18, 142:18, 150:25, 215:10, 215:18, 215:23, 239:25, 281:16
fingerprint [7] - 14:17, 14:23, 172:13, 191:23, 280:13, 280:14, 280:19
fingerprinting [6] - 44:17, 44:21, 176:3, 202:18, 202:22, 209:23
fingerprints [11] - 174:12, 183:6, 183:9, 184:12, 184:13, 185:6, 185:13, 185:14, 191:24, 202:15, 264:8
finish [2] - 31:16, 62:6
finished [4] - 31:17, 51:10, 62:8, 76:15
firearm [6] - 41:17, 45:7, 45:11, 46:6, 56:3, 208:9
Firearms - 207:13,

208:4
firearms [2] - 191:25, 195:25
fired [6] - 118:16, 183:4, 186:23, 187:3, 201:8, 261:23
FIRM [1] - 1:14
first [78] - 6:3, 6:12, 6:18, 11:20, 12:5, 12:11, 15:22, 21:3, 24:11, 26:4, 35:1, 40:23, 42:5, 64:4, 71:20, 72:19, 74:24, 75:23, 78:1, 78:10, 78:16, 81:8, 82:20, 83:15, 83:17, 83:19, 91:18, 91:19, 93:7, 93:13, 93:14, 93:17, 94:18, 95:14, 96:12, 97:16, 110:13, 113:4, 114:5, 116:9, 116:14, 116:16, 116:20, 116:21, 119:5, 123:11, 123:15, 141:25, 150:18, 151:19, 154:6, 155:21, 162:14, 172:2, 172:25, 175:21, 179:13, 183:16, 188:12, 201:11, 206:6, 206:8, 213:4, 215:14, 217:14, 217:16, 226:3, 238:7, 239:9, 249:16, 259:10, 264:12, 268:3, 268:4, 277:7, 282:21
FIT [8] - 125:19, 125:21, 127:6, 127:9, 164:18, 209:6, 209:15, 267:15
five [8] - 4:23, 30:16, 35:1, 67:3, 74:4, 74:13, 117:10, 130:18
five-minute [1] - 30:16
five-plus [1] - 117:10
fixing [4] - 104:14, 104:21, 105:4, 105:11
fleeing [7] - 57:5, 57:9, 60:12, 60:15, 60:23, 61:6
FLETC [4] - 53:18, 53:19, 53:23, 60:11
flew [1] - 218:10
floor [1] - 145:17
fly [1] - 222:5

focus [7] - 33:5, 33:12, 150:22, 154:5, 154:6, 160:21, 160:22
focused [3] - 114:19, 247:18, 248:16
folks [1] - 12:7
follow [9] - 60:22, 83:22, 199:25, 200:1, 223:10, 223:15, 223:25, 224:3, 244:7
following [10] - 56:16, 67:18, 110:3, 112:4, 162:3, 205:19, 218:25, 248:22, 254:23, 269:4
foot [26] - 106:2, 116:21, 120:12, 130:8, 136:15, 136:16, 136:17, 136:20, 136:24, 136:25, 167:20, 167:24, 168:13, 168:18, 244:8, 244:18, 245:6, 249:22, 250:24, 251:3, 251:6, 254:5, 254:7, 256:10, 261:20
football [2] - 165:25, 166:11
FOR [1] - 1:1
force [15] - 42:24, 47:11, 47:21, 48:22, 49:22, 50:3, 50:5, 51:1, 51:3, 51:18, 51:19, 52:22, 53:10, 68:9, 125:23
Force [7] - 6:25, 125:22, 209:12, 217:9, 264:17, 265:12, 266:13
Ford [6] - 71:23, 75:14, 75:16, 75:24, 77:11, 184:17
foregoing [1] - 285:4
forensic [13] - 174:4, 174:6, 174:9, 174:11, 174:18, 175:19, 178:7, 209:17, 209:20, 209:22, 264:1, 264:6, 264:8
forensics [1] - 173:2
Forest [5] - 227:3, 227:8, 230:17, 233:21, 234:16
forget [2] - 133:1, 133:2

form [8] - 43:22, 61:17, 91:23, 205:7, 225:6, 229:15, 246:18, 259:4
former [1] - 10:11
forming [1] - 123:25
forthcoming [2] - 18:13, 21:1
fortunately [1] - 245:9
forward [4] - 22:1, 47:1, 82:9, 109:3
forwarded [1] - 209:9
foundation [4] - 50:4, 132:9, 132:10, 283:6
four [22] - 18:10, 21:7, 42:8, 63:22, 67:3, 67:4, 70:4, 71:5, 74:13, 75:11, 76:20, 77:5, 98:2, 124:15, 138:12, 221:22, 225:1, 225:11, 226:24, 227:2, 244:19
four-hour [2] - 70:4, 71:5
Fourth [2] - 2:3, 43:12
frame [1] - 169:19
Francisco [6] - 218:10, 218:12, 219:2, 219:6, 219:10, 219:13
frankly [3] - 280:15, 283:3, 283:12
free [1] - 134:5
freely [1] - 22:5
Freeze [1] - 52:14
freeze [2] - 52:19, 52:20
frequently [5] - 28:16, 57:21, 58:21, 63:16, 235:23
Friday [2] - 218:23, 218:24
friend [5] - 133:8, 133:18, 133:21, 218:3, 220:9
friend's [1] - 131:12
friends [9] - 130:4, 130:13, 131:8, 218:1, 218:4, 221:23, 221:24, 245:15, 245:21
friendship [1] - 221:24
front [28] - 7:18, 10:9, 26:14, 71:23, 76:25, 79:25, 81:6, 92:9, 106:10, 107:8, 109:14, 119:14, 119:20, 122:20, 123:1, 181:20,

234:21, 234:22, 236:19, 247:17, 257:1, 257:22, 257:25, 259:15, 259:16, 261:2, 274:14, 277:4
**full** [6] - 34:19, 51:25, 139:20, 171:6, 216:14, 285:5
**fully** [3] - 10:6, 215:13, 263:3
**function** [1] - 98:14
**future** [1] - 145:19

## G

**game** [2] - 32:20, 32:21
**gate** [24] - 74:10, 74:15, 74:17, 74:19, 78:12, 78:17, 82:5, 84:24, 102:24, 108:3, 110:3, 110:15, 112:15, 112:17, 112:20, 112:21, 112:22, 236:19, 238:8, 238:9, 238:11, 238:12, 258:18
**gates** [2] - 19:2, 234:16
**gather** [2] - 174:3, 178:7
**gathering** [3] - 174:15, 174:18, 175:19
**gear** [2] - 92:9, 114:25
**General** [2] - 20:18, 20:20
**general** [66] - 74:24, 92:4, 97:1, 97:2, 128:2, 163:18, 222:9, 222:13, 222:14, 222:15, 222:16, 222:17, 222:19, 222:20, 223:3, 223:10, 223:19, 223:20, 223:23, 223:25, 224:10, 224:12, 228:6, 228:9, 248:17, 248:25, 249:14, 249:21, 249:23, 250:6, 250:9, 250:12, 250:13, 250:15, 250:16, 250:22, 251:18, 252:1, 252:10, 252:14, 252:15, 252:19, 252:24, 252:25, 253:11, 253:18,

254:1, 254:4, 254:5, 254:14, 255:2, 255:7, 255:10, 255:14, 255:22, 255:25, 256:7, 256:14, 256:16, 256:18, 256:22, 256:25, 257:6, 281:7
**GENERAL/DC** [1] - 2:3
**generally** [1] - 33:8
**gentleman** [3] - 143:10, 145:20, 148:20
**gentlemen** [11] - 33:24, 42:6, 43:1, 55:3, 72:12, 78:1, 87:16, 170:8, 211:1, 222:12, 272:15
**George** [2] - 42:8, 42:10
**Georgia** [4] - 17:21, 20:24, 53:25, 54:3
**Gilgeous** [1] - 265:17
**given** [9] - 22:5, 26:14, 33:10, 39:11, 126:17, 175:24, 222:9, 229:11, 242:10
**Glock** [13] - 41:18, 44:25, 46:15, 47:6, 47:13, 47:14, 54:8, 54:9, 54:20, 54:25, 55:7, 56:7, 187:7
**Glocks** [1] - 187:8
**Glynco** [1] - 54:3
**God** [1] - 61:25
**gotcha** [1] - 141:22
**govern** [1] - 222:22
**Government** [3] - 12:14, 17:14, 27:17
**grab** [1] - 246:24
**grabbing** [5] - 241:9, 241:23, 243:2, 246:22, 246:24
**grade** [3] - 225:19, 225:20, 253:12
**Graham** [1] - 166:23
**Grant** [2] - 175:16, 175:23
**granted** [2] - 67:23, 67:25
**grass** [4] - 8:9, 182:1, 182:6, 194:4
**gravel** [2] - 182:1, 182:6
**gray** [5] - 163:9, 163:20, 163:22, 235:13, 235:20
**great** [4] - 81:1, 86:19, 154:14, 180:1

**Green** [2] - 131:12, 131:16
**green** [8] - 83:12, 83:25, 84:14, 84:15, 87:8, 87:9, 92:8, 109:18
**Greenwald** [2] - 175:17, 175:23
**grip** [37] - 47:6, 117:11, 159:8, 160:15, 187:17, 188:2, 188:3, 188:15, 188:24, 189:8, 189:10, 190:1, 190:23, 190:24, 191:4, 191:9, 191:12, 191:16, 191:17, 192:10, 192:11, 192:16, 192:23, 192:24, 193:4, 193:5, 193:6, 193:7, 193:9, 193:10, 193:12, 195:3, 195:4, 204:10, 204:12, 204:16, 204:18
**grips** [8] - 132:18, 132:19, 132:21, 191:14, 194:19, 195:15, 203:14, 203:24
**Gronkowski** [1] - 166:23
**ground** [6] - 110:4, 116:16, 117:2, 117:12, 117:18, 139:7
**group** [6] - 143:11, 220:7, 226:11, 227:19, 232:5, 237:10
**groups** [1] - 220:19
**grow** [1] - 41:11
**GRU** [10] - 63:14, 63:19, 66:13, 68:13, 92:13, 100:23, 124:16, 226:9, 226:18, 226:22, 235:3, 235:7, 235:9, 235:11, 235:12, 235:21
**guess** [8] - 13:21, 39:19, 54:24, 55:21, 104:20, 222:24, 229:18, 266:1
**guide** [2] - 222:24
**guideline** [3] - 223:7, 223:14, 223:21
**guidelines** [7] - 25:12,

222:14, 222:21, 222:24, 223:2, 223:19, 256:16
**gun** [126] - 8:20, 10:25, 14:14, 14:19, 14:22, 41:13, 41:20, 41:22, 41:23, 44:22, 44:24, 45:2, 55:15, 55:23, 56:22, 57:2, 57:9, 57:19, 57:20, 58:17, 58:21, 59:1, 59:4, 59:13, 59:15, 66:18, 69:3, 70:5, 70:9, 70:14, 70:16, 70:20, 71:8, 100:18, 101:12, 102:4, 105:3, 108:9, 108:11, 108:19, 115:17, 115:22, 115:24, 115:25, 116:22, 116:24, 117:2, 117:3, 117:6, 117:7, 117:10, 117:12, 117:17, 120:9, 120:12, 120:16, 120:19, 121:4, 121:9, 124:22, 130:7, 131:15, 131:23, 159:4, 159:7, 159:9, 159:15, 160:14, 160:15, 160:22, 187:5, 194:1, 194:15, 194:17, 194:22, 202:23, 203:14, 203:24, 204:8, 204:14, 204:16, 204:18, 204:21, 206:15, 207:23, 208:5, 210:20, 229:10, 229:23, 232:8, 232:22, 233:11, 233:13, 239:16, 240:5, 240:10, 241:10, 241:25, 242:19, 242:23, 243:3, 245:23, 246:2, 246:3, 246:9, 246:11, 258:20, 258:22, 258:25, 257:9, 259:10, 259:17, 259:18, 261:16, 261:18, 261:22, 262:1, 262:12, 262:13, 262:23, 263:8, 263:9, 263:14
**Gun** [5] - 224:13, 224:15, 224:17, 226:6, 226:8

**gun's** [1] - 132:20
**guns** [15] - 66:23, 70:12, 100:25, 101:2, 101:3, 209:25, 210:3, 229:9, 229:19, 233:4, 239:1, 239:13, 239:16, 245:20
**gunshot** [1] - 36:9
**guy** [4] - 86:22, 93:22, 100:9, 228:11
**guys** [9] - 129:8, 147:14, 167:13, 214:6, 222:1, 241:4, 241:17, 242:4, 244:9
**guys'** [1] - 130:24

## H

**half** [6] - 40:21, 139:21, 142:16, 218:13, 218:15, 218:16
**hall** [5] - 130:10, 144:1, 145:21, 146:4, 156:7
**Halloween** [1] - 63:20
**hallway** [1] - 156:10
**hamburger** [1] - 80:12
**hand** [59] - 11:1, 14:20, 45:23, 47:6, 76:19, 106:10, 107:8, 108:2, 108:6, 108:8, 114:19, 114:22, 115:14, 116:3, 120:12, 120:15, 120:19, 121:3, 121:10, 157:5, 157:13, 161:21, 162:6, 163:25, 164:24, 164:25, 165:14, 171:22, 203:17, 203:23, 206:14, 212:11, 212:14, 231:6, 246:17, 247:8, 247:9, 247:12, 247:13, 247:14, 247:17, 258:20, 258:21, 258:22, 258:23, 259:19, 261:8, 261:17, 261:18, 261:22, 262:1, 262:13, 262:23, 263:9, 263:14, 277:24
**handcuff** [1] - 123:18
**handcuffed** [4] - 116:25, 117:18,

118:13, 118:14
**handcuffing** [1] - 153:12
**handcuffs** [1] - 149:5
**handed** [5] - 45:23, 45:24, 47:4, 192:21, 213:18
**handful** [1] - 41:16
**handgun** [3] - 41:24, 55:6, 55:14
**handing** [2] - 94:12, 184:7
**handle** [1] - 125:22, 173:10, 173:12, 173:13, 173:16, 209:22, 280:17
**handled** [1] - 173:8
**handles** [2] - 173:7, 173:19
**hands** [17] - 54:23, 102:22, 102:23, 104:12, 104:13, 105:20, 105:24, 106:3, 106:9, 114:18, 116:2, 116:4, 116:5, 116:6, 120:23, 120:25, 259:20
**hanging** [1] - 156:19, 243:15
**happenstance** [1] - 66:19
**happy** [9] - 16:25, 17:6, 57:23, 92:1, 136:6, 213:16, 277:24, 278:2, 282:14
**hard** [7] - 137:2, 165:10, 165:14, 260:17, 260:19, 260:24, 262:24
**Harley** [19] - 18:9, 21:19, 24:17, 148:19, 148:20, 150:5, 150:12, 150:23, 151:21, 153:4, 154:6, 211:12, 211:23, 211:25, 212:1, 212:2, 212:3, 212:8, 214:1
**Harley's** [2] - 153:6, 213:21
**hate** [2] - 23:21, 228:11
**head** [5] - 51:20, 52:4, 104:18, 177:4, 179:15
**hear** [7] - 9:24, 58:7, 82:5, 85:13, 99:10,

227:22, 251:17
**heard** [26] - 4:25, 6:11, 7:12, 19:5, 26:21, 60:24, 82:7, 85:14, 85:17, 85:19, 86:4, 86:15, 109:25, 123:4, 137:21, 137:22, 143:13, 149:13, 149:14, 151:2, 153:6, 153:11, 153:12, 227:9, 251:16, 283:7
**hearing** [11] - 38:5, 56:17, 67:19, 112:5, 162:4, 205:20, 248:23, 254:24, 269:5, 277:14, 284:15
**hearsay** [2] - 5:1, 12:17
**heavy** [1] - 115:1
**HELD** [1] - 1:10
**held** [8] - 56:16, 67:18, 112:4, 162:3, 205:19, 248:22, 254:23, 269:4
**help** [8] - 83:7, 96:1, 174:15, 179:17, 179:18, 179:20, 221:16, 268:15
**helped** [2] - 221:16, 265:25
**helpful** [2] - 31:21, 72:16
**helping** [1] - 174:23
**helps** [2] - 222:3, 245:15
**Hendricks** [2] - 97:9, 97:11
**hereby** [1] - 285:3
**hesitate** [1] - 97:11
**hi** [3] - 40:17, 144:14, 227:14
**high** [2] - 98:6, 106:25
**highly** [3] - 4:22, 5:2, 16:8
**himself** [1] - 212:20
**hindsight** [1] - 85:21
**hired** [1] - 35:3
**hit** [10] - 51:20, 51:21, 51:23, 82:8, 122:22, 122:23, 122:24, 122:25, 123:3, 123:4
**hitch** [2] - 168:3, 168:4
**hold** [9] - 55:10, 139:11, 181:17, 187:13, 189:8, 214:25, 218:18, 272:17, 273:11
**holding** [10] - 55:15,

59:15, 106:21, 107:15, 109:6, 110:18, 115:19, 116:3, 257:15, 258:17
**holds** [2] - 55:6, 206:17
**holster** [3] - 58:22, 59:4, 59:11
**home** [6] - 23:22, 140:16, 140:19, 173:16, 219:15, 219:24
**homes** [2] - 23:3, 64:4
**homicide** [2] - 10:11, 196:12
**homicides** [1] - 173:9
**honestly** [1] - 239:24
**Honor** [265] - 4:2, 4:4, 4:5, 4:12, 4:14, 4:17, 4:23, 5:9, 5:12, 5:24, 6:16, 6:19, 7:12, 8:6, 8:14, 8:16, 9:7, 13:15, 14:16, 15:6, 15:13, 15:20, 16:6, 16:9, 17:8, 17:9, 20:6, 21:4, 22:6, 22:17, 24:10, 24:24, 25:1, 26:23, 27:22, 27:25, 28:2, 29:11, 30:7, 30:15, 30:18, 31:8, 31:18, 32:2, 32:6, 32:18, 33:16, 33:22, 34:5, 35:9, 35:14, 36:23, 37:9, 38:19, 39:2, 39:24, 40:4, 40:6, 41:14, 43:17, 43:23, 43:25, 44:15, 49:10, 49:12, 51:12, 53:4, 56:11, 56:19, 58:23, 59:7, 61:18, 64:14, 64:23, 65:3, 65:5, 66:11, 67:10, 67:14, 68:19, 69:23, 71:25, 72:3, 72:15, 73:1, 75:22, 76:17, 77:13, 77:23, 87:13, 88:4, 88:9, 88:17, 88:19, 88:22, 89:18, 90:5, 90:20, 91:23, 93:9, 94:10, 96:9, 98:20, 98:22, 99:25, 101:22, 103:1, 109:22, 111:23, 112:1, 112:8, 116:10, 116:15, 116:18, 119:18, 120:4, 123:12, 132:7, 132:10, 134:1,

134:21, 135:12, 135:20, 140:1, 140:25, 141:3, 142:7, 142:19, 142:25, 143:7, 145:18, 146:2, 146:3, 146:10, 148:17, 149:8, 149:18, 150:8, 150:21, 151:1, 152:2, 152:21, 153:3, 155:7, 155:20, 156:1, 156:24, 157:1, 158:3, 158:6, 158:14, 161:16, 161:23, 164:10, 166:1, 166:4, 167:2, 169:6, 169:10, 170:2, 170:3, 170:15, 171:25, 176:4, 177:10, 178:13, 179:4, 180:16, 180:25, 181:19, 184:19, 187:11, 187:18, 188:22, 189:1, 190:12, 191:1, 191:3, 194:25, 197:4, 198:17, 202:5, 203:20, 204:23, 205:6, 205:18, 206:2, 206:6, 207:7, 207:19, 208:2, 210:11, 210:14, 211:10, 212:14, 212:23, 213:15, 214:8, 214:17, 215:3, 215:25, 216:7, 216:10, 229:14, 231:15, 232:15, 234:12, 245:3, 246:19, 248:19, 248:24, 249:18, 253:1, 253:6, 253:17, 254:11, 254:21, 255:9, 259:3, 261:10, 263:2, 263:4, 263:24, 265:3, 265:13, 266:22, 269:2, 270:7, 271:2, 271:25, 273:1, 273:13, 274:1, 274:15, 274:23, 275:3, 275:11, 275:16, 276:1, 276:18, 276:21, 277:7, 278:8,

278:19, 279:6, 279:13, 279:15, 279:17, 279:19, 279:23, 279:25, 280:12, 281:1, 281:19, 281:22, 281:25, 282:6, 282:23, 283:15, 283:16, 283:19, 283:23, 284:12, 284:14
**HONORABLE** [1] - 1:10
**hood** [1] - 159:22
**hopefully** [2] - 7:7, 34:1
**horse** [1] - 119:24
**Hospital** [3] - 34:22, 35:12, 36:4
**hospital** [3] - 25:17, 32:14, 273:15
**hosting** [1] - 219:21
**hotel** [1] - 219:13
**hour** [9] - 70:4, 71:5, 130:21, 141:12, 156:7, 218:13, 218:15, 218:16, 271:8
**hours** [8] - 66:25, 67:2, 139:13, 199:5, 218:15, 267:18, 267:20, 267:24
**house** [20] - 18:12, 86:5, 86:12, 86:17, 86:21, 99:7, 130:16, 130:18, 130:19, 137:13, 137:15, 148:22, 148:23, 165:4, 213:17, 219:18, 219:19, 221:13, 221:14, 221:17
**housed** [1] - 173:3
**houses** [2] - 64:3, 130:15
**housing** [1] - 78:11
**hovering** [1] - 143:11
**hug** [1] - 7:20
**huge** [2] - 27:1, 222:17
**hugged** [1] - 14:22
**hundreds** [3] - 62:22, 64:11, 64:12
**hunted** [2] - 42:3, 42:4
**hunting** [1] - 41:11
**hurt** [2] - 28:14, 63:8

**I**

**ID** [1] - 271:3
**idea** [7] - 64:19, 73:2,

96:17, 97:21, 97:24,
279:6, 282:6
**identical** [1] - 208:7
**identification** [5] -
66:18, 266:20,
267:3, 270:17, 271:3
**identified** [3] - 177:13,
177:22, 212:20
**identifies** [1] - 179:3
**identify** [3] - 187:16,
188:1, 212:10
**identifying** [1] - 66:22
**ignore** [1] - 62:3
**illegal** [4] - 101:2,
101:3, 239:14,
245:19
**imagine** [1] - 196:25
**immediacy** [1] - 33:20
**immediate** [2] - 235:8,
235:10
**immediately** [4] -
143:16, 228:25,
229:10, 244:1
**impeach** [1] - 113:1
**impeachment** [8] -
112:2, 161:17,
161:23, 162:6,
265:2, 265:4, 265:5,
270:20
**implicating** [1] - 150:2
**important** [9] - 57:3,
145:10, 166:25,
169:22, 177:3,
195:21, 213:7,
213:8, 263:22
**importantly** [1] - 5:1
**impossible** [1] -
250:13
**impression** [8] -
165:11, 227:24,
228:1, 228:4, 228:6,
228:20, 228:22,
242:6
**imprint** [2] - 117:3,
117:5
**improper** [8] - 4:22,
16:8, 68:25, 112:1,
140:2, 208:22,
265:2, 281:6
**impugn** [1] - 115:5
**impugning** [1] - 138:2
**IN** [1] - 1:1
**inadmissible** [1] - 4:23
**inadvertently** [1] -
193:1
**inches** [3] - 182:19,
182:23, 186:1
**incident** [7] - 28:8,
145:16, 155:2,
175:7, 199:17,

208:14, 210:8
**incidents** [1] - 67:21
**inclined** [1] - 15:14
**include** [1] - 36:9
**included** [1] - 209:10
**including** [1] - 143:20
**inconsistent** [1] -
112:7, 112:9, 113:4
**increased** [1] - 155:3
**indentations** [2] -
190:6, 190:7
**independently** [1] -
199:20
**indicate** [1] - 184:14
**indicated** [2] - 215:4,
215:7
**indicates** [1] - 274:7
**Indicating** [1] - 76:25
**indication** [3] -
188:18, 268:10,
283:20
**indirect** [1] - 160:17
**individual** [5] - 88:9,
161:9, 212:19,
227:10, 240:16
**individually** [1] - 157:9
**indulge** [1] - 197:22
**indulgence** [7] -
26:18, 123:9,
150:14, 151:12,
166:4, 169:4, 170:20
**inference** [3] - 5:2,
17:2, 17:3
**inflammatory** [2] -
4:22, 5:2
**infliction** [1] - 252:6
**information** [12] -
17:24, 18:20, 20:18,
20:21, 21:15, 23:23,
31:21, 195:10,
212:12, 264:21,
276:12, 282:5
**informed** [2] - 155:8,
278:7
**infrequent** [1] - 221:21
**initial** [9] - 24:22,
68:24, 69:2, 69:4,
69:6, 69:13, 85:24,
104:20, 165:11
**initials** [2] - 82:18,
86:18
**injured** [1] - 36:3
**injuries** [3] - 36:6,
36:7, 39:11
**injury** [2] - 68:11,
173:15
**Inman** [4] - 19:23,
19:24, 21:10, 234:7
**inquiring** [1] - 151:17
**inquiry** [1] - 96:8

inside [3] - 189:12,
247:6, 262:25
**instances** [1] - 251:1
**instead** [1] - 280:16
**instruct** [4] - 249:7,
251:14, 251:15,
271:20
**instructing** [1] - 249:8
**instruction** [12] - 5:6,
5:19, 13:21, 14:6,
22:8, 32:1, 88:16,
88:21, 154:11,
155:8, 249:9, 249:17
**instructions** [3] -
155:13, 249:11,
249:12
**instrument** [1] - 49:1
**intact** [2] - 203:25
**intend** [1] - 27:2
**intends** [1] - 26:25
**intentions** [1] - 268:19
**interactive** [2] - 37:17,
37:25
**interested** [1] - 253:14
**interesting** [1] - 46:23
**interests** [2] - 104:25,
105:8
**interject** [1] - 269:20
**Internet** [1] - 141:15
**interpretation** [1] -
6:13
**interrupting** [1] - 31:7
**intervention** [1] -
23:16
**interview** [10] - 97:18,
264:18, 265:9,
265:10, 265:22,
265:24, 267:18,
268:16, 269:19,
271:14
**intimidating** [1] - 22:4
**introduce** [5] - 40:16,
204:24, 205:1,
205:22, 234:6
**investigate** [1] - 241:1
**investigating** [4] -
6:24, 217:12,
217:15, 268:2
**Investigation** [2] -
125:22, 209:12
**investigation** [2] -
252:18, 264:24
**investigations** [5] -
10:9, 100:24,
171:11, 173:10
**investigative** [1] -
267:15
**Investigative** [5] -
6:25, 217:10,
264:17, 265:12,

266:13
**investigator** [25] -
16:14, 16:18, 16:24,
18:17, 19:10, 20:7,
20:15, 23:2, 23:25,
24:12, 24:13, 148:4,
148:5, 150:16,
152:3, 161:19,
161:25, 162:11,
209:7, 209:15,
213:16, 214:5,
214:9, 269:19, 270:3
**investigators** [5] -
6:23, 217:9, 217:12,
217:16, 266:14
**invited** [3] - 219:19,
219:23, 219:24
**invites** [2] - 12:17
**involve** [2] - 36:2,
240:3
**involved** [8] - 19:13,
20:4, 124:14, 175:8,
199:21, 200:6,
200:13, 256:23
**iPhone** [5] - 89:24,
126:11, 126:12,
127:2, 211:13
**irrelevant** [1] - 255:5
**ish** [2] - 129:9, 129:10
**issue** [26] - 6:7, 7:9,
11:5, 17:16, 17:18,
20:25, 22:9, 22:12,
25:10, 30:20, 32:8,
67:22, 133:24,
152:24, 206:7,
206:13, 206:18,
248:9, 249:7, 256:9,
269:11, 273:4,
274:1, 276:2,
280:25, 281:6
**issues** [4] - 6:3, 15:8,
34:1, 56:22
**it'll** [1] - 284:7
**item** [15] - 176:20,
178:23, 178:24,
179:1, 179:3,
179:10, 179:12,
179:13, 180:3,
180:8, 180:21,
186:10, 189:4,
193:18, 193:23
**Item** [14] - 178:24,
186:8, 186:9, 188:2,
188:15, 192:7,
192:9, 192:19,
192:21, 192:22,
194:9, 207:23, 208:5
**items** [7] - 8:8, 174:12,
176:22, 177:3,
183:20, 185:5, 185:8

itself [2] - 125:8,
218:24

---

**J**

---

**jacket** [7] - 70:20,
209:10, 233:4,
233:5, 233:6, 233:7,
233:9
**JAMES** [2] - 3:3, 34:14
**James** [4] - 23:10,
34:6, 34:20, 273:7
**January** [1] - 24:21
**Jersey** [1] - 41:8
**Jimmy** [1] - 166:23
**JK** [2] - 53:5, 90:20
**JK2** [1] - 77:14
**JK3** [1] - 109:16
**job** [9] - 40:23, 40:25,
41:1, 42:5, 60:16,
257:7, 257:11,
257:13
**job-wise** [1] - 40:23
**jobs** [1] - 124:5
**John** [7] - 36:14,
36:15, 36:16, 37:5,
39:6, 97:9, 97:11
**joined** [1] - 175:15
**joining** [1] - 171:4
**joints** [2] - 190:8,
190:10
**JORDAN** [3] - 3:5,
40:11, 156:2
**Jordan** [3] - 40:3,
40:17, 234:22
**JR** [1] - 2:2
**Judge** [19] - 10:19,
11:4, 12:18, 23:19,
50:1, 77:16, 85:9,
111:6, 116:13,
136:2, 145:13,
146:7, 150:25,
152:25, 154:7,
162:8, 195:11,
253:8, 272:7
**judge** [2] - 25:10,
29:14, 144:7
**JUDGE** [1] - 1:11
**judgment** [2] - 67:24,
67:25
**July** [4] - 43:5, 171:14,
171:20, 172:2
**jump** [12] - 69:5,
80:13, 80:20, 99:16,
102:18, 104:23,
108:15, 227:19,
227:23, 242:4, 244:1
**jump-outs** [4] -
227:19, 227:23,
242:4

15

**jumped** [12] - 79:22,
80:5, 80:9, 80:19,
81:21, 91:13, 91:18,
99:13, 100:1, 100:5,
104:17, 108:12
**Juror** [2] - 6:4, 91:8
**juror** [1] - 10:21
**jurors** [1] - 91:4
**Jury** [2] - 87:21, 211:7
**JURY** [1] - 1:10
**jury** [77] - 5:6, 6:6,
7:19, 26:14, 26:15,
27:1, 27:5, 30:17,
31:21, 33:21, 33:23,
40:16, 42:6, 43:1,
45:1, 53:23, 55:3,
56:17, 67:19, 72:12,
72:16, 74:22, 78:1,
78:15, 78:23, 82:2,
87:16, 90:2, 93:15,
99:4, 110:24, 112:5,
129:11, 129:23,
132:2, 136:1,
136:11, 141:16,
142:18, 153:10,
154:9, 155:9,
155:18, 155:23,
155:24, 157:16,
162:4, 164:12,
166:8, 167:6,
170:22, 174:6,
181:17, 189:9,
203:24, 204:1,
205:20, 207:21,
208:1, 211:2,
213:25, 215:4,
216:4, 222:12,
223:9, 248:23,
249:7, 251:14,
254:24, 269:5,
271:11, 272:11,
272:12, 272:23,
277:4, 278:3
**jury's** [1] - 282:7
**justice** [3] - 42:15,
42:16, 174:24

## K

**Katz** [67] - 15:25,
22:18, 40:4, 40:9,
40:14, 40:17, 41:11,
44:10, 44:17, 58:2,
62:8, 67:21, 72:2,
72:5, 73:4, 87:14,
87:22, 89:4, 89:8,
90:4, 90:9, 91:2,
91:13, 111:25,
113:15, 117:13,
121:2, 134:8,
134:25, 136:7,

141:17, 143:20,
147:3, 155:17,
156:5, 157:15,
161:12, 163:4,
163:9, 217:25,
218:1, 218:17,
218:22, 219:5,
221:1, 226:15,
234:15, 234:23,
234:25, 238:25,
239:5, 239:11,
239:12, 239:16,
240:5, 241:19,
242:1, 242:2,
243:25, 244:2,
245:23, 246:1,
246:3, 246:4,
246:10, 246:15,
247:21
**KATZ** [3] - 3:5, 40:11,
156:2
**Katz's** [1] - 219:15
**keep** [7] - 59:13, 64:6,
99:11, 103:22,
105:5, 108:24, 138:9
**keeping** [1] - 107:15
**keeps** [1] - 102:12
**kept** [6] - 100:19,
110:9, 110:10,
135:11, 191:20,
275:17
**Kerslyn** [1] - 4:9
**KERSLYN** [1] - 2:2
**kerslyn.featherstone
@dc.gov** [1] - 2:5
**kid** [3] - 41:13, 41:23,
130:7
**kids** [2] - 73:13,
243:14
**kill** [2] - 51:20, 51:24
**killed** [2] - 130:5,
131:13
**kind** [65] - 28:7, 41:1,
41:20, 42:17, 42:20,
44:24, 45:15, 50:2,
50:21, 52:12, 60:5,
60:7, 63:25, 72:7,
72:11, 72:13, 72:21,
73:4, 73:25, 74:6,
74:21, 75:13, 76:19,
78:13, 78:14, 79:6,
81:17, 82:1, 83:12,
83:22, 85:4, 86:3,
86:12, 90:9, 113:18,
114:25, 126:3,
136:25, 139:8,
160:17, 167:11,
167:12, 167:17,
184:5, 190:3, 196:9,
201:20, 204:5,

219:22, 223:6,
223:10, 224:8,
225:24, 227:12,
227:16, 232:25,
233:7, 236:8, 240:5,
243:15, 248:5,
261:20, 268:9,
268:13, 271:14
**kinds** [4] - 5:4, 29:23,
44:3, 62:21
**King** [2] - 24:11, 24:12
**KIRA** [2] - 1:17, 1:18
**Kira** [1] - 4:8
**kiraannewest@gmail
.com** [1] - 1:20
**knee** [1] - 117:19
**kneeling** [2] - 45:6,
59:14
**knocked** [2] - 152:5,
212:20
**knowing** [2] - 7:2,
16:23
**knowledge** [6] - 38:24,
39:3, 174:10, 235:5,
235:6, 235:7, 255:4
**known** [6] - 55:17,
203:9, 217:2, 226:1,
227:3, 227:6
**knows** [8] - 19:24,
24:19, 25:3, 53:14,
98:16, 119:25,
129:7, 255:5
**Korson** [2] - 273:9,
273:10

## L

**L-shaped** [1] - 64:6
**L1** [3] - 266:20,
266:21, 267:3
**lab** [3] - 196:2, 202:22,
209:23, 209:24
**label** [3] - 86:12,
266:19, 266:20
**labeled** [1] - 180:5
**labeling** [1] - 175:25
**ladies** [11] - 33:24,
42:6, 43:1, 55:3,
72:11, 77:25, 87:16,
170:8, 211:1,
222:12, 272:15
**laid** [1] - 93:8
**LANE** [1] - 1:3
**Lane** [6] - 4:7, 7:17,
143:4, 144:13,
145:5, 251:20
**Lane's** [5] - 143:11,
144:17, 154:15,
154:25, 252:2
**language** [1] - 282:7

**Lanier** [2] - 250:14,
250:15
**lap** [1] - 27:1
**larger** [2] - 48:10,
80:14
**last** [15] - 4:21, 23:10,
139:19, 139:20,
148:19, 183:17,
214:22, 238:13,
267:4, 267:7,
267:19, 267:21,
267:22, 281:11
**late** [6] - 6:4, 24:19,
25:1, 175:1, 280:15
**lately** [1] - 187:24
**latent** [4] - 172:13,
184:16, 191:23,
191:24
**LaTonya** [7] - 147:21,
151:9, 152:8,
152:12, 152:13,
152:14, 152:16
**Law** [1] - 53:24
**law** [20] - 17:5, 42:18,
42:20, 42:21, 43:9,
43:12, 229:11,
232:14, 232:18,
232:21, 233:17,
233:18, 233:22,
272:4, 281:5, 281:8
**LAW** [2] - 1:14, 1:18
**law-abiding** [5] -
229:11, 232:14,
232:18, 233:18,
233:22
**lawyer** [9] - 269:6,
269:7, 269:16,
269:18, 269:19,
269:20, 270:3,
270:9, 281:11
**lawyer's** [1] - 270:2
**lawyers** [2] - 49:14,
145:11
**lay** [3] - 8:5, 8:6,
149:19
**laying** [5] - 8:1, 8:8,
8:9, 175:25
**layman's** [1] - 118:4
**layout** [1] - 177:1
**lead** [7] - 66:8, 94:1,
174:13, 174:15,
175:13, 175:14,
240:24
**leading** [2] - 37:9,
38:20
**leads** [1] - 240:21
**learn** [6] - 44:22,
44:24, 50:9, 57:20,
97:16, 183:4
**learned** [1] - 255:6

**learning** [1] - 45:2
**least** [14] - 6:5, 17:25,
21:18, 24:18, 24:21,
58:6, 58:12, 147:6,
150:18, 225:1,
225:11, 225:12,
236:18, 281:5
**leave** [5] - 140:4,
141:25, 215:8,
227:24, 272:19
**leaving** [2] - 75:2,
100:16
**lecture** [2] - 70:7, 70:8
**led** [3] - 205:12, 243:1,
243:2
**leeway** [1] - 206:24
**left** [80] - 19:2, 42:9,
42:13, 45:24, 45:25,
47:8, 64:5, 64:8,
78:3, 78:4, 79:13,
79:14, 81:4, 82:25,
84:2, 84:22, 84:24,
99:10, 106:19,
106:20, 107:14,
108:5, 108:8,
112:13, 112:17,
112:18, 117:2,
117:10, 136:15,
136:16, 136:20,
136:24, 136:25,
161:21, 162:1,
162:5, 162:12,
163:19, 163:25,
164:2, 164:3,
164:24, 164:25,
167:19, 167:24,
168:13, 174:13,
187:9, 187:17,
188:2, 188:3,
188:15, 188:23,
189:8, 189:10,
189:25, 191:16,
192:11, 192:22,
192:24, 193:4,
193:8, 193:10,
194:7, 204:10,
204:14, 204:15,
204:16, 236:9,
236:22, 237:25,
258:9, 258:19,
259:13, 259:15,
259:17, 261:20
**left-hand** [4] - 161:21,
163:25, 164:24,
164:25
**left-handed** [1] - 45:24
**leg** [1] - 92:10
**legal** [2] - 94:25,
251:20
**length** [2] - 51:25,

108:24
**Leo** [56] - 6:14, 11:9,
11:21, 12:8, 12:21,
13:4, 13:14, 13:17,
14:2, 22:21, 75:4,
75:10, 77:1, 80:2,
81:3, 99:8, 110:3,
114:14, 119:11,
119:14, 121:22,
122:3, 122:16,
128:10, 128:12,
129:9, 131:3,
131:22, 133:19,
133:21, 138:17,
138:20, 143:21,
187:3, 214:15,
214:18, 216:8,
216:9, 216:15,
242:2, 249:21,
251:25, 252:12,
255:9, 256:7, 263:6,
266:24, 270:4,
270:8, 272:24,
273:5, 273:7,
273:23, 281:4
**LEO** [2] - 3:8, 216:11
**Leo's** [7] - 84:9, 84:20,
109:25, 115:1,
130:19, 159:16,
201:8
**less** [6] - 31:11, 31:19,
38:7, 39:20, 63:7,
284:7
**lesser** [2] - 173:14,
173:17
**lethal** [4] - 51:1, 51:3,
51:18, 51:19
**level** [3] - 33:13, 39:6
**levels** [1] - 4:23
**lever** [1] - 55:7
**Levy** [10] - 18:8, 18:9,
24:17, 148:19,
151:21, 153:22,
211:12, 212:2,
212:3, 212:7
**life** [4] - 50:15, 121:10,
230:25
**lift** [5] - 229:8, 232:23,
233:3, 233:5, 233:13
**lifting** [4] - 231:18,
232:10, 233:1,
233:12
**light** [2] - 235:13,
235:20
**lights** [9] - 248:3,
248:4, 248:5, 248:6,
251:7, 251:10,
254:17, 256:17,
256:19
**likely** [6] - 39:12,

65:13, 67:4, 95:9,
148:12, 192:25
**limine** [1] - 10:24
**limit** [1] - 25:16
**limited** [1] - 14:24
**limits** [1] - 29:25
**Line** [5] - 111:14,
112:10, 114:8,
278:24
**line** [6] - 13:6, 13:13,
67:15, 109:17,
109:18, 248:25
**lines** [1] - 190:3
**link** [4] - 6:11, 12:8,
13:20
**Lisa** [1] - 2:10
**LISA** [1] - 285:3
**list** [1] - 270:19
**listed** [3] - 24:18,
188:4, 192:23
**listen** [4] - 139:16,
139:19, 164:21,
252:20
**listening** [2] - 149:13,
214:19
**lists** [1] - 184:16
**literally** [2] - 115:1,
115:2
**litigate** [1] - 144:12
**live** [4] - 63:10, 152:9,
152:16, 219:20
**lived** [4] - 16:20,
19:25, 148:21, 234:7
**lives** [4] - 18:12,
86:21, 148:22,
227:18
**living** [1] - 279:19
**located** [5] - 182:16,
188:9, 194:12,
203:15
**location** [5] - 182:5,
186:10, 194:20,
194:23, 283:14
**locations** [3] - 184:17,
184:25, 185:2
**lock** [1] - 174:24
**logged** [1] - 181:8
**logical** [1] - 174:24
**long-winded** [1] -
173:21
**look** [33] - 94:13,
99:22, 100:11,
109:3, 109:16,
132:23, 133:3,
133:10, 133:11,
133:13, 157:15,
176:21, 177:15,
177:16, 187:25,
197:13, 200:18,
201:14, 203:18,

232:24, 243:20,
244:12, 244:23,
250:6, 252:13,
252:20, 266:24,
267:4, 267:19,
277:18, 280:6, 284:6
**looked** [7] - 71:16,
75:5, 81:11, 136:17,
157:9, 192:21,
254:18
**looking** [22] - 20:22,
99:23, 100:12,
100:13, 100:14,
101:11, 102:5,
104:10, 152:12,
180:3, 181:11,
181:23, 182:5,
182:24, 183:24,
188:18, 197:11,
198:16, 198:23,
200:23, 201:2, 204:7
**looks** [12] - 64:12,
64:16, 94:17, 94:20,
94:22, 137:6, 137:8,
177:5, 182:22,
203:24, 204:5, 231:2
**Los** [1] - 218:10
**losing** [1] - 261:7
**lost** [3] - 84:22, 85:1,
118:9
**lower** [1] - 76:19
**Lunch** [1] - 146:12
**lunch** [11] - 22:13,
33:17, 89:1, 89:5,
135:19, 141:3,
141:11, 143:8,
156:7, 164:8, 215:7

---

# M

**M.D** [2] - 3:3, 34:14
**ma'am** [1] - 204:17
**machine** [1] - 97:23
**magazine** [3] - 55:5,
55:13, 55:17
**magazines** [1] - 55:16
**main** [10] - 53:25,
78:12, 78:17, 78:18,
100:24, 100:25,
117:22, 117:24,
117:25, 118:1
**maintained** [2] - 20:1,
192:2
**male** [2] - 71:17,
129:17
**man** [10] - 18:11,
41:11, 65:14,
100:17, 102:4,
108:10, 125:6,
212:18, 212:20,

213:18
**management** [1] -
98:12
**manifestations** [1] -
37:20
**manner** [1] - 240:15
**manufacturer** [1] -
187:10
**map** [3] - 85:8, 87:17,
91:3
**marijuana** [1] - 66:7
**mark** [3] - 78:22,
83:22, 271:2
**marked** [9] - 73:6,
73:14, 157:5,
157:13, 180:19,
190:15, 207:4,
267:2, 270:17
**marker** [2] - 82:1,
83:12
**marking** [1] - 76:16
**marks** [1] - 179:3
**married** [2] - 131:2,
218:18
**Marshal** [3] - 144:1,
144:2, 146:5
**Marshals** [5] - 23:21,
23:22, 145:15,
145:22, 212:22
**Maryland** [4] - 54:1,
54:5, 60:11
**mass** [1] - 163:14
**mastered** [1] - 276:21
**material** [6] - 103:17,
196:15, 196:21,
197:9, 214:18,
279:14
**materials** [1] - 198:4
**matter** [4] - 28:2,
65:24, 154:16,
155:19
**matters** [2] - 10:10,
282:23
**McNeil** [7] - 7:16,
14:10, 14:21, 17:19,
20:11, 21:10, 21:13
**McNeil's** [1] - 88:16
**meals** [1] - 219:21
**mean** [55] - 12:7, 24:6,
43:21, 46:12, 51:7,
51:25, 52:5, 54:7,
56:2, 60:13, 61:10,
64:1, 64:16, 70:16,
79:12, 85:16, 85:18,
90:17, 93:25, 96:4,
98:16, 104:3, 104:4,
106:16, 122:20,
128:1, 138:13,
144:23, 159:3,
159:22, 167:13,

167:19, 182:11,
191:15, 205:7,
221:6, 226:11,
231:12, 234:1,
235:25, 241:8,
243:21, 250:16,
250:21, 268:5,
270:5, 275:22,
276:7, 276:8,
276:15, 279:7, 282:2
**meaning** [2] - 173:15,
202:21
**means** [5] - 143:23,
223:2, 276:15,
278:7, 282:6
**meant** [5] - 104:21,
143:18, 217:21,
220:19, 276:14
**measure** [1] - 193:13
**measurement** [2] -
189:17, 189:21
**measurements** [1] -
206:11
**mechanical** [1] - 1:24
**medical** [11] - 26:3,
26:5, 27:1, 35:11,
37:4, 196:24,
197:10, 198:5,
278:25, 280:4
**medium** [1] - 48:14
**MedStar** [7] - 34:22,
34:24, 35:11, 35:19,
36:4, 37:4, 39:15
**meet** [5] - 182:2,
217:9, 234:6, 234:9,
272:5
**meeting** [1] - 155:11
**member** [9] - 42:24,
63:14, 63:19, 66:13,
92:14, 164:18,
177:25, 198:3,
269:12
**members** [19] - 45:1,
53:23, 68:13, 74:21,
78:15, 78:23, 82:2,
93:15, 110:24,
127:9, 132:2,
136:11, 154:18,
157:16, 164:11,
175:10, 178:6,
235:12, 237:10
**memory** [8] - 55:24,
56:1, 56:2, 56:5,
56:24, 57:14, 57:16,
273:12
**mentioned** [1] - 52:9
**message** [1] - 148:9
**messing** [1] - 109:12,
115:14
**met** [3] - 219:10,

219:12, 226:3
**metal** [5] - 47:18, 48:3,
103:4, 103:5, 103:14
**Metrobus** [2] - 94:18,
94:19
**Metropolitan** [15] -
40:19, 171:10,
171:12, 173:3,
192:3, 196:5, 198:3,
207:12, 208:4,
216:17, 216:19,
225:4, 228:8, 250:8,
255:13
**mid** [1] - 9:2
**mid-trial** [1] - 9:2
**middle** [5] - 52:5, 52:7,
52:11, 79:6, 84:24
**midway** [1] - 181:25
**might** [23] - 28:3, 45:8,
52:16, 53:14, 53:16,
62:16, 64:19, 66:22,
70:9, 70:10, 70:11,
94:21, 104:9, 118:6,
119:24, 125:1,
132:23, 179:21,
179:22, 183:20,
275:10
**Mike** [1] - 168:5
**miles** [1] - 218:14
**mind** [8] - 52:17, 77:3,
93:4, 93:6, 93:24,
102:17, 108:18,
213:10
**minds** [1] - 155:11
**mine** [2] - 143:14,
143:24
**minimize** [1] - 34:1
**minivan** [3] - 94:22,
96:5, 163:11
**minute** [4] - 30:16,
82:22, 105:8, 142:16
**minutes** [19] - 6:4,
38:7, 39:20, 85:9,
87:24, 88:18,
118:20, 118:22,
118:24, 130:19,
141:5, 141:12,
142:23, 211:6,
271:8, 273:3, 284:2,
284:5, 284:7
**mirror** [1] - 159:23
**misrepresent** [1] -
5:15
**Miss** [1] - 74:9
**missed** [2] - 90:16,
127:3
**missing** [1] - 90:15
**mistake** [1] - 191:13
**mixed** [2] - 182:22,
192:19

**mobile** [12] - 172:21,
172:24, 173:5,
173:6, 173:8,
173:19, 173:22,
208:25, 209:2,
209:4, 209:8
**modify** [1] - 223:6
**moment** [3] - 49:13,
144:5, 202:10
**Monday** [2] - 215:9,
215:20
**months** [3] - 43:6,
44:19, 218:19
**Moore** [1] - 67:22
**MOREIRA** [1] - 285:3
**Moreira** [2] - 2:10,
285:10
**morning** [31] - 4:2,
4:3, 5:7, 5:9, 5:10,
5:24, 15:19, 16:1,
22:16, 23:9, 33:24,
34:10, 34:18, 40:7,
40:9, 40:10, 40:14,
40:15, 87:18, 147:4,
171:5, 200:22,
200:23, 215:6,
215:14, 272:22,
273:21, 278:14,
278:17, 284:3
**most** [6] - 23:6, 49:1,
160:15, 209:9,
231:20, 232:9
**mother** [3] - 17:22,
18:19, 20:24
**motion** [4] - 10:24,
259:22, 260:20,
261:21
**move** [22] - 26:3,
26:11, 27:8, 35:10,
45:24, 49:14, 53:5,
91:9, 98:22, 157:1,
169:25, 178:13,
180:25, 188:23,
195:1, 221:16,
233:6, 233:13,
274:18, 274:19,
281:21
**moved** [17] - 13:20,
14:8, 53:7, 82:8,
82:21, 82:23, 84:9,
109:25, 124:8,
124:9, 169:23,
178:16, 181:3,
182:10, 195:5,
207:20
**moving** [11] - 10:7,
23:11, 59:19, 59:20,
100:9, 104:18,
106:10, 107:16,
138:10, 221:15,

247:17
**MPD** [9] - 15:1, 43:3,
60:14, 60:22, 61:20,
98:12, 126:17,
127:18
**MR** [347] - 4:5, 4:14,
4:17, 5:23, 6:15,
6:19, 6:21, 6:23, 7:8,
8:5, 8:12, 9:7, 9:23,
10:2, 10:16, 10:19,
10:23, 11:4, 11:6,
11:16, 11:19, 11:25,
12:3, 12:10, 12:18,
12:24, 13:5, 13:8,
13:15, 13:18, 14:5,
14:16, 15:6, 15:13,
15:17, 15:20, 15:24,
16:6, 18:4, 18:6,
18:9, 18:11, 19:16,
19:19, 22:13, 22:17,
22:21, 22:23, 23:6,
23:14, 23:19, 24:4,
24:25, 25:10, 25:14,
25:25, 26:2, 26:8,
26:18, 26:20, 26:23,
27:3, 27:10, 27:12,
27:15, 27:19, 27:22,
27:24, 28:2, 28:12,
28:18, 28:23, 28:25,
29:11, 29:14, 29:19,
29:21, 30:3, 30:7,
30:12, 30:15, 31:4,
31:12, 31:15, 31:18,
31:25, 32:2, 32:5,
32:6, 32:8, 32:11,
32:18, 32:20, 32:23,
33:4, 33:7, 33:11,
33:14, 33:16, 34:5,
34:16, 35:9, 35:14,
36:23, 36:24, 36:25,
37:1, 37:9, 37:10,
38:19, 39:2, 39:21,
39:24, 41:14, 43:17,
43:22, 44:14, 49:20,
53:6, 56:11, 56:13,
56:18, 56:23, 58:7,
58:23, 59:7, 59:9,
60:19, 61:17, 64:14,
64:22, 65:3, 66:11,
67:10, 67:23, 68:5,
68:7, 68:19, 69:7,
69:23, 72:4, 72:8,
72:15, 75:22, 77:19,
77:21, 79:3, 90:23,
91:23, 93:9, 96:8,
98:20, 99:25,
101:22, 111:1,
111:3, 112:1, 112:8,
112:10, 112:14,
112:18, 112:21,
116:10, 116:15,

116:18, 119:17,
120:4, 123:12,
132:6, 134:17,
140:1, 140:24,
141:23, 142:11,
142:15, 144:7,
144:21, 145:1,
145:4, 145:13,
145:24, 147:5,
147:12, 147:15,
147:18, 147:21,
147:24, 148:3,
148:5, 148:8,
148:10, 148:13,
148:17, 148:22,
148:24, 149:4,
149:7, 149:10,
149:18, 149:21,
149:24, 150:4,
150:8, 150:11,
150:14, 150:16,
150:21, 150:25,
151:6, 151:9,
151:12, 151:21,
151:25, 152:2,
152:5, 152:25,
154:1, 154:4, 154:7,
154:12, 154:24,
155:5, 155:7,
155:16, 157:1,
158:6, 158:14,
161:16, 161:22,
162:14, 162:18,
164:7, 166:1, 167:1,
169:10, 170:3,
170:15, 170:18,
170:20, 171:3,
171:25, 176:4,
177:10, 178:13,
179:4, 180:16,
180:25, 181:16,
181:19, 187:18,
188:22, 190:12,
191:5, 191:7,
194:25, 195:3,
195:10, 195:13,
197:16, 202:1,
205:4, 205:6,
205:10, 205:15,
205:18, 205:23,
206:20, 210:15,
211:19, 212:9,
212:18, 213:1,
213:10, 214:9,
214:14, 214:17,
214:20, 214:24,
215:13, 216:3,
216:7, 216:13,
246:20, 249:13,
249:20, 253:8,
254:13, 255:12,

255:17, 255:20,
256:1, 256:6, 259:6,
263:3, 265:4,
266:19, 267:1,
269:18, 269:24,
270:1, 270:14,
270:16, 270:20,
271:1, 271:7,
271:12, 271:15,
271:18, 271:23,
272:7, 273:7,
273:13, 273:18,
273:22, 273:24,
274:1, 274:11,
274:15, 274:18,
274:22, 275:7,
275:13, 275:15,
275:20, 275:22,
276:1, 276:4,
276:18, 276:20,
278:6, 278:12,
278:19, 278:23,
279:13, 279:18,
279:22, 281:10,
281:13, 281:15,
282:5, 282:20,
283:1, 283:15,
283:18, 284:5,
284:10, 284:14
**MS** [290] - 4:2, 4:4,
4:12, 5:9, 5:11, 7:12,
7:14, 7:23, 7:25,
8:16, 9:2, 16:9,
16:11, 17:6, 17:8,
17:9, 17:12, 18:8,
20:6, 21:9, 21:14,
21:17, 21:20, 21:24,
22:10, 24:9, 24:24,
25:3, 25:9, 30:18,
31:1, 31:7, 33:22,
40:3, 40:6, 40:13,
43:25, 49:10, 49:12,
50:1, 51:12, 53:4,
57:1, 57:5, 57:8,
57:12, 57:16, 57:19,
57:23, 58:1, 58:10,
60:18, 60:20, 62:7,
65:5, 65:7, 67:14,
69:1, 69:15, 69:19,
69:25, 70:3, 71:25,
72:3, 72:10, 72:17,
73:1, 76:17, 77:13,
77:16, 77:20, 77:23,
85:9, 85:12, 87:13,
87:17, 88:4, 88:8,
88:12, 88:14, 88:17,
88:19, 88:22, 89:3,
89:7, 89:10, 89:13,
89:17, 89:21, 89:24,
90:5, 90:7, 90:8,
90:20, 91:1, 91:6,

91:12, 92:1, 94:10, 96:21, 98:22, 103:1, 109:22, 111:2, 111:4, 111:6, 111:8, 111:23, 112:20, 112:25, 113:5, 113:8, 113:14, 116:13, 123:9, 129:21, 130:25, 132:10, 134:1, 134:16, 134:18, 134:21, 134:24, 135:12, 135:15, 135:17, 135:19, 135:23, 136:2, 136:6, 141:2, 141:5, 141:8, 141:10, 142:2, 142:6, 142:13, 142:19, 142:22, 142:25, 143:7, 144:2, 145:14, 145:18, 146:2, 146:3, 146:7, 146:10, 148:4, 148:7, 151:1, 151:3, 151:13, 152:4, 152:21, 153:3, 153:19, 155:20, 156:1, 156:4, 156:24, 157:3, 158:3, 158:16, 162:7, 162:10, 162:22, 162:24, 163:2, 163:3, 163:6, 164:10, 166:4, 167:3, 169:4, 169:6, 169:12, 170:1, 178:15, 181:2, 184:19, 187:11, 189:1, 191:1, 191:3, 195:5, 196:6, 197:1, 197:4, 198:17, 202:5, 202:7, 203:19, 203:22, 204:23, 205:5, 205:13, 206:2, 206:5, 206:9, 206:19, 206:25, 207:3, 207:6, 207:18, 208:1, 210:10, 210:13, 210:21, 210:25, 211:10, 211:17, 211:20, 211:24, 212:1, 212:2, 212:4, 212:6, 212:14, 212:16, 213:15, 213:21, 213:23, 214:7, 214:11, 215:3, 215:25, 225:6, 228:14,

229:14, 231:14, 232:15, 234:11, 242:13, 242:15, 245:2, 246:18, 248:19, 248:24, 249:3, 249:6, 249:10, 249:18, 253:1, 253:3, 253:6, 253:16, 254:10, 254:20, 255:1, 259:1, 259:3, 261:9, 263:2, 263:24, 264:25, 265:2, 265:6, 265:13, 269:2, 269:7, 269:17, 270:7, 270:11, 270:23, 271:2, 271:25, 272:2, 277:7, 277:21, 278:16, 279:5, 279:10, 279:17, 279:25, 280:9, 280:12, 280:23, 281:1, 281:19, 281:22, 281:25, 282:11, 282:14, 282:17, 282:23, 283:16, 283:22, 283:25, 284:12
**multiple** [2] - 105:5, 184:17
**multitasking** [1] - 38:6
**muscle** [7] - 55:24, 56:1, 56:2, 56:5, 56:24, 57:14, 57:16
**must** [2] - 60:22, 277:14

### N
**name** [11] - 34:19, 36:11, 36:13, 36:18, 40:17, 67:6, 171:6, 208:8, 214:4, 214:7, 216:14
**named** [2] - 29:1, 263:20
**namely** [1] - 14:25
**Napa** [6] - 218:9, 218:13, 218:22, 218:25, 222:5
**nature** [2] - 155:3, 172:15
**near** [7] - 8:10, 80:6, 86:16, 130:8, 139:8, 143:9, 182:1
**nearly** [2] - 128:3, 250:13
**necessarily** [5] - 29:9, 51:24, 232:13,

240:23, 255:19
**necessary** [1] - 33:20
**need** [32] - 5:7, 5:23, 6:6, 7:5, 9:4, 29:12, 49:21, 72:8, 72:17, 87:23, 88:3, 118:6, 118:7, 118:16, 130:9, 134:6, 142:21, 143:3, 147:19, 157:1, 179:16, 179:21, 182:24, 184:3, 205:21, 205:24, 215:6, 273:3, 273:25, 275:18, 284:3
**needed** [6] - 29:1, 29:12, 38:7, 126:23, 275:2, 279:3
**needs** [2] - 13:6, 125:8
**negative** [5] - 14:17, 15:4, 228:1, 228:4, 228:5
**negligence** [6] - 68:1, 68:4, 249:3, 249:15, 251:21, 252:3
**negligent** [1] - 252:5
**neighbor** [4] - 152:7, 152:8, 152:9
**neighborhood** [17] - 19:12, 63:25, 64:21, 65:12, 65:15, 78:7, 92:3, 98:1, 123:24, 129:17, 137:12, 227:11, 227:15, 228:5, 229:7, 232:6, 233:17
**neighborhoods** [3] - 231:17, 231:25, 243:13
**nervousness** [1] - 232:25
**never** [29] - 21:2, 21:20, 24:16, 29:17, 42:3, 42:4, 54:3, 60:24, 76:9, 79:15, 93:3, 93:6, 108:17, 108:18, 121:9, 129:5, 130:16, 131:13, 131:21, 131:25, 137:13, 137:21, 138:1, 144:21, 151:13, 163:19, 165:19, 227:8, 243:4
**new** [3] - 8:20, 8:22, 35:24
**New** [1] - 41:8
**newly** [1] - 280:17
**NEXT** [1] - 1:22

**Next** [1] - 152:9
**next** [18] - 71:4, 99:7, 117:21, 139:2, 139:14, 152:7, 155:13, 170:15, 179:23, 200:18, 200:22, 200:23, 201:15, 210:4, 213:6, 214:13, 214:14, 271:21
**nice** [2] - 160:18, 284:12
**nickel** [1] - 66:7
**night** [7] - 4:21, 54:11, 140:15, 148:19, 219:8, 219:10, 281:12
**nights** [2] - 92:24, 219:1
**Nitz** [1] - 175:16, 175:22
**nobody** [6] - 126:23, 127:21, 127:22, 127:23, 138:18, 139:9
**noncumulative** [1] - 153:22
**nonresponsive** [3] - 60:18, 96:21, 197:5
**normal** [1] - 62:15
**normally** [2] - 183:13, 271:20
**Norman** [1] - 72:13
**Northeast** [1] - 172:23
**notate** [1] - 60:5
**notations** [1] - 60:7
**note** [1] - 195:23
**notebooks** [1] - 272:19
**noted** [1] - 10:8
**notes** [4] - 5:13, 60:2, 88:15, 285:5
**nothing** [17] - 10:14, 48:23, 68:14, 105:8, 105:9, 129:1, 144:8, 145:11, 170:1, 202:19, 202:20, 210:10, 245:16, 245:20, 274:24
**notice** [11] - 10:9, 24:17, 29:12, 93:17, 94:3, 100:12, 106:22, 170:8, 195:16, 195:19, 243:14
**noticed** [6] - 72:20, 97:3, 238:7, 239:9, 243:16, 243:23
**notified** [2] - 145:16, 215:11

**noting** [1] - 195:25
**nowhere** [1] - 17:1
**number** [30] - 4:25, 5:1, 10:2, 11:17, 15:18, 15:25, 26:17, 95:3, 130:1, 130:2, 130:3, 148:1, 148:16, 150:16, 150:17, 169:10, 178:2, 179:1, 186:6, 192:10, 205:24, 206:7, 213:20, 214:5, 214:7, 255:12, 255:14, 267:5, 277:20, 277:22
**numbers** [2] - 178:23, 178:24
**numerous** [5] - 18:13, 19:20, 148:8, 220:3, 260:4
**nurse's** [1] - 149:23
**nursing** [1] - 38:3
**NW** [5] - 1:14, 1:18, 2:3, 2:11, 285:12

### O
**OAG** [1] - 20:17
**Oaks** [3] - 227:6, 227:9
**oath** [4] - 90:4, 113:16, 141:18, 253:20
**object** [12] - 8:9, 8:15, 22:7, 27:17, 45:21, 56:13, 182:4, 184:19, 187:16, 205:6, 205:25, 233:8
**objected** [1] - 155:21
**objection** [85] - 4:18, 12:14, 13:8, 25:11, 27:23, 32:17, 35:13, 36:23, 37:9, 38:19, 39:2, 41:14, 43:17, 43:22, 44:14, 53:6, 58:23, 60:18, 60:19, 61:17, 64:14, 64:22, 65:3, 66:11, 67:10, 72:15, 75:22, 77:18, 77:21, 90:22, 91:23, 93:9, 96:21, 116:10, 116:15, 119:17, 120:4, 123:12, 132:6, 140:1, 140:24, 158:5, 158:14, 161:16, 161:22, 166:1, 168:17, 176:15, 181:2, 187:11, 188:25, 191:1, 195:6, 196:6, 197:1, 205:3, 206:5,

212:17, 225:6,
228:14, 229:14,
231:14, 232:15,
234:11, 242:13,
245:2, 246:18,
248:19, 253:1,
253:2, 253:16,
254:10, 254:20,
259:1, 259:3, 261:9,
263:24, 264:25,
265:13, 269:2,
274:9, 277:17,
283:6, 283:21
**objections** [3] - 212:7,
274:20, 283:7
**objects** [1] - 200:18
**obligated** [1] - 214:3
**obligation** [3] - 213:3,
276:20, 276:22
**observations** [1] -
30:9
**observe** [2] - 239:13,
258:15
**observed** [8] - 28:21,
29:9, 225:21,
225:25, 237:14,
239:7, 258:16,
260:20
**obtained** [1] - 97:24
**obviously** [10] - 23:12,
30:5, 52:4, 84:22,
93:4, 118:5, 123:3,
199:8, 272:6, 273:5
**Obviously** [1] - 145:25
**OC** [2] - 47:14, 47:18
**occasion** [3] - 19:19,
199:16, 227:14
**occasionally** [2] -
221:12, 226:4
**occasions** [2] - 18:13,
144:15
**occupation** [1] - 34:21
**occupied** [1] - 217:6
**occurred** [8] - 108:17,
175:7, 208:14,
208:15, 217:8,
267:18, 268:4,
268:10
**October** [1] - 224:16
**OF** [6] - 1:1, 1:6, 1:10,
1:18, 2:3, 285:1
**off-duty** [3] - 54:12,
54:14, 54:17
**offense** [3] - 173:14,
239:8, 242:9
**offenses** [2] - 173:18,
173:20
**offer** [6] - 13:16,
14:13, 77:13, 88:24,
90:20, 158:3

**offered** [1] - 155:20
**OFFICE** [1] - 2:3
**Office** [3] - 20:17,
203:3, 203:12
**office** [10] - 78:3, 78:5,
183:19, 196:24,
197:10, 198:5,
204:21, 211:18,
274:4
**officer** [54] - 8:7,
14:11, 14:13, 40:19,
40:22, 42:6, 42:23,
51:7, 60:23, 61:15,
61:21, 62:2, 68:7,
75:10, 88:10, 92:5,
105:23, 119:16,
125:5, 144:4, 146:6,
149:5, 155:4,
171:17, 172:2,
172:6, 172:16,
173:22, 173:24,
174:2, 174:3,
175:13, 185:5,
198:14, 199:16,
200:17, 208:22,
209:14, 213:18,
224:18, 224:20,
225:4, 225:10,
228:8, 230:12,
235:2, 238:21,
250:8, 250:20,
255:13, 264:1,
273:14
**Officer** [201] - 6:8,
6:14, 8:6, 11:7, 11:9,
11:21, 12:8, 12:21,
13:4, 13:14, 13:17,
14:2, 15:25, 22:18,
40:3, 40:14, 41:11,
44:10, 44:17, 58:2,
72:2, 73:4, 75:4,
84:9, 84:20, 87:22,
89:4, 89:7, 90:4,
90:9, 91:2, 91:13,
93:20, 99:8, 100:8,
109:25, 110:2,
111:25, 113:15,
117:12, 119:11,
122:3, 123:7,
128:10, 128:12,
128:19, 129:9,
129:10, 130:10,
130:18, 130:19,
131:1, 131:22,
133:19, 133:21,
134:8, 134:25,
136:7, 138:17,
138:20, 139:7,
139:8, 141:17,
143:20, 143:21,

147:3, 149:25,
150:6, 150:7, 153:6,
153:13, 153:17,
153:18, 153:23,
156:5, 156:12,
157:15, 159:11,
159:12, 159:14,
159:16, 160:5,
160:9, 160:11,
161:12, 163:4,
163:9, 169:15,
170:16, 170:17,
170:23, 171:4,
171:6, 171:9,
171:22, 176:5,
176:7, 176:16,
177:12, 177:21,
178:17, 179:7,
180:19, 181:4,
181:17, 181:21,
186:4, 187:21,
189:13, 190:15,
190:19, 192:5,
193:18, 195:14,
197:8, 198:20,
202:1, 202:8,
202:11, 203:23,
204:20, 204:25,
207:4, 207:9,
207:21, 208:11,
210:15, 210:17,
216:24, 217:2,
217:25, 218:1,
218:17, 218:22,
219:5, 219:15,
220:6, 221:1, 221:4,
221:10, 224:21,
224:23, 225:14,
226:15, 226:18,
226:21, 234:15,
234:22, 234:24,
234:25, 235:1,
238:25, 239:4,
239:11, 239:12,
239:16, 240:5,
241:19, 241:20,
242:1, 242:2,
243:25, 244:1,
244:2, 245:23,
246:1, 246:3, 246:4,
246:8, 246:10,
246:15, 247:20,
247:21, 249:21,
251:25, 252:12,
255:9, 256:7,
257:19, 257:20,
258:21, 260:21,
263:6, 266:24,
270:8, 273:5, 273:7,
273:9, 273:23, 281:4
**officers** [36] - 11:12,

15:18, 68:21, 74:22,
116:17, 124:20,
127:9, 127:19,
127:25, 129:16,
129:24, 138:4,
140:22, 143:12,
143:20, 149:14,
153:18, 160:6,
199:20, 199:21,
200:6, 200:13,
208:20, 217:22,
217:25, 226:11,
226:15, 226:19,
226:21, 229:4,
238:21, 256:9,
256:10, 264:17,
266:2, 268:2
**officers'** [1] - 252:1
**OFFICES** [1] - 1:18
**offices** [1] - 21:12
**OFFICIAL** [1] - 285:1
**official** [3] - 200:19,
250:20, 285:10
**Official** [1] - 2:10
**officials** [1] - 217:18
**often** [2] - 59:20, 92:13
**old** [1] - 154:17
**older** [1] - 168:8
**oldest** [2] - 227:18,
227:25
**Olympics** [1] - 107:3
**ON** [1] - 1:22
**once** [34] - 19:1,
32:23, 34:11, 52:11,
56:9, 59:22, 80:20,
84:9, 84:10, 85:14,
99:17, 116:25,
119:4, 125:7,
130:18, 165:6,
177:15, 185:19,
188:21, 189:3,
189:25, 191:20,
191:22, 204:20,
206:4, 210:1,
226:18, 226:22,
237:25, 240:5,
243:25, 244:2,
246:1, 263:16
**one** [113] - 4:24, 5:24,
6:23, 6:24, 8:9, 10:2,
11:16, 18:6, 19:19,
22:10, 28:2, 32:8,
36:3, 42:9, 42:13,
46:18, 46:20, 48:11,
53:25, 54:3, 54:5,
55:1, 55:13, 55:14,
58:14, 58:17, 62:11,
64:1, 64:7, 64:8,
66:17, 74:6, 79:21,
94:18, 94:22,

114:25, 118:8,
118:22, 119:2,
119:5, 124:5, 128:3,
129:16, 130:1,
130:2, 130:24,
143:10, 144:3,
144:5, 147:9,
147:19, 147:21,
147:25, 152:6,
154:10, 154:17,
155:14, 157:17,
158:12, 159:4,
159:7, 163:12,
166:12, 173:4,
173:6, 174:1,
179:22, 196:1,
199:23, 200:6,
200:13, 201:4,
201:15, 205:16,
205:24, 206:7,
206:21, 208:19,
208:20, 211:12,
212:4, 216:24,
216:25, 218:1,
218:4, 219:7,
221:14, 225:1,
225:12, 225:16,
226:15, 226:18,
226:21, 245:9,
245:22, 246:1,
248:13, 250:19,
251:21, 251:23,
255:12, 255:14,
256:11, 262:25,
267:5, 268:19,
273:15, 274:1, 278:9
**ones** [5] - 18:3, 157:8,
211:18, 235:10,
256:2
**ongoing** [1] - 129:3
**open** [10] - 80:9,
80:18, 80:22, 94:20,
99:21, 102:19,
102:20, 188:5, 258:1
**opened** [6] - 5:13,
5:16, 99:17, 99:19,
99:20, 100:21
**opening** [1] - 105:2
**operate** [1] - 223:4
**operating** [2] - 38:8,
38:10
**operation** [1] - 56:22
**opined** [1] - 68:20
**opinion** [2] - 28:16,
168:22
**opportunity** [6] -
71:13, 139:16,
176:18, 275:3,
276:5, 276:11
**opposed** [3] - 33:8,

144:24, 169:24
**opposite** [2] - 192:18, 258:11
**option** [1] - 54:13
**options** [3] - 47:20, 47:22, 48:19
**oral** [3] - 164:20, 164:23, 165:18
**order** [26] - 15:4, 15:10, 27:13, 222:17, 224:10, 224:12, 248:17, 249:14, 249:21, 249:23, 250:6, 250:13, 250:22, 252:19, 253:12, 254:1, 254:4, 254:5, 254:14, 255:10, 255:17, 255:25, 256:8, 256:14, 256:16, 256:22
**ordered** [1] - 211:10
**orders** [34] - 222:9, 222:13, 222:14, 222:15, 222:16, 222:19, 222:20, 223:3, 223:10, 223:19, 223:20, 223:23, 223:25, 249:1, 250:9, 250:12, 250:15, 250:17, 251:18, 252:1, 252:10, 252:14, 252:15, 252:24, 252:25, 253:18, 255:2, 255:7, 255:14, 255:22, 256:18, 257:1, 257:6
**organize** [1] - 175:18
**original** [3] - 179:19, 211:17, 283:25
**originally** [1] - 168:20
**otherwise** [1] - 34:3
**ourselves** [1] - 222:25
**outs** [4] - 227:19, 227:23, 242:4
**outset** [1] - 251:19
**outside** [21] - 23:3, 28:4, 28:5, 28:25, 29:3, 29:24, 34:7, 56:17, 67:19, 112:5, 112:22, 130:10, 162:4, 170:17, 170:19, 189:12, 205:20, 248:23, 254:24, 258:18, 269:5
**overall** [3] - 39:7, 223:20

**overhear** [1] - 150:9
**overheard** [2] - 150:7, 153:24
**overlap** [1] - 47:8
**overlook** [1] - 62:19
**overnight** [1] - 281:4
**overruled** [20] - 41:15, 58:24, 59:8, 59:10, 64:15, 64:24, 119:19, 158:17, 164:9, 187:13, 191:2, 196:7, 228:15, 229:16, 242:14, 242:16, 253:9, 263:5, 265:5, 265:15
**overseeing** [1] - 35:23
**own** [13] - 7:18, 23:25, 30:9, 30:11, 57:22, 133:16, 187:8, 196:4, 196:25, 208:23, 253:15, 276:21

**P**

**p.m** [3] - 199:8, 234:15, 284:16
**pace** [3] - 104:18, 240:6, 246:6
**package** [1] - 180:23
**packet** [1] - 127:5
**PAGE** [2] - 1:22, 3:2
**page** [9] - 111:1, 111:3, 267:4, 267:7, 267:19, 267:21, 267:22, 274:6
**Page** [3] - 111:14, 278:19, 278:23
**pages** [4] - 274:13, 277:16, 279:21, 281:17
**pain** [24] - 25:18, 28:3, 28:7, 28:11, 28:17, 29:8, 29:15, 29:20, 29:22, 30:6, 30:10, 30:23, 31:11, 31:20, 32:25, 33:2, 33:9, 33:13, 39:6, 39:9, 39:10, 39:13
**painful** [1] - 88:5
**painting** [1] - 73:12
**pants** [11] - 71:17, 71:18, 101:15, 101:16, 101:17, 108:21, 109:12, 243:15, 243:16, 246:17, 246:21
**paper** [1] - 76:23
**paperwork** [1] -

195:24
**parallel** [5] - 81:15, 188:13, 260:14, 262:11, 263:8
**parameters** [3] - 28:5, 29:22, 30:4
**pardon** [4] - 170:18, 200:15, 269:24, 271:12
**park** [1] - 94:24
**parked** [2] - 95:7, 104:9
**parking** [31] - 18:25, 74:9, 74:12, 75:2, 76:10, 78:19, 79:4, 79:10, 79:14, 79:15, 84:2, 84:19, 84:21, 84:23, 90:16, 94:25, 100:15, 102:25, 106:7, 107:7, 108:1, 108:23, 109:2, 110:2, 110:10, 110:11, 110:14, 110:15, 114:14, 164:6, 241:16
**part** [22] - 8:14, 23:7, 60:16, 135:6, 135:8, 135:9, 141:2, 159:9, 159:22, 161:7, 168:23, 177:18, 180:12, 185:4, 186:14, 199:19, 200:4, 202:22, 209:9, 220:7, 226:9, 231:20
**parte** [7] - 15:9, 15:15, 16:4, 16:7, 17:4, 23:16
**participate** [1] - 265:24
**participated** [1] - 269:18
**participation** [1] - 266:1
**particular** [2] - 9:19, 129:1
**particularly** [3] - 233:20, 272:8, 272:10
**particulars** [1] - 128:11
**parties** [3] - 27:5, 80:12, 220:20
**partner** [6] - 175:14, 175:21, 176:1, 176:15, 200:20, 201:23
**partners** [1] - 228:24
**parts** [2] - 159:4, 160:14

**party** [11] - 11:11, 12:15, 19:15, 218:18, 218:19, 220:22, 220:24, 221:1, 221:2, 221:7, 270:24
**party's** [1] - 12:23
**pass** [3] - 45:10, 170:2, 225:18
**passed** [1] - 265:20
**passenger** [12] - 12:4, 71:23, 80:23, 81:6, 159:20, 183:25, 184:8, 234:21, 234:22, 257:22, 257:24, 257:25
**passing** [1] - 225:18
**past** [12] - 75:6, 78:17, 81:23, 81:24, 82:9, 84:23, 209:24, 209:25, 230:5, 236:7, 237:14, 237:21
**pat** [1] - 116:25
**patch** [1] - 201:20
**patience** [1] - 34:3
**patient** [10] - 28:6, 36:11, 36:19, 37:5, 37:7, 37:8, 37:12, 38:22, 39:6, 39:14
**patients** [15] - 28:16, 28:21, 29:2, 29:3, 29:9, 31:11, 31:19, 32:25, 33:3, 33:9, 35:24, 36:1, 36:3, 36:6
**patrol** [6] - 63:16, 224:18, 224:20, 225:10, 232:7, 243:14
**patrolling** [1] - 64:9
**pattern** [1] - 166:11
**Pause** [9] - 33:15, 34:9, 40:8, 91:10, 134:4, 150:15, 169:5, 197:6, 279:24
**pay** [4] - 62:13, 94:1, 196:2, 253:12
**paying** [4] - 11:22, 62:14, 62:15, 62:17
**pen** [2] - 50:2, 79:21
**penetrating** [1] - 36:7
**people** [65] - 4:19, 4:25, 5:3, 16:20, 19:5, 21:25, 30:9, 46:9, 46:11, 46:20, 60:16, 61:1, 61:4, 63:6, 63:8, 66:17, 66:18, 66:22, 70:12, 115:16, 115:17,

115:18, 115:19, 118:6, 123:24, 124:6, 125:1, 125:19, 125:21, 126:10, 130:5, 130:13, 131:13, 137:25, 138:10, 138:19, 139:4, 139:10, 145:1, 152:15, 154:15, 156:10, 159:25, 163:15, 163:20, 222:4, 227:12, 227:13, 227:14, 227:22, 228:24, 229:4, 229:7, 230:25, 231:17, 231:24, 232:9, 232:11, 232:18, 232:22, 233:3, 233:20, 242:3, 268:13
**people's** [2] - 4:25, 16:18
**pepper** [4] - 47:18, 47:24, 48:19, 52:9
**per** [3] - 54:10, 54:11
**perceive** [1] - 68:10
**percent** [12] - 52:6, 56:4, 59:25, 79:7, 83:4, 83:6, 86:23, 101:8, 134:19, 134:22, 157:17, 157:18
**perception** [1] - 136:21
**percipient** [1] - 29:7
**perfect** [1] - 51:2
**perfected** [1] - 153:1
**perfectly** [1] - 12:6
**performing** [1] - 268:16
**perhaps** [3] - 88:7, 95:20, 228:12
**period** [1] - 27:21
**periods** [1] - 114:2
**permission** [5] - 23:9, 179:4, 181:16, 189:9, 204:24
**permitted** [1] - 4:18
**perpetrator** [1] - 174:14
**person** [29] - 51:9, 53:12, 61:7, 61:13, 63:1, 64:17, 65:8, 65:12, 71:4, 71:16, 93:24, 103:6, 116:9, 116:14, 116:16, 119:15, 119:20, 123:11, 123:15,

124:16, 173:16, 212:11, 229:23, 240:23, 249:22, 250:21, 256:10, 256:23

**person's** [4] - 62:23, 63:3, 124:9, 245:12

**personal** [4] - 23:25, 126:19, 126:20, 144:13

**personally** [8] - 16:16, 16:17, 21:3, 24:14, 61:23, 66:17, 70:22, 120:7

**phone** [31] - 14:20, 127:1, 148:1, 148:6, 148:16, 150:13, 180:10, 180:14, 181:1, 181:4, 181:12, 181:25, 182:3, 182:14, 182:19, 182:23, 186:2, 188:16, 189:5, 212:25, 214:4, 231:2, 231:4, 231:5, 231:8, 238:17, 243:4, 243:6, 243:10, 247:11, 250:14

**photo** [2] - 132:24, 133:3

**Photograph** [3] - 180:3, 180:21, 182:6

**photograph** [27] - 157:20, 159:2, 163:9, 163:13, 169:13, 178:18, 179:15, 179:16, 179:24, 179:25, 180:8, 182:8, 182:11, 182:25, 183:24, 184:3, 184:7, 185:20, 185:22, 189:4, 189:18, 189:19, 189:20, 207:12, 207:15, 208:3, 208:22

**photographed** [2] - 181:5, 181:6

**photographs** [44] - 8:7, 94:14, 94:16, 124:17, 132:11, 158:11, 158:13, 158:19, 159:1, 159:5, 160:9, 160:18, 160:20, 160:24, 169:8, 177:6, 177:8, 177:13, 177:15,

177:17, 177:20, 177:22, 177:24, 177:25, 178:5, 178:10, 199:14, 200:5, 200:7, 200:13, 204:20, 205:4, 205:25, 206:3, 208:19, 208:20, 209:1, 209:4, 209:6, 209:11, 209:12, 209:15

**Photographs** [2] - 178:5, 179:5

**photography** [2] - 172:13, 175:24

**photos** [15] - 127:4, 132:3, 132:15, 132:16, 132:19, 133:6, 133:11, 133:12, 133:13, 133:14, 133:16, 135:4, 157:7, 157:11, 157:15

**phrase** [3] - 137:21, 137:22, 242:8

**physical** [2] - 37:21, 180:12

**physician** [3] - 15:21, 28:20, 30:1

**pick** [3] - 109:1, 250:14

**picked** [2] - 82:24, 84:25

**picture** [11] - 80:17, 89:25, 95:25, 124:24, 159:19, 159:24, 160:2, 169:20, 207:23, 211:13, 228:10

**pictures** [21] - 124:1, 124:2, 124:11, 124:13, 124:21, 124:22, 125:6, 125:17, 125:18, 125:24, 126:10, 126:13, 126:23, 138:16, 156:21, 159:17, 160:3, 160:9, 160:15, 169:22, 169:23

**piece** [5] - 9:15, 76:23, 179:2, 213:8, 263:22

**pink** [5] - 79:21, 81:22, 82:1, 82:10, 85:4

**pistol** [34] - 47:2, 187:17, 188:2, 188:3, 188:15, 188:24, 190:1, 190:23, 190:24,

191:4, 191:9, 191:12, 191:14, 191:16, 191:17, 192:10, 192:11, 192:16, 192:23, 192:24, 193:4, 193:5, 193:6, 193:7, 193:9, 193:10, 193:12, 194:19, 195:3, 195:15, 207:24, 208:5, 208:6

**placard** [8] - 179:23, 179:25, 180:4, 180:6, 180:7, 181:5, 186:6, 194:8

**Placard** [28] - 182:12, 186:10, 187:14, 187:15, 187:16, 188:10, 188:19, 189:5, 189:6, 189:8, 189:14, 189:15, 189:16, 189:24, 189:25, 191:10, 192:8, 192:9, 192:15, 193:4, 193:10, 193:14, 194:6, 194:9, 194:11, 194:23

**Placards** [1] - 185:22

**placards** [4] - 175:25, 178:22, 178:23, 186:5

**place** [7] - 113:16, 178:24, 219:21, 255:3, 255:10, 268:15, 268:21

**placed** [6] - 25:20, 39:17, 145:17, 181:5, 181:8, 223:23

**plagued** [1] - 232:7

**plainly** [2] - 106:15, 106:16

**Plaintiff** [4] - 1:4, 1:13, 155:8, 276:24

**plaintiff** [17] - 4:8, 5:4, 14:9, 18:23, 26:25, 34:5, 40:3, 53:4, 170:10, 214:14, 216:8, 248:24, 269:8, 275:7, 276:10, 281:11, 282:21

**plaintiff's** [5] - 5:11, 20:7, 68:14, 170:15, 204:25

**Plaintiff's** [26] - 35:10, 77:14, 134:2, 134:9, 157:6, 176:8, 177:13, 178:14, 179:8, 180:20,

181:1, 181:23, 182:12, 185:18, 186:4, 187:25, 188:23, 189:3, 189:24, 190:16, 190:20, 191:9, 194:10, 195:1, 204:7, 266:21

**Plaintiffs** [1] - 276:21

**plaintiffs** [4] - 7:25, 8:18, 88:23, 206:14

**plan** [2] - 27:4, 280:7

**planning** [1] - 249:8

**plant** [5] - 14:9, 14:14, 14:15, 14:19, 269:8

**planted** [1] - 22:2

**planting** [4] - 8:20, 8:24, 10:16, 14:12

**plastic** [8] - 103:9, 103:12, 178:23, 179:2, 179:3, 188:6, 188:7, 195:15

**play** [2] - 134:1, 135:6

**played** [1] - 165:25

**playground** [3] - 73:15, 73:16, 160:19

**playing** [8] - 73:10, 109:14, 110:7, 110:13, 110:19, 134:7, 161:4, 163:8

**PLFPC@aol.com** [1] - 1:16

**plus** [3] - 43:7, 117:10, 129:9

**pocket** [6] - 14:19, 70:13, 229:22, 230:7, 230:14, 233:5

**podium** [2] - 45:19, 45:21

**point** [62] - 7:22, 9:19, 10:7, 11:1, 13:9, 13:22, 14:3, 38:2, 55:22, 72:19, 78:8, 81:10, 83:24, 99:25, 100:1, 101:8, 101:10, 105:2, 105:3, 105:25, 106:7, 106:24, 115:23, 119:13, 121:1, 122:17, 136:11, 136:17, 137:4, 138:24, 138:25, 140:11, 148:11, 156:8, 164:13, 165:15, 175:1, 200:12, 206:23, 222:15, 224:18, 224:23, 224:25, 225:5, 235:4, 239:14,

239:18, 246:15, 247:20, 254:1, 258:5, 258:19, 259:8, 260:8, 260:13, 260:19, 261:16, 261:22, 262:25, 271:6, 280:7, 281:9

**pointed** [2] - 132:4, 210:21

**pointing** [2] - 8:19, 74:14

**points** [1] - 206:17

**poles** [1] - 98:4

**police** [54] - 4:20, 5:3, 10:8, 10:12, 10:15, 40:22, 42:5, 42:23, 43:19, 44:1, 51:7, 52:15, 52:20, 61:15, 61:21, 63:7, 66:10, 68:21, 69:5, 74:22, 92:5, 95:9, 95:10, 105:23, 108:12, 108:16, 108:18, 116:17, 125:23, 160:6, 175:8, 216:21, 222:8, 222:10, 225:4, 228:6, 228:8, 230:10, 230:12, 239:23, 239:25, 240:21, 240:23, 240:24, 242:7, 248:6, 248:12, 250:8, 250:20, 251:19, 254:6, 264:1, 269:12

**Police** [14] - 40:19, 43:3, 92:8, 171:10, 171:12, 173:3, 192:3, 196:5, 198:3, 207:12, 208:4, 216:17, 216:19, 255:13

**police-involved** [1] - 175:8

**policy** [3] - 15:1, 15:3, 196:9

**Ponds** [25] - 4:8, 6:8, 6:10, 16:13, 29:13, 31:24, 34:4, 144:6, 147:2, 151:5, 153:5, 153:21, 171:5, 187:13, 215:4, 215:8, 215:10, 216:6, 232:17, 251:13, 255:11, 275:12, 281:20, 282:9

**PONDS** [219] - 1:13,

1:14, 6:15, 6:19, 6:21, 6:23, 7:8, 8:5, 8:12, 9:7, 9:23, 10:2, 10:16, 10:19, 10:23, 11:4, 11:6, 11:16, 11:19, 11:25, 12:3, 12:10, 12:18, 13:8, 13:15, 13:18, 14:16, 15:6, 15:13, 15:17, 15:20, 15:24, 18:4, 18:6, 18:9, 18:11, 19:16, 19:19, 22:17, 22:21, 22:23, 23:6, 23:14, 23:19, 24:4, 24:25, 25:10, 25:14, 25:25, 26:2, 26:8, 26:18, 26:20, 27:3, 27:10, 27:12, 27:15, 27:19, 27:22, 29:14, 29:19, 30:7, 30:15, 31:4, 31:12, 31:25, 32:6, 32:8, 32:11, 32:23, 33:4, 33:7, 33:11, 33:14, 34:5, 34:16, 35:9, 36:24, 37:1, 37:10, 39:21, 112:21, 134:17, 142:11, 142:15, 144:7, 144:21, 145:1, 145:4, 145:13, 145:24, 147:5, 147:12, 147:15, 147:18, 147:21, 147:24, 148:3, 148:5, 148:8, 148:10, 148:13, 148:17, 148:22, 148:24, 149:4, 149:7, 149:10, 149:18, 149:21, 149:24, 150:4, 150:8, 150:11, 150:14, 150:16, 150:21, 150:25, 151:6, 151:9, 151:12, 151:21, 151:25, 152:2, 152:5, 152:25, 154:1, 154:4, 154:7, 154:12, 154:24, 155:5, 155:16, 170:15, 170:18, 170:20, 171:3, 171:25, 176:4, 177:10, 178:13, 179:4, 180:16, 180:25, 181:16, 181:19, 187:18, 188:22, 190:12, 191:5, 191:7, 194:25, 195:3,

195:10, 195:13, 202:1, 205:4, 205:6, 205:10, 205:15, 205:18, 205:23, 206:20, 210:15, 211:19, 214:9, 214:14, 214:17, 214:20, 214:24, 215:13, 216:3, 216:7, 216:13, 246:20, 249:20, 253:8, 254:13, 255:12, 255:17, 255:20, 256:1, 256:6, 259:6, 263:3, 265:4, 266:19, 267:1, 269:18, 269:24, 270:1, 270:14, 270:16, 270:20, 271:1, 271:7, 271:12, 271:15, 271:18, 271:23, 272:7, 273:7, 273:13, 273:18, 273:22, 273:24, 274:1, 274:11, 274:15, 274:18, 275:13, 275:15, 275:20, 275:22, 281:13, 283:1, 284:5, 284:10, 284:14
**Ponds**)......................
............... [1] - 3:4
**Ponds**)......................
...............**171** [1] -
3:7
**Ponds**)......................
...............**216** [1] -
3:9
**portion** [5] - 80:14, 110:5, 135:22, 135:24, 184:13
**portions** [2] - 26:6, 283:10
**pose** [4] - 230:24, 256:3, 269:20, 270:3
**posed** [2] - 11:20, 269:22
**position** [10] - 5:11, 5:16, 30:12, 49:23, 59:11, 169:17, 208:25, 209:2, 255:20, 270:22
**possessing** [1] - 150:2
**possession** [3] - 10:3, 117:6, 180:14
**possibility** [2] - 6:9, 91:21
**possible** [6] - 63:4,

91:24, 236:20, 268:18, 270:20, 279:10
**possibly** [3] - 22:18, 174:23, 196:1
**post** [3] - 194:11, 194:13
**potentially** [1] - 7:5
**powder** [1] - 186:22
**powerful** [1] - 49:1
**PPK** [1] - 208:6
**PPK/S** [1] - 194:1
**practice** [3] - 15:1, 15:3, 196:9
**predicate** [14] - 7:10, 7:15, 7:16, 8:1, 8:4, 8:5, 9:6, 9:8, 9:20, 10:22, 14:14, 15:11, 75:23, 213:2
**prefer** [2] - 33:16, 174:1
**preference** [1] - 147:25
**preferred** [1] - 171:18
**prejudice** [1] - 283:13
**prejudicial** [3] - 282:2, 282:20, 283:11
**premarked** [1] - 88:7
**premature** [1] - 162:8
**prepare** [1] - 25:4
**prepared** [2] - 274:18, 274:19
**preparing** [1] - 280:16
**prerogative** [1] - 277:1
**presence** [5] - 50:25, 51:6, 51:14, 52:16, 155:4
**present** [2] - 213:11, 213:13, 254:19, 265:9, 265:10, 265:16, 265:22, 269:1
**presentation** [1] - 34:2
**presented** [2] - 20:12, 88:23
**preserve** [1] - 124:6
**pressed** [1] - 107:8
**pressing** [1] - 124:23
**pressured** [1] - 16:15
**pretrial** [7] - 21:11, 24:18, 25:15, 147:14, 277:15, 278:20, 278:21
**pretty** [6] - 52:25, 90:18, 90:19, 109:10, 114:4, 235:22
**previous** [3] - 83:8, 112:10, 269:13
**previously** [5] - 15:2,

66:19, 157:6, 165:7, 176:8
**primarily** [1] - 209:13
**primer** [1] - 186:22
**prints** [2] - 184:16, 185:15
**priority** [6] - 118:2, 118:5, 118:8, 118:15, 123:22, 125:15
**probate** [1] - 144:12
**problem** [10] - 5:18, 16:12, 16:17, 68:20, 69:8, 136:3, 213:1, 274:22, 276:4, 280:9
**procedures** [2] - 10:8, 10:12, 10:15
**proceed** [5] - 90:5, 113:12, 134:3, 163:1, 214:6
**proceedings** [1] - 285:6
**Proceedings** [1] - 1:24
**process** [13] - 56:7, 175:4, 183:6, 183:14, 183:18, 183:21, 185:8, 185:13, 185:14, 195:17, 242:18, 272:9, 281:6
**processed** [4] - 176:2, 183:16, 184:12, 185:9
**processing** [9] - 172:12, 172:13, 183:8, 192:25, 195:14, 199:11, 202:12, 202:14, 202:21
**produced** [1] - 1:25
**professional** [1] - 279:20
**proffer** [9] - 8:21, 13:6, 13:9, 13:16, 17:12, 153:4, 205:24, 215:1, 273:21
**profile** [1] - 198:9
**profound** [1] - 37:25
**program** [2] - 173:2
**progression** [1] - 57:13
**prohibit** [2] - 281:3, 281:11
**projectile** [1] - 201:15
**projectiles** [1] - 201:1
**promise** [3] - 89:13, 89:21, 272:17
**promised** [1] - 272:16
**prompt** [1] - 148:13
**proof** [1] - 211:11

**proper** [4] - 12:6, 12:12, 12:20, 28:8
**properly** [3] - 151:15, 151:18, 151:22
**propose** [3] - 5:21, 6:2
**proposed** [2] - 6:12, 22:8
**propriety** [1] - 152:19
**prosecutor** [1] - 278:7
**protocol** [1] - 209:25
**prove** [3] - 12:25, 13:3
**provide** [4] - 5:21, 21:21, 31:20, 264:20
**provided** [6] - 8:23, 20:16, 32:12, 48:21, 209:6, 270:1
**provisionally** [2] - 26:13, 274:12
**public** [5] - 92:4, 95:5, 95:6, 278:25, 280:3
**publish** [2] - 26:14, 179:4
**publishing** [1] - 27:4
**puddle** [1] - 182:18
**pull** [11] - 57:9, 229:5, 229:12, 231:24, 232:11, 232:18, 232:20, 252:24, 258:19, 259:10, 263:8
**pulling** [7] - 94:25, 95:1, 95:5, 99:8, 228:25, 246:17, 246:21
**pump** [1] - 259:18
**pumping** [2] - 259:18, 259:22
**punished** [1] - 224:1
**punishment** [1] - 224:3
**purple** [6] - 82:15, 84:15, 87:10, 87:11, 109:17
**purpose** [6] - 55:19, 100:22, 100:25, 198:9, 241:22, 282:24
**purposes** [2] - 266:20, 267:3
**pursue** [8] - 240:11, 241:1, 244:18, 245:6, 248:18, 250:20, 250:21
**pursued** [1] - 247:21
**pursuing** [11] - 13:13, 250:24, 251:3, 251:6, 254:4, 254:7, 256:9, 256:10, 256:23, 257:18, 258:5

**pursuit** [2] - 68:17, 249:22
**push** [1] - 103:22
**pushed** [3] - 121:17, 121:21, 277:9
**put** [29] - 22:25, 23:9, 27:1, 51:14, 51:21, 52:19, 70:9, 73:18, 73:25, 74:6, 78:25, 80:24, 81:13, 81:17, 82:18, 83:20, 86:8, 86:18, 87:6, 117:19, 149:5, 153:10, 157:8, 193:2, 212:11, 274:24, 275:8, 277:2, 284:9
**puts** [1] - 98:12
**putting** [4] - 52:17, 59:4, 77:3, 77:19

## Q

**qualification** [2] - 45:16, 59:17
**qualified** [1] - 60:2
**qualify** [5] - 54:8, 54:25, 55:19, 58:3, 58:11
**Quantico** [1] - 53:18
**quarter** [1] - 284:4
**question's** [2] - 262:20, 262:21
**questioned** [1] - 265:11
**questioning** [5] - 6:8, 13:7, 13:13, 205:7, 248:25
**questions** [21] - 5:17, 12:6, 12:12, 13:22, 14:24, 27:7, 39:24, 90:24, 110:25, 198:12, 210:15, 214:20, 214:22, 255:21, 255:23, 262:10, 265:25, 268:16, 269:20, 271:14
**queued** [1] - 284:10
**quick** [5] - 124:24, 167:5, 260:20, 261:19, 261:21
**Quick** [1] - 168:6
**quicken** [2] - 104:18, 107:11
**quickened** [2] - 240:6, 246:6
**quicker** [4] - 56:7, 57:20, 100:19, 101:13
**quickly** [1] - 56:14,

65:6, 75:5, 75:6, 81:11, 93:23, 93:24, 100:9, 100:11, 100:15, 102:5, 107:12, 109:9, 109:10, 115:11, 115:21, 125:2, 125:9, 126:24, 206:22
**quite** [3] - 37:18, 105:11, 280:14
**quote** [1] - 114:8

## R

**radical** [1] - 212:22
**radio** [2] - 118:9, 123:25
**Rahman** [8] - 6:21, 6:22, 22:19, 215:4, 215:8, 215:14, 265:17, 273:8
**raise** [4] - 4:15, 22:9, 25:10, 32:9
**raised** [2] - 6:7, 273:4
**Ralph** [3] - 175:16, 175:22, 176:2
**Ralphael** [70] - 11:1, 25:17, 36:12, 81:9, 81:13, 83:1, 83:13, 84:12, 86:24, 87:6, 91:21, 93:1, 95:15, 98:24, 103:19, 103:21, 107:5, 111:9, 116:9, 116:16, 116:20, 118:13, 119:8, 123:16, 125:13, 136:9, 136:12, 148:24, 149:5, 149:12, 149:13, 149:15, 150:1, 150:2, 154:15, 154:19, 161:20, 196:22, 197:9, 217:13, 238:7, 238:20, 238:22, 239:7, 239:12, 239:17, 241:3, 242:2, 242:11, 243:25, 245:23, 246:2, 246:8, 246:13, 246:16, 246:21, 247:22, 248:9, 252:12, 252:23, 257:18, 258:5, 258:8, 259:7, 260:6, 260:13, 260:16, 262:12, 264:16
**Ralphael's** [5] -

144:11, 198:4, 247:8, 261:25, 263:9
**reask** [2] - 162:17
**Ralphy** [6] - 69:3, 163:24, 164:24, 164:25, 167:4, 168:10
**Ralphy's** [1] - 7:19
**ran** [10] - 80:18, 82:5, 82:24, 83:25, 84:19, 91:17, 99:18, 241:12, 258:9, 258:18
**range** [6] - 41:23, 54:2, 55:1, 58:2, 59:2, 59:16
**rapes** [2] - 173:9, 173:12
**rare** [1] - 199:16
**Rashida** [1] - 7:16
**rather** [2] - 242:12, 279:9
**rattle** [1] - 61:25
**RDR** [3] - 2:10, 285:3, 285:10
**re** [1] - 152:24
**re-take** [1] - 152:24
**reach** [2] - 20:3, 213:5
**react** [5] - 257:6, 257:10, 257:12, 257:14
**reaction** [1] - 57:20
**read** [7] - 113:22, 149:22, 197:2, 279:11, 279:16, 283:4
**reading** [2] - 184:20, 212:10
**ready** [4] - 104:22, 154:9, 184:23, 284:10
**real** [9] - 50:15, 121:10, 163:25, 167:4, 206:10, 206:11, 208:6, 208:9, 223:6
**realized** [3] - 95:20, 192:7, 192:22
**realizes** [1] - 29:20
**really** [23] - 28:13, 57:3, 58:4, 69:1, 122:16, 124:24, 130:4, 135:7, 137:14, 138:6, 139:2, 151:14, 151:15, 165:4, 173:5, 174:2, 182:4, 184:5, 219:20, 226:5, 227:12, 230:16, 259:25
**rear** [3] - 12:3, 183:25,

184:8
**reask** [2] - 162:17
**reason** [13] - 62:20, 66:9, 105:18, 105:19, 105:21, 129:15, 131:20, 169:21, 199:19, 251:23, 251:24, 267:11, 276:25
**reasonable** [1] - 16:13
**reasons** [6] - 17:3, 62:11, 62:21, 62:22, 124:5, 199:23
**rebut** [1] - 153:13
**rebuttal** [7] - 153:8, 153:14, 153:25, 154:2, 215:21, 215:22, 273:8
**rebutting** [1] - 153:23
**receive** [2] - 172:6, 214:2
**received** [6] - 45:2, 68:9, 68:13, 151:13, 195:10, 213:11
**receiving** [1] - 26:16
**recess** [4] - 30:16, 143:2, 143:8, 146:12
**Recess** [3] - 30:19, 88:20, 213:24, 281:2
**recognize** [20] - 157:7, 157:19, 176:9, 177:17, 177:21, 177:24, 178:17, 180:3, 180:8, 180:20, 185:19, 190:19, 193:23, 207:9, 207:11, 229:10, 266:17, 267:5, 267:6
**recognized** [2] - 91:22, 92:4
**recollect** [1] - 183:11
**recollection** [15] - 36:22, 39:1, 72:18, 83:7, 96:1, 132:23, 184:22, 184:23, 197:14, 198:2, 198:19, 198:25, 199:4, 270:21, 277:14
**recollection's** [1] - 277:23
**reconsidered** [1] - 30:21
**reconvene** [2] - 87:19, 211:3
**record** [24] - 7:15, 24:10, 27:8, 34:19, 39:11, 134:8, 134:16, 143:3,

149:23, 153:10, 164:21, 166:24, 171:7, 198:17, 216:14, 268:2, 274:20, 275:16, 275:17, 275:19, 275:24, 278:25, 280:3
**recorded** [12] - 1:24, 96:18, 97:6, 97:8, 98:17, 139:12, 139:17, 139:24, 161:12, 164:16, 164:20, 195:20
**records** [20] - 25:19, 26:4, 26:5, 26:7, 26:24, 27:1, 27:21, 32:11, 32:16, 35:11, 36:21, 37:2, 37:4, 38:3, 38:13, 38:17, 38:25, 274:2, 274:3, 283:4
**recover** [2] - 191:20, 196:2
**recovered** [15] - 183:15, 184:17, 186:9, 187:15, 188:16, 190:24, 191:22, 194:3, 194:4, 195:18, 196:19, 201:12, 203:10, 207:24, 208:5
**Recovery** [5] - 224:13, 224:15, 224:17, 226:6, 226:8
**recovery** [2] - 172:14, 195:25
**Red** [1] - 41:22
**redact** [1] - 282:17
**redacted** [3] - 277:18, 283:11, 283:19
**redirect** [1] - 5:17
**reduced** [1] - 134:19
**refer** [3] - 5:13, 281:23, 282:8
**reference** [5] - 37:5, 137:23, 143:18, 168:23, 169:19
**referred** [1] - 14:21
**referring** [4] - 67:20, 166:2, 268:6, 279:6
**reflect** [4] - 25:20, 27:20, 198:18, 207:14
**reflected** [1] - 27:21
**reflects** [1] - 136:20
**refresh** [6] - 36:21, 38:25, 83:7, 96:1, 184:22, 184:23,

198:18, 198:25, 270:21
**refreshes** [3] - 197:14, 198:2, 199:4
**refreshing** [1] - 198:22
**refused** [1] - 148:19
**regard** [5] - 21:25, 56:2, 60:12, 60:23, 209:1
**regarding** [9] - 6:7, 28:7, 67:13, 68:9, 88:16, 248:25, 251:18, 251:25, 252:10
**regardless** [4] - 66:6, 244:10, 244:20, 244:22
**regards** [1] - 96:25
**registered** [1] - 39:16
**regular** [4] - 59:17, 219:16, 219:17, 275:17
**regulation** [1] - 223:17
**regulations** [7] - 222:22, 223:1, 223:18, 223:22, 251:18, 252:2, 252:11
**rehearsal** [1] - 218:23
**reiterating** [1] - 249:9
**relate** [1] - 68:15
**related** [3] - 173:18, 206:11, 250:24
**relationship** [1] - 144:22
**release** [2] - 215:7, 215:25
**releases** [1] - 55:7
**relevance** [9] - 59:9, 153:21, 206:8, 234:11, 254:10, 254:20, 255:1, 255:12, 265:14
**relevancy** [1] - 64:22
**relevant** [10] - 56:22, 57:3, 65:4, 68:4, 69:18, 206:7, 214:21, 253:6, 255:23, 269:22
**reluctant** [5] - 19:6, 19:7, 19:8, 19:21, 214:4
**remainder** [1] - 155:4
**Rembish** [2] - 175:15, 176:16
**Rembrandt** [2] - 20:15, 20:21
**remember** [124] - 38:5, 41:23, 41:24, 44:21, 45:14, 46:4, 46:13,

46:15, 46:17, 56:1, 61:12, 61:14, 69:15, 71:19, 74:19, 75:20, 76:8, 76:14, 95:25, 96:3, 96:5, 99:23, 101:18, 102:23, 102:24, 104:13, 106:20, 107:14, 107:15, 107:16, 108:5, 108:7, 108:8, 109:4, 111:9, 111:14, 111:17, 111:19, 111:20, 112:13, 113:19, 114:3, 114:9, 118:19, 119:1, 119:5, 127:3, 127:11, 127:15, 127:23, 129:1, 132:21, 133:3, 133:8, 140:7, 140:10, 140:11, 140:12, 140:14, 140:17, 161:12, 161:15, 161:19, 161:25, 163:22, 164:1, 164:12, 164:15, 165:1, 165:25, 168:4, 168:6, 168:8, 169:18, 169:20, 174:8, 174:11, 174:17, 177:4, 203:1, 209:18, 219:8, 220:4, 220:6, 220:21, 221:14, 221:17, 229:6, 234:5, 235:16, 235:17, 236:1, 237:4, 238:18, 238:19, 239:3, 239:4, 243:6, 243:7, 246:3, 246:10, 246:12, 247:25, 248:1, 248:7, 248:8, 250:16, 250:19, 251:2, 253:20, 254:2, 257:20, 258:2, 258:3, 260:16, 260:18, 263:12, 264:15, 264:16
**Remember** [2] - 132:19, 132:24
**remembered** [1] - 163:23
**remembers** [1] - 162:10
**remind** [4] - 251:15, 252:8, 275:5, 280:7

**remove** [2] - 183:20
**removed** [2] - 157:24, 191:17
**repeat** [5] - 56:12, 58:9, 200:11, 228:18, 245:25
**repeatedly** [2] - 152:6, 153:10
**rephrase** [17] - 36:24, 37:1, 37:10, 43:24, 43:25, 60:20, 60:21, 61:19, 91:25, 120:5, 123:14, 158:17, 225:7, 246:20, 259:5, 270:4
**replica** [1] - 194:1
**report** [32] - 9:18, 14:18, 14:23, 28:7, 28:19, 29:5, 146:9, 179:16, 179:18, 179:19, 184:14, 184:16, 188:11, 197:12, 197:13, 197:15, 197:16, 197:17, 197:18, 198:1, 198:16, 199:2, 274:2, 274:6, 274:10, 277:18, 278:4, 280:3, 280:13, 281:17
**reported** [1] - 30:10
**reporter** [2] - 279:18, 279:23
**REPORTER** [1] - 285:1
**Reporter** [3] - 2:10, 2:10, 285:10
**reporter's** [1] - 279:14
**reports** [2] - 145:22, 198:2
**represent** [2] - 193:4, 193:5
**representation** [5] - 13:12, 16:22, 16:23, 24:21, 152:19
**representations** [1] - 20:20
**representative** [1] - 144:13
**represented** [1] - 13:2
**represents** [4] - 192:15, 193:6, 193:10, 194:23
**requalification** [1] - 53:21
**request** [7] - 15:9, 16:4, 196:17, 196:18, 202:25, 203:6, 283:18
**requested** [1] - 203:12

**requesting** [1] - 20:19
**requests** [2] - 17:4, 202:15
**required** [5] - 224:24, 224:25, 225:3, 225:9, 250:16
**rescheduled** [1] - 21:5
**research** [4] - 141:15, 211:5, 253:15, 272:20
**resemblance** [1] - 208:8
**reserve** [2] - 89:19, 170:3
**residence** [3] - 18:18, 152:3, 152:16
**residences** [1] - 16:18
**residency** [1] - 35:2
**resolve** [1] - 22:11
**resolved** [1] - 154:16
**resource** [1] - 280:22
**respect** [6] - 4:21, 7:1, 14:25, 68:17, 153:3, 252:2
**respond** [6] - 17:9, 31:17, 148:14, 174:25, 184:24, 240:9
**responding** [2] - 239:3, 239:4
**response** [3] - 11:22, 239:2, 242:23
**responsibility** [1] - 200:4
**responsible** [3] - 35:23, 199:11, 199:13
**responsive** [2] - 60:19, 150:13
**rest** [2] - 219:2, 277:17
**restate** [1] - 197:7
**restaurant** [1] - 219:9
**result** [3] - 15:4, 252:15, 278:12
**resulted** [1] - 175:8
**resume** [2] - 87:14, 273:6
**Resumed** [1] - 156:2
**resumes** [1] - 273:23
**return** [2] - 20:3, 272:24
**returns** [1] - 211:21
**Revercomb** [8] - 275:2, 275:6, 275:23, 276:5, 276:25, 277:8, 278:4, 280:8
**Revercomb's** [1] - 280:20
**reversed** [1] - 191:19

**review** [6] - 27:3, 139:22, 199:3, 222:19, 266:9, 266:12
**reviewed** [2] - 36:21, 37:2
**reviewing** [2] - 38:3, 198:18
**reviews** [4] - 113:25, 177:20, 178:4, 267:8
**revving** [2] - 82:6, 82:7
**ridden** [1] - 235:19
**ride** [12] - 224:22, 225:1, 225:10, 225:11, 225:12, 225:14, 225:16, 225:19, 225:23, 226:12, 226:16, 232:8
**ride-along** [6] - 224:22, 225:10, 225:14, 225:16, 225:19, 225:23
**ride-alongs** [3] - 225:1, 225:11, 225:12
**Ridge** [5] - 227:3, 227:8, 230:17, 233:21, 234:16
**riding** [1] - 119:24
**rifle** [2] - 41:25, 42:1
**right-hand** [3] - 76:19, 114:22, 115:14
**right-handed** [2] - 45:23, 47:4
**road** [2] - 61:22, 188:13
**Road** [38] - 19:2, 63:16, 63:25, 64:13, 72:14, 72:22, 73:5, 73:6, 74:15, 78:11, 79:11, 92:13, 92:21, 94:17, 109:18, 109:19, 110:8, 110:9, 139:14, 158:25, 160:19, 161:21, 162:1, 162:12, 163:25, 164:25, 165:9, 175:1, 175:3, 177:2, 178:8, 188:13, 235:8, 258:6, 258:7, 258:8, 260:6
**Rob** [1] - 166:23
**robberies** [1] - 173:9
**Robert** [4] - 4:9, 265:18, 265:19
**ROBERT** [1] - 2:2
**robert.deberardinis @dc.gov** [1] - 2:5

**Roberto** [3] - 75:10, 216:24
**Rockwell** [1] - 72:13
**rode** [3] - 226:19, 226:22, 273:14
**roll** [1] - 229:12
**rolled** [5] - 184:2, 184:6, 184:9, 184:10
**Ron** [1] - 91:6
**room** [3] - 38:8, 38:10, 76:24
**Room** [2] - 2:11, 285:11
**root** [1] - 57:22
**rough** [1] - 72:23
**round** [6] - 54:10, 54:11, 55:14, 55:15, 58:14
**rounds** [9] - 45:16, 54:9, 54:10, 54:11, 55:10, 55:16, 58:6, 58:12, 59:3
**route** [1] - 166:15
**routine** [1] - 196:9
**rubber** [1] - 103:17
**rule** [5] - 7:2, 27:18, 60:24, 223:17, 224:3
**ruled** [4] - 10:18, 15:2, 30:13, 274:5
**rules** [10] - 60:12, 60:13, 60:14, 60:22, 222:22, 223:1, 223:18, 223:22, 251:18, 252:11
**ruling** [10] - 9:25, 10:23, 25:14, 27:15, 35:10, 69:2, 69:16, 253:7, 274:5, 279:2
**rulings** [2] - 67:11, 67:12
**run** [32] - 60:16, 70:10, 80:19, 80:20, 82:13, 84:10, 85:2, 91:17, 99:17, 99:21, 100:20, 102:16, 102:17, 106:25, 107:11, 109:24, 110:14, 115:13, 137:13, 230:21, 231:12, 240:7, 240:19, 240:20, 240:23, 242:24, 243:25, 244:10, 257:15, 261:17, 279:23
**runner's** [2] - 259:18, 259:22
**running** [93] - 6:4, 59:15, 61:13, 62:1, 62:4, 62:12, 62:20,

65:20, 65:21, 66:3, 66:8, 71:10, 82:21, 82:24, 83:13, 83:23, 84:5, 84:7, 84:8, 84:12, 84:13, 84:21, 85:13, 91:15, 93:8, 99:5, 99:11, 101:13, 102:2, 102:6, 102:20, 102:24, 105:22, 105:23, 106:2, 107:5, 107:6, 107:7, 107:12, 107:19, 107:22, 107:25, 108:1, 108:3, 108:25, 109:9, 109:10, 115:13, 136:15, 136:21, 136:23, 163:24, 166:11, 166:15, 167:4, 167:5, 167:13, 167:14, 167:16, 230:21, 231:2, 231:11, 241:1, 241:8, 241:19, 241:22, 242:19, 243:2, 244:2, 244:7, 244:14, 244:24, 245:24, 246:5, 246:7, 258:14, 258:17, 259:23, 259:25, 260:17, 261:15
**runs** [4] - 112:19, 137:24, 188:13, 244:20
**Ryder** [1] - 41:22

## S

**safe** [2] - 104:4, 195:12
**sample** [1] - 203:9
**San** [6] - 218:10, 218:12, 219:2, 219:6, 219:10, 219:13
**sanitize** [1] - 26:15
**sat** [4] - 66:20, 77:8, 129:5, 225:24
**Saturday** [1] - 218:25
**save** [1] - 135:25
**saw** [88] - 7:19, 11:21, 14:11, 14:13, 38:13, 39:12, 40:6, 66:7, 71:20, 74:24, 75:5, 76:9, 81:8, 81:13, 84:10, 85:15, 85:16, 85:25, 93:5, 93:13, 93:14, 94:4, 95:15, 95:18, 96:12,

101:24, 102:2, 102:23, 104:10, 104:18, 108:1, 108:22, 109:13, 110:7, 116:3, 117:10, 117:15, 117:17, 120:9, 121:7, 121:8, 121:9, 121:10, 121:12, 121:20, 122:4, 122:11, 125:16, 126:23, 129:6, 129:7, 129:14, 129:15, 131:15, 131:22, 134:14, 135:4, 135:10, 136:7, 136:9, 149:4, 161:20, 161:25, 162:5, 162:11, 165:17, 165:20, 167:20, 168:17, 226:4, 237:16, 241:23, 243:4, 246:16, 246:22, 246:24, 258:17, 258:19, 258:20, 258:25, 259:7, 259:16, 259:17, 259:18, 259:20, 264:12
**scale** [4] - 39:10, 72:24, 90:15, 176:23
**scared** [1] - 63:3
**scaring** [1] - 5:3
**scenario** [1] - 124:25
**scene** [61] - 8:7, 10:17, 20:9, 24:15, 90:13, 124:7, 124:13, 124:17, 124:18, 124:20, 125:1, 125:5, 138:19, 139:9, 157:22, 171:11, 171:17, 171:18, 172:1, 172:6, 172:12, 172:16, 172:22, 173:2, 173:4, 173:13, 173:22, 174:3, 175:4, 176:3, 178:11, 178:24, 179:3, 179:19, 180:13, 183:14, 185:5, 191:21, 191:22, 198:15, 198:21, 199:11, 199:16, 199:20, 200:4, 200:5, 202:12, 202:14, 203:15, 206:4, 207:24, 208:6,

208:12, 209:3, 210:4, 217:14, 264:18, 268:11, 268:12, 269:12
**scenes** [2] - 124:14, 208:23
**schematic** [5] - 72:22, 77:24, 84:11, 98:24, 274:16
**school** [3] - 42:20, 106:25, 172:12
**scientific** [1] - 185:12
**scope** [1] - 29:3
**scrambling** [1] - 280:14
**screen** [2] - 163:6, 180:21
**search** [1] - 173:4
**searching** [1] - 201:23
**seat** [3] - 34:13, 53:8, 71:23, 81:5, 81:6, 116:8, 119:14, 119:16, 119:20, 123:6, 234:21, 234:22, 257:25
**seated** [8] - 12:4, 71:23, 77:17, 92:11, 103:20, 234:22, 234:25, 235:2
**Second** [2] - 172:5, 173:1
**second** [14] - 6:13, 15:24, 35:8, 97:18, 105:8, 110:16, 157:3, 172:4, 201:15, 205:16, 255:20, 263:6, 267:22, 282:22
**second-to-last** [1] - 267:22
**secondly** [1] - 24:16
**seconds** [5] - 85:2, 118:12, 142:11, 142:13, 262:22
**security** [5] - 144:4, 145:17, 146:6, 146:7, 155:4
**see** [196] - 4:13, 10:21, 11:9, 13:23, 39:11, 46:9, 46:11, 49:14, 49:20, 49:24, 64:12, 64:20, 65:8, 65:11, 65:13, 70:11, 70:19, 72:4, 73:2, 73:5, 76:12, 78:21, 79:18, 80:1, 81:11, 81:24, 82:11, 83:7, 83:15, 83:17, 83:19, 85:21, 86:24, 87:2, 88:18, 89:12, 89:22, 91:5,

91:8, 92:12, 93:5, 95:7, 95:19, 95:22, 96:1, 96:20, 98:24, 99:1, 99:2, 99:5, 99:8, 99:9, 99:10, 100:6, 100:11, 101:13, 101:17, 102:22, 104:12, 104:25, 105:7, 105:20, 105:24, 106:6, 106:7, 106:11, 106:17, 106:18, 107:9, 107:13, 109:5, 109:19, 110:2, 110:5, 110:13, 110:18, 114:15, 114:18, 114:19, 115:17, 115:25, 116:2, 116:5, 116:6, 117:5, 117:12, 119:23, 120:6, 120:7, 120:9, 120:14, 120:16, 120:20, 120:21, 120:22, 120:23, 120:25, 122:16, 122:17, 122:19, 122:21, 131:21, 133:14, 134:25, 136:12, 136:19, 140:19, 141:18, 144:4, 152:22, 155:21, 159:4, 159:22, 159:25, 160:8, 161:5, 161:18, 163:9, 165:10, 165:13, 165:21, 165:22, 167:19, 168:14, 168:15, 168:18, 179:10, 179:21, 179:22, 181:17, 181:25, 182:3, 182:4, 182:11, 182:12, 182:25, 183:24, 184:3, 184:14, 187:21, 187:23, 189:4, 189:5, 189:9, 190:3, 190:6, 197:13, 199:3, 205:4, 206:1, 208:1, 211:5, 226:3, 229:8, 229:21, 231:5, 231:24, 232:9, 233:8, 233:10, 233:17, 233:18, 233:20, 240:22, 240:24, 246:21, 247:4, 247:5, 247:9,

247:16, 252:14,
252:25, 258:25,
259:10, 260:23,
261:1, 261:16,
261:18, 261:25,
262:23, 262:24,
263:8, 263:14,
267:4, 267:5, 267:6,
271:8, 272:21
**seed** [2] - 22:2, 269:8
**seeing** [9] - 101:18,
110:6, 163:22,
168:9, 243:6,
243:10, 257:14,
257:15, 260:18
**seeking** [1] - 26:10
**seem** [2] - 233:2,
255:6
**sees** [5] - 10:25,
116:9, 116:16,
123:11, 141:2
**segments** [1] - 226:12
**self** [1] - 275:12
**self-authenticating** [1]
- 275:12
**sell** [1] - 66:7
**semiaccurate** [1] -
53:2
**semiautomatic** [1] -
186:15
**send** [1] - 202:15
**sending** [2] - 23:22,
212:22
**sense** [3] - 10:4,
33:20, 95:18
**sent** [5] - 20:21,
191:22, 191:24,
196:18, 196:19
**separate** [2] - 7:22,
36:5
**sergeant** [4] - 67:6,
225:23, 264:23,
265:11
**Sergeant** [2] - 70:8,
265:17
**sergeants** [1] - 66:18
**series** [8] - 177:12,
177:15, 177:21,
214:22, 222:14,
222:16, 222:21,
238:13
**serious** [5] - 68:10,
118:5, 173:15,
173:19, 174:19
**serve** [1] - 23:21
**served** [7] - 16:25,
148:18, 151:15,
151:19, 151:22,
152:14
**serves** [1] - 20:16

**Service** [2] - 145:15,
145:22
**service** [6] - 151:7,
152:19, 152:20,
153:1, 187:2, 212:7
**services** [2] - 21:12,
211:11
**set** [7] - 21:4, 113:10,
124:12, 195:9,
219:22, 222:9,
256:16
**setting** [1] - 155:2
**seven** [5] - 129:9,
219:3, 225:1,
225:12, 284:7
**seven-plus** [1] - 129:9
**Seventh** [4] - 92:15,
92:21, 118:2, 123:21
**several** [13] - 38:18,
46:17, 47:20, 47:22,
57:19, 156:21,
168:1, 219:18,
219:19, 220:4,
220:15, 220:16,
220:17
**severe** [1] - 37:19
**shall** [1] - 252:3
**shaped** [1] - 64:6
**share** [1] - 9:5
**sharp** [2] - 261:4,
261:7
**Sharpie** [1] - 78:14
**Sheehan** [37] - 75:10,
93:20, 100:9,
128:19, 129:10,
132:3, 132:11,
133:2, 133:19,
139:6, 139:7, 140:9,
149:25, 150:6,
150:7, 153:7,
153:14, 153:17,
153:18, 160:9,
220:6, 224:21,
224:23, 225:14,
226:1, 226:18,
234:16, 234:24,
234:25, 241:20,
244:1, 244:3, 246:4,
246:8, 246:12,
247:21
**Sheehan's** [3] -
130:18, 131:1,
153:23
**shell** [4] - 159:14,
159:15, 160:16,
169:19
**shirt** [11] - 71:17,
106:13, 106:14,
182:1, 182:16,
185:24, 229:12,

233:1, 233:6,
233:12, 233:13
**shirts** [11] - 228:25,
229:5, 229:9,
231:19, 231:25,
232:10, 232:11,
232:19, 232:20,
232:23, 233:3
**shmoe** [1] - 212:21
**shock** [4] - 37:19,
37:20, 37:25, 39:9
**shoes** [1] - 115:20
**shoot** [24] - 45:17,
46:1, 46:6, 46:7,
46:15, 54:2, 54:9,
55:21, 56:8, 57:20,
58:5, 58:12, 58:14,
58:17, 58:21, 59:2,
59:11, 119:15,
119:25, 128:16,
230:23, 231:3, 231:6
**shooting** [33] - 6:25,
45:20, 46:11, 55:23,
56:3, 59:15, 59:19,
59:20, 63:21, 76:13,
97:17, 98:2, 98:19,
127:20, 127:24,
128:2, 128:6,
128:10, 128:13,
128:14, 129:13,
133:6, 138:24,
139:13, 149:3,
175:8, 217:8,
217:13, 217:15,
252:12, 252:23,
264:21, 267:19
**shootings** [2] -
125:22, 173:14
**short** [1] - 48:4
**shortly** [1] - 38:8
**shot** [25] - 46:10,
86:25, 87:2, 98:24,
99:1, 99:2, 106:3,
117:15, 119:8,
120:6, 120:17,
120:22, 123:16,
125:14, 129:16,
131:16, 136:9,
138:16, 148:25,
163:16, 262:5,
262:23, 264:16,
282:21, 282:22
**shotgun** [1] - 56:9
**Shots** [1] - 118:16
**shots** [14] - 85:13,
85:14, 85:17, 85:19,
86:4, 86:15, 86:18,
99:10, 121:8,
121:16, 122:22,
183:4, 187:3, 201:7

**show** [40] - 7:6, 8:12,
8:13, 27:2, 50:2,
76:20, 78:14, 86:3,
86:14, 111:25,
113:1, 122:7,
132:11, 132:17,
135:13, 135:23,
142:1, 142:9,
142:17, 161:1,
177:12, 179:1,
180:19, 182:10,
185:18, 186:4,
187:22, 188:21,
190:15, 193:18,
194:10, 203:24,
204:1, 207:4, 208:7,
208:8, 229:9,
229:18, 267:2,
281:17
**showed** [15] - 19:18,
21:9, 21:10, 29:9,
38:25, 132:3,
132:15, 132:19,
133:16, 165:7,
175:22, 228:10,
266:16
**showing** [5] - 15:9,
27:4, 132:25, 179:7,
189:3
**shown** [6] - 7:2, 32:3,
135:10, 135:22,
142:3, 142:7
**shows** [10] - 9:4,
10:14, 27:24,
124:12, 261:13,
261:15, 262:6,
274:14, 283:13
**sic** [1] - 172:2
**side** [25] - 9:21, 22:5,
46:10, 51:22, 72:9,
80:21, 80:23, 109:6,
114:22, 115:15,
148:21, 166:12,
173:4, 173:5, 173:7,
173:13, 192:22,
194:4, 194:7,
201:19, 201:21,
233:7, 248:16,
258:11
**sidebars** [1] - 34:1
**sides** [1] - 278:18
**sidewalk** [22] - 8:10,
83:3, 83:5, 93:8,
95:5, 99:6, 104:1,
104:2, 110:19,
117:11, 163:15,
179:10, 179:13,
179:14, 188:12,
189:4, 189:6, 190:4,
190:10, 194:5,

238:13, 258:14
**sideways** [1] - 46:10
**sight** [2] - 84:22, 85:1
**sign** [1] - 229:9
**signature** [2] - 267:6,
267:21
**significant** [2] - 39:13,
214:17
**signs** [1] - 37:25
**silver** [24] - 76:1, 76:2,
76:7, 76:9, 76:12,
76:14, 94:8, 94:19,
94:21, 95:22, 95:25,
96:4, 96:5, 96:25,
135:4, 135:17,
135:24, 161:5,
162:19, 181:15,
235:13, 235:20,
236:2
**similar** [3] - 28:17,
30:9, 159:2
**similarities** [1] - 208:7
**simple** [3] - 230:4,
231:3, 262:21
**simply** [9] - 9:14,
18:14, 27:3, 27:16,
65:21, 205:1, 209:5,
212:24, 282:9
**single** [4] - 64:4,
130:23, 131:1,
250:13
**single-family** [1] -
64:4
**siren** [2] - 248:2,
256:23
**sirens** [6] - 247:24,
248:3, 248:4, 251:7,
251:10, 254:17
**sits** [1] - 193:8
**sitting** [6] - 139:2,
143:10, 144:3,
193:11, 234:21,
234:24
**situated** [3] - 76:21,
77:6, 77:25
**situation** [8] - 28:22,
47:21, 48:24, 125:8,
195:22, 209:3,
244:23, 257:14
**situations** [2] - 30:9,
38:6
**six** [5] - 43:7, 44:19,
67:3, 129:9, 129:10
**six-ish** [2] - 129:9,
129:10
**six-plus** [1] - 43:7
**size** [4] - 48:9, 48:13,
48:14, 70:19
**skeet** [1] - 56:8
**sketch** [3] - 82:2,

277:16, 278:3
**skin** [1] - 117:3
**sleeve** [1] - 106:13
**slight** [3] - 168:19, 232:25, 259:13
**Sloan** [6] - 67:7, 67:8, 67:13, 67:21, 68:1, 70:8
**slow** [6] - 88:4, 261:15, 261:17, 262:2, 263:10, 263:11
**slowed** [7] - 111:10, 111:11, 111:13, 111:20, 112:12, 134:22, 138:11
**slowing** [9] - 111:18, 111:19, 112:15, 113:19, 114:3, 114:9, 114:12, 114:15
**small** [5] - 54:23, 54:24, 70:16, 94:1, 219:20
**smaller** [2] - 48:9, 54:21
**smallest** [2] - 227:17, 227:25
**smells** [1] - 23:23
**smoking** [11] - 107:20, 107:21, 109:7, 114:16, 114:21, 115:3, 115:4, 121:25, 122:1, 138:8, 163:24
**smoothly** [1] - 34:2
**snatch** [1] - 212:22
**snow** [1] - 21:4
**so-called** [1] - 14:9
**so..** [2] - 55:22, 215:11
**social** [1] - 221:6
**solve** [1] - 174:15
**someone** [15] - 12:15, 19:9, 19:11, 60:23, 62:1, 62:4, 62:17, 71:14, 144:25, 177:18, 212:22, 218:18, 248:18, 275:22, 277:21
**Someone** [1] - 75:5
**something's** [1] - 44:15
**sometimes** [23] - 25:5, 25:7, 45:5, 45:6, 53:15, 59:6, 59:11, 59:12, 59:14, 115:19, 126:24, 132:25, 185:11, 227:15, 229:2, 232:22, 233:8,

233:11, 245:10, 284:6
**somewhat** [1] - 90:17
**somewhere** [1] - 17:21
**son** [1] - 21:12
**soon** [7] - 125:13, 165:17, 227:21, 242:18, 244:13, 258:16, 259:12
**sorry** [43] - 20:6, 31:6, 31:7, 31:15, 47:15, 48:17, 49:20, 56:12, 58:7, 62:7, 72:4, 72:8, 76:17, 76:21, 79:3, 80:4, 91:16, 111:6, 111:12, 116:13, 126:5, 127:3, 130:25, 135:15, 142:1, 143:8, 154:10, 160:6, 160:7, 163:6, 178:2, 194:7, 195:12, 197:2, 200:11, 211:24, 242:1, 253:3, 255:9, 260:8, 267:7, 278:16
**sort** [9] - 61:14, 73:12, 101:16, 160:20, 227:21, 228:9, 233:9, 258:18, 259:13
**sorts** [1] - 100:24
**sounds** [3] - 60:10, 165:2, 165:6
**Southeast** [1] - 158:25
**Southwest** [1] - 43:3
**spaces** [1] - 74:13
**spatter** [1] - 195:16
**speaking** [4] - 16:14, 17:18, 156:12, 264:23
**specialized** [5] - 66:14, 66:16, 67:8, 68:2, 68:12
**specific** [15] - 39:19, 173:7, 175:19, 220:4, 232:24, 233:15, 241:22, 242:22, 250:23, 254:3, 254:7, 254:16, 257:6, 262:8, 263:1
**specifically** [15] - 19:23, 20:2, 36:7, 147:6, 173:12, 196:21, 221:19, 223:3, 229:6, 232:5, 234:5, 251:2, 254:6, 256:9, 263:7
**specifics** [1] - 256:13

**speculate** [1] - 282:7
**spelled** [1] - 171:8
**spoken** [16] - 19:9, 19:17, 19:19, 19:22, 22:5, 93:6, 128:3, 128:6, 128:7, 128:16, 128:20, 129:5, 130:3, 130:6, 130:9, 149:15
**spot** [1] - 94:25
**spray** [5] - 47:14, 47:18, 47:24, 48:20, 52:9
**spread** [1] - 139:9
**sprinter** [1] - 259:23
**Spruill** [1] - 17:20, 18:6, 18:7, 20:10, 21:16, 21:17, 147:7, 147:9, 147:13, 147:23, 150:24
**Spruill's** [3] - 20:23, 211:20, 211:22
**squad** [2] - 226:9, 226:11
**square** [7] - 122:25, 123:1, 166:6, 166:9, 167:11, 167:17, 167:23
**Sr** [2] - 154:15, 154:19
**stack** [1] - 27:1
**Stan** [1] - 176:1
**stance** [1] - 46:23
**stances** [1] - 46:18
**stand** [15] - 34:6, 36:4, 46:9, 46:20, 72:9, 79:25, 80:17, 87:15, 109:20, 114:5, 121:11, 134:5, 155:22, 169:17, 216:8
**stand-alone** [1] - 36:4
**standards** [1] - 68:3
**standing** [4] - 45:5, 159:11, 160:8, 169:18
**stands** [1] - 48:2
**Stanley** [1] - 175:15
**Stanton** [3] - 73:6, 94:23, 139:14
**start** [7] - 45:3, 50:24, 100:4, 102:19, 216:23, 228:25, 231:18
**started** [34] - 7:16, 34:12, 80:18, 80:19, 80:20, 82:21, 84:10, 84:21, 91:15, 91:17, 91:19, 99:17, 99:21, 101:19, 109:24, 110:14, 123:24,

124:1, 125:15, 125:17, 134:14, 134:16, 138:19, 139:4, 239:19, 241:18, 241:19, 242:18, 243:1, 244:2, 245:24, 258:17, 258:18
**starting** [3] - 134:13, 134:14, 252:10
**starts** [2] - 102:16, 102:17
**state** [3] - 34:19, 171:6, 216:14
**statement** [43] - 11:25, 12:23, 21:24, 24:18, 26:3, 32:12, 32:14, 38:11, 85:24, 96:18, 97:6, 97:8, 97:10, 97:11, 98:17, 112:7, 113:1, 113:2, 139:12, 139:17, 139:24, 140:11, 149:16, 161:12, 164:15, 164:16, 164:20, 164:21, 164:23, 165:18, 165:20, 266:4, 266:6, 266:13, 267:6, 267:8, 267:15, 267:23, 268:24, 270:13, 270:23, 270:24, 271:16
**statements** [10] - 20:11, 20:13, 22:5, 38:1, 38:4, 150:1, 153:11, 153:23, 269:23, 269:25
**States** [3] - 202:24, 203:12, 285:11
**states** [1] - 223:3
**STATES** [2] - 1:1, 1:11
**stating** [1] - 251:2
**stationed** [1] - 172:23
**stay** [5] - 59:12, 105:9, 138:20, 138:25, 219:12
**Stay** [1] - 138:17
**stayed** [2] - 138:21, 219:13
**staying** [1] - 215:18
**stenographic** [1] - 285:5
**stenography** [1] - 1:24
**step** [12] - 5:25, 31:4, 49:12, 72:3, 72:5, 99:12, 109:22, 123:21, 150:18, 212:22, 213:6,

261:20
**stepped** [2] - 34:11, 143:16
**steps** [1] - 232:25
**stick** [2] - 47:19, 93:4
**still** [14] - 14:14, 14:23, 14:24, 87:22, 90:4, 104:24, 109:11, 110:18, 110:19, 136:22, 141:17, 154:3, 154:4, 165:1, 165:14, 167:24, 206:18, 212:4, 212:5, 224:23, 231:4, 233:15, 261:18, 261:22, 263:14
**stipulate** [1] - 26:24
**stipulated** [4] - 32:4, 68:23, 68:24, 154:10
**stolen** [1] - 231:8
**stomach** [1] - 92:9
**stood** [2] - 115:2, 138:18
**stop** [20] - 68:24, 69:2, 69:4, 69:6, 69:14, 165:13, 165:22, 169:2, 169:3, 229:23, 230:8, 230:14, 230:18, 236:22, 237:19, 237:21, 237:24, 237:25, 238:1, 250:25
**Stop** [3] - 108:12, 108:16, 248:12
**stopped** [9] - 82:7, 82:21, 82:23, 84:18, 108:4, 109:4, 114:23, 115:1, 165:12
**stopping** [2] - 165:21, 168:15
**stops** [3] - 43:15, 99:10, 122:12
**story** [1] - 80:15
**straight** [5] - 46:11, 59:3, 64:7, 166:11, 206:18
**strategic** [3] - 276:24, 277:8, 280:21
**strategy** [2] - 8:14, 8:17
**street** [34] - 31:4, 32:9, 32:16, 34:10, 35:16, 39:25, 51:8, 52:14, 65:9, 72:22, 74:11, 84:24, 85:14, 99:5, 100:25, 104:6, 110:17, 112:19,

118:9, 122:11,
122:21, 145:21,
148:21, 149:21,
165:11, 169:24,
186:7, 212:23,
230:13, 245:20,
258:9, 259:2, 261:14
**STREET** [2] - 3:3,
34:14
**Street** [10] - 1:14, 1:18,
2:3, 15:20, 22:18,
25:11, 25:15, 34:6,
34:20, 172:23
**stress** [1] - 252:9
**stretch** [3] - 119:2,
134:6
**stricken** [2] - 155:10,
269:13
**stride** [2] - 115:8,
115:12
**strike** [2] - 167:3,
185:16
**structured** [1] - 107:9
**stuck** [1] - 193:1
**study** [2] - 29:8, 42:16
**studying** [1] - 42:14
**stuff** [5] - 46:19, 75:17,
132:1, 168:8, 169:23
**stupid** [1] - 243:20
**subject** [1] - 10:10
**submission** [1] -
23:17
**submit** [7] - 13:5, 28:8,
155:13, 195:24,
202:21, 275:15,
278:1
**submitted** [1] - 280:17
**subpoena** [11] - 16:25,
151:4, 151:8,
151:11, 152:14,
152:22, 213:3,
213:4, 213:5,
213:11, 214:2
**subpoenaed** [4] -
16:3, 17:14, 20:13,
211:12
**subpoenas** [6] -
20:16, 23:21,
151:14, 151:24,
152:23, 154:6
**substance** [2] -
182:21, 188:7
**suffering** [1] - 33:13
**sufficient** [4] - 7:10,
7:14, 10:11, 14:14
**suggest** [3] - 13:1,
14:11, 24:5
**suggesting** [2] -
212:24, 275:23
**suggestive** [1] - 22:7

**suit** [4] - 64:18, 65:8,
65:9, 230:11
**Suite** [2] - 1:15, 1:19
**summary** [2] - 67:24,
67:25
**Sunday** [6] - 16:17,
152:4, 152:5, 219:8,
219:10, 219:11
**Super** [1] - 16:17
**supervisor** [1] -
225:23
**supervisors** [1] -
143:15
**support** [2] - 8:24,
174:23
**supported** [1] - 279:3
**supporting** [3] -
274:23, 276:16,
277:2
**suppose** [1] - 12:20
**supposed** [8] - 6:13,
60:16, 108:16,
125:6, 223:4, 250:8,
251:7, 251:10
**surgeon** [3] - 34:22,
39:8, 149:20
**surgical** [2] - 35:1,
35:3
**surprise** [3] - 10:4,
69:20, 142:3
**surprised** [4] - 53:16,
200:9, 200:12,
206:20
**suspect** [12] - 52:14,
57:2, 57:6, 57:9,
60:12, 60:15, 61:6,
105:18, 108:15,
162:1, 250:21,
251:17
**suspected** [2] - 69:12,
69:18
**suspects** [2] - 43:20,
68:17
**suspicious** [7] - 93:15,
93:24, 99:24, 100:3,
100:7, 239:20, 240:4
**sustain** [1] - 36:6
**sustained** [20] - 38:21,
39:4, 43:18, 44:16,
66:12, 98:21,
116:12, 116:19,
140:3, 141:1,
161:24, 162:2,
231:16, 234:13,
245:4, 253:19,
261:11, 263:25,
274:12
**SUV** [37] - 6:10, 8:10,
19:1, 76:7, 76:9,
76:12, 76:14, 77:11,

94:3, 94:8, 94:20,
95:25, 96:4, 99:8,
103:4, 120:23,
122:19, 136:13,
159:19, 161:5,
162:19, 163:10,
163:11, 163:21,
163:22, 167:9,
168:11, 183:1,
184:12, 185:2,
189:14, 189:15,
189:22, 214:22,
247:22, 248:1,
257:19
**swab** [3] - 196:10,
196:18, 210:3
**swabbed** [1] - 209:25
**swabbing** [3] - 191:25,
202:23, 209:23
**swabs** [4] - 196:14,
202:15, 202:19,
203:8
**swear** [1] - 34:12
**swiftly** [1] - 146:1
**swing** [1] - 80:21
**switch** [1] - 235:22
**switched** [3] - 118:1,
191:14, 192:5
**Sworn** [4] - 34:14,
40:11, 171:1, 216:11
**sworn** [1] - 87:23
**swung** [1] - 80:9
**system** [2] - 36:14,
39:16

**T**

**T-shirt** [2] - 71:17,
106:14
**table** [2] - 211:22,
272:25
**tables** [1] - 219:21
**tactical** [2] - 92:8,
117:23
**tape** [4] - 97:20,
134:11, 135:8,
261:13
**target** [1] - 45:20
**task** [2] - 174:3,
175:19
**taught** [5] - 46:6,
46:13, 46:15, 53:10,
53:12
**teach** [7] - 46:1, 46:7,
46:8, 47:10, 55:24,
60:11, 108:14
**team** [14] - 127:6,
127:9, 164:18,
175:10, 175:18,
177:18, 178:1,

178:6, 195:11,
198:3, 199:10,
199:13, 267:15
**Team** [5] - 6:25,
217:10, 264:17,
265:12, 266:13
**technically** [1] -
151:14
**technician** [9] -
171:18, 173:23,
173:24, 175:14,
175:16, 196:2,
197:20, 209:20,
209:21
**technicians** [3] -
175:22, 196:1, 210:3
**technique** [1] - 56:6
**tedious** [1] - 88:6
**telephone** [1] - 181:11
**ten** [7] - 6:4, 40:21,
56:9, 126:16,
126:24, 127:5,
140:25
**tend** [5] - 92:21,
124:21, 154:1,
232:7, 235:22
**tenure** [1] - 210:2
**term** [2] - 43:16, 242:7
**terminology** [1] -
242:8
**terms** [21] - 10:8,
10:10, 10:11, 10:12,
10:16, 11:19, 16:2,
19:16, 24:6, 38:11,
38:17, 118:4,
145:20, 150:2,
154:14, 176:25,
187:14, 253:18,
256:16, 256:22,
262:10
**Terrence** [1] - 67:22
**Terry** [2] - 43:15, 69:14
**test** [3] - 45:10, 45:15,
196:15
**testified** [25] - 7:17,
17:15, 21:13, 69:7,
94:7, 95:14, 98:23,
104:10, 104:17,
110:7, 120:14,
121:12, 143:20,
149:3, 149:20,
149:22, 163:24,
202:14, 202:24,
203:14, 204:8,
208:11, 227:10,
233:24, 259:7
**testify** [19] - 4:18,
4:24, 16:15, 17:24,
19:8, 25:15, 28:18,
29:5, 29:21, 56:21,

68:8, 116:11, 149:4,
149:10, 150:7,
153:6, 158:15,
278:25, 280:4
**testifying** [13] - 5:4,
10:12, 10:25, 20:8,
28:3, 29:2, 29:22,
29:25, 44:6, 73:3,
132:6, 167:1, 261:9
**testimony** [48] - 6:9,
6:11, 9:11, 9:12,
9:13, 14:10, 14:13,
18:23, 21:21, 25:16,
28:9, 29:7, 30:10,
30:25, 40:1, 42:3,
46:16, 56:19, 57:1,
66:4, 68:15, 69:10,
88:2, 88:16, 93:7,
108:5, 109:11,
109:16, 139:22,
139:25, 149:11,
150:1, 153:8,
153:14, 153:22,
156:14, 164:1,
168:9, 206:6,
210:18, 213:8,
251:17, 252:10,
269:13, 271:20,
271:21, 274:23,
275:9
**testing** [10] - 15:1,
15:2, 15:4, 195:24,
195:25, 196:14,
196:19, 203:4,
203:6, 203:12
**tests** [1] - 45:13
**THE** [552] - 1:1, 1:1,
1:10, 4:3, 4:6, 4:11,
4:13, 4:16, 5:8, 5:10,
5:20, 6:1, 6:17, 6:20,
6:22, 7:1, 7:9, 7:13,
7:21, 7:24, 8:2, 8:11,
8:15, 9:1, 9:3, 9:8,
10:1, 10:13, 10:18,
10:20, 11:3, 11:5,
11:7, 11:18, 11:24,
12:2, 12:5, 12:11,
12:19, 13:2, 13:11,
13:16, 13:19, 14:7,
14:17, 15:7, 15:14,
15:18, 15:23, 16:10,
17:5, 17:7, 17:11,
18:2, 18:5, 18:7,
18:10, 19:14, 19:17,
20:5, 21:7, 21:13,
21:16, 21:19, 21:23,
22:8, 22:11, 22:14,
22:20, 22:22, 23:5,
23:12, 23:15, 24:3,
24:8, 24:22, 25:2,

25:7, 25:13, 25:22,
26:1, 26:6, 26:17,
26:19, 26:21, 27:2,
27:8, 27:11, 27:14,
27:16, 27:20, 27:23,
28:1, 28:10, 28:15,
28:21, 28:24, 29:7,
29:13, 29:17, 30:2,
30:5, 30:8, 30:14,
30:16, 30:20, 31:3,
31:6, 31:9, 31:13,
31:17, 31:22, 32:1,
32:3, 32:7, 32:10,
32:17, 32:19, 32:21,
33:2, 33:5, 33:8,
33:12, 33:19, 33:24,
34:8, 34:10, 35:13,
35:15, 37:11, 38:21,
39:4, 39:23, 39:25,
40:2, 40:5, 40:9,
40:10, 41:15, 43:18,
43:24, 44:16, 49:11,
49:15, 49:23, 50:4,
51:10, 51:13, 53:7,
56:12, 56:15, 56:21,
57:4, 57:7, 57:11,
57:14, 57:18, 57:22,
57:24, 58:9, 58:24,
59:8, 59:10, 60:21,
61:19, 62:6, 62:8,
62:9, 64:15, 64:24,
65:6, 66:12, 67:12,
67:17, 67:20, 68:3,
68:6, 68:16, 68:22,
69:11, 69:17, 69:21,
69:24, 70:1, 72:1,
72:5, 76:15, 77:15,
77:18, 77:22, 79:24,
80:3, 85:7, 85:11,
87:14, 87:18, 87:22,
87:25, 88:1, 88:6,
88:11, 88:13, 88:15,
88:18, 88:21, 89:1,
89:4, 89:9, 89:11,
89:15, 89:19, 89:22,
90:1, 90:3, 90:6,
90:22, 90:25, 91:4,
91:8, 91:11, 91:25,
92:2, 93:11, 94:11,
96:10, 96:22, 98:21,
101:23, 103:2,
109:23, 111:5,
111:7, 111:24,
112:3, 112:6, 112:9,
112:12, 112:17,
112:22, 113:3,
113:6, 113:10,
113:12, 116:12,
116:19, 119:19,
120:5, 123:10,
123:14, 129:20,

129:22, 132:8,
134:3, 134:5,
134:19, 134:22,
135:14, 135:16,
135:18, 135:21,
135:25, 136:4,
140:3, 141:1, 141:4,
141:7, 141:9,
141:11, 141:17,
141:20, 141:21,
141:22, 141:25,
142:5, 142:9,
142:12, 142:17,
142:20, 142:23,
143:1, 143:3, 144:1,
144:6, 144:19,
144:23, 145:3,
145:11, 145:15,
145:19, 145:25,
146:6, 146:9,
146:11, 147:2,
147:8, 147:13,
147:17, 147:19,
147:22, 148:1,
148:6, 148:9,
148:11, 148:15,
148:20, 148:23,
149:1, 149:6, 149:9,
149:16, 149:19,
149:22, 150:3,
150:5, 150:9,
150:12, 150:18,
150:22, 151:2,
151:4, 151:7,
151:10, 151:17,
151:23, 152:1,
152:18, 152:23,
153:1, 153:16,
153:21, 154:3,
154:5, 154:8,
154:23, 155:1,
155:6, 155:12,
155:17, 155:23,
155:25, 156:25,
158:5, 158:7,
158:17, 161:18,
161:24, 162:2,
162:5, 162:9,
162:16, 162:20,
162:23, 163:1,
164:9, 166:2, 166:5,
169:7, 170:5, 170:7,
170:8, 170:17,
170:19, 170:21,
170:24, 170:25,
171:22, 171:24,
176:6, 177:11,
178:16, 179:6,
180:18, 181:3,
181:18, 187:13,
187:20, 188:25,

189:2, 189:11,
190:14, 191:2,
191:4, 191:6, 195:2,
195:7, 195:8, 195:9,
195:12, 196:7,
197:2, 197:7,
198:20, 198:23,
198:24, 202:3,
202:4, 203:21,
205:3, 205:8,
205:12, 205:14,
205:17, 205:21,
206:1, 206:8,
206:17, 206:21,
207:1, 207:8,
207:20, 210:12,
210:17, 210:19,
210:23, 211:1,
211:8, 211:16,
211:22, 211:25,
212:3, 212:5, 212:7,
212:15, 212:17,
212:24, 213:2,
213:13, 213:20,
213:22, 213:25,
214:10, 214:12,
214:16, 214:19,
214:23, 214:25,
215:12, 215:23,
216:1, 216:5, 216:9,
216:10, 225:7,
228:15, 229:16,
231:16, 232:17,
234:13, 242:14,
242:16, 245:4,
248:21, 249:2,
249:5, 249:8,
249:11, 249:16,
251:13, 253:2,
253:5, 253:9,
253:19, 254:12,
254:22, 254:25,
255:11, 255:15,
255:19, 255:24,
256:4, 259:5,
261:11, 263:5,
263:25, 265:1,
265:5, 265:15,
266:23, 269:6,
269:15, 269:23,
269:25, 270:6,
270:10, 270:12,
270:15, 270:18,
270:22, 270:25,
271:5, 271:10,
271:13, 271:17,
271:19, 271:24,
272:1, 272:4,
272:11, 272:15,
272:24, 273:1,
273:2, 273:11,

273:17, 273:20,
273:23, 273:25,
274:9, 274:12,
274:16, 275:5,
275:12, 275:14,
275:18, 275:21,
275:25, 276:3,
276:17, 276:19,
277:6, 277:20,
278:11, 278:14,
278:17, 278:21,
279:8, 279:12,
279:16, 279:20,
280:6, 280:10,
280:21, 280:24,
281:3, 281:14,
281:16, 281:20,
281:23, 282:1,
282:8, 282:12,
282:16, 282:19,
282:24, 283:3,
283:17, 283:21,
283:24, 284:2,
284:9, 284:11,
284:13
**theft** [1] - 173:17
**themselves** [1] - 145:9
**theory** [4] - 8:20, 8:24,
14:18, 14:19
**therefore** [2] - 210:2,
214:2
**they've** [10] - 8:23,
19:22, 46:19, 68:22,
151:15, 151:18,
153:17, 192:19,
229:22, 274:3
**thinking** [11] - 100:14,
108:7, 120:2, 154:1,
241:6, 241:14,
241:20, 241:22,
242:21, 242:22,
257:5
**thinks** [2] - 10:13,
283:11
**third** [10] - 6:15, 6:17,
6:20, 11:18, 11:20,
12:13, 17:17, 18:5,
18:6, 19:15
**Thomas** [5] - 175:16,
175:23, 220:6, 226:1
**thoughts** [1] - 88:9
**threat** [11] - 68:10,
119:23, 120:1,
120:3, 120:6, 120:7,
120:9, 120:11,
120:12, 120:18,
230:24
**three** [22] - 5:1, 11:17,
41:16, 41:24, 45:4,
67:3, 67:4, 70:4,

71:5, 92:3, 92:23,
92:24, 124:15,
127:19, 127:25,
140:22, 172:11,
217:22, 217:25,
228:24, 229:4
**three-week** [2] -
172:11
**threw** [3] - 12:15,
12:21, 220:23
**throughout** [2] -
222:18, 269:1
**throw** [5] - 11:8, 11:9,
13:25, 70:11, 277:4
**throwing** [1] - 11:21
**thrown** [9] - 6:9, 7:5,
8:3, 9:4, 11:12,
11:13, 13:23,
214:21, 280:13
**thumb** [2] - 247:4,
247:5
**tie** [5] - 65:5, 204:3,
204:5, 253:6, 253:8, 254:12
**tied** [1] - 69:9
**tight** [1] - 166:13
**tired** [1] - 284:6
**title** [1] - 171:19
**today** [19] - 7:7, 8:6,
22:22, 23:1, 34:17,
50:13, 89:17, 93:7,
130:10, 149:20,
214:23, 215:2,
215:5, 215:10,
215:16, 215:20,
233:25, 255:5,
272:17
**Todd** [2] - 273:9,
273:10
**together** [11] - 19:25,
131:6, 155:15,
156:10, 220:14,
221:25, 222:2,
226:12, 226:24,
283:22
**Tom** [4] - 75:10, 132:3,
132:11, 133:2
**Tommy** [4] - 129:9,
220:11, 220:12,
220:13
**tomorrow** [7] - 23:8,
214:23, 214:24,
215:1, 215:8, 273:5,
284:3
**tons** [1] - 62:11
**took** [44] - 8:7, 18:20,
18:21, 38:7, 66:19,
97:20, 97:22,
112:12, 113:15,
124:11, 132:4,
132:11, 132:12,

133:5, 133:6,
156:20, 157:11,
157:16, 158:11,
158:19, 159:17,
169:13, 169:22,
169:23, 177:8,
177:18, 178:1,
178:6, 181:6, 206:3,
206:11, 207:12,
208:20, 209:14,
211:12, 241:8,
244:13, 246:4,
246:7, 253:20,
266:3, 266:4, 268:15
**top** [3] - 51:1, 177:4,
179:15
**Torres** [32] - 6:8, 11:7,
75:10, 119:12,
121:22, 129:4,
129:9, 130:11,
131:1, 139:6, 139:8,
140:9, 143:21,
156:12, 159:11,
159:12, 160:5,
160:11, 169:15,
216:24, 216:25,
217:2, 221:4,
221:10, 226:21,
234:15, 235:1,
235:2, 257:19,
257:20, 258:21,
260:21
**Torres's** [2] - 130:16,
159:14
**total** [1] - 35:1
**totality** [2] - 244:23,
244:24
**toto** [1] - 26:7
**touched** [1] - 118:12
**toward** [8] - 64:3, 82:5,
102:24, 108:3,
136:13, 164:13,
168:15, 254:4
**towards** [11] - 99:6,
122:5, 122:8,
122:14, 168:11,
228:7, 238:6,
249:15, 254:4,
260:21, 261:21
**toy** [1] - 206:15
**track** [2] - 106:25,
107:2
**traffic** [2] - 218:14,
250:25
**train** [1] - 59:2
**trained** [14] - 41:17,
46:22, 47:20, 49:6,
49:16, 50:5, 50:14,
50:22, 58:21, 59:2,
60:25, 61:3, 61:5,

209:24
**Training** [1] - 53:24
**training** [49] - 29:19,
35:2, 42:24, 43:2,
43:4, 43:20, 44:1,
44:3, 44:5, 44:13,
44:17, 45:1, 45:4,
45:7, 46:21, 50:8,
52:21, 53:9, 53:17,
53:20, 53:22, 56:6,
56:21, 57:8, 59:1,
60:1, 60:5, 60:9,
60:10, 61:10, 61:12,
61:14, 66:14, 66:16,
67:9, 67:24, 68:1,
68:2, 68:3, 68:9,
68:12, 68:17, 70:22,
71:6, 108:14, 172:7,
172:9, 172:10
**transcribed** [1] - 266:6
**transcript** [8] - 1:24,
278:21, 278:23,
279:5, 279:14,
279:21, 285:5, 285:6
**TRANSCRIPT** [1] -
1:10
**transcription** [2] -
1:25, 266:12
**transpired** [1] - 143:23
**trapped** [1] - 138:13
**trauma** [8] - 34:22,
35:23, 35:24, 36:1,
36:5, 36:8, 37:13,
39:8
**Trauma** [4] - 34:24,
35:19, 37:5, 39:15
**traveling** [1] - 122:20
**treating** [1] - 15:21,
28:20, 29:25, 36:11
**treatment** [4] - 28:5,
29:4, 29:22, 29:24
**TRIAL** [1] - 1:10
**trial** [12] - 8:17, 9:2,
25:8, 151:14,
151:24, 154:20,
155:3, 155:4, 192:3,
277:10, 280:10,
280:16
**trial's** [1] - 128:25
**Trial's** [1] - 128:25
**triangle** [3] - 50:23,
52:2, 52:15
**triangulating** [1] -
138:11
**trim** [1] - 181:15
**troubling** [2] - 19:3,
19:4
**true** [10] - 91:18,
111:17, 133:9,
133:10, 133:18,

147:24, 164:23,
222:7, 285:4, 285:6
**truly** [1] - 150:21
**truthful** [1] - 264:21
**try** [17] - 25:4, 50:1,
89:5, 150:23, 153:2,
155:14, 174:19,
174:22, 213:5,
215:11, 227:14,
233:2, 234:9,
240:15, 268:21,
272:16, 272:17
**trying** [26] - 22:2,
24:14, 38:9, 55:12,
57:12, 61:9, 80:17,
102:16, 115:5,
115:7, 115:15,
162:22, 174:21,
245:19, 257:6,
257:7, 257:10,
257:11, 257:12,
257:13, 260:16,
267:15, 268:17,
269:8, 280:17
**tuck** [1] - 59:13
**turn** [33] - 35:16, 73:1,
78:19, 79:5, 79:11,
84:17, 109:17,
109:18, 121:8,
121:13, 122:4,
122:8, 136:13,
161:21, 163:25,
164:25, 167:23,
167:25, 168:3,
168:12, 168:19,
168:25, 237:6,
247:24, 248:5,
259:13, 259:16,
259:17, 260:21,
261:5, 261:7
**turned** [12] - 79:6,
109:11, 121:19,
136:18, 136:22,
162:12, 167:7,
168:10, 169:1,
209:5, 209:15,
218:14
**turning** [8] - 136:22,
167:7, 168:24,
209:7, 209:11,
209:13, 258:19,
261:21
**turns** [6] - 99:10,
122:12, 122:14,
136:24, 167:24,
168:25
**twice** [7] - 54:8, 55:19,
58:2, 58:5, 58:14,
59:24, 60:1
**twice-a-years** [1] -

58:5
**two** [58] - 4:25, 6:12,
6:18, 9:23, 11:16,
12:5, 12:11, 15:8,
17:25, 18:3, 24:9,
38:7, 41:16, 41:24,
45:8, 45:9, 54:10,
55:14, 55:16, 58:5,
58:11, 64:7, 92:23,
92:24, 113:22,
114:1, 114:11,
115:1, 118:22,
119:2, 126:2, 126:3,
130:3, 130:17,
139:20, 141:5,
144:14, 149:17,
152:15, 152:23,
154:14, 154:17,
173:3, 173:6,
201:10, 218:15,
218:25, 219:12,
221:15, 264:11,
267:18, 267:20,
267:24, 274:13,
277:16, 279:21,
281:17, 282:3
**Tyler** [3] - 19:6, 147:9,
147:10
**type** [12] - 39:5, 127:1,
144:16, 172:6,
175:6, 182:21,
185:13, 188:6,
230:9, 239:8, 270:9
**types** [2] - 98:13,
251:1
**typically** [1] - 183:18

# U

**U-turn** [2] - 78:19,
237:6
**U.S** [4] - 2:11, 146:5,
196:17, 203:3
**ultimately** [1] - 82:8
**unable** [1] - 21:10
**unaccompanied** [1] -
275:8
**unarmed** [1] - 129:16
**unbelievable** [2] -
115:16, 115:18
**unbiased** [1] - 199:24
**unconscious** [4] -
25:21, 26:10, 38:2,
39:18
**under** [13] - 12:22,
68:10, 90:4, 113:16,
141:18, 151:4,
151:10, 213:3,
213:4, 213:5,
253:20, 268:22,
283:10

**underline** [1] - 87:10
**underneath** [1] - 74:15
**understood** [8] - 7:24,
8:2, 24:8, 90:25,
150:3, 162:20,
217:21, 249:5
**underwear** [1] - 70:17
**unfortunate** [2] -
131:10, 283:8
**uniform** [1] - 230:9
**unintelligible** [1] -
276:8
**union** [3] - 269:7,
269:11, 269:12
**unique** [1] - 36:3
**Unit** [7] - 207:13,
208:4, 224:14,
224:15, 224:17,
226:6, 226:8
**unit** [19] - 35:23,
35:25, 63:14, 63:22,
66:13, 172:22,
172:24, 172:25,
173:19, 196:4,
209:3, 210:2,
220:21, 229:10,
233:13, 235:3,
235:8, 235:11
**United** [3] - 202:24,
203:11, 285:11
**UNITED** [2] - 1:1, 1:11
**units** [4] - 173:3,
173:6, 235:9, 235:21
**University** [1] - 42:8
**university** [1] - 42:16
**unless** [6] - 12:25,
27:23, 49:14,
145:22, 213:4, 250:5
**unmarked** [1] - 235:23
**unusual** [7] - 64:20,
64:25, 65:4, 65:8,
65:10, 65:11, 65:13
**up** [100] - 6:7, 6:11,
7:9, 12:1, 12:2, 12:4,
12:8, 12:25, 13:3,
13:19, 13:20, 19:18,
20:11, 22:15, 41:11,
50:25, 51:2, 51:21,
52:4, 65:5, 69:9,
82:24, 84:25, 85:11,
85:15, 93:17, 93:19,
98:12, 99:9, 104:25,
109:1, 109:2,
109:20, 110:4,
110:17, 114:6,
121:11, 122:2,
122:3, 128:25,
129:18, 129:25,
133:13, 134:5,
138:11, 152:24,

168:5, 174:24, 175:22, 178:25, 181:17, 188:5, 189:9, 189:24, 191:14, 192:5, 192:19, 206:17, 208:2, 218:13, 219:10, 219:22, 226:8, 228:25, 229:5, 229:8, 229:12, 231:18, 231:25, 232:10, 232:11, 232:17, 232:18, 232:20, 232:23, 233:1, 233:3, 233:5, 233:12, 233:13, 234:2, 235:22, 239:14, 246:17, 246:21, 250:14, 253:8, 254:12, 254:18, 254:19, 259:20, 259:22, 272:12, 277:9, 278:14, 278:17, 284:10
**update** [1] - 147:3
**upper** [2] - 233:4, 260:21
**utilize** [1] - 185:12

---

**V**

**vacation** [2] - 219:1, 219:3
**vague** [1] - 31:20
**Valley** [1] - 218:9
**vantage** [4] - 119:13, 137:4, 164:13, 165:15
**variety** [1] - 251:20
**various** [3] - 8:7, 177:2, 185:5
**Vaughan** [1] - 214:10
**veer** [3] - 99:9, 121:20, 122:11
**vehicle** [64] - 18:24, 75:13, 75:15, 76:21, 77:5, 77:9, 77:25, 79:5, 79:21, 80:5, 80:21, 81:22, 85:5, 91:14, 91:18, 92:11, 92:12, 95:9, 95:11, 95:23, 99:13, 99:16, 99:18, 100:1, 100:5, 102:10, 103:3, 104:23, 122:5, 122:8, 122:9, 122:14, 135:17, 135:24, 183:3, 183:6, 183:9,

183:10, 183:16, 183:18, 184:13, 185:1, 185:15, 217:6, 235:4, 235:11, 235:14, 235:20, 236:2, 237:11, 238:21, 244:1, 247:21, 248:18, 249:22, 250:20, 251:1, 254:6, 256:10, 256:24, 259:15, 259:16, 260:22, 261:22
**vehicles** [2] - 160:24, 235:12
**verbal** [3] - 144:17, 248:9, 248:12
**verbatim** [5] - 249:24, 249:25, 250:1, 250:3, 250:7
**verbiage** [2] - 254:8, 254:16
**verify** [1] - 176:18
**Vernon** [3] - 166:16, 166:24, 166:25
**version** [4] - 134:20, 134:22, 173:21, 263:12
**vest** [1] - 92:8
**vicinity** [1] - 163:18
**victim** [1] - 174:14
**video** [76] - 6:13, 7:2, 7:5, 7:6, 8:17, 9:4, 9:9, 9:16, 10:3, 10:14, 15:9, 15:11, 18:24, 85:22, 95:15, 95:16, 95:18, 95:22, 95:23, 95:24, 96:2, 96:20, 96:23, 96:25, 97:2, 97:3, 97:19, 97:24, 121:6, 121:10, 134:7, 136:19, 141:9, 155:18, 161:4, 163:5, 163:8, 165:8, 165:10, 165:13, 165:17, 165:21, 165:22, 168:14, 168:18, 168:21, 260:18, 260:20, 260:23, 261:2, 261:3, 261:6, 261:16, 262:1, 262:6, 262:10, 262:11, 262:12, 262:16, 262:19, 262:20, 262:23, 262:24, 263:1, 263:7, 263:8,

263:11, 263:13, 263:19, 263:22, 264:10, 264:12, 268:5, 284:7
**Video** [1] - 41:4
**videotape** [34] - 10:4, 10:5, 11:2, 85:25, 95:12, 96:12, 96:19, 97:16, 97:22, 98:18, 134:2, 134:9, 134:25, 135:3, 136:12, 137:3, 137:5, 137:6, 141:3, 142:4, 142:8, 156:20, 161:2, 161:7, 167:18, 167:19, 167:22, 168:1, 168:10, 260:2, 261:13, 261:14, 261:15, 261:25
**videotape's** [1] - 264:6
**view** [4] - 12:6, 155:17, 262:7, 262:25
**violate** [1] - 223:23
**violated** [7] - 224:10, 252:14, 252:18, 252:25, 253:11, 255:4, 255:10
**violation** [1] - 27:13
**violence** [1] - 232:8
**visited** [1] - 19:10
**visual** [2] - 258:16, 268:14
**visualize** [1] - 102:17
**visually** [1] - 109:2
**voice** [1] - 49:1
**voluntarily** [4] - 19:18, 19:21, 229:8, 268:24
**vs** [3] - 1:5, 4:7, 143:4

---

**W**

**waist** [2] - 7:19, 243:15
**waistband** [51] - 70:9, 70:13, 70:18, 70:19, 106:11, 106:21, 107:9, 108:2, 108:21, 109:14, 110:8, 110:13, 110:18, 110:20, 114:20, 115:17, 115:19, 115:22, 115:24, 115:25, 116:3, 116:22, 116:24, 117:4, 121:2, 124:22, 162:11, 164:4, 164:11, 164:12, 164:14, 165:1,

165:5, 165:9, 165:14, 241:9, 241:23, 241:25, 242:20, 243:2, 243:3, 246:22, 246:25, 247:6, 247:8, 247:15, 247:18, 257:15, 258:17, 258:20, 259:11
**wait** [5] - 111:5, 139:5, 141:2, 190:16, 280:24
**waiting** [1] - 31:15
**waived** [2] - 24:22, 170:9
**walk** [7] - 62:16, 80:11, 240:10, 240:17, 268:6, 268:7, 268:12
**walk-through** [3] - 268:6, 268:7, 268:12
**walked** [2] - 125:16, 268:9
**walking** [53] - 19:11, 51:8, 64:13, 64:21, 65:9, 65:15, 71:21, 75:5, 75:6, 80:12, 81:11, 81:12, 81:14, 83:15, 83:16, 83:17, 83:19, 91:19, 93:14, 93:16, 93:23, 93:24, 99:19, 99:20, 100:6, 100:11, 100:15, 100:19, 101:11, 102:5, 143:9, 143:12, 229:21, 229:22, 229:25, 230:1, 230:2, 230:5, 230:7, 230:12, 230:13, 230:17, 233:20, 238:25, 239:8, 239:19, 239:22, 239:25, 240:2, 240:12, 240:13, 240:15, 241:19
**walks** [2] - 71:3, 101:12
**wall** [1] - 91:6
**Walther** [4] - 194:1, 206:10, 206:12, 208:6
**wants** [3] - 244:25, 278:1, 282:15
**warm** [1] - 129:2
**Washington** [12] - 1:4, 1:15, 1:19, 2:4, 2:12, 34:22, 35:11, 36:4, 42:8, 42:10, 100:25, 285:12

**watch** [1] - 233:8
**watched** [4] - 95:22, 95:24, 107:2, 167:25
**watching** [2] - 134:8, 233:15
**Wayne** [1] - 125:4
**ways** [1] - 6:12
**weapon** [15] - 54:12, 54:14, 54:17, 186:15, 186:23, 186:25, 187:3, 194:3, 201:8, 202:21, 203:10, 203:25, 206:4, 206:11, 206:14
**weapons** [4] - 47:16, 47:17, 196:10, 232:12
**wear** [2] - 230:11, 243:14
**wearing** [4] - 101:15, 106:13, 230:9, 233:6
**wedding** [8] - 130:22, 131:3, 131:5, 132:24, 218:6, 218:8, 218:24, 219:5
**weddings** [1] - 130:24
**Wednesday** [1] - 1:5
**weeds** [1] - 16:20
**week** [5] - 45:8, 172:11, 219:3, 227:9
**weekend** [1] - 139:20
**weeks** [2] - 45:9, 139:21
**weighted** [1] - 233:8
**welcome** [8] - 82:17, 90:3, 181:22, 197:25, 202:3, 207:1, 216:5, 270:12
**West** [2] - 4:8, 51:11
**WEST** [183] - 1:17, 1:18, 5:9, 5:11, 7:12, 7:14, 7:23, 7:25, 16:9, 16:11, 17:6, 17:8, 18:8, 22:10, 24:9, 25:3, 25:9, 40:3, 40:6, 40:13, 43:25, 49:10, 49:12, 50:1, 51:12, 53:4, 57:1, 57:5, 57:8, 57:12, 57:16, 57:19, 57:23, 58:1, 58:10, 60:18, 60:20, 62:7, 65:5, 65:7, 67:14, 69:1, 69:15, 69:19, 69:25, 70:3, 71:25, 72:3, 72:10, 72:17, 73:1, 76:17, 77:13, 77:16, 77:20, 77:23, 85:9, 85:12, 87:13,

87:17, 88:4, 88:8, 88:12, 88:14, 88:19, 89:7, 89:10, 89:13, 89:21, 89:24, 90:5, 90:7, 90:8, 90:20, 91:1, 91:6, 91:12, 92:1, 94:10, 96:21, 98:22, 103:1, 109:22, 111:2, 111:4, 111:6, 111:8, 111:23, 112:20, 112:25, 113:5, 113:8, 113:14, 116:13, 123:9, 129:21, 130:25, 132:10, 134:1, 134:16, 134:18, 134:21, 134:24, 135:12, 135:15, 135:17, 135:19, 135:23, 136:2, 136:6, 141:2, 141:5, 141:8, 141:10, 142:2, 142:6, 142:13, 142:19, 142:22, 142:25, 146:3, 146:7, 148:4, 148:7, 152:4, 155:20, 156:1, 156:4, 156:24, 157:3, 158:3, 158:16, 162:7, 162:10, 162:22, 162:24, 163:2, 163:3, 164:10, 166:4, 167:3, 169:4, 169:6, 169:12, 170:1, 206:5, 210:25, 211:10, 211:17, 211:20, 211:24, 212:2, 212:4, 212:6, 212:14, 212:16, 213:15, 213:21, 213:23, 214:7, 214:11, 271:2, 277:7, 277:21, 278:16, 279:5, 279:10, 279:17, 279:25, 280:9, 280:12, 280:23, 281:19, 281:22, 281:25, 282:11, 282:14, 282:17, 282:23, 283:16, 283:22, 283:25, 284:12

**west** [20] - 5:8, 14:21, 16:1, 17:23, 24:1, 49:23, 76:15, 85:7, 89:22, 111:5, 152:2,

152:11, 152:14, 155:25, 158:18, 163:1, 194:4, 277:6, 281:20, 282:9

**West)**..........................
.............. [1] - 3:5

**white** [8] - 18:12, 64:16, 64:18, 65:8, 65:9, 65:12, 148:22, 148:23

**who've** [1] - 233:24

**whole** [5] - 124:5, 138:21, 145:21, 244:23, 280:2

**wide** [1] - 45:21

**wife** [1] - 219:9

**willing** [1] - 283:12

**willingly** [3] - 17:15, 18:22, 21:6

**wind** [1] - 13:19

**winded** [1] - 173:21

**window** [25] - 6:10, 8:3, 9:4, 10:14, 10:21, 11:8, 11:10, 11:13, 11:22, 12:1, 12:2, 12:4, 12:16, 12:22, 13:23, 13:25, 100:17, 102:7, 102:13, 183:25, 184:8, 239:5, 257:22, 257:24, 258:1

**windows** [4] - 102:10, 102:12, 183:10, 184:2

**wise** [1] - 40:23

**wishes** [1] - 213:15

**withstand** [3] - 44:8, 44:9, 44:12

**Witness** [26] - 51:15, 52:8, 52:13, 72:24, 73:21, 74:1, 74:8, 74:18, 77:4, 80:10, 81:2, 81:19, 82:4, 82:20, 83:14, 83:21, 85:6, 86:7, 86:11, 86:13, 86:20, 87:7, 113:25, 178:4, 180:24, 267:8

**WITNESS** [15] - 39:23, 40:2, 40:10, 62:9, 87:25, 141:20, 141:22, 170:7, 170:24, 171:24, 198:23, 202:3, 210:19, 216:10, 273:1

**witness** [76] - 4:18, 4:24, 6:15, 6:17, 7:17, 14:12, 15:22,

15:24, 17:17, 17:20, 19:7, 21:21, 23:10, 24:17, 24:25, 25:4, 25:5, 25:8, 28:20, 30:4, 31:1, 49:10, 49:12, 56:20, 71:25, 72:3, 79:2, 91:5, 91:8, 94:10, 103:1, 109:22, 111:23, 135:13, 141:25, 148:18, 149:19, 153:20, 156:24, 169:6, 170:2, 170:4, 170:15, 177:20, 180:17, 184:20, 187:19, 190:13, 198:18, 203:19, 204:2, 205:1, 205:8, 205:11, 207:6, 210:13, 211:14, 213:7, 214:4, 214:13, 214:14, 215:21, 215:22, 270:19, 271:20, 272:8, 273:9, 273:13, 276:16, 276:17, 276:19, 276:22, 277:10, 283:9

**witness's** [1] - 72:17

**WITNESSES** [1] - 3:2

**witnesses** [31] - 5:4, 16:3, 16:14, 16:24, 17:13, 17:18, 17:24, 19:14, 19:17, 19:22, 19:23, 20:9, 20:13, 20:17, 21:2, 22:4, 22:15, 22:16, 22:24, 23:20, 24:14, 147:3, 149:3, 149:17, 170:10, 170:11, 170:13, 211:11, 233:24

**witnesses'** [1] - 215:16

**woman** [5] - 64:20, 152:11, 152:12, 152:14

**wonder** [1] - 233:9

**wondering** [1] - 170:12

**wooden** [2] - 194:11, 194:13

**woods** [11] - 137:16, 137:17, 137:18, 137:24, 137:25, 138:3, 138:11, 138:13, 201:17, 201:20, 201:23

**word** [9] - 44:9,

164:24, 227:23, 249:25, 250:1, 250:2, 250:3, 282:18

**words** [4] - 144:11, 149:15, 278:1, 282:15

**wore** [2] - 243:18, 243:20

**workers** [2] - 221:23, 222:1

**world** [1] - 223:6

**worst** [1] - 242:21

**wound** [1] - 276:7

**wounds** [14] - 25:18, 25:19, 29:16, 29:17, 29:23, 32:24, 36:9, 274:8, 274:17, 277:25, 282:25, 283:14, 283:20

**wrap** [2] - 85:11, 232:17

**write** [3] - 51:2, 52:12, 74:17

**writing** [2] - 274:25, 276:9

**written** [1] - 266:7

**wrote** [1] - 20:11

**Y**

**yards** [8] - 45:4, 45:5, 45:18, 45:20, 236:13, 236:17, 236:18, 238:12

**year** [9] - 35:2, 54:8, 55:19, 58:3, 58:11, 58:18, 60:1, 216:21, 221:15

**years** [23] - 35:1, 40:21, 42:8, 42:18, 45:3, 46:9, 46:12, 46:19, 50:16, 50:23, 55:23, 56:9, 58:5, 63:22, 75:16, 76:6, 98:2, 124:14, 126:24, 129:9, 129:13, 171:14, 264:11

**yell** [2] - 227:19, 242:3

**yelled** [1] - 258:21

**yelling** [1] - 227:22

**yesterday** [6] - 4:17, 5:12, 6:7, 14:10, 14:21, 215:5

**young** [1] - 41:11

**yourself** [10] - 40:16, 56:6, 95:19, 125:3, 136:13, 223:21, 228:16, 228:20, 230:24, 234:6

**yourselves** [1] - 223:8

**Z**

**zip** [2] - 204:2, 204:5