```
1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
    - - - - - - - - - - - - - - - x
3   BRIDZETTE LANE,
                                   CA No:  1:12-cv-00514-CRC
4              Plaintiff,
                                   Washington, D.C.
5   vs.                            Thursday, February 5, 2015
                                   9:07 a.m.
6
    DISTRICT OF COLUMBIA, ET AL.,
7
               Defendants.
8   - - - - - - - - - - - - - - - x

9   _____

10                 TRANSCRIPT OF JURY TRIAL
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                 UNITED STATES DISTRICT JUDGE

12  _____

    APPEARANCES:
13
    For the Plaintiff:        BILLY L. PONDS, ESQ.
14                            PONDS LAW FIRM
                              1250 24th Street, NW
15                            Suite 300
                              Washington, DC 20037
16                            (202) 333-2922
                              PLFPC@aol.com
17
                              KIRA ANNE WEST, ESQ.
18                            LAW OFFICES OF KIRA ANNE WEST
                              1325 G Street, NW
19                            Suite 500
                              Washington, DC 20005
20                            (202) 236-2042
                              kiraannewest@gmail.com
21

22
    (CONTINUED ON NEXT PAGE)
23

24

    Proceedings recorded by mechanical stenography; transcript
25  produced by computer-aided transcription
```

1    APPEARANCES (CONTINUED):

2    For the Defendant:       **KERSLYN D. FEATHERSTONE, ESQ.**
                              **ROBERT A. DeBERARDINIS, JR., ESQ.**
3                             OFFICE OF ATTORNEY GENERAL/DC
                              441 Fourth Street, NW
4                             Washington, DC 20001
                              (202) 724-6600
5                             kerslyn.featherstone@dc.gov
                              robert.deberardinis@dc.gov
6

7

8

9

10   Court Reporter:         Lisa A. Moreira, RDR, CRR
                             Official Court Reporter
11                           U.S. Courthouse, Room 6718
                             333 Constitution Avenue, NW
12                           Washington, DC  20001
                             202-354-3187
13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3       <u>WITNESSES</u>                                              <u>PAGE</u>

        CHAD LEO
4            (By Mr. Ponds).................................... 22

5       TODD KORSON
             (By Mr. Ponds).................................... 84
6            (By Ms. Featherstone)............................. 89

7       JAMES E. BRADLEY
             (By Mr. Ponds).................................... 97
8            (By Mr. DeBerardinis).............................199
             (By Mr. Ponds)....................................240
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          MS. FEATHERSTONE:  Good morning, Your Honor.

3          THE COURT:  Good morning, everyone.

4          THE COURTROOM DEPUTY:  Civil Case No. 12-514,

5    *Bridzette Lane vs. District of Columbia*.  For the

6    plaintiffs, we have Billy Ponds and Kira West.  For the

7    defendants, we have Kerslyn Featherstone and Robert

8    DeBerardinis.

9          MS. FEATHERSTONE:  Your Honor, may I raise an

10   issue with the Court very briefly before we begin?

11         THE COURT:  Let's let Ms. West get settled, okay?

12         MS. FEATHERSTONE:  Very well, Your Honor.

13         MS. WEST:  Good morning, Your Honor.  I apologize

14   for being late.  I have to say this is the first time in 25

15   years.  I'll never forget it.  I'm ready.

16         THE COURT:  There's a first time for everything,

17   right?

18         MS. WEST:  Yes.  I'm ready.

19         THE COURT:  Okay.  Is Mr. Ponds -- there we go.

20   There he is.

21         Okay.  What do we have, Ms. Featherstone?

22         MS. FEATHERSTONE:  Your Honor, I just want to

23   disclose to the Court that this morning, as I was getting

24   off the elevators, I noticed Officer Korson getting off of

25   the elevators across from me with Juror No. 4, who is a male

1    juror.  Officer Korson doesn't know who is on the jury, and

2    I saw them kind of laughing as they exited the elevator.  So

3    I inquired of Officer Korson what the nature of the

4    conversation, if any, was, and he said that he just -- they

5    were laughing about his breakfast and whether or not it was

6    a healthy breakfast or unhealthy breakfast, and that was the

7    substance of the conversation.

8                THE COURT:  Okay.

9                MS. FEATHERSTONE:  But he didn't know it was a

10   juror when they were having that very brief conversation.

11   But I wanted to let the Court know because I did observe it.

12               THE COURT:  Okay.

13               MS. FEATHERSTONE:  Thank you.

14               THE COURT:  Any issues with that, Ms. West?

15   Mr. Ponds?

16               MR. PONDS:  Ms. West?

17               MS. WEST:  I don't have an issue with it, Your

18   Honor, but I believe, in an abundance of caution, that the

19   juror should be brought out just like the other two and

20   voir-dired.  It's different than reading an article in *The*

21   *Washington Post*.

22               THE COURT:  Do I need to voir dire Juror No. 4,

23   Ms. Featherstone?

24               MS. FEATHERSTONE:  I wasn't expecting the Court

25   to.  I just --

1          THE COURT:  I'll just admonish everyone at the

2     same time.

3          MS. WEST:  Yes, Your Honor.

4          THE COURT:  I don't want to single it out, since

5     there's no suggestion that there were any improper

6     communications other than a chuckle over what one of them

7     may have had for breakfast.  Okay?

8          MS. FEATHERSTONE:  Thank you.

9          THE COURT:  Okay.  We need to deal with this video

10    evidence; is that right?

11         MR. PONDS:  Yes, Your Honor.

12         MS. FEATHERSTONE:  Yes, Your Honor.

13         MR. PONDS:  Your Honor, the only thing Mr. Thomas

14    would have to do is -- if you could, Mr. Thomas.

15         (Pause)

16         THE COURT:  While we're dealing with this, on the

17    curative instruction issue, Mr. DeBerardinis, I went back to

18    Ms. McNeil's transcript, and I did not see the statement --

19    the testimony that was quoted in your proposed curative

20    instruction.

21         MR. DeBERARDINIS:  Actually, the statement is

22    worse than the curative instruction even indicates.  The

23    court reporter pulled it up for us yesterday.  Maybe she

24    could do that.

25         (Pause)

1          THE COURT:  You said that she said people are

2     afraid to come to court because they are afraid of the

3     police.

4          MR. DeBERARDINIS:  Yes, Your Honor.

5          THE COURT:  I did not see that in the transcript.

6          (Pause)

7          THE COURT:  So I've gone back to the transcript of

8     Ms. McNeil's testimony, and the defense has proposed a

9     curative instruction.  Ms. West, have you had a chance to

10     review that?

11          MS. WEST:  I have, Your Honor, and the reason

12     we didn't submit one is I felt that we could -- and

13     Mr. DeBerardinis and I talked about this yesterday

14     afternoon -- that with a couple of adjustments, we would

15     agree to it.

16          THE COURT:  Okay.  Here's what I would propose to

17     tell them.  "Ladies and gentlemen of the jury, you have

18     heard testimony through Ms. Rashida McNeil that there may be

19     witnesses to the events in question who may be scared to get

20     involved in this case because of the police.  That testimony

21     is stricken from the record, and you may not consider it in

22     your deliberations."

23          Ms. West?

24          MS. WEST:  The only thing I thought, Your Honor,

25     in that vein was that we should take Ms. McNeil's name out

 1    of the equation; that you've heard testimony from a witness.

 2    That way -- I can't remember, because I did Caroletta Inman,

 3    if she said something to that effect, but I think it was

 4    certainly an implication in her testimony.  And so I thought

 5    if you said you've heard testimony from a witness or

 6    witnesses that there are witnesses who would come -- who are

 7    scared, I think that's the word that she used.  Ms. McNeil

 8    used the word "scared."

 9            THE COURT:  She used that word, and I thought it

10    was an implication.  It may be a little bit more direct now

11    that I've gone back to the transcript so I'd like to read

12    the one that I just proposed.  Okay?

13            MS. WEST:  And we also thought that --

14            THE COURT:  And in order for them to assess

15    whether they remember it or not, I think they need to know

16    that it was her in order to orient them.

17            MS. WEST:  And the other -- and the only thing is

18    "stricken," we thought, was too strong of a word, and we

19    thought "disregard in your deliberations" would be a better

20    way to say it.

21            THE COURT:  Well, we're going to strike it.

22            MS. WEST:  Okay.  That's all we have.  Other than

23    that, Your Honor --

24            THE COURT:  Mr. Ponds?

25            MR. PONDS:  Your Honor, we are ready to present

```
1    the -- provide the proffer visually in terms of the

2    videotape.

3              THE COURT:  Okay.  Aaron, why don't you come up.

4    Aileen, you can come up as well.

5              (Pause)

6              THE COURT:  Counsel, it's been brought to my

7    attention that the reference in the transcript that I just

8    referred to is not from Ms. McNeil's testimony, but it's the

9    testimony of Ms. Lane; and I read Ms. McNeil's transcript

10   this morning, and she did not say that.  I think it's Ms.

11   Lane, if I'm not mistaken, who is referring to -- who is

12   interpreting the implications of what Ms. McNeil testified

13   to.

14             MS. WEST:  And that's why, Your Honor, I

15   believed -- I didn't have that in my notes because she was

16   the witness that I was examining, but I believe that there

17   was another witness, and now you tell me it's Ms. Lane, who

18   made that implication, who stated that.  That's why I wanted

19   to say "you've heard from witnesses in this case."

20             MR. DeBERARDINIS:  "We heard from witnesses" is

21   fine from the defense's perspective.

22             MS. WEST:  I felt like that covered everybody in

23   the event that there was someone who did it, and I missed

24   it.

25             THE COURT:  Okay.  Let's do it that way because it
```

1     was not Ms. McNeil's testimony, so it would be a mistaken

2     instruction.

3              MS. FEATHERSTONE:  Thank you, Your Honor.

4              THE COURT:  I'll just say you've heard testimony

5     in the case.

6              MR. DeBERARDINIS:  Yes, Your Honor.

7              MS. FEATHERSTONE:  Yes, Your Honor.

8              (Pause)

9              MR. PONDS:  Whenever the Court's ready.

10             THE COURT:  Okay.  Please proceed.

11             MR. PONDS:  And I'd just advise the Court, we may

12    have to look at it -- you may have to look at it a couple of

13    times because it happens very quick, and you should be

14    focused on the right side of the SUV.

15             If you could run it, Mr. Thomas.

16             MS. FEATHERSTONE:  Mine is not moving.

17             (Video playing)

18             MR. PONDS:  As you can see barely, there's an

19    object coming out of the vehicle.

20             Now, Mr. Thomas, if you could go frame by frame.

21    Another frame.

22             Could you do it again, Mr. Thomas.  No, start from

23    the beginning.  Do it frame by frame.

24             If you go back one step.  Go back another step.

25             Your Honor, you can barely see there is an object

```
1      -- just go forward, and then after it's over go all the way

2      back.

3              Keep going.

4              MS. FEATHERSTONE:  Your Honor, may I just --

5              THE COURT:  What's your argument, Mr. Ponds?

6              MS. FEATHERSTONE:  First, I don't see anything

7      coming out of the car.

8              THE COURT:  Mr. Ponds first.  Mr. Ponds first.

9              MS. FEATHERSTONE:  Oh, I'm sorry.

10             THE COURT:  What am I looking at?

11             MR. PONDS:  Your Honor -- if you could start from

12     the beginning, Mr. Thomas.

13             (Video playing)

14             Your Honor, right where the arrow is an item is

15     being tossed out.  As the Court can see the sidewalk,

16     Mr. Briscoe's down, and that sidewalk --

17             Put the arrow on the sidewalk, the sidewalk where

18     Officer Coker -- no, the sidewalk on the other -- that

19     adjoins the driveway, Mr. Thomas.

20             MS. FEATHERSTONE:  Mr. Ponds, if you could just

21     tap the screen, it would have an arrow appear, with your

22     finger.

23             MR. PONDS:  Maybe you can do it.

24             MS. WEST:  It's right here, right?

25             MR. PONDS:  As the Court can see, the sidewalk
```

1    where Officer Coker recovered one of the pistol grips, the

2    sidewalk is clear.  There is a small object coming -- being

3    thrown out of the vehicle.  Mr. Briscoe's down.

4              Continue, Mr. Thomas, going forward frame by

5    frame.

6              (Video playing)

7              MR. PONDS:  Okay, if you can reverse it now.  If

8    you could go back because the object was on the sidewalk,

9    and when Mr. Thomas just clicked it, it went back in the

10   direction of the vehicle.

11             You can see it better on the screen.  I can see it

12   on this screen.  It's very difficult to see it on the small

13   screens.

14             MS. WEST:  I can't even see it on the small

15   screen.

16             MR. PONDS:  You can see it very clearly in the big

17   screen.  You can't see it on the small screen.  It's very

18   different.

19             Now, start from the beginning.  Take it frame by

20   frame.

21             That's the object.  And if you go and click it

22   backwards, it goes back in the vehicle.

23             Okay.  Now, click forward.

24             And there's the object which just came out of the

25   SUV.

1      Click forward again.

2      It's in flight.

3      He's going too fast.

4      And it lands right here, and that is not a shell

5   casing.  That is the grip of the pistol, and that's exactly

6   where Officer Coker found it, and Mr. Briscoe's been down

7   the entire time.

8      THE COURT:  Okay.  Ms. Featherstone?

9      MS. FEATHERSTONE:  Thank you, Your Honor.

10      Your Honor, the only testimony in this case about

11   anything coming out of the window are the two bullets and

12   the shell casing, which was Item No. 3, as identified by

13   Officer Coker on the scene that dropped.  At the same time,

14   Mr. Briscoe dropped the handgun, and the handgun broke.  The

15   plaintiff is only pointing to one item, which is the grip

16   that was found, which I believe is Item No. 4 on the

17   sidewalk as well.  The item that the plaintiff is attempting

18   to show the Court, it just looked like an ejection.  It

19   could have been the bullet, the casing from the bullet that

20   fell in the street.  But the only testimony here about

21   anything coming out of the window is the bullets themselves

22   that struck Mr. Briscoe.

23      THE COURT:  Right.  Well, Officer Leo hasn't

24   testified to that yet, correct?  And Officer Katz testified

25   that he didn't see anything being thrown out of the window.

```
1    He didn't throw anything out the window.  So those are the

2    only two people that would be in the position.

3              MS. WEST:  It's Torres, Your Honor.

4              THE COURT:  Torres.

5              MS. FEATHERSTONE:  Officer Torres was in the car.

6              THE COURT:  He was sitting in the car.

7              MS. FEATHERSTONE:  Correct.

8              THE COURT:  So no one else would be in a position

9    to testify, so that would explain why there's no testimony

10   to that effect, right?

11             MS. FEATHERSTONE:  Correct.

12             THE COURT:  Now we have a video, which I think the

13   question I have to decide is whether there is sufficient

14   basis in that video for plaintiff's counsel to make that

15   argument to the jury, right?

16             MS. FEATHERSTONE:  Well, we believe that the

17   question -- the question that posed the problem with Officer

18   Torres had to do with the implication of a conversation

19   about the officers throwing something out of the window.

20             THE COURT:  Well, there are two different things

21   here.

22             MS. FEATHERSTONE:  Okay.

23             THE COURT:  Okay?  There's whether I'm going to

24   let them argue in closing that the video, which is in

25   evidence, depicts something being thrown out of the car,
```

1    okay?

2              MS. FEATHERSTONE:  Okay.

3              THE COURT:  And then there is the separate

4    question as to whether there is a factual basis to inquire

5    about a conversation amongst the officers about a gun being

6    thrown out of the car.

7              MS. FEATHERSTONE:  And I don't believe that this

8    video shows or presents a sufficient basis for the Court to

9    allow questioning of Officer Leo about whether or not

10   something was thrown out of the car.  It's not clear enough

11   that -- I mean, that video does not show something being

12   thrown out of the car.

13             THE COURT:  Well, he was there.  They can ask him

14   if he threw something out of the car.  And if he says no,

15   the question then becomes can they show in the video and ask

16   him, "Does that reflect something being thrown out of the

17   car?"  Right?  I don't know what his answer to that is going

18   to be.

19             MS. FEATHERSTONE:  Brief indulgence, Your Honor.

20             (Pause)

21             MS. FEATHERSTONE:  Your Honor, the issue is that

22   no reasonable juror could find that that object that the

23   plaintiff claims is coming out of the window is a gun, is a

24   full gun being thrown out of the window.  It is insufficient

25   to establish that.  No reasonable juror could find that.

1    Whatever that minuscule -- that they were pointing to that I

2    still didn't see, whatever that small article that they're

3    trying to say is there, it's definitely -- it cannot be --

4    no reasonable juror can believe that was a gun being thrown

5    out of the window, the handgun that we've seen in court

6    that's in evidence right now, that large gun.

7            That is not reflected in that video, and to allow

8    the witness to be questioned about whether that spec --

9            THE COURT:  What do you think it is?

10           MS. FEATHERSTONE:  The only thing that I know that

11   has come out in testimony is that there was a shell casing

12   found just by the SUV, and it was marked as No. 3.  And we

13   know that Mr. Briscoe was shot by Officer Leo, and that two

14   bullets came out of the car as a result.

15           So the only things that are now in evidence are

16   that two bullets came out of the car.  The shell casing from

17   one of those bullets hit the ground near the SUV.  I believe

18   it was 93J where Officer Torres was standing near the bullet

19   casing to protect it.  Those are the only projectiles that

20   have been testified to, and no reasonable juror could look

21   at that video at the place where the plaintiff just pointed

22   to to say that a full -- the handgun that's in evidence

23   right now, that that was what that was.  Thank you.

24           THE COURT:  Mr. Ponds?

25           MR. PONDS:  The Court's indulgence.  The Court's

```
 1    indulgence.

 2              THE COURT:  Remind me of the exhibit number that

 3    corresponds to Officer Coker's crime scene photos with the

 4    placards that we saw yesterday.

 5              MR. PONDS:  Plaintiff's Exhibit 4I.

 6              THE COURT:  Anything else, Mr. Ponds?  I'm going

 7    to take a brief recess.

 8              MR. PONDS:  Just to clarify my position, Your

 9    Honor, it was 4I where -- I questioned Officer Coker

10    concerning Plaintiff's Exhibit 4I, which depicts Placards 2

11    and 3.  3 is one of the pistol grips.  Remember him saying

12    they were mixed up in the bags?  That's the pistol grip on

13    the -- as the Court can recall, I talked about the lines on

14    the sidewalk to distinguish they were kind of blocked off,

15    and I think he said they were transformers or something.

16              I can't remember exactly what he said, but that is

17    the -- one of the pistol grips, and it lands -- we submit to

18    the Court that the object flying out of the window that

19    eventually lands where Placard 3 is is that -- is one of the

20    pistol grips.

21              THE COURT:  Okay.

22              MR. PONDS:  And in the video that we showed the

23    Court, Mr. Briscoe's down the entire time.  The pistol

24    grip -- whoever threw the pistol grip -- Mr. Briscoe,

25    Ralphael Briscoe, could not have possessed the BB pistol in
```

1    this case if one of the grips was being thrown from the

2    vehicle.

3              THE COURT:  Well, Ms. Featherstone's point is that

4    we're not talking about a grip being thrown out of the

5    vehicle.  We're talking about a whole gun, and this does

6    not -- you're not even arguing that --

7              MR. PONDS:  I'm not arguing that.

8              THE COURT:  -- you see the whole gun.  You're

9    saying they threw out the grip only?

10             MR. PONDS:  The grip.  Whoever had the grip had

11   the gun.  He couldn't have the gun and not have the grip,

12   because they said -- because whoever threw the grip out had

13   to have, eventually, the gun.  That is the link between the

14   gun -- the grip is a link between whoever possessed the gun.

15   He could not have possessed the gun.

16             THE COURT:  Where does the gun show up on the

17   video you just showed me?

18             MR. PONDS:  You don't see it on the video.

19             THE COURT:  So what's your theory?  Why would that

20   be?

21             MR. PONDS:  Position of the camera.  And as the

22   Court recalls -- and to make it even more specific, why

23   would one of the officers be throwing the grip out of the

24   window?  And I suspect if Officer Leo answers that question,

25   his answer would be no; if he answers that question.

1    Because there's other implications to answering that

2    question, and we should be able to show him this videotape

3    because it's clearly, from our perspective, coming out of

4    the vehicle.

5            Mr. Briscoe is down.  He is not up.  He's not

6    being shot at that time.  He is down.

7            Our position is whoever threw the grip out of the

8    window that landed on that sidewalk was also one of the

9    persons who are persons involved in planting the rest of the

10   evidence.

11           THE COURT:  Okay.  Let me take a brief recess, and

12   we'll come back in five minutes.

13           MR. PONDS:  Yes, sir.

14           (Recess taken)

15           THE COURT:  Okay.  Having looked at the video and

16   Plaintiff's Exhibit 4I, which are both in evidence, I think

17   the plaintiffs have sufficiently raised an inference that

18   at least the grip was -- appeared on the sidewalk after

19   Mr. Briscoe had fallen, and that that is sufficient to

20   entitle them to inquire of Mr. Leo about whether something

21   was thrown from the car and could question him about the

22   video on that point, okay?

23           MR. PONDS:  Yes, sir.

24           THE COURT:  And you can also argue that in

25   closing, but as we discussed yesterday, you cannot elicit

1    testimony from your expert on that point.  Okay?

2              MR. PONDS:  I understand the Court's point.

3              THE COURT:  Are we ready for the jury?

4              MS. FEATHERSTONE:  Your Honor, may I just get a

5    clarification of the Court's ruling?

6              THE COURT:  Yes.

7              MS. FEATHERSTONE:  Is the Court saying that the

8    plaintiff can argue that the grip was planted, or is the

9    Court allowing them to make the leap that the gun was also

10   planted as a result of that video?

11             THE COURT:  The fact that the grip appears later

12   enables them to make the argument that something was thrown

13   out of the car, the gun was thrown out of the car.  Will

14   that fly?  I don't know.  I mean, you can -- you know your

15   cross-examination on that and your argument.

16             MS. FEATHERSTONE:  Thank you, Your Honor.

17             THE COURT:  Okay.

18             MR. PONDS:  Your Honor, I would make another

19   request to the Court.  In asking the questions and depending

20   on how he answers the question, I would make a request that,

21   because it's very difficult to view it on these small

22   screens, particularly the ones that the jurors have, the

23   jurors be allowed to stand near the large screen while the

24   video is being played, and then I could reserve my questions

25   of Officer Leo after the different versions of the tape have

1      been played, specific to this one --

2              THE COURT:  Are you going to do this after the

3      first break?  Because it's possible we can bring in a larger

4      monitor.

5              MR. PONDS:  That would be fine.

6              THE COURT:  Why don't we try to back it up until

7      after the break and see if we can bring in a larger monitor

8      on this side of the courtroom.  Okay?

9              MR. PONDS:  Thank you.

10             (Jury enters courtroom)

11             THE COURT:  Good morning, everyone.

12             JURY IN UNISON:  Good morning.

13             THE COURT:  How are you?  Good.  Sorry for the

14     delay.  We had a couple of evidentiary issues to resolve

15     before bringing you out this morning.

16             Before we get started with Officer Leo again, let

17     me just give you one cautionary instruction.  You've heard

18     testimony in the case, I think maybe the first couple of

19     days, to the effect that there may be witnesses to the

20     events in question who may be scared to get involved in the

21     case because of the police.  That testimony is stricken from

22     the record, and you are not to regard it or consider it in

23     your deliberations.  Is that clear?  Okay.

24             Mr. Ponds.

25             MR. PONDS:  Thank you, Your Honor.

1          Your Honor, we'll continue with our direct

2     examination of Officer Leo.

3          THE COURT:  Officer Leo, how are you?

4          THE WITNESS:  How are you doing?

5                    CHAD LEO, Resumed

6                DIRECT EXAMINATION, Continued

7     BY MR. PONDS:

8     Q.  Officer Leo, when we left off yesterday, I was asking

9     you some questions concerning the statement you gave to

10    police officials on April the 26th, 2011.

11    A.  That's correct.

12    Q.  And you understood that it was important on that day,

13    when you were questioned for the very first time about the

14    shooting of Ralphael Briscoe, to provide the investigators

15    truthful information?

16    A.  Correct.

17    Q.  And did you provide them truthful information?

18    A.  Yes, I did.

19    Q.  And you provided truthful information in terms of what

20    happened that day?

21    A.  Yes, I did.

22    Q.  And because it had happened about two hours prior to

23    giving your statement?

24    A.  Can you repeat that question again.

25    Q.  Did it -- did the event occur approximately about two

1    hours before you gave your statement to the investigators?

2    A.   Yes.

3    Q.   So it was fresh in your mind?

4    A.   Yes.

5    Q.   In terms of what had occurred?

6    A.   Correct.

7    Q.   And it was fresh in your mind as to where -- what

8    Ralphael Briscoe was doing when you shot him, when you shot

9    him twice?

10   A.   Correct.

11   Q.   It was fresh in your mind?

12   A.   Correct.

13   Q.   And while it was fresh in your mind, you gave them a

14   recorded statement?

15   A.   I did.

16   Q.   And that statement was later transcribed in writing?

17   A.   Yes, it was.

18   Q.   And you had an opportunity to review that statement?

19   A.   Yes, I did.

20   Q.   And you signed it?

21   A.   I did.

22   Q.   Was it accurate?

23   A.   Yes.

24   Q.   Was it truthful?

25   A.   Yes.

1    Q.  Sir, did you tell the investigators -- well, sir, do you

2    recall being questioned whether or not your vehicle was

3    stopped when you shot Ralphael Briscoe?

4    A.  Yes.  I remember them asking the question, and at that

5    time I may have said I thought it was stopped, but after

6    watching the video --

7    Q.  My question is, were you questioned about whether the

8    vehicle was stopped when you shot Ralphael Briscoe?

9    A.  Yes.

10   Q.  Did you provide them a truthful answer?

11   A.  I provided them with the -- at the time, with the answer

12   that I thought at the time.  I thought the vehicle was

13   stopped.

14   Q.  My question is, did you provide them a truthful answer?

15   A.  Yes, at the time.

16   Q.  So you gave them a truthful answer in terms of the

17   question as to whether or not the vehicle was stopped when

18   you shot Ralphael Briscoe?

19            MS. FEATHERSTONE:  Asked and answered, Your Honor.

20            THE COURT:  Sustained.

21   Q.  Did you tell them, "I think I was stopped"?

22   A.  I believe that's accurate, yes.

23   Q.  Now, you were later -- did they want to know -- did the

24   investigators want to know if the vehicle was still moving

25   when you shot Ralphael Briscoe?

1    A.  In the first interview?

2    Q.  Yes.

3    A.  Yes.  I believe they had some questions about whether

4    the vehicle was still moving.

5    Q.  Now, sir, were you later questioned again, on February

6    the 7th of the year 2012, by the investigators?

7    A.  What was your question?  I'm sorry.

8    Q.  The question was, were you questioned by the

9    investigators again on February the 7th, 2012?

10   A.  Yes, I was.

11   Q.  Were you required to give truthful answers at that time?

12   A.  Yes, I was.

13   Q.  By February the 7th, 2012, did you have an opportunity

14   to look at the videotape?

15   A.  I did.  That's the first time I looked at the video.

16   Q.  Because -- well, let me ask you this, sir:  When you

17   gave your statement on April 26, 2011, you had not seen the

18   videotape?

19   A.  That's correct.

20   Q.  You didn't even know that a videotape existed at the

21   time you gave your statement?

22   A.  I did not, no.

23   Q.  Do you remember them, the investigators, asking you

24   again on February the 7th, 2012, whether your vehicle was

25   moving when you shot Ralphael Briscoe?

```
1    A.  Yes, they asked again.

2    Q.  What did you tell them?

3    A.  I'd have to take a look at the -- my statement to know

4    exactly what I said.

5    Q.  You don't know exactly what you said?

6    A.  That's what I said.  I don't remember exactly what I

7    said.  I need to take a look at my statement.

8    Q.  Okay.  We'll get there.

9    A.  Okay.

10   Q.  But did you tell them on April the 26th, 2011, that the

11   vehicle -- you thought it was not moving?

12          MS. FEATHERSTONE:  Objection, Your Honor; asked

13   and answered.

14          THE COURT:  Sustained.

15   Q.  Did you change your story on February the 7th, 2012,

16   whether or not the car was moving when you shot Ralphael

17   Briscoe?

18          MS. FEATHERSTONE:  Objection, Your Honor.

19          THE COURT:  Overruled.

20   A.  I did change my story.

21   Q.  Well, you changed your story, right?

22   A.  Yes, because I had an opportunity to look at the

23   videotape.

24   Q.  You changed your story because you looked at the

25   videotape?
```

1    A.  Correct.

2    Q.  All right.  The videotape showed that the vehicle was

3    moving?

4    A.  Yes.

5    Q.  But two hours after the shooting in April 2011 you told

6    them it wasn't moving.

7    A.  Correct.  I told them I thought it wasn't moving.

8    Q.  So you would agree --

9            THE COURT:  Let him finish.

10           MR. PONDS:  Sorry, Judge.  Go ahead.

11   A.  My initial statement was I thought the vehicle was

12   stopped.

13   Q.  Did you ever tell them you didn't know on April the

14   26th, 2011?

15   A.  I may have.

16           MS. FEATHERSTONE:  Objection, Your Honor.  This

17   question's been asked and answered.

18           THE COURT:  Overruled.

19   Q.  Did you tell them that you didn't know on April the

20   26th, 2011, when they asked you that question?

21   A.  I may have.  Again, I'd have to take a look at my

22   statement to refresh my memory.

23   Q.  You don't recall what you told the investigators

24   concerning the shooting on April the 26th, 2011?

25   A.  I would have to take a look at the statement to refresh

1    my memory.

2    Q.  Well, sir, on April the 26th, 2011, you realized that it

3    would have been a violation of your general orders to fire

4    from a moving vehicle?

5    A.  No.

6    Q.  You didn't know that?

7    A.  I did know that.

8    Q.  You did know that?

9    A.  I know the general order on that, and I didn't believe I

10   was in violation of that general order.

11   Q.  But does that general order discuss firing from a moving

12   vehicle?

13   A.  Yes, it does.

14          MS. FEATHERSTONE:  Objection to the form of

15   question, Your Honor.

16          THE COURT:  I believe -- I think we established

17   this yesterday.

18   Q.  You changed -- Officer Leo, did you change your version

19   of whether the vehicle was stopped on February the 7th,

20   2012, because you realized the videotape is accurate?

21   A.  The video shows that the car was still moving.

22   Q.  Okay.  Would you agree the videotape is accurate?

23   A.  The videotape is accurate in showing that the car is

24   still moving in that -- from that perspective, yes.

25   Q.  Is the videotape accurate in total, everything that's

1    captured on that videotape?

2    A.   No.

3    Q.   You disagree with the videotape?

4    A.   To the totality of the accuracy of the video and the

5    angle that the video shows, I disagree with the video being

6    accurate as far as my perception of that day and what I saw

7    from my perspective being in the vehicle that day.

8    Q.   Officer Leo, do you realize my question is about the

9    videotape?  Do you understand that question?

10   A.   I do understand your question, yes.

11   Q.   You've seen the videotape.

12   A.   Correct.

13   Q.   Is there anything on the videotape that you suggest is

14   inaccurate?

15          MS. FEATHERSTONE:  Objection, Your Honor.  This

16   was asked and answered.

17          THE COURT:  Sustained.

18          MR. PONDS:  If I could have the Court's

19   indulgence?

20          THE COURT:  I'm sorry?

21          MR. PONDS:  The Court's indulgence, Your Honor?

22   Q.   Sir, do you recall your testimony that you gave at a

23   deposition on February 19, 2014, regarding whether or not

24   the vehicle was still moving when you shot Ralphael Briscoe?

25   A.   Yes.  I remember giving a deposition.

1    Q.  What was your response?

2    A.  I believe my response was the vehicle may have still

3    been moving at the time, yes.

4    Q.  You say may have been still moving?

5    A.  It was still moving at the time.

6    Q.  It was still moving at the time.  Was that your --

7    A.  I believe my response was, "I was slowing down.  My foot

8    was on the brake, and the car was slowing down."  But it was

9    still -- you could still see that I was moving.

10    Q.  Still moving?

11    A.  Yes.

12    Q.  And you would agree that's different than what you told

13    the investigators on April the 26th, 2011?

14    A.  Correct.  That's not what I told them on April 26th.

15    Q.  Sir, do you also -- sir, do you recall providing

16    testimony on that day, on February the 19th, 2014, that

17    Ralphael Briscoe fell down immediately after he was shot?

18    A.  Yes.

19    Q.  Was Ralphael Briscoe facing you when he was shot?

20    A.  The upper portion of his body turned very quickly

21    towards the car with the gun in his hand.  He came out -- he

22    turned very quickly towards the car.  It was a very quick

23    motion towards the car.

24         I can't say his entire body was facing the car,

25    but a portion of his upper body turned very quickly towards

1    the car, and that's when I fired.

2    Q.  My question was, was his entire body facing you when he

3    was shot?

4    A.  His entire -- no.  I just explained a portion of his

5    upper body was turned towards the vehicle.  So no, not his

6    entire body.

7    Q.  Was he standing still facing you when he was shot?

8    A.  I think he was still moving, still running.

9    Q.  Well, was he moving facing you, or was he moving running

10   in the opposite direction?

11   A.  Well, as he was running, he turned very quickly towards

12   the car.

13   Q.  Okay.  So it's your testimony that when Ralphael was

14   running on that sidewalk, he turned left towards your car

15   rather than right going down the driveway?

16          MS. FEATHERSTONE:  Objection to the form of the

17   question, Your Honor.

18          THE COURT:  Overruled.

19   A.  His upper body turned left -- turned very quickly

20   towards the car.

21   Q.  Sir, what did you tell the investigators on April the

22   26th in terms of what Ralphael Briscoe did before you --

23   before you shot him right at that driveway?

24   A.  I believe I said something to the same effect, that he

25   turned his upper body towards the car, and I saw the gun

1    come --

2    Q.  He turned his body -- could you say that again.

3            THE COURT:  Let him finish.

4            MS. FEATHERSTONE:  Objection, Your Honor.  He's

5    not letting the witness finish.

6            THE COURT:  Let him finish.

7    A.  I saw the gun coming up towards the vehicle, and I was

8    in fear for my life.

9    Q.  And that's what you told them?

10   A.  It would be nice if I could refresh my memory again, if

11   you'd like.

12   Q.  I mean, do you need your memory refreshed?

13           MS. FEATHERSTONE:  Your Honor, objection to

14   these -- the witness is asking to see a document to refresh

15   his recollection.

16           THE COURT:  Overruled.

17   Q.  Do you need to have your recollection refreshed as to

18   what you told the investigators on April the 26th, 2011?

19   A.  If you're going to ask me specifically what I said, and

20   I'm going to go off of what I said on April 26, 2011, which

21   was almost four years ago, then yes.

22   Q.  Okay.

23           MR. PONDS:  Your Honor, if I could approach the

24   witness?

25           THE COURT:  You may.

1    Q.  Sir, I'm providing you what has been marked for

2    identification as L1.  Is that a copy of the statement that

3    you gave on April 26, 2011?

4    A.  Yes, it is.

5    Q.  Can you take a minute to review it to refresh your

6    recollection.

7    A.  (Witness reviews document) Anything specific?

8    Q.  Well, why don't you look at the document first.

9    A.  I thought you were asking a specific question that you

10   wanted me to remember.

11   Q.  No, why don't you just look at it first.  Refresh your

12   recollection, and then we'll -- I'll ask you some questions.

13   A.  Okay.

14           (Pause)

15   Q.  Okay.  Sir, does that -- does your statement of April

16   the 26th, 2011, refresh your recollection as to what you

17   told the investigators concerning any movements by

18   Mr. Briscoe, by Ralphael Briscoe, prior to you shooting him?

19   A.  Yes, sir.

20   Q.  Okay.  What did you tell them?

21   A.  I said that he turned his upper body towards the

22   vehicle.  I saw the gun coming up facing our direction.

23   There was another question, too, and I said that he rotated

24   his upper body towards the vehicle, and I saw the gun coming

25   up facing our direction.

1    Q.  He rotated his body?

2    A.  I said he turned and rotated.

3    Q.  Rotated.

4          MR. PONDS:  I'd like to show you, sir, Defendants'

5    Exhibit 13.

6          (Pause)

7    Q.  Officer Leo, I draw your attention to the monitor in

8    front of you, if you could observe this.

9          MR. PONDS:  If you could start it, Mr. Thomas.

10         (Video playing)

11         MR. PONDS:  Stop.

12   Q.  Do you see that, Officer Leo?

13   A.  Yes, sir.

14   Q.  He's making a hard right.  Isn't that what the video

15   depicts?  He's making that hard right into that driveway.

16   A.  Yes.

17   Q.  Okay.  And you notice he was running real fast?

18   A.  Correct.

19   Q.  He was running really, really, really fast.  You noticed

20   that?

21   A.  Yes.

22   Q.  And he's making -- he was making that hard right to go

23   into the driveway.  You saw that in the videotape?

24   A.  It appears so, yes.

25   Q.  And you saw his left hand go out as though, perhaps, he

1     was losing his balance.  You saw that on the videotape?

2     A.  I didn't see that.

3     Q.  You didn't see that on the videotape?

4     A.  No.

5     Q.  Do you need us to play it again?

6     A.  Sure.

7     Q.  Do you want to see it again?

8     A.  Sure.

9          MR. PONDS:  Start it again, Mr. Thomas.

10         Go back a little bit.  Keep going.  Okay.  Thank

11    you.  Start it from there.

12              (Video playing)

13         MR. PONDS:  Stop.

14    Q.  Do you see his right hand?  See where the arrow is?

15    A.  Yes, I see where the arrow is.

16         MR. PONDS:  Take the arrow down so Officer Leo can

17    see his right hand.

18    Q.  Do you see where Ralphael Briscoe's right hand is, sir?

19    A.  I don't see it.

20    Q.  You don't see it.  Do you see his left hand out as

21    though -- because he's making that turn down the driveway?

22    Do you see that?

23    A.  It looks like his left hand may be out, but it's hard to

24    see.

25    Q.  Okay.  You don't see a right hand with any gun in it, do

1    you?

2    A.  I don't see his right hand at all.

3    Q.  You don't see his right hand.  Well, his right hand's

4    not coming towards you, is it?

5    A.  Yes, it was.

6         MS. FEATHERSTONE:  Objection, Your Honor.

7    Q.  On the videotape, sir?

8         THE COURT:  Overruled.

9    Q.  On the videotape, does it depict a gun being pointed in

10   the direction of your vehicle?

11        THE COURT:  Are you referring to this particular

12   frame?

13        MR. PONDS:  Yes, this particular frame.

14   A.  No, that frame does not show that in the videotape.

15   Q.  Does not show.  Do you want us to go to the next frame?

16   A.  Sure.

17        MR. PONDS:  Next frame, Mr. Thomas.

18   Q.  Is he pointing a gun at your vehicle in that frame?

19   A.  On the frame in the videotape, it does not show that.

20        MR. PONDS:  Next frame.

21   Q.  Does it show him -- can you see his right hand now?

22   It's hanging out -- hanging out to the right.  Do you see

23   his right hand on the video?

24   A.  No.

25   Q.  You don't see his right hand.

1          Well, let me ask you this:  Do you see his right

2     hand pointing a gun at you?

3     A.   From the vehicle I did.

4     Q.   My question is based on this frame, sir.

5     A.   Okay.  I didn't know you --

6     Q.   All of my questions are going to be based on this

7     videotape and the various frames.

8     A.   Okay.  No, I did not see it in the frame.

9     Q.   Okay.

10          MR. PONDS:  Next frame, Mr. Thomas.

11    Q.   Do you see the right hand being extended from the

12    shoulder now, below where the arrow is?

13    A.   It appears so.

14    Q.   Okay.  Do you see a gun in his hand?

15    A.   There could be something in his hand.  I can't tell in

16    that.

17    Q.   You can't tell what it is?

18          MS. FEATHERSTONE:  Objection, Your Honor.

19          THE COURT:  Overruled.

20    Q.   It could be a cell phone?

21    A.   I can't see what it is from this --

22    Q.   Is that right hand pointed in the direction of your

23    vehicle?

24    A.   Not in that frame.

25          MR. PONDS:  Next frame, Mr. Thomas.

```
1    Q.  What about in that frame?  Do you see the right hand

2    again?

3    A.  Yes.

4    Q.  It's down, isn't it?

5    A.  Yes.

6    Q.  It's not pointing in the direction of your vehicle?

7    A.  Not at that time, no.

8              MR. PONDS:  Next frame.

9    Q.  See the right hand again as he's beginning to fall

10   forward?  Do you see that?

11   A.  Yes.

12   Q.  Is it pointed in your direction, Officer Leo?

13   A.  No.

14             MR. PONDS:  Next frame, Mr. Thomas.  Did you go to

15   the next frame?

16   Q.  Do you see his right hand even lower now as it appears

17   he's beginning to fall?

18             THE COURT:  Is there a question?

19             MR. PONDS:  Yes.

20   Q.  Do you see that?

21   A.  Yes.

22   Q.  Do you see the right hand again?

23   A.  Yes.

24   Q.  Is he pointing anything in your direction?

25   A.  No.
```

```
 1                  MR. PONDS:  Next frame, Mr. Thomas.

 2      Q.  He's going down further now.  Is anything pointed in

 3      your direction?

 4      A.  No.

 5                  MR. PONDS:  Next frame, Mr. Thomas.

 6      Q.  He appears to be -- he's been shot now.  Is he pointing

 7      anything in your direction?

 8      A.  No.

 9                  MR. PONDS:  Next frame, Mr. Thomas.

10      Q.  It looks like he's going down further at this point.  Is

11      he pointing anything in your direction?

12      A.  I can't tell.

13      Q.  You can't tell.  Do you see where the right hand is now?

14      A.  I can't see where the right hand is.

15      Q.  You see the left hand as he's losing his balance.  Do

16      you see that left hand up?

17      A.  It appears so.

18      Q.  And you told -- did you tell the investigators that

19      Ralphael Briscoe had the gun in his right hand?

20      A.  I told him when I first saw him pull the gun out it was

21      in his right hand.

22      Q.  Didn't you tell them, the investigators, that when he

23      pointed the weapon at you it was in his right hand?

24      A.  Correct, initially.

25      Q.  Initially.  Did you change your story?
```

```
1    A.  On the second interview, I wasn't sure if it was -- once

2    the shots were fired, if the gun was still in his right

3    hand, or if he had switched hands at that point.

4    Q.  Right.  But on the very first day, two hours after it

5    happened, you told them that Ralphael had a gun in his right

6    hand when you shot him.

7    A.  Correct.

8    Q.  Because you said, "He pointed that gun at me with his

9    right -- the gun in his right hand."

10   A.  Correct.

11   Q.  And that was before you saw the videotape.

12   A.  Correct.

13   Q.  And on February the -- prior to February the 7th, 2012,

14   you saw the videotape?

15   A.  I think I saw the videotape that day, February 7th.

16   Q.  You saw the videotape before you gave your statement?

17   A.  Yes.

18   Q.  And then when you gave your statement, after you saw

19   this videotape, you changed your testimony -- you changed

20   your statement about which hand the gun was in?

21   A.  Yes.

22   Q.  Do you want to see any more frames, sir, from this

23   video?

24        MS. FEATHERSTONE:  Objection.  Improper question,

25   Your Honor.
```

1           THE COURT:  Sustained.

2           MR. PONDS:  Next frame, Mr. Thomas.  Next frame.

3   Q.  Now, Officer Leo, have you previously provided sworn

4   testimony that you felt threatened at this driveway that is

5   depicted on the video screen, this frame?

6   A.  Yes.

7   Q.  Okay.  And you gave sworn testimony that you never felt

8   threatened until Ralphael rotated or turned his body and

9   pointed a gun at you with his right hand at the driveway.

10  A.  I may have said as soon as he pulled out the gun there

11  was a threat, but I felt the imminent threat as far as I

12  thought my life and my fellow officers' lives were in danger

13  at that driveway.

14  Q.  At that driveway.

15          Now, sir, before you fired those two rounds into

16  Ralphael Briscoe's back, did you know what was beyond in the

17  distance -- going -- were you aware of what was in the back

18  of this white house?

19  A.  Woods.

20  Q.  Woods.  Did you have an opportunity to look to see if

21  anybody was in that backyard in the woods before you fired

22  those two shots?

23  A.  I didn't see anybody in the yard.

24  Q.  My question is, did you have an opportunity before you

25  fired those two shots to know what was in the background?

1    A.  Can you repeat the question again?

2    Q.  Before you fired those two shots in Ralphael Briscoe's

3    back --

4              MS. FEATHERSTONE:  Objection.

5              THE COURT:  Overruled.

6    Q.  -- did you look to see what was in the backyard or at

7    the edge of the woods?

8    A.  My focus was on Mr. Briscoe.  I didn't see anybody else

9    behind him or anybody else that could have --

10   Q.  Did you look, sir, before you fired the shots?

11   A.  At the time I was focused on the threat.

12   Q.  Okay.  Because you know that there's a general order

13   that talks about before you fire shots you've got to know

14   the environment in the background.

15   A.  Correct.

16   Q.  Because other people could have been harmed in the

17   background.

18   A.  Or I could have been harmed, or somebody else -- one of

19   the officers could have been harmed as well.

20   Q.  But the purpose of the rule is to protect the citizens.

21   Do you disagree or agree with that?

22   A.  It does state that, yes.  You're supposed to know --

23   before you fire your weapon, you're supposed to know your

24   target and what's beyond.

25   Q.  And you didn't have an opportunity to realize what was

1    beyond?

2    A.  I was focused on the threat.

3    Q.  And you agree that the threat is what's depicted in the

4    videotape.  Would you agree with that?

5    A.  It's not depicted in the videotape.

6            THE COURT:  Again, we're referring to the frame

7    that's on the screen; is that right?

8            MR. PONDS:  The frame, yes.

9            If I could just have the Court's indulgence?

10           THE COURT:  Sure.

11           (Pause)

12           THE COURT:  Let's move along, Mr. Ponds.

13           MR. PONDS:  Your Honor, I'm just trying to

14   establish each frame.  It's something we need to do.  But I

15   can ask questions, and he can determine whether that...

16   Q.  Now, sir, was the last frame that we just discussed the

17   09-22.126 frame that's depicted on the -- if you could look

18   at the bottom.

19   A.  Yes.  09-22.126?

20   Q.  Yes.

21   A.  Yes.

22   Q.  Thank you.

23           THE COURT:  And what version of the video is this?

24   Is it a --

25           MR. PONDS:  It comes from --

1          THE COURT:  Is it the 50 percent version?

2          MR. PONDS:  I believe it is.

3          Is it the 50 percent version?

4          THE COURT:  Will the frame numbers be the same in

5     each of the versions?   Let's clear that up at the break.

6          MR. PONDS:  I will.

7     Q.  Sir, what did you tell the -- on April the 26th, what

8     did you tell the investigators concerning Ralphael and him

9     holding his pants up?

10    A.  I said that when I first saw Mr. Briscoe running out of

11    the -- when he first took off running, I said that he was

12    grabbing his right front waistband area as we were behind

13    him.

14    Q.  Did you ever use the word "holding his waistband"?

15    A.  Do you mind if I take a look?

16    Q.  Yes.

17    A.  (Witness reviews document) I said his right hand

18    clutching -- initially the first statement, when they asked,

19    I said he was -- with his right hand he was clutching his

20    right waistband area.

21    Q.  Well, sir, do you recall telling the investigator, "It's

22    been known that people holding their waistbands like that

23    are trying to conceal a weapon, and then once" --

24          MS. FEATHERSTONE:  What page?

25          MR. PONDS:  I'm sorry, Page 3, bottom line.

1    Q.  And I'll start again.

2            "It's been known that people holding their

3    waistbands like that are trying to conceal a weapon, and

4    then once he made a left-hand turn on the street, I could

5    see him running with a firearm in his right hand."  Do you

6    remember telling them that?

7    A.  Yes, I do.

8    Q.  And you said he was holding -- you were making a

9    reference to other people and Ralphael holding their

10   waistband?

11   A.  Yes.

12   Q.  Now, sir, when you went back on February the 7th, 2012,

13   which was about ten months after the fatal shooting, did the

14   investigators ask you any questions concerning whether

15   anyone had touched or moved anything after the shooting,

16   specifically evidence?

17   A.  I don't recall if there was a question like that.  If

18   you have a copy of it to refresh my memory?

19   Q.  Would you like a copy of your February 7, 2012,

20   statement?

21   A.  Yes.

22            MR. PONDS:  Let the record reflect I'm showing

23   defense counsel what has been marked for identification as

24   L2.

25   A.  Any particular page?

```
1    Q.  Just read -- if you could look down at the third line.

2    A.  Thank you, sir.

3         MS. FEATHERSTONE:  What page are we looking at,

4    Mr. Ponds?

5         MR. PONDS:  The last page, third line.

6    A.  (Witness reviews documents) I'm ready.

7    Q.  Were you asked the question, "Did you see anyone touch

8    or move anything after the shooting happened, like

9    evidence?"

10   A.  Yes, and my response was no.

11   Q.  And you gave a response, did you?

12   A.  Yes.

13   Q.  And you understood the nature of that question, did you

14   not?

15   A.  Yes, I did.

16   Q.  Did you believe that the investigator was talking about

17   whether anybody had --

18        MS. FEATHERSTONE:  Objection.

19   Q.  -- tampered with evidence on the scene?

20        MS. FEATHERSTONE:  Objection.

21        THE COURT:  Sustained.

22        MS. FEATHERSTONE:  Your Honor, may we approach on

23   this, please?

24            (The following is a conference held at the

25              bench outside the hearing of the jury)
```

1              MS. FEATHERSTONE:  Plaintiff does not have a good

2      faith basis to ask this question, and he's trying to taint

3      the jury.  This has nothing to do with the question about

4      something being thrown out of the window.  He just said

5      tampered with evidence.  That is a strong suggestion that's

6      beyond what he's trying to show with this other video of

7      something being thrown out of the window.  He has now taken

8      this jury into something that is not admitted in evidence.

9              MR. PONDS:  Embodied in that question -- that is

10     why I asked him, "What do you understand the question to

11     mean?"  So I believe it is a proper question, because I

12     asked him whether anybody moved --

13             THE COURT:  It says touch or move anything.  Okay?

14     Do you have a basis for -- what's your basis for the

15     question that someone touched or moved something at the

16     crime scene?

17             MR. PONDS:  I believe that's, Your Honor,

18     consistent with the videotape.  The investigators had seen

19     the tape.  I believe that this question was asked because I

20     think they believed that there was evidence that had been

21     moved, and if the item is thrown out of the vehicle, that

22     can be consistent with something being moved.

23             THE COURT:  Okay.  I'm going to sustain the

24     objection, okay.  You can ask him questions we talked about

25     this morning, but let's not get into tampering with

1        evidence.

2                MS. FEATHERSTONE:  Can you have it stricken from

3        the record, that question about tampering with evidence?

4        That tampered with evidence is a really strong suggestion of

5        something that is just not here, and I believe it's been

6        improperly planted in the jury's mind.

7                Tampering suggests more than something -- that

8        they're throwing something out the window.  He can't testify

9        -- because he's saying that the investigator believed --

10               THE COURT:  All he asked is what they asked him

11       and what his answer was.  They asked the question.  He

12       answered it.  It's his prior statement.

13               MS. FEATHERSTONE:  There's nothing in that

14       question that asks about tampering.

15               MR. PONDS:  I don't know if the Court has a copy

16       of it, but I will show -- they asked a very specific

17       question.

18               THE COURT:  I have it right here.  "Did you see

19       anyone touch or move anything after the shooting happened,

20       like evidence?

21               "ANSWER:  No."  And they went on to a different

22       question.

23               MS. FEATHERSTONE:  We're fine with that.  But it's

24       the next question where he says about tampering with

25       evidence.  That's the question we're objecting to.  Because

1    there's a suggestion to the jury that there's somewhere

2    out here evidence that there was tampering or that they

3    believed -- that the investigators believed that there was

4    tampering.  There's no evidence that they believed that in

5    that one question.

6              THE COURT:  I'll clear it up for the jury.

7              MS. FEATHERSTONE:  Thank you, Your Honor.

8              THE COURT:  I'll clear it up.

9              MS. WEST:  And for the record, Your Honor, it's L2

10   for identification only, not L2.

11             THE COURT:  Yes.

12             MR. PONDS:  What I'd ask the Court to do is that

13   -- I would ask the Court to -- if he answers yes to whether

14   he threw something out of the window, then I don't think

15   there would be a need for that because that would be

16   tampering.  I just don't think counsel understands the

17   concept of tampering.

18             Tampering doesn't --

19             THE COURT:  We'll get to that when we get to it,

20   but I'm going to clean up this.

21             MR. PONDS:  Okay, Judge.

22             THE COURT:  Okay.

23             (This is the end of the bench conference)

24             THE COURT:  Okay.  Ladies and gentlemen of the

25   jury, you just heard a question.  Mr. Ponds asked Mr. Leo

1    whether the investigators, during his -- one of his

2    interviews asked whether anyone touched or moved anything

3    from -- after the shooting happened, like evidence, and his

4    answer was that he told them no.

5         Mr. Ponds asked a follow-up question that used the

6    word "tampering."  Just so that the record's clear, the

7    investigators did not ask about tampering.  They simply

8    asked if anything was moved or touched after the shooting,

9    and Mr. Leo, I believe, answered that question no.  Okay?

10        MR. PONDS:  Thank you, Your Honor.

11   BY MR. PONDS:

12   Q.  Now, Officer Leo, when you fired those two shots at

13   Ralphael Briscoe, did you extend your arm towards the

14   window, the passenger window, the front passenger window?

15   A.  Yes.

16   Q.  And then that's when you fired the shots?

17   A.  Yes.

18   Q.  Now, sir, after Ralphael Briscoe had been shot and he

19   was down on the ground -- let me rephrase that question.

20        Who was in the vehicle with you after Ralphael

21   Briscoe had been shot?

22   A.  Officer Torres, who was seated directly behind me at the

23   time.

24   Q.  He's right behind you?

25   A.  Seated behind me, yes.

1    Q.  Okay.  Now, he was in the vehicle when you shot

2    Ralphael?

3    A.  Correct.

4    Q.  And right as soon as you shot Ralphael, he went down to

5    the ground?

6    A.  Correct.

7    Q.  Now, after Ralphael went down to the ground, prior to

8    you getting out of the vehicle, did you throw anything out

9    of the window?

10   A.  No.

11   Q.  You threw nothing out of the window?

12          MS. FEATHERSTONE:  Objection; asked and answered,

13   Your Honor.

14          THE COURT:  Sustained.

15   Q.  Did you observe Officer Torres throw anything out of the

16   window?

17   A.  No.

18   Q.  Okay.  Was that front passenger window down?

19   A.  Yes.

20          MR. PONDS:  I think this is a good stopping point,

21   Your Honor.

22          THE COURT:  Okay.  Ladies and gentlemen, we're

23   going to take our morning break for about 15 minutes so be

24   ready to come back at about ten minutes to 11:00.  Okay?

25          Leave your notebooks here.  Don't talk about the

```
 1      case.  Don't do any research about the case.

 2                  (Jury exits courtroom)

 3                  THE COURT:  Okay.  For planning purposes this

 4      afternoon, I have a telephonic hearing scheduled for 12:30

 5      so I may try to break a little bit prior to that, five or

 6      ten minutes prior to that, if you could think about that in

 7      your examination.

 8                  MR. PONDS:  Yes, sir.

 9                  THE COURT:  Okay.  Anything else?

10                  MS. WEST:  Yes, Your Honor.  Did we call Johnny to

11      get a monitor?

12                  THE COURT:  We're working on it.

13                  MS. WEST:  Okay.  Thank you.

14                  (Recess taken)

15                  THE COURT:  Okay.  So this monitor is connected to

16      our video system?

17                  Ms. Featherstone, is this going to obscure your

18      view of the jury, or can you see them?

19                  MS. FEATHERSTONE:  It's high enough that I can

20      still see under the monitor, Your Honor.

21                  THE COURT:  Anything before we bring the jury in?

22                  MR. PONDS:  Your Honor, I want to make a

23      clarification.  The video that we're using is the video

24      that's been moved into evidence.  It's the full one.

25                  THE COURT:  Okay.
```

```
 1                MR. PONDS:  And we're just slowing it down,

 2     showing -- in some aspects showing frame by frame or just

 3     showing segments of that video.

 4                THE COURT:  When you say "the full one," the full

 5     speed one?

 6                MR. PONDS:  Full speed one.

 7                THE COURT:  Okay.

 8                MR. PONDS:  I just wanted to clarify that.  I have

 9     not done a very good job in identifying the frames.

10                THE COURT:  Well, hey --

11                MR. PONDS:  Your Honor, I just want to let the

12     Court know that two gentlemen sitting on the back bench in

13     the well of the court are two of my legal assistants.

14     They're second-year law students at Howard University --

15                THE COURT:  Okay.  Welcome.

16                MR. PONDS:  -- and they've assisted on this case.

17                THE COURT:  They all aren't like this.

18                (Jury enters courtroom)

19                THE COURT:  Okay.  Welcome back.

20                Mr. Ponds.

21                MR. PONDS:  Yes, Your Honor.

22                Your Honor, at this time I'd like to publish to

23     the jury this aspect of the videotape that is a portion of

24     Exhibit 13.

25                THE COURT:  Go ahead.
```

```
 1                MR. PONDS:  May Officer Leo be permitted, because

 2     I don't believe he's going to be able to step down --

 3                THE COURT:  Maybe we can tilt it so that it's

 4     pointed more towards Officer Leo.

 5                Terri, can you help him with that perhaps?

 6                THE WITNESS:  You might want to bring it back a

 7     little bit further so -- I don't know.  Can you guys on the

 8     end see?

 9                THE COURT:  Juror No. 1 and Juror No. 6, can you

10     all see the video monitor?

11                Okay.  Mr. Leo, can you see the video monitor?

12                THE WITNESS:  Yes, Your Honor.

13                THE COURT:  And you have it in front of you as

14     well, right?

15                THE WITNESS:  Yes.

16                THE COURT:  We've brought in a larger monitor just

17     in case the smaller monitors are a little fuzzy to help aid

18     your assessment of this aspect of the video.

19                MR. PONDS:  With the Court's permission, could

20     Officer Leo step down, and I just want to point him to

21     something on the screen before we actually begin to play the

22     portion?

23                THE COURT:  Very well.

24                MR. PONDS:  Step down, sir.

25     BY MR. PONDS:
```

 1    Q.  Is this the vehicle that you were driving?

 2    A.  That's correct.

 3    Q.  Can you observe the sidewalk that adjoins the driveway?

 4    A.  Yes.

 5    Q.  Do you see anything on that sidewalk?

 6    A.  No.

 7    Q.  Okay.  You can take the stand.

 8              MR. PONDS:  If we can begin.

 9              MS. WEST:  Billy.

10              MR. PONDS:  What?

11              MS. WEST:  What's the frame?

12              MR. PONDS:  If you could -- what is the frame,

13    Mr. Thomas?

14              MR. THOMAS:  The start.

15              MR. PONDS:  Start.  We're at zero.

16              All right.  If you could start it by clicking,

17    Mr. Thomas.

18              Officer Leo, can you step down, please.

19    Q.  Do you see underneath that arrow?  Do you see that item

20    underneath the arrow?

21    A.  Yes.  The little dot?

22    Q.  Yes.

23              MS. FEATHERSTONE:  Objection, Your Honor.  May we

24    approach very briefly?

25              THE COURT:  Yes.

```
 1                    (The following is a conference held at the

 2                     bench outside the hearing of the jury)

 3              MS. FEATHERSTONE:  The only issue I have is the

 4     arrow.  It is the arrow.  He's using the arrow, and he's

 5     mimicking trying to establish that it's coming out of the

 6     car.  That's part of the question.

 7              Mr. Ponds isn't doing it.  His videographer is

 8     doing it.  He keeps taking the arrow and going back forth.

 9              THE COURT:  Have him place the cursor underneath

10     what it is you want to draw the witness's attention to.

11              MR. PONDS:  If he places it underneath the object,

12     is that fine?

13              THE COURT:  That's fine.  And then I'll give you a

14     little leeway, but don't suggest in your question that it's

15     an item.  "What do you see?"

16              MR. PONDS:  Oh, no.

17              THE COURT:  "Can you see something?"  "Do you see

18     something dark?"

19              You can describe it to him, but don't suggest in

20     your question that it is an item.

21              MR. PONDS:  Yes.

22              THE COURT:  Okay.

23              (This is the end of the bench conference)

24              MR. PONDS:  Mr. Thomas, the arrow, if you could

25     place it beneath that object.
```

1   BY MR. PONDS:

2   Q.  Now, Officer Leo, was that object thrown out of your

3   vehicle?

4   A.  No.

5   Q.  Did you observe it come from the direction of your

6   vehicle?

7   A.  Did I observe it come from the direction of my vehicle?

8   Q.  Right.

9   A.  It's a small object.  I don't know what that is.

10  Q.  Okay.  Well, let me ask you this:  In looking at the

11  video -- and we're talking about Frame 0.080 -- does it

12  appear that Ralphael Briscoe -- he's down at this point?

13  A.  I believe so.  I can't see.

14  Q.  You can move closer if you need to.

15  A.  Well, you can't see him in the frame because I believe

16  there's a trash can right there or some bushes.

17  Q.  Well, do you see him standing, is my question?

18  A.  No, I don't.

19  Q.  Okay.  All right.  And he fell as soon as you shot him?

20  A.  Yes.

21  Q.  Okay.  If you could continue --

22          MS. WEST:  No, no, excuse me, Your Honor.

23          MR. PONDS:  And the frame number is 0.085.

24          Next frame, Mr. Thomas.  Did you click it again?

25  Click it forward.  Did you put the arrow?  Underneath the

1    object, underneath.

2    Q.  Do you see that, sir, that dark whatever it is?

3    A.  Blurry object.

4    Q.  Has moved?

5    A.  Yes.  I see that moved slightly.

6    Q.  Okay.  And you also notice that the sidewalk that

7    adjoins the driveway is still clear?

8    A.  There's something underneath that sign.  I don't know if

9    it's a shadow or what.

10   Q.  Well, we'll continue.

11             MR. PONDS:  And that is at frame -- well, we'll

12   continue to the next frame.  0.160 was that frame.

13             Can we move to the next frame.

14   Q.  You no longer see that object.  Can you see that object

15   at this point?

16   A.  No.

17   Q.  Okay.

18             MR. PONDS:  0.200.  Next frame.

19             Thank you, Ms. West.

20   Q.  Do you see it in Frame 0.40?

21   A.  No.

22             MS. WEST:  0.240.

23   Q.  And this frame is 0.280.  Do you see it in that frame?

24   A.  No.

25   Q.  Besides this sign post, what appears to be a sign post,

```
1    you don't see anything else that is close -- on that

2    sidewalk close to the driveway, do you?

3    A.   Do I see anything close to the driveway?

4    Q.   Yes, any object laying on the sidewalk?

5    A.   No.

6    Q.   All right.

7              MR. PONDS:  Next frame, which is 0.30.

8    Q.   Do you see anything that has landed on that first block

9    of the sidewalk yet?

10   A.   Which first block?

11             MS. FEATHERSTONE:  Objection.

12             THE COURT:  Sustained.

13   Q.   Well, sir -- well, let's just go -- let's put it in the

14   next frame.

15             MS. WEST:  Excuse me, it was 0.320, that previous

16   one.

17             MR. PONDS:  I think that you've changed something.

18   Well, our screen is a little different.

19             Let Mr. Thomas handle it.  This frame is 0.360.

20   Q.   Can you see the object now, Officer Leo?

21   A.   No.

22             MR. PONDS:  Next frame.  That point is 0.400.

23   Q.   Do you see anything in the frame now?

24   A.   No.

25   Q.   And would you agree that Mr. Briscoe's not standing?
```

1    A.  Yes.

2    Q.  Okay.

3          MR. PONDS:  Next frame.  That frame is 0.480.

4    Q.  Do you see anything in that frame?

5    A.  No.

6    Q.  Is Mr. Briscoe still down?

7    A.  Yes.

8          MR. PONDS:  Next frame, 0.560.

9    Q.  Do you see that object again?

10         MS. FEATHERSTONE:  Objection.

11         THE COURT:  Sustained.

12   Q.  Well, do you see the object that you had previously

13   stated that you saw?

14         MS. FEATHERSTONE:  Objection.

15         THE COURT:  Sustained.

16   Q.  Well, sir, let me ask you this:  Is Ralphael Briscoe

17   still down on the ground?

18   A.  I believe so.

19   Q.  Do you see anything on the sidewalk that has changed

20   from any of the other frames?

21   A.  There's more -- there's more blurs.  It's not a clear

22   picture.

23   Q.  Okay.

24         MR. PONDS:  Next frame.  This frame is 0.600.

25   Q.  Is Mr. Briscoe still down?

```
 1    A.  Yes.

 2              MR. PONDS:  Next frame, 0.640.

 3    Q.  Is Mr. Briscoe still down?

 4    A.  Yes.

 5              MR. PONDS:  Next frame, 0.680.

 6    Q.  Is Mr. Briscoe still down?

 7    A.  Yes.

 8    Q.  Okay.  And you're still in your vehicle?

 9    A.  Yes.

10              MR. PONDS:  Next frame, 0.720.

11    Q.  Are you still in your vehicle?

12    A.  Yes.

13    Q.  Is Mr. Briscoe still down on the ground?

14    A.  Yes.

15              MR. PONDS:  Next frame, 0.760.

16    Q.  Are you still in your vehicle?

17    A.  Yes.

18    Q.  Is Mr. Briscoe still down on the ground?

19    A.  Yes.

20              MR. PONDS:  Next frame, 0.80.

21    Q.  Is the view of the sidewalk clearer in this frame?

22    A.  Yes.

23    Q.  Okay.  Do you see anything besides that sign that's in

24    that first block of the sidewalk?

25    A.  It looks like it could be a shadow or something.
```

1    Q.  It could be a shadow, okay.

2            MR. PONDS:  And this frame is 0.80, 0.800.

3            Next frame.

4    Q.  Now, sir, do you see that object that was not there

5    before?

6    A.  Yes.

7    Q.  It's there now?

8    A.  Correct.

9    Q.  You would agree it was in the previous frame?

10   A.  Correct.

11   Q.  And Mr. Briscoe's been down for quite some time at this

12   point.  Well, let me rephrase the question.

13           In the previous frames that we've shown you, was

14   Mr. Briscoe down?

15   A.  Yes.

16   Q.  And you were in your vehicle?

17   A.  Yes.

18   Q.  And you saw that -- in the previous frames you saw that

19   object near your vehicle?

20           MS. FEATHERSTONE:  Objection.

21   Q.  Well, did you see it near your vehicle on the screen?

22   A.  I saw what you pointed out, and I saw a small object

23   near the vehicle, yes.

24   Q.  Okay.  Now, do you see this small object on the ground?

25           MS. FEATHERSTONE:  Objection.

1    Q.  Well, do you see that small object on the ground, on the

2    sidewalk?

3    A.  Are you trying to say -- is that the same object?  I

4    can't say for certain.

5    Q.  Well, no, I'm just asking you now if this is -- do you

6    see this object that just appeared in this frame?

7    A.  I see that object, yes.

8    Q.  And it was not in the previous frame?

9    A.  Correct.

10   Q.  All right.  And it was not -- this object, this line in

11   the first block of the sidewalk was not on the -- well, the

12   question is -- remember the previous question I asked you

13   when you looked at the sidewalk, and you said it was clear,

14   when we began?

15   A.  Yes.

16          MS. FEATHERSTONE:  Objection to the -- objection,

17   Your Honor.  Which frame?

18          THE COURT:  Rephrase.

19   Q.  The first frame when we began to start?

20   A.  Yes, I remember.

21   Q.  And you didn't see it in the second frame, that object?

22   A.  No.

23   Q.  And you didn't see it in any of the other frames?

24   A.  No.

25   Q.  Up until this frame.

1    A.  Correct.

2    Q.  Who threw it out of the vehicle?

3            MS. FEATHERSTONE:  Objection, Your Honor.

4            THE COURT:  Sustained.

5            MS. FEATHERSTONE:  Move to strike.

6            MR. PONDS:  If you could take the stand, sir.

7            THE COURT:  Mr. Leo.

8            Ladies and gentlemen of the jury, you will

9    disregard the last question, okay?

10           MS. FEATHERSTONE:  Your Honor, may we move the

11   video screen over just a little bit because it is blocking

12   our view.

13           THE COURT:  Are we done with the video screen?

14           MR. PONDS:  Oh, yes, we are.

15           THE COURT:  Okay.

16   Q.  Going back to what we just saw in the last frame, do you

17   see Plaintiff's Exhibit 4D?

18   A.  Yes.

19   Q.  Okay.  Do you see the object -- do you remember, when we

20   just looked at the last frame of the video, the item that

21   landed in the first block of the sidewalk?

22           MS. FEATHERSTONE:  Objection, Your Honor.

23           THE COURT:  Sustained.

24   Q.  Well, sir, do you recall, based on viewing the last

25   frame on the video, where that object landed?

```
1                    MS. FEATHERSTONE:  Objection, Your Honor.

2                    THE COURT:  Sustained.

3                    MS. FEATHERSTONE:  Move to strike.  May I ask if

4       we could approach?

5                    THE COURT:  Okay.

6                    MS. FEATHERSTONE:  Thank you.

7                    (The following is a conference held at the

8                     bench outside the hearing of the jury)

9                    THE COURT:  You have to say where the object

10      appears on the video, not where it landed.  That suggests --

11                   MR. PONDS:  Okay, where it appears.  Okay.  I'm

12      sorry, Judge.

13                   THE COURT:  Where it shows up or appears.  Because

14      "landed" suggests that -- is that your objection?

15                   MS. FEATHERSTONE:  It is, Your Honor.  Mr. Ponds

16      knows exactly what he's saying, and he's trying to impute to

17      this jury that it was thrown from this car.

18                   THE COURT:  Well, I sustained your objection.

19                   MS. FEATHERSTONE:  Thank you, Your Honor.

20                   (This is the end of the bench conference)

21      BY MR. PONDS:

22      Q.  Officer Leo, looking at Plaintiff's Exhibit 4D, do you

23      know what the object is that is in the -- on 4D, what is in

24      the first block of 4D?

25      A.  I believe that's one of the pistol grips.
```

1    Q.  It's one of the pistol grips.  From the pistol that was

2    recovered from the scene?

3    A.  Correct.

4    Q.  And do you see Plaintiff's Exhibit 4I?

5    A.  Yes, I do.

6    Q.  Okay.  Do you see that Placard 3?

7    A.  Yes.

8    Q.  Where is that located, sir?

9    A.  On the sidewalk.

10   Q.  Can you tell us which block of the sidewalk?

11   A.  Well, the entrance to the driveway.  It's the first

12   block next to the entrance of the driveway.

13   Q.  The first block.  And in viewing the videotape, does it

14   appear that the item that was on the videotape lands in that

15   first block?

16          MS. FEATHERSTONE:  Objection, Your Honor.

17          THE COURT:  Sustained, Mr. Ponds.

18   Q.  Well, sir --

19          THE COURT:  Rephrase.

20   Q.  -- where does that object appear to land?

21          MS. FEATHERSTONE:  Objection, Your Honor.

22          THE COURT:  Sustained.  One more time, Mr. Ponds.

23   Q.  Sir, in viewing the videotape, based on your perception

24   of that videotape, where does that object land?

25          MS. FEATHERSTONE:  Objection.

```
 1                    MR. PONDS:  If we could just approach, Your Honor?

 2                    THE COURT:  Okay.

 3                    (The following is a conference held at the

 4                     bench outside the hearing of the jury)

 5                    THE COURT:  Does the object that appears on the

 6         video -- is the object that appears on the video in the

 7         location of Placard 3?

 8                    MR. PONDS:  Okay.  I'm just trying to -- it's me.

 9         Sleep deprivation, Judge.  Write it down for me, Ms. West.

10                    MS. WEST:  I am.  I am.

11                    THE COURT:  Is the object that you testified to --

12                    MS. WEST:  The object that appears on the video.

13                    THE COURT:  -- located where Placard 3 appears on

14         the sidewalk?  All right?

15                    MS. FEATHERSTONE:  Right, Your Honor, and I would

16         object --

17                    THE COURT:  The implication is that when you say

18         "lands," it suggests that he's agreeing to your

19         characterization that it was thrown.

20                    MS. FEATHERSTONE:  Yes.

21                    THE COURT:  Something that is thrown lands.

22         Something that appears on the video, who knows how it got

23         there?

24                    MR. PONDS:  I understand, Judge.

25                    MS. FEATHERSTONE:  Your Honor, at this point we've
```

1    objected so many times that the jury may think we're trying

2    to cover something up and may think the evidence is coming

3    in appropriately.

4              THE COURT:  I sustained the objection.  I

5    sustained the objection.  They get it.  They get it.

6              MS. FEATHERSTONE:  Okay.  Okay.

7              (This is the end of the bench conference)

8    BY MR. PONDS:

9    Q.  Officer Leo, is the object that appears in the videotape

10   located where Placard 3 appears on the sidewalk?

11   A.  Am I supposed to be looking at the picture again?

12   Because it just went off my screen.

13   Q.  Sorry.

14   A.  Can you repeat the question again?

15   Q.  Yes.  Is the object that appears on the video located

16   where Placard 3 appears on the sidewalk?

17   A.  The object -- can you repeat it one more time?  I'm

18   sorry.

19   Q.  Is the object that appears on the video --

20   A.  Which object?

21   Q.  The object that appears on the video.

22   A.  Which frame?

23   Q.  The very first or second frame.  Do you recall seeing an

24   object in the very first beginning frames?

25   A.  A very small object.

```
 1     Q.  Right.  And in subsequent frames it landed somewhere?

 2               MS. FEATHERSTONE:  Objection, Your Honor.

 3               THE COURT:  Let me do this.

 4               MR. PONDS:  Yes, sir.

 5               THE COURT:  Mr. Leo, we spent a long time looking

 6     at the video, and you went frame by frame.

 7               THE WITNESS:  Correct.

 8               THE COURT:  And at some point during that video

 9     what appears to be a black object shows up on the video.  Do

10     you recall that?

11               THE WITNESS:  Yes.

12               THE COURT:  And I think what he's asking you is

13     where that object appeared on the video, is that at or near

14     where Placard 3 appears on the sidewalk on Plaintiff's

15     Exhibit 4D?

16               THE WITNESS:  Yes, on the last frame with the

17     black object appears to be where Object 3 is.

18               THE COURT:  Okay.

19               MR. PONDS:  Thank you so much, Your Honor.

20               I think I may be done, Your Honor.  I just want to

21     check a few things.

22     Q.  Officer Leo, the object that appears on the video, does

23     it appear to come from the direction of your vehicle?

24     A.  From the frames that you're showing me, and the small

25     object, there was a point in time in the frame where that
```

1    object disappeared, and from my -- from viewing that, it

2    looked like it did not -- it looked like that black object

3    just, on that last frame, appeared.

4    Q.  Okay.  Well, let me rephrase the question, sir.

5            In the first or the second frame that you were

6    shown, does it appear that the object that's in the video is

7    near your vehicle?

8    A.  It's hard to say.  It could have been the shell casing.

9    Q.  Okay.  Do you recall where the shell casing was

10   recovered?

11   A.  I believe it's Item No. 2.

12   Q.  Item No. 2.  And do you recall the question that Judge

13   Cooper asked you and the answer that you gave concerning

14   where the object that appears in the video, whether you knew

15   where it landed?

16           MS. FEATHERSTONE:  Objection.

17           THE COURT:  Sustained.

18   Q.  Well, sir, would you like me to play the video in

19   reverse to see if it goes back to your vehicle from the

20   place where it landed?

21           MS. FEATHERSTONE:  Objection.

22           THE COURT:  Overruled.

23   Q.  Would you like me to do that?

24   A.  For what?  To show what Item No. 3 was?

25   Q.  Yes, to see if Item -- well, to see if that object goes

1     back to your vehicle?

2              MS. FEATHERSTONE:  Objection to the form of the

3     question, Your Honor.

4              THE COURT:  Sustained.

5     Q.  Would you like to see the video again?

6              MS. FEATHERSTONE:  Objection.

7              THE COURT:  Sustained.

8              MS. WEST:  May I have a moment, Your Honor?

9              THE COURT:  Sure.

10             Mr. Ponds, you can show him the video and ask him

11    questions about it, if that's what you want.

12             MR. PONDS:  Okay.  Well, we'll play it.

13             Mr. Thomas, if you can set it up.

14             (Pause)

15             MR. PONDS:  You can stand until they set it up.

16             THE WITNESS:  Thank you, Mr. Ponds.

17    Q.  Officer Leo, while they're setting up the video again,

18    were you trained at the academy in the use of force?

19    A.  Yes, I was.

20    Q.  And in specifically use of force continuum?

21    A.  Yes.

22    Q.  And are you aware of your -- you're aware of your

23    general orders concerning the use of force continuum?

24    A.  Yes, sir.

25    Q.  And you're also familiar with the general orders

1   concerning excessive force?

2   A.  Yes.

3   Q.  And you were taught those subject matters in the

4   academy?

5   A.  Correct.  And we get a refresher on the use of force

6   continuum every time we go to the range and requalify twice

7   a year.

8   Q.  And were you taught, in terms of use of force, what is

9   objectively reasonable?  Were you taught that in the

10  academy?

11  A.  Yes, sir.

12  Q.  As well as the two landmark Supreme Court cases

13  concerning that subject matter?

14  A.  The two landmark Supreme Court cases?

15  Q.  Right.  I think it's *Tennessee vs. Garner* and *Graham vs.*

16  *Connor.*

17  A.  We may have.  I'm not familiar with them, but yes, we

18  may have, yes.

19  Q.  You may want to step down again, Officer Leo.

20          Let's just wait.  He's trying to get a signal.  No

21  signal.

22          Okay.  Why don't you step down, and I'll place

23  this so everybody can see.

24          Officer Leo, do you see that -- do you see

25  something on the sidewalk?

1    A.  Yes.  That's the black object.

2    Q.  Okay.

3          MR. PONDS:  And we're on Frame 0.840.  If you

4    could go in reverse clicking each time until I tell you to

5    stop.  If you could stop, Mr. Thomas.

6    Q.  Officer Leo, looking at Frame 0.640, do you see that

7    object that -- that dark object on the sidewalk?

8    A.  No.

9    Q.  Okay.

10         MR. PONDS:  Click one more -- go back one more,

11   Mr. Thomas.

12   Q.  We're looking at Frame 0.60, 0.600.  Do you see anything

13   in that frame now, Officer Leo?

14         MS. FEATHERSTONE:  Your Honor, please don't move

15   the arrow.

16         MR. PONDS:  Don't move the arrow around please,

17   okay.

18         Click one more time.  Go back.  Continue in

19   reverse.

20   Q.  We're looking at Frame 0.560.  Do you see anything -- do

21   you see that black object in this frame?

22   A.  No.

23         MR. PONDS:  Let's click another -- one more

24   section of the frame.

25   Q.  0.520.  Do you see the black object now, Officer Leo?

```
 1    A.  No.
 2              MR. PONDS:  Next frame, Mr. Thomas.
 3    Q.  We're looking at Frame 0.480.  Do you see any -- that
 4    black object in that frame, sir?
 5    A.  No.
 6              MR. PONDS:  Next frame backwards, Mr. Thomas.
 7    Q.  This is Frame 0.440.  Do you see the object in that
 8    frame, sir?
 9    A.  No.
10    Q.  Okay.
11              MR. PONDS:  Backwards one more time, Mr. Thomas.
12    Q.  We're looking at Frame 0.40.  Do you see anything in
13    that frame, that black object in that frame, Officer Leo?
14    A.  No.
15    Q.  Okay.
16              MR. PONDS:  Continue in reverse with another
17    click, Mr. Thomas.
18    Q.  We're looking at Frame 0.360.  Do you see any -- that
19    black object in that frame, sir?
20    A.  No.
21              MR. PONDS:  If you could reverse one more time,
22    one more click, Mr. Thomas.
23    Q.  We're looking at Frame 0.320.  Do you see anything in
24    that frame, sir?
25    A.  No.
```

```
1              MR. PONDS:  Reverse one more time, Mr. Thomas.

2    Q.  Looking at Frame 0.8 -- 0.280, do you see that black

3    object at this point?

4    A.  No.

5              MR. PONDS:  Reverse one more time, Mr. Thomas.

6    Q.  Looking at Frame 0.240, do you see anything in that

7    frame, sir?

8    A.  No, sir.

9              MR. PONDS:  If you could reverse one more time,

10   Mr. Thomas, one click.

11   Q.  Looking at Frame 0.200, do you see the black object in

12   that frame?

13   A.  No, sir.

14             MR. PONDS:  If you could click in reverse one more

15   time, Mr. Thomas.  You can put it there, Mr. Thomas,

16   underneath.

17   Q.  Do you see that item on the video underneath the arrow?

18   A.  Yes.  I see that.

19   Q.  Okay.

20             MS. WEST:  Billy, what frame is that?

21             MR. PONDS:  That frame is 0.160.

22             Click one more time, Mr. Thomas, going into

23   reverse.  Okay.  Put the arrow --

24   Q.  Do you see that object?

25             MS. FEATHERSTONE:  Objection.
```

1          THE COURT:  Sustained.

2    Q.  Do you see anything on the video, sir, underneath the

3    arrow?

4    A.  I do see an object underneath the arrow.

5    Q.  Now, has that object moved since --

6          MS. FEATHERSTONE:  Objection to the form of the

7    question, Your Honor.

8          THE COURT:  He asked him if he saw anything, and

9    he gave an answer.  Overruled.

10         MR. PONDS:  Can you click in reverse, Mr. Thomas,

11   one.

12         MS. CUBBAGE:  What frame is it?

13         MR. PONDS:  This frame is 0.20.

14   Q.  Let me ask you this  --

15         MR. PONDS:  I'm so sorry.  It's 0.120.

16         MS. WEST:  Right.

17   Q.  Officer Leo, is that object closer to your vehicle now?

18   A.  As compared to the last frame?

19   Q.  Yes.

20   A.  Can you put the other frame forward again?

21   Q.  Yes.

22         MR. PONDS:  One click forward, Mr. Thomas.

23         MS. WEST:  And that frame is...?

24   Q.  Okay.  We're looking at Frame 1 -- excuse me -- 0.160.

25   Do you see the object in that frame?

1    A.  Yes.

2              MR. PONDS:  And now let's click in reverse back to

3    0 -- I believe it's 2 -- 0.120.  If you'd put the arrow

4    under the object, Mr. Thomas.

5    Q.  Do you see the object?

6    A.  Yes.

7    Q.  Is it closer to your vehicle than the previous frame?

8    A.  It appears so.

9    Q.  Okay.

10             MR. PONDS:  One more click, Mr. Thomas.  If you'd

11   put the arrow --

12   Q.  Do you see the object?

13             MS. FEATHERSTONE:  Objection, Your Honor.

14             THE COURT:  Sustained.

15   Q.  Well, do you see anything on the video?

16   A.  Right under the arrow?

17   Q.  Yes.

18   A.  There's an object underneath the arrow.

19   Q.  Is that object closer to your vehicle than the previous

20   frame?

21   A.  It looks like it.

22             MS. WEST:  080.

23             MR. PONDS:  0.080.  And click one more time,

24   Mr. Thomas?  Ms. West --

25             MS. WEST:  But then I can't see it.

1          MR. PONDS:  Mr. Thomas, could you use the arrow,

2     and don't move it, please.

3     Q.  Do you see anything on the video at this point?

4     A.  Under the arrow, yes, I see a small object.

5     Q.  Okay.

6          MR. PONDS:  If you could click -- and once

7     again --

8          MS. WEST:  0.080.

9          MR. PONDS:  And if you could click it one more

10    time in reverse, Mr. Thomas.

11          MS. WEST:  Billy, you're good.

12    Q.  Now, we're looking at Frame 0.040.  Do you see any -- do

13    you see the object on the screen at this point?

14    A.  No, sir.

15    Q.  Was it -- was that object closer -- was the object in

16    the previous frame very close to your view?

17    A.  It appears so.

18    Q.  Going in reverse and going through each frame, taking

19    it from whatever was on the sidewalk back towards your

20    vehicle, did it get closer and closer to your vehicle as we

21    went back -- as we reversed in frames?

22    A.  From the point that I could see it by going in reverse,

23    the first time I saw it by going in reverse it did appear

24    that it was getting closer and closer to the vehicle.

25          MR. PONDS:  You can retake the stand, Officer.

1     And the last frame is 0.040.

2              If you can come down, please -- is it in this

3     frame?

4              Officer Leo, if you could just step down for a

5     second.

6     Q.  This is Frame 0.08.  Do you see anything, any object,

7     near your vehicle?

8              MR. PONDS:  If you could use the arrow,

9     Mr. Thomas.

10    Q.  Do you see anything?

11    A.  Yes.  There's a small -- a tiny object right where that

12    arrow is pointing.

13    Q.  Okay.

14             MR. PONDS:  And this is Frame 0.08.

15             MS. WEST:  No, no, 0.080.

16             MR. PONDS:  0.080.

17             MS. WEST:  Yes.

18             MR. PONDS:  That's it.  That's it.

19    Q.  Now, sir, you've had an opportunity --

20             MR. PONDS:  If I could approach the witness, Your

21    Honor?

22             THE COURT:  You may.

23    Q.  Officer Leo, I'm going to show you what has been moved

24    into evidence as Defendants' Exhibit 137.

25             MS. FEATHERSTONE:  Sorry, I missed -- plaintiff's

1    exhibit?

2           MR. PONDS:  Plaintiff's exhibit, I'm so sorry.

3    Q.  Plaintiff's Exhibit 137, and I'll get you the exhibit on

4    the other grip.

5           Can you look at Plaintiff's Exhibit 137.  And I'm

6    going to show you what has already been moved into evidence

7    as Plaintiff's Exhibit 68.  Can you look at both of those.

8    A.  (Witness reviews exhibits)

9    Q.  Okay.  Do you recognize what 137 and Plaintiff's

10   Exhibit -- I think it's 68; do you know what those items

11   are, sir?

12   A.  Those are grips on the pistol.

13   Q.  The grips from the pistol?

14   A.  Correct.

15   Q.  That was the BB pistol that was found on the scene?

16   A.  Correct.

17   Q.  And were those grips found in different locations?

18   A.  Yes.

19   Q.  And one of the grips, if you look at Plaintiff's Exhibit

20   4I, was found --

21   A.  I'm sorry, I can't see the -- the evidence is 4I that

22   I'm looking at right now?

23   Q.  Let me pull it down.

24   A.  Thank you.

25   Q.  One of those grips was found where Placard 3 is.

1     A.   Correct.

2     Q.   And is that the first block of the sidewalk?

3     A.   Yes.

4     Q.   Now, Item 2, what did you recognize what -- Placard 2,

5     what was by Placard 2?

6     A.   That was a shell casing.

7     Q.   That was a shell casing.

8     A.   Yes.

9     Q.   All right.  And the shell casing is a little -- from

10    a -- you were using a 9 millimeter Glock 17, right?

11    A.   That's correct.

12    Q.   And a shell casing in a 9 millimeter from a Glock is

13    very tiny?

14    A.   Yes.

15    Q.   And that is what ejected out of your gun when you fired

16    your gun?

17    A.   Yes.

18    Q.   Okay.  I'd like to --

19              MR. PONDS:  If I could approach the witness, Your

20    Honor?

21              THE COURT:  You may.

22    Q.   Let me show you, for identification purposes,

23    Plaintiff's Exhibits 15A and 15B.  If you'd look at those

24    two, and tell me if you recognize those items, sir.

25    A.   (Witness reviews exhibits) These are spent shell

1    casings.

2    Q.  And those are the shell casings that were ejected from

3    your Glock 17 after you shot Ralphael Briscoe?

4    A.  Yes, they could -- the same date.

5    Q.  Okay.  Because you fired two shots?

6    A.  Correct.

7    Q.  And one of the casings ended up -- looking at

8    Plaintiff's Exhibit 4I, one ended up in -- actually in the

9    street?

10   A.  Yes.

11   Q.  Okay.  It didn't end up on the sidewalk?

12   A.  That's where he found it.

13   Q.  Right.  And there was another one found inside your

14   vehicle?

15   A.  Correct.

16          MR. PONDS:  Your Honor, the plaintiff would move

17   in Plaintiff's Exhibits 15A and 15B.

18          MS. FEATHERSTONE:  No objection.

19          THE COURT:  So moved.

20   Q.  And if you could hold up 15A --

21          MR. PONDS:  Permission to publish to the jury?

22          THE COURT:  You may.

23   Q.  If you could, hold up 15A -- Plaintiff's 15A and

24   Plaintiff's 68 so the jury can see it.

25   A.  (Witness complies)

1    Q.   Thank you, sir.

2              MR. PONDS:  I have no further questions, Your

3    Honor.

4              THE COURT:  Thank you, Mr. Ponds.

5              MS. FEATHERSTONE:  Your Honor, the defense will

6    call Officer Leo in its case in chief.

7              THE COURT:  Okay.  Officer Leo, you're excused.

8              THE WITNESS:  Thank you, Your Honor.

9              THE COURT:  You can go back to the defense table.

10             Who do we have next, Mr. Ponds?

11             MR. PONDS:  Yes, I would ask to call Officer Todd

12   Korson to the stand.

13             THE COURT:  Very well.

14             MR. PONDS:  The Court's indulgence.  I just want

15   to consult with counsel about the whereabouts of the

16   witness.

17             THE COURT:  (To the jury ) Is everybody doing

18   okay?

19             MS. FEATHERSTONE:  He's in the anteroom.  He just

20   gave us the evidence.

21             MR. PONDS:  If I could go out and retrieve him?

22             (Pause)

23             THE COURT:  Good morning, Mr. Korson.

24             THE WITNESS:  Good morning, Your Honor.

25                       TODD KORSON, Sworn

```
 1                        DIRECT EXAMINATION

 2     BY MR. PONDS:

 3     Q.   Good afternoon, Officer Korson.

 4     A.   Good afternoon, sir.

 5     Q.   Thank you for joining us today, sir.

 6     A.   Yes, sir.

 7     Q.   Could you state your full name for the record.

 8     A.   Last name is Korson, K-o-r-s-o-n.  First name is Todd.

 9     My middle is Mike.

10     Q.   Who is your current employer?

11     A.   Metropolitan Police Department.

12     Q.   How long have you been a member of the Metropolitan

13     Police Department?

14     A.   Just short of 15 years.

15     Q.   15 years.  And what unit are you assigned to, sir?

16     A.   Seventh District, PSA 708 currently.

17     Q.   And what are your responsibilities at the Seventh

18     District?

19     A.   Patrol officer, field training officer, and crisis

20     intervention officer.

21     Q.   I want to bring your attention to the afternoon of

22     April the 26th, 2011.  Did you have an opportunity to

23     respond to -- did you respond to the 2400 block of Elvans

24     Road, Southeast?

25     A.   Yes, sir.
```

1    Q.   And what was the purpose of your responding there?

2    A.   Call for assistance by the GRU unit, as I recall.

3    Q.   Okay.  And you responded to the area?

4    A.   Yes.

5    Q.   And at some -- did you notice that there was a young

6    black male who was suffering from gunshot wounds?

7    A.   Yes.

8    Q.   And at some point did an ambulance arrive?

9    A.   Yes.

10   Q.   And did you -- once the ambulance arrived, what did you

11   do, sir?

12   A.   I went in the ambulance with the individual to the

13   hospital.

14   Q.   What was the purpose of you accompanying Mr. Briscoe to

15   the hospital?

16   A.   That he was under arrest.

17   Q.   He was under arrest?

18   A.   Yes.

19   Q.   Okay.  And did Mr. Briscoe make any statements to you

20   while he was in the ambulance?

21   A.   To me, no.

22   Q.   Okay.  Did you overhear any statements that he made to

23   anyone?

24   A.   He spoke with the firemen.  I don't remember what he

25   specifically said to the firemen.

1   Q.  If I showed you -- is there anything that would refresh

2   your recollection?

3   A.  If you've got some paperwork, I can look at it.

4   Q.  Okay.

5             MR. PONDS:  Your Honor, may I approach the

6   witness?

7             THE COURT:  You may.

8   Q.  Officer Korson, I'd like to show you what has been

9   marked for identification as TK1.  See if that refreshes

10  your recollections.

11  A.  (Witness reviews document) Yes, sir.

12  Q.  Sir, did Mr. Briscoe make any statements while he was in

13  the ambulance and brought to the hospital?

14  A.  Like I said here, it was either in the ambulance or at

15  the hospital.  I believe it was at the hospital.  I believe

16  it was when we actually got to the hospital.

17  Q.  And what did you overhear him say?

18  A.  It was words to the effect of, "Am I going to die?" or

19  "Am I dying?"  Something like that.

20  Q.  And at that time you were not aware of what the young

21  man's name was?

22  A.  No.

23  Q.  He was entered in the hospital -- was he entered into

24  the hospital as a John Doe?

25  A.  I would assume so.  That would be their normal procedure

1    whether they knew his name or not.  He was under arrest so

2    they would have done him as John Doe.

3    Q.  So when a person is arrested, and they have to get

4    medical treatment, and they have to go to the hospital,

5    they're registered as a John Doe?

6    A.  That's what's supposed to happen, yes.  That way the

7    family --

8    Q.  The family members can't visit him?

9    A.  Family, friends, whatever, yes.

10   Q.  Because he's in police custody?

11   A.  Yes.

12   Q.  So his mother wouldn't have been able to --

13            MS. FEATHERSTONE:  Objection.

14            THE COURT:  Overruled.

15   Q.  So his mother would not have been able to visit him?

16   A.  No.  Not at that point, no.

17   Q.  Not at that point?

18   A.  That would have been hospital standards, however, as

19   well.  He was in the ER and then responded to surgery.  No

20   one goes in.

21   Q.  Well, specific to MPD, while he was in custody, he would

22   not have been able to see his mother?

23            MS. FEATHERSTONE:  Objection.

24            THE COURT:  Sustained.

25   Q.  Did you wait outside the operating room?

1    A.  Yes.  At one point I stepped out of the operating room

2    and waited, yes.

3    Q.  All right.  Were you armed at the time, sir?

4    A.  Yes.

5    Q.  Who did he make the remark to that -- when he said, "I'm

6    going to die"?

7            MS. FEATHERSTONE:  Objection.

8            THE COURT:  Rephrase.

9    Q.  Did you hear -- when Mr. Briscoe made any statements, do

10   you recall who he was making those statements to?

11   A.  I'm not sure who he was saying them to.  I believe it

12   was to medical staff.  That's what I believe.

13   Q.  Now, sir, had you -- do you recall approximately what

14   time the ambulance arrived on the 2400 block of Elvans Road?

15   A.  No, I don't remember the time.

16   Q.  And do you recall, sir, who requested that you -- do you

17   recall which police official --

18   A.  I do not recall.

19           THE COURT:  Let him finish the question.

20           THE WITNESS:  Oh, I'm sorry.

21           MR. PONDS:  Thank you.  It's been a long morning

22   so I'm just thinking it through.

23           THE WITNESS:  Understood.

24   Q.  Do you recall what police official asked you to detain

25   Ralphael Briscoe?

1    A.  No, I do -- I don't recall.

2    Q.  Do you recall if it was an officer?

3    A.  I don't recall.

4           MR. PONDS:  Thank you, sir.  I have no further

5    questions.

6           THE WITNESS:  You're welcome, sir.

7           THE COURT:  Ms. Featherstone?

8           MS. FEATHERSTONE:  Very briefly, Your Honor.

9                         CROSS-EXAMINATION

10   BY MS. FEATHERSTONE:

11   Q.  Officer Korson, when you got to the hospital, how long

12   before Mr. Briscoe was taken into surgery?

13   A.  Oh, it was very quick.  We went into the emergency room.

14   As standard procedure, a lot of doctors and nurses were

15   around him.  They did their brief cursory once-over, and

16   then we moved from there to the surgery room.

17           Then the surgeons had to get prepared, maybe five

18   minutes there, and then they admitted anesthesia for

19   surgery.

20   Q.  And is that -- was that the time Mr. Briscoe was no

21   longer awake?

22   A.  Correct.  I was in the surgery room until they

23   administered the anesthesia and he went to sleep, and then

24   they asked me to step out, and I just waited like right

25   outside the door.

```
 1                   There's windows in there.  You can look in.

 2                   MS. FEATHERSTONE:  Nothing further, Your Honor.

 3                   THE COURT:  Thank you.

 4                   MR. PONDS:  No redirect, Your Honor.

 5                   THE COURT:  Officer Korson, thank you very much

 6       for your testimony.

 7                   THE WITNESS:  Thank you, Your Honor.

 8                   MR. PONDS:  One more before lunch?  That is a very

 9       long witness, so I'm mindful --

10                   THE COURT:  Who do we have?

11                   MR. PONDS:  The police expert.

12                   THE COURT:  Okay.  Ladies and gentlemen, I think

13       it makes sense for us to take a somewhat early lunch today.

14       Why don't we reconvene at 1:20, okay?

15                   As always, don't talk about the case.  No

16       research.  And in addition, if you happen to run into any

17       witnesses or parties or people who you may think could be

18       witnesses or parties to the case, please do your best to

19       avoid them and not exchange any words or interactions with

20       them, okay?  Have a nice lunch.

21                   (Jury exits courtroom)

22                   THE COURT:  Okay.  One of the jurors has inquired

23       about -- or at least one of the jurors has inquired about

24       the schedule going forward, and I'd like to give them

25       whatever information I can when they return from lunch.
```

1              I know Officer Sheehan is still on tap for

2     tomorrow morning; is that correct?

3              MS. FEATHERSTONE:  Yes, Your Honor.

4              THE COURT:  Okay.  And we're going to take

5     tomorrow afternoon off.  Given that, what can I tell them

6     about how long the plaintiff's case is going to take and how

7     long the defense case may be after that?

8              MR. PONDS:  Your Honor, we will rest today.

9     There's some exhibits that we need to move in.  There may be

10    some exhibits that we'll ask the Court to provisionally

11    admit pending redactions --

12             THE COURT:  Okay.

13             MR. PONDS:  -- but we will rest today.

14             THE COURT:  You'll rest.

15             MR. PONDS:  We'll start with James E. Bradley

16    today, and we will rest, and that's where we are.

17             THE COURT:  Okay.  Will the defense be prepared to

18    begin their case this afternoon, if we could?

19             MS. FEATHERSTONE:  We would like to be able to

20    make our argument, our Rule 50 argument, Your Honor, with

21    respect to some of the claims and also potentially put on

22    Sergeant Gilgeous very briefly.

23             THE COURT:  Okay.

24             MS. FEATHERSTONE:  We also -- Officer Sheehan is a

25    short witness, we expect, and so we would also want to call

1    Dr. Betsey, who is our economist, in the morning.

2              THE COURT:  Okay.

3              MS. FEATHERSTONE:  And then we would finish up on

4    Friday morning with them.

5              THE COURT:  So that Sheehan and Betsey should get

6    us to midday tomorrow?

7              MS. FEATHERSTONE:  Yes.

8              THE COURT:  And then we'll start up again Monday

9    morning?

10             MS. FEATHERSTONE:  Yes.

11             THE COURT:  Okay.  Thanks very much.

12             MS. FEATHERSTONE:  Thank you.

13             (Lunch recess taken)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A F T E R N O O N   S E S S I O N

 2          THE COURT:  Okay.  So Mr. DeBerardinis, when we

 3    were talking about the schedule, I didn't ask you whether

 4    the estimate for your case has changed.  Do you still think

 5    a day or two?

 6          MR. DeBERARDINIS:  Certainly no longer than that,

 7    Your Honor.

 8          THE COURT:  Okay.  And a rebuttal case?

 9          MR. PONDS:  Pardon, Your Honor?

10          THE COURT:  Rebuttal case?  Any estimate?

11          MR. PONDS:  If we put one on, it will probably --

12          THE COURT:  Very short.

13          MR. PONDS:  -- be an hour and a half, two hours.

14    A few questions of a couple of people.

15          THE COURT:  So we may get to closings Tuesday?

16          MR. PONDS:  Oh, absolutely.  For sure.

17          MS. FEATHERSTONE:  Yes, Your Honor.

18          THE COURT:  Okay.  Anything else before we bring

19    the jury in?

20          MR. PONDS:  I believe Ms. West wants to raise an

21    issue.

22          MS. WEST:  We'd ask permission, Your Honor, to

23    recall Bridzette Lane.  I just want to do it for the record.

24    I don't think that we made it clear that she's the personal

25    legal representative of the estate of Ralphael Briscoe, and
```

```
1    I just want to make sure that that's totally clear on the

2    record.

3              THE COURT:  Any objection?

4              MS. FEATHERSTONE:  For that issue --

5              MS. WEST:  Oh, if they'll stipulate, that's great.

6    We won't --

7              MS. FEATHERSTONE:  -- we'll stipulate that she's

8    the personal representative.

9              THE COURT:  Let's stipulate to it, okay?

10             MS. WEST:  Great, thanks.

11             THE COURT:  Thank you, Counsel.

12             Okay.  Let's bring them back.

13             (Jury enters courtroom)

14             THE COURT:  Okay.  Ladies and gentlemen, before we

15   start, welcome back from lunch.  I thought I'd give you a

16   little update as to how we're doing against our anticipated

17   schedule.  I'm informed by the plaintiff that they will most

18   likely rest their case this afternoon, and the defense will

19   have some legal arguments probably late this afternoon.

20             The defense will present two witnesses tomorrow

21   morning.  We will not be holding court tomorrow afternoon so

22   we'll take off after lunch.

23             The defense case will continue Monday, and there's

24   a possibility that we will get to jury instructions and

25   closing arguments on Tuesday.  Okay?  So that's our best
```

1      guess at this point.  If that changes, we will update you.

2      Okay?

3                 MR. PONDS:  Your Honor, prior to calling the next

4      witness, I'd like to move in some exhibits.

5                 The first exhibit is Plaintiff's Exhibit 148.

6      It's a supplementary evidence report.  Your Honor, this is a

7      new exhibit pursuant to the Court's ruling last Friday.

8                 THE COURT:  You've got to give me more than -- why

9      don't you all approach.

10                MR. PONDS:  Yes, sir.

11                (The following is a conference held at the

12                 bench outside the hearing of the jury)

13                THE COURT:  It's been a long week for me, too.

14                MR. PONDS:  I didn't mean to sound cryptic, but

15     it's the fingerprint report.

16                THE COURT:  Fingerprint report.  We're fine with

17     that, right?

18                MR. PONDS:  We've added that to the list, and also

19     we'll be moving in Plaintiff's Exhibit 35.

20                MS. WEST:  Not this one.  We need a Xeroxed copy

21     of this.  You can see that I whited-out all that.

22                MR. PONDS:  What I will do then -- let me move it

23     in, but I will re-mark one, and I'll show it to counsel, if

24     I -- prior to showing it to them.

25                THE COURT:  Okay.  Now, are you going to -- you're

1    not going to ask your expert about the fingerprint report,

2    right?  I thought we were just going to get that in and

3    argue it, right?

4              MR. PONDS:  If that's the Court's ruling.

5              MS. WEST:  I think that was the Court's previous

6    ruling.

7              THE COURT:  Yes, it was.

8              MR. PONDS:  Thank you.

9              (This is the end of the bench conference)

10             MS. WEST:  Judge, may I be excused for about one

11   minute?

12             THE COURT:  Sure.

13             MS. WEST:  Thank you.

14             MR. PONDS:  Your Honor, at this time I'd like to

15   move in Plaintiff's Exhibit 148.

16             THE COURT:  So moved.

17             MR. PONDS:  And also I'd like to, at this time,

18   move into evidence Plaintiff's Exhibit 35.

19             THE COURT:  Which one is that?

20             MR. PONDS:  The chart.

21             THE COURT:  Yes, so moved.

22             MR. PONDS:  Thank you so much, Your Honor.

23             And our next witness, Your Honor, will be James E.

24   Bradley, Jr.  If I could be allowed to...?

25             THE COURT:  Sure.

```
 1                    (Pause)
 2               THE COURT:  Good afternoon, Mr. Bradley.
 3               THE WITNESS:  Good day, sir.
 4               THE COURT:  How are you?
 5               THE WITNESS:  Fine, sir.
 6                    JAMES E. BRADLEY, JR., Sworn
 7                    DIRECT EXAMINATION
 8    BY MR. PONDS:
 9    Q.   Mr. Bradley, thank you for joining us today.
10    A.   Thank you.
11    Q.   Sir, could you state your full name for the record.
12    A.   James E. Bradley, Jr.
13    Q.   And, sir, what is your current occupation?
14    A.   Well, I have a couple of them.  I do contract work for
15    the Government, and I do litigation consulting for several
16    law firms.
17    Q.   Now, sir, have you been -- were you hired by the
18    plaintiff to review some materials in this case?
19    A.   I was.
20    Q.   Now, sir, can you tell us where you're from?
21    A.   Washington, D.C.
22    Q.   Where were you born?  Washington, D.C.?
23    A.   Yes, sir.
24    Q.   Did you go to the local schools in town?
25    A.   I did.  I grew up in Southeast.
```

1    Q.   Southeast Washington?

2    A.   Yes, sir.

3    Q.   And did you live in Washington throughout the early

4    years of your life?

5    A.   I did.

6    Q.   Did you go to high school in Washington, D.C.?

7    A.   No, I didn't.

8    Q.   Junior high?

9    A.   No.

10   Q.   Now, sir, where did you graduate from high school?

11   A.   Bladensburg High School in Bladensburg, Maryland.

12   Q.   After you graduated from high school, what did you do

13   next?

14   A.   I joined the Metropolitan Police Department.

15   Q.   What year was that, sir?

16   A.   1968.

17   Q.   1968.  In what capacity did you join the Metropolitan

18   Police Department?

19   A.   As a police cadet.

20   Q.   A police cadet?

21   A.   Yes, sir.

22   Q.   And how old were you at the time?

23   A.   18.

24   Q.   18.  Were they allowing people to join the force at age

25   18 in 1968?

```
1    A.  As a police cadet, yes.

2    Q.  As a police cadet.  And how long were you a police

3    cadet?

4    A.  Until May 3, 1970.

5    Q.  Okay.  Is that when you became a sworn member of the

6    Metropolitan Police Department?

7    A.  Yes, sir.

8    Q.  Now, prior to becoming a sworn member of the

9    Metropolitan Police Department, while you were a cadet, did

10   you go to the academy?

11   A.  I did.  In 1969, from August until December.

12   Q.  Okay.  Now, when you were at the academy, one of many --

13   was one of the things that you were taught the general

14   orders of the Metropolitan Police Department?

15   A.  Yes, sir.

16   Q.  And can you briefly tell us what the general orders are?

17          MR. DeBERARDINIS:  He hasn't been qualified yet.

18          THE COURT:  I'm sorry, I can't hear you.

19          MR. DeBERARDINIS:  He hasn't been qualified yet.

20   Q.  Well, I'll go through the questions.

21          Now, sir, you became a sworn member in 1970?

22   A.  That's correct, sir.

23   Q.  Now, what was your first assignment?

24   A.  Special operations division, tactical branch.

25   Q.  And what did you do in the special operations tactical
```

```
1     branch?

2     A.   Uniformed high-visibility patrol in high crime areas of

3     the District of Columbia.

4     Q.   Was this in a specialized unit?

5     A.   It was.

6     Q.   And specifically what did that unit do?

7     A.   Someone much higher than I was read the crime

8     statistics, trends and patterns of criminal activity, and

9     would saturate the particular areas with uniformed patrols,

10    two officers to a car, to attempt to suppress criminal

11    activity taking place, effect arrests.

12    Q.   So you didn't directly go to a precinct like most patrol

13    officers do when you graduated from the academy?

14    A.   I did not.

15    Q.   So you went to the specialized unit?

16    A.   I did.

17    Q.   How long did you stay in the specialized operation

18    tactical branch?

19    A.   Until November of -- November the following year, which

20    would have been 1971.

21    Q.   And where did you go in approximately November of 1971?

22    A.   I went to the Fifth District -- I'm sorry, the Ninth

23    Precinct Tactical Unit.

24    Q.   And what type of -- what work did you do at the tactical

25    unit?
```

1   A.  I started off in the month of November and half of

2   December doing almost the same thing I did in the special

3   operations division, but within the confines of the Ninth

4   Precinct.

5   Q.  Okay.  Was the tactical unit a specialized unit?

6   A.  It was.

7   Q.  And what did that unit do, sir?

8   A.  The Ninth Precinct at the time consisted of part of

9   Capitol Hill all the way out to RFK Stadium down to Florida

10  Avenue and over to East Capitol Street, and at that time it

11  was a high crime area.  A lot of burglaries, robberies,

12  street robberies, liquor store hold-ups, and drug crime.

13  Q.  Now, going back to the special operations tactical

14  branch, did you encounter individuals with weapons when you

15  were in that unit?

16  A.  I did.

17  Q.  Did you arrest people who possessed weapons?

18  A.  I did.

19  Q.  And while you were at the -- when you went to the Ninth

20  Precinct Tactical Unit, did you also -- did you arrest

21  people with guns?

22  A.  I did.

23  Q.  Did you encounter people who had guns on their body?

24  A.  I did.

25  Q.  And how long did you stay in the Ninth Precinct Tactical

1    Unit?

2    A.  Until -- well, I moved -- I transitioned from uniform to

3    casual clothes to vice.

4    Q.  How long were you in uniform?

5    A.  All total, my entire career?

6    Q.  Yes.

7    A.  About a year and a half.

8    Q.  About a year and a half.  And how long were you in the

9    Metropolitan Police Department before you retired?

10   A.  25 and a half years.

11   Q.  25 and a half years.  So if my math's right, you were

12   only -- you were in plain clothes for 24 years?

13   A.  23, 24 years, something like that.

14   Q.  You never spent any time just driving a patrol car

15   around town?

16   A.  Just for a short period of time.  When I was at the

17   Ninth Precinct, which became the Fifth District, there was a

18   reorganization, and I had a pending -- I had put in for a

19   transfer, and it was pending at the time, so I did maybe a

20   couple of months of patrol.

21   Q.  A couple of months of patrol out of your entire 25 and a

22   half years --

23   A.  Yes, sir.

24   Q.  -- of service to the Metropolitan Police Department?

25   A.  Yes, sir.

1    Q.  Now, when did you leave the Ninth Precinct Tactical

2    Unit?

3    A.  1973.

4    Q.  And where did you go in 1973?

5    A.  I was selected to go to the Metropolitan Police

6    Department intelligence unit.

7    Q.  Okay.  The intelligence department?

8    A.  Intelligence division.

9    Q.  Right.  Now, what rank were you when you went to the

10   intelligence division?

11   A.  Plainclothesman with compensation.

12   Q.  And what were your duties when you were in the

13   intelligence division?

14   A.  Domestic security dealing with terrorism, in those days,

15   and then eventually organized crime.

16   Q.  During -- while you were with the intelligence division,

17   what type of cases did you investigate?

18   A.  A little bit of everything.  Conspiracies --

19   Q.  Give us an example.

20   A.  Conspiracies, weapons trafficking, international weapons

21   trafficking, bombings, drug trafficking, sex slave trading.

22   A little bit of everything.

23   Q.  Did you ever do any undercover work when you were with

24   the intelligence division?

25   A.  Not with the intelligence division.

1    Q.  Now, when you were with the intelligence division, were

2    you ever involved in any arrests where guns or pistols were

3    recovered?

4    A.  Yes.

5    Q.  Did you encounter people who were -- who possessed

6    weapons or pistols on their body?

7    A.  Yes.

8    Q.  Now, when you were at the intelligence division, were

9    you able -- were you ever detailed to any type of federal

10   agency?

11   A.  I was.

12   Q.  And what were those agencies, sir?

13   A.  The United States Secret Service for the inaugurations

14   of the President and for VIP dignitary travels.  I worked

15   protective intelligence probably eight or nine times.

16   Sometimes it would be for a month at a time; sometimes it

17   would be less.

18          When a new president or a president is

19   inaugurated, there's a lot of upfront work to do, and

20   then -- you know, sites, locations, traveling with the

21   motorcade, things like that.  I spent time with the -- when

22   Mikhail Gorbachev came here, I was detailed to that Secret

23   Service detail for two weeks before his arrival and probably

24   a week after doing protective intelligence; and other

25   dignitaries, when they came.

```
 1              I spent a large amount of time with the United
 2     States Department of Justice Drug Enforcement
 3     Administration.
 4     Q.  Is that also -- the acronym is DEA?
 5     A.  That's correct.  From '78 to '84 I was deputized as a
 6     deputy of the United States Marshals to give me the
 7     authority to leave the District of Columbia and investigate
 8     crimes throughout the country.
 9     Q.  So you were allowed to investigate -- as a Metropolitan
10     police officer, you were allowed to investigate federal
11     crimes?
12     A.  That's correct.  Well, D.C. police officers can
13     investigate federal crimes anyway.
14     Q.  Well, that is true, but were you able to go outside of
15     the District of Columbia to investigate federal crimes?
16     A.  Yes.  I actually ended up in Australia.
17     Q.  And were there any other agencies, federal agencies,
18     that you were assigned to?
19     A.  Yes.  From 1988 to 1989 I was assigned to the Bureau of
20     Alcohol, Tobacco & Firearms.
21     Q.  And let me ask you this:  Going back to the Drug
22     Enforcement Administration, how many times were you detailed
23     to the Drug Enforcement Administration?
24     A.  Well, the first time was for six years, from '78 to '84.
25     Q.  What type of cases did you investigate with the Drug
```

1    Enforcement Administration?

2    A.   Narcotics investigations.  I was detailed to the -- to

3    Dulles Airport and to National Airport to do drug

4    interdiction.  I worked undercover for almost a year

5    investigating a heroin operation out of Baltimore, and then

6    I worked a few other short-term undercover assignments

7    during that time.

8    Q.   Was there another period of time that you were

9    detailed -- that you were assigned to work with the Drug

10   Enforcement Administration?

11   A.   From 1990 to 1995 I was assigned to the -- a REDRUM task

12   force.

13   Q.   What did "REDRUM" stand for?

14   A.   "Murder" spelled backwards.  The city was in the midst

15   of a crack cocaine epidemic, and people -- there were lots

16   and lots of murders, so I was transferred to the homicide

17   unit to investigate drug-related homicides in the District

18   of Columbia and surrounding jurisdictions.

19   Q.   Were you specialty deputized in that second period of

20   time, from 1990 to 1995, with the Drug Enforcement

21   Administration?

22   A.   I was.

23   Q.   And during both periods of time, from '78 to '84, did

24   you arrest people when you were specially assigned to the

25   Drug Enforcement Administration for possession of guns or

1    pistols?

2    A.  I did.

3    Q.  During the course of that work, that period of time, did

4    you encounter people who actually had guns or pistols on

5    their body?

6    A.  I did.

7    Q.  When you were in the REDRUM unit when you were working

8    with the Drug Enforcement Administration, did you encounter

9    people who had weapons or pistols?

10   A.  Many times.

11   Q.  Did you encounter people who had weapons -- I mean, got

12   pistols or guns on their body?

13   A.  Many times.

14   Q.  During those years from 19 -- during the years that you

15   were from 1970 to -- well, during the 25 years of your

16   service with the Metropolitan Police Department, were you

17   ever decorated?

18   A.  Yes.

19   Q.  Did you receive any commendations or promotions?

20   A.  Yes, sir.

21   Q.  Well, let me ask you this:  When were you first promoted

22   to detective?

23   A.  1973.

24   Q.  Well, that's only four years after you started on the

25   force.

 1    A.   That's correct.

 2    Q.   You became a detective?

 3    A.   Investigator with compensation.

 4    Q.   Can you -- Mr. Bradley, starting with your first award,

 5    can you tell us the first award of commendation you received

 6    for your service.

 7    A.   Well, I received lots of commendations over the course

 8    of my career.  A lot of them are just unit citations and

 9    smaller awards, you know, for crime reduction and specific

10    incidents.

11         But I received several what I would consider high-

12    level awards throughout the -- I guess starting in 1979

13    going on.

14    Q.   Can you give us an example?  Tell us specifically.  What

15    did you receive?

16    A.   Do you want me to list them?

17    Q.   Yes, please.

18    A.   In 1979, I received the DEA Task Force Award of

19    Excellence.  In 1982, I received a second DEA Award of

20    Excellence.  In 1983, I received the Australian Police Award

21    of Merit.  In 1984, I received the DEA Administrator's

22    Award.  In 1984, I received my first United States

23    Attorney's Award.  In 1987, I received -- I was the only

24    police officer in the United States to receive the Secretary

25    of State's Award.  It was personally given to me by George

1    Shultz.

2    Q.  Do you know why you received that award from Former

3    Secretary Shultz?

4    A.  There was a threat -- a gentleman had come down from

5    Boston in an attempt to assassinate Secretary Shultz and

6    President Reagan.  I uncovered the plot.  We caught the

7    individuals and recovered a cache of weapons and ammunition.

8    That's why they decided to give me the award.

9    Q.  And what was your next award, sir?

10   A.  The next one was -- I received the ACES Award, the Armed

11   Criminal Enforcement Study Award, from the U.S. Department

12   of Treasury.

13   Q.  And so you did work -- what was the work that you did

14   with the -- excuse me, the United States Treasury?

15   A.  With Bureau of Alcohol, Tobacco & Firearms.  That was

16   all guns and drugs.

17   Q.  And was the acronym ATF?

18   A.  That's correct.

19   Q.  Were they a part of the Treasury Department at that

20   time?

21   A.  They were.

22   Q.  What was your next award, sir?

23   A.  In 1989, I received the Director's Award from U.S.

24   Treasury given by the director of the United States

25   Treasury, the ATF bureau.

1    Q.   What was your next award, sir?

2    A.   I received a commendation from Scotland Yard.

3    Q.   You did work with Scotland Yard?

4    A.   I did.

5    Q.   And specifically what was that?

6    A.   Protection of dignitaries, royals that were here.

7    Q.   And what was your next award, sir?

8    A.   In 1991, I received the Director's Award for the second

9    time from the U.S. Treasury.

10   Q.   And what was your next award?

11   A.   In 1992, I received the Special Agent in Charge Award of

12   Excellence.  That was my first one.  And I received a second

13   one in 1994.

14   Q.   And this was -- what is a special agent in charge of the

15   DEA?

16   A.   The DEA is broken down into district offices throughout

17   the United States; Washington being a very big one.  And it

18   covers Baltimore, Norfolk, Wilmington, North Carolina, and

19   into West Virginia.

20   Q.   And what role does the special agent in charge play in

21   terms of -- or what is his role, his or her role, within

22   that specific district?

23   A.   He controls the entire -- he's the head man.

24   Q.   And you received that award twice?

25   A.   Yes.

1   Q.   What was your next award?

2   A.   In 1994, I received my second United States Attorney's

3   Award.

4   Q.   Well, let me ask you about that.  Are you talking about

5   the United States Attorney's Office in Washington, D.C.?

6   A.   District of Columbia, yes, sir.

7   Q.   And why did you receive the -- how many times did you

8   receive that award?

9   A.   Totally, four times.

10  Q.   Four times.  And do you understand what was the basis of

11  you receiving that award four times?

12  A.   Excellence in investigative police work with various

13  cases.  A nomination is put in by the United States

14  Attorneys working the case with you, and then it goes to the

15  United States Attorney, and they make a determination of

16  whether or not you merit that award.

17  Q.   So the United States Attorney --

18  A.   For the District of Columbia.

19  Q.   -- would personally make that decision?

20  A.   That's correct.

21  Q.   Let's also talk about some of your formal training.  I

22  believe we've already discussed that you attended the

23  Metropolitan Police Academy?

24  A.   That's correct.

25  Q.   What other law enforcement training did you receive?

1    A.  Metropolitan Police Department Criminal Investigation

2    School.

3    Q.  And what did that school involve, sir?

4    A.  The elements of conducting criminal investigations.

5    Q.  And what was your next formal law enforcement training?

6    A.  FBI investigative criminal investigations training.

7    Q.  So that was something that you went to one of the FBI's

8    facilities, and was the course controlled by one of their

9    instructors from the FBI?

10   A.  It was.

11   Q.  Did you receive any training from the Drug Enforcement

12   Administration?

13   A.  I did.  I went to their narcotics school when it was at

14   14th and L -- 14th and I.

15   Q.  Was that program run by agents from the Drug Enforcement

16   Administration?

17   A.  It was.

18   Q.  Any other formal training, sir?

19   A.  Department of Justice interdiction training.  Prior to

20   my assignment at National and Dulles Airports, the

21   Department of Justice sent me to I think a two-week school

22   at the Justice Department to learn the right way, proper way

23   to conduct interdictions at the airports.

24   Q.  And when you're talking about interdictions, are you --

25   does that involve having -- well, let me ask you.  You tell

1   us.  In terms of interdiction at the airport, what would you

2   do, sir?

3   A.  I spent four of the five days at National, and the fifth

4   day at Dulles.

5          At Dulles we would do the international travel.

6   Obviously, when you enter the United States, you don't have

7   any -- you're not protected by any rights of search and

8   seizure so it's a little bit different.

9          But the four days that I spent at the -- four days

10  of the week that I spent at National, we would gather

11  information or watch flights coming in from source cities.

12  DEA and other cities would notify us that somebody had paid

13  cash for a ticket, had brought a large amount of money into

14  the city and had left the same day, no baggage.

15         It was a profile, is actually what it was.  And it

16  was a profile based on good intelligence information about

17  particular individuals.

18  Q.  Going back to the school that you received the training

19  for interdiction, did they cover subject matters when it was

20  permissible to stop citizens and when it was not

21  permissible?

22  A.  Absolutely.  When somebody came off an airplane,

23  sometimes they'd go right to a phone, and it was -- you

24  know, there wasn't cell phones in those days, and you could

25  just pick up the phone.  You could stand next to them, and

1    that wasn't privileged conversations.

2          And then we would walk -- one of our tactics we

3    would use is we would walk with people out of the airport.

4    "How are you doing?  I'm with DEA.  You're just coming in

5    from Miami.  Can we talk for a few minutes?"  And more

6    likely than not or more often than not, the people would

7    stop and engage you in conversation.

8          Sometimes they wouldn't.  Sometimes they'd keep on

9    going.

10   Q.  Okay.

11   A.  It wasn't a basis for a stop.

12   Q.  Now, sir, did you ever go to University of Florida for

13   any type of training?

14   A.  I went for narcotics training there, and I also taught

15   there.

16   Q.  What did you teach at the University of North Florida?

17   A.  Investigative techniques.

18   Q.  Did you receive any training from the FBI?

19   A.  I did.  I went to their death investigation school when

20   I was transferred into homicide.  I was sent for I think two

21   weeks for a death investigation class on all kinds of

22   different manners or causes of death.  I spent about two

23   weeks.

24   Q.  Did you do that -- did that -- was that something to

25   continue your education in terms of being a homicide

1      detective?

2      A.   It was required.

3      Q.   Did you ever receive any training from United States --

4      from the protective intelligence -- did you ever receive any

5      type of protective intelligence training?

6      A.   I did.

7      Q.   And what agency did you receive that from?

8      A.   Secret Service.

9      Q.   Oh, from the Secret Service.

10          And what did that training involve?

11     A.   Key factors of people who had threats against

12     dignitaries, people that were under the protection of the

13     United States Secret Service, things to look for, methods

14     and --

15     Q.   What other training did you receive, sir?

16     A.   I spent two weeks with the Maryland State Police on

17     their dynamic entry team, their state team.

18     Q.   Can you repeat that again?

19     A.   Dynamic entry team.  Dealing with armed individuals.

20     Q.   What other training have you received, formal training?

21     A.   I received interview and interrogation schooling with

22     the Metropolitan Police Department along with the FBI;

23     narcotics and dangerous drugs training with the DEA.  I

24     received my firearms training with the FBI; not just the

25     FBI, the Metropolitan police, but specialized training with

1    specialized weapons with the FBI.  And I was trained as a

2    certified voice stress analyzer, and I did that up until my

3    retirement with the police department.

4    Q.  Now, have you ever -- all of these schools and various

5    trainings that you attended, did you ever teach at any of

6    these places, or at any training center, or at any agency?

7    A.  I did.

8    Q.  Can you please tell us about that.

9    A.  I gave -- I was an instructor in investigative methods

10   at the Metropolitan Police Department with the United States

11   Park Police, the Maryland State Police, the Virginia State

12   Police, Pennsylvania State Police, Connecticut State Police,

13   San Francisco Police Department, New Jersey State Police,

14   New York State Police, IPTM University in North Florida --

15   that's the International Police Technology and Management

16   School -- and I was an instructor at McGill University in

17   Canada.

18   Q.  That's in Montreal, Canada?

19   A.  Believe it or not -- it is in Montreal.  This week

20   that I gave, this week-long class, was given in Toronto

21   though.

22   Q.  Now, sir, have you ever been qualified as an expert in

23   any court on police practices, procedures, and protocols?

24   A.  I have.

25   Q.  Can you please state the court.

1    A.   United States District Court for the District of

2    Columbia.

3    Q.   How many times have you been qualified as an expert in

4    this courthouse on police procedures, practices, and

5    protocols?

6    A.   Probably seven or eight times.

7    Q.   Are there any other courts?  What about D.C. Superior

8    Court?

9    A.   I have.

10   Q.   How many times have you been qualified as an expert in

11   those courts --

12   A.   Three or four.

13   Q.   I mean that court.  Excuse me.

14   A.   Three or four times.

15   Q.   What about in Maryland, the state of Maryland?  Have you

16   ever been --

17   A.   Montgomery County, Prince George's County, Anne Arundell

18   County.

19   Q.   That's Anne Arundell County, Montgomery County --

20   A.   Prince George.

21   Q.   -- and Prince George's County?

22   A.   Yes.

23   Q.   What about in the state of Virginia?

24   A.   U.S. District Court and for the Eastern District of

25   Virginia.

1    Q.  How many times have you been qualified as an expert in

2    the Eastern District of Virginia?

3    A.  Once or twice.

4    Q.  Have you ever been qualified as an expert witness in

5    police practices, procedures, and protocol in federal court

6    in Maryland?

7    A.  I have, both in Greenbelt and Baltimore.

8    Q.  Pardon?

9    A.  Both in Greenbelt and in Baltimore.  Also the Western

10   District of Virginia.

11   Q.  And since your retirement in 1995, in addition to

12   appearing and testifying as an expert witness, have there

13   been any other federal agencies that you've worked for?

14   A.  I did contract work for several federal agencies.

15   Q.  And can you please state the names of those agencies.

16   A.  Department of Justice, the U.S. National Labor Relations

17   Board, Department of Defense.

18   Q.  Mr. Bradley, during your 25 and a half years of service

19   to the District of Columbia as a member of the Metropolitan

20   Police Department, how many arrests during your career as an

21   officer and remainder of the years as a detective were you

22   involved in, arrests that involved a gun or a pistol?

23   A.  Over a thousand.

24   Q.  And how many homicide investigations were you -- did you

25   participate in during the course of your 25 and a half years

1    with the Metropolitan Police Department?

2    A.  Well, participated in or actually conducted the

3    investigation?

4    Q.  Well, let's start with participated in?

5    A.  Maybe 20 to 25 prior to me being assigned to homicide.

6    Q.  Prior to being assigned to homicide?

7    A.  Yes.

8    Q.  Well, once you were with homicide, how many homicide

9    division -- how many homicide investigations did you

10   investigate?

11   A.  Unfortunately, we were averaging about 300 a year.  I

12   would say -- and that was for five years.

13          I wasn't doing all of them, of course.  I'd say 40

14   a year that were related to the REDRUM initiative.

15   Q.  40?

16   A.  Yes, sir.

17   Q.  Were you the lead detective on some of those

18   investigations?

19   A.  Every time -- there were four lead investigators and

20   four back-ups.  So every fourth REDRUM homicide, I would

21   catch that one.

22   Q.  So it was on a rotation?

23   A.  That's right.  We would all participate, but you

24   actually, as the case investigator, would handle every

25   fourth one.

1    Q.  And the lead detective is the one responsible for

2    assigning the tasks for the investigation?

3    A.  From soup to nuts.

4    Q.  Mr. Bradley, since your retirement from the Metropolitan

5    Police Department -- and what year did that occur, sir?

6    A.  1995.

7    Q.  1995.  How do you keep abreast of the current laws and

8    regulations as it governs police officers?

9    A.  With the protocols and practices, I -- when I first

10   retired, I got to thinking that I was going to do this.  I

11   got the manuals and protocols and practices from the major

12   police departments and federal agencies throughout the

13   United States.  I reached out to the people I knew and had

14   them send me manuals.

15        Subsequently, I got the updates.  As, you know,

16   general orders change.  Special orders are put in and taken

17   out.  Practices are changed because of lots of different

18   things; differences in the type of investigation done, the

19   type of target might change, you know.  So you have to stay

20   abreast of that.

21        So over the time since my retirement, I have kept

22   abreast of all that information in primarily Los Angeles,

23   Boston, New York, Washington, D.C., of course, Prince

24   George's County, Baltimore City, Atlanta, the FBI and DEA.

25   Q.  Now, sir, do you maintain communications with current

1   members of law enforcement of the United States?

2   A.  I do.

3   Q.  Does that communication with those current members, does

4   that keep you abreast of trends and changes in police work?

5   A.   It does, and I do my own investigation, too.  I mean,

6   you know, when you're looking at crime rates, you're looking

7   at drug trafficking, you're looking at what's the driving

8   factor behind the rise or fall in homicides or arrests.

9           So you do a lot of -- I do a lot of Internet

10  searching with that, and, you know, you have to stay on it

11  and use all media as possible.

12  Q.  Is it a continuing educational process in terms of

13  acquiring the new information through publications or

14  information through sources or on the Internet?

15  A.  Absolutely.

16          MR. PONDS:  Your Honor, at this time the plaintiff

17  would proffer James E. Bradley as an expert witness in the

18  areas of police practices, protocols --

19          THE COURT:  Procedures?

20          MR. PONDS:  -- and procedures.

21          THE COURT:  Okay.

22          MR. PONDS:  And if I could just have the Court's

23  indulgence.

24          THE COURT:  Mr. Bradley's qualified to provide --

25          MR. DeBERARDINIS:  Objection, Your Honor.

```
 1              THE COURT:  Do you have an objection?

 2              MR. DeBERARDINIS:  Absolutely.

 3              THE COURT:  Approach the bench.

 4              (The following is a conference held at the

 5               bench outside the hearing of the jury)

 6              THE COURT:  Did you object pretrial?  First

 7     question.

 8              MR. DeBERARDINIS:  Your Honor, he hasn't

 9     qualified.

10              THE COURT:  Why not?

11              MR. DeBERARDINIS:  He hasn't qualified.  He's

12     qualified as an expert in police investigation.  We haven't

13     heard one word from this witness that he's -- in the subject

14     areas that we're going -- that are in dispute in this case.

15     We haven't heard one word that he's qualified as to the use

16     of force, what standards you use, et cetera, et cetera.

17              THE COURT:  Follow up with those questions.  We

18     can clean up the record.

19              MR. PONDS:  I'll follow up.

20              THE COURT:  Okay.  He'll follow up.

21              (This is the end of the bench conference)

22     BY MR. PONDS:

23     Q.  Mr. Bradley?

24     A.  Yes, sir.

25     Q.  Are you familiar with general orders that concerns the
```

```
 1    issue of use of force continuum?

 2    A.   I am.

 3    Q.   Have you been educated on those issues?

 4    A.   I have.

 5    Q.   Have you previously testified as an expert witness in

 6    any court on that subject?

 7    A.   I have.

 8    Q.   And, sir, are you familiar with general orders

 9    concerning the use of force?

10    A.   I have.

11    Q.   Have you been trained in those -- on that issue?

12    A.   I have.

13    Q.   Have you ever provided any instructions to other

14    officers in terms of the use of force?

15    A.   The proper use of force, yes.

16    Q.   Have you ever testified as an expert witness in court on

17    that subject matter?

18    A.   I have.

19    Q.   Mr. Bradley, have you ever testified -- well, let me ask

20    you this, sir:  Are you aware of general orders that concern

21    the issue of citizen contacts, stops and frisks?

22    A.   I am.

23    Q.   Were you taught that in the academy?

24    A.   I was.

25    Q.   Have you taught that either formally or informally to
```

1    other officers?

2    A.  I have.

3    Q.  Are you aware of the provisions of the general orders

4    involving police and citizen contacts, stops and frisks?

5    A.  Very much so.

6    Q.  Have you ever testified as an expert witness in court on

7    those subject matters?

8    A.  I've testified in federal court in Baltimore regarding

9    stops.

10   Q.  Have you ever testified as an expert in this court

11   relating to any type of stop?

12   A.  I don't believe I have.

13   Q.  Okay.  Have you ever -- are you familiar with the

14   general orders concerning vehicular pursuits?

15   A.  I am.

16   Q.  Are you trained in those general orders concerning

17   vehicular pursuits?

18   A.  I was.

19   Q.  Have you ever testified on the subject matter of

20   vehicular pursuits?

21   A.  I have.

22   Q.  As an expert witness?

23   A.  As an expert witness.

24   Q.  Mr. Bradley, are you familiar with the duties and --

25   general orders concerning the duties, responsibilities and

```
1    conduct of members of the Metropolitan Police Department?

2    A.   I am.

3    Q.   Were you trained in that subject matter?

4    A.   I was.

5    Q.   Have you explained that subject matter to other officers

6    when you were in the Metropolitan Police Department?

7    A.   I have.

8    Q.   Have you previously testified as an expert in any court

9    on general orders concerning the duties, responsibilities,

10   and conduct of members of a police department?

11   A.   I have.

12   Q.   On all these subject matters that I've discussed, are

13   you aware of the national standard of care as it applies to

14   those subject matters?

15   A.   I am.

16   Q.   And have you ever testified in any court concerning the

17   standard of care as it applies to the duty that a police

18   officer owes in terms of his duty of care?

19   A.   I have.

20   Q.   And do you understand how -- do you have an

21   understanding of how the general orders from various police

22   departments across the country are used to establish the

23   standard of care?

24   A.   Yes.

25   Q.   Have you ever testified in any court as an expert
```

1      witness concerning that subject matter?

2      A.  I have, and I -- and the D.C. Court of Appeals also in

3      the *Butera* case.

4              MR. DeBERARDINIS:  Objection, Your Honor.  Move to

5      strike.

6              THE COURT:  Sustained.

7              MR. PONDS:  I will -- once again, I will make my

8      renewal to proffer James E. Bradley as an expert in police

9      procedures, practices, and protocols.

10             THE COURT:  Any objection?

11             MR. DeBERARDINIS:  Yes, Your Honor.  I'd like to

12     approach the bench.

13             THE COURT:  Yes.

14             (The following is a conference held at the

15              bench outside the hearing of the jury)

16             MR. DeBERARDINIS:  At best, Your Honor, he has --

17     I apologize.

18             MS. WEST:  That's all right.

19             MR. DeBERARDINIS:  At best, Your Honor -- and I

20     say "at best" -- he's qualified as an expert as to the

21     negligence count.  He hasn't qualified as to the other two

22     counts.

23             THE COURT:  Use of force doesn't go to the other

24     count, use of force continuum?

25             MR. DeBERARDINIS:  Not the way he has teed it up,

```
 1      Your Honor.

 2              THE COURT:  What specifically has he not done?

 3              MR. DeBERARDINIS:  I'm going to leave that up to

 4      plaintiff.  I'm submitting -- I'm telling the Court on this

 5      record he's not qualified for the Fourth Amendment or for

 6      the assault and battery.

 7              THE COURT:  Okay.  Your objection's noted.

 8              (This is the end of the bench conference)

 9              MR. PONDS:  Just a couple of other questions, Your

10      Honor.

11      BY MR. PONDS:

12      Q.  Mr. Bradley, have you ever testified as an expert

13      witness concerning issues related to a 1983 claim?  And do

14      you understand what a 1983 claim is?

15      A.  I do.

16      Q.  Have you done that personally?

17      A.  I have.

18      Q.  Have you been allowed to testify as an expert witness in

19      that subject matter?

20      A.  I have.

21      Q.  Have you ever testified on subject matters concerning

22      Fourth Amendment violations?

23      A.  I have.

24      Q.  As an expert witness?

25      A.  I have.
```

1    Q.  Have you done that in this court or other courts?

2    A.  This court.

3         MR. PONDS:  At this time I proffer the witness as

4    an expert witness in police procedures, practices, and

5    protocols.

6         MR. DeBERARDINIS:  Same objection, Your Honor.

7         THE COURT:  Okay.  Your objection's overruled.

8    Mr. Bradley is qualified to provide expert testimony in this

9    case on police practices, procedures, and protocols.

10        MR. PONDS:  If I could just have the Court's

11   indulgence.

12        (Pause)

13   Q.  Mr. Bradley?

14   A.  Yes, sir.

15   Q.  Once you were retained in this case, from the time you

16   were retained in this case, have you reviewed any material?

17   A.  I have.

18   Q.  Can you give us -- tell us some of the items that you've

19   reviewed.

20   A.  I reviewed general orders of the Metropolitan Police

21   Department; special orders of the Metropolitan Police

22   Department; circulars of the Metropolitan Police Department;

23   Hyattsville, Maryland, Police Department General Order 617;

24   Prince George's Police Department General Order 900 Series

25   901.15; Baltimore, Maryland, Police Department General

 1    Orders Protocols and Procedures; the complaint in this case,

 2    the original complaint; the autopsy report of the decedent

 3    in this case, Mr. Briscoe; Boston, Massachusetts, Police

 4    Department General Orders; The Elements of Police

 5    Supervision, Second Edition; United States Code 1983; the

 6    statements of the individuals taken as witnesses or

 7    eyewitnesss to the case; photographs taken in the area of

 8    the shooting.

 9         I visited the scene I think nine times; MPD

10    evidence report dated 5/17/2011; MPD evidence report dated

11    5/17/2011 redacted; CAD report dated 4/26/2011; event

12    report, eight pages, redacted, dated 4/26/2011; multiple

13    black-and-white video reproductions; the U.S. Attorney's

14    declination letter dated 1/25/2012; four-page email,

15    redacted, dated 5/24/2012.

16    Q.  Would those documents encompass some of the discovery in

17    the case?

18    A.  It would.

19    Q.  All right.  Did you read any depositions of any of the

20    officers?

21    A.  I did.  I read them all, and I also looked at the

22    videotape.

23    Q.  Now, in terms of general orders, were there any other

24    jurisdictions that you looked to the general orders for?  I

25    think you've mentioned Boston and perhaps Baltimore.

1    A.  Baltimore, Boston, Hyattsville, Prince George's County,

2    the FBI and DEA, and I think ATF, too.

3    Q.  Now, sir, did you review the general orders -- in

4    formulating your opinion, did you utilize the general orders

5    concerning the use of force continuum?

6    A.  I did.

7    Q.  Did you do it for the Metropolitan Police Department?

8    A.  Yes.

9    Q.  Any other departments that you looked at in terms of the

10   use of force continuum?

11   A.  Yes.  Most major police departments have a use of force

12   continuum.

13   Q.  All right.  And you looked at other major --

14   A.  Absolutely.

15   Q.  Do you recall which ones you looked at, sir?

16   A.  Los Angeles, Baltimore, and I think Boston, also.

17   Q.  Did you also look at any general orders for the

18   Metropolitan Police Department that addressed the subject

19   matter of excessive force?

20   A.  Yes.

21   Q.  Did you do it through the Metropolitan Police

22   Department?

23   A.  Yes.

24   Q.  Did you look at other jurisdictions in terms of their

25   general orders as it applies to excessive force?

1    A.  For every general order that I examined in the

2    Metropolitan Police Department concerning this case, I found

3    the parallel or the twin or the very similar in the other

4    jurisdictions that I mentioned before.

5    Q.  And the other jurisdictions were Boston --

6    A.  -- Baltimore, Hyattsville, Prince George's County,

7    and --

8    Q.  Los Angeles?

9    A.  -- Los Angeles, and the FBI, DEA, and ATF.

10   Q.  Now, in terms of general orders, we'll start with the

11   Metropolitan Police Department.  Did you look at general

12   orders that addressed the issue of police and citizen

13   contacts, stops and frisks?

14   A.  I did.

15   Q.  Did you look at that for the Metropolitan Police

16   Department?

17   A.  Yes.

18   Q.  What other jurisdictions did you look at in terms of --

19   A.  All the ones I mentioned before.

20   Q.  All of them?

21   A.  And not all of them are -- not all of them are titled

22   exactly the same.

23   Q.  They may fall in a different category?

24   A.  Contact toward the public, assisting contacts,

25   interaction with the community, things like that.

1    Q.  But it's the substance of those rules in the various

2    jurisdictions --

3    A.  -- that establishes the national standard.

4    Q.  Is the substance of those rules and the various -- in

5    the various jurisdictions, does it address the issue of

6    police and citizens contacts, stops and frisks?

7    A.  Yes.

8    Q.  What about vehicular pursuits?

9    A.  I did.

10   Q.  And you looked at it for the Metropolitan Police

11   Department?

12   A.  I did.

13   Q.  And did you -- all those other jurisdictions that you've

14   mentioned, did you look at theirs also?

15   A.  Yes.

16   Q.  Did you look at, with the Metropolitan Police

17   Department, general orders addressing duties,

18   responsibilities, and conduct of the members of the

19   department?

20   A.  I did.

21   Q.  Did you look at the -- all the other jurisdictions that

22   you looked at -- I mean, the other jurisdictions that you've

23   listed, did you look at any general orders that would

24   address that subject matter, specifically duties and

25   responsibilities, conduct of members of the department?

1    A.  I did.

2    Q.  And I believe we've covered vehicular pursuits.

3    A.  We did.

4    Q.  Did you look at any general orders from the Metropolitan

5    Police Department in terms of use of firearms?

6    A.  Yes.

7    Q.  And that was from the Metropolitan Police Department's

8    general order?

9    A.  Correct.

10   Q.  Did you look at the other jurisdictions that you

11   previously have stated to compare them to the Metropolitan

12   Police Department?

13   A.  I did.

14   Q.  Also, did you look at any general orders involving the

15   use of force as it pertains to the Metropolitan Police

16   Department?

17   A.  I did.

18   Q.  And did you look at similar general orders that apply to

19   that subject matter to the other jurisdictions that you

20   previously have discussed?

21   A.  Yes.

22   Q.  Now, Mr. Bradley, can you please explain how -- in

23   looking at all of these general orders specific to certain

24   subject matters, how do you come up with a national standard

25   of care?

1    A.  In law enforcement I have found that there is an

2    identical or -- not identical, but there is a stream that

3    runs through all police departments; for instance, how you

4    store your weapon, how you -- how many times a year you have

5    to testify, how you do a vehicular pursuit, how you -- use

6    of force and the use of force continuum.  They're not

7    exactly the same in any of the police departments.  There's

8    a variation, you know.

9        When you're talking about the FBI, it's "agents"

10   as opposed to "officers."  Use of force is a lot smaller

11   with the federal agencies.  It might only be two paragraphs,

12   whereas most police departments, particularly urban police

13   departments, carry -- a general order might be five, six,

14   seven pages long.

15       But the same stream idea goes to each one of the

16   general orders for all the police departments and the agency

17   -- federal agencies regarding practices, protocols, and

18   procedures.  And when you put all those together, you

19   establish the national standard of care.

20   Q.  Is there any type of association or organization that

21   kind of recognizes the national standard of care as it

22   applies to police practices, procedures, and protocols?

23   A.  The courts have.

24   Q.  In reviewing the facts of any particular case, how do

25   you come to a determination whether or not a specific

1    officer has breached the duty of care as it applies to the

2    national standard of care?

3    A.  You review the actions, the activities, of whatever

4    you're dealing with -- you know, vehicular pursuit, a

5    shooting, use of force; it could be one and the same, but

6    they're a little higher threshold -- and you weigh that

7    against the responsibilities and directions that the officer

8    received in his training and the conduct that is expected of

9    the officers in the specific police department.

10   Q.  Have you looked at also general orders that apply to the

11   use of deadly force --

12   A.  Yes.

13   Q.  -- as it applies to Metropolitan Police Department

14   officers?

15   A.  Yes.

16   Q.  And did you also look at those other general orders --

17   well, general orders as it applies to those other

18   jurisdictions or other cities?

19   A.  Yes, but I want to make it clear that deadly force is

20   usually included in the use of force, and they explain the

21   different levels that you can go to that you're permitted to

22   use at what time and what circumstances.

23   Q.  Is that -- when you're talking about that, are you

24   talking about the spectrum?

25   A.  The spectrum of force.

1    Q.   Spectrum of force?

2    A.   Force continuum.

3    Q.   All right.  And can you explain, to the ladies and

4    gentlemen of the jury, what a spectrum of force is.

5    A.   These police departments and federal agencies throughout

6    the United States have come up with what they believe to be

7    the best way to handle situations that escalate and de-

8    escalate in the use of force.

9            For instance, at the bottom rung is a police

10   officer will say to you, "Stop," give you a verbal command.

11           If you don't respond to that, then there's hands

12   on.  They take you by the arm; they make their arrest; do

13   whatever.

14           If you resist, then there's the next step, which

15   could be a baton, which could be a capsicum spray, could

16   be -- pepper spray, as it's better known.

17           And then the last element is the use of deadly

18   force.

19   Q.   Now, sir, is that kind of like a -- well, generally

20   speaking, is it generally a gradual increase of force based

21   on the resistance?

22   A.   Or the threat.

23   Q.   Do you always have to go through that gradual

24   progression?

25   A.   Absolutely not.

 1              MR. PONDS:  Your Honor, may I approach the

 2     witness?

 3              THE COURT:  Sure.

 4     Q.  Mr. Bradley, I'd like to show you what's been marked for

 5     identification as Plaintiff's Exhibit 39.

 6     A.  Yes, sir.

 7     Q.  Do you recognize that?

 8     A.  I do.

 9     Q.  Have you seen it previously?

10     A.  Yes.

11     Q.  Okay.  And can you tell us what it is.

12     A.  It's the Metropolitan Police Department's use of force

13     continuum.

14              MR. PONDS:  Your Honor, at this time the plaintiff

15     would request admission of Plaintiff's Exhibit 39.

16              THE COURT:  Any objection?

17              MR. DeBERARDINIS:  No objection, Your Honor.

18              THE COURT:  So moved.

19              MR. PONDS:  Permission to publish, Your Honor?

20              THE COURT:  You may.

21     Q.  Mr. Bradley, can you see that?

22     A.  I can.

23     Q.  Does it -- tell us what the use of force continuum is.

24     A.  Again, in this diagram, which there's another part to it

25     also that explains it, it's the perception of the officer,

```
 1    where we are.  We go from strategic to tactical.  I guess

 2    it's volatile, then harmful, then lethal.  And as it

 3    escalates and de-escalates in the situation, the action of

 4    the officer corresponds with that.

 5    Q.  Well, let me give you an example.  Say I was a really

 6    terrible person, and you're a police officer, and I punched

 7    you in the face.  Could you shoot me at that point?

 8    A.  No.

 9    Q.  Why not?

10    A.  Because you haven't -- there's not an imminent threat to

11    my life or others.

12    Q.  Okay.  Say I was a really bad person, and I hit you with

13    a baseball bat, and then I took off running.  Could you

14    shoot me?

15    A.  No.

16    Q.  Why not?

17    A.  Because the threat is now diminished.

18    Q.  Well, when you talk about the use of force continuum,

19    does it also deal with the amount of resistance?

20    A.  Sure.

21    Q.  For example, when a person is running away, is that

22    person -- is that resistance, or is that force?

23    A.  It's -- you're talking about on behalf of the officer?

24    Q.  No.

25    A.  The subject is --
```

1    Q.  No, the person who is fleeing away.

2    A.  Right.

3    Q.  If a person is fleeing away, can you talk about what

4    resistance occurs at that point, when the person is running

5    away from an officer.

6    A.  Running away for what reason?

7    Q.  Just didn't want to be with the police officer.

8    A.  There's no police activity there.

9    Q.  Okay.  And would it be justifiable for the officer to

10   shoot that person fleeing?

11   A.  No.

12   Q.  Let me give you another example.  The person punches the

13   police officer really hard, but he takes off running.

14   A.  Okay.

15   Q.  Is it justifiable for the officer to shoot that person,

16   even though the person's hit the officer very hard in the

17   face?

18   A.  No.

19   Q.  Why?

20   A.  Because they're no threat anymore.  The threat has been

21   diminished.  He's now in an escape mode.  He's running away.

22   Q.  So when an officer is pursuing a person, and they're

23   running away, no resistance is being offered at that point?

24   A.  That's correct.

25   Q.  What type of measures -- at that point, in terms of the

1    use of force continuum or the spectrum of force, he can go

2    directly to deadly force?

3    A.   In that instance?

4    Q.   Yes.

5    A.   No.

6    Q.   Now, Mr. Bradley, let me just -- I'm may be getting

7    ahead of myself a little bit.

8              Did you formulate any opinions concerning the

9    facts of this case?

10   A.   I have.

11   Q.   And in forming those opinions, you relied on certain

12   data?

13   A.   I did.

14   Q.   And part of the data, was that the general -- the

15   various general orders from the various jurisdictions?

16   A.   Part of it.

17   Q.   A lot of the material in this case, if not all of the

18   material in this case?

19   A.   A lot of material.

20   Q.   And did you take those together and analyze the facts as

21   well as the materials that you had?

22   A.   I did.

23   Q.   And was it also a continuing process as you would get

24   additional information?

25   A.   Sure.

```
 1    Q.  And, sir, when you formulated your legal -- excuse me.
 2         When you formulated your expert opinions in this
 3    case, were they done with a reasonable degree of certainty
 4    as it applies to your expertise as an expert in police
 5    practices, procedures, and protocols?
 6    A.  It was.
 7    Q.  Let's start with -- are you familiar with the initial
 8    contact in this case?
 9    A.  Yes.
10    Q.  Okay.  Now, Mr. Bradley, is it permissible --
11         THE COURT:  Counsel, let's approach.
12         (The following is a conference held at the
13          bench outside the hearing of the jury)
14         THE COURT:  I thought we agreed pretrial that he
15    would not be asked whether the initial stop was proper or
16    not.
17         MS. WEST:  Was what?
18         THE COURT:  Was proper or not.
19         MR. PONDS:  Oh, no, he was going to say it was
20    proper.
21         THE COURT:  Okay.  We probably should have dealt
22    with this pretrial, but in asking him his conclusions, are
23    you going to ask him whether it was, quote-unquote,
24    negligent or -- I'm not sure you should use those ultimate
25    terms.
```

```
 1              MR. PONDS:  No, I'm not.

 2              THE COURT:  Okay.  I don't want him stating legal

 3     conclusions.  He can state, you know, whether something

 4     violated a practice, whether it violated an order, whether

 5     it was unreasonable under the circumstances, but I don't

 6     want ultimate legal conclusions to be stated, okay?

 7              MR. PONDS:  Okay.  Your Honor, this is our last

 8     witness, and I don't want there to be any mistakes or any

 9     hiccups.  Is the Court going to take a break soon so I can

10     admonish the witness not to -- I don't anticipate that he

11     is.

12              MR. DeBERARDINIS:  Say what?

13              MR. PONDS:  The legal conclusion.

14              MS. FEATHERSTONE:  I know the witness has been

15     admonished about certain things, but he's already let one

16     thing out, which was the declination letter.

17              THE COURT:  I didn't hear that.

18              MS. FEATHERSTONE:  You can't hear that?

19              THE COURT:  I didn't hear that.  I didn't hear him

20     say that.

21              MS. FEATHERSTONE:  In the list of things he had

22     reviewed.  We should give him time to let him know certain

23     things he shouldn't talk about, so that we don't have any

24     problems.

25              THE COURT:  Okay.  It will be their objection, not
```

1    yours to that, okay?

2              Just admonish him without stating an ultimate

3    legal conclusion.  This guy is smart enough to know what

4    that means.

5              MR. PONDS:  Thank you, Your Honor.

6              (This is the end of the bench conference)

7    BY MR. PONDS:

8    Q.  Now, Mr. Bradley, in formulating your conclusions,

9    you've relied on general orders?

10   A.  Partly.

11   Q.  Documents in the case?

12   A.  Yes.

13   Q.  A lot of material?

14   A.  Yes.

15   Q.  Okay.  And you've formulated expert opinions as it

16   applies to whether the individual violated any general

17   order?

18   A.  Correct.

19   Q.  As well as whether or not that person violated any --

20   breached his standard of care?

21   A.  Correct.

22   Q.  All right.  And you're not going to render any type of

23   legal conclusions in terms of that?

24   A.  I'm not a lawyer.

25   Q.  Okay.  Thank you, sir.

1          Let's go back to -- let's start with -- after

2    Mr. Briscoe was stopped -- I mean, excuse me.

3          After Mr. Briscoe was -- had his contact with the

4    police officers in the parking lot --

5    A.  Yes, sir.

6    Q.  -- do you have an opinion as to the conduct of the

7    officers as it applies to the general orders and the

8    national standard of care when he began to walk away and

9    eventually began to run, when he walked away and then began

10   to run?

11   A.  Are you asking about the contact first, or beyond that?

12   Q.  No, let's not worry about the contact.  Let's not worry

13   about the contact.

14   A.  Okay.

15   Q.  Let's talk about everything from the point he began --

16   after the officers asked him if he had a gun and he began to

17   walk away.

18   A.  There was no problem with that.

19   Q.  Could you repeat that again.

20   A.  There was no problem with Mr. Briscoe walking away.

21   Q.  Okay.  Why was it fine for Mr. -- for Ralphael Briscoe

22   to walk away?

23   A.  There was no reason to detain him.  There was no reason

24   to stop him.

25   Q.  Based on your review --

1          MR. DeBERARDINIS:  Objection, Your Honor.

2          THE COURT:  Okay.  Sustained.

3     Q.  Well, let me ask you this, Mr. Bradley --

4          MR. DeBERARDINIS:  Move to strike that, Your

5     Honor.

6          THE COURT:  The jury will disregard the last

7     question and answer.

8     Q.  Mr. Bradley, was there a violation of the general

9     order -- it was an inartfully asked question on my part.

10         Was it a violation of the general orders for the

11    officers to pursue Ralphael Briscoe as he began to walk

12    away?

13    A.  Yes.

14    Q.  And can you point to any general order that discusses

15    that, that discusses that violation?

16    A.  General Order 304.10.

17    Q.  304.10?

18    A.  Yes, sir, Section 2, No. 2, Section B.  "First contact

19    may not be" --

20         MS. FEATHERSTONE:  Sorry, Your Honor, if we can

21    get the exhibit number he's referencing.

22         THE COURT:  Mr. Ponds, could you advise the Court

23    what the exhibit number is.

24         MR. PONDS:  The Court's indulgence.

25         THE COURT:  Sure.

```
 1              MR. PONDS:  82, Your Honor.

 2    Q.  Can you state that general order again, Mr. Bradley.

 3    A.  304.10.

 4    Q.  Three-oh-four-ten.  So it would be --

 5              MR. PONDS:  I'm sorry, Judge, it's --

 6              THE COURT:  84.

 7              MR. PONDS:  I gave the Court the eight series.

 8              MR. DeBERARDINIS:  Your Honor, may we approach the

 9    bench?

10              THE COURT:  Sure.

11              MR. DeBERARDINIS:  And I apologize.

12              (The following is a conference held at the

13               bench outside the hearing of the jury)

14              MR. DeBERARDINIS:  Your Honor, the defense is at a

15    loss as to if this expert is not allowed to testify that

16    there was a problem with the chase, why are we going over

17    contacts, stops and frisks?

18              MR. PONDS:  Because he confused the issue.

19              THE COURT:  I think he said that the initial

20    contact was fine.  After he begins to run, I think there is

21    an issue as to whether that violated -- can you pursue a

22    fleeing citizen?  Right?  Not whether -- I thought the Terry

23    issue was when they first encountered him on the phone,

24    right?  That's what we excluded, but I think you can start

25    with the chase.
```

1          MR. PONDS:  That's where we are.

2          THE COURT:  Does this general order relate to

3     that?

4          MR. PONDS:  General Order 304.10 addresses issues

5     of contacts, stops, and frisks.

6          THE COURT:  How does that relate to the chase?

7          MR. PONDS:  What Mr. Bradley is going to -- I

8     believe he's going to testify that the contact obviously was

9     fine.  The subsequent conduct, the chase, falls pursuant to

10    a stop.

11         MS. WEST:  Your Honor, I just want the record to

12    be perfectly clear.  My understanding of the Court's

13    previous order was that you said, and we agreed, that the

14    initial contact would not be gone into; that we wouldn't

15    argue that; that that was fine.

16         But it starts before the chase.  It starts when

17    the car door is opened, and he quickens his walk.  That's

18    where it starts.  That's not the initial encounter, but

19    that's where we contend that the --

20         THE COURT:  Okay.  If you want to question him

21    about the propriety of that, okay, the pursuit of him after

22    he quickens his pace and starts to run and link it to a

23    general order, that's fine.

24         MR. DeBERARDINIS:  I'll tell you why we object to

25    this also, Your Honor.  This was not -- he never

 1    supplemented his opinion that he was going to be testifying

 2    about this.  In his deposition he said, "I don't take issue

 3    with any of this stuff."

 4              THE COURT:  Well, that's cross.  That's cross.

 5    You can cross him on that, okay?

 6              (This is the end of the bench conference)

 7              THE COURT:  I apologize, ladies and gentlemen.

 8    BY MR. PONDS:

 9    Q.  Mr. Bradley, I just want to make certain we have the

10    right general order.  Can you state the order again.

11    A.  304.10.

12    Q.  So it's Series 304?

13    A.  No. 10.

14    Q.  No. 10.  And it's titled "Police-Citizen Contacts, Stops

15    and Frisks"?

16    A.  Correct.

17    Q.  You reviewed the facts in terms of the police -- the

18    officers' conduct -- well, their actions in pursuing

19    Mr. Briscoe after the initial stop?

20    A.  After the initial --

21    Q.  After the initial contact, I'm so sorry.

22    A.  Yes.

23    Q.  And as it applies to the general orders, was there any

24    violation of the general orders by the officers chasing

25    Ralphael Briscoe after the initial stop?

1    A.  Yes, contact.  Yes.

2    Q.  After the contact?

3    A.  Yes, sir.

4    Q.  Okay.  Please explain.

5    A.  The general orders talk about contacts, and then they

6    talk about stops.  Contacts, they make it very clear that

7    people cannot be detained.  Police can talk to the

8    individual and -- you know, "Hi, I'm the police," you know,

9    and they can ask him anything they want to ask him.  But if

10   that person decides that they no longer want to interact

11   with the police and want to walk away, they're free to do

12   so.

13         Mr. Briscoe left the area where he was

14   originally contacted, and he was pursued by the officers,

15   and at that time they're -- the reason for their pursuit was

16   to conduct a stop, and there was no probable cause for a

17   stop because the stop would have consisted upon the seizure

18   of Mr. Briscoe, which eventually it did.  But there was no

19   basis for a stop of Mr. Briscoe at the time that the pursuit

20   began.

21   Q.  And what general order of the Metropolitan Police

22   Department did they violate?

23   A.  304.10.

24   Q.  Now, sir, do you have an expert opinion within a

25   reasonable degree of certainty as it applies to your

1    expertise in terms of police practices, procedures, and

2    protocols whether or not they violated the national standard

3    of care by pursuing Mr. Briscoe after the initial stop?

4    A.  Yes.

5    Q.  And what is that opinion, sir?

6    A.  That they violated the national standard of care by

7    pursuing him with the intent to seize him.

8    Q.  Now, sir, in terms of the pursuit by Defendant Leo in

9    his unmarked black SUV --

10                MR. PONDS:  The Court's indulgence.

11   Q.  Specifically addressing the issue of Defendant Leo and

12   his pursuit of Ralphael Briscoe in the black SUV --

13   A.  Yes, sir.

14   Q.  -- are there any general orders, Metropolitan Police

15   Department general orders, that address the subject matter

16   of use of sirens in unmarked vehicles?

17   A.  Yes, sir.

18   Q.  And what general order is that, sir?

19   A.  I may not have this one here.  I'll check.  It's the one

20   concerning vehicular pursuits.

21   Q.  It concerns vehicular pursuits?

22   A.  Vehicular pursuits.

23   Q.  Can you take the time and see if there is anything

24   that -- well, is there anything that will refresh your

25   recollection?

1    A.  The general order.

2    Q.  Okay.

3    A.  I have it.  I'm sorry, I have it.  It's General Order

4    301.03.

5    Q.  Would you repeat that again, sir.

6    A.  301.03.

7    Q.  And is the title of that general order, "Vehicular

8    Pursuits"?

9            MS. FEATHERSTONE:  Exhibit number, please?

10           MR. PONDS:  Exhibit No. 86.

11   A.  Yes.

12   Q.  Well, before we get to 86 -- well, no, let's go back

13   to -- let's go to 86.  What does that general order

14   specifically address in terms of vehicular pursuits?

15   A.  It talks about the background, the policy, the

16   definitions, and the rules.

17   Q.  In that general order, are there any provisions

18   for -- that set out the rules and regulations or standards

19   for Metropolitan police officers utilizing sirens in

20   vehicular -- when they're in a vehicle, and they're pursuing

21   a citizen who is on foot?

22   A.  It talks about vehicular pursuits; it doesn't talk about

23   on foot.  But it talks about fleeing felons.

24   Q.  Okay.  Well, is there any -- is there any aspect of that

25   rule that talks about what an officer should do when he's

1   pursuing someone in his vehicle?

2          MR. DeBERARDINIS:  He hasn't established a

3   foundation yet, Your Honor.

4   Q.  Well, sir --

5          THE COURT:  Rephrase, Mr. Ponds.

6          MR. PONDS:  Yes.

7   Q.  Mr. Bradley, have you read depositions in this case?

8   A.  I have.

9   Q.  Did you read the deposition of Chad Leo?

10  A.  I did.

11  Q.  Did you read the deposition of Officer Roberto Torres?

12  A.  I did.

13  Q.  Based on your reading of those depositions, do you

14  recall whether there was -- whether either of those

15  individuals were able to state that the emergency sirens

16  were used?

17         MR. DeBERARDINIS:  Objection, Your Honor.  The

18  problem is he hasn't -- this witness hasn't established a

19  foundation that that GO applies in the circumstances of this

20  case.

21         THE COURT:  Understood.  Lay the foundation based

22  on the general order.

23  Q.  Now, sir, have you watched the video in this case?

24  A.  I have.

25  Q.  Okay.  What did you observe in that video, from the

1    beginning to the end, the long version one, in terms of the

2    chase?

3    A.   The decedent running on the sidewalk, the SUV coming up

4    behind him and eventually overtaking him right at the

5    driveway.

6    Q.   Now, sir, during -- from the beginning of the video --

7    from the time that you see the black SUV in the video until

8    the SUV stops after the shooting, did you notice any

9    emergency lights on that vehicle as depicted on the video?

10   A.   No.

11   Q.   What does that lead you to believe, sir?

12               MR. DeBERARDINIS:  Objection if we're referring

13   back to the general order, Your Honor.

14               THE COURT:  Ask him whether the general order

15   covers the conduct reflected in the video and the

16   depositions.

17               MR. PONDS:  Thank you, Your Honor.

18   Q.   Mr. Bradley, does the general order cover the conduct

19   reflected in the video?

20   A.   It does not.

21   Q.   It does not cover it?

22   A.   The general order covers it.  The actions didn't -- are

23   not in -- do not adhere to the general order, I'm sorry.

24   Q.   So let's go back.  The general order does cover the

25   subject matter that is depicted in the video?

1    A.  Yes.

2    Q.  And, sir, based on your observations of the video, as

3    well as the reading of the depositions, were the emergency

4    lights used?

5    A.  No.

6    Q.  And what violation, if any, would that be?

7    A.  The general order says that unmarked vehicles do not

8    have identifiable markings but are equipped with siren and a

9    portable emergency beacon light that should be activated in

10   a vehicular pursuit of any fleeing felon.

11        MR. PONDS:  Your Honor, at this time I would

12   request admission to -- I would request permission to submit

13   Plaintiff's Exhibit 86 into evidence.

14        THE COURT:  Any objection?

15        MR. DeBERARDINIS:  Yes, Your Honor.

16        THE COURT:  What's your objection?

17        MR. DeBERARDINIS:  Based upon our prior

18   objections.

19        THE COURT:  Overruled.  86 is admitted.

20        MR. PONDS:  If I can approach the witness?

21        THE COURT:  You may.

22   Q.  Mr. Bradley, I'm going to show you what has already been

23   admitted into evidence as Plaintiff's Exhibit 86.  Can you

24   look at this exhibit and show me where the language is.

25   A.  Sure.  Under "Definitions," that's No. 3, under B,

1    "Unmarked vehicles do not have any identifiable markings but

2    are equipped with a siren and portable emergency beacon

3    light identifying that as an emergency vehicle."

4            Page 3 -- the next page under 2, "Vehicular

5    Pursuits:  An attempt by a member of the department to

6    apprehend a fleeing felon while in an authorized emergency

7    vehicle with all emergency warning devices activated."

8    Q.  Okay.

9            MR. PONDS:  Permission to publish those two pages,

10   Your Honor?

11           THE COURT:  You may.

12   Q.  And we're looking at -- Mr. Bradley, we're looking at

13   General Order 301.03?

14   A.  301.03, correct.

15   Q.  And looking at this on the ELMO -- well, on your

16   monitor, this talks about -- based on your review of the

17   videotape of May 26, 2011 [sic] from the midafternoon on

18   Elvans Road, do you recall whether or not that black SUV was

19   a marked or unmarked vehicle?

20   A.  Unmarked vehicle.

21   Q.  So it would fall under Category B?

22   A.  That's correct.

23   Q.  And looking at Page 2 of that general order --

24   A.  Yes, sir.

25   Q.  -- is it Section --

1    A.   2.

2    Q.   -- 2?  That Section 2 under Roman numeral No. 3, it

3    would be -- it addresses the issue of what type of device

4    should be used during that vehicular pursuit.

5    A.   With all emergency warning devices activated.

6    Q.   And what does "activated" mean?

7    A.   Turned on, lights flashing, siren whining.

8    Q.   Now, in reviewing the videotape, as well as your review

9    of the depositions, as well as General Order 301.03, did you

10   formulate an opinion as to whether or not Defendant Leo

11   violated the general order?  And let me rephrase that

12   question.

13           In reviewing General Order 301.03, did you

14   formulate an expert opinion based on a reasonable degree of

15   certainty based on your expertise in the subject matter of

16   police procedures and protocols whether or not Defendant Leo

17   violated General Order 301.03?

18   A.   I did.

19   Q.   And can you please tell us what that opinion is.

20   A.   That he approached in a stealthy manner without

21   activating his emergency lights and siren to overtake the

22   decedent in this case without letting him know that the

23   police were pursuing him.

24   Q.   All right.  Now, sir, in terms of applying the same

25   facts or the facts that you reviewed in this case as it

1    applies to the national standard of care, do you have an

2    expert opinion as to whether or not Defendant Leo violated

3    the national standard of care as it applies to the General

4    Order 301.03, "Vehicular Pursuits"?

5    A.  Well, it violated the national standard; not just the

6    301.03, but other like general orders throughout the United

7    States.

8    Q.  Well, in looking and making a determination, did you

9    make a determination as to whether or not Defendant Leo

10   violated the national standard of care?

11   A.  He did.

12   Q.  And in formulating that opinion, did you apply, in your

13   expert opinion -- did you do it with a reasonable degree of

14   certainty as an expert in the field of police practices,

15   procedures, and protocols?

16   A.  Yes.

17   Q.  And please tell us whether or not -- what is your

18   opinion concerning whether or not Defendant Leo violated

19   a -- violated or breached the national standard of care?

20   A.  He did.

21   Q.  And why is that again?

22   A.  Because he pursued the decedent in this case in a manner

23   not prescribed in general orders.  He did not activate the

24   emergency equipment, did not put the red light and siren on,

25   and approached the defendant in a stealthy manner, from

1    behind.

2    Q.   Now, Mr. Bradley, is there a Metropolitan Police

3    Department general order that addresses the issue of a

4    police officer shooting from a moving vehicle?

5    A.   There is.

6    Q.   Can you please identify which general order that is.

7    A.   901.7.

8    Q.   901.7?

9    A.   That would be on Page 4 of 10 under "Rules."

10                THE COURT:  Hold on.

11                THE WITNESS:  I'm sorry, Your Honor.

12                MR. PONDS:  The Court's indulgence.

13                (Pause)

14                THE COURT:  We have to find it first, Mr. Bradley.

15   We have a lot of stuff.

16                THE WITNESS:  Yes.

17                MS. WEST:  It's in the front.

18                MR. PONDS:  It's in the front.  It would be in the

19   front.  Your Honor, Exhibit 71.

20                THE COURT:  71, okay.

21                MS. FEATHERSTONE:  I'm sorry, I didn't hear you.

22                THE COURT:  71.

23                MS. FEATHERSTONE:  Thank you.

24                MR. PONDS:  Thank you so much.  Thank you so much.

25   Q.   What facts did you review to make a determination

1    whether or not the black SUV was moving after shots were

2    fired at Ralphael -- during the time shots were fired at

3    Ralphael Briscoe?

4    A.  I reviewed the videotape.

5    Q.  Did you review any statements of Defendant Leo?

6    A.  I did.

7    Q.  Did you review any of the Force Investigative Team's

8    summary reports?

9    A.  I did.

10   Q.  Did you review depositions?

11   A.  I did.

12   Q.  Based on your review of all of the above materials, did

13   you formulate an expert opinion as to whether or not

14   Defendant Leo violated any of the general orders as it

15   applies to shooting from a moving vehicle?

16   A.  I did.

17   Q.  And did you also formulate any expert opinions of

18   whether or not Defendant Leo also violated the national

19   standard of care as it applies to shooting from a moving

20   vehicle?

21   A.  I did.

22   Q.  And, sir, in applying -- in terms of formulating those

23   opinions concerning whether or not Defendant Leo violated

24   the Metropolitan Police Department general orders as it

25   applies to shooting from a moving vehicle, did you reach

1    those conclusions within a reasonable degree of certainty as

2    it applies to your expertise -- as to your expertise on the

3    subject matter of police practices, protocols, and

4    procedures?

5    A.  I did.

6    Q.  And can you please tell us whether or not -- if he

7    violated General Order 901.07?

8    A.  He did.

9    Q.  Can you please tell us why.  How and why.  Why did you

10   reach it?

11   A.  General order 901.07 clearly states under "Rules," A,

12   that no member of the Metropolitan Police Department --

13   Q.  Mr. Bradley -- sorry to cut you off -- can you tell me

14   what page.

15   A.  Page 4.

16   Q.  Page 4?  Which line are you reading from?

17   A.  The top of the -- under "Rules" at the top of the page.

18   Q.  Yes.

19   A.  "No member of the Metropolitan Police Department shall

20   discharge his or her firearm under the following

21   circumstances."  No. 3 is "at or from a moving vehicle

22   unless deadly force is being used against the officer or

23   another person.  For the purpose of this order, a moving

24   vehicle is not considered deadly force.  Members shall, as a

25   rule, avoid tactics that could place them in a position

1    where a vehicle could be used against them."

2          So we're talking about two things here, but the

3    part that pertains is the first line.

4    Q.   Okay.  So it's your expert opinion within a reasonable

5    degree of certainty in your expertise of police practices,

6    protocols, and procedures that Officer Leo, Defendant Leo,

7    violated General Order 901.07?

8    A.   But I wasn't able to finish the second part of it,

9    Mr. Ponds, I'm sorry.

10   Q.   Oh, please.

11   A.   And No. 7 under "Rules," "No member of the Metropolitan

12   Police Department shall discharge his or her firearm under

13   the following circumstances:  If you stop an individual on

14   mere suspicion of a crime simply because the individual runs

15   away."

16   Q.   And as it applies to --

17          MR. PONDS:  At this time, Your Honor, I would make

18   a request to move into evidence Plaintiff's Exhibit 71,

19   which is the General Order 901.07.

20          THE COURT:  Any objection?

21          MR. DeBERARDINIS:  No objection, Your Honor.

22          THE COURT:  So moved.

23          MR. PONDS:  May I approach, Your Honor?

24          THE COURT:  Yes.

25   Q.   Mr. Bradley, I'd like to show you what has been moved

1   into evidence as Plaintiff's Exhibit 71.  Do you recognize

2   this general order?

3   A.   I do.

4   Q.   And the language that you were quoting from is on Page

5   4?

6   A.   Correct, under "Rules," A3 and A7.

7           MR. PONDS:   Permission to publish, Your Honor?

8           THE COURT:   You may.

9   Q.   Mr. Bradley, I'm going to publish Page 4 of General

10   Order 901.07.

11   A.   Yes, sir.

12   Q.   And you were -- and you believe this situation with

13   Defendant Leo firing from a moving vehicle is applicable to

14   section Roman numeral 4?

15   A.   No. 4.

16   Q.   "Rules"?

17   A.   Yes.

18   Q.   And specifically No. 3?

19   A.   Yes.

20   Q.   And that addresses discharging a weapon from a moving

21   vehicle?

22   A.   It does, but also 7.

23   Q.   Please continue.

24   A.   Also -- not only is it No. 3, at or from a moving

25   vehicle, also No. 7.

1    Q.  How does No. 7 apply, sir?

2    A.  "To stop an individual on mere suspicion of a crime

3    simply because the individual runs away."

4            The videotape that I saw was the SUV that was

5    operated by Officer Leo overtaking the decedent who was

6    running away.  There was no crime afoot that I could see.

7    Q.  Right.  Based on your review of the videotape,

8    specifically at the mouth of the driveway --

9    A.  Yes, sir.

10   Q.  Based on your review of that videotape, is that a part

11   of your conclusion that you're rendering in this case, based

12   on the chase and what occurred at the driveway?

13   A.  The entire chase and the seizure -- and the shooting and

14   seizure of the decedent, yes.

15   Q.  And do you have an opinion whether or not Defendant Leo

16   violated the national standard of care -- have you rendered

17   an opinion based on whether or not Defendant Leo violated

18   the national standard of care as to the subject matter of

19   moving from -- shooting -- discharging his weapon from a

20   moving vehicle?

21   A.  Yes.

22   Q.  And, sir, in rendering that opinion, did you render that

23   opinion with a reasonable degree of certainty as it applies

24   to your expertise in the subject matter of police practices,

25   procedures, and protocols?

1    A.  Yes.

2    Q.  And can you please tell us whether or not Defendant Leo

3    violated or breached that national standard of care.

4    A.  He did.

5    Q.  And once again, can you please explain how he violated

6    that national standard of care.

7    A.  He fired from a moving vehicle as it was proceeding --

8    as he was pursuing, which he was violate -- well, that's

9    another general order, but he was pursuing the decedent in

10   this case.  He fired from a moving vehicle, and he had no --

11   there was no reasonable suspicion to shoot and kill the

12   decedent in this case.

13   Q.  Now, sir --

14   A.  And more so, he didn't have the authority -- national

15   standard violation, he didn't have the authority to even

16   stop the decedent in this case.  He pursued him because he

17   was running.

18         MR. PONDS:  The Court's indulgence.

19   Q.  Sir, based on your observations of the videotape --

20   A.  Yes, sir.

21   Q.  -- as well as reviewing the enormous amount of materials

22   that you reviewed in this case, do you have an expert

23   opinion with a reasonable degree of certainty whether or not

24   there was probable cause?

25   A.  There was not probable cause.  Yes, I have.

1          MR. DeBERARDINIS:  Probable cause for what, Your

2     Honor?

3          THE COURT:  Clarify the question.

4          MR. PONDS:  Yes.

5     Q.  Was there probable cause to effectuate a stop of

6     Ralphael Briscoe?

7          MR. DeBERARDINIS:  Those are separate -- apples

8     and oranges, Your Honor.  Objection.

9          MR. PONDS:  Well, I'll split it down.

10    Q.  Was there probable cause to seize Ralphael Briscoe?

11    A.  No.

12    Q.  Was there probable cause to give pursuit of Ralphael

13    Briscoe?

14         MR. DeBERARDINIS:  Now we're on apples and

15    oranges, Your Honor.  Probable cause is a different concept.

16         THE COURT:  I can't help him with that.  It's your

17    witness.

18         MR. PONDS:  Yes.

19    A.  Your question again, sir?

20    Q.  Well, was there probable cause -- well, let me ask --

21    specify.

22         Was there probable cause to shoot -- for Defendant

23    Leo to shoot Ralphael Briscoe?

24    A.  No.

25    Q.  Was there probable cause for Defendant Leo to stop

1     Ralphael Briscoe?

2     A.  No.

3              MR. DeBERARDINIS:  Now objection, Your Honor.

4     Again, it's a different concept.

5              THE COURT:  You can clear that up.

6              MR. DeBERARDINIS:  Very well, Your Honor.

7              THE COURT:  Okay.

8              (Pause)

9     Q.  Mr. Bradley?

10    A.  Sir.

11    Q.  In your expert opinion, within a reasonable degree of

12    certainty as it applies to police procedures, practices, and

13    protocols, was Ralphael Briscoe under arrest?

14    A.  He was not.

15    Q.  He was not?

16    A.  Oh, was he ever arrested?  I'm sorry.  I misunderstood

17    your question.

18    Q.  Was he ever arrested?

19    A.  Yes.

20    Q.  Do you have an opinion as to the -- do you have an

21    expert opinion as it applies to the length of detention?

22    More specifically, whether the length of detention was

23    justified?

24    A.  Which one do you want me to answer?

25    Q.  Well, let's start with this.  Was it proper for the

1   officers, once they came onto the scene when Ralphael

2   Briscoe was on the ground, to place handcuffs on him?

3   A.   Yes.

4   Q.   When did it become, in your expert opinion,

5   impermissible to have him in handcuffs?

6   A.   The reason to place him in handcuffs was for officer

7   safety.

8   Q.   Is that something that's standard?

9   A.   That's a standard.

10   Q.   Okay.

11   A.   But the decedent didn't commit any crimes.  The decedent

12   ran up the street, and the defendant pursued him for the

13   purpose of seizing his person, which he accomplished by

14   shooting him in the back.

15         So if you're going to ask me when the arrest took

16   place --

17   Q.   Well, let me formulate a question on that.  Do you have

18   an expert opinion, within a reasonable degree of certainty

19   as it applies to the subject matter of police practices,

20   procedures, and protocols, whether or not Mr. Briscoe was

21   unlawfully seized when he was shot?

22   A.   He was.

23   Q.   And why is that, sir?

24   A.   Because he was not free to go.  He was detained by -- he

25   was stopped by shooting him in the back.

1    Q.   Now, was that a violation of -- the shooting of Ralphael

2    Briscoe, was that a violation of any general order that's

3    contained within the Metropolitan Police Department?

4    A.   Many.   I mean, yes, it was.   901.7.

5    Q.   901 -- is that contained in 901.07?

6    A.   Correct.

7    Q.   Any other general order that you can think of, sir?

8    A.   Well, we're going back to the -- if you're asking me

9    about the stop and the detaining, that was in the previous

10   general order that we discussed having to do with -- I

11   believe it was the one we handled with duties and

12   responsibilities -- no, I'm sorry, stop and frisk.

13   Q.   Well, Mr. Bradley, do you have an expert opinion as it

14   applies to -- with a reasonable degree of certainty as it

15   applies to police practices, protocols, and procedures

16   whether there was a threat to the officer at the time he

17   shot Ralphael Briscoe?

18   A.   I do.

19   Q.   And what is that opinion?

20   A.   That there was no threat to the officer, or any other

21   officers.

22   Q.   Did Defendant Leo breach the national standard of care

23   when he shot Ralphael Briscoe on April the 26th, 2011?

24   A.   Among other things, yes.

25   Q.   Well, just dealing with that.   And have you formulated

```
 1    an expert opinion as it applies to your expertise in the

 2    subject matter of police practices, protocols, and

 3    procedures whether or not Defendant Leo breached the

 4    national standard of care?

 5    A.   I have.

 6    Q.   Can you please explain.

 7    A.   That he did breach the national standard of care by

 8    shooting Mr. Briscoe in the back when there was no threat.

 9              THE COURT:  Mr. Ponds, we're coming up on 3:15.

10              MR. PONDS:  Can we break at this point, Judge?

11              THE COURT:  Why don't we break at this point?

12              MR. PONDS:  Okay.  Thank you.

13              THE COURT:  Ladies and gentlemen, we're going to

14    take our afternoon break at this point for about 15 minutes.

15    As always, don't talk about the case, don't do any research

16    about the case, and please avoid any of the parties and the

17    witnesses.  Thank you.

18              Mr. Bradley, you're excused for 15 minutes.  Don't

19    speak -- you're still under oath.

20              THE WITNESS:  Absolutely.

21              THE COURT:  Okay.  We'll see you in 15 minutes.

22              (Recess taken)

23              THE COURT:  Mr. Bradley, you can come back up.

24              THE WITNESS:  Thank you, sir.

25              THE COURT:  You're welcome.
```

1          MS. WEST:  Your Honor, we have one thing I think

2     we should bring up before the jury comes in.

3          As the Court knows, we've been trying to serve

4     several witnesses and find several witnesses in this case,

5     and I just got an email from our investigator within the

6     last hour that he spoke with Ms. LaTonya Boyd.  He's going

7     out to find her right now, and we're going to get an

8     additional subpoena for him with a new date.

9          THE COURT:  For him or her?

10          MS. WEST:  For her, but for him to give to her --

11          THE COURT:  Oh, I see.

12          MS. WEST:  -- with the appropriate dates since

13     we're this far into trial.

14          THE COURT:  So she'll be a rebuttal witness, if

15     anything?

16          MS. WEST:  Well, we were hoping we would call her

17     tomorrow morning.  I was hoping he could get her here this

18     afternoon, but she's at work, so I'm still waiting to hear

19     from him.  It's in flux.  I just wanted the Court to be

20     aware.

21          THE COURT:  If you can get her tomorrow morning,

22     how long will she last?

23          MS. WEST:  15 minutes, 15 max.

24          THE COURT:  Okay.  I'll give you until 9:45, but

25     we have Officer Sheehan who is going to be ready to go in

1    the morning.

2              MS. WEST:  Yes, Your Honor.  It may be that I step

3    out during the proceedings.  May I have permission to do

4    that, Your Honor?

5              THE COURT:  Sure.

6              MS. WEST:  Thank you.

7              (Jury enters courtroom)

8              THE COURT:  Okay.  Welcome back.

9              Mr. Ponds.

10             MR. PONDS:  Thank you, Your Honor.

11   BY MR. PONDS:

12   Q.  Mr. Bradley?

13   A.  Yes, sir.

14   Q.  In your expert opinion on the subject matter of police

15   procedures, practices, and protocols, were the actions of

16   Defendant Leo on April the 26th, 2011, a violation of

17   Ralphael Briscoe's civil rights pursuant to the Fourth

18   Amendment to the United States Constitution?

19             THE COURT:  Mr. Ponds, please approach.

20             (The following is a conference held at the

21              bench outside the hearing of the jury)

22             THE COURT:  Okay.  So that's an ultimate issue,

23   right?  That's an ultimate issue in the case, okay.  That's

24   the province of the jury.

25             You can ask him about elements of that.  Was there

1    a threat?  Was his use of force appropriate given the

2    threat?  Questions like that.

3                 MR. PONDS:  Yes, sir.

4                 THE COURT:  But I don't want him expressing an

5    opinion as to what is in the jury's province, which is

6    whether it was a violation of his Fourth Amendment rights or

7    not.  Okay?

8                 MR. PONDS:  Understood, Your Honor.

9                 THE COURT:  Is that clear?

10                MR. PONDS:  Yes, sir.

11                MS. FEATHERSTONE:  Thank you, Your Honor.

12                (This is the end of the bench conference)

13   BY MR. PONDS:

14   Q.  Mr. Bradley, based on your -- do you have an expert

15   opinion within a reasonable degree of certainty as it

16   applies to the subject matter of police practices,

17   procedures, and protocols whether or not Ralphael Briscoe

18   posed a threat to Defendant Leo?

19   A.  I do.

20   Q.  And what is that opinion, sir?

21   A.  That at the time he was shot, he posed no threat to

22   anyone.

23   Q.  Now, sir, in reaching that conclusion, did you rely on

24   the various general orders?

25   A.  Yes.

1    Q.  And based on reaching your conclusions and making that

2    determination as to whether or not Defendant Leo -- whether

3    or not Ralphael Briscoe was a threat to Defendant Leo, did

4    Defendant Leo breach any national standard of care in

5    shooting him when Ralphael Briscoe posed no threat?

6    A.  Yes.

7    Q.  Please explain.

8    A.  There was no threat.  The general orders -- the national

9    standard of care is clear that police officers cannot shoot

10   people down for running or when there's no threat -- not

11   just running, but no threat at all against the officer or

12   other people, passersby or whatever.

13   Q.  Now, the Metropolitan Police Department general orders,

14   do any of those orders speak to that issue?

15   A.  Yes.

16   Q.  And which general orders would that be?

17   A.  901.7.

18   Q.  Okay.  And you've already discussed 901.07?

19   A.  That's correct.

20   Q.  Now, sir, in formulating that opinion, did you take into

21   consideration that Ralphael Briscoe was --

22          MR. DeBERARDINIS:  Objection; leading, Your Honor.

23          MR. PONDS:  I'll rephrase.

24   Q.  Did you -- in making your determination --

25          MR. DeBERARDINIS:  Objection; leading, Your Honor.

1    What did you take into consideration?

2              THE COURT:  Sustained.

3    Q.  Mr. Bradley, did you look at the videotape?

4    A.  I did.

5    Q.  Did that factor into your consideration?

6    A.  It did.

7    Q.  Please tell us why.

8    A.  I watched the videotape maybe 50 times, backwards and

9    forwards, and at no time did the decedent ever pose a threat

10   to Officer Leo.  During the pursuit to the time he made the

11   turn to go into the driveway that would go to the wooded

12   area, at no time was there a threat or even a -- or even a

13   gesture of a threat toward Officer Leo.

14   Q.  Now, in terms of whether or not Ralphael Briscoe posed

15   any threat to Defendant Leo, was there anything in that

16   video that you watched that would indicate to you that any

17   actions that Ralphael Briscoe took that's captured on the

18   videotape posed a threat to Defendant Leo?

19   A.  I saw none.

20             MR. PONDS:  Your Honor, permission to play

21   Plaintiff's Exhibit 13, the videotape, a small portion?

22             THE COURT:  Permission granted.

23   Q.  What we're going to do, Mr. Bradley -- we're going to --

24   you've seen the videotape.  Have you seen it in full speed?

25   A.  I have.

1    Q.  And have you seen it in a slower speed?

2    A.  I have.

3    Q.  All right.

4         MR. PONDS:  If we can start with the full speed,

5    please.

6         (Video playing)

7         MR. PONDS:  All right.  If you can stop it, and

8    then rewind it and go back to slow motion.

9    Q.  Mr. Bradley, this portion of the videotape you've

10   seen -- have you seen the whole tape?

11   A.  I have.

12   Q.  And you've seen this portion?

13   A.  I have.

14   Q.  And in watching that video in slow motion -- I mean, in

15   fast motion what does it appear that Ralphael Briscoe is

16   doing?

17   A.  Running away.

18   Q.  Was there a threat at any point when Ralphael Briscoe

19   was running on that sidewalk up to the point till he got to

20   the mouth of the driveway, when he was shot?

21   A.  Was there a threat?  No.

22   Q.  Was there a threat at any point --

23   A.  No.

24   Q.  -- to Defendant Leo as Ralphael Briscoe -- in terms of

25   him running and turning down the driveway on April the 26th,

1    2011?

2    A.  There was no threat.

3    Q.  Additionally, was there -- based on reviewing the tape

4    in full speed, was there any threat to any of the officers

5    that may have been on the scene that day?

6    A.  No.

7    Q.  And why do you say that, sir?

8    A.  Because there were no hand gestures.  There was no --

9    there was no threat to anyone.  The decedent was running

10   away.

11   Q.  Is that -- what we previously -- do you recall

12   previously discussing resistance?

13   A.  Yes.

14   Q.  What would you describe it -- how would you describe

15   Mr. Briscoe's conduct in the videotape?

16   A.  There was no resistance.  He was trying to get away.

17   Q.  Okay.

18           MR. PONDS:  If we could go through it in slow

19   motion, please.

20           (Video playing)

21           MR. PONDS:  Okay.  Thank you, Mr. Thomas.

22   Q.  Mr. Bradley, did you have an opportunity to view the

23   monitor as that clip of the video ran in slow motion?

24   A.  I did.

25   Q.  Viewing the videotape of Ralphael Briscoe running along

1    the sidewalk and as he began to make that right turn into

2    the driveway of 2409 Elvans Road, did you see any actions on

3    the part of Ralphael Briscoe that would have threatened the

4    life of Defendant Leo?

5    A.   No.

6    Q.   Did you see any actions on the part of Ralphael Briscoe

7    that would have threatened the life of anyone else in that

8    SUV?

9    A.   No.

10   Q.   Were those factors that -- were those factors that you

11   considered in terms of formulating your opinion?

12   A.   Absolutely.

13   Q.   Now, Mr. Bradley, have you been out to 2409 Elvans Road

14   where that driveway is?

15   A.   Yes.

16   Q.   How many times have you been to that exact location in

17   the past, say, couple of years?

18   A.   Eight or nine.  Oh, the last couple of years?  Eight or

19   nine.

20   Q.   Okay.  Now, sir, have you ever gone into the backyard of

21   that house where the driveway leads to?  Well, the house is

22   alongside the driveway.

23   A.   I walked the entire area.

24   Q.   What's in back of that home?

25           MR. DeBERARDINIS:  Objection, Your Honor.  This is

1    cumulative.

2          THE COURT:  Overruled.

3    A.  Woods and apartment buildings on the other side.

4    Q.  Is there any general order that covers knowing your

5    environment in the background before a police officer

6    discharges his weapon?

7    A.  Yes.

8    Q.  And what is that, sir?

9    A.  901.7.

10   Q.  901.7?

11   A.  Yes, sir.

12   Q.  And can you explain to the ladies and gentlemen of the

13   jury what it means to know your background and your

14   environment.

15   A.  You have to first look at where that bullet may go if it

16   doesn't strike the person that you're aiming your weapon at.

17   You always have to be careful of what the background is

18   before discharging a weapon because bullets have no eyes.

19   They just go where they go.

20   Q.  And when you were on the scene the times that you were

21   at the location of 2409 Elvans Road, did you notice what was

22   in back of that house specifically?

23   A.  Right.  There's woods, a wooded area.  It more kind of

24   shoots off from the left over to the right, and then there's

25   apartment buildings.

1    Q.  Now, sir, have you formulated any opinions as to whether

2    or not Defendant Leo violated General Order 901.07 as a

3    result of not knowing the environment or the background

4    before discharging his weapon?

5    A.  I have.

6    Q.  And what section does that specifically apply to, sir?

7              THE COURT:  Give us an exhibit number, Mr. Ponds.

8              MR. PONDS:  The exhibit number is 71, Your Honor.

9    A.  It would be -- actually, it would be the third paragraph

10   under "Background."

11   Q.  What page is that on, Mr. Bradley?

12   A.  The first page.  And it pertains to the D.C. Municipal

13   Regulations, 6A.

14   Q.  6A.

15   A.  No, the first page, sir, the third paragraph.

16   Q.  Let me provide you with a copy of what has previously

17   been admitted as 901.07.

18             MR. PONDS:  Permission to publish again, Your

19   Honor?

20             THE COURT:  Granted.

21   Q.  Can you please read the appropriate section,

22   Mr. Bradley.

23   A.  Yes, sir.

24   Q.  And can you point out the paragraph, sir.

25   A.  It would be the third paragraph.  It begins with 61

1    DCMR, for District of Columbia Municipal Regulations, 207.2,

2    and halfway down -- a little more than halfway down they're

3    talking about felons, again -- and, again, this case doesn't

4    involve a felony, but, nonetheless, "provided that the

5    felony for which the arrest is sought involved an actual or

6    threatened attack which the officer has reasonable cause to

7    believe could result in death or serious bodily injury; and

8    provided further, that the lives of innocent persons will

9    not be endangered if the officer uses his or her firearm."

10   Q.  Mr. Bradley, have you formulated an expert opinion as to

11   whether or not Defendant Leo violated General Order 901.07

12   in his failure to know his background or environment before

13   discharging his weapon?

14   A.  Yes.

15   Q.  And what is that opinion?

16   A.  That he recklessly fired his weapon from a moving car

17   without taking into consideration the background of the

18   target.

19   Q.  Now, Mr. Bradley, have you formulated an opinion -- have

20   you formulated an expert opinion within the subject matter

21   of police practices, procedures, and protocols as to whether

22   or not Officer -- Defendant Leo violated the national

23   standard of care by not knowing the background and

24   environment before discharging his weapon?

25   A.  I have.

1    Q.  And what is that, sir?

2    A.  That's universal in any discharge of firearms, that the

3    officer or the agent must be sure of his background before

4    he discharges a firearm.

5    Q.  And what is the purpose of those general orders?

6    They're kind of consistent across the United States on this

7    subject matter.

8    A.  They're directives.  They're orders.  They're the

9    protocols for which police officers function.

10   Q.  Well, this specific rule -- is this specific rule to

11   protect citizens?

12   A.  Of course.

13   Q.  Does it allow an officer to shoot into a public space

14   without knowing what that background is?

15   A.  No, private or public.

16   Q.  Mr. Bradley, are there any regulations or general orders

17   in terms of the minimum amount of force used by police

18   officers in the Metropolitan Police Department?

19   A.  Sure.

20   Q.  And what would that be, sir?

21   A.  901.07.

22   Q.  Okay.  Is there another -- is there any DCMR regulation

23   that goes along with that?

24   A.  There is.

25   Q.  And can you please tell us what that is.

1    A.   6A, DCMR Section 207.1.

2              MR. PONDS:   The Court's indulgence.   And, Your

3    Honor, that's going to be Exhibit 85.

4              THE COURT:   Exhibit 5?

5              MR. PONDS:   85.

6              THE COURT:   85.

7              MR. PONDS:   If I could approach, Your Honor?

8              THE COURT:   You may.

9    Q.   Mr. Bradley, I want to show you what is Plaintiff's

10   Exhibit 85.   Can you please tell us what 85 is.

11   A.   That's D.C. Municipal Regulations and D.C. Register, and

12   it's the use of firearms and other weapons, Rule 6A, 207.

13   Q.   Do you have a copy of that, sir?

14   A.   I do.

15   Q.   Okay.   Do you need it to refresh your recollection?

16   A.   No.

17   Q.   Okay.   And does this regulation --

18             MR. PONDS:   Your Honor, at this time the

19   plaintiffs would like to move into evidence Plaintiff's

20   Exhibit 85.

21             THE COURT:   Any objection?

22             MR. DeBERARDINIS:   No, Your Honor.

23             THE COURT:   So moved.

24   Q.   And Mr. Bradley, what aspect of Plaintiff's Exhibit 85

25   did you utilize in forming any opinions?

```
 1    A.  201 -- 207.1 and 207.2.

 2              MR. PONDS:  Permission to publish, Your Honor?

 3              THE COURT:  Granted.

 4              MR. PONDS:  Granted?

 5              THE COURT:  Granted.

 6              MR. PONDS:  Thank you, sir.

 7    A.  And also 207.3.

 8    Q.  Now, let's discuss 207.1.  How does that apply in terms

 9    of you formulating an opinion, an expert opinion, in this

10    case?

11    A.  That the Metropolitan Police Department has indicated

12    that it is the policy in all cases that only a minimum

13    amount of force be used consistent with the accomplishment

14    of his or her mission, talking about police officers.

15    Q.  What other part of 207 applies to the facts of this case

16    that you used in formulating your opinion, sir?

17    A.  207 -- well, let me finish this one.

18    Q.  Oh, please.

19    A.  "Shall exhaust every other reasonable means of

20    apprehension or defense before resorting to firearms."

21    Q.  What do they mean by "defense"?  What does that speak

22    to?

23    A.  I think they're speaking to a fact that if -- let's say

24    you're in a confrontation and -- we're back again to the

25    force continuum where someone's fighting you or struggling
```

 1    with you.  You should try to use every other defensive

 2    method before resorting to deadly force.

 3    Q.  What other aspect of 207 does -- 207.2, did you utilize

 4    that --

 5    A.  Yes.

 6    Q.  -- in forming your expert opinion?

 7    A.  "No member of the Metropolitan Police Department shall

 8    discharge a firearm in the performance of police duties

 9    except under the following circumstances:  To effect the

10    arrest or prevent the escape, when every other means of

11    effecting the arrest or preventing the escape has been

12    exhausted, of a person who has committed a felony or has

13    attempted to commit a felony in the officer's presence; or

14    when the felony has been committed and the police officer

15    has reasonable grounds to believe the person he or she is

16    attempting to apprehend committed the felony, provided that

17    the felony for which the arrest is sought involved an actual

18    or threatened attack which the officer has reasonable cause

19    to believe could result in death or serious bodily injury,

20    and provided further, that the lives of innocent persons

21    will not be endangered if the officer uses his or her

22    firearm."

23    Q.  Now, looking at 207.2(a) and (b), what facts of the

24    shooting of Ralphael Briscoe applies to either 207.2(a) or

25    (b)?

1   A.  It's at the beginning.  "No member of the police

2   department shall discharge his firearm unless these

3   circumstances are in effect," and neither A nor B were in

4   effect.

5   Q.  In rendering your expert opinion in the subject matter

6   of police practices, procedures, and protocols, did you make

7   a determination whether Defendant Leo violated 207.2, either

8   Section (a) or (b) or both?

9   A.  I did.

10  Q.  And what was the basis of you reaching that expert

11  opinion?

12  A.  Review of the tape, statements, transcripts, crime scene

13  diagrams, photographs.

14  Q.  Also in conjunction with that, did Defendant Leo also

15  breach a national standard of care as Rule -- as is

16  applicable to Rule 207.2(a) and (b)?

17  A.  He did.

18  Q.  And once again explain why.

19  A.  Because, one, there was no -- he was not defending

20  himself from attack, he was not being attacked, and the

21  decedent in this case was running away.  He was not a

22  fleeing felon, and there was no reason to discharge his

23  firearm.

24  Q.  Mr. Bradley, did you review any general orders that

25  addressed the subject matter of handling service weapons?

1   A.  I did.

2   Q.  Were any of the provisions of -- and what rule was that,

3   sir?

4              MR. DeBERARDINIS:  Objection, Your Honor;

5   relevance.

6              THE COURT:  I'm sorry, restate the question.

7              MR. PONDS:  If I could just have the Court's

8   indulgence?

9              THE COURT:  Yes.

10             MR. PONDS:  Yes, I'll rephrase the question.

11  Q.  Mr. Bradley, in formulating your expert opinion in this

12  case, did you rely, if any, on General Order 901.01?

13  A.  I reviewed it.

14  Q.  You reviewed it.  Is there anything in that rule -- in

15  that general order that's applicable to the facts of this

16  case?

17  A.  Not in my opinion.

18  Q.  Not in your opinion.

19             Mr. Bradley, in formulating any conclusions in

20  this case, did you rely on --

21             MR. DeBERARDINIS:  Objection, Your Honor.  This is

22  leading.

23             MR. PONDS:  I'll rephrase the question.  I'll

24  rephrase.

25  Q.  Mr. Bradley, are there any other regulations or general

1    orders that you relied upon in rendering an opinion in this

2    case as it applies to use of force?

3    A.  You know, I looked at the training modules that were

4    given in the cases.  Most of them are a repetition of 901.7.

5    Q.  Rep --

6    A.  Repetition.  So I don't -- there's standards in there.

7    There's *Graham vs. Connor*.  There's *Tennessee vs. Garner* or

8    *Garner vs. Tennessee*.  They're all mentioned in there.

9    There's some training that's given in the police academy

10   that kind of rehashes what we've discussed today.

11   Q.  Okay.  Talking about training at the academy, are

12   recruits at the police academy required -- are they given a

13   set of the general orders?

14   A.  Absolutely.

15   Q.  Are they required to know their general orders?

16   A.  Absolutely.

17   Q.  Does that continue once the recruit graduates from the

18   police academy?

19   A.  Yes.

20   Q.  Is it required for the officer -- well, the recruit,

21   once he becomes an officer, to know the general orders?

22   A.  Yes.

23   Q.  At any point in the officer's career is he excused from

24   not knowing the general orders?

25   A.  No.

1   Q.  Is it any type of defense to any disciplinary action by

2   not knowing the general order?

3   A.  No; and that includes the special orders in the

4   circulars, also.

5   Q.  So in your opinion, sir, your expert opinion, the

6   general orders dealing with the recruit training program is

7   incorporated in 90.107 [sic] general order?

8   A.  And the D.C. Municipal Regulations, the D.C. code, and

9   the policy of the Metropolitan Police Department, which is

10  the 901.7.

11  Q.  Now, Mr. Bradley, are there any general orders that deal

12  with the subject matter of duties and responsibilities and

13  conduct of members of the Metropolitan Police Department?

14  A.  There are.

15  Q.  And can you please identify what general order that is.

16  A.  Bear with me a second.

17  Q.  Take your time.

18  A.  It's General Order 201.26.

19  Q.  201, No. --

20          MR. PONDS:  Your Honor, that's Exhibit No. 141.

21          THE COURT:  141?

22          MR. PONDS:  Yes.

23          MS. FEATHERSTONE:  Exhibit 141?

24          MR. PONDS:  Yes, 141.

25          MS. FEATHERSTONE:  Okay.

1    Q.  Now, Mr. Bradley --

2              MR. PONDS:  If I could approach the witness, Your

3    Honor?

4              THE COURT:  You may.

5    Q.  -- I'd like to show you what has been marked for

6    identification as Plaintiff's Exhibit 141.

7    A.  Okay.

8    Q.  Okay.  And what is that, sir?

9    A.  General Order 201.26, "Duties, Responsibilities and

10   Conduct of Members of the Department."

11             MR. PONDS:  Your Honor, at this time we'd move --

12   we request permission to move into evidence Plaintiff's

13   Exhibit 141.

14             MR. DeBERARDINIS:  Objection, Your Honor.

15             THE COURT:  Foundation?

16             MR. DeBERARDINIS:  Among other things.  Foundation

17   and relevance actually.

18             MR. PONDS:  Let me see if I can establish the

19   foundation.

20             THE COURT:  Link it up, yes.

21   Q.  Now, Mr. Bradley, in reviewing General Order 201 No. 26,

22   "Duties and Responsibilities and Conduct of Members of the

23   Police Department," can you please tell me how this general

24   order would apply to any of the facts in the case that

25   you're testifying about.

1    A.   Number -- under "Responsibilities," No. 30.

2    Q.   No. 30.  If you could just indulge me.

3    A.   It's on Page 5.

4    Q.   On Page 5.  Page 5 that states "5 of 11"?

5    A.   "5 of 11."

6    Q.   Okay.  If you could just indulge me for a second,

7    Mr. Bradley.

8              MR. DeBERARDINIS:  I'd like to approach the bench

9    on this, Your Honor.

10             THE COURT:  Yes.  Please do.

11             (The following is a conference held at the

12              bench outside the hearing of the jury)

13             MR. DeBERARDINIS:  No. 30 says an officer is

14   supposed to testify truthfully.  The issue here is the jury

15   is going to have to determine whether he's testifying

16   truthfully.  And the fact that it's an order of the

17   Metropolitan Police Department is of no moment, and it's

18   prejudicial suggesting that somehow this expert is

19   suggesting that he's not being truthful.

20             THE COURT:  I'm going to limit you on this one for

21   those reasons.  I think you can ask him that if one were to

22   conclude that an officer did not testify truthfully, would

23   it violate this order?  I think that's fair game.

24             MR. PONDS:  Okay.

25             THE COURT:  But to have him say the guy lied, I

1    don't think is appropriate.

2           MR. PONDS:  I agree with you.

3           MR. DeBERARDINIS:  But he's planting the seed by

4    the --

5           THE COURT:  I know.

6           MR. DeBERARDINIS:  I think it's improper.

7           THE COURT:  It's in the order, okay?

8           (This is the end of the bench conference)

9    BY MR. PONDS:

10   Q.  Mr. Bradley, looking at General Order 201 and going to

11   No. 30, I have a specific question to ask you.

12   A.  Yes.

13   Q.  Embodied in that question is going to be a yes or no

14   answer.

15   A.  Yes, sir.

16   Q.  If someone concluded that an officer provided untruthful

17   information, would Paragraph 30 apply?

18   A.  It would.

19          MR. PONDS:  Your Honor, we renew our request to

20   introduce Plaintiff's Exhibit 141.

21          THE COURT:  Mr. DeBerardinis?

22          MR. DeBERARDINIS:  Subject to our previous

23   objection.

24          THE COURT:  Okay, objection overruled.  141 is

25   admitted.

```
 1              MR. PONDS:  Permission to publish?

 2              THE COURT:  Yes.

 3   Q.  Mr. Bradley, bringing your attention to No. 30, without

 4   commenting on the facts of this case, what is your

 5   understanding of how Paragraph 30 applies as to police

 6   officers?

 7   A.  That police officers will always be truthful in any

 8   responses they make to inquiries by investigating or

 9   superior officers.

10   Q.  Mr. Bradley, is there any other section of 201 that

11   would be applicable?

12   A.  Yes.

13   Q.  Which paragraph?

14   A.  This order jumps and it has an addendum to it, and the

15   older -- the older order was incorporated in it.  So it

16   would be Page 7 of the addendum entitled "Conduct" -- at the

17   top of it it says, "Conduct toward the public," and it's

18   Page 7 of 201.26 with a revision date of 6/25/86.

19   Q.  Okay.  And which paragraph?

20   A.  No. 7.

21   Q.  And that is consistent with your response as to

22   Paragraph 30?

23   A.  Correct.

24              MR. DeBERARDINIS:  We make the same objection to

25   this testimony, Your Honor, as we did before.
```

1          THE COURT:  Overruled.

2          MR. PONDS:  Your Honor -- excuse me.

3   Q.  Mr. Bradley, have you come to any conclusions as to

4   whether Ralphael Briscoe was being detained when he was

5   escorted to the hospital by a Metropolitan police --

6          MR. DeBERARDINIS:  This is beyond the scope of

7   expertise here and beyond the scope of discovery.

8          THE COURT:  Overruled.

9   A.  Yes.

10  Q.  Have you formulated an expert opinion -- well, strike

11  that.

12          Mr. Bradley, have you come to a -- well, have

13  you -- have you formulated an expert opinion whether or not

14  Ralphael Briscoe was being detained because he was escorted

15  to the hospital by a Metropolitan police officer after he

16  had been shot?

17  A.  I have.

18  Q.  And what is your -- what is your expert opinion

19  concerning that, sir?

20          And let me ask you this:  Is that opinion that

21  you're rendering within a reasonable degree of certainty as

22  it applies to your subject matter -- the subject matter that

23  you're expert in, police procedures, practices, and

24  protocols?

25  A.  Yes.

1    Q.  And what is that opinion?

2    A.  That from the time that the decedent was shot, that he

3    was seized by the police, including the time he was on the

4    ground and handcuffed to the time he got medical care and

5    was placed in an ambulance.  From then on he was -- from the

6    time of the shooting, he was in police custody.

7    Q.  Now, Mr. Bradley, have you -- well, let me ask you this:

8    Have you formulated an expert opinion as to whether or not

9    the police officer riding with Mr. Briscoe in the ambulance

10   to the hospital was a violation of the national standard of

11   care?

12   A.  Yes.

13   Q.  And in formulating an opinion, is that opinion rendered

14   with a reasonable degree of certainty in your subject matter

15   of expertise as it applies to police practices, protocols,

16   and procedures?

17   A.  Yes.

18   Q.  And can you please render that expert opinion.

19   A.  Again, he was seized from the time he was shot, and he

20   was unlawfully seized and shot, put in an ambulance and

21   taken to the hospital under police custody.  He had

22   committed no crime except being shot.

23   Q.  In your experience as a Metropolitan police officer, if

24   a patient is registered as a John Doe when he's escorted by

25   a police officer, what does that mean?

1   A.  That they didn't know his name.

2   Q.  Okay.  Now, sir, do you -- as to -- have you rendered

3   a -- have you reached any expert opinions in terms of

4   whether or not Ralphael Briscoe was either assaulted or

5   battered by Officer -- by Defendant Leo?

6        MR. DeBERARDINIS:  This is the same thing the

7   Court went over earlier.

8        THE COURT:  Sustained.

9        MR. PONDS:  Okay.

10       If I could just have the Court's indulgence, I

11  just want to double-check.

12  Q.  Mr. Bradley, I just have a few questions, a few final

13  questions to ask you.

14       Now, sir, have you ever testified as an expert

15  witness on behalf of any member of law enforcement?

16  A.  Yes, sir.

17  Q.  Approximately how many times?

18  A.  I'm not sure.

19  Q.  Mr. Bradley, while employed by the Metropolitan Police

20  Department, were you ever -- did you ever have to discharge

21  your weapon?

22  A.  Yes.

23  Q.  How many times over the course of that 25 and a half

24  years?

25  A.  Twice.

1    Q.  Okay.  Can you please explain what happened.  What year

2    the first --

3              MR. DeBERARDINIS:  Relevance, Your Honor.

4              THE COURT:  Overruled.

5    A.  1970 or '71.  I think it was '71.

6    Q.  What were the facts and circumstances?

7    A.  I was in uniform.  I had received information from

8    another officer that a subject -- an armed subject would be

9    exiting a building in the vicinity of 16th and Park Road.

10   Q.  Northwest?

11   A.  Yes, sir.  And the subject matching the description of

12   the information given to me by the officer exited the

13   building and crossed 16th Street right behind Bell

14   Vocational High School.  It's an open field.  It's right

15   there at Hyatt Place where it meets 16th.

16              Upon approaching -- because we were caught up in

17   traffic, upon approaching the subject -- and there was kind

18   of a parking lot behind it -- he turned, and he was looking

19   at an eight-foot or ten-foot fence that surrounds -- to this

20   day that surrounds Bell Vocational.  And he fired at myself

21   and my partner, and he climbed -- he scaled the fence.  We

22   took cover.  He scaled the fence.

23   Q.  Let me ask you:  Where were you?  Were you in a vehicle?

24   Were you --

25   A.  I was in a vehicle.

1   Q.  You were in the vehicle when the assailant fired upon

2   you?

3   A.  Fired -- yes, that's correct.

4   Q.  Once he fired upon you, what did you do?

5   A.  I tried to get the car stopped to take cover.

6   Q.  And did you exit the car?

7   A.  I did.

8   Q.  And where did you take cover?

9   A.  Well, I took cover behind the door of the car, but by

10  this time he had climbed -- scaled the fence and had dropped

11  to the other side.

12  Q.  What did the assailant do once he jumped to the other

13  side?

14  A.  He started to run.  I got to the fence, and he turned

15  and fired again, and I returned fire.

16  Q.  Was there another incident?

17  A.  1994.

18          MR. DeBERARDINIS:  Objection, relevance.

19          THE COURT:  Overruled.  Quickly, Mr. --

20          MR. PONDS:  Yes.

21  A.  1994, doing a buy bust behind Howard University.  The

22  bad guy who did the swap with the informant, we approached

23  --

24  Q.  I mean, what was the swap?

25  A.  Crack cocaine for money.

1    Q.  Small amount?  Large amount?

2    A.  Half a kilo.

3         We approached the vehicle.  He ran.  I pursued

4    him.  I was the closest one to him.  I pursued him.  And

5    there's a big parking lot behind Howard.  He turned around,

6    fired at me, and I returned fire.

7    Q.  Okay.  Did you continue to pursue him?

8    A.  I did.

9    Q.  What happened next?

10   A.  I had a clear shot of him at V Street and Seventh, but

11   just as I set to get ready to fire, there was a Burger

12   King/McDonald's thing there, and a whole bunch of school

13   kids came out, so I couldn't fire any.  He ran down to

14   Georgia Avenue through a shoe store and escaped.  We

15   arrested him --

16   Q.  The assailant escaped?

17   A.  Yes.  We arrested him the next day.

18   Q.  And why didn't you fire at him when you had that clear

19   shot after he fired at you?

20   A.  Because there were kids coming out of the McDonald's.

21   Q.  Is that a part of the general orders in terms of knowing

22   your environment and your background?

23   A.  Absolutely.

24   Q.  But you could have put your life at risk?

25   A.  It's part of the job.

```
 1              THE COURT:  Overruled, if that's an objection.

 2              MR. DeBERARDINIS:  Relevance.

 3              THE COURT:  Overruled.

 4              MR. PONDS:  Mr. Bradley, thank you so much.

 5              THE WITNESS:  You're welcome, sir.

 6              THE COURT:  Your witness.

 7              MR. DeBERARDINIS:  Thank you, Your Honor.

 8                        CROSS-EXAMINATION

 9    BY MR. DeBERARDINIS:

10    Q.  Good afternoon, Mr. Bradley.

11    A.  Good afternoon, sir.

12    Q.  We've met before.

13    A.  We have.

14    Q.  Okay.  Mr. Bradley, you're not suggesting that

15    Mr. Briscoe was taken to jail before he was taken to the

16    hospital, are you?

17    A.  No.

18    Q.  And you're not suggesting that he was taken to court

19    before he went to the hospital?

20    A.  No.

21    Q.  And an officer was in the back of the ambulance?

22    A.  True.

23    Q.  And Mr. Briscoe went to the hospital.  Whether or not

24    there was an officer there, he's going to the hospital.

25    A.  The officer was there, yes, sir.
```

1    Q.   Yes.

2    A.   Yes, sir.

3    Q.   But with or without an officer, he's going to the

4    hospital.

5    A.   I would hope so.

6    Q.   And he went directly to the hospital.

7    A.   Yes, sir.

8    Q.   Okay.  Now, did I hear you say in order to seize someone

9    you have to have probable cause?

10   A.   Reasonable suspicion that they committed a crime.  If

11   you seize somebody, if you take away their Fourth Amendment

12   right and you stop them from going where they want to go --

13   and you can't do that on a whim or a guess or a hunch.

14   Q.   So that officer could get in the ambulance if he had a

15   reasonable suspicion that there was -- that Mr. Briscoe

16   committed a crime.  Is that your testimony?

17   A.   Sure.

18   Q.   Okay.  Now, the officer who went into that ambulance,

19   what did he know when he went in there?

20   A.   That the decedent had been shot.  Or Mr. Briscoe -- he

21   wasn't the decedent then.  Mr. Briscoe had been shot.

22   Q.   And he was told that he had been shot after the officer

23   had seen a gun in his hand, correct?

24   A.   I have no idea.

25   Q.   You have no idea.  So you cannot assess whether there

1    was a reasonable suspicion to get inside that ambulance, can

2    you, without knowing what the officer knew who got in there?

3    A.  He had already been seized, sir.

4    Q.  But the officer who was in the ambulance -- that's the

5    problem you have, the officer getting inside the ambulance,

6    is it not?

7              MR. PONDS:  Objection.  Objection to the form.

8              THE COURT:  Rephrase it.

9    Q.  You testified on direct that he was -- the seizure was

10   because the officer got in the ambulance and rode with him.

11   You had a problem with that, did you not?

12   A.  You misunderstood me.  I said I had a problem from the

13   time that he was shot.  He was seized at that time.

14   Q.  Okay.  And if there was a suspicion, articulable

15   suspicion that Mr. Briscoe pointed a gun at the officer and

16   the officer shot or that the officer was in reasonable fear

17   of his life, they would have an articulable suspicion to

18   seize him, correct?

19   A.  If that happened.

20   Q.  Yes, that's my question.

21   A.  If that happened.

22   Q.  Yes, absolutely.  And that's what the jury's going to

23   decide here.

24   A.  Exactly, exactly.

25   Q.  Okay.  Now, I heard you mention *Graham v. Connor*,

1    correct?

2    A.   Uh-huh.

3    Q.   You have trained officers in the use of force, have you

4    not?

5    A.   I have.

6    Q.   And you've been to -- you've been trained in the use of

7    force?

8    A.   I have.

9    Q.   You've talked to other people about the use of force?

10   A.   Yes, sir.

11   Q.   And is it not correct that whenever you discuss a police

12   officer's -- evaluating a police officer's use of force, you

13   have to evaluate it within the guidelines or the principles

14   of *Graham v. Connor*?

15   A.   Partially.

16   Q.   And, in fact, that's -- you have taught *Graham v.*

17   *Connor*?

18   A.   I have.

19   Q.   Okay.  And you refer to it by name, do you not?

20   A.   I do.

21   Q.   The Supreme Court case of *Graham v. Connor* instructs you

22   officers on how we're going to evaluate your conduct --

23   A.   Partially.

24   Q.   -- and use of force?

25   A.   Partially.

1    Q.   And other things, too.

2    A.   Sure.

3    Q.   Okay.  But that case is the gold standard, right?

4    A.   I wouldn't say that.

5    Q.   It's the first thing you look to, is it not?

6    A.   I look at *Garner vs. Tennessee*.

7    Q.   Another Supreme Court case.

8    A.   Right, exactly.

9    Q.   Okay.  And *Graham v. Connor* -- you're guided by

10   *Graham v. Connor* in assessing the conduct of a police

11   officer.  You're guided by the principle, are you not, that

12   the reasonableness of a particular use of force must be

13   judged from the perspective of a reasonable officer on the

14   scene?

15   A.   True.

16   Q.   Absolutely true, correct?

17   A.   True.

18   Q.   And you can't look at 20/20 vision of hindsight?

19   A.   That's what it says.

20   Q.   Not only does it say, that's what -- that's what you

21   teach, and that's how you evaluate the conduct.

22   A.   I'm agreeing with you.

23   Q.   Okay.  I just want to make sure.

24   A.   Okay.

25   Q.   In other words, this 20/20 hindsight, if an officer is

1     in reasonable fear of serious bodily injury or death, and

2     then he uses fatal -- he uses deadly force, and then later

3     it turns out that what appeared to be a real gun was a toy

4     gun, that doesn't matter because of 20/20 hindsight.

5     A.   You're asking me that question?

6     Q.   I'm asking you that question.

7     A.   If that was the case, yes.

8     Q.   If that was the case, yes.  That would be 20/20

9     hindsight?

10    A.   Correct.

11    Q.   Okay.  And when you evaluate the conduct of an officer

12    generally -- and you've done that many, many, many times,

13    have you not?

14    A.   I have.

15    Q.   Okay.  That's why you qualify as an expert, correct?

16    A.   If that's what you say.

17    Q.   Okay.  And when evaluating that officer, you must make

18    allowance for the fact that police officers are often forced

19    to make split-second judgments in circumstances that are

20    tense, uncertain, and rapidly evolving about the amount of

21    force that is necessary in a particular situation.

22    A.   Partially.

23    Q.   Officers have to make split-second decisions?

24    A.   That's true.

25    Q.   Am I going to shoot, or am I not going to shoot?  Split-

1    second decision.

2    A.  That's true.

3    Q.  And they have to base that on the totality of

4    circumstances that's been -- that they're aware of at that

5    point?

6    A.  That's true.

7    Q.  Okay.  And you would agree that pursuant to *Graham v.*

8    *Connor*, where a reasonable officer -- a reasonable

9    officer -- would conclude under the totality of the

10   surrounding facts and circumstances that a suspect poses a

11   threat of serious physical harm to the officer, his fellow

12   officers or to civilians, it is reasonable to use deadly

13   force?

14   A.  Partially.  I partially agree with that.

15   Q.  Partially?

16   A.  You take -- as you said before, the total package has to

17   be evaluated, what exactly took place.  Not just -- not just

18   that particular -- because you know *Graham vs. Connor* has to

19   do with a diabetic and rushing into a store and running out.

20   It's not really -- it's not as clear-cut as you're sounding

21   it here.

22   Q.  But if it's reasonable for an officer to suspect -- I

23   mean, if it was reasonable for a police officer to suspect

24   that a bad guy -- I'll not going to use the words "bad

25   guy" -- that an individual poses a threat of serious bodily

1   injury or death to him --

2   A.   Yes.

3   Q.   -- he's authorized to use deadly force.

4   A.   He is.

5   Q.   Okay.  So we agree on that?

6   A.   We do.

7   Q.   Okay.  And here again, that's ultimately going to be the

8   jury's mission in this case.

9   A.   It's the jury's job.

10  Q.   Okay.  Now, it sounded like you've been involved in a

11  gazillion investigations of crime investigations.

12  A.   I don't know a gazillion, but a lot.

13  Q.   Okay.  Maybe a billion and not a gazillion, okay.

14          Okay.  And you take statements from -- in a lot of

15  these investigations you have to deal with witnesses and

16  take their statements.

17  A.   I did.

18  Q.   Okay.  And that's part of -- that's a tool of

19  investigation, just one of the tools.

20  A.   Sure.

21  Q.   Okay.  Now, when you -- and frequently in cases there's

22  more than one witness.

23  A.   Sure.

24  Q.   Okay.  There would be several.  There would be several

25  witnesses?

1    A.   Sure.

2    Q.   And they all -- in many of the cases you've

3    investigated, the witnesses have viewed the facts and

4    circumstances from different vantage points, correct?

5    A.   Correct.

6    Q.   Mary's over here; Joe's over here; Charlie's up here.

7    Correct?

8    A.   Correct.

9    Q.   Okay.   And when you talk to these witnesses --

10            MR. PONDS:   Objection, Your Honor; relevancy.

11            THE COURT:   Overruled.

12   Q.   When you talk to these witnesses, based upon your

13   experience, it's not uncommon -- in fact, it's common --

14   that you get, in a case, witnesses who will view the same

15   incident and have different versions of what happened.   The

16   facts won't match up.

17   A.   Sometimes.

18   Q.   Okay.   And that does not -- that doesn't mean anybody's

19   necessarily lying, does it?

20   A.   Not unless there was something else.

21   Q.   Okay.   And, in fact, it just means that they have viewed

22   it from a different perspective?

23   A.   Sure.

24   Q.   And you don't say, "Oh, you disagree" -- "Your view is

25   different than Joe, you must be lying."   You've got to

1  take -- you've got to take it all from their perspectives.

2  A.  Everybody has an opinion.

3  Q.  It's not a question of opinion.  It's a question of --

4  A.  They're telling you what they saw.

5  Q.  -- perspectives, especially --

6        MR. DeBERARDINIS:  I'm sorry.  I'm sorry, Your

7  Honor.  I got a very dirty look from the court reporter.  I

8  apologize.

9  Q.  Especially -- you're going to get that different point

10  of view where the incident happens very quickly, are you

11  not?

12  A.  Sometimes.

13  Q.  When it happens in seconds, human perception is

14  different.

15  A.  Agreed.

16  Q.  Okay.  So we need to be careful when we start labeling

17  people liars because there's different views of things.

18        MR. PONDS:  Objection, Your Honor.

19        THE COURT:  Overruled.

20  A.  I'm sorry?

21  Q.  We need to be careful before we label somebody a liar

22  because they perceive something differently than somebody

23  else.

24  A.  I don't know anything about anybody calling anybody a

25  liar, but yes.

```
 1   Q.  Okay.  And, indeed, in this particular case, we do have

 2   one -- we do have a perspective from the camera that's up in

 3   the air.

 4   A.  Pole cam, yes.

 5   Q.  And we have perspectives from witnesses who are down on

 6   the ground?

 7   A.  True.

 8   Q.  Okay.  Now, you talked about this continuum of force.

 9   A.  I'm sorry?

10   Q.  You spoke about the continuum of force.

11   A.  Continuum, force continuum.

12   Q.  Force continuum?

13   A.  Yes, sir.

14   Q.  Okay.  And you've got that diagram there.  You've got

15   arrows.  You've got circles.  It's got a whole bunch of

16   stuff on there, right?

17   A.  That's correct.

18   Q.  But the real bottom line is an officer -- the real

19   bottom line, you look at that, and what it really says is

20   the use of force must be reasonable under the circumstances.

21   Isn't that what all that stuff means?

22   A.  Correct.

23   Q.  Okay.  And it's certainly -- I think I heard you say

24   that you don't -- if you're in reasonable fear of serious

25   bodily injury or death, you don't have to start out with
```

1   using pepper spray, for example?

2   A.  Actually, verbal commands.

3   Q.  Okay.

4   A.  You don't have to start with verbal commands.

5   Q.  You don't have to start with verbal commands, "Please,

6   don't shoot me."

7   A.  Right.

8   Q.  Okay.  So that nice little diagram with all the arrows

9   and -- is really not helpful.  It doesn't add much, does it?

10  A.  I think it's very important.

11  Q.  Well, it's important in the sense it's telling us that

12  you measure the officer's conduct by what's reasonable under

13  the circumstances.

14  A.  And it's an instruction for law enforcement personnel --

15  Q.  Okay.

16  A.  -- to know what the escalating and de-escalating scale

17  of the force continuum is.

18  Q.  Okay.  Now, you spoke about the regulation in D.C.

19  regarding shooting from a car.

20  A.  Correct.

21  Q.  And in your view, an officer is always prohibited from

22  shooting from a car.

23  A.  That's not what the order says.

24  Q.  Okay.  In fact, the order says if an individual is in,

25  what we said earlier, reasonable fear of serious bodily

1    injury or death, you can shoot from that vehicle.

2    A.   It actually says they're prohibited from shooting at or

3    from a moving vehicle unless deadly force is being used

4    against the officer or another person.

5    Q.   But you would agree, would you not, that as far as

6    what's reasonable for an officer to do under the

7    circumstances, if he faces -- if he reasonably faces or she

8    faces serious bodily injury or death, they are privileged to

9    use deadly force?

10   A.   If deadly force was pitted against them, yes.

11   Q.   In other words, a person has to shoot first?

12   A.   That's not what I said.

13   Q.   Okay.  If there is a reasonable apprehension of serious

14   bodily injury?

15   A.   If they're faced with imminent danger or death --

16   Q.   Yes.

17   A.   -- and there was nothing else they could do, as a last

18   resort they could respond, of course.

19   Q.   Nothing else.  As a last resort.  That is not anything

20   the Supreme Court tells us, is it?

21   A.   No.

22   Q.   Okay.  So if you're faced with serious bodily injury or

23   death, your officer does not have to say, "Well, hold on,

24   let me see if I can hide behind a tree"?

25   A.   Of course not.

1    Q.  Okay.  And if an officer is faced with serious bodily

2    injury or death, he or she does not have to shoot in the

3    arm?

4    A.  I'm sorry?

5    Q.  Does not have to try to wound the individual?

6    A.  I don't know any department that directs that.

7    Q.  No.  You shoot center mass.

8    A.  Shoot to kill.

9    Q.  Shoot to stop the threat?

10   A.  Right.

11   Q.  Okay.  And that's what's told to you; you shoot to stop

12   the threat.  You don't shoot to try to kill the person.

13   A.  The national procedures are -- the national protocols

14   are that you shoot two to the body, one to the head.  That's

15   the shooting practicum.

16   Q.  And yes, it says to stop the threat, correct?

17   A.  That's correct.

18   Q.  It doesn't say you shoot the guy to try to kill him.

19   A.  No.  Okay.

20   Q.  Okay.  Now, I thought -- you spoke about this general

21   order regarding pursuits.

22   A.  Vehicular pursuits.

23   Q.  Yes.

24   A.  Yes, sir.

25   Q.  Tell me if I'm wrong, and maybe I am, but didn't I hear

1   you say when you were -- when you were first given this

2   order, you said, "Oh, yes, this applies to an officer using

3   his vehicle to chase another vehicle"?

4   A.   No.   It's vehicular.   It could be pursuit of a car,

5   pursuit of a person.

6   Q.   That's what we're talking about here, isn't it?   The

7   siren and the lights when they're going down the highway

8   chasing another vehicle, and there's other cars coming.

9   You've got to be really worried about car accidents.   Isn't

10  that what this applies to?

11  A.   No.   It applies all the time.   It says an attempt by a

12  member of the department to apprehend a fleeing felon.   It

13  doesn't say if he's in a car or if he's on foot.

14  Q.   Okay.   Now, let's talk about -- well, before we -- one

15  more thing before we talk about -- get into the details of

16  this case a little bit.

17  A.   Okay.

18  Q.   You mentioned an officer cannot shoot -- in your view,

19  cannot use deadly force unless he's fully -- unless he's

20  checked out the surroundings to make sure it's not a problem

21  with other people.

22  A.   I agree.

23  Q.   And I'm asking you if that's what you said?

24  A.   Oh, that's what I said.

25  Q.   Oh, okay.   So you're agreeing with what you said?

1    A.   I'm agreeing with what I said.

2    Q.   Okay.  And that's what you did.  You said, "Oh, my

3    life's in danger here, I'm in reasonable fear of serious

4    bodily injury and death, but I am not going to shoot," on

5    the second incident that you gave?

6    A.   That's correct.

7    Q.   And you're suggesting that an officer -- not suggesting.

8    Is it your opinion that when an officer reasonably is in

9    fear of serious bodily injury or death, he must -- he or she

10   must yell out to the threat, must yell out, "Hold it a

11   minute.  I need about a few seconds to check my surroundings

12   and then I can decide whether I can shoot"?

13   A.   I didn't say that.

14   Q.   It's not?

15   A.   That's not what I said.

16   Q.   And, in fact, officers go to the police academy, in this

17   jurisdiction at least, every six months to requalify on the

18   range.

19   A.   They do.

20   Q.   And they only requalify if they are accurate in their

21   shooting?

22   A.   That's true.

23   Q.   Okay.  So that training cuts down a great deal on the

24   potential mishap that you described, that Charlie's walking

25   down a street and gets shot; he's the wrong person.

1    A.   Does it minimize it?  Yes.

2    Q.   Yes.

3    A.   But does it make it go away?  No.

4    Q.   Okay.  You're not -- are you suggesting that -- or is it

5    your opinion that where an officer is in reasonable fear of

6    serious bodily injury or death, that he or she cannot defend

7    themselves if there's any possibility that someone is in

8    the -- someone is close by, someone else is close by?

9    A.   That's not what I said.

10   Q.   Well, what did you say?

11   A.   I said they had to make sure that there was no one in

12   the line of fire, such as civilians or other police

13   officers, before discharging their weapon.

14   Q.   In the line of fire?

15   A.   In the line of fire.

16   Q.   That means I can't shoot now because -- I can't shoot

17   you now because the court reporter's in the way.  Isn't that

18   what that means?

19   A.   Maybe you're shooting at the court reporter, and you

20   can't shoot because I'm here.

21   Q.   So if the court reporter --

22   A.   Is the bad guy?

23   Q.   -- who gave me a dirty look before, if she --

24          THE COURT:  Watch yourself.

25          MR. DeBERARDINIS:  I agree.

1    Q.  If the court reporter poses to me a -- oh -- no, if

2    you --

3    A.  Okay.

4    Q.  If you -- no, no, let me think about it for a moment.

5           If the court reporter poses to me and I'm in

6    reasonable fear of serious bodily injury or death at the

7    hands of the court reporter, I cannot shoot her -- I cannot

8    defend myself because you're sitting in that chair.

9    A.  Absolutely.

10   Q.  So I have to die?

11   A.  Well, you're not -- this is not a job like delivering

12   milk, delivering mail, washing windows.  Every officer who

13   raises his hand and takes an oath understands that there is

14   a possibility of death or serious bodily injury in the

15   commission of their job.

16   Q.  Can you refer me to one order anywhere in the United

17   States of America or any principle from the Supreme Court

18   cases that forms the basis of your field -- can you show me

19   anywhere where it says if somebody is behind somebody that's

20   about to kill you, you cannot defend yourself; you have to

21   die.

22   A.  No, I can't show you that, but I can show you the

23   municipal regulations of the District of Columbia that says

24   you have to make sure that it's done where people are not in

25   danger.

1              So we don't have to go to the Supreme Court.  It's

2     right in --

3     Q.  So you're suggesting that that says you've got to die?

4     A.  I'm saying that you have to protect the public.  Right

5     on your identification folder as a Metropolitan police

6     officer that is one of the priorities, and it says the

7     protection of life.  You have to protect the citizenry of

8     the District of Columbia.  If you don't want to be a

9     policeman, you can be a lawyer.

10    Q.  Okay.  Now, Mr. Bradley, you were retained when in this

11    case, sir?

12    A.  Shortly thereafter the shooting.

13    Q.  Okay.  And since then you've been collecting all the

14    data that you mentioned in the beginning of your testimony?

15    A.  Sure.

16    Q.  Okay.  And from all of that data that you had, all the

17    orders, the depositions, et cetera, et cetera, as part of

18    your job in order to render an opinion, you came to some

19    conclusions about the facts of the case?

20    A.  At the beginning and throughout the case.

21    Q.  Yes.

22    A.  Some of those opinions have -- as a matter of fact, you

23    corrected me on one of them during deposition.  So as we go

24    on, you gather more information, and you -- I testified to

25    what I believe as I'm sitting here today.

1    Q.   Okay.  Now, you were deposed in this case on February

2    28, 2014.

3    A.   Yes, sir.

4    Q.   And the reason that -- and a deposition is nothing more

5    than you came to my office, there's a court reporter there,

6    you were sworn in, and every word -- I got to ask you

7    questions about the conclusions that you had drawn.

8    A.   At that time, yes, sir.

9    Q.   Okay.  And you take your job very seriously, correct?

10   A.   I do.

11   Q.   Okay.  And you came to that deposition prepared?

12   A.   As much as I could, yes, sir.

13   Q.   Okay.  And there was a lawyer there representing the

14   plaintiff?

15   A.   There was.

16   Q.   Okay.  And at that time, at the point of that

17   deposition, as I -- and I'm repeating myself a little bit

18   here -- you had formed a great deal of your opinions?

19   A.   Part of it.

20   Q.   Because that's the time you're supposed to come in and

21   tell me, as the defense attorney, what your conclusions are

22   and the basis for your conclusions.

23   A.   And I also told you that it was still preliminary, and I

24   was adding to my opinion.

25   Q.   Okay.  And before that deposition you had reviewed the

1    depositions, had you not?

2    A.  Part of it.  I can't remember if I --

3    Q.  You had reviewed -- well, is there some way to check in

4    there?

5    A.  I'm sorry?

6    Q.  Is there some way of checking right now?

7    A.  No.

8    Q.  Okay.  You had reviewed the depositions, though, of the

9    four police officers at issue here, had you not?

10   A.  Oh, I'm sorry, yes, sir.

11   Q.  Okay.  And you had reviewed the police reports, had you

12   not?

13   A.  The ones that were supplied to me, yes, sir.

14   Q.  Okay.  And when you came marching -- when you woke up

15   that day you had formulated some conclusions about the facts

16   of the case.

17   A.  I think that was in my expert opinion report.

18   Q.  Okay.  And one of the conclusions that you had reached

19   before you came to my office was that Mr. Briscoe was

20   approached by the police, by the Gun Recovery Unit, and that

21   during the conversation with members of the Gun Recovery

22   Unit he broke and ran.  You came to that conclusion?

23   A.  There came a time, correct.

24   Q.  Well, you came to the conclusion before you came to my

25   office, correct?

1    A.  Right.

2    Q.  Okay.  Because that's what you said to me.

3    A.  I wrote this report June 10th, so it would have been in

4    this report.

5    Q.  I'm not asking you about your report now.  I'm asking

6    you about when you came to my office on February 28, 2014,

7    you had reviewed the depositions of the four individuals.

8    A.  Yes.

9    Q.  Okay.  And you had drawn a conclusion that Mr. Briscoe

10   had been approached by the Gun Recovery Unit?

11   A.  True.

12   Q.  That during the conversation with members of the Gun

13   Recovery Unit, he broke and ran?

14   A.  Okay.

15   Q.  Okay.  Now, I asked you -- now, at that point -- you

16   didn't have any problems with the conduct of the police up

17   until that point.

18   A.  Of the contact?  Not at all.  I still don't.

19   Q.  Okay.  And then you also came -- had come to factual

20   conclusions at -- one of them was that Mr. Briscoe was --

21   Mr. Briscoe was pursued on foot and then eventually

22   overtaken by the vehicle.

23   A.  Correct.

24   Q.  Okay.  And you had absolutely no problems or concerns

25   with the conduct of the police officers at that point.

1    A.  I think I said that.

2    Q.  Exactly.  And that was your opinion then?

3    A.  That was my deposition's answer.

4    Q.  Okay.  So you were being untruthful to trick me?

5    A.  Not at all.

6    Q.  Okay.  But as far as that scenario, you didn't learn any

7    additional facts related to that scenario, did you?

8    A.  I learned a lot of facts.

9    Q.  But I'm talking about that he was stopped, they ran --

10   he was stopped, they talked to him, he ran off, and they

11   pursued him on foot and by car, and you didn't -- and none

12   of those facts changed?

13   A.  He was contacted, and then he ran, and then he was

14   stopped.  I found no problem with the contact.

15   Q.  You found no problem with the police chasing him down

16   the street either, did you?

17   A.  If I said that, I was wrong.

18   Q.  Well, you understood what I said.

19   A.  We had a long -- we had a long day that day.

20   Q.  Oh, so you're blaming the long day for this?

21   A.  I'm not blaming anything, sir.

22   Q.  Okay.

23   A.  I'm saying if I said --

24   Q.  Did you ever file a report to supplement that opinion?

25   A.  No.

1    Q.   When did that opinion change?

2    A.   When I gathered more information, and I said I --

3    Q.   When you were given your marching orders.

4    A.   Excuse me?

5            MR. PONDS:   Objection, Your Honor.

6            THE COURT:   Sustained.

7    Q.   When you realized -- pardon me.   Let me rephrase that.

8            When you had -- when did you review that

9    deposition?

10   A.   When did I review my deposition?

11   Q.   Yes.

12   A.   I've reviewed my deposition several times since --

13   Q.   When was the first time you reviewed the deposition?

14   A.   I don't know the date.

15   Q.   Approximately.   Within 30 days --

16   A.   Sure.

17   Q.   -- of the deposition?

18   A.   No.   Probably within 30 days of this proceeding.

19   Q.   So you never filed a -- you never reviewed it -- or 30

20   days ago, when you reviewed it, did you file anything with

21   the Court saying, "Hey, my opinion's changing"?

22   A.   No.

23   Q.   And as a matter of fact, your opinion as of 2/28/14,

24   which was not quite three years after the incident -- and

25   you've had -- and you'd been dealing with this case now for

1    almost three years at that point?

2    A.   True.

3    Q.   Okay.  Your opinion at that point was the only problem

4    that you had with the conduct of the police was the actual

5    discharge of the weapon.

6    A.   That's not true.

7    Q.   That's not true?

8    A.   What I'm saying --

9    Q.   Isn't that what you told me back then?

10   A.   I'm telling you that if I said that I had no problem

11   with the stop, that I was mistaken if I said that.

12   Q.   I'm asking you now.  Did you not tell me during that

13   deposition, after you'd been in this case for three years

14   and had reviewed the depositions, the statements of the

15   officers, and you reviewed the police reports, that you had

16   absolutely no problem with the conduct of the police except

17   for the discharge of the weapon?

18            MR. PONDS:  Objection, Your Honor; asked and

19   answered.  Improper impeachment.

20            THE COURT:  Overruled.

21   A.   That I -- if I said that I had --

22   Q.   Will you agree that you said that, is my question?

23   A.   Yes, sir.

24   Q.   You will agree that you said that?

25   A.   I did say it.

1    Q.  Okay.  Did you ever file a supplemental report saying,

2    "Hey, DeBerardinis, it was a long day, and now I'm changing

3    my opinion"?

4    A.  No, I did not.

5    Q.  Okay.  And as a matter of fact, as of 2/28/14 anyway,

6    you were not rendering any opinion as to whether Mr. Briscoe

7    had a gun.

8    A.  You asked me during that deposition to look at a

9    videotape, and in the deposition we went over and over and

10   over and over it again, and I believe your statement was,

11   "Can't you see a gun in his hand?  Isn't that a gun in his

12   hand?"

13           And my statement was, "Sir, all I see is shadows."

14   Q.  Okay.  But didn't you say, "I never came to a conclusion

15   that he was never carrying a gun"?  Didn't you say that?

16   A.  I'm sure I did.

17   Q.  Another long day?

18   A.  Sir?

19   Q.  Another long day?

20   A.  No.

21           MR. PONDS:  Objection, Your Honor.

22           THE COURT:  Sustained.

23   Q.  Okay.  Mr. Bradley, I'm holding in my hand what's been

24   admitted as Defendants' 7.  Can you see this?

25   A.  I can.

1    Q.   Have you seen this before?

2    A.   No.

3    Q.   Let me show you --

4              MR. DeBERARDINIS:  May I approach the witness?

5              THE COURT:  You may.

6    Q.   I'd ask you to look down the barrel, too, while you're

7    at it.

8    A.   I was doing that, make sure it didn't have anything in

9    it.

10   Q.   Absolutely.

11   A.   Okay.

12   Q.   Do you know what that is?

13   A.   It's a BB gun.

14   Q.   It's a BB gun, but BB guns -- notice anything about the

15   hole at the end of the barrel?

16   A.   Anything about the hole?

17   Q.   Yes.  Why don't you take a look at it again.

18   A.   Well, the gun is made to represent a nine -- 380 Walther

19   PPK/S.

20   Q.   To represent?  It's an absolute knock-off, isn't it?

21   A.   Well, it's close, but as I was saying -- you're asking

22   me about the barrel.  The barrel would not be a Walther

23   PPK/S or a 380.  It looks like something of a .45 or .50

24   caliber, something like that.

25   Q.   And it doesn't look like a BB gun hole, does it?

1    A.  No.

2    Q.  So this has been hollowed out to look like a real gun,

3    based upon your experience?

4    A.  I don't know if it was hollowed out.  I'd have to take

5    it apart and look at it.

6    Q.  Well, have you seen these BB guns before?

7    A.  I've seen BB guns.

8    Q.  And they have holes that are a lot smaller so a BB --

9    A.  That a BB comes out of.

10   Q.  And if you had a big hole like this in a BB gun, the BB

11   wouldn't come out.  It would be a problem.

12   A.  That's correct.

13   Q.  It would be bouncing all over the place in there.

14   A.  Okay.

15   Q.  So if this is a BB gun, someone -- we don't know who, of

16   course -- hollowed that out.

17   A.  Okay.  I'm not disagreeing with you.

18   Q.  Okay.  I'm just asking.

19   A.  I don't know how --

20   Q.  We're getting along fine.  I'm just asking.

21   A.  I don't know how it happened.

22   Q.  I'm not suggesting that you know how it happened.

23   A.  Oh, okay.

24   Q.  And it would be fair to say that officers are trained

25   that -- let me back up.

1          It would not be unreasonable for an officer, if he

2     saw something like this in the hand of an individual, that

3     it would raise potential for danger considerably, wouldn't

4     it?

5     A.   It would have raised danger, correct.

6     Q.   Okay.  Because the officer would have to assume that it

7     was the real thing.

8     A.   Okay.

9     Q.   You agree with me on that?

10    A.   Sure.

11    Q.   Okay.  Because otherwise, if you don't assume, bad

12    things can happen to the officer.

13    A.   Or other people.  Anybody.

14    Q.   Exactly.  Now, as of -- do you know where -- what parts

15    of the body the bullets took effect in Mr. Briscoe's body?

16    A.   My recollection of the autopsy report is that he was

17    shot in the back and in the buttocks.

18    Q.   And it was the left side of the back and the left

19    buttocks.  Would you agree with that?

20    A.   From my memory.  But if you have an autopsy report, it

21    would be easier for me to look at.

22    Q.   Okay.  Would that help refresh your recollection?

23    A.   Absolutely.  I want to be accurate.

24          MR. DeBERARDINIS:  May I approach, Your Honor?

25          THE COURT:  You may.

1    Q.  I'm showing you what's been marked as Plaintiff's

2    Exhibit No. 35.  Does that refresh your recollection of

3    where the bullets took effect?

4    A.  Yes.

5    Q.  Okay.  And where did they take effect?

6    A.  Probably the middle of the back, a few inches from the

7    midline on the left side; and on the left buttocks, probably

8    a little further over on the left-hand side.  But if you had

9    the right, I believe -- it usually says exactly where.

10   Q.  Now, where you say the middle of the back, are we

11   talking horizontally or vertically?

12   A.  Vertically.  The middle of your back.  There's a

13   midline.  The spine is considered your midline.

14   Q.  Okay.  You're saying it's in the midline?

15   A.  No, no, I was saying left of the midline.

16   Q.  Left of the midline, okay.

17         Rather than us talking about it, why don't we

18   just -- why don't you take a look at the diagram.

19         THE COURT:  It's in evidence, correct?

20         MR. DeBERARDINIS:  Yes, Your Honor.

21   A.  Do you have the written autopsy report, too?

22   Q.  I want you to take a look at this.

23   A.  Okay.  Okay, go ahead.

24   Q.  Take a look at that.

25   A.  Okay.

1   Q.  And is that where the -- you have no reason to believe

2   otherwise, that's where the -- that's where the entrance

3   wounds were.

4   A.  Entrance was in the -- both were in the back, correct.

5   Q.  Okay.  So we at least know where the entrance wounds

6   are.  That's not in dispute.

7   A.  And the exit wounds, too.

8   Q.  And the exit wounds.  No dispute about that, of course.

9   A.  Not to me.

10   Q.  Okay.  Now, is it your opinion that because the entrance

11   wounds are where they are, okay --

12   A.  Okay.

13   Q.  -- that that -- do you draw the conclusion, again, at

14   the time that Officer Leo fired his weapon, that Mr. Briscoe

15   had his back turned to him?

16   A.  Based on the videotape, based on the wounds, I would say

17   yes.

18   Q.  And that is based, in your mind, on the time it takes

19   the bullet to leave the weapon and hit the -- strike the

20   body?

21   A.  900 feet per second mode of velocity.

22   Q.  And that's what you're basing your opinion on?

23   A.  On the videotape.  I saw it.

24   Q.  Are you taking into account a term in the field called

25   "reaction time"?

1    A.   I've read all those articles on reaction time.

2    Q.   Yes.  And they say that you have to -- when evaluating

3    when an officer -- what was going on when an officer --

4              MR. PONDS:  Objection, Your Honor.

5    Q.   -- made a decision to shoot --

6              MR. PONDS:  Objection.  It's not a question.  It's

7    a statement.

8              THE COURT:  He's on cross.

9              MR. PONDS:  I understand.

10   Q.   And those articles inform you that when evaluating what

11   was confronting an officer at the time he made the decision

12   to shoot, you have to take into account that the brain has

13   to think about the totality of circumstances, and the

14   officer has to make a decision whether or not to shoot.

15   Correct?

16   A.   That's what they say.

17   Q.   Well, the brain isn't what's considering the totality of

18   the circumstances?

19   A.   That's what the articles say, sir.

20   Q.   Okay.  That's what they say.

21              And the articles also say once a decision is made,

22   the brain has got to communicate with the hand "we're

23   deciding to shoot here"?

24   A.   That's what they say.

25   Q.   Okay.  And then after the brain communicates to the

```
 1    hand, the hand has got to get the gun, raise it up, and

 2    shoot?

 3    A.   That's what they say.

 4    Q.   And all that takes some measurable time.

 5    A.   That's what the articles say.

 6    Q.   Okay.

 7              MR. DeBERARDINIS:   The Court's indulgence.

 8    Q.   And as of February 28, 2014, you had come to no opinion

 9    regarding credibility of Officer Leo?

10    A.   I'm sorry?

11    Q.   You had not come to any opinion as to the credibility of

12    Officer Leo?

13    A.   Correct.

14    Q.   That's not part of your job?

15    A.   That's not my job.

16    Q.   Exactly.  And you did view the entire video?

17    A.   I saw the entire video.

18    Q.   And when I say "entire video," from the time Mr. Briscoe

19    left the parking lot and crossed the street?

20    A.   Right.

21    Q.   Okay.

22    A.   Until it went on -- while he ran up the sidewalk, he

23    turned right, was shot, and then the officers get out of the

24    car.  And then the second officers come up in the gray car,

25    pull up behind them --
```

1    Q.  You don't know those are officers, do you?

2    A.  They were directing traffic, I thought.

3    Q.  How do you know it wasn't an SBO from a nearby

4    apartment?

5    A.  Actually it could be.  Okay, well, the SBO came out and

6    started directing traffic.

7    Q.  Okay.  You don't know if that was an MPD guy.

8    A.  It was someone that was acting in a police fashion.

9    Q.  And sometimes -- in your experience, sometimes civilians

10   take on a hero's role, and they go out and start helping

11   everybody.

12   A.  I don't know about that.

13   Q.  It's happened in your cases, hasn't it?

14   A.  Not in my cases.

15   Q.  Never.  It's never happened?

16   A.  It's never happened that a citizen came out and directed

17   Metrobus traffic.

18   Q.  Excuse me?

19   A.  We were talking about directing Metrobus traffic.

20   Q.  Yes.

21   A.  I never had -- I'm sorry, I never had one.

22   Q.  Okay.  And you viewed that video, the whole video, from

23   what you just described; from going out in the street to the

24   end -- to the pursuit and until the end.  Correct?

25   A.  Yes.  Yes, sir.

1    Q.  And you came to no conclusions as to whether Mr. Briscoe

2    had ever had a weapon?

3    A.  Can you ask that another way?  I'm not sure what you're

4    saying.

5    Q.  You came to no conclusion one way or the other.  "I

6    can't tell, based upon that video, whether he had a weapon

7    or not."

8    A.  Well, some other things have happened since you and I

9    had our deposition so --

10   Q.  I'm just asking --

11   A.  Can I finish?

12   Q.  -- based upon your view of the video.

13              MR. PONDS:  Your Honor, if we can approach?

14              THE COURT:  Sure.

15              (The following is a conference held at the

16               bench outside the hearing of the jury)

17              THE COURT:  Where are we going?

18              MR. PONDS:  Your Honor, my objection is what

19   Mr. DeBerardinis objected to the defense [sic] doing he's

20   doing, and he's using the Court's ruling by baiting this

21   witness when this witness knows -- in fact, that is one of

22   the reasons why he's changed his opinion, and I think that

23   what he's done is he's put us -- he's opened the door.

24              THE COURT:  His opinion on what?

25              MR. PONDS:  What?

1          THE COURT:  His opinion on what?

2          MR. PONDS:  On whether or not Mr. Briscoe

3    possessed a weapon on April the 26th, and then

4    specifically --

5          THE COURT:  How has he changed his opinion on

6    that?

7          MR. PONDS:  Well, he's telling us that Mr. Briscoe

8    did not possess a weapon on April the 26th, 2011 --

9          MR. DeBERARDINIS:  That's not --

10          MR. PONDS:  If I can just finish, please.  If I

11   can just finish.

12          There's two things going on.  First of all, I

13   think that he is -- he's mischaracterizing the witness's

14   testimony at the deposition.  There was the shadow when he

15   first comes out of the complex where Mr. DeBerardinis asks

16   Mr. Bradley whether or not he recognized the object, and

17   Mr. Bradley says, "I can't tell.  I can't render opinion on

18   that."

19          MR. DeBERARDINIS:  And that's exactly what I've

20   asked him.

21          MR. PONDS:  Well, no, but you've taken it out of

22   character.  You've taken it out of context.

23          THE COURT:  Where do you want to go with this?

24          MR. DeBERARDINIS:  I just want him to admit that.

25          THE COURT:  Admit that he...?

1          MR. DeBERARDINIS:  He looked at that video, and he

2     made no determination one way or the other.

3          MR. PONDS:  But also what's happened, Your Honor,

4     he's locked him in by saying, Mr. Bradley saying, "Look,

5     I've changed my opinion since over a year ago because" --

6     well, if I can finish, please?

7          And Mr. DeBerardinis knows that the facts have

8     changed because we specifically asked him and introduced the

9     evidence this morning through the expert, and he's taken

10    advantage of the Court's ruling barring us from having the

11    expert even mention that as one of the factors, and it's

12    extremely prejudicial to us.

13         MR. DeBERARDINIS:  I asked him --

14         MR. PONDS:  And there was absolutely no --

15         MR. DeBERARDINIS:  Mr. Ponds, please.

16         THE COURT:  The whole basis of the testimony --

17    the whole basis for his testimony on direct was that he

18    posed no threat.

19         And you're trying to suggest that his testimony

20    will change if there was a gun in his hand, right?

21         MR. DeBERARDINIS:  Yes.

22         THE COURT:  But that he's come to no opinion on

23    that?

24         MR. DeBERARDINIS:  Yes, yes.

25         THE COURT:  And if he were to conclude -- if one

```
1     were to conclude that he had a gun, your opinion might

2     change.  Is that --

3               MR. DeBERARDINIS:  Yes, Your Honor.

4               THE COURT:  Well, let's limit it to that.

5               MR. DeBERARDINIS:  Okay.  And indeed -- okay.

6               THE COURT:  Okay.  That's what we're -- that's the

7     crux.

8               MR. DeBERARDINIS:  I'll get right to that.

9               THE COURT:  Okay.  Now, how much longer do we

10    have?

11              MR. DeBERARDINIS:  Very little.

12              THE COURT:  Let's get him off the stand today,

13    okay?

14              (This is the end of the bench conference)

15    BY MR. DeBERARDINIS:

16    Q.  Would it be fair to say, Mr. Bradley, that as far as

17    your opinion, in a real sense, it doesn't matter to you

18    whether Mr. Briscoe was carrying the weapon or not because

19    he was shot -- those bullets took effect in the back?

20    A.  Your question is...?

21    Q.  That in order -- you've reached the opinion that the

22    shooting was unjustified.

23    A.  I have.

24    Q.  And in rendering that opinion, in a very real sense

25    it doesn't -- it's really of no moment to you whether
```

1    Mr. Briscoe was carrying a weapon or not because, in your

2    view, the shooting was improper because the bullets took

3    effect in the back.  Isn't that your conclusion?

4    A.  My conclusion is there is no indication that Mr. Briscoe

5    was carrying a weapon.  Secondly, he was shot in the back

6    where he could not pose a threat to the officer.  He had his

7    back turned to the officer when he was shot by the officer

8    who was in a car driving by.

9    Q.  There's no indication -- absolutely no indication in

10   this case that Mr. Briscoe was carrying a weapon?

11   A.  Not in my opinion.

12   Q.  Officer Leo testified to it.

13   A.  Is that a question?

14   Q.  Yes.

15   A.  What is your question?

16   Q.  Officer Leo -- in those depositions that you read,

17   Officer Leo said, "He was carrying a weapon.  I saw it."

18   A.  And as I said in the deposition, and I'll say again

19   today, he has a vested interest in saying that.

20   Q.  Oh, so it's your opinion that if you're a defendant in

21   this case -- you shouldn't be believed just because you're a

22   defendant?  Is that your testimony?

23   A.  That's not my testimony at all.  You asked me a

24   question.  I gave you an answer.

25   Q.  Doesn't everybody have a vested interest in the case?

1    A.   I don't have a vested interest in the case.

2    Q.   Plaintiffs have a vested interest.  Everybody has a

3    vested interest, don't they?

4    A.   I don't have a vested interest in the case.

5    Q.   The fact that Officer Leo is a defendant in this case

6    tells us absolutely nothing about whether his use of force

7    was justified, does it?

8    A.   No.

9    Q.   Okay.  And Officer Torres, you read his deposition.

10   There was an indication there that he saw a weapon.

11   A.   That's correct.

12   Q.   And Officer Sheehan, you read his deposition, and you

13   heard information from him that he saw the weapon drop from

14   Mr. Briscoe's hands, and he saw the clips come off.

15   A.   Hand grips.

16   Q.   The hand grips, and he knew at that point it was a BB

17   gun.

18   A.   Yes.

19   Q.   Okay.  So -- and the BB gun was recovered on the scene.

20   A.   It was.

21   Q.   Okay.  So to say that there is absolutely no indication

22   in this case that there was a weapon in Mr. Briscoe's hand

23   is to ignore a lot of the evidence.

24   A.   Is that a question?

25   Q.   Yes.

1    A.  I'm also looking at evidence that I'm not -- I am not

2    opining about in this case that --

3    Q.  But I'm asking you --

4         MR. PONDS:  If -- Your Honor, if he could allow

5    the witness to finish his answer?

6         MR. DeBERARDINIS:  I don't think -- that's not a

7    good idea, but --

8         THE COURT:  Next question.

9    Q.  But for you to say there's no indication, that's clearly

10   not the case.

11   A.  I disagree.

12   Q.  Maybe we have a different view of what the word

13   "indication" means.  "Indication" means there's some

14   evidence in the case.

15        MR. PONDS:  Your Honor, this is argumentative and

16   repetitive.

17        THE COURT:  Why don't we move on.

18   Q.  Mr. Bradley, is it your -- did you come to the

19   conclusion that Officer Leo breached the standard of care as

20   it relates to the general orders that you mentioned because

21   he was not authorized to shoot at the time?

22   A.  Not authorized to shoot at the time.  What time are we

23   talking about?

24   Q.  When he discharged his weapon, under the circumstances,

25   he was utilizing excessive force?

```
 1    A.  He was.

 2    Q.  Okay.  And that is where you -- and as a result of that

 3    you concluded that he breached the standard of care?

 4    A.  He did.

 5    Q.  Okay.

 6              MR. DeBERARDINIS:  The Court's indulgence.

 7              THE COURT:  Sure.

 8              MR. DeBERARDINIS:  I only have a few questions to

 9    go here now, Your Honor.

10              THE COURT:  Take your time.

11              MR. DeBERARDINIS:  I know you wouldn't --

12    Q.  I just want to make sure, because I'm not going to get

13    another chance to ask you any more questions -- oh, I did

14    forget something.

15              You took no exception -- you take no exception to

16    the use of handcuffs?

17    A.  I agree.

18    Q.  Okay.  That was appropriate for the police to do that?

19    A.  It was appropriate for them to -- for officer safety.

20    Q.  Absolutely.

21    A.  Okay.

22    Q.  So we don't disagree on that one?

23    A.  We do not.

24    Q.  Okay.  So you don't take exception to the fact that the

25    police turned the decedent over and put handcuffs on him.
```

1    A.  For officer safety.

2    Q.  Okay.

3            MR. DeBERARDINIS:  I have no further questions,

4    Your Honor.

5            THE COURT:  Okay.  Mr. Ponds?

6            MR. PONDS:  Thank you.

7                    REDIRECT EXAMINATION

8    BY MR. PONDS:

9    Q.  Mr. Bradley, Mr. DeBerardinis asked you some questions

10   concerning Officer Leo's deposition, Officer Sheehan,

11   Officer Torres, and Officer Katz.  Based on your review of

12   the material, is there any common thread between those four

13   officers?

14   A.  They all work together.

15   Q.  Do you know whether or not they're friends?

16   A.  Yes.

17           MR. DeBERARDINIS:  Object -- well...

18   Q.  Now, Mr. Bradley, what would you consider -- what type

19   of evidence is a videotape?

20   A.  Pretty strong evidence.

21   Q.  Okay.  Is there -- is it forensic evidence?

22   A.  It's photographic evidence in a case.  It's good

23   evidence.

24   Q.  When you met with Mr. DeBerardinis, he asked you some

25   questions about the videotape.

```
1    A.  He did.

2    Q.  And sometimes when we were in the deposition he would

3    confuse "stops" with "contacts."

4    A.  Right.

5    Q.  Was there any problem with the initial contact between

6    the police officers and Ralphael Briscoe?

7    A.  No.

8    Q.  And you've been consistent about that?

9    A.  Right.

10   Q.  Was all the other conduct unjustified after the contact?

11   A.  Yes.

12   Q.  You've made that perfectly clear to Mr. DeBerardinis?

13   A.  I did.

14   Q.  And you know what a stop is from a contact?

15   A.  I do.

16   Q.  Because you were a police officer, what, 25 and a half

17   years?

18   A.  True.

19   Q.  Now, sir, he showed you a portion of the videotape when

20   Ralphael Briscoe's running outside the gates.

21   A.  Yes.

22   Q.  What is your recollection as to what that videotape

23   depicts?

24   A.  It depicts Ralphael Briscoe running away from the

25   complex on the sidewalk and the defendant officer's SUV
```

1    pursuing him up the street.

2    Q.  Right.  Before the black SUV that pursues him, does it

3    appear that he's carrying something in his right hand?

4    A.  No.  I can't tell.

5    Q.  You can't tell what it is?

6    A.  I can't tell.

7    Q.  It's a shadow?

8    A.  It's a shadow.

9           MR. DeBERARDINIS:  He's leading, Your Honor.

10   Q.  When he's running down on the sidewalk, can you -- have

11   you seen that aspect of the video in slow motion?

12   A.  I have.

13   Q.  Is that a better view, or is the one where it's the

14   shadow the better view?

15   A.  I don't think either one of them is a good view.  I

16   don't think the tape's that good.

17   Q.  Okay.  Well, let me ask you this, sir:  When he's

18   running down that sidewalk, does he ever turn and face the

19   vehicle with his right hand?

20   A.  No.

21   Q.  Do you have any doubt about that?

22   A.  No doubt at all.

23   Q.  Is that one of the factors you relied on?

24   A.  Absolutely.

25   Q.  Also, Mr. DeBerardinis asked you some questions -- if I

1    could have the autopsy report, please.

2              Mr. Bradley, what do you consider -- what type of

3    evidence is an autopsy report?

4    A.   Strong physical evidence of what took place to the body.

5    Q.   Is that forensic evidence?

6    A.   Yes.

7    Q.   And does the autopsy reflect another factor that went to

8    your expert opinion?

9    A.   Yes.

10   Q.   And why was -- and what does the autopsy report reflect

11   that went towards one of the other factors in your decision?

12   A.   It reflects the track of the bullets from the back, and

13   then it elevates to --

14              MR. DeBERARDINIS:  Objection, Your Honor.

15              THE COURT:  Hold on.

16              MR. DeBERARDINIS:  This is a discovery issue now,

17   Your Honor.

18              THE COURT:  Hold on.  Let's limit this to what was

19   discussed on cross, okay?

20              MR. PONDS:  Okay.

21   Q.   Mr. Bradley, in looking at the entry wounds --

22   A.   Yes.

23   Q.   -- where did they enter?

24   A.   In the back.

25   Q.   Okay.  Going back to the videotape, at any point when

1    Ralphael was at the mouth of the driveway, does he ever turn

2    around and face the vehicle?

3    A.   No.

4    Q.   Was he continuously running down the sidewalk, and then

5    he made a hard right turn to go down the driveway?

6    A.   That's correct.

7    Q.   In viewing the videotape, where does that reflect that

8    he was shot at?

9    A.   In the back.

10   Q.   And is that consistent with this autopsy report?

11   A.   It is.

12   Q.   Was that a second factor that went into your -- that was

13   a factor that went into your -- formulating your opinion?

14   A.   Absolutely.

15   Q.   Now, was there -- based on your review of the videotape,

16   was there any indication, as Ralphael Briscoe is running

17   down the sidewalk and he got to the mouth of the driveway,

18   that Defendant Leo was -- that Defendant Leo was in imminent

19   threat of death?

20   A.   No.

21   Q.   How about serious bodily injury?

22   A.   No.

23   Q.   What's the problem sometimes in simply relying on a

24   person's statement?

25   A.   Well, there's lots of things.  The person's excited at

1    the time the incident took place.  They're afraid.  They're

2    confused.  All those things have to be taken into

3    consideration.  That's why statements vary from different

4    people.

5    Q.  What about bias of a witness?

6    A.  Absolutely.

7    Q.  Is bias a factor when the person is a friend of a

8    person?

9    A.  Absolutely.

10   Q.  Do you find anything about the tape to be bias?

11   A.  Not at all.

12   Q.  Now, you were asked some questions by Mr. DeBerardinis

13   about this reaction response time.  You read the studies for

14   Fackler and Tobin?

15   A.  I did.

16   Q.  Okay.  Do the facts that are in that article and some of

17   those studies apply to this case?

18   A.  No.

19   Q.  Was Ralphael Briscoe facing, at any point in the

20   videotape, Defendant Leo?

21   A.  No.

22   Q.  Is that one of the reasons why the studies don't apply

23   in this case?

24   A.  True.  Part of the reason.

25   Q.  Sir, have you ever changed your opinion in terms of

1    whether or not Ralphael Briscoe possessed a weapon on April

2    the 26th, 2011, when he was running on Elvans Road?

3    A.  I have not.

4    Q.  Have you -- without getting into what you've seen, have

5    you seen additional information --

6              MR. DeBERARDINIS:  Objection, Your Honor.

7              THE COURT:  Sustained.

8              MR. DeBERARDINIS:  Move to strike.

9              THE COURT:  Sustained.

10   Q.  Did Mr. DeBerardinis reach out to you at any point --

11             MR. DeBERARDINIS:  Objection, Your Honor.

12             MR. PONDS:  I'll withdraw that question.

13             MR. DeBERARDINIS:  Move to strike, Your Honor.

14   We'd ask for a -- no, it doesn't matter.

15   Q.  He also said some reference to somebody had given you

16   marching orders.

17   A.  He did.

18   Q.  Who gives you marching orders?

19   A.  My wife.

20   Q.  Me, too.

21             MR. PONDS:  Thank you, sir.

22             MR. DeBERARDINIS:  May we approach very quickly?

23             THE COURT:  Yes.

24             (The following is a conference held at the

25              bench outside the hearing of the jury)

 1            MR. DeBERARDINIS:  Your Honor, given the testimony

 2    that DeBerardinis was totally confused that day in the

 3    deposition, that --

 4            THE COURT:  Wait, wait, wait, what testimony about

 5    you being confused?

 6            MR. DeBERARDINIS:  Mr. Ponds just said, during the

 7    deposition, Mr. DeBerardinis was confused by -- about what

 8    was going on.

 9            MR. PONDS:  I don't think that was his testimony.

10            MR. DeBERARDINIS:  He did.  He answered your

11    question and said Mr. DeBerardinis was confused about

12    factors, and the implication --

13            THE COURT:  Let's go to the -- let's go to the

14    transcript.  What was the question?  What was the question,

15    and what was the answer?

16            MR. DeBERARDINIS:  The question was -- he said

17    something about my conduct during the deposition, that I was

18    the one confused, and that he set me straight on all the

19    factors.

20            MS. WEST:  The question was, do you remember

21    having -- when you had your deposition taken,

22    Mr. DeBerardinis -- I don't know if "confusing the issues"

23    were the words he used, but it was -- that was the

24    implication, about what a stop was and the chase.

25            MR. PONDS:  Versus a contact.

1                    MS. WEST:  Yes.

2                    THE COURT:  This is a question that you asked on

3        redirect?

4                    MR. PONDS:  Yes, sir.

5                    THE COURT:  At the beginning of redirect?

6                    MR. DeBERARDINIS:  It was towards the beginning.

7        It was about in the middle actually.

8                    (Pause)

9                    THE COURT:  So what's your point while I look?

10                   MR. DeBERARDINIS:  My point is, given that he said

11       I was the one that was confused, fundamental fairness

12       dictates I should be able to recross for just one question.

13                   THE COURT:  What's your question?

14                   MR. DeBERARDINIS:  Whether I asked him in his

15       deposition would it be fair to say that the only thing that

16       you take issue with is the actual shooting, and your answer

17       was yes.  And that goes to that I'm the one that was

18       confused about contacts or stops.

19                   THE COURT:  I'll let you ask that one question.

20                   MR. PONDS:  Judge, I would object because it

21       doesn't really get to contacts, and that becomes problematic

22       because the questioning could have been in reference just to

23       the shooting.

24                   MR. DeBERARDINIS:  If he wants it in context, I

25       can read further back, Your Honor.

1              MR. PONDS:  If I can see the pages.

2              MR. DeBERARDINIS:  Sure.

3              (Pause)

4              THE COURT:  Okay.  Your question, Mr. Ponds, "When

5      you met with Mr. DeBerardinis, he asked you some questions

6      about the videotape."

7              "ANSWER:  He did.

8              "And sometimes when we were in the deposition, he

9      would confuse 'stops' with 'contacts'?

10             "ANSWER:  Right.

11             "Was there any problem with the initial contact

12     between police officers and Ralphael Briscoe?

13             "No."

14             Okay.  So where's the confusion?

15             MR. PONDS:  And that is consistent with what he

16     said in the deposition.  That's why I'm objecting, because

17     he's taking it out of context because specifically the

18     question is, "Tell me" -- okay, this is the question:  "Have

19     you reached a conclusion as to how the incident involving

20     Mr. Briscoe commenced?"

21             MS. WEST:  A juror has to go to the bathroom.

22             THE COURTROOM DEPUTY:  Juror No. 4 has to go to

23     the restroom.

24             THE COURT:  Do you want to take him out?

25             THE COURTROOM DEPUTY:  Yes.

1          THE COURT:  I think the record is pretty clear on

2     this, okay?  He's testified that there was no problem with

3     respect to the initial contact, but that he does have a

4     problem with the subsequent chase, okay, or the stop.

5          MR. PONDS:  Right.

6          THE COURT:  And that's inconsistent with what he

7     said before, and he has changed his testimony, and I think

8     he has acknowledged that.

9          MR. PONDS:  Right.  But that's what I contest,

10    Your Honor, because in looking at this deposition --

11         THE COURT:  So I'm not sure there's any confusion.

12         MR. PONDS:  There is no confusion.

13         MR. DeBERARDINIS:  The factor is I'm the one that

14    was --

15         THE COURT:  I don't think that's the issue.  I

16    really don't.  I think the record is clear as to what he

17    said then and said now.

18         MR. DeBERARDINIS:  Very well, Your Honor.

19         (This is the end of the bench conference)

20         MR. PONDS:  Thank you, Mr. Bradley.

21         THE COURT:  Hold on, we have a juror out.

22         MR. PONDS:  I'm so sorry.

23         (Pause)

24         MR. PONDS:  Your Honor, there is one exhibit I'd

25    like to move in before the jury's excused.

```
1              THE COURT:  Okay.  Will you dismiss Mr. Bradley?

2              MR. PONDS:  I can't give him marching orders,

3       Judge, but he's free to leave.

4              MS. WEST:  We have one thing, Your Honor.

5              MR. PONDS:  Before he leaves, and I don't think it

6       will affect his ability to leave, but I thought I had moved

7       in Plaintiff's Exhibit 35, the chart.

8              MS. WEST:  Autopsy report.

9              THE COURT:  I asked, and you all told me it was in

10      evidence.  Is that not correct?

11             MR. PONDS:  I thought it was.

12             THE COURTROOM DEPUTY:  That's what they have down

13      here, the first two pages with redactions.

14             THE COURT:  It's in evidence.

15             MR. PONDS:  That's right.

16             Mr. Bradley.

17             THE WITNESS:  Thank you, sir.

18             THE COURT:  Thank you for your testimony.

19             Okay.  Ladies and gentlemen, we went about 30

20      minutes over today.  I thought it was important for

21      Mr. Bradley to get back to his wife and not have to come

22      back tomorrow morning, and we've accomplished that.  I am

23      informed by the plaintiffs that they may have one brief

24      witness tomorrow morning so they will not be resting their

25      case tonight, as I told you they might after lunch, but
```

1     likely in the morning, and then we'll go from there.

2              And, again, we will be -- we will not be having

3     court tomorrow after lunch so you can plan accordingly.

4              Thank you for your time.  You're dismissed.  We'll

5     see you at 9:15 in the morning.  Don't read about the case,

6     don't talk to anyone, and don't do any independent research.

7     See you in the morning.

8              (Jury exits courtroom)

9              THE COURT:  Okay, anything?

10             MS. FEATHERSTONE:  Yes, Your Honor, given Ms. Boyd

11    may now testify on Monday --

12             THE COURT:  No, if Ms. Boyd testifies, she's going

13    to testify before 9:45 tomorrow, and that's it.

14             MS. FEATHERSTONE:  Very well, Your Honor, just

15    keeping in mind -- we were just trying to determine about

16    Dr. Betsey, our economist.

17             THE COURT:  We're going to have Sheehan and Betsey

18    tomorrow; is that correct?

19             MS. FEATHERSTONE:  That was our plan, Your Honor.

20             THE COURT:  Let's try to hold to it.

21             MS. WEST:  And because the Court's inquired before

22    about -- with reference to Levy Harley, I just wanted the

23    Court to know that Mr. Vaughan was here, picked up a new

24    subpoena for Ms. Boyd with new dates on it, and he's out and

25    about trying to get her right now.

1          THE COURT:  Yes, we'll see.

2          MS. FEATHERSTONE:  Can we be excused, Your Honor?

3          THE COURT:  Okay.  See you all tomorrow.

4          MS. WEST:  Have a nice evening, Your Honor.

5          MR. PONDS:  Good evening, Your Honor.

6               (Whereupon the hearing was

7               adjourned at 5:38 p.m.)

8

9          **CERTIFICATE OF OFFICIAL COURT REPORTER**

10

11          I, LISA A. MOREIRA, RDR, CRR, do hereby

12     certify that the above and foregoing constitutes a true and

13     accurate transcript of my stenographic notes and is a full,

14     true and complete transcript of the proceedings to the best

15     of my ability.

16       Dated this 14th day of July, 2015.

17

18                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
19                              United States Courthouse
                                Room 6718
20                              333 Constitution Avenue, NW
                                Washington, DC 20001
21

22

23

24

25

**'**

**'71** [2] - 196:5
**'78** [3] - 105:5, 105:24, 106:23
**'84** [3] - 105:5, 105:24, 106:23
**'contacts'** [1] - 250:9
**'stops'** [1] - 250:9

**/**

**/s/Lisa** [1] - 254:18

**0**

**0** [1] - 77:3
**0.040** [2] - 78:12, 79:1
**0.08** [2] - 79:6, 79:14
**0.080** [5] - 57:11, 77:23, 78:8, 79:15, 79:16
**0.085** [1] - 57:23
**0.120** [2] - 76:15, 77:3
**0.160** [3] - 58:12, 75:21, 76:24
**0.20** [1] - 76:13
**0.200** [2] - 58:18, 75:11
**0.240** [2] - 58:22, 75:6
**0.280** [2] - 58:23, 75:2
**0.30** [1] - 59:7
**0.320** [2] - 59:15, 74:23
**0.360** [2] - 59:19, 74:18
**0.40** [2] - 58:20, 74:12
**0.400** [1] - 59:22
**0.440** [1] - 74:7
**0.480** [2] - 60:3, 74:3
**0.520** [1] - 73:25
**0.560** [2] - 60:8, 73:20
**0.60** [1] - 73:12
**0.600** [2] - 60:24, 73:12
**0.640** [2] - 61:2, 73:6
**0.680** [1] - 61:5
**0.720** [1] - 61:10
**0.760** [1] - 61:15
**0.8** [1] - 75:2
**0.80** [2] - 61:20, 62:2
**0.800** [1] - 62:2
**0.840** [1] - 73:3
**080** [1] - 77:22
**09-22.126** [2] - 43:17, 43:19

**1**

**1** [2] - 54:9, 76:24
**1/25/2012** [1] - 129:14

**10** [3] - 148:13, 148:14, 158:9
**10th** [1] - 220:3
**11** [2] - 190:4, 190:5
**11:00** [1] - 51:24
**12-514** [1] - 4:4
**1250** [1] - 1:14
**12:30** [1] - 52:4
**13** [3] - 34:5, 53:24, 174:21
**1325** [1] - 1:18
**137** [4] - 79:24, 80:3, 80:5, 80:9
**141** [8] - 188:20, 188:21, 188:23, 188:24, 189:6, 189:13, 191:20, 191:24
**148** [2] - 95:5, 96:15
**14th** [2] - 112:14
**15** [8] - 51:23, 84:14, 84:15, 169:14, 169:18, 169:21, 170:23
**15A** [5] - 81:23, 82:17, 82:20, 82:23
**15B** [2] - 81:23, 82:17
**16th** [3] - 196:9, 196:13, 196:15
**17** [2] - 81:10, 82:3
**18** [3] - 98:23, 98:24, 98:25
**19** [2] - 29:23, 107:14
**1968** [3] - 98:16, 98:17, 98:25
**1969** [1] - 99:11
**1970** [4] - 99:4, 99:21, 107:15, 196:5
**1971** [2] - 100:20, 100:21
**1973** [3] - 103:3, 103:4, 107:23
**1979** [2] - 108:12, 108:18
**1982** [1] - 108:19
**1983** [4] - 108:20, 127:13, 127:14, 129:5
**1984** [2] - 108:21, 108:22
**1987** [1] - 108:23
**1988** [1] - 105:19
**1989** [2] - 105:19, 109:23
**1990** [2] - 106:11, 106:20
**1991** [1] - 110:8
**1992** [1] - 110:11
**1994** [4] - 110:13, 111:2, 197:17,

197:21
**1995** [5] - 106:11, 106:20, 118:11, 120:6, 120:7
**19th** [1] - 30:16
**1:12-cv-00514-CRC** [1] - 1:3
**1:20** [1] - 90:14

**2**

**2** [14] - 17:10, 70:11, 70:12, 77:3, 81:4, 81:5, 145:18, 155:4, 155:23, 156:1, 156:2
**2/28/14** [2] - 222:23, 224:5
**20** [1] - 119:5
**20/20** [4] - 203:18, 203:25, 204:4, 204:8
**20001** [3] - 2:4, 2:12, 254:20
**20005** [1] - 1:19
**20037** [1] - 1:15
**201** [5] - 183:1, 188:19, 189:21, 191:10, 192:10
**201.26** [3] - 188:18, 189:9, 192:18
**2011** [20] - 22:10, 25:17, 26:10, 27:5, 27:14, 27:20, 27:24, 28:2, 30:13, 32:18, 32:20, 33:3, 33:16, 84:22, 155:17, 168:23, 171:16, 176:1, 234:8, 247:2
**2012** [9] - 25:6, 25:9, 25:13, 25:24, 26:15, 28:20, 40:13, 45:12, 45:19
**2014** [5] - 29:23, 30:16, 218:2, 220:6, 231:8
**2015** [2] - 1:5, 254:16
**202** [3] - 1:16, 1:20, 2:4
**202-354-3187** [1] - 2:12
**207** [4] - 182:12, 183:15, 183:17, 184:3
**207.1** [3] - 182:1, 183:1, 183:8
**207.2** [4] - 180:1, 183:1, 184:3, 185:7
**207.2(a** [3] - 184:23, 184:24, 185:16
**207.3** [1] - 183:7
**22** [1] - 3:4

**23** [1] - 102:13
**236-2042** [1] - 1:20
**24** [2] - 102:12, 102:13
**2400** [2] - 84:23, 88:14
**2409** [3] - 177:2, 177:13, 178:21
**24th** [1] - 1:14
**25** [10] - 4:14, 102:10, 102:11, 102:21, 107:15, 118:18, 118:25, 119:5, 195:23, 242:16
**26** [5] - 25:17, 32:20, 33:3, 155:17, 189:21
**26th** [19] - 22:10, 26:10, 27:14, 27:20, 27:24, 28:2, 30:13, 30:14, 31:22, 32:18, 33:16, 44:7, 84:22, 168:23, 171:16, 175:25, 234:3, 234:8, 247:2
**28** [3] - 218:2, 220:6, 231:8

**3**

**3** [22] - 13:12, 16:12, 17:11, 17:19, 44:25, 66:6, 67:7, 67:13, 68:10, 68:16, 69:14, 69:17, 70:24, 80:25, 99:4, 154:25, 155:4, 156:2, 160:21, 162:18, 162:24
**30** [12] - 190:1, 190:2, 190:13, 191:11, 191:17, 192:3, 192:5, 192:22, 222:15, 222:18, 222:19, 252:19
**300** [2] - 1:15, 119:11
**301.03** [9] - 151:4, 151:6, 155:13, 155:14, 156:9, 156:13, 156:17, 157:4, 157:6
**304** [1] - 148:12
**304.10** [6] - 145:16, 145:17, 146:3, 147:4, 148:11, 149:23
**333** [2] - 2:11, 254:20
**333-2922** [1] - 1:16
**35** [4] - 95:19, 96:18, 228:2, 252:7
**380** [2] - 225:18, 225:23
**39** [2] - 137:5, 137:15
**3:15** [1] - 169:9

**4**

**4** [11] - 4:25, 5:22, 13:16, 158:9, 160:15, 160:16, 162:5, 162:9, 162:14, 162:15, 250:22
**4/26/2011** [2] - 129:11, 129:12
**40** [2] - 119:13, 119:15
**441** [1] - 2:3
**45** [1] - 225:23
**4D** [5] - 64:17, 65:22, 65:23, 65:24, 69:15
**4I** [8] - 17:5, 17:9, 17:10, 19:16, 66:4, 80:20, 80:21, 82:8

**5**

**5** [7] - 1:5, 182:4, 190:3, 190:4, 190:5
**5/17/2011** [2] - 129:10, 129:11
**5/24/2012** [1] - 129:15
**50** [5] - 44:1, 44:3, 91:20, 174:8, 225:23
**500** [1] - 1:19
**5:38** [1] - 254:7

**6**

**6** [1] - 54:9
**6/25/86** [1] - 192:18
**61** [1] - 179:25
**617** [1] - 128:23
**6718** [2] - 2:11, 254:19
**68** [3] - 80:7, 80:10, 82:24
**6A** [4] - 179:13, 179:14, 182:1, 182:12

**7**

**7** [9] - 45:19, 161:11, 162:22, 162:25, 163:1, 192:16, 192:18, 192:20, 224:24
**708** [1] - 84:16
**71** [6] - 158:19, 158:20, 158:22, 161:18, 162:1, 179:8
**724-6600** [1] - 2:4
**7th** [7] - 25:6, 25:9, 25:13, 25:24, 26:15, 28:19, 40:13, 40:15, 45:12

**8**

**82** [1] - 146:1
**84** [2] - 3:5, 146:6
**85** [7] - 182:3, 182:5, 182:6, 182:10, 182:20, 182:24
**86** [6] - 151:10, 151:12, 151:13, 154:13, 154:19, 154:23
**89** [1] - 3:6

**9**

**9** [2] - 81:10, 81:12
**90.107** [1] - 188:7
**900** [2] - 128:24, 229:21
**901** [1] - 168:5
**901.01** [1] - 186:12
**901.07** [11] - 160:7, 160:11, 161:7, 161:19, 162:10, 168:5, 173:18, 179:2, 179:17, 180:11, 181:21
**901.15** [1] - 128:25
**901.7** [8] - 158:7, 158:8, 168:4, 173:17, 178:9, 178:10, 187:4, 188:10
**93J** [1] - 16:18
**97** [1] - 3:7
**9:07** [1] - 1:5
**9:15** [1] - 253:5
**9:45** [2] - 170:24, 253:13

**A**

**a.m** [1] - 1:5
**A3** [1] - 162:6
**A7** [1] - 162:6
**Aaron** [1] - 9:3
**ability** [2] - 252:6, 254:15
**able** [11] - 19:2, 54:2, 87:12, 87:15, 87:22, 91:19, 104:9, 105:14, 152:15, 161:8, 249:12
**abreast** [4] - 120:7, 120:20, 120:22, 121:4
**absolute** [1] - 225:20
**absolutely** [27] - 93:16, 113:22, 121:15, 122:2, 130:14, 136:25,

169:20, 177:12, 187:14, 187:16, 198:23, 201:22, 203:16, 216:9, 220:24, 223:16, 225:10, 227:23, 235:14, 237:9, 238:6, 238:21, 240:20, 243:24, 245:14, 246:6, 246:9
**abundance** [1] - 5:18
**academy** [12] - 71:18, 72:4, 72:10, 99:10, 99:12, 100:13, 123:23, 187:9, 187:11, 187:12, 187:18, 214:16
**Academy** [1] - 111:23
**accidents** [1] - 213:9
**accompanying** [1] - 85:14
**accomplished** [2] - 167:13, 252:22
**accomplishment** [1] - 183:13
**accordingly** [1] - 253:3
**account** [2] - 229:24, 230:12
**accuracy** [1] - 29:4
**accurate** [10] - 23:22, 24:22, 28:20, 28:22, 28:23, 28:25, 29:6, 214:20, 227:23, 254:13
**ACES** [1] - 109:10
**acknowledged** [1] - 251:8
**acquiring** [1] - 121:13
**acronym** [2] - 105:4, 109:17
**acting** [1] - 232:8
**action** [2] - 138:3, 188:1
**actions** [7] - 135:3, 148:18, 153:22, 171:15, 174:17, 177:2, 177:6
**activate** [1] - 157:23
**activated** [4] - 154:9, 155:7, 156:5, 156:6
**activating** [1] - 156:21
**activities** [1] - 135:3
**activity** [3] - 100:8, 100:11, 139:8
**actual** [4] - 180:5, 184:17, 223:4, 249:16
**add** [1] - 210:9
**added** [1] - 95:18

**addendum** [2] - 192:14, 192:16
**adding** [1] - 218:24
**addition** [2] - 90:16, 118:11
**additional** [4] - 140:24, 170:8, 221:7, 247:5
**additionally** [1] - 176:3
**address** [4] - 132:5, 132:24, 150:15, 151:14
**addressed** [3] - 130:18, 131:12, 185:25
**addresses** [4] - 147:4, 156:3, 158:3, 162:20
**addressing** [2] - 132:17, 150:11
**adhere** [1] - 153:23
**adjoins** [2] - 11:19, 55:3, 58:7
**adjourned** [1] - 254:7
**adjustments** [1] - 7:14
**administered** [1] - 89:23
**Administration** [10] - 105:3, 105:22, 105:23, 106:1, 106:10, 106:21, 106:25, 107:8, 112:12, 112:16
**Administrator's** [1] - 108:21
**admission** [2] - 137:15, 154:12
**admit** [3] - 91:11, 234:24, 234:25
**admitted** [7] - 47:8, 89:18, 154:19, 154:23, 179:17, 191:25, 224:24
**admonish** [3] - 6:1, 142:10, 143:2
**admonished** [1] - 142:15
**advantage** [1] - 235:10
**advise** [2] - 10:11, 145:22
**affect** [1] - 252:6
**afoot** [1] - 163:6
**afraid** [3] - 7:2, 246:1
**afternoon** [15] - 7:14, 52:4, 84:3, 84:4, 84:21, 91:5, 91:18, 94:18, 94:19, 94:21, 97:2, 169:14, 170:18, 199:10, 199:11

**age** [1] - 98:24
**agencies** [10] - 104:12, 105:17, 118:13, 118:14, 118:15, 120:12, 134:11, 134:17, 136:5
**agency** [4] - 104:10, 115:7, 116:6, 134:16
**Agent** [1] - 110:11
**agent** [3] - 110:14, 110:20, 181:3
**agents** [2] - 112:15, 134:9
**ago** [3] - 32:21, 222:20, 235:5
**agree** [21] - 7:15, 27:8, 28:22, 30:12, 42:21, 43:3, 43:4, 59:25, 62:9, 191:2, 205:7, 205:14, 206:5, 211:5, 213:22, 215:25, 223:22, 223:24, 227:9, 227:19, 240:17
**agreed** [3] - 141:14, 147:13, 208:15
**agreeing** [4] - 67:18, 203:22, 213:25, 214:1
**ahead** [4] - 27:10, 53:25, 140:7, 228:23
**aid** [1] - 54:17
**aided** [1] - 1:25
**Aileen** [1] - 9:4
**aiming** [1] - 178:16
**air** [1] - 209:3
**airplane** [1] - 113:22
**Airport** [2] - 106:3
**airport** [2] - 113:1, 114:3
**Airports** [1] - 112:20
**airports** [1] - 112:23
**AL** [1] - 1:6
**Alcohol** [2] - 105:20, 109:15
**allow** [4] - 15:9, 16:7, 181:13, 239:4
**allowance** [1] - 204:18
**allowed** [6] - 20:23, 96:24, 105:9, 105:10, 127:18, 146:15
**allowing** [2] - 20:9, 98:24
**almost** [4] - 32:21, 101:2, 106:4, 223:1
**alongside** [1] - 177:22
**ambulance** [7] - 85:8, 85:10, 85:12, 85:20, 86:13, 86:14, 88:14,

194:5, 194:9, 194:20, 199:21, 200:14, 200:18, 201:1, 201:4, 201:5, 201:10
**Amendment** [5] - 127:5, 127:22, 171:18, 172:6, 200:11
**America** [1] - 216:17
**ammunition** [1] - 109:7
**amount** [4] - 105:1, 113:13, 138:19, 164:21, 181:17, 183:13, 198:1, 204:20
**analyze** [1] - 140:20
**analyzer** [1] - 116:2
**anesthesia** [2] - 89:18, 89:23
**Angeles** [4] - 120:22, 130:16, 131:8, 131:9
**angle** [1] - 29:5
**Anne** [2] - 117:17, 117:19
**ANNE** [2] - 1:17, 1:18
**answer** [9] - 15:17, 18:25, 24:10, 24:11, 24:14, 24:16, 48:11, 50:4, 70:13, 76:9, 145:7, 166:24, 191:14, 221:3, 237:24, 239:5, 248:15, 249:16
**ANSWER** [3] - 48:21, 250:7, 250:10
**answered** [9] - 24:19, 26:13, 27:17, 29:16, 48:12, 50:9, 51:12, 223:19, 248:10
**answering** [1] - 19:1
**answers** [5] - 18:24, 18:25, 20:20, 25:11, 49:13
**anteroom** [1] - 83:19
**anticipate** [1] - 142:10
**anticipated** [1] - 94:16
**anyway** [2] - 105:13, 224:5
**apart** [1] - 226:5
**apartment** [3] - 178:3, 178:25, 232:4
**apologize** [5] - 4:13, 126:17, 146:11, 148:7, 208:8
**Appeals** [1] - 126:2
**appear** [9] - 11:21, 57:12, 66:14, 66:20, 69:23, 70:6, 78:23,

175:15, 243:3
**aPPEARANCES** [1] - 1:12
**APPEARANCES** [1] - 2:1
**appeared** [5] - 19:18, 63:6, 69:13, 70:3, 204:3
**appearing** [1] - 118:12
**apples** [2] - 165:7, 165:14
**applicable** [4] - 162:13, 185:16, 186:15, 192:11
**applies** [37] - 125:13, 125:17, 130:25, 134:22, 135:1, 135:13, 135:17, 141:4, 143:16, 144:7, 148:23, 149:25, 152:19, 157:1, 157:3, 159:15, 159:19, 159:25, 160:2, 161:16, 163:23, 166:12, 166:21, 167:19, 168:14, 168:15, 169:1, 172:16, 183:15, 184:24, 187:2, 192:5, 193:22, 194:15, 213:2, 213:10, 213:11
**apply** [10] - 133:18, 135:10, 157:12, 163:1, 179:6, 183:8, 189:24, 191:17, 246:17, 246:22
**applying** [2] - 156:24, 159:22
**apprehend** [3] - 155:6, 184:16, 213:12
**apprehension** [2] - 183:20, 211:13
**approach** [24] - 32:23, 46:22, 55:24, 65:4, 67:1, 79:20, 81:19, 86:5, 95:9, 122:3, 126:12, 137:1, 141:11, 146:8, 154:20, 161:23, 171:19, 182:7, 189:2, 190:8, 225:4, 227:24, 233:13, 247:22
**approached** [6] - 156:20, 157:25, 197:22, 198:3, 219:20, 220:10
**approaching** [2] -

196:16, 196:17
**appropriate** [6] - 170:12, 172:1, 179:21, 191:1, 240:18, 240:19
**appropriately** [1] - 68:3
**April** [23] - 22:10, 25:17, 26:10, 27:5, 27:13, 27:19, 27:24, 28:2, 30:13, 30:14, 31:21, 32:18, 32:20, 33:3, 33:15, 44:7, 84:22, 168:23, 171:16, 175:25, 234:3, 234:8, 247:1
**area** [9] - 44:12, 44:20, 85:3, 101:11, 129:7, 149:13, 174:12, 177:23, 178:23
**areas** [4] - 100:2, 100:9, 121:18, 122:14
**argue** [5] - 14:24, 19:24, 20:8, 96:3, 147:15
**arguing** [2] - 18:6, 18:7
**argument** [6] - 11:5, 14:15, 20:12, 20:15, 91:20
**argumentative** [1] - 239:15
**arguments** [2] - 94:19, 94:25
**arm** [3] - 50:13, 136:12, 212:3
**armed** [3] - 88:3, 115:19, 196:8
**Armed** [1] - 109:10
**arrest** [13] - 85:16, 85:17, 87:1, 101:17, 101:20, 106:24, 136:12, 166:13, 167:15, 180:5, 184:10, 184:11, 184:17
**arrested** [5] - 87:3, 166:16, 166:18, 198:15, 198:17
**arrests** [5] - 100:11, 104:2, 118:20, 118:22, 121:8
**arrival** [1] - 104:23
**arrive** [1] - 85:8
**arrived** [2] - 85:10, 88:14
**arrow** [29] - 11:14, 11:17, 11:21, 35:14, 35:15, 35:16, 37:12,

55:19, 55:20, 56:4, 56:8, 56:24, 57:25, 73:15, 73:16, 75:17, 75:23, 76:3, 76:4, 77:3, 77:11, 77:16, 77:18, 78:1, 78:4, 79:8, 79:12
**arrows** [2] - 209:15, 210:8
**article** [3] - 5:20, 16:2, 246:16
**articles** [5] - 230:1, 230:10, 230:19, 230:21, 231:5
**articulable** [2] - 201:14, 201:17
**Arundell** [2] - 117:17, 117:19
**aspect** [6] - 53:23, 54:18, 151:24, 182:24, 184:3, 243:11
**aspects** [1] - 53:2
**assailant** [3] - 197:1, 197:12, 198:16
**assassinate** [1] - 109:5
**assault** [1] - 127:6
**assaulted** [1] - 195:4
**assess** [2] - 8:14, 200:25
**assessing** [1] - 203:10
**assessment** [1] - 54:18
**assigned** [8] - 84:15, 105:18, 105:19, 106:9, 106:11, 106:24, 119:5, 119:6
**assigning** [1] - 120:2
**assignment** [2] - 99:23, 112:20
**assignments** [1] - 106:6
**assistance** [1] - 85:2
**assistants** [1] - 53:13
**assisted** [1] - 53:16
**assisting** [1] - 131:24
**association** [1] - 134:20
**assume** [3] - 86:25, 227:6, 227:11
**ATF** [4] - 109:17, 109:25, 130:2, 131:9
**Atlanta** [1] - 120:24
**attack** [3] - 180:6, 184:18, 185:20
**attacked** [1] - 185:20
**attempt** [4] - 100:10, 109:5, 155:5, 213:11
**attempted** [1] - 184:13

**attempting** [2] - 13:17, 184:16
**attended** [2] - 111:22, 116:5
**attention** [5] - 9:7, 34:7, 56:10, 84:21, 192:3
**ATTORNEY** [1] - 2:3
**Attorney** [2] - 111:15, 111:17
**attorney** [1] - 218:21
**Attorney's** [4] - 108:23, 111:2, 111:5, 129:13
**Attorneys** [1] - 111:14
**August** [1] - 99:11
**Australia** [1] - 105:16
**Australian** [1] - 108:20
**authority** [3] - 105:7, 164:14, 164:15
**authorized** [4] - 155:6, 206:3, 239:21, 239:22
**autopsy** [10] - 129:2, 227:16, 227:20, 228:21, 244:1, 244:3, 244:7, 244:10, 245:10, 252:8
**Avenue** [4] - 2:11, 101:10, 198:14, 254:20
**averaging** [1] - 119:11
**avoid** [3] - 90:19, 160:25, 169:16
**awake** [1] - 89:21
**award** [14] - 108:4, 108:5, 109:2, 109:8, 109:9, 109:22, 110:1, 110:7, 110:10, 110:24, 111:1, 111:8, 111:11, 111:16
**Award** [12] - 108:18, 108:19, 108:20, 108:22, 108:23, 108:25, 109:10, 109:11, 109:23, 110:8, 110:11, 111:3
**awards** [2] - 108:9, 108:12
**aware** [9] - 41:17, 71:22, 86:20, 123:20, 124:3, 125:13, 170:20, 205:4

## B

**back-ups** [1] - 119:20

**Background** [1] - 179:10
**background** [14] - 41:25, 42:14, 42:17, 151:15, 178:5, 178:13, 178:17, 179:3, 180:12, 180:17, 180:23, 181:3, 181:14, 198:22
**backwards** [5] - 12:22, 74:6, 74:11, 106:14, 174:8
**backyard** [3] - 41:21, 42:6, 177:20
**bad** [2] - 138:12, 197:22, 205:24, 215:22, 227:17
**baggage** [1] - 113:14
**bags** [1] - 17:12
**baiting** [1] - 233:20
**balance** [2] - 35:1, 39:15
**Baltimore** [11] - 106:5, 110:18, 118:7, 118:9, 120:24, 124:8, 128:25, 129:25, 130:1, 130:16, 131:6
**barely** [2] - 10:18, 10:25
**barrel** [4] - 225:6, 225:15, 225:22
**barring** [1] - 235:10
**base** [1] - 205:3
**baseball** [1] - 138:13
**based** [32] - 37:4, 37:6, 64:24, 66:23, 113:16, 136:20, 144:25, 152:13, 152:21, 154:2, 154:17, 155:16, 156:14, 156:15, 159:12, 163:7, 163:10, 163:11, 163:17, 164:19, 172:14, 173:1, 176:3, 207:12, 226:3, 229:16, 229:18, 233:6, 233:12, 241:11, 245:15
**basing** [1] - 229:22
**basis** [14] - 14:14, 15:4, 15:8, 47:2, 47:14, 111:10, 114:11, 149:19, 185:10, 216:18, 218:22, 235:16, 235:17

**bat** [1] - 138:13
**bathroom** [1] - 250:21
**baton** [1] - 136:15
**battered** [1] - 195:5
**battery** [1] - 127:6
**BB** [15] - 17:25, 80:15, 225:13, 225:14, 225:25, 226:6, 226:7, 226:8, 226:9, 226:10, 226:15, 238:16, 238:19
**beacon** [2] - 154:9, 155:2
**bear** [1] - 188:16
**became** [4] - 99:5, 99:21, 102:17, 108:2
**become** [1] - 167:4
**becomes** [3] - 15:15, 187:21, 249:21
**becoming** [1] - 99:8
**BEFORE** [1] - 1:10
**began** [10] - 63:14, 63:19, 144:8, 144:9, 144:15, 144:16, 145:11, 149:20, 177:1
**begin** [4] - 4:10, 54:21, 55:8, 91:18
**beginning** [13] - 10:23, 11:12, 12:19, 38:9, 38:17, 68:24, 153:1, 153:6, 185:1, 217:14, 217:20, 249:5, 249:6
**begins** [2] - 146:20, 179:25
**behalf** [2] - 138:23, 195:15
**behind** [16] - 42:9, 44:12, 50:22, 50:24, 50:25, 121:8, 153:4, 158:1, 196:13, 196:18, 197:9, 197:21, 198:5, 211:24, 216:19, 231:25
**Bell** [2] - 196:13, 196:20
**below** [1] - 37:12
**bench** [31] - 46:25, 49:23, 53:12, 56:2, 56:23, 65:8, 65:20, 67:4, 68:7, 95:12, 96:9, 122:3, 122:5, 122:21, 126:12, 126:15, 127:8, 141:13, 143:6, 146:9, 146:13, 148:6, 171:21, 172:12, 190:8,

190:12, 191:8, 233:16, 236:14, 247:25, 251:19
**beneath** [1] - 56:25
**best** [7] - 90:18, 94:25, 126:16, 126:19, 126:20, 136:7, 254:14
**Betsey** [4] - 92:1, 92:5, 253:16, 253:17
**better** [5] - 8:19, 12:11, 136:16, 243:13, 243:14
**between** [5] - 18:13, 18:14, 241:12, 242:5, 250:12
**beyond** [7] - 41:16, 42:24, 43:1, 47:6, 144:11, 193:6, 193:7
**bias** [3] - 246:5, 246:7, 246:10
**big** [4] - 12:16, 110:17, 198:5, 226:10
**billion** [1] - 206:13
**BILLY** [1] - 1:13
**Billy** [4] - 4:6, 55:9, 75:20, 78:11
**bit** [11] - 8:10, 35:10, 52:5, 54:7, 64:11, 103:18, 103:22, 113:8, 140:7, 213:16, 218:17
**black** [19] - 69:9, 69:17, 70:2, 73:1, 73:21, 73:25, 74:4, 74:13, 74:19, 75:2, 75:11, 85:6, 129:13, 150:9, 150:12, 153:7, 155:18, 159:1, 243:2
**black-and-white** [1] - 129:13
**Bladensburg** [2] - 98:11
**blaming** [2] - 221:20, 221:21
**block** [13] - 59:8, 59:10, 61:24, 63:11, 64:21, 65:24, 66:10, 66:12, 66:13, 66:15, 81:2, 84:23, 88:14
**blocked** [1] - 17:14
**blocking** [1] - 64:11
**blurry** [1] - 58:3
**blurs** [1] - 60:21
**Board** [1] - 118:17
**bodily** [16] - 180:7, 184:19, 204:1, 205:25, 209:25, 210:25, 211:8,

211:14, 211:22, 212:1, 214:4, 214:9, 215:6, 216:6, 216:14, 245:21
**body** [22] - 30:20, 30:24, 30:25, 31:2, 31:5, 31:6, 31:19, 31:25, 32:2, 33:21, 33:24, 34:1, 41:8, 101:23, 104:6, 107:5, 107:12, 212:14, 227:15, 229:20, 244:4
**bombings** [1] - 103:21
**born** [1] - 97:22
**Boston** [7] - 109:5, 120:23, 129:3, 129:25, 130:11, 130:16, 131:5
**bottom** [5] - 43:18, 44:25, 136:9, 209:18, 209:19
**bouncing** [1] - 226:13
**Boyd** [4] - 170:6, 253:10, 253:12, 253:24
**Bradley** [88] - 91:15, 96:24, 97:2, 97:9, 97:12, 108:4, 118:18, 120:4, 121:17, 122:23, 123:19, 124:24, 126:8, 127:12, 128:8, 128:13, 133:22, 137:4, 137:21, 140:6, 141:10, 143:8, 145:3, 145:8, 146:2, 147:7, 148:9, 152:7, 153:18, 154:22, 155:12, 158:2, 158:14, 160:13, 161:25, 162:9, 166:9, 168:13, 169:18, 169:23, 171:12, 172:14, 174:3, 174:23, 175:9, 176:22, 177:13, 179:11, 179:22, 180:10, 180:19, 181:16, 182:9, 182:24, 185:24, 186:11, 186:19, 186:25, 188:11, 189:1, 189:21, 190:7, 191:10, 192:3, 192:10, 193:3, 193:12, 194:7, 195:12, 195:19,

199:4, 199:10, 199:14, 217:10, 224:23, 234:16, 234:17, 235:4, 236:16, 239:18, 241:9, 241:18, 244:2, 244:21, 251:20, 252:1, 252:16, 252:21
**BRADLEY** [2] - 3:7, 97:6
**Bradley's** [1] - 121:24
**brain** [4] - 230:12, 230:17, 230:22, 230:25
**brake** [1] - 30:8
**branch** [4] - 99:24, 100:1, 100:18, 101:14
**breach** [4] - 168:22, 169:7, 173:4, 185:15
**breached** [7] - 135:1, 143:20, 157:19, 164:3, 169:3, 239:19, 240:3
**break** [9] - 21:3, 21:7, 44:5, 51:23, 52:5, 142:9, 169:10, 169:11, 169:14
**breakfast** [4] - 5:5, 5:6, 6:7
**BRIDZETTE** [1] - 1:3
**Bridzette** [2] - 4:5, 93:23
**brief** [6] - 5:10, 15:19, 17:7, 19:11, 89:15, 252:23
**briefly** [5] - 4:10, 55:24, 89:8, 91:22, 99:16
**bring** [8] - 21:3, 21:7, 52:21, 54:6, 84:21, 93:18, 94:12, 170:2
**bringing** [2] - 21:15, 192:3
**Briscoe** [115] - 13:14, 13:22, 16:13, 17:24, 17:25, 19:5, 19:19, 22:14, 23:8, 24:3, 24:8, 24:18, 24:25, 25:25, 26:17, 29:24, 30:17, 30:19, 31:22, 33:18, 39:19, 42:8, 44:10, 50:13, 50:18, 50:21, 57:12, 60:6, 60:16, 60:25, 61:3, 61:6, 61:13, 61:18, 62:14, 82:3, 85:14, 85:19, 86:12, 88:9, 88:25, 89:12, 89:20,

93:25, 129:3, 144:2, 144:3, 144:20, 144:21, 145:11, 148:19, 148:25, 149:13, 149:18, 149:19, 150:3, 150:12, 159:3, 165:6, 165:10, 165:13, 165:23, 166:1, 166:13, 167:2, 167:20, 168:2, 168:17, 168:23, 169:8, 172:17, 173:3, 173:5, 173:21, 174:14, 174:17, 175:15, 175:18, 175:24, 176:25, 177:3, 177:6, 184:24, 193:4, 193:14, 194:9, 195:4, 199:15, 199:23, 200:15, 200:20, 200:21, 201:15, 219:19, 220:9, 220:20, 220:21, 224:6, 229:14, 231:18, 233:1, 234:2, 234:7, 236:18, 237:1, 237:4, 237:10, 242:6, 242:24, 245:16, 246:19, 247:1, 250:12, 250:20
**Briscoe's** [15] - 11:16, 12:3, 13:6, 17:23, 35:18, 41:16, 42:2, 59:25, 62:11, 171:17, 176:15, 227:15, 238:14, 238:22, 242:20
**broke** [3] - 13:14, 219:22, 220:13
**broken** [1] - 110:16
**brought** [5] - 5:19, 9:6, 54:16, 86:13, 113:13
**building** [2] - 196:9, 196:13
**buildings** [2] - 178:3, 178:25
**bullet** [3] - 13:19, 16:18, 178:15, 229:19
**bullets** [11] - 13:11, 13:21, 16:14, 16:16, 16:17, 178:18, 227:15, 228:3, 236:19, 237:2, 244:12

**bunch** [2] - 198:12, 209:15
**Bureau** [2] - 105:19, 109:15
**bureau** [1] - 109:25
**Burger** [1] - 198:11
**burglaries** [1] - 101:11
**bushes** [1] - 57:16
**bust** [1] - 197:21
**Butera** [1] - 126:3
**buttocks** [3] - 227:17, 227:19, 228:7
**buy** [1] - 197:21
**BY** [19] - 22:7, 50:11, 54:25, 57:1, 65:21, 68:8, 84:2, 89:10, 97:8, 122:22, 127:11, 143:7, 148:8, 171:11, 172:13, 191:9, 199:9, 236:15, 241:8

## C

**CA** [1] - 1:3
**cache** [1] - 109:7
**CAD** [1] - 129:11
**cadet** [6] - 98:19, 98:20, 99:1, 99:2, 99:3, 99:9
**caliber** [1] - 225:24
**cam** [1] - 209:4
**camera** [2] - 18:21, 209:2
**Canada** [2] - 116:17, 116:18
**cannot** [11] - 16:3, 19:25, 149:7, 173:9, 200:25, 213:18, 213:19, 215:6, 216:7, 216:20
**capacity** [1] - 98:17
**Capitol** [2] - 101:9, 101:10
**capsicum** [1] - 136:15
**captured** [2] - 29:1, 174:17
**car** [45] - 11:7, 14:5, 14:6, 14:25, 15:6, 15:10, 15:12, 15:14, 15:17, 16:14, 16:16, 19:21, 20:13, 26:16, 28:21, 28:23, 30:8, 30:21, 30:22, 30:23, 30:24, 31:1, 31:12, 31:14, 31:20, 31:25, 56:6, 65:17, 100:10, 102:14, 147:17, 180:16, 197:5, 197:6, 197:9,

210:19, 210:22, 213:4, 213:9, 213:13, 221:11, 231:24, 237:8
**care** [33] - 125:13, 125:17, 125:18, 125:23, 133:25, 134:19, 134:21, 135:1, 135:2, 143:20, 144:8, 150:3, 150:6, 157:1, 157:3, 157:10, 157:19, 159:19, 163:16, 163:18, 164:3, 164:6, 168:22, 169:4, 169:7, 173:4, 173:9, 180:23, 185:15, 194:4, 194:11, 239:19, 240:3
**career** [4] - 102:5, 108:8, 118:20, 187:23
**careful** [3] - 178:17, 208:16, 208:21
**Caroletta** [1] - 8:2
**Carolina** [1] - 110:18
**carry** [1] - 134:13
**carrying** [7] - 224:15, 236:18, 237:1, 237:5, 237:10, 237:17, 243:3
**cars** [1] - 213:8
**case** [98] - 7:20, 9:19, 10:5, 13:10, 18:1, 21:18, 21:21, 52:1, 53:16, 54:17, 83:6, 90:15, 90:18, 91:6, 91:7, 91:18, 93:4, 93:8, 93:10, 94:18, 94:23, 97:18, 111:14, 119:24, 122:14, 126:3, 128:9, 128:15, 128:16, 129:1, 129:3, 129:7, 129:17, 131:2, 134:24, 140:9, 140:17, 140:18, 141:3, 141:8, 143:11, 152:7, 152:20, 152:23, 156:22, 156:25, 157:22, 163:11, 164:10, 164:12, 164:16, 164:22, 169:15, 169:16, 170:4, 171:23, 180:3, 183:10, 183:15, 185:21,

186:12, 186:16, 186:20, 187:2, 189:24, 192:4, 202:21, 203:3, 203:7, 204:7, 204:8, 206:8, 207:14, 209:1, 213:16, 217:11, 217:19, 217:20, 218:1, 219:16, 222:25, 223:13, 237:10, 237:21, 237:25, 238:1, 238:4, 238:5, 238:22, 239:2, 239:10, 239:14, 241:22, 246:17, 246:23, 252:25, 253:5
**Case** [1] - 4:4
**cases** [12] - 72:12, 72:14, 103:17, 105:25, 111:13, 183:12, 187:4, 206:21, 207:2, 216:18, 232:13, 232:14
**cash** [1] - 113:13
**casing** [12] - 13:5, 13:12, 13:19, 16:11, 16:16, 16:19, 70:8, 70:9, 81:6, 81:7, 81:9, 81:12
**casings** [3] - 82:1, 82:2, 82:7
**casual** [1] - 102:3
**catch** [1] - 119:21
**category** [1] - 131:23
**Category** [1] - 155:21
**caught** [2] - 109:6, 196:16
**causes** [1] - 114:22
**caution** [1] - 5:18
**cautionary** [1] - 21:17
**cell** [2] - 37:20, 113:24
**center** [2] - 116:6, 212:7
**certain** [6] - 63:4, 133:23, 140:11, 142:15, 142:22, 148:9
**certainly** [3] - 8:4, 93:6, 209:23
**certainty** [14] - 141:3, 149:25, 156:15, 157:14, 160:1, 161:5, 163:23, 164:23, 166:12, 167:18, 168:14, 172:15, 193:21, 194:14

**CERTIFICATE** [1] - 254:9
**certified** [1] - 116:2
**certify** [1] - 254:12
**cetera** [4] - 122:16, 217:17
**Chad** [1] - 152:9
**CHAD** [2] - 3:3, 22:5
**chair** [1] - 216:8
**chance** [2] - 7:9, 240:13
**change** [9] - 26:15, 26:20, 28:18, 39:25, 120:16, 120:19, 222:1, 235:20, 236:2
**changed** [16] - 26:21, 26:24, 28:18, 40:19, 59:17, 60:19, 93:4, 120:17, 221:12, 233:22, 234:5, 235:5, 235:8, 246:25, 251:7
**changes** [2] - 95:1, 121:4
**changing** [2] - 222:21, 224:2
**character** [1] - 234:22
**characterization** [1] - 67:19
**Charge** [1] - 110:11
**charge** [2] - 110:14, 110:20
**Charlie's** [2] - 207:6, 214:24
**chart** [2] - 96:20, 252:7
**chase** [11] - 146:16, 146:25, 147:6, 147:9, 147:16, 153:2, 163:12, 163:13, 213:3, 248:24, 251:4
**chasing** [3] - 148:24, 213:8, 221:15
**check** [5] - 69:21, 150:19, 195:11, 214:11, 219:3
**checked** [1] - 213:20
**checking** [1] - 219:6
**chief** [1] - 83:6
**CHRISTOPHER** [1] - 1:10
**chuckle** [1] - 6:6
**circles** [1] - 209:15
**circulars** [2] - 128:22, 188:4
**circumstances** [18] - 135:22, 142:5, 152:19, 160:21, 161:13, 184:9, 185:3, 196:6,

204:19, 205:4, 205:10, 207:4, 209:20, 210:13, 211:7, 230:13, 230:18, 239:24
**citations** [1] - 108:8
**cities** [3] - 113:11, 113:12, 135:18
**Citizen** [1] - 148:14
**citizen** [6] - 123:21, 124:4, 131:12, 146:22, 151:21, 232:16
**citizenry** [1] - 217:7
**citizens** [4] - 42:20, 113:20, 132:6, 181:11
**city** [2] - 106:14, 113:14
**City** [1] - 120:24
**civil** [2] - 4:4, 171:17
**civilians** [3] - 205:12, 215:12, 232:9
**claim** [2] - 127:13, 127:14
**claims** [2] - 15:23, 91:21
**clarification** [2] - 20:5, 52:23
**clarify** [3] - 17:8, 53:8, 165:3
**class** [2] - 114:21, 116:20
**clean** [2] - 49:20, 122:18
**clear** [24] - 12:2, 15:10, 21:23, 44:5, 49:6, 49:8, 50:6, 58:7, 60:21, 63:13, 93:24, 94:1, 135:19, 147:12, 149:6, 166:5, 172:9, 173:9, 198:10, 198:18, 205:20, 242:12, 251:1, 251:16
**clear-cut** [1] - 205:20
**clearer** [1] - 61:21
**clearly** [4] - 12:16, 19:3, 160:11, 239:9
**Click** [1] - 73:18
**click** [19] - 12:21, 12:23, 13:1, 57:24, 57:25, 73:10, 73:23, 74:17, 74:22, 75:10, 75:14, 75:22, 76:10, 76:22, 77:2, 77:10, 77:23, 78:6, 78:9
**clicked** [1] - 12:9
**clicking** [1] - 55:16, 73:4

**climbed** [2] - 196:21,
197:10
**clip** [1] - 176:23
**clips** [1] - 238:14
**close** [7] - 59:1, 59:2,
59:3, 78:16, 215:8,
225:21
**closer** [9] - 57:14,
76:17, 77:7, 77:19,
78:15, 78:20, 78:24
**closest** [1] - 198:4
**closing** [3] - 14:24,
19:25, 94:25
**closings** [1] - 93:15
**clothes** [2] - 102:3,
102:12
**clutching** [2] - 44:18,
44:19
**cocaine** [2] - 106:15,
197:25
**code** [1] - 188:8
**Code** [1] - 129:5
**Coker** [5] - 11:18,
12:1, 13:6, 13:13,
17:9
**Coker's** [1] - 17:3
**collecting** [1] - 217:13
**Columbia** [12] - 4:5,
100:3, 105:7,
105:15, 106:18,
111:6, 111:18,
117:2, 118:19,
180:1, 216:23, 217:8
**COLUMBIA** [2] - 1:1,
1:6
**coming** [19] - 10:19,
11:7, 12:2, 13:11,
13:21, 15:23, 19:3,
32:7, 33:22, 33:24,
36:4, 56:5, 68:2,
113:11, 114:4,
153:3, 169:9,
198:20, 213:8
**command** [1] - 136:10
**commands** [3] -
210:2, 210:4, 210:5
**commenced** [1] -
250:20
**commendation** [2] -
108:5, 110:2
**commendations** [2] -
107:19, 108:7
**commenting** [1] -
192:4
**commission** [1] -
216:15
**commit** [2] - 167:11,
184:13
**committed** [6] -
184:12, 184:14,

184:16, 194:22,
200:10, 200:16
**common** [2] - 207:13,
241:12
**communicate** [1] -
230:22
**communicates** [1] -
230:25
**communication** [1] -
121:3
**communications** [2] -
6:6, 120:25
**community** [1] -
131:25
**compare** [1] - 133:11
**compared** [1] - 76:18
**compensation** [2] -
103:11, 108:3
**complaint** [2] - 129:1,
129:2
**complete** [1] - 254:14
**complex** [2] - 234:15,
242:25
**complies** [1] - 82:25
**computer** [1] - 1:25
**computer-aided** [1] -
1:25
**conceal** [2] - 44:23,
45:3
**concept** [3] - 49:17,
165:15, 166:4
**concern** [1] - 123:20
**concerning** [27] -
17:10, 22:9, 27:24,
33:17, 44:8, 45:14,
70:13, 71:23, 72:1,
72:13, 123:9,
124:14, 124:16,
124:25, 125:9,
125:16, 126:1,
127:13, 127:21,
130:5, 131:2, 140:8,
150:20, 157:18,
159:23, 193:19,
241:10
**concerns** [3] - 122:25,
150:21, 220:24
**conclude** [4] - 190:22,
205:9, 235:25, 236:1
**concluded** [2] -
191:16, 240:3
**conclusion** [14] -
142:13, 143:3,
163:11, 172:23,
219:22, 219:24,
220:9, 224:14,
229:13, 233:5,
237:3, 237:4,
239:19, 250:19
**conclusions** [17] -

141:22, 142:3,
142:6, 143:8,
143:23, 160:1,
173:1, 186:19,
193:3, 217:19,
218:7, 218:21,
218:22, 219:15,
219:18, 220:20,
233:1
**conduct** [25] - 112:23,
125:1, 125:10,
132:18, 132:25,
135:8, 144:6, 147:9,
148:18, 149:16,
153:15, 153:18,
176:15, 188:13,
202:22, 203:10,
203:21, 204:11,
210:12, 220:16,
220:25, 223:4,
223:16, 242:10,
248:17
**Conduct** [4] - 189:10,
189:22, 192:16,
192:17
**conducted** [1] - 119:2
**conducting** [1] - 112:4
**conference** [26] -
46:24, 49:23, 56:1,
56:23, 65:7, 65:20,
67:3, 68:7, 95:11,
96:9, 122:4, 122:21,
126:14, 127:8,
141:12, 143:6,
146:12, 148:6,
171:20, 172:12,
190:11, 191:8,
233:15, 236:14,
247:24, 251:19
**confines** [1] - 101:3
**confrontation** [1] -
183:24
**confronting** [1] -
230:11
**confuse** [2] - 242:3,
250:9
**confused** [9] - 146:18,
246:2, 248:2, 248:5,
248:7, 248:11,
248:18, 249:11,
249:18
**confusing** [1] - 248:22
**confusion** [3] -
250:14, 251:11,
251:12
**conjunction** [1] -
185:14
**connected** [1] - 52:15
**Connecticut** [1] -
116:12

**Connor** [9] - 187:7,
201:25, 202:14,
202:17, 202:21,
203:9, 203:10,
205:8, 205:18
**connor** [1] - 72:16
**consider** [5] - 7:21,
21:22, 108:11,
241:18, 244:2
**considerably** [1] -
227:3
**consideration** [5] -
173:21, 174:1,
174:5, 180:17, 246:3
**considered** [3] -
160:24, 177:11,
228:13
**considering** [1] -
230:17
**consisted** [2] - 101:8,
149:17
**consistent** [8] - 47:18,
47:22, 181:6,
183:13, 192:21,
242:8, 245:10,
250:15
**conspiracies** [2] -
103:18, 103:20
**constitutes** [1] -
254:12
**Constitution** [3] -
2:11, 171:18, 254:20
**consult** [1] - 83:15
**consulting** [1] - 97:15
**contact** [21] - 131:24,
141:8, 144:3,
144:11, 144:12,
144:13, 145:18,
146:20, 147:8,
147:14, 148:21,
149:1, 149:2,
220:18, 221:14,
242:5, 242:10,
242:14, 248:25,
250:11, 251:3
**contacted** [2] -
149:14, 221:13
**contacts** [12] - 123:21,
124:4, 131:13,
131:24, 132:6,
146:17, 147:5,
149:5, 149:6, 242:3,
249:18, 249:21
**Contacts** [1] - 148:14
**contained** [2] - 168:3,
168:5
**contend** [1] - 147:19
**contest** [1] - 251:9
**context** [3] - 234:22,
249:24, 250:17

**continue** [12] - 12:4,
22:1, 57:21, 58:10,
58:12, 73:18, 74:16,
94:23, 114:25,
162:23, 187:17,
198:7
**CONTINUED** [2] -
1:22, 2:1
**Continued** [1] - 22:6
**continuing** [2] -
121:12, 140:23
**continuously** [1] -
245:4
**continuum** [21] -
71:20, 71:23, 72:6,
123:1, 126:24,
130:5, 130:10,
130:12, 134:6,
136:2, 137:13,
137:23, 138:18,
140:1, 183:25,
209:8, 209:10,
209:11, 209:12,
210:17
**contract** [2] - 97:14,
118:14
**controlled** [1] - 112:8
**controls** [1] - 110:23
**conversation** [8] - 5:4,
5:7, 5:10, 14:18,
15:5, 114:7, 219:21,
220:12
**conversations** [1] -
114:1
**Cooper** [1] - 70:13
**COOPER** [1] - 1:10
**copy** [7] - 33:2, 45:18,
45:19, 48:15, 95:20,
179:16, 182:13
**correct** [88] - 13:24,
14:7, 14:11, 22:11,
22:16, 23:6, 23:10,
23:12, 25:19, 27:1,
27:7, 29:12, 30:14,
34:18, 39:24, 40:7,
40:10, 40:12, 42:15,
51:3, 51:6, 55:2,
62:8, 62:10, 63:9,
64:1, 66:3, 69:7,
72:5, 80:14, 80:16,
81:1, 81:11, 82:6,
82:15, 89:22, 91:2,
99:22, 105:5,
105:12, 108:1,
109:18, 111:20,
111:24, 133:9,
139:24, 143:18,
143:21, 148:16,
155:14, 155:22,
162:6, 168:6,

173:19, 192:23,
197:3, 200:23,
201:18, 202:1,
202:11, 203:16,
204:10, 204:15,
207:4, 207:5, 207:7,
207:8, 209:17,
209:22, 210:20,
212:16, 212:17,
214:6, 218:9,
219:23, 219:25,
220:23, 226:12,
227:5, 228:19,
229:4, 230:15,
231:13, 232:24,
238:11, 245:6,
252:10, 253:18
**corrected** [1] - 217:23
**corresponds** [2] -
17:3, 138:4
**counsel** [6] - 14:14,
45:23, 49:16, 83:15,
95:23, 141:11
**Counsel** [2] - 9:6,
94:11
**count** [2] - 126:21,
126:24
**country** [2] - 105:8,
125:22
**counts** [1] - 126:22
**County** [9] - 117:17,
117:18, 117:19,
117:21, 120:24,
130:1, 131:6
**couple** [11] - 7:14,
10:12, 21:14, 21:18,
93:14, 97:14,
102:20, 102:21,
127:9, 177:17,
177:18
**course** [12] - 107:3,
108:7, 112:8,
118:25, 119:13,
120:23, 181:12,
195:23, 211:18,
211:25, 226:16,
229:8
**Court** [44] - 2:10, 2:10,
4:10, 4:23, 5:11,
5:24, 10:11, 11:15,
11:25, 13:18, 15:8,
17:13, 17:18, 17:23,
18:22, 20:7, 20:9,
20:19, 48:15, 49:12,
49:13, 53:12, 72:12,
72:14, 91:10, 117:1,
117:8, 117:24,
126:2, 127:4, 142:9,
145:22, 146:7,
170:3, 170:19,

195:7, 202:21,
203:7, 211:20,
216:17, 217:1,
222:21, 253:23,
254:18
**court** [29] - 6:23, 7:2,
16:5, 53:13, 94:21,
116:23, 116:25,
117:13, 118:5,
123:6, 123:16,
124:6, 124:8,
124:10, 125:8,
125:16, 125:25,
128:1, 128:2,
199:18, 208:7,
215:17, 215:19,
215:21, 216:1,
216:5, 216:7, 218:5,
253:3
**COURT** [382] - 1:1, 4:3,
4:11, 4:16, 4:19, 5:8,
5:12, 5:14, 5:22, 6:1,
6:4, 6:9, 6:16, 7:1,
7:5, 7:7, 7:16, 8:9,
8:14, 8:21, 8:24, 9:3,
9:6, 9:25, 10:4,
10:10, 11:5, 11:8,
11:10, 13:8, 13:23,
14:4, 14:6, 14:8,
14:12, 14:20, 14:23,
15:3, 15:13, 16:9,
16:24, 17:2, 17:6,
17:21, 18:3, 18:8,
18:16, 18:19, 19:11,
19:15, 19:24, 20:3,
20:6, 20:11, 20:17,
21:2, 21:6, 21:11,
21:13, 22:3, 24:20,
26:14, 26:19, 27:9,
27:18, 28:16, 29:17,
29:20, 31:18, 32:3,
32:6, 32:16, 32:25,
36:8, 36:11, 37:19,
38:18, 41:1, 42:5,
43:6, 43:10, 43:12,
43:23, 44:1, 44:4,
46:21, 47:13, 47:23,
48:10, 48:18, 49:6,
49:8, 49:11, 49:19,
49:22, 49:24, 51:14,
51:22, 52:3, 52:9,
52:12, 52:15, 52:21,
52:25, 53:4, 53:7,
53:10, 53:15, 53:17,
53:19, 53:25, 54:3,
54:9, 54:13, 54:16,
54:23, 55:25, 56:9,
56:13, 56:17, 56:22,
59:12, 60:11, 60:15,
63:18, 64:4, 64:7,
64:13, 64:15, 64:23,

65:2, 65:5, 65:9,
65:13, 65:18, 66:17,
66:19, 66:22, 67:2,
67:5, 67:11, 67:13,
67:17, 67:21, 68:4,
69:3, 69:5, 69:8,
69:12, 69:18, 70:17,
70:22, 71:4, 71:7,
71:9, 76:1, 76:8,
77:14, 79:22, 81:21,
82:19, 82:22, 83:4,
83:7, 83:9, 83:13,
83:17, 83:23, 86:7,
87:14, 87:24, 88:8,
88:19, 89:7, 90:3,
90:5, 90:10, 90:12,
90:22, 91:4, 91:12,
91:14, 91:17, 91:23,
92:2, 92:5, 92:8,
92:11, 93:2, 93:8,
93:10, 93:12, 93:15,
93:18, 94:3, 94:9,
94:11, 94:14, 95:8,
95:13, 95:16, 95:25,
96:7, 96:12, 96:16,
96:19, 96:21, 96:25,
97:2, 97:4, 99:18,
121:19, 121:21,
121:24, 122:1,
122:3, 122:6,
122:10, 122:17,
122:20, 126:6,
126:10, 126:13,
126:23, 127:2,
127:7, 128:7, 137:3,
137:16, 137:18,
137:20, 141:11,
141:14, 141:18,
141:21, 142:2,
142:17, 142:19,
142:25, 145:2,
145:6, 145:22,
145:25, 146:6,
146:10, 146:19,
147:2, 147:6,
147:20, 148:4,
148:7, 152:5,
152:21, 153:14,
154:14, 154:16,
154:19, 154:21,
155:11, 158:10,
158:14, 158:20,
158:22, 161:20,
161:22, 161:24,
162:8, 165:3,
165:16, 166:5,
166:7, 169:9,
169:11, 169:13,
169:21, 169:23,
169:25, 170:9,
170:11, 170:14,

170:21, 170:24,
171:5, 171:8,
171:19, 171:22,
172:4, 172:9, 174:2,
174:22, 178:2,
179:7, 179:20,
182:4, 182:6, 182:8,
182:21, 182:23,
183:3, 183:5, 186:6,
186:9, 188:21,
189:4, 189:15,
189:20, 190:10,
190:20, 190:25,
191:5, 191:7,
191:21, 191:24,
192:2, 193:1, 193:8,
195:8, 196:4,
197:19, 199:1,
199:3, 199:6, 201:8,
207:11, 208:19,
215:24, 222:6,
223:20, 224:22,
225:5, 227:25,
228:19, 230:8,
233:14, 233:17,
233:24, 234:1,
234:5, 234:23,
234:25, 235:16,
235:22, 235:25,
236:4, 236:6, 236:9,
236:12, 239:8,
239:17, 240:7,
240:10, 241:5,
244:15, 244:18,
247:7, 247:9,
247:23, 248:4,
248:13, 249:2,
249:5, 249:9,
249:13, 249:19,
250:4, 250:24,
251:1, 251:6,
251:11, 251:15,
251:21, 252:1,
252:9, 252:14,
252:18, 253:9,
253:12, 253:17,
253:20, 254:1,
254:3, 254:9
**Court's** [28] - 10:9,
16:25, 20:2, 20:5,
29:18, 29:21, 43:9,
54:19, 83:14, 95:7,
96:4, 96:5, 121:22,
128:10, 145:24,
147:12, 150:10,
158:12, 164:18,
182:2, 186:7,
195:10, 231:7,
233:20, 235:10,
240:6, 253:21
**courthouse** [1] - 117:4

**Courthouse** [2] - 2:11,
254:19
**courtroom** [8] - 21:8,
21:10, 52:2, 53:18,
90:21, 94:13, 171:7,
253:8
**COURTROOM** [4] -
4:4, 250:22, 250:25,
252:12
**courts** [4] - 117:7,
117:11, 128:1,
134:23
**cover** [9] - 68:2,
113:19, 153:18,
153:21, 153:24,
196:22, 197:5,
197:8, 197:9
**covered** [2] - 9:22,
133:2
**covers** [4] - 110:18,
153:15, 153:22,
178:4
**crack** [2] - 106:15,
197:25
**credibility** [2] - 231:9,
231:11
**crime** [17] - 17:3,
47:16, 100:2, 100:7,
101:11, 101:12,
103:15, 108:9,
121:6, 161:14,
163:2, 163:6,
185:12, 194:22,
200:10, 200:16,
206:11
**crimes** [5] - 105:8,
105:11, 105:13,
105:15, 167:11
**Criminal** [2] - 109:11,
112:1
**criminal** [4] - 100:8,
100:10, 112:4, 112:6
**crisis** [1] - 84:19
**CROSS** [2] - 89:9,
199:8
**cross** [6] - 20:15,
148:4, 148:5, 230:8,
244:19
**CROSS-
EXAMINATION** [2] -
89:9, 199:8
**cross-examination** [1]
- 20:15
**crossed** [2] - 196:13,
231:19
**CRR** [3] - 2:10, 254:11,
254:18
**crux** [1] - 236:7
**cryptic** [1] - 95:14
**CUBBAGE** [1] - 76:12

**cumulative** [1] - 178:1
**curative** [4] - 6:17, 6:19, 6:22, 7:9
**current** [5] - 84:10, 97:13, 120:7, 120:25, 121:3
**cursor** [1] - 56:9
**cursory** [1] - 89:15
**custody** [4] - 87:10, 87:21, 194:6, 194:21
**cut** [2] - 160:13, 205:20
**cuts** [1] - 214:23

# D

**D.C** [15] - 1:4, 97:21, 97:22, 98:6, 105:12, 111:5, 117:7, 120:23, 126:2, 179:12, 182:11, 188:8, 210:18
**danger** [6] - 41:12, 211:15, 214:3, 216:25, 227:3, 227:5
**dangerous** [1] - 115:23
**dark** [3] - 56:18, 58:2, 73:7
**data** [4] - 140:12, 140:14, 217:14, 217:16
**date** [4] - 82:4, 170:8, 192:18, 222:14
**Dated** [1] - 254:16
**dated** [6] - 129:10, 129:11, 129:12, 129:14, 129:15
**dates** [2] - 170:12, 253:24
**days** [9] - 21:19, 103:14, 113:3, 113:9, 113:24, 222:15, 222:18, 222:20
**DC** [5] - 1:15, 1:19, 2:4, 2:12, 254:20
**DCMR** [3] - 180:1, 181:22, 182:1
**de** [3] - 136:7, 138:3, 210:16
**de-escalates** [1] - 138:3
**de-escalating** [1] - 210:16
**DEA** [12] - 105:4, 108:18, 108:19, 108:21, 110:15, 110:16, 113:12, 114:4, 115:23,

---

120:24, 130:2, 131:9
**deadly** [14] - 135:11, 135:19, 136:17, 140:2, 160:22, 160:24, 184:2, 204:2, 205:12, 206:3, 211:3, 211:9, 211:10, 213:19
**deal** [6] - 6:9, 138:19, 188:11, 206:15, 214:23, 218:18
**dealing** [7] - 6:16, 103:14, 115:19, 135:4, 168:25, 188:6, 222:25
**dealt** [1] - 141:21
**death** [19] - 114:19, 114:21, 114:22, 180:7, 184:19, 204:1, 206:1, 209:25, 211:1, 211:8, 211:15, 211:23, 212:2, 214:4, 214:9, 215:6, 216:6, 216:14, 245:19
**DeBerardinis**)...........
.....................**199** [1] - 3:8
**DeBerardinis** [123] - 2:2, 4:8, 6:17, 6:21, 7:4, 7:13, 9:20, 10:6, 93:2, 93:6, 99:17, 99:19, 121:25, 122:2, 122:8, 122:11, 126:4, 126:11, 126:16, 126:19, 126:25, 127:3, 128:6, 137:17, 142:12, 145:1, 145:4, 146:8, 146:11, 146:14, 147:24, 152:2, 152:17, 153:12, 154:15, 154:17, 161:21, 165:1, 165:7, 165:14, 166:3, 166:6, 173:22, 173:25, 177:25, 182:22, 186:4, 186:21, 189:14, 189:16, 190:8, 190:13, 191:3, 191:6, 191:21, 191:22, 192:24, 193:6, 195:6, 196:3, 197:18, 199:2, 199:7, 199:9, 208:6, 215:25, 224:2, 225:4, 227:24, 228:20, 231:7, 233:19, 234:9,

---

234:15, 234:19, 234:24, 235:1, 235:7, 235:13, 235:15, 235:21, 235:24, 236:3, 236:5, 236:8, 236:11, 236:15, 239:6, 240:6, 240:8, 240:11, 241:3, 241:9, 241:17, 241:24, 242:12, 243:9, 243:25, 244:14, 244:16, 246:12, 247:6, 247:8, 247:10, 247:11, 247:13, 247:22, 248:1, 248:2, 248:6, 248:7, 248:10, 248:11, 248:16, 248:22, 249:6, 249:10, 249:14, 249:24, 250:2, 250:5, 251:13, 251:18
**decedent** [18] - 129:2, 153:3, 156:22, 157:22, 163:5, 163:14, 164:9, 164:12, 164:16, 167:11, 174:9, 176:9, 185:21, 194:2, 200:20, 200:21, 240:25
**December** [2] - 99:11, 101:2
**decide** [3] - 14:13, 201:23, 214:12
**decided** [1] - 109:8
**decides** [1] - 149:10
**deciding** [1] - 230:23
**decision** [7] - 111:19, 205:1, 230:5, 230:11, 230:14, 230:21, 244:11
**decisions** [1] - 204:23
**declination** [2] - 129:14, 142:16
**decorated** [1] - 107:17
**defend** [3] - 215:6, 216:8, 216:20
**defendant** [6] - 157:25, 167:12, 237:20, 237:22, 238:5, 242:25
**Defendant** [39] - 2:2, 150:8, 150:11, 156:10, 156:16,

---

157:2, 157:9, 157:18, 159:5, 159:14, 159:18, 159:23, 161:6, 162:13, 163:15, 163:17, 164:2, 165:22, 165:25, 168:22, 169:3, 171:16, 172:18, 173:2, 173:3, 173:4, 174:15, 174:18, 175:24, 177:4, 179:2, 180:11, 180:22, 185:7, 185:14, 195:5, 245:18, 246:20
**defendants** [1] - 4:7
**Defendants** [1] - 1:7
**Defendants'** [3] - 34:4, 79:24, 224:24
**defending** [1] - 185:19
**Defense** [1] - 118:17
**defense** [15] - 7:8, 45:23, 83:5, 83:9, 91:7, 91:17, 94:18, 94:20, 94:23, 146:14, 183:20, 183:21, 188:1, 218:21, 233:19
**defense's** [1] - 9:21
**defensive** [1] - 184:1
**definitely** [1] - 16:3
**definitions** [1] - 151:16
**Definitions** [1] - 154:25
**degree** [14] - 141:3, 149:25, 156:14, 157:13, 160:1, 161:5, 163:23, 164:23, 166:11, 167:18, 168:14, 172:15, 193:21, 194:14
**delay** [1] - 21:14
**deliberations** [3] - 7:22, 8:19, 21:23
**delivering** [2] - 216:11, 216:12
**Department** [65] - 84:11, 84:13, 98:14, 98:18, 99:6, 99:9, 99:14, 102:9, 102:24, 103:6, 105:2, 107:16, 109:11, 109:19, 112:1, 112:19, 112:21, 112:22, 115:22, 116:10, 116:13, 118:16,

---

118:17, 118:20, 119:1, 120:5, 125:1, 125:6, 128:21, 128:22, 128:23, 128:24, 128:25, 129:4, 130:7, 130:18, 130:22, 131:2, 131:11, 131:16, 132:11, 132:17, 133:5, 133:12, 133:16, 135:13, 149:22, 150:15, 158:3, 159:24, 160:12, 160:19, 161:12, 168:3, 173:13, 181:18, 183:11, 184:7, 188:9, 188:13, 189:10, 189:23, 190:17, 195:20
**department** [10] - 103:7, 116:3, 125:10, 132:19, 132:25, 135:9, 155:5, 185:2, 212:6, 213:12
**Department's** [2] - 133:7, 137:12
**departments** [10] - 120:12, 125:22, 130:9, 130:11, 134:3, 134:7, 134:12, 134:13, 134:16, 136:5
**depict** [1] - 36:9
**depicted** [6] - 41:5, 43:3, 43:5, 43:17, 153:9, 153:25
**depicts** [5] - 14:25, 17:10, 34:15, 242:23, 242:24
**deposed** [1] - 218:1
**deposition** [33] - 29:23, 29:25, 148:2, 152:9, 152:11, 217:23, 218:4, 218:11, 218:17, 218:25, 222:9, 222:10, 222:12, 222:13, 222:17, 223:13, 224:8, 224:9, 233:9, 234:14, 237:18, 238:9, 238:12, 241:10, 242:2, 248:3, 248:7, 248:17, 248:21, 249:15, 250:8, 250:16, 251:10

**deposition's** [1] - 221:3
**depositions** [13] - 129:19, 152:7, 152:13, 153:16, 154:3, 156:9, 159:10, 217:17, 219:1, 219:8, 220:7, 223:14, 237:16
**deprivation** [1] - 67:9
**deputized** [2] - 105:5, 106:19
**DEPUTY** [4] - 4:4, 250:22, 250:25, 252:12
**deputy** [1] - 105:6
**describe** [3] - 56:19, 176:14
**described** [2] - 214:24, 232:23
**description** [1] - 196:11
**detail** [1] - 104:23
**detailed** [5] - 104:9, 104:22, 105:22, 106:2, 106:9
**details** [1] - 213:15
**detain** [2] - 88:24, 144:23
**detained** [4] - 149:7, 167:24, 193:4, 193:14
**detaining** [1] - 168:9
**detective** [6] - 107:22, 108:2, 115:1, 118:21, 119:17, 120:1
**detention** [2] - 166:21, 166:22
**determination** [9] - 111:15, 134:25, 157:8, 157:9, 158:25, 173:2, 173:24, 185:7, 235:2
**determine** [3] - 43:15, 190:15, 253:15
**device** [1] - 156:3
**devices** [2] - 155:7, 156:5
**diabetic** [1] - 205:19
**diagram** [4] - 137:24, 209:14, 210:8, 228:18
**diagrams** [1] - 185:13
**dictates** [1] - 249:12
**die** [5] - 86:18, 88:6, 216:10, 216:21, 217:3
**differences** [1] - 120:18

**different** [24] - 5:20, 12:18, 14:20, 20:25, 30:12, 48:21, 59:18, 80:17, 113:8, 114:22, 120:17, 131:23, 135:21, 165:15, 166:4, 207:4, 207:15, 207:22, 207:25, 208:9, 208:14, 208:17, 239:12, 246:3
**differently** [1] - 208:22
**difficult** [2] - 12:12, 20:21
**dignitaries** [3] - 104:25, 110:6, 115:12
**dignitary** [1] - 104:14
**diminished** [2] - 138:17, 139:21
**dire** [1] - 5:22
**DIRECT** [3] - 22:6, 84:1, 97:7
**direct** [4] - 8:10, 22:1, 201:9, 235:17
**directed** [1] - 232:16
**directing** [3] - 232:2, 232:6, 232:19
**direction** [15] - 12:10, 31:10, 33:22, 33:25, 36:10, 37:22, 38:6, 38:12, 38:24, 39:3, 39:7, 39:11, 57:5, 57:7, 69:23
**directions** [1] - 135:7
**directives** [1] - 181:8
**directly** [4] - 50:22, 100:12, 140:2, 200:6
**director** [1] - 109:24
**Director's** [2] - 109:23, 110:8
**directs** [1] - 212:6
**dired** [1] - 5:20
**dirty** [2] - 208:7, 215:23
**disagree** [6] - 29:3, 29:5, 42:21, 207:24, 239:11, 240:22
**disagreeing** [1] - 226:17
**disappeared** [1] - 70:1
**discharge** [9] - 160:20, 161:12, 181:2, 184:8, 185:2, 185:22, 195:20, 223:5, 223:17
**discharged** [1] - 239:24
**discharges** [2] -

178:6, 181:4
**discharging** [7] - 162:20, 163:19, 178:18, 179:4, 180:13, 180:24, 215:13
**disciplinary** [1] - 188:1
**disclose** [1] - 4:23
**discovery** [3] - 129:16, 193:7, 244:16
**discuss** [3] - 28:11, 183:8, 202:11
**discussed** [9] - 19:25, 43:16, 111:22, 125:12, 133:20, 168:10, 173:18, 187:10, 244:19
**discusses** [2] - 145:14, 145:15
**discussing** [1] - 176:12
**dismiss** [1] - 252:1
**dismissed** [1] - 253:4
**dispute** [3] - 122:14, 229:6, 229:8
**disregard** [3] - 8:19, 64:9, 145:6
**distance** [1] - 41:17
**distinguish** [1] - 17:14
**district** [2] - 110:16, 110:22
**DISTRICT** [4] - 1:1, 1:1, 1:6, 1:11
**District** [21] - 4:5, 84:16, 84:18, 100:3, 100:22, 102:17, 105:7, 105:15, 106:17, 111:6, 111:18, 117:1, 117:24, 118:2, 118:10, 118:19, 180:1, 216:23, 217:8
**division** [11] - 99:24, 101:3, 103:8, 103:10, 103:13, 103:16, 103:24, 103:25, 104:1, 104:8, 119:9
**doctors** [1] - 89:14
**document** [5] - 32:14, 33:7, 33:8, 44:17, 86:11
**documents** [3] - 46:6, 129:16, 143:11
**Doe** [4] - 86:24, 87:2, 87:5, 194:24
**domestic** [1] - 103:14
**done** [12] - 53:9, 64:13, 69:20, 87:2,

120:18, 127:2, 127:16, 128:1, 141:3, 204:12, 216:24, 233:23
**door** [4] - 89:25, 147:17, 197:9, 233:23
**dot** [1] - 55:21
**double** [1] - 195:11
**double-check** [1] - 195:11
**doubt** [2] - 243:21, 243:22
**down** [62] - 11:16, 12:3, 13:6, 17:23, 19:5, 19:6, 30:7, 30:8, 30:17, 31:15, 35:16, 35:21, 38:4, 39:2, 39:10, 46:1, 50:19, 51:4, 51:7, 51:18, 53:1, 54:2, 54:20, 54:24, 55:18, 57:12, 60:6, 60:17, 60:25, 61:3, 61:6, 61:13, 61:18, 62:11, 62:14, 67:9, 72:19, 72:22, 79:2, 79:4, 80:23, 101:9, 109:4, 110:16, 165:9, 173:10, 175:25, 180:2, 198:13, 209:5, 213:7, 214:23, 214:25, 221:15, 225:6, 243:10, 243:18, 245:4, 245:5, 245:17, 252:12
**Dr** [2] - 92:1, 253:16
**draw** [3] - 34:7, 56:10, 229:13
**drawn** [2] - 218:7, 220:9
**driveway** [29] - 11:19, 31:15, 31:23, 34:15, 34:23, 35:21, 41:4, 41:9, 41:13, 41:14, 55:3, 58:7, 59:2, 59:3, 66:11, 66:12, 153:5, 163:8, 163:12, 174:11, 175:20, 175:25, 177:2, 177:14, 177:21, 177:22, 245:1, 245:5, 245:17
**driving** [4] - 55:1, 102:14, 121:7, 237:8
**drop** [1] - 238:13
**dropped** [3] - 13:13, 13:14, 197:10
**drug** [5] - 101:12,

103:21, 106:3, 106:17, 121:7
**Drug** [10] - 105:2, 105:21, 105:23, 105:25, 106:9, 106:20, 106:25, 107:8, 112:11, 112:15
**drug-related** [1] - 106:17
**drugs** [2] - 109:16, 115:23
**Dulles** [4] - 106:3, 112:20, 113:4, 113:5
**during** [24] - 50:1, 69:8, 103:16, 106:7, 106:23, 107:3, 107:14, 107:15, 118:18, 118:20, 118:25, 153:6, 156:4, 159:2, 171:3, 174:10, 217:23, 219:21, 220:12, 223:12, 224:8, 248:6, 248:17
**Duties** [2] - 189:9, 189:22
**duties** [9] - 103:12, 124:24, 124:25, 125:9, 132:17, 132:24, 168:11, 184:8, 188:12
**duty** [3] - 125:17, 125:18, 135:1
**dying** [1] - 86:19
**dynamic** [2] - 115:17, 115:19

---

**E**

**early** [2] - 90:13, 98:3
**easier** [1] - 227:21
**East** [1] - 101:10
**Eastern** [2] - 117:24, 118:2
**economist** [2] - 92:1, 253:16
**edge** [1] - 42:7
**Edition** [1] - 129:5
**educated** [1] - 123:3
**education** [1] - 114:25
**educational** [1] - 121:12
**effect** [14] - 8:3, 14:10, 21:19, 31:24, 86:18, 100:11, 184:9, 185:3, 185:4, 227:15, 228:3, 228:5, 236:19, 237:3
**effecting** [1] - 184:11

**effectuate** [1] - 165:5
**eight** [7] - 104:15, 117:6, 129:12, 146:7, 177:18, 196:19
**eight-foot** [1] - 196:19
**either** [8] - 86:14, 123:25, 152:14, 184:24, 185:7, 195:4, 221:16, 243:15
**ejected** [2] - 81:15, 82:2
**ejection** [1] - 13:18
**element** [1] - 136:17
**elements** [2] - 112:4, 171:25
**Elements** [1] - 129:4
**elevates** [1] - 244:13
**elevator** [1] - 5:2
**elevators** [2] - 4:24, 4:25
**elicit** [1] - 19:25
**ELMO** [1] - 155:15
**Elvans** [7] - 84:23, 88:14, 155:18, 177:2, 177:13, 178:21, 247:2
**email** [1] - 129:14, 170:5
**embodied** [2] - 47:9, 191:13
**emergency** [12] - 89:13, 152:15, 153:9, 154:3, 154:9, 155:2, 155:3, 155:6, 155:7, 156:5, 156:21, 157:24
**employed** [1] - 195:19
**employer** [1] - 84:10
**enables** [1] - 20:12
**encompass** [1] - 129:16
**encounter** [7] - 101:14, 101:23, 104:5, 107:4, 107:8, 107:11, 147:18
**encountered** [1] - 146:23
**end** [19] - 49:23, 54:8, 56:23, 65:20, 68:7, 82:11, 96:9, 122:21, 127:8, 143:6, 148:6, 153:1, 172:12, 191:8, 225:15, 232:24, 236:14, 251:19
**endangered** [2] - 180:9, 184:21
**ended** [3] - 82:7, 82:8,

105:16
**Enforcement** [11] - 105:2, 105:22, 105:23, 106:1, 106:10, 106:20, 106:25, 107:8, 109:11, 112:11, 112:15
**enforcement** [6] - 111:25, 112:5, 121:1, 134:1, 195:15, 210:14
**engage** [1] - 114:7
**enormous** [1] - 164:21
**enter** [2] - 113:6, 244:23
**entered** [2] - 86:23
**enters** [4] - 21:10, 53:18, 94:13, 171:7
**entire** [14] - 13:7, 17:23, 30:24, 31:2, 31:4, 31:6, 102:5, 102:21, 110:23, 163:13, 177:23, 231:16, 231:17, 231:18
**entitle** [1] - 19:20
**entitled** [1] - 192:16
**entrance** [4] - 66:11, 66:12, 229:2, 229:4, 229:5, 229:10
**entry** [3] - 115:17, 115:19, 244:21
**environment** [7] - 42:14, 178:5, 178:14, 179:3, 180:12, 180:24, 198:22
**epidemic** [1] - 106:15
**equation** [1] - 8:1
**equipment** [1] - 157:24
**equipped** [2] - 154:8, 155:2
**ER** [1] - 87:19
**escalate** [2] - 136:7, 136:8
**escalates** [2] - 138:3
**escalating** [2] - 210:16
**escape** [3] - 139:21, 184:10, 184:11
**escaped** [2] - 198:14, 198:16
**escorted** [3] - 193:5, 193:14, 194:24
**especially** [2] - 208:5, 208:9
**ESQ** [4] - 1:13, 1:17, 2:2, 2:2
**establish** [6] - 15:25,

43:14, 56:5, 125:22, 134:19, 189:18
**established** [3] - 28:16, 152:2, 152:18
**establishes** [1] - 132:3
**estate** [2] - 93:4, 93:10
**estimate** [2] - 93:4, 93:10
**ET** [1] - 1:6
**et** [4] - 122:16, 217:17
**evaluate** [4] - 202:13, 202:22, 203:21, 204:11
**evaluated** [1] - 205:17
**evaluating** [4] - 202:12, 204:17, 230:2, 230:10
**evening** [2] - 254:4, 254:5
**event** [3] - 9:23, 22:25, 129:11
**events** [2] - 7:19, 21:20
**eventually** [7] - 17:19, 18:13, 103:15, 144:9, 149:18, 153:4, 220:21
**evidence** [52] - 6:10, 14:25, 16:6, 16:15, 16:22, 19:10, 19:16, 45:16, 46:9, 46:19, 47:5, 47:8, 47:20, 48:1, 48:3, 48:4, 48:20, 48:25, 49:2, 49:4, 50:3, 52:24, 68:2, 79:24, 80:6, 80:21, 83:20, 95:6, 96:18, 129:10, 154:13, 154:23, 161:18, 162:1, 182:19, 189:12, 228:19, 235:9, 238:23, 239:1, 239:14, 241:19, 241:20, 241:21, 241:22, 241:23, 244:3, 244:4, 244:5, 252:10, 252:14
**evidentiary** [1] - 21:14
**evolving** [1] - 204:20
**exact** [1] - 177:16
**exactly** [17] - 13:5, 17:16, 26:4, 26:5, 26:6, 65:16, 131:22, 134:7, 201:24, 203:8, 205:17, 221:2, 227:14, 228:9, 231:16, 234:19
**examination** [3] -

20:15, 22:2, 52:7
**EXAMINATION** [6] - 22:6, 84:1, 89:9, 97:7, 199:8, 241:7
**examined** [1] - 131:1
**examining** [1] - 9:16
**example** [6] - 103:19, 108:14, 138:5, 138:21, 139:12, 210:1
**excellence** [1] - 111:12
**Excellence** [3] - 108:19, 108:20, 110:12
**except** [3] - 184:9, 194:22, 223:16
**exception** [3] - 240:15, 240:24
**excessive** [4] - 72:1, 130:19, 130:25, 239:25
**exchange** [1] - 90:19
**excited** [1] - 245:25
**excluded** [1] - 146:24
**excuse** [10] - 57:22, 59:15, 76:24, 109:14, 117:13, 141:1, 144:2, 193:2, 222:4, 232:18
**excused** [6] - 83:7, 96:10, 169:18, 187:23, 251:25, 254:2
**exhaust** [1] - 183:19
**exhausted** [1] - 184:12
**exhibit** [14] - 17:2, 80:1, 80:2, 80:3, 95:5, 95:7, 145:21, 145:23, 151:9, 151:10, 154:24, 179:7, 179:8, 251:24
**Exhibit** [40] - 17:5, 17:10, 19:16, 34:5, 53:24, 64:17, 65:22, 66:4, 69:15, 79:24, 80:3, 80:5, 80:7, 80:10, 80:19, 82:8, 95:5, 95:19, 96:15, 96:18, 137:5, 137:15, 154:13, 154:23, 158:19, 161:18, 162:1, 174:21, 182:3, 182:4, 182:10, 182:20, 182:24, 188:20, 188:23, 189:6, 189:13, 191:20, 228:2, 252:7
**exhibits** [5] - 80:8,

81:25, 91:9, 91:10, 95:4
**Exhibits** [2] - 81:23, 82:17
**existed** [1] - 25:20
**exit** [3] - 197:6, 229:7, 229:8
**exited** [2] - 5:2, 196:12
**exiting** [1] - 196:9
**exits** [3] - 52:2, 90:21, 253:8
**expect** [1] - 91:25
**expected** [1] - 135:8
**expecting** [1] - 5:24
**experience** [4] - 194:23, 207:13, 226:3, 232:9
**expert** [69] - 20:1, 90:11, 96:1, 116:22, 117:3, 117:10, 118:1, 118:4, 118:12, 121:17, 122:12, 123:5, 123:16, 124:6, 124:10, 124:22, 124:23, 125:8, 125:25, 126:8, 126:20, 127:12, 127:18, 127:24, 128:4, 128:8, 141:2, 141:4, 143:15, 146:15, 149:24, 156:14, 157:2, 157:13, 157:14, 159:13, 159:17, 161:4, 164:22, 166:11, 166:21, 167:4, 167:18, 168:13, 169:1, 171:14, 172:14, 180:10, 180:20, 183:9, 184:6, 185:5, 185:10, 186:11, 188:5, 190:18, 193:10, 193:13, 193:18, 193:23, 194:8, 194:18, 195:3, 195:14, 204:15, 219:17, 235:9, 235:11, 244:8
**expertise** [10] - 141:4, 150:1, 156:15, 160:2, 161:5, 163:24, 169:1, 193:7, 194:15
**explain** [11] - 14:9, 133:22, 135:20, 136:3, 149:4, 164:5, 169:6, 173:7, 178:12, 185:18,

196:1
**explained** [2] - 31:4, 125:5
**explains** [1] - 137:25
**expressing** [1] - 172:4
**extend** [1] - 50:13
**extended** [1] - 37:11
**extremely** [1] - 235:12
**eyes** [1] - 178:18
**eyewitnesss** [1] - 129:7

## F

**face** [4] - 138:7, 139:17, 243:18, 245:2
**faced** [3] - 211:15, 211:22, 212:1
**faces** [3] - 211:7, 211:8
**facilities** [1] - 112:8
**facing** [8] - 30:19, 30:24, 31:2, 31:7, 31:9, 33:22, 33:25, 246:19
**Fackler** [1] - 246:14
**fact** [15] - 20:11, 183:23, 190:16, 202:16, 204:18, 207:13, 207:21, 210:24, 214:16, 217:22, 222:23, 224:5, 233:21, 238:5, 240:24
**factor** [7] - 121:8, 174:5, 244:7, 245:12, 245:13, 246:7, 251:13
**factors** [8] - 115:11, 177:10, 235:11, 243:23, 244:11, 248:12, 248:19
**facts** [23] - 134:24, 140:9, 140:20, 148:17, 156:25, 158:25, 183:15, 184:23, 186:15, 189:24, 192:4, 196:6, 205:10, 207:3, 207:16, 217:19, 219:15, 221:7, 221:8, 221:12, 235:7, 246:16
**factual** [2] - 15:4, 220:19
**failure** [1] - 180:12
**fair** [4] - 190:23, 226:24, 236:16,

249:15
**fairness** [1] - 249:11
**faith** [1] - 47:2
**fall** [5] - 38:9, 38:17, 121:8, 131:23, 155:21
**fallen** [1] - 19:19
**falls** [1] - 147:9
**familiar** [1] - 71:25, 72:17, 122:25, 123:8, 124:13, 124:24, 141:7
**family** [3] - 87:7, 87:8, 87:9
**far** [6] - 29:6, 41:11, 170:13, 211:5, 221:6, 236:16
**fashion** [1] - 232:8
**fast** [4] - 13:3, 34:17, 34:19, 175:15
**fatal** [2] - 45:13, 204:2
**FBI** [11] - 112:6, 112:9, 114:18, 115:22, 115:24, 115:25, 116:1, 120:24, 130:2, 131:9, 134:9
**FBI's** [1] - 112:7
**fear** [2] - 32:8, 201:16, 204:1, 209:24, 210:25, 214:3, 214:9, 215:5, 216:6
**FEATHERSTONE** [123] - 2:2, 4:2, 4:9, 4:12, 4:22, 5:9, 5:13, 5:24, 6:8, 6:12, 10:3, 10:7, 10:16, 11:4, 11:6, 11:9, 11:20, 13:9, 14:5, 14:7, 14:11, 14:16, 14:22, 15:2, 15:7, 15:19, 15:21, 16:10, 20:4, 20:7, 20:16, 24:19, 26:12, 26:18, 27:16, 28:14, 29:15, 31:16, 32:4, 32:13, 36:6, 37:18, 40:24, 42:4, 44:24, 46:3, 46:18, 46:20, 46:22, 47:1, 48:2, 48:13, 48:23, 49:7, 51:12, 52:19, 55:23, 56:3, 59:11, 60:10, 60:14, 62:20, 62:25, 63:16, 64:3, 64:5, 64:10, 64:22, 65:1, 65:3, 65:6, 65:15, 65:19, 66:16, 66:21, 66:25, 67:15, 67:20, 67:25, 68:6, 69:2, 70:16, 70:21, 71:2, 71:6, 73:14,

75:25, 76:6, 77:13, 79:25, 82:18, 83:5, 83:19, 87:13, 87:23, 88:7, 89:8, 89:10, 90:2, 91:3, 91:19, 91:24, 92:3, 92:7, 92:10, 92:12, 93:17, 94:4, 94:7, 142:14, 142:18, 142:21, 145:20, 151:9, 158:21, 158:23, 172:11, 188:23, 188:25, 253:10, 253:14, 253:19, 254:2
**Featherstone** [6] - 4:7, 4:21, 5:23, 13:8, 52:17, 89:7
**Featherstone's** [1] - 18:3
**Featherstone)**..........
..................... [1] - 3:6
**February** [17] - 1:5, 25:5, 25:9, 25:13, 25:24, 26:15, 28:19, 29:23, 30:16, 40:13, 40:15, 45:12, 45:19, 218:1, 220:6, 231:8
**federal** [13] - 104:9, 105:10, 105:13, 105:15, 105:17, 118:5, 118:13, 118:14, 120:12, 124:8, 134:11, 134:17, 136:5
**feet** [1] - 229:21
**fell** [3] - 13:20, 30:17, 57:19
**fellow** [2] - 41:12, 205:11
**felon** [4] - 154:10, 155:6, 185:22, 213:12
**felons** [2] - 151:23, 180:3
**felony** [7] - 180:4, 180:5, 184:12, 184:13, 184:14, 184:16, 184:17
**felt** [5] - 7:12, 9:22, 41:4, 41:7, 41:11
**fence** [5] - 196:19, 196:21, 196:22, 197:10, 197:14
**few** [9] - 69:21, 93:14, 106:6, 114:5, 195:12, 214:11, 228:6, 240:8
**field** [5] - 84:19, 157:14, 196:14,

216:18, 229:24
**Fifth** [2] - 100:22, 102:17
**fifth** [1] - 113:3
**fighting** [1] - 183:25
**file** [3] - 221:24, 222:20, 224:1
**filed** [1] - 222:19
**final** [1] - 195:12
**fine** [13] - 9:21, 21:5, 48:23, 56:12, 56:13, 95:16, 97:5, 144:21, 146:20, 147:9, 147:15, 147:23, 226:20
**finger** [1] - 11:22
**fingerprint** [3] - 95:15, 95:16, 96:1
**finish** [13] - 27:9, 32:3, 32:5, 32:6, 88:19, 92:3, 161:8, 183:17, 233:11, 234:10, 234:11, 235:6, 239:5
**fire** [11] - 28:3, 42:13, 42:23, 197:15, 198:6, 198:11, 198:13, 198:18, 215:12, 215:14, 215:15
**firearm** [9] - 45:5, 160:20, 161:12, 180:9, 181:4, 184:8, 184:22, 185:2, 185:23
**Firearms** [2] - 105:20, 109:15
**firearms** [5] - 115:24, 133:5, 181:2, 182:12, 183:20
**fired** [24] - 31:1, 40:2, 41:15, 41:21, 41:25, 42:2, 42:10, 50:12, 50:16, 81:15, 82:5, 159:2, 164:7, 164:10, 180:16, 196:20, 197:1, 197:3, 197:4, 197:15, 198:6, 198:19, 229:14
**firemen** [2] - 85:24, 85:25
**firing** [2] - 28:11, 162:13
**FIRM** [1] - 1:14
**firms** [1] - 97:16
**first** [59] - 4:14, 4:16, 11:6, 11:8, 21:3, 21:18, 22:13, 25:1, 25:15, 33:8, 33:11, 39:20, 40:4, 44:10,

44:11, 44:18, 59:8, 59:10, 61:24, 63:11, 63:19, 64:21, 65:24, 66:11, 66:13, 66:15, 68:23, 68:24, 70:5, 78:23, 81:2, 84:8, 95:5, 99:23, 105:24, 107:21, 108:4, 108:5, 108:22, 110:12, 120:9, 122:6, 144:11, 145:18, 146:23, 158:14, 161:3, 178:15, 179:12, 179:15, 196:2, 203:5, 211:11, 213:1, 222:13, 234:12, 234:15, 252:13
**five** [6] - 19:12, 52:5, 89:17, 113:3, 119:12, 134:13
**flashing** [1] - 156:7
**fleeing** [9] - 139:1, 139:3, 139:10, 146:22, 151:23, 154:10, 155:6, 185:22, 213:12
**flight** [1] - 13:2
**flights** [1] - 113:11
**Florida** [4] - 101:9, 114:12, 114:16, 116:14
**flux** [1] - 170:19
**fly** [1] - 20:14
**flying** [1] - 17:18
**focus** [1] - 42:8
**focused** [3] - 10:14, 42:11, 43:2
**folder** [1] - 217:5
**follow** [4] - 50:5, 122:17, 122:19, 122:20
**follow-up** [1] - 50:5
**following** [17] - 46:24, 56:1, 65:7, 67:3, 95:11, 100:19, 122:4, 126:14, 141:12, 146:12, 160:20, 161:13, 171:20, 184:9, 190:11, 233:15, 247:24
**foot** [8] - 30:7, 151:21, 151:23, 196:19, 213:13, 220:21, 221:11
**FOR** [1] - 1:1
**Force** [2] - 108:18, 159:7

**force** [73] - 71:18, 71:20, 71:23, 72:1, 72:5, 72:8, 98:24, 106:12, 107:25, 122:16, 123:1, 123:9, 123:14, 123:15, 126:23, 126:24, 130:5, 130:10, 130:11, 130:19, 130:25, 133:15, 134:6, 134:10, 135:5, 135:11, 135:19, 135:20, 135:25, 136:1, 136:2, 136:4, 136:8, 136:18, 136:20, 137:12, 137:23, 138:18, 138:22, 140:1, 140:2, 160:22, 160:24, 172:1, 181:17, 183:13, 183:25, 184:2, 187:2, 202:3, 202:7, 202:9, 202:12, 202:24, 203:12, 204:2, 204:21, 205:13, 206:3, 209:8, 209:10, 209:11, 209:12, 209:20, 210:17, 211:3, 211:9, 211:10, 213:19, 238:6, 239:25
**forced** [1] - 204:18
**foregoing** [1] - 254:12
**forensic** [2] - 241:21, 244:5
**forget** [2] - 4:15, 240:14
**form** [5] - 28:14, 31:16, 71:2, 76:6, 201:7
**formal** [4] - 111:21, 112:5, 112:18, 115:20
**formally** [1] - 123:25
**formed** [1] - 218:18
**Former** [1] - 109:2
**forming** [3] - 140:11, 182:25, 184:6
**forms** [1] - 216:18
**formulate** [6] - 140:8, 156:10, 156:14, 159:13, 159:17, 167:17
**formulated** [12] - 141:1, 141:2, 143:15, 168:25, 179:1, 180:10,

180:19, 180:20, 193:10, 193:13, 194:8, 219:15
**formulating** [12] - 130:4, 143:8, 157:12, 159:22, 173:20, 177:11, 183:9, 183:16, 186:11, 186:19, 194:13, 245:13
**forth** [1] - 56:8
**forward** [9] - 11:1, 12:4, 12:23, 13:1, 38:10, 57:25, 76:20, 76:22, 90:24
**forwards** [1] - 174:9
**foundation** [6] - 152:3, 152:19, 152:21, 189:15, 189:16, 189:19
**four** [17] - 32:21, 107:24, 111:9, 111:10, 111:11, 113:3, 113:9, 117:12, 117:14, 119:19, 119:20, 129:14, 146:4, 219:9, 220:7, 241:12
**four-page** [1] - 129:14
**fourth** [2] - 119:20, 119:25
**Fourth** [6] - 2:3, 127:5, 127:22, 171:17, 172:6, 200:11
**frame** [116] - 10:20, 10:21, 10:23, 12:4, 12:5, 12:19, 12:20, 36:12, 36:13, 36:14, 36:15, 36:17, 36:18, 36:19, 36:20, 37:4, 37:8, 37:10, 37:24, 37:25, 38:1, 38:8, 38:14, 38:15, 39:1, 39:5, 39:9, 41:2, 41:5, 43:6, 43:8, 43:14, 43:16, 43:17, 44:4, 53:2, 55:11, 55:12, 57:15, 57:23, 57:24, 58:11, 58:12, 58:13, 58:18, 58:23, 59:7, 59:14, 59:19, 59:22, 59:23, 60:3, 60:4, 60:8, 60:24, 61:2, 61:5, 61:10, 61:15, 61:20, 61:21, 62:2, 62:3, 62:9, 63:6, 63:8, 63:17, 63:19, 63:21, 63:25, 64:16, 64:20, 64:25, 68:22, 68:23, 69:6,

69:16, 69:25, 70:3, 70:5, 73:13, 73:21, 73:24, 74:2, 74:4, 74:6, 74:8, 74:13, 74:19, 74:24, 75:7, 75:12, 75:20, 75:21, 76:12, 76:13, 76:18, 76:20, 76:23, 76:25, 77:7, 77:20, 78:16, 78:18, 79:1, 79:3
**Frame** [18] - 57:11, 58:20, 73:3, 73:6, 73:12, 73:20, 74:3, 74:7, 74:12, 74:18, 74:23, 75:2, 75:6, 75:11, 76:24, 78:12, 79:6, 79:14
**frames** [11] - 37:7, 40:22, 53:9, 60:20, 62:13, 62:18, 63:23, 68:24, 69:1, 69:24, 78:21
**Francisco** [1] - 116:13
**free** [3] - 149:11, 167:24, 252:3
**frequently** [1] - 206:21
**fresh** [4] - 23:3, 23:7, 23:11, 23:13
**Friday** [2] - 92:4, 95:7
**friend** [1] - 246:7
**friends** [2] - 87:9, 241:15
**frisk** [1] - 168:12
**frisks** [6] - 123:21, 124:4, 131:13, 132:6, 146:17, 147:5
**Frisks** [1] - 148:15
**front** [8] - 34:8, 44:12, 50:14, 51:18, 54:13, 158:17, 158:18, 158:19
**full** [12] - 15:24, 16:22, 52:24, 53:4, 53:6, 84:7, 97:11, 174:24, 175:4, 176:4, 254:13
**fully** [1] - 213:19
**function** [1] - 181:9
**fundamental** [1] - 249:11
**fuzzy** [1] - 54:17

## G

**game** [1] - 190:23
**Garner** [4] - 72:15, 187:7, 187:8, 203:6
**gates** [1] - 242:20
**gather** [2] - 113:10, 217:24
**gathered** [1] - 222:2

**gazillion** [3] - 206:11, 206:12, 206:13
**General** [20] - 128:23, 128:24, 128:25, 129:4, 151:3, 155:13, 156:9, 156:13, 156:17, 157:3, 160:7, 161:7, 161:19, 162:9, 179:2, 180:11, 186:12, 188:18, 189:21, 191:10
**general** [112] - 28:3, 28:9, 28:10, 28:11, 42:12, 71:23, 71:25, 99:13, 99:16, 120:16, 122:25, 123:8, 123:20, 124:3, 124:14, 124:16, 124:25, 125:9, 125:21, 128:20, 129:23, 129:24, 130:3, 130:4, 130:17, 130:25, 131:1, 131:10, 131:11, 132:17, 132:23, 133:4, 133:8, 133:14, 133:18, 133:23, 134:13, 134:16, 135:10, 135:16, 135:17, 140:14, 140:15, 143:9, 143:16, 144:7, 145:8, 145:10, 145:14, 145:16, 146:2, 147:2, 147:4, 147:23, 148:10, 148:23, 148:24, 149:5, 149:21, 150:14, 150:15, 150:18, 151:1, 151:7, 151:13, 151:17, 152:22, 153:13, 153:14, 153:18, 153:22, 153:23, 153:24, 154:7, 155:23, 156:11, 157:6, 157:23, 158:3, 158:6, 159:14, 159:24, 160:11, 162:2, 164:9, 168:2, 168:7, 168:10, 172:24, 173:8, 173:13, 173:16, 178:4, 181:5, 181:16, 185:24, 186:15, 186:25, 187:13, 187:15,

187:21, 187:24, 188:2, 188:6, 188:7, 188:11, 188:15, 189:9, 189:23, 198:21, 212:20, 239:20
**GENERAL/DC** [1] - 2:3
**generally** [3] - 136:19, 136:20, 204:12
**gentleman** [1] - 109:4
**gentlemen** [12] - 7:17, 49:24, 51:22, 53:12, 64:8, 90:12, 94:14, 136:4, 148:7, 169:13, 178:12, 252:19
**George** [2] - 108:25, 117:20
**George's** [6] - 117:17, 117:21, 120:24, 128:24, 130:1, 131:6
**Georgia** [1] - 198:14
**gesture** [1] - 174:13
**gestures** [1] - 176:8
**Gilgeous** [1] - 91:22
**given** [15] - 91:5, 108:25, 109:24, 116:20, 172:1, 187:4, 187:9, 187:12, 196:12, 213:1, 222:3, 247:15, 248:1, 249:10, 253:10
**Glock** [3] - 81:10, 81:12, 82:3
**GO** [1] - 152:19
**gold** [1] - 203:3
**Gorbachev** [1] - 104:22
**Government** [1] - 97:15
**governs** [1] - 120:8
**grabbing** [1] - 44:12
**gradual** [2] - 136:20, 136:23
**graduate** [1] - 98:10
**graduated** [2] - 98:12, 100:13
**graduates** [1] - 187:17
**Graham** [10] - 72:15, 187:7, 201:25, 202:14, 202:16, 202:21, 203:9, 203:10, 205:7, 205:18
**granted** [5] - 174:22, 179:20, 183:3, 183:4, 183:5
**gray** [1] - 231:24
**great** [4] - 94:5, 94:10,

**214**:23, **218**:18
**Greenbelt** [2] - **118**:7, **118**:9
**grew** [1] - **97**:25
**grip** [18] - **13**:5, **13**:15, **17**:12, **17**:24, **18**:4, **18**:9, **18**:10, **18**:11, **18**:12, **18**:14, **18**:23, **19**:7, **19**:18, **20**:8, **20**:11, **80**:4
**grips** [14] - **12**:1, **17**:11, **17**:17, **17**:20, **18**:1, **65**:25, **66**:1, **80**:12, **80**:13, **80**:17, **80**:19, **80**:25, **238**:15, **238**:16
**ground** [12] - **16**:17, **50**:19, **51**:5, **51**:7, **60**:17, **61**:13, **61**:18, **62**:24, **63**:1, **167**:2, **194**:4, **209**:6
**grounds** [1] - **184**:15
**GRU** [1] - **85**:2
**guess** [4] - **95**:1, **108**:12, **138**:1, **200**:13
**guided** [2] - **203**:9, **203**:11
**guidelines** [1] - **202**:13
**gun** [59] - **15**:5, **15**:23, **15**:24, **16**:4, **16**:6, **18**:5, **18**:8, **18**:11, **18**:13, **18**:14, **18**:15, **18**:16, **20**:9, **20**:13, **30**:21, **31**:25, **32**:7, **33**:22, **33**:24, **35**:25, **36**:9, **36**:18, **37**:2, **37**:14, **39**:19, **39**:20, **40**:2, **40**:5, **40**:8, **40**:9, **40**:20, **41**:9, **41**:10, **81**:15, **81**:16, **118**:22, **144**:16, **200**:23, **201**:15, **204**:3, **204**:4, **224**:7, **224**:11, **224**:15, **225**:13, **225**:14, **225**:18, **225**:25, **226**:2, **226**:10, **226**:15, **231**:1, **235**:20, **236**:1, **238**:17, **238**:19
**Gun** [4] - **219**:20, **219**:21, **220**:10, **220**:12
**guns** [10] - **101**:21, **101**:23, **104**:2, **106**:25, **107**:4, **107**:12, **109**:16, **225**:14, **226**:6, **226**:7
**gunshot** [1] - **85**:6

**guy** [8] - **143**:3, **190**:25, **197**:22, **205**:24, **205**:25, **212**:18, **215**:22, **232**:7
**guys** [1] - **54**:7

**H**

**half** [12] - **93**:13, **101**:1, **102**:7, **102**:8, **102**:10, **102**:11, **102**:22, **118**:18, **118**:25, **195**:23, **198**:2, **242**:16
**halfway** [2] - **180**:2
**hand** [55] - **30**:21, **34**:25, **35**:14, **35**:17, **35**:18, **35**:20, **35**:23, **35**:25, **36**:2, **36**:3, **36**:21, **36**:23, **36**:25, **37**:2, **37**:11, **37**:14, **37**:15, **37**:22, **38**:1, **38**:9, **38**:16, **38**:22, **39**:13, **39**:14, **39**:15, **39**:16, **39**:19, **39**:21, **39**:23, **40**:3, **40**:6, **40**:9, **40**:20, **41**:9, **44**:17, **44**:19, **45**:4, **45**:5, **176**:8, **200**:23, **216**:13, **224**:11, **224**:12, **224**:23, **227**:2, **228**:8, **230**:22, **231**:1, **235**:20, **238**:15, **238**:16, **238**:22, **243**:3, **243**:19
**hand's** [1] - **36**:3
**handcuffed** [1] - **194**:4
**handcuffs** [5] - **167**:2, **167**:5, **167**:6, **240**:16, **240**:25
**handgun** [4] - **13**:14, **16**:5, **16**:22
**handle** [3] - **59**:19, **119**:24, **136**:7
**handled** [1] - **168**:11
**handling** [1] - **185**:25
**hands** [4] - **40**:3, **136**:11, **216**:7, **238**:14
**hanging** [2] - **36**:22
**hard** [8] - **34**:14, **34**:15, **34**:22, **35**:23, **70**:8, **139**:13, **139**:16, **245**:5
**Harley** [1] - **253**:22
**harm** [1] - **205**:11
**harmed** [3] - **42**:16, **42**:18, **42**:19

**harmful** [1] - **138**:2
**he..** [1] - **234**:25
**head** [2] - **110**:23, **212**:14
**healthy** [1] - **5**:6
**hear** [10] - **88**:9, **99**:18, **142**:17, **142**:18, **142**:19, **158**:21, **170**:18, **200**:8, **212**:25
**heard** [13] - **7**:18, **8**:1, **8**:5, **9**:19, **9**:20, **10**:4, **21**:17, **49**:25, **122**:13, **122**:15, **201**:25, **209**:23, **238**:13
**hearing** [15] - **46**:25, **52**:4, **56**:2, **65**:8, **67**:4, **95**:12, **122**:5, **126**:15, **141**:13, **146**:13, **171**:21, **190**:12, **233**:16, **247**:25, **254**:6
**HELD** [1] - **1**:10
**held** [13] - **46**:24, **56**:1, **65**:7, **67**:3, **95**:11, **122**:4, **126**:14, **141**:12, **146**:12, **171**:20, **190**:11, **233**:15, **247**:24
**help** [4] - **54**:5, **54**:17, **165**:16, **227**:22
**helpful** [1] - **210**:9
**helping** [1] - **232**:10
**hereby** [1] - **254**:11
**hero's** [1] - **232**:10
**heroin** [1] - **106**:5
**Hi** [1] - **149**:8
**hiccups** [1] - **142**:9
**hide** [1] - **211**:24
**High** [2] - **98**:11, **196**:14
**high** [9] - **52**:19, **98**:6, **98**:8, **98**:10, **98**:12, **100**:2, **101**:11, **108**:11
**high-visibility** [1] - **100**:2
**higher** [2] - **100**:7, **135**:6
**highway** [1] - **213**:7
**Hill** [1] - **101**:9
**himself** [1] - **185**:20
**hindsight** [4] - **203**:18, **203**:25, **204**:4, **204**:9
**hired** [1] - **97**:17
**hit** [4] - **16**:17, **138**:12, **139**:16, **229**:19
**hold** [9] - **82**:20, **82**:23, **101**:12, **158**:10,

**211**:23, **244**:15, **244**:18, **251**:21, **253**:20
**Hold** [1] - **214**:10
**hold-ups** [1] - **101**:12
**holding** [8] - **44**:9, **44**:14, **44**:22, **45**:2, **45**:8, **45**:9, **94**:21, **224**:23
**hole** [4] - **225**:15, **225**:16, **225**:25, **226**:10
**holes** [2] - **225**:16, **226**:10
**hollowed** [3] - **226**:2, **226**:4, **226**:16
**home** [1] - **177**:24
**homicide** [10] - **106**:16, **114**:20, **114**:25, **118**:24, **119**:5, **119**:6, **119**:8, **119**:9, **119**:20
**homicides** [2] - **106**:17, **121**:8
**Honor** [215] - **4**:2, **4**:9, **4**:12, **4**:13, **4**:22, **5**:18, **6**:3, **6**:11, **6**:12, **6**:13, **7**:4, **7**:11, **7**:24, **8**:23, **8**:25, **9**:14, **10**:3, **10**:6, **10**:7, **10**:25, **11**:4, **11**:11, **11**:14, **13**:9, **13**:10, **14**:3, **15**:19, **15**:21, **17**:9, **20**:4, **20**:16, **20**:18, **21**:25, **22**:1, **24**:19, **26**:12, **26**:18, **27**:16, **28**:15, **29**:15, **29**:21, **31**:17, **32**:4, **32**:13, **32**:23, **36**:6, **37**:18, **40**:25, **43**:13, **46**:22, **47**:17, **49**:7, **49**:9, **50**:10, **51**:13, **51**:21, **52**:10, **52**:20, **52**:22, **53**:11, **53**:21, **53**:22, **54**:12, **55**:23, **57**:22, **63**:17, **64**:3, **64**:10, **64**:22, **65**:1, **65**:15, **65**:19, **66**:16, **66**:21, **67**:1, **67**:15, **67**:25, **69**:2, **69**:19, **69**:20, **71**:3, **71**:8, **73**:14, **76**:7, **77**:13, **79**:21, **81**:20, **82**:16, **83**:3, **83**:5, **83**:8, **83**:24, **86**:5, **89**:8, **90**:2, **90**:4, **90**:7, **91**:3, **91**:8, **91**:20, **93**:7, **93**:9, **93**:17, **93**:22, **95**:3, **95**:6, **96**:14, **96**:22, **96**:23, **121**:16, **121**:25,

**122**:8, **126**:4, **126**:11, **126**:16, **126**:19, **127**:1, **127**:10, **128**:6, **137**:1, **137**:14, **137**:17, **137**:19, **142**:7, **143**:5, **145**:1, **145**:5, **145**:20, **146**:1, **146**:8, **146**:14, **147**:11, **147**:25, **152**:3, **152**:17, **153**:13, **153**:17, **154**:11, **154**:15, **155**:10, **158**:11, **158**:19, **161**:17, **161**:21, **161**:23, **162**:7, **165**:2, **165**:8, **165**:15, **166**:3, **166**:6, **170**:1, **171**:2, **171**:4, **171**:10, **172**:8, **172**:11, **173**:22, **173**:25, **174**:20, **177**:25, **179**:8, **179**:19, **182**:3, **182**:7, **182**:18, **182**:22, **183**:2, **186**:4, **186**:21, **188**:20, **189**:3, **189**:11, **189**:14, **190**:9, **191**:19, **192**:25, **193**:2, **196**:3, **199**:7, **207**:10, **208**:7, **208**:18, **222**:5, **223**:18, **224**:21, **227**:24, **228**:20, **230**:4, **233**:13, **233**:18, **235**:3, **236**:3, **239**:4, **239**:15, **240**:9, **241**:4, **243**:9, **244**:14, **244**:17, **247**:6, **247**:11, **247**:13, **248**:1, **249**:25, **251**:10, **251**:18, **251**:24, **252**:4, **253**:10, **253**:14, **253**:19, **254**:2, **254**:4, **254**:5
**HONORABLE** [1] - **1**:10
**hope** [1] - **200**:5
**hoping** [2] - **170**:16, **170**:17
**horizontally** [1] - **228**:11
**hospital** [21] - **85**:13, **85**:15, **86**:13, **86**:15, **86**:16, **86**:23, **86**:24,

87:4, 87:18, 89:11, 193:5, 193:15, 194:10, 194:21, 199:16, 199:19, 199:23, 199:24, 200:4, 200:6
**hour** [2] - 93:13, 170:6
**hours** [5] - 22:22, 23:1, 27:5, 40:4, 93:13
**house** [4] - 41:18, 177:21, 178:22
**Howard** [3] - 53:14, 197:21, 198:5
**human** [1] - 208:13
**hunch** [1] - 200:13
**Hyatt** [1] - 196:15
**Hyattsville** [3] - 128:23, 130:1, 131:6

**I**

**idea** [4] - 134:15, 200:24, 200:25, 239:7
**identical** [2] - 134:2
**identifiable** [2] - 154:8, 155:1
**identification** [8] - 33:2, 45:23, 49:10, 81:22, 86:9, 137:5, 189:6, 217:5
**identified** [1] - 13:12
**identify** [2] - 158:6, 188:15
**identifying** [1] - 53:9, 155:3
**ignore** [1] - 238:23
**immediately** [1] - 30:17
**imminent** [4] - 41:11, 138:10, 211:15, 245:18
**impeachment** [1] - 223:19
**impermissible** [1] - 167:5
**implication** [7] - 8:4, 8:10, 9:18, 14:18, 67:17, 248:12, 248:24
**implications** [2] - 9:12, 19:1
**important** [4] - 22:12, 210:10, 210:11, 252:20
**improper** [5] - 6:5, 40:24, 191:6, 223:19, 237:2
**improperly** [1] - 48:6

**impute** [1] - 65:16
**IN** [2] - 1:1, 21:12
**inaccurate** [1] - 29:14
**inartfully** [1] - 145:9
**inaugurated** [1] - 104:19
**inaugurations** [1] - 104:13
**inches** [1] - 228:6
**incident** [7] - 197:16, 207:15, 208:10, 214:5, 222:24, 246:1, 250:19
**incidents** [1] - 108:10
**included** [1] - 135:20
**includes** [1] - 188:3
**including** [1] - 194:3
**inconsistent** [1] - 251:6
**incorporated** [2] - 188:7, 192:15
**increase** [1] - 136:20
**indeed** [2] - 209:1, 236:5
**independent** [1] - 253:6
**indicate** [1] - 174:16
**indicated** [1] - 183:11
**indicates** [1] - 6:22
**indication** [9] - 237:4, 237:9, 238:10, 238:21, 239:9, 239:13, 245:16
**individual** [1] - 85:12, 143:16, 149:8, 161:13, 161:14, 163:2, 163:3, 205:25, 210:24, 212:5, 227:2
**individuals** [7] - 101:14, 109:7, 113:17, 115:19, 129:6, 152:15, 220:7
**indulge** [2] - 190:2, 190:6
**indulgence** [18] - 15:19, 16:25, 17:1, 29:19, 29:21, 43:9, 83:14, 121:23, 128:11, 145:24, 150:10, 158:12, 164:18, 182:2, 186:8, 195:10, 231:7, 240:6
**inference** [1] - 19:17
**inform** [1] - 230:10
**informally** [1] - 123:25
**informant** [1] - 197:22
**information** [17] - 22:15, 22:17, 22:19,

90:25, 113:11, 113:16, 120:22, 121:13, 121:14, 140:24, 191:17, 196:7, 196:12, 217:24, 222:2, 238:13, 247:5
**informed** [2] - 94:17, 252:23
**initial** [14] - 27:11, 141:7, 141:15, 146:19, 147:14, 147:18, 148:19, 148:20, 148:21, 148:25, 150:3, 242:5, 250:11, 251:3
**initiative** [1] - 119:14
**injury** [16] - 180:7, 184:19, 204:1, 206:1, 209:25, 211:1, 211:8, 211:14, 211:22, 212:2, 214:4, 214:9, 215:6, 216:6, 216:14, 245:21
**Inman** [1] - 8:2
**innocent** [2] - 180:8, 184:20
**inquire** [2] - 15:4, 19:20
**inquired** [4] - 5:3, 90:22, 90:23, 253:21
**inquiries** [1] - 192:8
**inside** [3] - 82:13, 201:1, 201:5
**instance** [3] - 134:3, 136:9, 140:3
**instruction** [7] - 6:17, 6:20, 6:22, 7:9, 10:2, 21:17, 210:14
**instructions** [2] - 94:24, 123:13
**instructor** [2] - 116:9, 116:16
**instructors** [1] - 112:9
**instructs** [1] - 202:21
**insufficient** [1] - 15:24
**intelligence** [15] - 103:6, 103:7, 103:8, 103:10, 103:13, 103:16, 103:24, 103:25, 104:1, 104:8, 104:15, 104:24, 113:16, 115:4, 115:5
**intent** [1] - 150:7
**interact** [1] - 149:10
**interaction** [1] - 131:25
**interactions** [1] -

90:19
**interdiction** [4] - 106:4, 112:19, 113:1, 113:19
**interdictions** [2] - 112:23, 112:24
**interest** [6] - 237:19, 237:25, 238:1, 238:2, 238:3, 238:4
**International** [1] - 116:15
**international** [2] - 103:20, 113:5
**Internet** [2] - 121:9, 121:14
**interpreting** [1] - 9:12
**interrogation** [1] - 115:21
**intervention** [1] - 84:20
**interview** [3] - 25:1, 40:1, 115:21
**interviews** [1] - 50:2
**introduce** [1] - 191:20
**introduced** [1] - 235:8
**investigate** [9] - 103:17, 105:7, 105:9, 105:10, 105:13, 105:15, 105:25, 106:17, 119:10
**investigated** [1] - 207:3
**investigating** [2] - 106:5, 192:8
**investigation** [8] - 114:19, 114:21, 119:3, 120:2, 120:18, 121:5, 122:12, 206:19
**Investigation** [1] - 112:1
**investigations** [9] - 106:2, 112:4, 112:6, 118:24, 119:9, 119:18, 206:11, 206:15
**Investigative** [1] - 159:7
**investigative** [4] - 111:12, 112:6, 114:17, 116:9
**investigator** [6] - 44:21, 46:16, 48:9, 108:3, 119:24, 170:5
**investigators** [21] - 22:14, 23:1, 24:1, 24:24, 25:6, 25:9, 25:23, 27:23, 30:13, 31:21, 32:18, 33:17,

39:18, 39:22, 44:8, 45:14, 47:18, 49:3, 50:1, 50:7, 119:19
**involve** [4] - 112:3, 112:25, 115:10, 180:4
**involved** [9] - 7:20, 19:9, 21:20, 104:2, 118:22, 180:5, 184:17, 206:10
**involving** [3] - 124:4, 133:14, 250:19
**IPTM** [1] - 116:14
**is..** [2] - 76:23, 236:20
**issue** [27] - 4:10, 5:17, 6:17, 15:21, 56:3, 93:21, 94:4, 123:1, 123:11, 123:21, 131:12, 132:5, 146:18, 146:21, 146:23, 148:2, 150:11, 156:3, 158:3, 171:22, 171:23, 173:14, 190:14, 219:9, 244:16, 249:16, 251:15
**issues** [6] - 5:14, 21:14, 123:3, 127:13, 147:4, 248:22
**item** [10] - 11:14, 13:15, 13:17, 47:21, 55:19, 56:15, 56:20, 64:20, 66:14, 75:17
**Item** [7] - 13:12, 13:16, 70:11, 70:12, 70:24, 70:25, 81:4
**items** [3] - 80:10, 81:24, 128:18

**J**

**jail** [1] - 199:15
**JAMES** [2] - 3:7, 97:6
**James** [5] - 91:15, 96:23, 97:12, 121:17, 126:8
**Jersey** [1] - 116:13
**job** [8] - 53:9, 198:25, 206:9, 216:11, 216:15, 217:18, 218:9, 231:14, 231:15
**Joe** [1] - 207:25
**Joe's** [1] - 207:6
**John** [4] - 86:24, 87:2, 87:5, 194:24
**Johnny** [1] - 52:10
**join** [2] - 98:17, 98:24

**joined** [1] - 98:14
**joining** [2] - 84:5, 97:9
**JR** [2] - 2:2, 97:6
**Jr** [2] - 96:24, 97:12
**Judge** [9] - 27:10, 49:21, 65:12, 67:9, 67:24, 70:12, 146:5, 169:10, 252:3
**JUDGE** [1] - 1:11
**judge** [2] - 96:10, 249:20
**judged** [1] - 203:13
**judgments** [1] - 204:19
**jumped** [1] - 197:12
**jumps** [1] - 192:14
**June** [1] - 220:3
**junior** [1] - 98:8
**jurisdiction** [1] - 214:17
**jurisdictions** [15] - 106:18, 129:24, 130:24, 131:4, 131:5, 131:18, 132:2, 132:5, 132:13, 132:21, 132:22, 133:10, 133:19, 135:18, 140:15
**Juror** [5] - 4:25, 5:22, 54:9, 250:22
**juror** [9] - 5:1, 5:10, 5:19, 15:22, 15:25, 16:4, 16:20, 250:21, 251:21
**jurors** [4] - 20:22, 20:23, 90:22, 90:23
**JURY** [2] - 1:10, 21:12
**jury** [45] - 5:1, 7:17, 14:15, 20:3, 21:10, 46:25, 47:3, 47:8, 49:1, 49:6, 49:25, 52:2, 52:18, 52:21, 53:18, 53:23, 56:2, 64:8, 65:8, 65:17, 67:4, 68:1, 82:21, 82:24, 83:17, 90:21, 93:19, 94:24, 95:12, 122:5, 126:15, 136:4, 141:13, 145:6, 146:13, 170:2, 171:7, 171:21, 171:24, 178:13, 190:12, 190:14, 233:16, 247:25, 253:8
**Jury** [1] - 94:13
**jury's** [4] - 48:6, 172:5, 201:22, 206:8, 206:9, 251:25

**Justice** [5] - 105:2, 112:19, 112:21, 112:22, 118:16
**justifiable** [2] - 139:9, 139:15
**justified** [2] - 166:23, 238:7

## K

**K-o-r-s-o-n** [1] - 84:8
**Katz** [2] - 13:24, 241:11
**keep** [5] - 11:3, 35:10, 114:8, 120:7, 121:4
**keeping** [1] - 253:15
**keeps** [1] - 56:8
**kept** [1] - 120:21
**Kerslyn** [1] - 4:7
**KERSLYN** [1] - 2:2
**kerslyn.featherstone @dc.gov** [1] - 2:5
**key** [1] - 115:11
**kids** [2] - 198:13, 198:20
**kill** [5] - 164:11, 212:8, 212:12, 212:18, 216:20
**kilo** [1] - 198:2
**kind** [8] - 5:2, 17:14, 134:21, 136:19, 178:23, 181:6, 187:10, 196:17
**kinds** [1] - 114:21
**King/McDonald's** [1] - 198:12
**KIRA** [2] - 1:17, 1:18
**Kira** [1] - 4:6
**kiraannewest@gmail .com** [1] - 1:20
**knock** [1] - 225:20
**knock-off** [1] - 225:20
**knowing** [8] - 178:4, 179:3, 180:23, 181:14, 187:24, 188:2, 198:21, 201:2
**known** [3] - 44:22, 45:2, 136:16
**knows** [5] - 65:16, 67:22, 170:3, 233:21, 235:7
**KORSON** [2] - 3:5, 83:25
**Korson** [10] - 4:24, 5:1, 5:3, 83:12, 83:23, 84:3, 84:8, 86:8, 89:11, 90:5

## L

**L1** [1] - 33:2
**L2** [3] - 45:24, 49:9, 49:10
**label** [1] - 208:21
**labeling** [1] - 208:16
**Labor** [1] - 118:16
**ladies** [11] - 7:17, 49:24, 51:22, 64:8, 90:12, 94:14, 136:3, 148:7, 169:13, 178:12, 252:19
**land** [2] - 66:20, 66:24
**landed** [9] - 19:8, 59:8, 64:21, 64:25, 65:10, 65:14, 69:1, 70:15, 70:20
**landmark** [2] - 72:12, 72:14
**lands** [6] - 13:4, 17:17, 17:19, 66:14, 67:18, 67:21
**LANE** [1] - 1:3
**Lane** [5] - 4:5, 9:9, 9:11, 9:17, 93:23
**language** [2] - 154:24, 162:4
**large** [5] - 16:6, 20:23, 105:1, 113:13, 198:1
**larger** [3] - 21:3, 21:7, 54:16
**last** [20] - 43:16, 46:5, 64:9, 64:16, 64:20, 64:24, 69:16, 70:3, 76:18, 79:1, 84:8, 95:7, 136:17, 142:7, 145:6, 170:6, 170:22, 177:18, 211:17, 211:19
**late** [2] - 4:14, 94:19
**LaTonya** [1] - 170:6
**laughing** [2] - 5:2, 5:5
**LAW** [2] - 1:14, 1:18
**law** [8] - 53:14, 97:16, 111:25, 112:5, 121:1, 134:1, 195:15, 210:14
**laws** [1] - 120:7
**lawyer** [3] - 143:24, 217:9, 218:13
**lay** [1] - 152:21
**laying** [1] - 59:4
**lead** [4] - 119:17, 119:19, 120:1, 153:11
**leading** [4] - 173:22, 173:25, 186:22, 243:9
**leads** [1] - 177:21

**leap** [1] - 20:9
**learn** [2] - 112:22, 221:6
**learned** [1] - 221:8
**least** [4] - 19:18, 90:23, 214:17, 229:5
**leave** [7] - 51:25, 103:1, 105:7, 127:3, 229:19, 252:3, 252:6
**leaves** [1] - 252:5
**leeway** [1] - 56:14
**left** [20] - 22:8, 31:14, 31:19, 34:25, 35:20, 35:23, 39:15, 39:16, 45:4, 113:14, 149:13, 178:24, 227:18, 228:7, 228:8, 228:15, 228:16, 231:19
**left-hand** [2] - 45:4, 228:8
**legal** [9] - 53:13, 93:25, 94:19, 141:1, 142:2, 142:6, 142:13, 143:3, 143:23
**length** [2] - 166:21, 166:22
**Leo** [95] - 13:23, 15:9, 16:13, 18:24, 19:20, 20:25, 21:16, 22:2, 22:3, 22:8, 28:18, 29:8, 34:7, 34:12, 35:16, 38:12, 41:3, 49:25, 50:9, 50:12, 54:1, 54:4, 54:11, 54:20, 55:18, 57:2, 59:20, 64:7, 65:22, 68:9, 69:5, 69:22, 71:17, 72:19, 72:24, 73:6, 73:13, 73:25, 74:13, 76:17, 79:4, 79:23, 83:6, 83:7, 150:8, 150:11, 152:9, 156:10, 156:16, 157:2, 157:9, 157:18, 159:5, 159:14, 159:18, 159:23, 161:6, 162:13, 163:5, 163:15, 163:17, 164:2, 165:23, 165:25, 168:22, 169:3, 171:16, 172:18, 173:2, 173:3, 173:4, 174:10, 174:13, 174:15, 174:18, 175:24, 177:4, 179:2, 180:11,

**leap** - 180:22, 185:7, 185:14, 195:5, 229:14, 231:9, 231:12, 237:12, 237:16, 237:17, 238:5, 239:19, 245:18, 246:20
**LEO** [2] - 3:3, 22:5
**Leo's** [1] - 241:10
**less** [1] - 104:17
**lethal** [1] - 138:2
**letter** [2] - 129:14, 142:16
**letting** [2] - 32:5, 156:22
**level** [1] - 108:12
**levels** [1] - 135:21
**Levy** [1] - 253:22
**liar** [2] - 208:21, 208:25
**liars** [1] - 208:17
**lied** [1] - 190:25
**life** [9] - 32:8, 41:12, 98:4, 138:11, 177:4, 177:7, 198:24, 201:17, 217:7
**life's** [1] - 214:3
**light** [3] - 154:9, 155:3, 157:24
**lights** [5] - 153:9, 154:4, 156:7, 156:21, 213:7
**likely** [4] - 94:18, 114:6, 253:1
**limit** [3] - 190:20, 236:4, 244:18
**line** [11] - 44:25, 46:1, 46:5, 63:10, 160:16, 161:3, 209:18, 209:19, 215:12, 215:14, 215:15
**lines** [1] - 17:13
**link** [4] - 18:13, 18:14, 147:22, 189:20
**liquor** [1] - 101:12
**LISA** [1] - 254:11
**Lisa** [1] - 2:10
**list** [3] - 95:18, 108:16, 142:21
**listed** [1] - 132:23
**litigation** [1] - 97:15
**live** [1] - 98:3
**lives** [3] - 41:12, 180:8, 184:20
**local** [1] - 97:24
**located** [4] - 66:8, 67:13, 68:10, 68:15
**location** [3] - 67:7, 177:16, 178:21
**locations** [2] - 80:17,

104:20
**locked** [1] - 235:4
**look** [58] - 10:12,
16:20, 25:14, 26:3,
26:7, 26:22, 27:21,
27:25, 33:8, 33:11,
41:20, 42:6, 42:10,
43:17, 44:15, 46:1,
80:5, 80:7, 80:19,
81:23, 86:3, 90:1,
115:13, 130:17,
130:24, 131:11,
131:15, 131:18,
132:14, 132:16,
132:21, 132:23,
133:4, 133:10,
133:14, 133:18,
135:16, 154:24,
174:3, 178:15,
203:5, 203:6,
203:18, 208:7,
209:19, 215:23,
224:8, 225:6,
225:17, 225:25,
226:2, 226:5,
227:21, 228:18,
228:22, 228:24,
249:9
**Look** [1] - 235:4
**looked** [18] - 13:18,
19:15, 25:15, 26:24,
63:13, 64:20, 70:2,
129:21, 129:24,
130:9, 130:13,
130:15, 132:10,
132:22, 135:10,
187:3, 235:1
**looking** [35] - 11:10,
46:3, 57:10, 65:22,
68:11, 69:5, 73:6,
73:12, 73:20, 74:3,
74:12, 74:18, 74:23,
75:2, 75:6, 75:11,
76:24, 78:12, 80:22,
82:7, 121:6, 121:7,
133:23, 155:12,
155:15, 155:23,
157:8, 184:23,
191:10, 196:18,
239:1, 244:21,
251:10
**looks** [5] - 35:23,
39:10, 61:25, 77:21,
225:23
**Los** [4] - 120:22,
130:16, 131:8, 131:9
**losing** [2] - 35:1, 39:15
**loss** [1] - 146:15
**lower** [1] - 38:16
**Lunch** [1] - 92:13

**lunch** [8] - 90:8, 90:13,
90:20, 90:25, 94:15,
94:22, 252:25, 253:3
**lying** [2] - 207:19,
207:25

## M

**mail** [1] - 216:12
**maintain** [1] - 120:25
**major** [3] - 120:11,
130:11, 130:13
**male** [2] - 4:25, 85:6
**man** [1] - 110:23
**man's** [1] - 86:21
**Management** [1] -
116:15
**manner** [3] - 156:20,
157:22, 157:25
**manners** [1] - 114:22
**manuals** [2] - 120:11,
120:14
**marching** [5] - 219:14,
222:3, 247:16,
247:18, 252:2
**mark** [1] - 95:23
**marked** [8] - 16:12,
33:1, 45:23, 86:9,
137:4, 155:19,
189:5, 228:1
**markings** [2] - 154:8,
155:1
**Marshals** [1] - 105:6
**Mary's** [1] - 207:6
**Maryland** [8] - 98:11,
115:16, 116:11,
117:15, 118:6,
128:23, 128:25
**mass** [1] - 212:7
**Massachusetts** [1] -
129:3
**match** [1] - 207:16
**matching** [1] - 196:11
**material** [6] - 128:16,
140:17, 140:18,
140:19, 143:13,
241:12
**materials** [4] - 97:18,
140:21, 159:12,
164:21
**math's** [1] - 102:11
**matter** [34] - 72:13,
123:17, 124:19,
125:3, 125:5, 126:1,
127:19, 130:19,
132:24, 133:19,
150:15, 153:25,
156:15, 160:3,
163:18, 163:24,
167:19, 169:2,

171:14, 172:16,
180:20, 181:7,
185:5, 185:25,
188:12, 193:22,
194:14, 204:4,
217:22, 222:23,
224:5, 236:17,
247:14
**matters** [7] - 72:3,
113:19, 124:7,
125:12, 125:14,
127:21, 133:24
**max** [1] - 170:23
**McDonald's** [1] -
198:20
**McGill** [1] - 116:16
**McNeil** [3] - 7:18, 8:7,
9:12
**McNeil's** [6] - 6:18,
7:8, 7:25, 9:8, 9:9,
10:1
**mean** [18] - 15:11,
20:14, 32:12, 47:11,
95:14, 107:11,
117:13, 121:5,
132:22, 144:2,
156:6, 168:4,
175:14, 183:21,
194:25, 197:24,
205:23, 207:18
**means** [10] - 143:4,
178:13, 183:19,
184:10, 207:21,
209:21, 215:16,
215:18, 239:13
**measurable** [1] -
231:4
**measure** [1] - 210:12
**measures** [1] - 139:25
**mechanical** [1] - 1:24
**media** [1] - 121:11
**medical** [3] - 87:4,
88:12, 194:4
**meets** [1] - 196:15
**member** [13] - 84:12,
99:5, 99:8, 99:21,
118:19, 155:5,
160:12, 160:19,
161:11, 184:7,
185:1, 195:15,
213:12
**Members** [2] - 189:10,
189:22
**members** [11] - 87:8,
121:1, 121:3, 125:1,
125:10, 132:18,
132:25, 160:24,
188:13, 219:21,
220:12
**memory** [6] - 27:22,

28:1, 32:10, 32:12,
45:18, 227:20
**mention** [2] - 201:25,
235:11
**mentioned** [8] -
129:25, 131:4,
131:19, 132:14,
187:8, 213:18,
217:14, 239:20
**mere** [2] - 161:14,
163:2
**Merit** [1] - 108:21
**merit** [1] - 111:16
**met** [3] - 199:12,
241:24, 250:5
**method** [1] - 184:2
**methods** [2] - 115:13,
116:9
**Metrobus** [2] - 232:17,
232:19
**Metropolitan** [60] -
84:11, 84:12, 98:14,
98:17, 99:6, 99:9,
99:14, 102:9,
102:24, 103:5,
105:9, 107:16,
111:23, 112:1,
115:22, 115:25,
116:10, 118:19,
119:1, 120:4, 125:1,
125:6, 128:20,
128:21, 128:22,
130:7, 130:18,
130:21, 131:2,
131:11, 131:15,
132:10, 132:16,
133:4, 133:7,
133:11, 133:15,
135:13, 137:12,
149:21, 150:14,
151:19, 158:2,
159:24, 160:12,
160:19, 161:11,
168:3, 173:13,
181:18, 183:11,
184:7, 188:9,
188:13, 190:17,
193:5, 193:15,
194:23, 195:19,
217:5
**Miami** [1] - 114:5
**midafternoon** [1] -
155:17
**midday** [1] - 92:6
**middle** [5] - 84:9,
228:6, 228:10,
228:12, 249:7
**midline** [5] - 228:7,
228:13, 228:14,
228:15, 228:16

**midst** [1] - 106:14
**might** [6] - 54:6,
120:19, 134:11,
134:13, 236:1,
252:25
**Mike** [1] - 84:9
**Mikhail** [1] - 104:22
**milk** [1] - 216:12
**millimeter** [2] - 81:10,
81:12
**mimicking** [1] - 56:5
**mind** [8] - 23:3, 23:7,
23:11, 23:13, 44:15,
48:6, 229:18, 253:15
**mindful** [1] - 90:9
**mine** [1] - 10:16
**minimize** [1] - 215:1
**minimum** [2] - 181:17,
183:12
**minuscule** [1] - 16:1
**minute** [3] - 33:5,
96:11, 214:11
**minutes** [11] - 19:12,
51:23, 51:24, 52:6,
89:18, 114:5,
169:14, 169:18,
169:21, 170:23,
252:20
**mischaracterizing** [1]
- 234:13
**mishap** [1] - 214:24
**missed** [2] - 9:23,
79:25
**mission** [2] - 183:14,
206:8
**mistaken** [3] - 9:11,
10:1, 223:11
**mistakes** [1] - 142:8
**misunderstood** [2] -
166:16, 201:12
**mixed** [1] - 17:12
**mode** [2] - 139:21,
229:21
**modules** [1] - 187:3
**moment** [4] - 71:8,
190:17, 216:4,
236:25
**Monday** [3] - 92:8,
94:23, 253:11
**money** [2] - 113:13,
197:25
**monitor** [11] - 21:4,
21:7, 34:7, 52:11,
52:15, 52:20, 54:10,
54:11, 54:16,
155:16, 176:23
**monitors** [1] - 54:17
**Montgomery** [2] -
117:17, 117:19
**month** [2] - 101:1,

104:16
**months** [4] - 45:13, 102:20, 102:21, 214:17
**Montreal** [2] - 116:18, 116:19
**Moreira** [2] - 2:10, 254:18
**MOREIRA** [1] - 254:11
**morning** [27] - 4:2, 4:3, 4:13, 4:23, 9:10, 21:11, 21:12, 21:15, 47:25, 51:23, 83:23, 83:24, 88:21, 91:2, 92:1, 92:4, 92:9, 94:21, 170:17, 170:21, 171:1, 235:9, 252:22, 252:24, 253:1, 253:5, 253:7
**most** [5] - 94:17, 100:12, 130:11, 134:12, 187:4
**mother** [3] - 87:12, 87:15, 87:22
**motion** [7] - 30:23, 175:8, 175:14, 175:15, 176:19, 176:23, 243:11
**motorcade** [1] - 104:21
**mouth** [4] - 163:8, 175:20, 245:1, 245:17
**move** [28] - 43:12, 46:8, 47:13, 48:19, 57:14, 58:13, 64:5, 64:10, 65:3, 73:14, 73:16, 78:2, 82:16, 91:9, 95:4, 95:22, 96:15, 96:18, 126:4, 145:4, 161:18, 182:19, 189:11, 189:12, 239:17, 247:8, 247:13, 251:25
**moved** [23] - 45:15, 47:12, 47:15, 47:21, 47:22, 50:2, 50:8, 52:24, 58:4, 58:5, 76:5, 79:23, 80:6, 82:19, 89:16, 96:16, 96:21, 102:2, 137:18, 161:22, 161:25, 182:23, 252:6
**movements** [1] - 33:17
**moving** [40] - 10:16, 24:24, 25:4, 25:25,

26:11, 26:16, 27:3, 27:6, 27:7, 28:4, 28:11, 28:21, 28:24, 29:24, 30:3, 30:4, 30:5, 30:6, 30:9, 30:10, 31:8, 31:9, 95:19, 158:4, 159:1, 159:15, 159:19, 159:25, 160:21, 160:23, 162:13, 162:20, 162:24, 163:19, 163:20, 164:7, 164:10, 180:16, 211:3
**MPD** [4] - 87:21, 129:9, 129:10, 232:7
**MR** [407] - 5:16, 6:11, 6:13, 6:21, 7:4, 8:25, 9:20, 10:6, 10:9, 10:11, 10:18, 11:11, 11:23, 11:25, 12:7, 12:16, 16:25, 17:5, 17:8, 17:22, 18:7, 18:10, 18:18, 18:21, 19:13, 19:23, 20:2, 20:18, 21:5, 21:9, 21:25, 22:7, 27:10, 29:18, 29:21, 32:23, 34:4, 34:9, 34:11, 35:9, 35:13, 35:16, 36:13, 36:17, 36:20, 37:10, 37:25, 38:8, 38:14, 38:19, 39:5, 39:9, 41:2, 43:8, 43:13, 43:25, 44:2, 44:6, 44:25, 45:22, 46:5, 47:9, 47:17, 48:15, 49:12, 49:21, 50:10, 50:11, 51:20, 52:8, 52:22, 53:1, 53:6, 53:8, 53:11, 53:16, 53:21, 54:1, 54:19, 54:24, 54:25, 55:8, 55:10, 55:12, 55:14, 55:15, 56:11, 56:16, 56:21, 56:24, 57:1, 57:23, 58:11, 58:18, 59:7, 59:17, 59:22, 60:3, 60:8, 60:24, 61:2, 61:5, 61:10, 61:15, 61:20, 62:2, 64:6, 64:14, 65:11, 65:21, 67:1, 67:8, 67:24, 68:8, 69:4, 69:19, 71:12, 71:15, 73:3, 73:10, 73:16, 74:2, 74:6, 74:11, 74:16, 74:21, 75:1, 75:5, 75:9, 75:14, 75:21, 76:10, 76:13, 76:15, 76:22,

77:2, 77:10, 77:23, 78:1, 78:6, 78:9, 78:25, 79:8, 79:14, 79:16, 79:18, 79:20, 80:2, 81:19, 82:16, 82:21, 83:2, 83:11, 83:14, 83:21, 84:2, 86:5, 88:21, 89:4, 90:4, 90:8, 90:11, 91:8, 91:13, 91:15, 93:6, 93:9, 93:11, 93:13, 93:16, 93:20, 95:3, 95:10, 95:14, 95:18, 95:22, 96:4, 96:8, 96:14, 96:17, 96:20, 96:22, 97:8, 99:17, 99:19, 121:16, 121:20, 121:22, 121:25, 122:2, 122:8, 122:11, 122:19, 122:22, 126:4, 126:7, 126:11, 126:16, 126:25, 127:3, 127:9, 127:11, 128:3, 128:6, 128:10, 137:1, 137:14, 137:17, 137:19, 141:19, 142:1, 142:7, 142:12, 142:13, 143:5, 143:7, 145:1, 145:4, 145:24, 146:1, 146:5, 146:7, 146:8, 146:11, 146:14, 146:18, 147:1, 147:4, 147:7, 147:24, 148:8, 150:10, 151:10, 152:2, 152:6, 152:17, 153:12, 153:17, 154:11, 154:15, 154:17, 154:20, 155:9, 158:12, 158:18, 158:24, 161:17, 161:21, 161:23, 162:7, 164:18, 165:1, 165:4, 165:7, 165:9, 165:14, 165:18, 166:3, 166:6, 169:10, 169:12, 171:10, 171:11, 172:3, 172:8, 172:10, 172:13, 173:22, 173:23, 173:25, 174:20, 175:4, 175:7, 176:18, 176:21, 177:25,

179:8, 179:18, 182:2, 182:5, 182:7, 182:18, 182:22, 183:2, 183:4, 183:6, 186:4, 186:7, 186:10, 186:21, 186:23, 188:20, 188:22, 188:24, 189:2, 189:11, 189:14, 189:16, 189:18, 190:8, 190:13, 190:24, 191:2, 191:3, 191:6, 191:9, 191:19, 191:22, 192:1, 192:24, 193:2, 193:6, 195:6, 195:9, 196:3, 197:18, 197:20, 199:2, 199:4, 199:7, 199:9, 201:7, 207:10, 208:6, 208:18, 215:25, 222:5, 223:18, 224:21, 225:4, 227:24, 228:20, 230:4, 230:6, 230:9, 231:7, 233:13, 233:18, 233:25, 234:2, 234:7, 234:9, 234:10, 234:19, 234:21, 234:24, 235:1, 235:3, 235:13, 235:14, 235:15, 235:21, 235:24, 236:3, 236:5, 236:8, 236:11, 236:15, 239:4, 239:6, 239:15, 240:6, 240:8, 240:11, 241:3, 241:6, 241:8, 241:17, 243:9, 244:14, 244:16, 244:20, 247:6, 247:8, 247:11, 247:12, 247:13, 247:21, 247:22, 248:1, 248:6, 248:9, 248:10, 248:16, 248:25, 249:4, 249:6, 249:10, 249:14, 249:20, 249:24, 250:1, 250:2, 250:15, 251:5, 251:9, 251:12, 251:13, 251:18, 251:20, 251:22, 251:24, 252:2, 252:5, 252:11, 252:15,

254:5
**MS** [182] - 4:2, 4:9, 4:12, 4:13, 4:18, 4:22, 5:9, 5:13, 5:17, 5:24, 6:3, 6:8, 6:12, 7:11, 7:24, 8:13, 8:17, 8:22, 9:14, 9:22, 10:3, 10:7, 10:16, 11:4, 11:6, 11:9, 11:20, 11:24, 12:14, 13:9, 14:3, 14:5, 14:7, 14:11, 14:16, 14:22, 15:2, 15:7, 15:19, 15:21, 16:10, 20:4, 20:7, 20:16, 24:19, 26:12, 26:18, 27:16, 28:14, 29:15, 31:16, 32:4, 32:13, 36:6, 37:18, 40:24, 42:4, 44:24, 46:3, 46:18, 46:20, 46:22, 47:1, 48:2, 48:13, 48:23, 49:7, 49:9, 51:12, 52:10, 52:13, 52:19, 55:9, 55:11, 55:23, 56:3, 57:22, 58:22, 59:11, 59:15, 60:10, 60:14, 62:20, 62:25, 63:16, 64:3, 64:5, 64:10, 64:22, 65:1, 65:3, 65:6, 65:15, 65:19, 66:16, 66:21, 66:25, 67:10, 67:12, 67:15, 67:20, 67:25, 68:6, 69:2, 70:16, 70:21, 71:2, 71:6, 71:8, 73:14, 75:20, 75:25, 76:6, 76:12, 76:16, 76:23, 77:13, 77:22, 77:25, 78:8, 78:11, 79:15, 79:17, 79:25, 82:18, 83:5, 83:19, 87:13, 87:23, 88:7, 89:8, 89:10, 90:2, 91:3, 91:19, 91:24, 92:3, 92:7, 92:10, 92:12, 93:17, 93:22, 94:4, 94:5, 94:7, 94:10, 95:20, 96:5, 96:10, 96:13, 126:18, 141:17, 142:14, 142:18, 142:21, 145:20, 147:11, 151:9, 158:17, 158:21, 158:23, 170:1, 170:10, 170:12, 170:16, 170:23, 171:2, 171:6, 172:11, 188:23,

188:25, 248:20, 249:1, 250:21, 252:4, 252:8, 253:10, 253:14, 253:19, 253:21, 254:2, 254:4
**multiple** [1] - 129:12
**Municipal** [4] - 179:12, 180:1, 182:11, 188:8
**municipal** [1] - 216:23
**murder** [1] - 106:14
**murders** [1] - 106:16
**must** [8] - 181:3, 203:12, 204:17, 207:25, 209:20, 214:9, 214:10

## N

**name** [9] - 7:25, 84:7, 84:8, 86:21, 87:1, 97:11, 195:1, 202:19
**names** [1] - 118:15
**narcotics** [4] - 106:2, 112:13, 114:14, 115:23
**national** [30] - 125:13, 132:3, 133:24, 134:19, 134:21, 135:2, 144:8, 150:2, 150:6, 157:1, 157:3, 157:5, 157:10, 157:19, 159:18, 163:16, 163:18, 164:3, 164:6, 164:14, 168:22, 169:4, 169:7, 173:4, 173:8, 180:22, 185:15, 194:10, 212:13
**National** [5] - 106:3, 112:20, 113:3, 113:10, 118:16
**nature** [2] - 5:3, 46:13
**near** [9] - 16:17, 16:18, 20:23, 62:19, 62:21, 62:23, 69:13, 70:7, 79:7
**nearby** [1] - 232:3
**necessarily** [1] - 207:19
**necessary** [1] - 204:21
**need** [16] - 5:22, 6:9, 8:15, 26:7, 32:12, 32:17, 35:5, 43:14, 49:15, 57:14, 91:9, 95:20, 182:15, 208:16, 208:21, 214:11
**negligence** [1] -

126:21
**negligent** [1] - 141:24
**never** [13] - 4:15, 41:7, 102:14, 147:25, 222:19, 224:14, 224:15, 232:15, 232:16, 232:21
**new** [6] - 95:7, 104:18, 121:13, 170:8, 253:23, 253:24
**New** [3] - 116:13, 116:14, 120:23
**next** [51] - 36:15, 36:17, 36:20, 37:10, 37:25, 38:8, 38:14, 38:15, 39:1, 39:5, 39:9, 41:2, 48:24, 57:24, 58:12, 58:13, 58:18, 59:7, 59:14, 59:22, 60:3, 60:8, 60:24, 61:2, 61:5, 61:10, 61:15, 61:20, 62:3, 66:12, 74:2, 74:6, 83:10, 95:3, 96:23, 98:13, 109:9, 109:10, 109:22, 110:1, 110:7, 110:10, 111:1, 112:5, 113:25, 136:14, 155:4, 198:9, 198:17, 239:8
**NEXT** [1] - 1:22
**nice** [4] - 32:10, 90:20, 210:8, 254:4
**nine** [5] - 104:15, 129:9, 177:18, 177:19, 225:18
**Ninth** [7] - 100:22, 101:3, 101:8, 101:19, 101:25, 102:17, 103:1
**nomination** [1] - 111:13
**none** [2] - 174:19, 221:11
**nonetheless** [1] - 180:4
**Norfolk** [1] - 110:18
**normal** [1] - 86:25
**North** [3] - 110:18, 114:16, 116:14
**northwest** [1] - 196:10
**notebooks** [1] - 51:25
**noted** [1] - 127:7
**notes** [2] - 9:15, 254:13
**nothing** [8] - 47:3, 48:13, 51:11, 90:2, 211:17, 211:19, 218:4, 238:6

**notice** [6] - 34:17, 58:6, 85:5, 153:8, 178:21, 225:14
**noticed** [2] - 4:24, 34:19
**notify** [1] - 113:12
**November** [4] - 100:19, 100:21, 101:1
**number** [8] - 17:2, 57:23, 145:21, 145:23, 151:9, 179:7, 179:8, 190:1
**numbers** [1] - 44:4
**numeral** [2] - 156:2, 162:14
**nurses** [1] - 89:14
**nuts** [1] - 120:3
**NW** [5] - 1:14, 1:18, 2:3, 2:11, 254:20

## O

**oath** [2] - 169:19, 216:13
**object** [91] - 10:19, 10:25, 12:2, 12:8, 12:21, 12:24, 15:22, 17:18, 56:11, 56:25, 57:2, 57:9, 58:1, 58:3, 58:14, 59:4, 59:20, 60:9, 60:12, 62:4, 62:19, 62:22, 62:24, 63:1, 63:3, 63:6, 63:7, 63:10, 63:21, 64:19, 64:25, 65:9, 65:23, 66:20, 66:24, 67:5, 67:6, 67:11, 67:12, 67:16, 68:9, 68:15, 68:17, 68:19, 68:20, 68:21, 68:24, 68:25, 69:9, 69:13, 69:17, 69:22, 69:25, 70:1, 70:2, 70:6, 70:14, 70:25, 73:1, 73:7, 73:21, 73:25, 74:4, 74:7, 74:13, 74:19, 75:3, 75:11, 75:24, 76:4, 76:5, 76:17, 76:25, 77:4, 77:5, 77:12, 77:18, 77:19, 78:4, 78:13, 78:15, 79:6, 79:11, 122:6, 147:24, 234:16, 241:17, 249:20
**Object** [1] - 69:17
**objected** [2] - 68:1, 233:19
**objecting** [2] - 48:25, 250:16

**objection** [89] - 26:12, 26:18, 27:16, 28:14, 29:15, 31:16, 32:4, 32:13, 36:6, 37:18, 40:24, 42:4, 46:18, 46:20, 47:24, 51:12, 55:23, 59:11, 60:10, 60:14, 62:20, 62:25, 63:16, 64:3, 64:22, 65:1, 65:14, 65:18, 66:16, 66:21, 66:25, 68:4, 68:5, 69:2, 70:16, 70:21, 71:2, 71:6, 75:25, 76:6, 77:13, 82:18, 87:13, 87:23, 88:7, 94:3, 121:25, 122:1, 126:4, 126:10, 128:6, 137:16, 137:17, 142:25, 145:1, 152:17, 153:12, 154:14, 154:16, 161:20, 161:21, 165:8, 166:3, 173:22, 173:25, 177:25, 182:21, 186:4, 186:21, 189:14, 191:23, 191:24, 192:4, 197:18, 199:1, 201:7, 207:10, 208:18, 222:5, 223:18, 224:21, 230:4, 230:6, 233:18, 244:14, 247:6, 247:11
**objection's** [2] - 127:7, 128:7
**objections** [1] - 154:18
**objectively** [1] - 72:9
**obscure** [1] - 52:17
**observations** [2] - 154:2, 164:19
**observe** [7] - 5:11, 34:8, 51:15, 55:3, 57:5, 57:7, 152:25
**obviously** [2] - 113:6, 147:8
**occupation** [1] - 97:13
**occur** [2] - 22:25, 120:5
**occurred** [2] - 23:5, 163:12
**occurs** [1] - 139:4
**OF** [6] - 1:1, 1:6, 1:10, 1:18, 2:3, 254:9
**offered** [1] - 139:23
**OFFICE** [1] - 2:3

**office** [4] - 218:5, 219:19, 219:25, 220:6
**Office** [1] - 111:5
**officer** [99] - 79:4, 84:19, 84:20, 89:2, 105:10, 108:24, 118:21, 125:18, 135:1, 135:7, 136:10, 137:25, 138:4, 138:6, 138:23, 139:5, 139:7, 139:9, 139:13, 139:15, 139:16, 139:22, 151:25, 158:4, 160:22, 167:6, 168:16, 168:20, 173:11, 178:5, 180:6, 180:9, 181:3, 181:13, 184:14, 184:18, 184:21, 187:20, 187:21, 190:13, 190:22, 191:16, 193:15, 194:9, 194:23, 194:25, 196:8, 196:12, 199:21, 199:24, 199:25, 200:3, 200:14, 200:18, 200:22, 201:2, 201:4, 201:5, 201:10, 201:15, 201:16, 203:11, 203:13, 203:25, 204:11, 204:17, 205:8, 205:9, 205:11, 205:22, 205:23, 209:18, 210:21, 211:4, 211:6, 211:23, 212:1, 213:2, 213:18, 214:7, 214:8, 215:5, 216:12, 217:6, 227:1, 227:6, 227:12, 230:3, 230:11, 230:14, 237:6, 237:7, 240:19, 241:1, 242:16
**Officer** [82] - 4:24, 5:1, 5:3, 11:18, 12:1, 13:6, 13:13, 13:23, 13:24, 14:5, 14:17, 15:9, 16:13, 16:18, 17:3, 17:9, 18:24, 20:25, 21:16, 22:2, 22:3, 22:8, 28:18, 29:8, 34:7, 34:12, 35:16, 38:12, 41:3,

50:12, 50:22, 51:15,
54:1, 54:4, 54:20,
55:18, 57:2, 59:20,
65:22, 68:9, 69:22,
71:17, 72:19, 72:24,
73:6, 73:13, 73:25,
74:13, 76:17, 78:25,
79:23, 83:6, 83:7,
83:11, 84:3, 86:8,
89:11, 90:5, 91:1,
91:24, 152:11,
161:6, 163:5,
170:25, 174:10,
174:13, 180:22,
195:5, 229:14,
231:9, 231:12,
237:12, 237:16,
237:17, 238:5,
238:9, 238:12,
239:19, 241:10,
241:11
**officer's** [6] - 184:13,
187:23, 202:12,
210:12, 242:25
**officers** [49] - 14:19,
15:5, 18:23, 42:19,
100:10, 100:13,
105:12, 120:8,
123:14, 124:1,
125:5, 129:20,
134:10, 135:9,
135:14, 144:4,
144:7, 144:16,
145:11, 148:24,
149:14, 151:19,
167:1, 168:21,
173:9, 176:4, 181:9,
181:18, 183:14,
192:6, 192:7, 192:9,
202:3, 202:22,
204:18, 204:23,
205:12, 214:16,
215:13, 219:9,
220:25, 223:15,
226:24, 231:23,
231:24, 232:1,
241:13, 242:6,
250:12
**officers'** [2] - 41:12,
148:18
**offices** [1] - 110:16
**OFFICES** [1] - 1:18
**official** [3] - 88:17,
88:24, 254:18
**Official** [1] - 2:10
**OFFICIAL** [1] - 254:9
**officials** [1] - 22:10
**often** [2] - 114:6,
204:18
**old** [1] - 98:22

**older** [2] - 192:15
**ON** [1] - 1:22
**once** [18] - 40:1,
44:23, 45:4, 78:6,
85:10, 89:15, 118:3,
119:8, 126:7,
128:15, 164:5,
167:1, 185:18,
187:17, 187:21,
197:4, 197:12,
230:21
**once-over** [1] - 89:15
**one** [121] - 6:6, 7:12,
8:12, 10:24, 12:1,
13:15, 14:8, 16:17,
17:11, 17:17, 17:19,
18:1, 18:23, 19:8,
21:1, 21:17, 42:18,
49:5, 50:1, 52:24,
53:4, 53:5, 53:6,
59:16, 65:25, 66:1,
66:22, 68:17, 73:10,
73:18, 73:23, 74:11,
74:21, 74:22, 75:1,
75:5, 75:9, 75:10,
75:14, 75:22, 76:11,
76:22, 77:10, 77:23,
78:9, 80:19, 80:25,
82:7, 82:8, 82:13,
87:20, 88:1, 90:8,
90:22, 90:23, 93:11,
95:20, 95:23, 96:10,
96:19, 99:12, 99:13,
109:10, 110:12,
110:13, 110:17,
112:7, 112:8, 114:2,
119:21, 119:25,
120:1, 122:13,
122:15, 134:15,
135:5, 142:15,
150:19, 153:1,
166:24, 168:11,
170:1, 183:17,
185:19, 190:20,
190:21, 198:4,
206:19, 206:22,
209:2, 212:14,
213:14, 215:11,
216:16, 217:6,
217:23, 219:18,
220:20, 232:21,
233:5, 233:21,
235:2, 235:11,
235:25, 240:22,
243:13, 243:15,
243:23, 244:11,
246:22, 248:18,
249:11, 249:12,
249:17, 249:19,
251:13, 251:24,

252:4, 252:23
**ones** [4] - 20:22,
130:15, 131:19,
219:13
**open** [1] - 196:14
**opened** [2] - 147:17,
233:23
**operated** [1] - 163:5
**operating** [2] - 87:25,
88:1
**operation** [2] - 100:17,
106:5
**operations** [4] - 99:24,
99:25, 101:3, 101:13
**opining** [1] - 239:2
**opinion** [92] - 130:4,
144:6, 148:1,
149:24, 150:5,
156:10, 156:14,
156:19, 157:2,
157:12, 157:13,
157:18, 159:13,
161:4, 163:15,
163:17, 163:22,
163:23, 164:23,
166:11, 166:20,
166:21, 167:4,
167:18, 168:13,
168:19, 169:1,
171:14, 172:5,
172:15, 172:20,
173:20, 177:11,
180:10, 180:15,
180:19, 180:20,
183:9, 183:16,
184:6, 185:5,
185:11, 186:11,
186:17, 186:18,
187:1, 188:5,
193:10, 193:13,
193:18, 193:20,
194:1, 194:8,
194:13, 194:18,
208:2, 208:3, 214:8,
215:5, 217:18,
218:24, 219:17,
221:2, 221:24,
222:1, 222:23,
223:3, 224:3, 224:6,
229:10, 229:22,
231:8, 231:11,
233:22, 233:24,
234:1, 234:5,
234:17, 235:5,
235:22, 236:1,
236:17, 236:21,
236:24, 237:11,
237:20, 244:8,
245:13, 246:25
**opinion's** [1] - 222:21

**opinions** [11] - 140:8,
140:11, 141:2,
143:15, 159:17,
159:23, 179:1,
182:25, 195:3,
217:22, 218:18
**opportunity** [9] -
23:18, 25:13, 26:22,
41:20, 41:24, 42:25,
79:19, 84:22, 176:22
**opposed** [1] - 134:10
**opposite** [1] - 31:10
**oranges** [2] - 165:8,
165:15
**Order** [21] - 128:23,
128:24, 145:16,
147:4, 151:3,
155:13, 156:9,
156:13, 156:17,
157:4, 160:7, 161:7,
161:19, 162:10,
179:2, 180:11,
186:12, 188:18,
189:9, 189:21,
191:10
**order** [63] - 8:14, 8:16,
28:9, 28:10, 28:11,
42:12, 131:1, 133:8,
134:13, 142:4,
143:17, 145:9,
145:14, 146:2,
147:2, 147:13,
147:23, 148:10,
149:21, 150:18,
151:1, 151:7,
151:13, 151:17,
152:22, 153:13,
153:14, 153:18,
153:22, 153:23,
153:24, 154:7,
155:23, 156:11,
158:3, 158:6,
160:11, 160:23,
162:2, 164:9, 168:2,
168:7, 168:10,
178:4, 186:15,
188:2, 188:7,
188:15, 189:24,
190:16, 190:23,
191:7, 192:14,
192:15, 200:8,
210:23, 210:24,
212:21, 213:2,
216:16, 217:18,
236:21
**Orders** [2] - 129:1,
129:4
**orders** [73] - 28:3,
71:23, 71:25, 99:14,
99:16, 120:16,

122:25, 123:8,
123:20, 124:3,
124:14, 124:16,
124:25, 125:9,
125:21, 128:20,
128:21, 129:23,
129:24, 130:3,
130:4, 130:17,
130:25, 131:10,
131:12, 132:17,
132:23, 133:4,
133:14, 133:18,
133:23, 134:16,
135:10, 135:16,
135:17, 140:15,
143:9, 144:7,
145:10, 148:23,
148:24, 149:5,
150:14, 150:15,
157:6, 157:23,
159:14, 159:24,
172:24, 173:8,
173:13, 173:14,
173:16, 181:5,
181:8, 181:16,
185:24, 187:1,
187:13, 187:15,
187:21, 187:24,
188:3, 188:6,
188:11, 198:21,
217:17, 222:3,
239:20, 247:16,
247:18, 252:2
**organization** [1] -
134:20
**organized** [1] - 103:15
**orient** [1] - 8:16
**original** [1] - 129:2
**originally** [1] - 149:14
**otherwise** [2] - 227:11,
229:2
**outside** [17] - 46:25,
56:2, 65:8, 67:4,
87:25, 89:25, 95:12,
105:14, 122:5,
126:15, 141:13,
146:13, 171:21,
190:12, 233:16,
242:20, 247:25
**overhear** [2] - 85:22,
86:17
**overruled** [23] - 26:19,
27:18, 31:18, 32:16,
36:8, 37:19, 42:5,
70:22, 76:9, 87:14,
128:7, 154:19,
178:2, 191:24,
193:1, 193:8, 196:4,
197:19, 199:1,
199:3, 207:11,

208:19, 223:20
**overtake** [1] - 156:21
**overtaken** [1] - 220:22
**overtaking** [2] - 153:4, 163:5
**owes** [1] - 125:18
**own** [1] - 121:5

**P**

**p.m** [1] - 254:7
**pace** [1] - 147:22
**package** [1] - 205:16
**page** [11] - 44:24, 45:25, 46:3, 46:5, 129:14, 155:4, 160:14, 160:17, 179:11, 179:12, 179:15
**PAGE** [2] - 1:22, 3:2
**Page** [13] - 44:25, 155:4, 155:23, 158:9, 160:15, 160:16, 162:4, 162:9, 190:3, 190:4, 192:16, 192:18
**pages** [5] - 129:12, 134:14, 155:9, 250:1, 252:13
**paid** [1] - 113:12
**pants** [1] - 44:9
**paperwork** [1] - 86:3
**Paragraph** [3] - 191:17, 192:5, 192:22
**paragraph** [6] - 179:9, 179:15, 179:24, 179:25, 192:13, 192:19
**paragraphs** [1] - 134:11
**parallel** [1] - 131:3
**pardon** [3] - 93:9, 118:8, 222:7
**Park** [2] - 116:11, 196:9
**parking** [4] - 144:4, 196:18, 198:5, 231:19
**part** [21] - 56:6, 101:8, 109:19, 137:24, 140:14, 140:16, 145:9, 161:3, 161:8, 163:10, 177:3, 177:6, 183:15, 198:21, 198:25, 206:18, 217:17, 218:19, 219:2, 231:14, 246:24
**partially** [7] - 202:15,

202:23, 202:25, 204:22, 205:14, 205:15
**participate** [2] - 118:25, 119:23
**participated** [2] - 119:2, 119:4
**particular** [10] - 36:11, 36:13, 45:25, 100:9, 113:17, 134:24, 203:12, 204:21, 205:18, 209:1
**particularly** [2] - 20:22, 134:12
**parties** [3] - 90:17, 90:18, 169:16
**partly** [1] - 143:10
**partner** [1] - 196:21
**parts** [1] - 227:14
**passenger** [3] - 50:14, 51:18
**passersby** [1] - 173:12
**past** [1] - 177:17
**patient** [1] - 194:24
**patrol** [6] - 84:19, 100:2, 100:12, 102:14, 102:20, 102:21
**patrols** [1] - 100:9
**patterns** [1] - 100:8
**Pause** [18] - 6:15, 6:25, 7:6, 9:5, 10:8, 15:20, 33:14, 34:6, 43:11, 71:14, 83:22, 97:1, 128:12, 158:13, 166:8, 249:8, 250:3, 251:23
**pending** [3] - 91:11, 102:18, 102:19
**Pennsylvania** [1] - 116:12
**people** [32] - 7:1, 14:2, 42:16, 44:22, 45:2, 45:9, 90:17, 93:14, 98:24, 101:17, 101:21, 101:23, 104:5, 106:15, 106:24, 107:4, 107:9, 107:11, 114:3, 114:6, 115:11, 115:12, 120:13, 149:7, 173:10, 173:12, 202:9, 208:17, 213:21, 216:24, 227:13, 246:4
**pepper** [2] - 136:16, 210:1
**per** [1] - 229:21
**perceive** - 208:22

**percent** [2] - 44:1, 44:3
**perception** [4] - 29:6, 66:23, 137:25, 208:13
**perfectly** [2] - 147:12, 242:12
**performance** [1] - 184:8
**perhaps** [3] - 34:25, 54:5, 129:25
**period** [4] - 102:16, 106:8, 106:19, 107:3
**periods** [1] - 106:23
**permissible** [3] - 113:20, 113:21, 141:10
**permission** [14] - 54:19, 82:21, 93:22, 137:19, 154:12, 155:9, 162:7, 171:3, 174:20, 174:22, 179:18, 183:2, 189:12, 192:1
**permitted** [2] - 54:1, 135:21
**person** [26] - 87:3, 138:6, 138:12, 138:21, 138:22, 139:1, 139:3, 139:4, 139:10, 139:12, 139:15, 139:22, 143:19, 149:10, 160:23, 167:13, 178:16, 184:12, 184:15, 211:4, 211:11, 212:12, 213:5, 214:25, 246:7, 246:8
**person's** [3] - 139:16, 245:24, 245:25
**personal** [2] - 93:24, 94:8
**personally** [3] - 108:25, 111:19, 127:16
**personnel** [1] - 210:14
**persons** [4] - 19:9, 180:8, 184:20
**perspective** [7] - 9:21, 19:3, 28:24, 29:7, 203:13, 207:22, 209:2
**perspectives** [3] - 208:1, 208:5, 209:5
**pertains** [2] - 133:15, 161:3, 179:12
**phone** [4] - 37:20, 113:23, 113:25, 146:23

**phones** [1] - 113:24
**photographic** [1] - 241:22
**photographs** [2] - 129:7, 185:13
**photos** [1] - 17:3
**physical** [2] - 205:11, 244:4
**pick** [1] - 113:25
**picked** [1] - 253:23
**picture** [2] - 60:22, 68:11
**pistol** [16] - 12:1, 13:5, 17:11, 17:12, 17:17, 17:20, 17:23, 17:24, 17:25, 65:25, 66:1, 80:12, 80:13, 80:15, 118:22
**pistols** [6] - 104:2, 104:6, 107:1, 107:4, 107:9, 107:12
**pitted** [1] - 211:10
**Placard** [10] - 17:19, 66:6, 67:7, 67:13, 68:10, 68:16, 69:14, 80:25, 81:4, 81:5
**placards** [1] - 17:4
**Placards** [1] - 17:10
**Place** [1] - 196:15
**place** [14] - 16:21, 56:9, 56:25, 70:20, 72:22, 100:11, 160:25, 167:2, 167:6, 167:16, 205:17, 226:13, 244:4, 246:1
**placed** [1] - 194:5
**places** [2] - 56:11, 116:6
**plain** [1] - 102:12
**plainclothesman** [1] - 103:11
**plaintiff** [13] - 13:15, 13:17, 15:23, 16:21, 20:8, 47:1, 82:16, 94:17, 97:18, 121:16, 127:4, 137:14, 218:14
**Plaintiff** [2] - 1:4, 1:13
**Plaintiff's** [35] - 17:5, 17:10, 19:16, 64:17, 65:22, 66:4, 69:14, 80:5, 80:7, 80:9, 80:19, 81:23, 82:8, 82:17, 82:23, 82:24, 95:5, 95:19, 96:15, 96:18, 137:5, 137:15, 154:13, 154:23, 161:18, 162:1, 174:21,

182:9, 182:19, 182:24, 189:6, 189:12, 191:20, 228:1, 252:7
**plaintiff's** [5] - 14:14, 79:25, 80:2, 80:3, 91:6
**Plaintiffs** [1] - 238:2
**plaintiffs** [4] - 4:6, 19:17, 182:19, 252:23
**plan** [2] - 253:3, 253:19
**planning** [1] - 52:3
**planted** [3] - 20:8, 20:10, 48:6
**planting** [2] - 19:9, 191:3
**play** [6] - 35:5, 54:21, 70:18, 71:12, 110:20, 174:20
**played** [2] - 20:24, 21:1
**playing** [7] - 10:17, 11:13, 12:6, 34:10, 35:12, 175:6, 176:20
**PLFPC@aol.com** [1] - 1:16
**plot** [1] - 109:6
**point** [52] - 18:3, 19:22, 20:1, 20:2, 39:10, 40:3, 51:20, 54:20, 57:12, 58:15, 59:22, 62:12, 67:25, 69:8, 69:25, 75:3, 78:3, 78:13, 78:22, 85:8, 87:16, 87:17, 88:1, 95:1, 138:7, 139:4, 139:23, 139:25, 144:15, 145:14, 169:10, 169:11, 169:14, 175:18, 175:19, 175:22, 179:24, 187:23, 205:5, 208:9, 218:16, 220:15, 220:17, 220:25, 223:1, 223:3, 238:16, 244:25, 246:19, 247:10, 249:9, 249:10
**pointed** [11] - 16:21, 36:9, 37:22, 38:12, 39:2, 39:23, 40:8, 41:9, 54:4, 62:22, 201:15
**pointing** [9] - 13:15, 16:1, 36:18, 37:2, 38:6, 38:24, 39:6,

39:11, 79:12
**points** [1] - 207:4
**pole** [1] - 209:4
**Police** [71] - 84:11,
84:13, 98:14, 98:18,
99:6, 99:9, 99:14,
102:9, 102:24,
103:5, 107:16,
108:20, 111:23,
112:1, 115:16,
115:22, 116:10,
116:11, 116:12,
116:13, 116:14,
116:15, 118:20,
119:1, 120:5, 125:1,
125:6, 128:20,
128:21, 128:22,
128:23, 128:24,
128:25, 129:3,
129:4, 130:7,
130:18, 130:21,
131:2, 131:11,
131:15, 132:10,
132:16, 133:5,
133:7, 133:12,
133:15, 135:13,
137:12, 148:14,
149:21, 150:14,
158:2, 159:24,
160:12, 160:19,
161:12, 168:3,
173:13, 181:18,
183:11, 184:7,
188:9, 188:13,
189:23, 190:17,
195:19
**police** [119] - 7:3, 7:20,
21:21, 22:10, 87:10,
88:17, 88:24, 90:11,
98:19, 98:20, 99:1,
99:2, 105:10,
105:12, 108:24,
111:12, 115:25,
116:3, 116:23,
117:4, 118:5, 120:8,
120:12, 121:4,
121:18, 122:12,
124:4, 125:10,
125:17, 125:21,
126:8, 128:4, 128:9,
130:11, 131:12,
132:6, 134:3, 134:7,
134:12, 134:16,
134:22, 135:9,
136:5, 136:9, 138:6,
139:7, 139:8,
139:13, 141:4,
144:4, 148:17,
149:7, 149:8,
149:11, 150:1,
151:19, 156:16,

156:23, 157:14,
158:4, 160:3, 161:5,
163:24, 166:12,
167:19, 168:15,
169:2, 171:14,
172:16, 173:9,
178:5, 180:21,
181:9, 181:17,
183:14, 184:8,
184:14, 185:1,
185:6, 187:9,
187:12, 187:18,
192:5, 192:7, 193:5,
193:15, 193:23,
194:3, 194:6, 194:9,
194:15, 194:21,
194:23, 194:25,
202:11, 202:12,
203:10, 204:18,
205:23, 214:16,
215:12, 217:5,
219:9, 219:11,
219:20, 220:16,
220:25, 221:15,
223:4, 223:15,
223:16, 232:8,
240:18, 240:25,
242:6, 242:16,
250:12
**Police-Citizen** [1] -
148:14
**policeman** [1] - 217:9
**policy** [3] - 151:15,
183:12, 188:9
**ponds** [1] - 21:24
**PONDS** [309] - 1:13,
1:14, 5:16, 6:11,
6:13, 8:25, 10:9,
10:11, 10:18, 11:11,
11:23, 11:25, 12:7,
12:16, 16:25, 17:5,
17:8, 17:22, 18:7,
18:10, 18:18, 18:21,
19:13, 19:23, 20:2,
20:18, 21:5, 21:9,
21:25, 22:7, 27:10,
29:18, 29:21, 32:23,
34:4, 34:9, 34:11,
35:9, 35:13, 35:16,
36:13, 36:17, 36:20,
37:10, 37:25, 38:8,
38:14, 38:19, 39:1,
39:5, 39:9, 41:2,
43:8, 43:13, 43:25,
44:2, 44:6, 44:25,
45:22, 46:5, 47:9,
47:17, 48:15, 49:12,
49:21, 50:10, 50:11,
51:20, 52:8, 52:22,
53:1, 53:6, 53:8,

53:11, 53:16, 53:21,
54:1, 54:19, 54:24,
54:25, 55:8, 55:10,
55:12, 55:15, 56:11,
56:16, 56:21, 56:24,
57:1, 57:23, 58:11,
58:18, 59:7, 59:17,
59:22, 60:3, 60:8,
60:24, 61:2, 61:5,
61:10, 61:15, 61:20,
62:2, 64:6, 64:14,
65:11, 65:21, 67:1,
67:8, 67:24, 68:8,
69:4, 69:19, 71:12,
71:15, 73:3, 73:10,
73:16, 73:23, 74:2,
74:6, 74:11, 74:16,
74:21, 75:1, 75:5,
75:9, 75:14, 75:21,
76:10, 76:13, 76:15,
76:22, 77:2, 77:10,
77:23, 78:1, 78:6,
78:9, 78:25, 79:8,
79:14, 79:16, 79:18,
79:20, 80:2, 81:19,
82:16, 82:21, 83:2,
83:11, 83:14, 83:21,
84:2, 86:5, 88:21,
89:4, 90:4, 90:8,
90:11, 91:8, 91:13,
91:15, 93:9, 93:11,
93:13, 93:16, 93:20,
95:3, 95:10, 95:14,
95:18, 95:22, 96:4,
96:8, 96:14, 96:17,
96:20, 96:22, 97:8,
121:16, 121:20,
121:22, 122:19,
122:22, 126:7,
127:9, 127:11,
128:3, 128:10,
137:1, 137:14,
137:19, 141:19,
142:1, 142:7,
142:13, 143:5,
143:7, 145:24,
146:1, 146:5, 146:7,
146:18, 147:1,
147:4, 147:7, 148:8,
150:10, 151:10,
152:6, 153:17,
154:11, 154:20,
155:9, 158:12,
158:18, 158:24,
161:17, 161:23,
162:7, 164:18,
165:4, 165:9,
165:18, 169:10,
169:12, 171:10,
171:11, 172:3,
172:8, 172:10,

172:13, 173:23,
174:20, 175:4,
175:7, 176:18,
176:21, 179:8,
179:18, 182:2,
182:5, 182:7,
182:18, 183:2,
183:4, 183:6, 186:7,
186:10, 186:23,
188:20, 188:22,
188:24, 189:2,
189:11, 189:18,
190:24, 191:2,
191:9, 191:19,
192:1, 193:2, 195:9,
197:20, 199:4,
201:7, 207:10,
208:18, 222:5,
223:18, 224:21,
230:4, 230:6, 230:9,
233:13, 233:18,
233:25, 234:2,
234:7, 234:10,
234:21, 235:3,
235:14, 239:4,
239:15, 241:6,
241:8, 244:20,
247:12, 247:21,
248:9, 248:25,
249:4, 249:20,
250:1, 250:15,
251:5, 251:9,
251:12, 251:20,
251:22, 251:24,
252:2, 252:5,
252:11, 252:15,
254:5
**Ponds** [34] - 4:6, 4:19,
5:15, 8:24, 11:5,
11:8, 11:20, 16:24,
17:6, 43:12, 46:4,
49:25, 50:5, 53:20,
56:7, 65:15, 66:17,
66:22, 71:10, 71:16,
83:4, 83:10, 145:22,
152:5, 161:9, 169:9,
171:9, 171:19,
179:7, 235:15,
241:5, 248:6, 250:4
**Ponds)**....................
................. [3] - 3:4,
3:5, 3:7
**Ponds)**....................
.................**240** [1] -
3:8
**portable** [2] - 154:9,
155:2
**portion** [9] - 30:20,
30:25, 31:4, 53:23,
54:22, 174:21,

175:9, 175:12,
242:19
**pose** [2] - 174:9, 237:6
**posed** [7] - 14:17,
172:18, 172:21,
173:5, 174:14,
174:18, 235:18
**poses** [4] - 205:10,
205:25, 216:1, 216:5
**position** [6] - 14:2,
14:8, 17:8, 18:21,
19:7, 160:25
**possess** [1] - 234:8
**possessed** [7] - 17:25,
18:14, 18:15,
101:17, 104:5,
234:3, 247:1
**possession** [1] -
106:25
**possibility** [3] - 94:24,
215:7, 216:14
**possible** [2] - 21:3,
121:11
**post** [2] - 58:25
**Post** [1] - 5:21
**potential** [2] - 214:24,
227:3
**potentially** [1] - 91:21
**PPK/S** [2] - 225:19,
225:23
**practice** [1] - 142:4
**practices** [28] -
116:23, 117:4,
118:5, 120:9,
120:11, 120:17,
121:18, 126:9,
128:4, 128:9,
134:17, 134:22,
141:5, 150:1,
157:14, 160:3,
161:5, 163:24,
166:12, 167:19,
168:15, 169:2,
171:15, 172:16,
180:21, 185:6,
193:23, 194:15
**practicum** [1] - 212:15
**precinct** [1] - 100:12
**Precinct** [7] - 100:23,
101:4, 101:8,
101:20, 101:25,
102:17, 103:1
**prejudicial** [2] -
190:18, 235:12
**preliminary** [1] -
218:23
**prepared** [3] - 89:17,
91:17, 218:11
**prescribed** [1] -
157:23

**presence** [1] - 184:13
**present** [2] - 8:25,
94:20
**presents** [1] - 15:8
**President** [2] - 104:14,
109:6
**president** [2] - 104:18
**pretrial** [3] - 122:6,
141:14, 141:22
**pretty** [2] - 241:20,
251:1
**prevent** [1] - 184:10
**preventing** [1] -
184:11
**previous** [13] - 59:15,
62:9, 62:13, 62:18,
63:8, 63:12, 77:7,
77:19, 78:16, 96:5,
147:13, 168:9,
191:22
**previously** [10] - 41:3,
60:12, 123:5, 125:8,
133:11, 133:20,
137:9, 176:11,
176:12, 179:16
**primarily** [1] - 120:22
**Prince** [7] - 117:17,
117:20, 117:21,
120:23, 128:24,
130:1, 131:6
**principle** [2] - 203:11,
216:17
**principles** [1] - 202:13
**priorities** [1] - 217:6
**private** [1] - 181:15
**privileged** [2] - 114:1,
211:8
**probable** [12] - 149:16,
164:24, 164:25,
165:1, 165:5,
165:10, 165:12,
165:15, 165:20,
165:22, 165:25,
200:9
**problem** [20] - 14:17,
144:18, 144:20,
146:16, 152:18,
201:5, 201:11,
201:12, 213:20,
221:14, 221:15,
223:3, 223:10,
223:16, 226:11,
242:5, 245:23,
250:11, 251:2, 251:4
**problematic** [1] -
249:21
**problems** [3] - 142:24,
220:16, 220:24
**procedure** [2] - 86:25,
89:14

**Procedures** [1] - 129:1
**procedures** [28] -
116:23, 117:4,
118:5, 121:19,
121:20, 126:9,
128:4, 128:9,
134:18, 134:22,
141:5, 150:1,
156:16, 157:15,
160:4, 161:6,
163:25, 166:12,
167:20, 168:15,
169:3, 171:15,
172:17, 180:21,
185:6, 193:23,
194:16, 212:13
**proceed** [1] - 10:10
**proceeding** [2] -
164:7, 222:18
**Proceedings** [1] - 1:24
**proceedings** [2] -
171:3, 254:14
**process** [2] - 121:12,
140:23
**produced** [1] - 1:25
**proffer** [4] - 9:1,
121:17, 126:8, 128:3
**profile** [2] - 113:15,
113:16
**program** [2] - 112:15,
188:6
**progression** [1] -
136:24
**prohibited** [2] -
210:21, 211:2
**projectiles** [1] - 16:19
**promoted** [1] - 107:21
**promotions** [1] -
107:19
**proper** [7] - 47:11,
112:22, 123:15,
141:15, 141:18,
141:20, 166:25
**propose** [1] - 7:16
**proposed** [3] - 6:19,
7:8, 8:12
**propriety** [1] - 147:21
**protect** [5] - 16:19,
42:20, 181:11,
217:4, 217:7
**protected** [1] - 113:7
**protection** [3] - 110:6,
115:12, 217:7
**protective** [4] -
104:15, 104:24,
115:4, 115:5
**protocol** [1] - 118:5
**Protocols** [1] - 129:1
**protocols** [29] -
116:23, 117:5,

120:9, 120:11,
121:18, 126:9,
128:5, 128:9,
134:17, 134:22,
141:5, 150:2,
156:16, 157:15,
160:3, 161:6,
163:25, 166:13,
167:20, 168:15,
169:2, 171:15,
172:17, 180:21,
181:9, 185:6,
193:24, 194:15,
212:13
**provide** [8] - 9:1,
22:14, 22:17, 24:10,
24:14, 121:24,
128:8, 179:16
**provided** [9] - 22:19,
24:11, 41:3, 123:13,
180:4, 180:8,
184:16, 184:20,
191:16
**providing** [2] - 30:15,
33:1
**province** [2] - 171:24,
172:5
**provisionally** [1] -
91:10
**provisions** [3] - 124:3,
151:17, 186:2
**PSA** [1] - 84:16
**public** [5] - 131:24,
181:13, 181:15,
192:17, 217:4
**publications** [1] -
121:13
**publish** [9] - 53:22,
82:21, 137:19,
155:9, 162:7, 162:9,
179:18, 183:2, 192:1
**pull** [3] - 39:20, 80:23,
231:25
**pulled** [2] - 6:23, 41:10
**punched** [1] - 138:6
**punches** [1] - 139:12
**purpose** [6] - 42:20,
85:1, 85:14, 160:23,
167:13, 181:5
**purposes** [2] - 52:3,
81:22
**pursuant** [4] - 95:7,
147:9, 171:17, 205:7
**pursue** [3] - 145:11,
146:21, 198:7
**pursued** [8] - 149:14,
157:22, 164:16,
167:12, 198:3,
198:4, 220:21,
221:11

**pursues** [1] - 243:2
**pursuing** [10] -
139:22, 148:18,
150:3, 150:7,
151:20, 152:1,
156:23, 164:8,
164:9, 243:1
**pursuit** [14] - 134:5,
135:4, 147:21,
149:15, 149:19,
150:8, 150:12,
154:10, 156:4,
165:12, 174:10,
213:4, 213:5, 232:24
**pursuits** [12] - 124:14,
124:17, 124:20,
132:8, 133:2,
150:20, 150:21,
150:22, 151:14,
151:22, 212:21,
212:22
**Pursuits** [3] - 151:8,
155:5, 157:4
**put** [19] - 11:17, 57:25,
59:13, 75:15, 75:23,
76:20, 77:3, 77:11,
91:21, 93:11,
102:18, 111:13,
120:16, 134:18,
157:24, 194:20,
198:24, 233:23,
240:25

**Q**

**qualified** [16] - 99:17,
99:19, 116:22,
117:3, 117:10,
118:1, 118:4,
121:24, 122:9,
122:11, 122:12,
122:15, 126:20,
126:21, 127:5, 128:8
**qualify** [1] - 204:15
**question's** [1] - 27:17
**questioned** [7] - 16:8,
17:9, 22:13, 24:2,
24:7, 25:5, 25:8
**questioning** [2] - 15:9,
249:22
**questions** [28] - 20:19,
20:24, 22:9, 25:3,
33:12, 37:6, 43:15,
45:14, 47:24, 71:11,
83:2, 89:5, 93:14,
99:20, 122:17,
127:9, 172:2,
195:12, 195:13,
218:7, 240:8,
240:13, 241:3,
241:9, 241:25,

**pursues** [1] - 243:2 (dup)
**pursuing** [10] - (dup)

243:25, 246:12,
250:5
**quick** [3] - 10:13,
30:22, 89:13
**quickens** [2] - 147:17,
147:22
**quickly** [8] - 30:20,
30:22, 30:25, 31:11,
31:19, 197:19,
208:10, 247:22
**quite** [2] - 62:11,
222:24
**quote** [1] - 141:23
**quote-unquote** [1] -
141:23
**quoted** [1] - 6:19
**quoting** [1] - 162:4

**R**

**raise** [4] - 4:9, 93:20,
227:3, 231:1
**raised** [2] - 19:17,
227:5
**raises** [1] - 216:13
**Ralphael** [75] - 17:25,
22:14, 23:8, 24:3,
24:8, 24:18, 24:25,
25:25, 26:16, 29:24,
30:17, 30:19, 31:13,
31:22, 33:18, 35:18,
39:19, 40:5, 41:8,
41:16, 42:2, 44:8,
45:9, 50:13, 50:18,
50:20, 51:2, 51:4,
51:7, 57:12, 60:16,
82:3, 88:25, 93:25,
144:21, 145:11,
148:25, 150:12,
159:2, 159:3, 165:6,
165:10, 165:12,
165:23, 166:1,
166:13, 167:1,
168:1, 168:17,
168:23, 171:17,
172:17, 173:3,
173:5, 173:21,
174:14, 174:17,
175:15, 175:18,
175:24, 176:25,
177:3, 177:6,
184:24, 193:4,
193:14, 195:4,
242:6, 242:20,
242:24, 245:1,
245:16, 246:19,
247:1, 250:12
**ran** [10] - 167:12,
176:23, 198:3,
198:13, 219:22,
220:13, 221:9,

221:10, 221:13,
231:22
**range** [2] - 72:6,
214:18
**rank** [1] - 103:9
**rapidly** [1] - 204:20
**Rashida** [1] - 7:18
**rates** [1] - 121:6
**rather** [2] - 31:15,
228:17
**RDR** [3] - 2:10, 254:11,
254:18
**re** [1] - 95:23
**re-mark** [1] - 95:23
**reach** [3] - 159:25,
160:10, 247:10
**reached** [5] - 120:13,
195:3, 219:18,
236:21, 250:19
**reaching** [3] - 172:23,
173:1, 185:10
**reaction** [3] - 229:25,
230:1, 246:13
**read** [17] - 8:11, 9:9,
46:1, 100:7, 129:19,
129:21, 152:7,
152:9, 152:11,
179:21, 230:1,
237:16, 238:9,
238:12, 246:13,
249:25, 253:5
**reading** [4] - 5:20,
152:13, 154:3,
160:16
**ready** [9] - 4:15, 4:18,
8:25, 10:9, 20:3,
46:6, 51:24, 170:25,
198:11
**Reagan** [1] - 109:6
**real** [8] - 34:17, 204:3,
209:18, 226:2,
227:7, 236:17,
236:24
**realize** [2] - 29:8,
42:25
**realized** [3] - 28:2,
28:20, 222:7
**really** [14] - 34:19,
48:4, 138:5, 138:12,
139:13, 205:20,
209:19, 210:9,
213:9, 236:25,
249:21, 251:16
**reason** [10] - 7:11,
139:6, 144:23,
149:15, 167:6,
185:22, 218:4,
229:1, 246:24
**reasonable** [44] -
15:22, 15:25, 16:4,

16:20, 72:9, 141:3,
149:25, 156:14,
157:13, 160:1,
161:4, 163:23,
164:11, 164:23,
166:11, 167:18,
168:14, 172:15,
180:6, 183:19,
184:15, 184:18,
193:21, 194:14,
200:10, 200:15,
201:1, 201:16,
203:13, 204:1,
205:8, 205:12,
205:22, 205:23,
209:20, 209:24,
210:12, 210:25,
211:6, 211:13,
214:3, 215:5, 216:6
**reasonableness** [1] -
203:12
**reasonably** [2] -
211:7, 214:8
**reasons** [3] - 190:21,
233:22, 246:22
**rebuttal** [3] - 93:8,
93:10, 170:14
**receive** [12] - 107:19,
108:15, 108:24,
111:7, 111:8,
111:25, 112:11,
114:18, 115:3,
115:4, 115:7, 115:15
**received** [24] - 108:5,
108:7, 108:11,
108:18, 108:19,
108:20, 108:21,
108:22, 108:23,
109:2, 109:10,
109:23, 110:2,
110:8, 110:11,
110:12, 110:24,
111:2, 113:18,
115:20, 115:21,
115:24, 135:8, 196:7
**receiving** [1] - 111:11
**recess** [3] - 17:7,
19:11, 92:13
**Recess** [3] - 19:14,
52:14, 169:22
**recklessly** [1] - 180:16
**recognize** [5] - 80:9,
81:4, 81:24, 137:7,
162:1
**recognized** [1] -
234:16
**recognizes** [1] -
134:21
**recollection** [12] -
32:15, 32:17, 33:6,

33:12, 33:16, 86:2,
150:25, 182:15,
227:16, 227:22,
228:2, 242:22
**recollections** [1] -
86:10
**reconvene** [1] - 90:14
**record** [14] - 7:21,
21:22, 45:22, 48:3,
49:9, 84:7, 93:23,
94:2, 97:11, 122:18,
127:5, 147:11,
251:1, 251:16
**record's** [1] - 50:6
**recorded** [2] - 1:24,
23:14
**recovered** [6] - 12:1,
66:2, 70:10, 104:3,
109:7, 238:19
**Recovery** [4] - 219:20,
219:21, 220:10,
220:13
**recross** [1] - 249:12
**recruit** [3] - 187:17,
187:20, 188:6
**recruits** [1] - 187:12
**red** [1] - 157:24
**redacted** [3] - 129:11,
129:12, 129:15
**redactions** [2] - 91:11,
252:13
**REDIRECT** [1] - 241:7
**redirect** [3] - 90:4,
249:3, 249:5
**REDRUM** [5] - 106:11,
106:13, 107:7,
119:14, 119:20
**reduction** [1] - 108:9
**refer** [2] - 202:19,
216:16
**reference** [5] - 9:7,
45:9, 247:15,
249:22, 253:22
**referencing** [1] -
145:21
**referred** [1] - 9:8
**referring** [4] - 9:11,
36:11, 43:6, 153:12
**reflect** [5] - 15:16,
45:22, 244:7,
244:10, 245:7
**reflected** [3] - 16:7,
153:15, 153:19
**reflects** [1] - 244:12
**refresh** [13] - 27:22,
27:25, 32:10, 32:14,
33:5, 33:11, 33:16,
45:18, 86:1, 150:24,
182:15, 227:22,
228:2

**refreshed** [2] - 32:12,
32:17
**refresher** [1] - 72:5
**refreshes** [1] - 86:9
**regard** [1] - 21:22
**regarding** [5] - 29:23,
124:8, 134:17,
210:19, 212:21,
231:9
**Register** [1] - 182:11
**registered** [2] - 87:5,
194:24
**regulation** [3] -
181:22, 182:17,
210:18
**regulations** [5] -
120:8, 151:18,
181:16, 186:25,
216:23
**Regulations** [4] -
179:13, 180:1,
182:11, 188:8
**rehashes** [1] - 187:10
**relate** [2] - 147:2,
147:6
**related** [4] - 106:17,
119:14, 127:13,
221:7
**relates** [1] - 239:20
**relating** [1] - 124:11
**Relations** [1] - 118:16
**relevance** [5] - 186:5,
189:17, 196:3,
197:18, 199:2
**relevancy** [1] - 207:10
**relied** [4] - 140:11,
143:9, 187:1, 243:23
**rely** [3] - 172:23,
186:12, 186:20
**relying** [1] - 245:23
**remainder** [1] - 118:21
**remark** [1] - 88:5
**remember** [17] - 8:2,
8:15, 17:11, 17:16,
24:4, 25:23, 26:6,
29:25, 33:10, 45:6,
63:12, 63:20, 64:19,
85:24, 88:15, 219:2,
248:20
**remind** [1] - 17:2
**render** [5] - 143:22,
163:22, 194:18,
217:18, 234:17
**rendered** [3] - 163:16,
194:13, 195:2
**rendering** [7] - 163:11,
163:22, 185:5,
187:1, 193:21,
224:6, 236:24
**renew** [1] - 191:19

**renewal** [1] - 126:8
**reorganization** [1] -
102:18
**rep** [1] - 187:5
**repeat** [7] - 22:24,
42:1, 68:14, 68:17,
115:18, 144:19,
151:5
**repeating** [1] - 218:17
**repetition** [2] - 187:4,
187:6
**repetitive** [1] - 239:16
**rephrase** [14] - 50:19,
62:12, 63:18, 66:19,
70:4, 88:8, 152:5,
156:11, 173:23,
186:10, 186:23,
186:24, 201:8, 222:7
**report** [23] - 95:6,
95:15, 95:16, 96:1,
129:2, 129:10,
129:11, 129:12,
219:17, 220:3,
220:4, 220:5,
221:24, 224:1,
227:16, 227:20,
228:21, 244:1,
244:3, 244:10,
245:10, 252:8
**REPORTER** [1] -
254:9
**reporter** [8] - 6:23,
208:7, 215:19,
215:21, 216:1,
216:5, 216:7, 218:5
**Reporter** [3] - 2:10,
2:10, 254:18
**reporter's** [1] - 215:17
**reports** [3] - 159:8,
219:11, 223:15
**represent** [2] - 225:18,
225:20
**representative** [2] -
93:25, 94:8
**representing** [1] -
218:13
**reproductions** [1] -
129:13
**requalify** [3] - 72:6,
214:17, 214:20
**request** [8] - 20:19,
20:20, 137:15,
154:12, 161:18,
189:12, 191:19
**requested** [1] - 88:16
**required** [5] - 25:11,
115:2, 187:12,
187:15, 187:20
**research** [4] - 52:1,
90:16, 169:15, 253:6

**reserve** [1] - 20:24
**resist** [1] - 136:14
**resistance** [7] -
  136:21, 138:19,
  138:22, 139:4,
  139:23, 176:12,
  176:16
**resolve** [1] - 21:14
**resort** [2] - 211:18,
  211:19
**resorting** [2] - 183:20,
  184:2
**respect** [2] - 91:21,
  251:3
**respond** [4] - 84:23,
  136:11, 211:18
**responded** [2] - 85:3,
  87:19
**responding** [1] - 85:1
**response** [7] - 30:1,
  30:2, 30:7, 46:10,
  46:11, 192:21,
  246:13
**responses** [1] - 192:8
**responsibilities** [8] -
  84:17, 124:25,
  125:9, 132:18,
  132:25, 135:7,
  168:12, 188:12
**Responsibilities** [3] -
  189:9, 189:22, 190:1
**responsible** [1] -
  120:1
**rest** [6] - 19:9, 91:8,
  91:13, 91:14, 91:16,
  94:18
**restate** [1] - 186:6
**resting** [1] - 252:24
**restroom** [1] - 250:23
**result** [6] - 16:14,
  20:10, 179:3, 180:7,
  184:19, 240:2
**Resumed** [1] - 22:5
**retained** [3] - 128:15,
  128:16, 217:10
**retake** [1] - 78:25
**retired** [2] - 102:9,
  120:10
**retirement** [4] - 116:3,
  118:11, 120:4,
  120:21
**retrieve** [1] - 83:21
**return** [1] - 90:25
**returned** [2] - 197:15,
  198:6
**reverse** [17] - 12:7,
  70:19, 73:4, 73:19,
  74:16, 74:21, 75:1,
  75:5, 75:9, 75:14,
  75:23, 76:10, 77:2,

78:10, 78:18, 78:22,
  78:23
**reversed** [1] - 78:21
**review** [22] - 7:10,
  23:18, 33:5, 97:18,
  130:3, 135:3,
  144:25, 155:16,
  156:8, 158:25,
  159:5, 159:7,
  159:10, 159:12,
  163:7, 163:10,
  185:12, 185:24,
  222:8, 222:10,
  241:11, 245:15
**reviewed** [21] - 128:16,
  128:19, 128:20,
  142:22, 148:17,
  156:25, 159:4,
  164:22, 186:13,
  186:14, 218:25,
  219:3, 219:8,
  219:11, 220:7,
  222:12, 222:13,
  222:19, 222:20,
  223:14, 223:15
**reviewing** [6] - 134:24,
  156:8, 156:13,
  164:21, 176:3,
  189:21
**reviews** [6] - 33:7,
  44:17, 46:6, 80:8,
  81:25, 86:11
**revision** [1] - 192:18
**rewind** [1] - 175:8
**RFK** [1] - 101:9
**riding** [1] - 194:9
**rights** [3] - 113:7,
  171:17, 172:6
**rise** [1] - 121:8
**risk** [1] - 198:24
**Road** [8] - 84:24,
  88:14, 155:18,
  177:2, 177:13,
  178:21, 196:9, 247:2
**robberies** [2] - 101:11,
  101:12
**ROBERT** [1] - 2:2
**Robert** [1] - 4:7
**robert.deberardinis
  @dc.gov** [1] - 2:5
**Roberto** [1] - 152:11
**rode** [1] - 201:10
**role** [4] - 110:20,
  110:21, 232:10
**Roman** [2] - 156:2,
  162:14
**Room** [2] - 2:11,
  254:19
**room** [5] - 87:25, 88:1,
  89:13, 89:16, 89:22

**rotated** [5] - 33:23,
  34:1, 34:2, 34:3,
  41:8
**rotation** [1] - 119:22
**rounds** [1] - 41:15
**royals** [1] - 110:6
**Rule** [4] - 91:20,
  182:12, 185:15,
  185:16
**rule** [7] - 42:20,
  151:25, 160:25,
  181:10, 186:2,
  186:14
**Rules** [5] - 158:9,
  160:11, 160:17,
  161:11, 162:6
**rules** [5] - 132:1,
  132:4, 151:16,
  151:18, 162:16
**ruling** [6] - 20:5, 95:7,
  96:4, 96:6, 233:20,
  235:10
**run** [8] - 10:15, 90:16,
  112:15, 144:9,
  144:10, 146:20,
  147:22, 197:14
**rung** [1] - 136:9
**running** [35] - 31:8,
  31:9, 31:11, 31:14,
  34:17, 34:19, 44:10,
  44:11, 45:5, 138:13,
  138:21, 139:4,
  139:6, 139:13,
  139:21, 139:23,
  153:3, 163:6,
  164:17, 173:10,
  173:11, 175:17,
  175:19, 175:25,
  176:9, 176:25,
  185:21, 205:19,
  242:20, 242:24,
  243:10, 243:18,
  245:4, 245:16, 247:2
**runs** [3] - 134:3,
  161:14, 163:3
**rushing** [1] - 205:19

## S

**safety** [3] - 167:7,
  240:19, 241:1
**San** [1] - 116:13
**saturate** [1] - 100:9
**saw** [35] - 5:2, 17:4,
  29:6, 31:25, 32:7,
  33:22, 33:24, 34:23,
  34:25, 35:1, 39:20,
  40:11, 40:14, 40:15,
  40:16, 40:18, 44:10,
  60:13, 62:18, 62:22,

64:16, 76:8, 78:23,
  163:4, 174:19,
  208:4, 227:2,
  229:23, 231:17,
  237:17, 238:10,
  238:13, 238:14
**SBO** [2] - 232:3, 232:5
**scale** [1] - 210:16
**scaled** [3] - 196:21,
  196:22, 197:10
**scared** [4] - 7:19, 8:7,
  8:8, 21:20
**scenario** [2] - 221:6,
  221:7
**scene** [13] - 13:13,
  17:3, 46:19, 47:16,
  66:2, 80:15, 129:9,
  167:1, 176:5,
  178:20, 185:12,
  203:14, 238:19
**schedule** [1] - 90:24,
  93:3, 94:17
**scheduled** [1] - 52:4
**school** [9] - 98:6,
  98:10, 98:12, 112:3,
  112:13, 112:21,
  113:18, 114:19,
  198:12
**School** [4] - 98:11,
  112:2, 116:16,
  196:14
**schooling** [1] - 115:21
**schools** [2] - 97:24,
  116:4
**scope** [2] - 193:6,
  193:7
**Scotland** [2] - 110:2,
  110:3
**screen** [16] - 11:21,
  12:11, 12:12, 12:15,
  12:17, 20:23, 41:5,
  43:7, 54:21, 59:18,
  62:21, 64:11, 64:13,
  68:12, 78:13
**screens** [2] - 12:13,
  20:22
**search** [1] - 113:7
**searching** [1] - 121:10
**seated** [2] - 50:22,
  50:25
**Second** [1] - 129:5
**second** [21] - 40:1,
  53:14, 63:21, 68:23,
  70:5, 79:5, 106:19,
  108:19, 110:8,
  110:12, 111:2,
  161:8, 188:16,
  190:6, 204:19,
  204:23, 205:1,
  214:5, 229:21,

231:24, 245:12
**second-year** [1] -
  53:14
**secondly** [1] - 237:5
**seconds** [2] - 208:13,
  214:11
**Secret** [5] - 104:13,
  104:22, 115:8,
  115:9, 115:13
**Secretary** [3] - 108:24,
  109:3, 109:5
**Section** [6] - 145:18,
  155:25, 156:2,
  182:1, 185:8
**section** [5] - 73:24,
  162:14, 179:6,
  179:21, 192:10
**security** [1] - 103:14
**see** [165] - 6:18, 7:5,
  10:18, 10:25, 11:6,
  11:15, 11:25, 12:11,
  12:12, 12:14, 12:16,
  12:17, 13:25, 16:2,
  18:8, 18:18, 21:7,
  30:9, 32:14, 34:12,
  35:2, 35:3, 35:7,
  35:14, 35:15, 35:17,
  35:18, 35:19, 35:20,
  35:22, 35:24, 35:25,
  36:2, 36:3, 36:21,
  36:22, 36:25, 37:1,
  37:8, 37:11, 37:14,
  37:21, 38:1, 38:9,
  38:10, 38:16, 38:20,
  38:22, 39:13, 39:14,
  39:15, 39:16, 40:22,
  41:20, 41:23, 42:6,
  42:8, 45:5, 46:7,
  48:18, 52:18, 52:20,
  54:8, 54:10, 54:11,
  55:5, 55:19, 56:15,
  56:17, 57:13, 57:15,
  57:17, 58:2, 58:5,
  58:14, 58:20, 58:23,
  59:1, 59:3, 59:8,
  59:20, 59:23, 60:4,
  60:9, 60:12, 60:19,
  61:23, 62:4, 62:21,
  62:24, 63:1, 63:6,
  63:7, 63:21, 63:23,
  64:17, 64:19, 66:4,
  66:6, 70:19, 70:25,
  71:5, 72:23, 72:24,
  73:6, 73:12, 73:20,
  73:21, 73:25, 74:3,
  74:7, 74:12, 74:18,
  74:23, 75:2, 75:6,
  75:11, 75:17, 75:18,
  75:24, 76:2, 76:4,
  76:25, 77:5, 77:12,

25

77:15, 77:25, 78:3,
78:4, 78:12, 78:13,
78:22, 79:6, 79:10,
80:21, 82:24, 86:9,
87:22, 95:21,
137:21, 150:23,
153:7, 163:6,
169:21, 170:11,
177:2, 177:6,
189:18, 211:24,
224:11, 224:13,
224:24, 250:1,
253:5, 253:7, 254:1,
254:3
**seed** [1] - 191:3
**seeing** [1] - 68:23
**segments** [1] - 53:3
**seize** [5] - 150:7,
165:10, 200:8,
200:11, 201:18
**seized** [6] - 167:21,
194:3, 194:19,
194:20, 201:3,
201:13
**seizing** [1] - 167:13
**seizure** [5] - 113:8,
149:17, 163:13,
163:14, 201:9
**selected** [1] - 103:5
**send** [1] - 120:14
**sense** [4] - 90:13,
210:11, 236:17,
236:24
**sent** [2] - 112:21,
114:20
**separate** [2] - 15:3,
165:7
**Sergeant** [1] - 91:22
**Series** [2] - 128:24,
148:12
**series** [1] - 146:2
**serious** [17] - 180:7,
184:19, 204:1,
205:11, 205:25,
209:24, 210:25,
211:8, 211:13,
211:22, 212:1,
214:3, 214:9, 215:6,
216:6, 216:14,
245:21
**seriously** [1] - 218:9
**serve** [1] - 170:3
**Service** [5] - 104:13,
104:23, 115:8,
115:9, 115:13
**service** [5] - 102:24,
107:16, 108:6,
118:18, 185:25
**set** [6] - 71:13, 71:15,
151:18, 187:13,

198:11, 248:18
**setting** [1] - 71:17
**settled** [1] - 4:11
**seven** [2] - 117:6,
134:14
**seventh** [1] - 84:16
**Seventh** [2] - 84:17,
198:10
**several** [8] - 97:15,
108:11, 118:14,
170:4, 206:24,
222:12
**sex** [1] - 103:21
**shadow** [7] - 58:9,
61:25, 62:1, 234:14,
243:7, 243:8, 243:14
**shadows** [1] - 224:13
**shall** [6] - 160:19,
160:24, 161:12,
183:19, 184:7, 185:2
**Sheehan** [7] - 91:1,
91:24, 92:5, 170:25,
238:12, 241:10,
253:17
**shell** [12] - 13:4, 13:12,
16:11, 16:16, 70:8,
70:9, 81:6, 81:7,
81:9, 81:12, 81:25,
82:2
**shoe** [1] - 198:14
**shoot** [36] - 138:7,
138:14, 139:10,
139:15, 164:11,
165:22, 165:23,
173:9, 181:13,
204:25, 210:6,
211:1, 211:11,
212:2, 212:7, 212:8,
212:9, 212:11,
212:12, 212:14,
212:18, 213:18,
214:4, 214:12,
215:16, 215:20,
216:7, 230:5,
230:12, 230:14,
230:23, 231:2,
239:21, 239:22
**shooting** [37] - 22:14,
27:5, 27:24, 33:18,
45:13, 45:15, 46:8,
48:19, 50:3, 50:8,
129:8, 135:5, 153:8,
158:4, 159:15,
159:19, 159:25,
163:13, 163:19,
167:14, 167:25,
168:1, 169:8, 173:5,
184:24, 194:6,
210:19, 210:22,
211:2, 212:15,

214:21, 215:19,
217:12, 236:22,
237:2, 249:16,
249:23
**shoots** [1] - 178:24
**short** [5] - 84:14,
91:25, 93:12,
102:16, 106:6
**short-term** [1] - 106:6
**shortly** [1] - 217:12
**shot** [48] - 16:13, 19:6,
23:8, 24:3, 24:8,
24:18, 24:25, 25:25,
26:16, 29:24, 30:17,
30:19, 31:3, 31:7,
31:23, 39:6, 40:6,
50:18, 50:21, 51:1,
51:4, 57:19, 82:3,
167:21, 168:17,
168:23, 172:21,
175:20, 193:16,
194:2, 194:19,
194:20, 194:22,
198:10, 198:19,
200:20, 200:21,
200:22, 201:13,
201:16, 214:25,
227:17, 231:23,
236:19, 237:5,
237:7, 245:8
**shots** [11] - 40:2,
41:22, 41:25, 42:2,
42:10, 42:13, 50:12,
50:16, 82:5, 159:1,
159:2
**shoulder** [1] - 37:12
**show** [29] - 13:18,
15:11, 15:15, 18:16,
19:2, 34:4, 36:14,
36:15, 36:19, 36:21,
47:6, 48:16, 70:24,
71:10, 79:23, 80:6,
81:22, 86:8, 95:23,
137:4, 154:22,
154:24, 161:25,
182:9, 189:5,
216:18, 216:22,
225:3
**showed** [5] - 17:22,
18:17, 27:2, 86:1,
242:19
**showing** [8] - 28:23,
45:22, 53:2, 53:3,
69:24, 95:24, 228:1
**shown** [2] - 62:13,
70:6
**shows** [5] - 15:8,
28:21, 29:5, 65:13,
69:9
**Shultz** [3] - 109:1,

109:3, 109:5
**sic** [3] - 155:17, 188:7,
233:19
**side** [8] - 10:14, 21:8,
178:3, 197:11,
197:13, 227:18,
228:7, 228:8
**sidewalk** [46] - 11:15,
11:16, 11:17, 11:18,
11:25, 12:2, 12:8,
13:17, 17:14, 19:8,
19:18, 31:14, 55:3,
55:5, 58:6, 59:2,
59:4, 59:9, 60:19,
61:21, 61:24, 63:2,
63:11, 63:13, 64:21,
66:9, 66:10, 67:14,
68:10, 68:16, 69:14,
72:25, 73:7, 78:19,
81:2, 82:11, 153:3,
175:19, 177:1,
231:22, 242:25,
243:10, 243:18,
245:4, 245:17
**sign** [4] - 58:8, 58:25,
61:23
**signal** [2] - 72:20,
72:21
**signed** [1] - 23:20
**similar** [2] - 131:3,
133:18
**simply** [4] - 50:7,
161:14, 163:3,
245:23
**single** [1] - 6:4
**siren** [6] - 154:8,
155:2, 156:7,
156:21, 157:24,
213:7
**sirens** [3] - 150:16,
151:19, 152:15
**sites** [1] - 104:20
**sitting** [4] - 14:6,
53:12, 216:8, 217:25
**situation** [3] - 138:3,
162:12, 204:21
**situations** [1] - 136:7
**six** [3] - 105:24,
134:13, 214:17
**slave** [1] - 103:21
**sleep** [2] - 67:9, 89:23
**slightly** [1] - 58:5
**slow** [5] - 175:8,
175:14, 176:18,
176:23, 243:11
**slower** [1] - 175:1
**slowing** [3] - 30:7,
30:8, 53:1
**small** [16] - 12:2,
12:12, 12:14, 12:17,

16:2, 20:21, 57:9,
62:22, 62:24, 63:1,
68:25, 69:24, 78:4,
79:11, 174:21, 198:1
**smaller** [4] - 54:17,
108:9, 134:10, 226:8
**smart** [1] - 143:3
**someone** [11] - 9:23,
47:15, 100:7, 152:1,
191:16, 200:8,
215:7, 215:8,
226:15, 232:8
**sometimes** [12] -
104:16, 113:23,
114:8, 207:17,
208:12, 232:9,
242:2, 245:23, 250:8
**somewhat** [1] - 90:13
**somewhere** [2] - 49:1,
69:1
**soon** [4] - 41:10, 51:4,
57:19, 142:9
**sorry** [38] - 11:9,
21:13, 25:7, 27:10,
29:20, 44:25, 65:12,
68:13, 68:18, 76:15,
79:25, 80:2, 80:21,
88:20, 99:18,
100:22, 145:20,
146:5, 148:21,
151:3, 153:23,
158:11, 158:21,
160:13, 161:9,
166:16, 168:12,
186:6, 208:6,
208:20, 209:9,
212:4, 219:5,
219:10, 231:10,
232:21, 251:22
**sought** [2] - 180:5,
184:17
**sound** [1] - 95:14
**sounded** [1] - 206:10
**sounding** [1] - 205:20
**soup** [1] - 120:3
**source** [1] - 113:11
**sources** [1] - 121:14
**southeast** [1] - 98:1
**Southeast** [2] - 84:24,
97:25
**space** [1] - 181:13
**speaking** [2] - 136:20,
183:23
**spec** [1] - 16:8
**Special** [1] - 110:11
**special** [9] - 99:24,
99:25, 101:2,
101:13, 110:14,
110:20, 120:16,
128:21, 188:3

**specialized** [6] - 100:4, 100:15, 100:17, 101:5, 115:25, 116:1
**specially** [1] - 106:24
**specialty** [1] - 106:19
**specific** [14] - 18:22, 21:1, 33:7, 33:9, 48:16, 87:21, 108:9, 110:22, 133:23, 134:25, 135:9, 181:10, 191:11
**specifically** [19] - 32:19, 45:16, 71:20, 85:25, 100:6, 108:14, 110:5, 127:2, 132:24, 150:11, 151:14, 162:18, 163:8, 166:22, 178:22, 179:6, 234:4, 235:8, 250:17
**specify** [1] - 165:21
**spectrum** [5] - 135:24, 135:25, 136:1, 136:4, 140:1
**speed** [6] - 53:5, 53:6, 174:24, 175:1, 175:4, 176:4
**spelled** [1] - 106:14
**spent** [10] - 69:5, 81:25, 102:14, 104:21, 105:1, 113:3, 113:9, 113:10, 114:22, 115:16
**spine** [1] - 228:13
**split** [4] - 165:9, 204:19, 204:23, 204:25
**split-second** [2] - 204:19, 204:23
**spray** [3] - 136:15, 136:16, 210:1
**Stadium** [1] - 101:9
**staff** [1] - 88:12
**stand** [9] - 20:23, 55:7, 64:6, 71:15, 78:25, 83:12, 106:13, 113:25, 236:12
**standard** [37] - 89:14, 125:13, 125:17, 125:23, 132:3, 133:24, 134:19, 134:21, 135:2, 143:20, 144:8, 150:2, 150:6, 157:1, 157:3, 157:5, 157:10, 157:19, 159:19, 163:16,

163:18, 164:3, 164:6, 164:15, 167:8, 167:9, 168:22, 169:4, 169:7, 173:4, 173:9, 180:23, 185:15, 194:10, 203:3, 239:19, 240:3
**standards** [4] - 87:18, 122:16, 151:18, 187:6
**standing** [4] - 16:18, 31:7, 57:17, 59:25
**start** [26] - 10:22, 11:11, 12:19, 34:9, 35:9, 35:11, 45:1, 55:14, 55:15, 55:16, 63:19, 91:15, 92:8, 94:15, 119:4, 131:10, 141:7, 144:1, 146:24, 166:25, 175:4, 208:16, 209:25, 210:4, 210:5, 232:10
**started** [5] - 21:16, 101:1, 107:24, 197:14, 232:6
**starting** [2] - 108:4, 108:12
**starts** [4] - 147:16, 147:18, 147:22
**State** [7] - 115:16, 116:11, 116:12, 116:13, 116:14
**state** [12] - 42:22, 84:7, 97:11, 115:17, 116:25, 117:15, 117:23, 118:15, 142:3, 146:2, 148:10, 152:15
**State's** [1] - 108:25
**statement** [27] - 6:18, 6:21, 22:9, 22:23, 23:1, 23:14, 23:16, 23:18, 25:17, 25:21, 26:3, 26:7, 27:11, 27:22, 27:25, 33:2, 33:15, 40:16, 40:18, 40:20, 44:18, 45:20, 48:12, 224:10, 224:13, 230:7, 245:24
**statements** [12] - 85:19, 85:22, 86:12, 88:9, 88:10, 129:6, 159:5, 185:12, 206:14, 206:16, 223:14, 246:3
**States** [27] - 104:13, 105:2, 105:6,

108:22, 108:24, 109:14, 109:24, 110:17, 111:2, 111:5, 111:13, 111:15, 111:17, 113:6, 115:3, 115:13, 116:10, 117:1, 120:13, 121:1, 129:5, 136:6, 157:7, 171:18, 181:6, 216:17, 254:19
**states** [2] - 160:11, 190:4
**STATES** [2] - 1:1, 1:11
**stating** [2] - 142:2, 143:2
**statistics** [1] - 100:8
**stay** [4] - 100:17, 101:25, 120:19, 121:10
**stealthy** [2] - 156:20, 157:25
**stenographic** [1] - 254:13
**stenography** [1] - 1:24
**step** [12] - 10:24, 54:2, 54:20, 54:24, 55:18, 72:19, 72:22, 79:4, 89:24, 136:14, 171:2
**stepped** [1] - 88:1
**still** [35] - 16:2, 24:24, 25:4, 28:21, 28:24, 29:24, 30:2, 30:4, 30:5, 30:6, 30:9, 30:10, 31:7, 31:8, 40:2, 52:20, 58:7, 60:6, 60:17, 60:25, 61:3, 61:6, 61:8, 61:11, 61:13, 61:16, 61:18, 91:1, 93:4, 169:19, 170:18, 218:23, 220:18
**stipulate** [3] - 94:5, 94:7, 94:9
**stop** [34] - 34:11, 35:13, 73:5, 113:20, 114:7, 114:11, 124:11, 141:15, 144:24, 147:10, 148:19, 148:25, 149:16, 149:17, 149:19, 150:3, 161:13, 163:2, 164:16, 165:5, 165:25, 168:9, 168:12, 175:7, 200:12, 212:9, 212:11, 212:16, 223:11, 242:14,

248:24, 251:4
**Stop** [1] - 136:10
**stopped** [14] - 24:3, 24:5, 24:8, 24:13, 24:17, 24:21, 27:12, 28:19, 144:2, 167:25, 197:5, 221:9, 221:10, 221:14
**stopping** [1] - 51:20
**stops** [5] - 123:21, 124:4, 124:9, 131:13, 132:6, 146:17, 147:5, 149:6, 153:8, 242:3, 249:18
**Stops** [1] - 148:14
**store** [4] - 101:12, 134:4, 198:14, 205:19
**story** [5] - 26:15, 26:20, 26:21, 26:24, 39:25
**straight** [1] - 248:18
**strategic** [1] - 138:1
**stream** [2] - 134:2, 134:15
**street** [1] - 13:20, 45:4, 82:9, 101:12, 167:12, 214:25, 221:16, 231:19, 232:23, 243:1
**Street** [6] - 1:14, 1:18, 2:3, 101:10, 196:13, 198:10
**stress** [1] - 116:2
**stricken** [4] - 7:21, 8:18, 21:21, 48:2
**strike** [10] - 8:21, 64:5, 65:3, 126:5, 145:4, 178:16, 193:10, 229:19, 247:8, 247:13
**strong** [5] - 8:18, 47:5, 48:4, 241:20, 244:4
**struck** [1] - 13:22
**struggling** [1] - 183:25
**students** [1] - 53:14
**studies** [3] - 246:13, 246:17, 246:22
**Study** [1] - 109:11
**stuff** [4] - 148:3, 158:15, 209:16, 209:21
**subject** [43] - 72:3, 72:13, 113:19, 122:13, 123:6, 123:17, 124:7, 124:19, 125:3, 125:5, 125:12,

125:14, 126:1, 127:19, 127:21, 130:18, 132:24, 133:19, 133:24, 138:25, 150:15, 153:25, 156:15, 160:3, 163:18, 163:24, 167:19, 169:2, 171:14, 172:16, 180:20, 181:7, 185:5, 185:25, 188:12, 191:22, 193:22, 194:14, 196:8, 196:11, 196:17
**submit** [3] - 7:12, 17:17, 154:12
**submitting** [1] - 127:4
**subpoena** [2] - 170:8, 253:24
**subsequent** [3] - 69:1, 147:9, 251:4
**subsequently** [1] - 120:15
**substance** [3] - 5:7, 132:1, 132:4
**suffering** [1] - 85:6
**sufficient** [3] - 14:13, 15:8, 19:19
**sufficiently** [1] - 19:17
**suggest** [4] - 29:13, 56:14, 56:19, 235:19
**suggesting** [9] - 190:18, 190:19, 199:14, 199:18, 214:7, 215:4, 217:3, 226:22
**suggestion** [4] - 6:5, 47:5, 48:4, 49:1
**suggests** [4] - 48:7, 65:10, 65:14, 67:18
**Suite** [2] - 1:15, 1:19
**summary** [1] - 159:8
**Superior** [1] - 117:7
**superior** [1] - 192:9
**Supervision** [1] - 129:5
**supplement** [1] - 221:24
**supplemental** [1] - 224:1
**supplementary** [1] - 95:6
**supplemented** [1] - 148:1
**supplied** [1] - 219:13
**supposed** [6] - 42:22, 42:23, 68:11, 87:6, 190:14, 218:20
**suppress** [1] - 100:10

**Supreme** [7] - 72:12, 72:14, 202:21, 203:7, 211:20, 216:17, 217:1
**surgeons** [1] - 89:17
**surgery** [5] - 87:19, 89:12, 89:16, 89:19, 89:22
**surrounding** [2] - 106:18, 205:10
**surroundings** [2] - 213:20, 214:11
**surrounds** [2] - 196:19, 196:20
**suspect** [4] - 18:24, 205:10, 205:22, 205:23
**suspicion** [9] - 161:14, 163:2, 164:11, 200:10, 200:15, 201:1, 201:14, 201:15, 201:17
**sustain** [1] - 47:23
**sustained** [31] - 24:20, 26:14, 29:17, 41:1, 46:21, 51:14, 59:12, 60:11, 60:15, 64:4, 64:23, 65:2, 65:18, 66:17, 66:22, 68:4, 68:5, 70:17, 71:4, 71:7, 76:1, 77:14, 87:24, 126:6, 145:2, 174:2, 195:8, 222:6, 224:22, 247:7, 247:9
**SUV** [15] - 10:14, 12:25, 16:12, 16:17, 150:9, 150:12, 153:3, 153:7, 153:8, 155:18, 159:1, 163:4, 177:8, 242:25, 243:2
**swap** [2] - 197:22, 197:24
**switched** [1] - 40:3
**Sworn** [2] - 83:25, 97:6
**sworn** [6] - 41:3, 41:7, 99:5, 99:8, 99:21, 218:6
**system** [1] - 52:16

**T**

**table** [1] - 83:9
**tactical** [7] - 99:24, 99:25, 100:18, 100:24, 101:5, 101:13, 138:1
**Tactical** [4] - 100:23, 101:20, 101:25,

103:1
**tactics** [2] - 114:2, 160:25
**taint** [1] - 47:2
**talks** [6] - 42:13, 151:15, 151:22, 151:23, 151:25, 155:16
**tampered** [3] - 46:19, 47:5, 48:4
**tampering** [12] - 47:25, 48:3, 48:7, 48:14, 48:24, 49:2, 49:4, 49:16, 49:17, 49:18, 50:6, 50:7
**tap** [2] - 11:21, 91:1
**tape** [6] - 20:25, 47:19, 175:10, 176:3, 185:12, 246:10
**tape's** [1] - 243:16
**target** [3] - 42:24, 120:19, 180:18
**task** [1] - 106:11
**Task** [1] - 108:18
**tasks** [1] - 120:2
**taught** [8] - 72:3, 72:8, 72:9, 99:13, 114:14, 123:23, 123:25, 202:16
**teach** [3] - 114:16, 116:5, 203:21
**team** [3] - 115:17, 115:19
**Team's** [1] - 159:7
**techniques** [1] - 114:17
**Technology** [1] - 116:15
**teed** [1] - 126:25
**telephonic** [1] - 52:4
**ten** [5] - 45:13, 51:24, 52:6, 146:4, 196:19
**ten-foot** [1] - 196:19
**Tennessee** [4] - 72:15, 187:7, 187:8, 203:6
**tense** [1] - 204:20
**term** [2] - 106:6, 229:24
**terms** [36] - 9:1, 22:19, 23:5, 24:16, 31:22, 72:8, 110:21, 113:1, 114:25, 121:12, 123:14, 125:18, 129:23, 130:9, 130:24, 131:10, 131:18, 133:5, 139:25, 141:25, 143:23, 148:17, 150:1, 150:8, 151:14, 153:1,

156:24, 159:22, 174:14, 175:24, 177:11, 181:17, 183:8, 195:3, 198:21, 246:25
**Terri** [1] - 54:5
**terrible** [1] - 138:6
**terrorism** [1] - 103:14
**Terry** [1] - 146:22
**testified** [22] - 9:12, 13:24, 16:20, 67:11, 123:5, 123:16, 123:19, 124:6, 124:8, 124:10, 124:19, 125:8, 125:16, 125:25, 127:12, 127:21, 195:14, 201:9, 217:24, 237:12, 251:2
**testifies** [1] - 253:12
**testify** [10] - 14:9, 48:8, 127:18, 134:5, 146:15, 147:8, 190:14, 190:22, 253:11, 253:13
**testifying** [4] - 118:12, 148:1, 189:25, 190:15
**testimony** [40] - 6:19, 7:8, 7:18, 7:20, 8:1, 8:4, 8:5, 9:8, 9:9, 10:1, 10:4, 13:10, 13:20, 14:9, 16:11, 20:1, 21:18, 21:21, 29:22, 30:16, 31:13, 40:19, 41:4, 41:7, 90:6, 128:8, 192:25, 200:16, 217:14, 234:14, 235:16, 235:17, 235:19, 237:22, 237:23, 248:1, 248:4, 248:9, 251:7, 252:18
**that..** [1] - 43:15
**THE** [409] - 1:1, 1:1, 1:10, 4:3, 4:4, 4:11, 4:16, 4:19, 5:8, 5:12, 5:14, 5:22, 6:1, 6:4, 6:9, 6:16, 7:1, 7:5, 7:7, 7:16, 8:9, 8:14, 8:21, 8:24, 9:3, 9:6, 9:25, 10:4, 10:10, 11:5, 11:8, 11:10, 13:8, 13:23, 14:4, 14:6, 14:8, 14:12, 14:20, 14:23, 15:3, 15:13, 16:9, 16:24, 17:2, 17:6, 17:21, 18:3, 18:8, 18:16,

18:19, 19:11, 19:15, 19:24, 20:3, 20:6, 20:11, 20:17, 21:2, 21:6, 21:11, 21:13, 22:3, 22:4, 24:20, 26:14, 26:19, 27:9, 27:18, 28:16, 29:17, 29:20, 31:18, 32:3, 32:6, 32:16, 32:25, 36:8, 36:11, 37:19, 38:18, 41:1, 42:5, 43:6, 43:10, 43:12, 43:23, 44:1, 44:4, 46:21, 47:13, 47:23, 48:10, 48:18, 49:6, 49:8, 49:11, 49:19, 49:22, 49:24, 51:14, 51:22, 52:3, 52:9, 52:12, 52:15, 52:21, 52:25, 53:4, 53:7, 53:10, 53:15, 53:17, 53:19, 53:25, 54:3, 54:6, 54:9, 54:12, 54:13, 54:15, 54:16, 54:23, 55:25, 56:9, 56:13, 56:17, 56:22, 59:12, 60:11, 60:15, 63:18, 64:4, 64:7, 64:13, 64:15, 64:23, 65:2, 65:5, 65:9, 65:13, 65:18, 66:17, 66:19, 66:22, 67:2, 67:5, 67:11, 67:13, 67:17, 67:21, 68:4, 69:3, 69:5, 69:7, 69:8, 69:11, 69:12, 69:16, 69:18, 70:17, 70:22, 71:4, 71:7, 71:9, 71:16, 76:1, 76:8, 77:14, 79:22, 81:21, 82:19, 82:22, 83:4, 83:7, 83:8, 83:9, 83:13, 83:17, 83:23, 83:24, 86:7, 87:14, 87:24, 88:8, 88:19, 88:20, 88:23, 89:6, 89:7, 90:3, 90:5, 90:7, 90:10, 90:12, 90:22, 91:4, 91:12, 91:14, 91:17, 91:23, 92:2, 92:5, 92:8, 92:11, 93:2, 93:8, 93:10, 93:12, 93:15, 93:18, 94:3, 94:9, 94:11, 94:14, 95:8, 95:13, 95:16, 95:25, 96:7, 96:12, 96:16, 96:19, 96:21, 96:25, 97:2, 97:3, 97:4, 97:5, 99:18, 121:19, 121:21,

121:24, 122:1, 122:3, 122:6, 122:10, 122:17, 122:20, 126:6, 126:10, 126:13, 126:23, 127:2, 127:7, 128:7, 137:3, 137:16, 137:18, 137:20, 141:11, 141:14, 141:18, 141:21, 142:2, 142:17, 142:19, 142:25, 145:2, 145:6, 145:22, 145:25, 146:6, 146:10, 146:19, 147:2, 147:6, 147:20, 148:4, 148:7, 152:5, 152:21, 153:14, 154:14, 154:16, 154:19, 154:21, 155:11, 158:10, 158:11, 158:14, 158:16, 158:20, 158:22, 161:20, 161:22, 161:24, 162:8, 165:3, 165:16, 166:5, 166:7, 169:9, 169:11, 169:13, 169:20, 169:21, 169:23, 169:24, 169:25, 170:9, 170:11, 170:14, 170:21, 170:24, 171:5, 171:8, 171:19, 171:22, 172:4, 172:9, 174:2, 174:22, 178:2, 179:7, 179:20, 182:4, 182:6, 182:8, 182:21, 182:23, 183:3, 183:5, 186:6, 186:9, 188:21, 189:4, 189:15, 189:20, 190:10, 190:20, 190:25, 191:5, 191:7, 191:21, 191:24, 192:2, 193:1, 193:8, 195:8, 196:4, 197:19, 199:1, 199:3, 199:5, 199:6, 201:8, 207:11, 208:19, 215:24, 222:6, 223:20, 224:22, 225:5, 227:25, 228:19, 230:8, 233:14, 233:17, 233:24,

234:1, 234:5,
234:23, 234:25,
235:16, 235:22,
235:25, 236:4,
236:6, 236:9,
236:12, 239:8,
239:17, 240:7,
240:10, 241:5,
244:15, 244:18,
247:7, 247:9,
247:23, 248:4,
248:13, 249:2,
249:5, 249:9,
249:13, 249:19,
250:4, 250:22,
250:24, 250:25,
251:1, 251:6,
251:11, 251:15,
251:21, 252:1,
252:9, 252:12,
252:14, 252:17,
252:18, 253:9,
253:12, 253:17,
253:20, 254:1, 254:3
**theirs** [1] - 132:14
**themselves** [2] -
13:21, 215:7
**theory** [1] - 18:19
**thereafter** [1] - 217:12
**they've** [1] - 53:16
**thinking** [2] - 88:22,
120:10
**third** [5] - 46:1, 46:5,
179:9, 179:15,
179:25
**Thomas** [47] - 6:13,
6:14, 10:15, 10:20,
10:22, 11:12, 11:19,
12:4, 12:9, 34:9,
35:9, 36:17, 37:10,
37:25, 38:14, 39:1,
39:5, 39:9, 41:2,
55:13, 55:17, 56:24,
57:24, 59:19, 71:13,
73:5, 73:11, 74:2,
74:6, 74:11, 74:17,
74:22, 75:1, 75:5,
75:10, 75:15, 75:22,
76:10, 76:22, 77:4,
77:10, 77:24, 78:1,
78:10, 79:9, 176:21
**THOMAS** [1] - 55:14
**thousand** [1] - 118:23
**thread** [1] - 241:12
**threat** [43] - 41:11,
42:11, 43:2, 43:3,
109:4, 136:22,
138:10, 138:17,
139:20, 168:16,
168:20, 169:8,

172:1, 172:2,
172:18, 172:21,
173:3, 173:5, 173:8,
173:10, 173:11,
174:9, 174:12,
174:13, 174:15,
174:18, 175:18,
175:21, 175:22,
176:2, 176:4, 176:9,
205:11, 205:25,
212:9, 212:12,
212:16, 214:10,
235:18, 237:6,
245:19
**threatened** [6] - 41:4,
41:8, 177:3, 177:7,
180:6, 184:18
**threats** [1] - 115:11
**three** [6] - 117:12,
117:14, 146:4,
222:24, 223:1,
223:13
**three-oh-four-ten** [1] -
146:4
**threshold** [1] - 135:6
**threw** [8] - 15:14,
17:24, 18:9, 18:12,
19:7, 49:14, 51:11,
64:2
**throughout** [2] - 98:3,
105:8, 108:12,
110:16, 120:12,
136:5, 157:6, 217:20
**throw** [3] - 14:1, 51:8,
51:15
**throwing** [3] - 14:19,
18:23, 48:8
**thrown** [21] - 12:3,
13:25, 14:25, 15:6,
15:10, 15:12, 15:16,
15:24, 16:4, 18:1,
18:4, 19:21, 20:12,
20:13, 47:4, 47:7,
47:21, 57:2, 65:17,
67:19, 67:21
**Thursday** [1] - 1:5
**ticket** [1] - 113:13
**tilt** [1] - 54:3
**tiny** [2] - 79:11, 81:13
**title** [1] - 151:7
**titled** [2] - 131:21,
148:14
**TK1** [1] - 86:9
**to..** [1] - 96:24
**Tobacco** [2] - 105:20,
109:15
**Tobin** [1] - 246:14
**today** [11] - 84:5,
90:13, 91:8, 91:13,
91:16, 97:9, 187:10,

217:25, 236:12,
237:19, 252:20
**TODD** [2] - 3:5, 83:25
**Todd** [2] - 83:11, 84:8
**together** [3] - 134:18,
140:20, 241:14
**tomorrow** [13] - 91:2,
91:5, 92:6, 94:20,
94:21, 170:17,
170:21, 252:22,
252:24, 253:3,
253:13, 253:18,
254:3
**tonight** [1] - 252:25
**took** [14] - 44:11,
138:13, 167:15,
174:17, 196:22,
197:9, 205:17,
227:15, 228:3,
236:19, 237:2,
240:15, 244:4, 246:1
**tool** [1] - 206:18
**tools** [1] - 206:19
**top** [3] - 160:17,
192:17
**Toronto** [1] - 116:20
**Torres** [10] - 14:3,
14:4, 14:5, 14:18,
16:18, 50:22, 51:15,
152:11, 238:9,
241:11
**tossed** [1] - 11:15
**total** [3] - 28:25, 102:5,
205:16
**totality** [5] - 29:4,
205:3, 205:9,
230:13, 230:17
**totally** [3] - 94:1,
111:9, 248:2
**touch** [3] - 46:7, 47:13,
48:19
**touched** [4] - 45:15,
47:15, 50:2, 50:8
**toward** [3] - 131:24,
174:13, 192:17
**towards** [18] - 30:21,
30:22, 30:23, 30:25,
31:5, 31:11, 31:14,
31:20, 31:25, 32:7,
33:21, 33:24, 36:4,
50:13, 54:4, 78:19,
244:11, 249:6
**town** [2] - 97:24,
102:15
**toy** [1] - 204:3
**track** [1] - 244:12
**trading** [1] - 103:21
**traffic** [5] - 196:17,
232:2, 232:6,
232:17, 232:19

**trafficking** [4] -
103:20, 103:21,
121:7
**trained** [8] - 71:18,
116:1, 123:11,
124:16, 125:3,
202:3, 202:6, 226:24
**training** [28] - 84:19,
111:21, 111:25,
112:5, 112:6,
112:11, 112:18,
112:19, 113:18,
114:13, 114:14,
114:18, 115:3,
115:5, 115:10,
115:15, 115:20,
115:23, 115:24,
115:25, 116:6,
135:8, 187:3, 187:9,
187:11, 188:6,
214:23
**trainings** [1] - 116:5
**transcribed** [1] - 23:16
**TRANSCRIPT** [1] -
1:10
**transcript** [10] - 1:24,
6:18, 7:5, 7:7, 8:11,
9:7, 9:9, 248:14,
254:13, 254:14
**transcription** [1] -
1:25
**transcripts** [1] -
185:12
**transfer** [1] - 102:19
**transferred** [2] -
106:16, 114:20
**transformers** [1] -
17:15
**transitioned** [1] -
102:2
**trash** [1] - 57:16
**travel** [1] - 113:5
**traveling** [1] - 104:20
**travels** [1] - 104:14
**Treasury** [6] - 109:12,
109:14, 109:19,
109:24, 109:25,
110:9
**treatment** [1] - 87:4
**tree** [1] - 211:24
**trends** [2] - 100:8,
121:4
**trial** [1] - 170:13
**TRIAL** [1] - 1:10
**trick** [1] - 221:4
**tried** [1] - 197:5
**true** [18] - 105:14,
199:22, 203:15,
203:16, 203:17,
204:24, 205:2,

205:6, 209:7,
214:22, 220:11,
223:2, 223:6, 223:7,
242:18, 246:24,
254:12, 254:14
**truthful** [10] - 22:15,
22:17, 22:19, 23:24,
24:10, 24:14, 24:16,
25:11, 190:19, 192:7
**truthfully** [3] - 190:14,
190:16, 190:22
**try** [7] - 21:6, 52:5,
184:1, 212:5,
212:12, 212:18,
253:20
**trying** [17] - 16:3,
43:13, 44:23, 45:3,
47:2, 47:6, 56:5,
63:3, 65:16, 67:8,
68:1, 72:20, 170:3,
176:16, 235:19,
253:15, 253:25
**Tuesday** [2] - 93:15,
94:25
**turn** [7] - 35:21, 45:4,
174:11, 177:1,
243:18, 245:1, 245:5
**turned** [21] - 30:20,
30:22, 30:25, 31:5,
31:11, 31:14, 31:19,
31:25, 32:2, 33:21,
34:2, 41:8, 156:7,
196:18, 197:14,
198:5, 229:15,
231:23, 237:7,
240:25
**turning** [1] - 175:25
**turns** [1] - 204:3
**twice** [5] - 23:9, 72:6,
110:24, 118:3,
195:25
**twin** [1] - 131:3
**two** [37] - 5:19, 13:11,
14:2, 14:20, 16:13,
16:16, 22:22, 22:25,
27:5, 40:4, 41:15,
41:22, 41:25, 42:2,
50:12, 53:12, 53:13,
72:12, 72:14, 81:24,
82:5, 93:5, 93:13,
94:20, 100:10,
104:23, 112:21,
114:20, 114:22,
115:16, 126:21,
134:11, 155:9,
161:2, 212:14,
234:12, 252:13
**two-week** [1] - 112:21
**type** [5] - 100:24,
103:17, 104:9,

105:25, 114:13,
115:5, 120:18,
120:19, 124:11,
134:20, 139:25,
143:22, 156:3,
188:1, 241:18, 244:2

## U

**U.S** [7] - 2:11, 109:11,
109:23, 110:9,
117:24, 118:16,
129:13
**ultimate** [5] - 141:24,
142:6, 143:2,
171:22, 171:23
**ultimately** [1] - 206:7
**uncertain** [1] - 204:20
**uncommon** [1] -
207:13
**uncovered** [1] - 109:6
**under** [32] - 52:20,
77:4, 77:16, 78:4,
85:16, 85:17, 87:1,
115:12, 142:5,
154:25, 155:4,
155:21, 156:2,
158:9, 160:11,
160:17, 160:20,
161:11, 161:12,
162:6, 166:13,
169:19, 179:10,
184:9, 190:1,
194:21, 205:9,
209:20, 210:12,
211:6, 239:24
**undercover** [3] -
103:23, 106:4, 106:6
**underneath** [12] -
55:19, 55:20, 56:9,
56:11, 57:25, 58:1,
58:8, 75:16, 75:17,
76:2, 76:4, 77:18
**understood** [6] -
22:12, 46:13, 88:23,
152:21, 172:8,
221:18
**unfortunately** [1] -
119:11
**unhealthy** [1] - 5:6
**uniform** [3] - 102:2,
102:4, 196:7
**uniformed** [2] - 100:2,
100:9
**UNISON** [1] - 21:12
**Unit** [8] - 100:23,
101:20, 102:1,
103:2, 219:20,
219:22, 220:10,
220:13
**unit** [14] - 84:15, 85:2,

---

100:4, 100:6,
100:15, 100:25,
101:5, 101:7,
101:15, 103:6,
106:17, 107:7, 108:8
**United** [27] - 104:13,
105:1, 105:6,
108:22, 108:24,
109:14, 109:24,
110:17, 111:2,
111:5, 111:13,
111:15, 111:17,
113:6, 115:3,
115:13, 116:10,
117:1, 120:13,
121:1, 129:5, 136:6,
157:6, 171:18,
181:6, 216:16,
254:19
**UNITED** [2] - 1:1, 1:11
**universal** [1] - 181:2
**University** [6] - 53:14,
114:12, 114:16,
116:14, 116:16,
197:21
**unjustified** [2] -
236:22, 242:10
**unlawfully** [2] -
167:21, 194:20
**unless** [6] - 160:22,
185:2, 207:20,
211:3, 213:19
**Unmarked** [1] - 155:1
**unmarked** [5] - 150:9,
150:16, 154:7,
155:19, 155:20
**unquote** [1] - 141:23
**unreasonable** [2] -
142:5, 227:1
**untruthful** [2] -
191:16, 221:4
**up** [64] - 6:23, 9:3, 9:4,
17:12, 18:16, 19:5,
21:6, 32:7, 33:22,
33:25, 39:16, 44:5,
44:9, 49:6, 49:8,
49:20, 50:5, 63:25,
65:13, 68:2, 69:9,
71:13, 71:15, 71:17,
82:7, 82:8, 82:11,
82:20, 82:23, 92:3,
92:8, 97:25, 105:16,
113:25, 116:2,
122:17, 122:18,
122:19, 122:20,
126:25, 127:3,
133:24, 136:6,
153:3, 166:5,
167:12, 169:9,
169:23, 170:2,

---

175:19, 189:20,
196:16, 207:6,
207:16, 209:2,
219:14, 220:16,
226:25, 231:1,
231:22, 231:24,
231:25, 243:1,
253:23
**update** [2] - 94:16,
95:1
**updates** [1] - 120:15
**upfront** [1] - 104:19
**upper** [7] - 30:20,
30:25, 31:5, 31:19,
31:25, 33:21, 33:24
**ups** [2] - 101:12,
119:20
**urban** [1] - 134:12
**uses** [4] - 180:9,
184:21, 204:2
**utilize** [3] - 130:4,
182:25, 184:3
**utilizing** [2] - 151:19,
239:25

## V

**vantage** [1] - 207:4
**variation** [1] - 134:8
**various** [10] - 37:7,
111:12, 116:4,
125:21, 132:1,
132:4, 132:5,
140:15, 172:24
**vary** [1] - 246:3
**Vaughan** [1] - 253:23
**vehicle** [92] - 10:19,
12:3, 12:10, 12:22,
18:2, 18:5, 19:4,
24:2, 24:8, 24:12,
24:17, 24:24, 25:4,
25:24, 26:11, 27:2,
27:11, 28:4, 28:12,
28:19, 29:7, 29:24,
30:2, 31:5, 32:7,
33:22, 33:24, 36:10,
36:18, 37:3, 37:23,
38:6, 47:21, 50:20,
51:1, 51:8, 55:1,
57:3, 57:6, 57:7,
61:8, 61:11, 61:16,
62:16, 62:19, 62:21,
62:23, 64:2, 69:23,
70:7, 70:19, 71:1,
76:17, 77:7, 77:19,
78:20, 78:24, 79:7,
82:14, 151:20,
152:1, 153:9, 155:3,
155:7, 155:19,
155:20, 158:4,
159:15, 159:20,

---

159:25, 160:21,
160:24, 161:1,
162:13, 162:21,
162:25, 163:20,
164:7, 164:10,
196:23, 196:25,
197:1, 198:3, 211:1,
211:3, 213:3, 213:8,
220:22, 243:19,
245:2
**vehicles** [3] - 150:16,
154:7, 155:1
**vehicular** [17] -
124:14, 124:17,
124:20, 132:8,
133:2, 134:5, 135:4,
150:20, 150:21,
150:22, 151:14,
151:20, 151:22,
154:10, 156:4,
212:22, 213:4
**Vehicular** [3] - 151:7,
155:4, 157:4
**vein** [1] - 7:25
**velocity** [1] - 229:21
**verbal** [4] - 136:10,
210:2, 210:4, 210:5
**version** [5] - 28:18,
43:23, 44:1, 44:3,
153:1
**versions** [3] - 20:25,
44:5, 207:15
**versus** [1] - 248:25
**vertically** [2] - 228:11,
228:12
**vested** [6] - 237:19,
237:25, 238:1,
238:2, 238:3, 238:4
**vice** [1] - 102:3
**vicinity** [1] - 196:9
**video** [91] - 6:9, 10:17,
11:13, 12:6, 14:12,
14:14, 14:24, 15:8,
15:11, 15:15, 16:7,
16:21, 17:22, 18:17,
18:18, 19:15, 19:22,
20:10, 20:24, 24:6,
25:15, 28:21, 29:4,
29:5, 34:14, 35:12,
36:23, 40:23, 41:5,
43:23, 47:6, 52:16,
52:23, 53:3, 54:10,
54:11, 54:18, 57:11,
64:11, 64:13, 64:20,
64:25, 65:10, 67:6,
67:12, 67:22, 68:15,
68:19, 68:21, 69:6,
69:8, 69:9, 69:13,
69:22, 70:6, 70:14,
70:18, 71:5, 71:10,

---

71:17, 75:17, 76:2,
77:15, 78:3, 129:13,
152:23, 152:25,
153:6, 153:7, 153:9,
153:15, 153:19,
153:25, 154:2,
174:16, 175:6,
175:14, 176:20,
176:23, 231:16,
231:17, 231:18,
232:22, 233:6,
233:12, 235:1,
243:11
**Video** [1] - 34:10
**videographer** [1] -
56:7
**videotape** [67] - 9:2,
19:2, 25:14, 25:18,
25:20, 26:23, 26:25,
27:2, 28:20, 28:22,
28:23, 28:25, 29:1,
29:3, 29:9, 29:11,
29:13, 34:23, 35:1,
35:3, 36:7, 36:9,
36:14, 36:19, 37:7,
40:11, 40:14, 40:15,
40:16, 40:19, 43:4,
43:5, 47:18, 53:23,
66:13, 66:14, 66:23,
66:24, 68:9, 129:22,
155:17, 156:8,
159:4, 163:4, 163:7,
163:10, 164:19,
174:3, 174:8,
174:18, 174:21,
174:24, 175:9,
176:15, 176:25,
224:9, 229:16,
229:23, 241:19,
241:25, 242:19,
242:22, 244:25,
245:7, 245:15,
246:20, 250:6
**view** [18] - 20:21,
52:18, 61:21, 64:12,
78:16, 176:22,
207:14, 207:24,
208:10, 210:21,
213:18, 231:16,
233:12, 237:2,
239:12, 243:13,
243:14, 243:15
**viewed** [3] - 207:3,
207:21, 232:22
**viewing** [6] - 64:24,
66:13, 66:23, 70:1,
176:25, 245:7
**views** [1] - 208:17
**violate** [3] - 149:22,
164:8, 190:23

**violated** [27] - 142:4, 143:16, 143:19, 146:21, 150:2, 150:6, 156:11, 156:17, 157:2, 157:5, 157:10, 157:18, 157:19, 159:14, 159:18, 159:23, 160:7, 161:7, 163:16, 163:17, 164:3, 164:5, 179:2, 180:11, 180:22, 185:7
**violation** [13] - 28:3, 28:10, 145:8, 145:10, 145:15, 148:24, 154:6, 164:15, 168:1, 168:2, 171:16, 172:6, 194:10
**violations** [1] - 127:22
**VIP** [1] - 104:14
**Virginia** [6] - 110:19, 116:11, 117:23, 117:25, 118:2, 118:10
**visibility** [1] - 100:2
**vision** [1] - 203:18
**visit** [2] - 87:8, 87:15
**visited** [1] - 129:9
**visually** [1] - 9:1
**Vocational** [2] - 196:14, 196:20
**voice** [1] - 116:2
**voir** [2] - 5:20, 5:22
**voir-dired** [1] - 5:20
**volatile** [1] - 138:2
**vs** [9] - 1:5, 4:5, 72:15, 187:7, 187:8, 203:6, 205:18

## W

**waistband** [4] - 44:12, 44:14, 44:20, 45:10
**waistbands** [2] - 44:22, 45:3
**wait** [5] - 72:20, 87:25, 248:4
**waited** [2] - 88:2, 89:24
**waiting** [1] - 170:18
**walk** [8] - 114:2, 114:3, 144:8, 144:17, 144:22, 145:11, 147:17, 149:11
**walked** [2] - 144:9, 177:23
**walking** [2] - 144:20,

214:24
**Walther** [2] - 225:18, 225:22
**wants** [2] - 93:20, 249:24
**warning** [2] - 155:7, 156:5
**washing** [1] - 216:12
**Washington** [15] - 1:4, 1:15, 1:19, 2:4, 2:12, 5:21, 97:21, 97:22, 98:1, 98:3, 98:6, 110:17, 111:5, 120:23, 254:20
**watch** [2] - 113:11, 215:24
**watched** [3] - 152:23, 174:8, 174:16
**watching** [2] - 24:6, 175:14
**weapon** [34] - 39:23, 42:23, 44:23, 45:3, 134:4, 162:20, 163:19, 178:6, 178:16, 178:18, 179:4, 180:13, 180:16, 180:24, 195:21, 215:13, 223:5, 223:17, 229:14, 229:19, 233:2, 233:6, 234:3, 234:8, 236:18, 237:1, 237:5, 237:10, 237:17, 238:10, 238:13, 238:22, 239:24, 247:1
**weapons** [11] - 101:14, 101:17, 103:20, 104:6, 107:9, 107:11, 109:7, 116:1, 182:12, 185:25
**week** [6] - 95:13, 104:24, 112:21, 113:10, 116:19, 116:20
**week-long** [1] - 116:20
**weeks** [4] - 104:23, 114:21, 114:23, 115:16
**weigh** [1] - 135:6
**welcome** [7] - 53:15, 53:19, 89:6, 94:15, 169:25, 171:8, 199:5
**well..** [1] - 241:17
**WEST** [61] - 1:17, 1:18, 4:13, 4:18, 5:17, 6:3, 7:11, 7:24, 8:13, 8:17, 8:22, 9:14,

9:22, 11:24, 12:14, 14:3, 49:9, 52:10, 52:13, 55:9, 55:11, 57:22, 58:22, 59:15, 67:10, 67:12, 71:8, 75:20, 76:16, 76:23, 77:22, 77:25, 78:8, 78:11, 79:15, 79:17, 93:22, 94:5, 94:10, 95:20, 96:5, 96:10, 96:13, 126:18, 141:17, 147:11, 158:17, 170:1, 170:10, 170:12, 170:16, 170:23, 171:2, 171:6, 248:20, 249:1, 250:21, 252:4, 252:8, 253:21, 254:4
**West** [3] - 4:6, 7:23, 110:19
**west** [8] - 4:11, 5:14, 5:16, 7:9, 58:19, 67:9, 77:24, 93:20
**Western** [1] - 118:9
**whereabouts** [1] - 83:15
**whereas** [1] - 134:12
**whim** [1] - 200:13
**whining** [1] - 156:7
**white** [2] - 41:18, 129:13
**whited** [1] - 95:21
**whited-out** [1] - 95:21
**whole** [8] - 18:5, 18:8, 175:10, 198:12, 209:15, 232:22, 235:16, 235:17
**wife** [2] - 247:19, 252:21
**Wilmington** [1] - 110:18
**window** [22] - 13:11, 13:21, 13:25, 14:1, 14:19, 15:23, 15:24, 16:5, 17:18, 18:24, 19:8, 47:4, 47:7, 48:8, 49:14, 50:14, 51:9, 51:11, 51:16, 51:18
**windows** [2] - 90:1, 216:12
**withdraw** [1] - 247:12
**WITNESS** [22] - 22:4, 54:6, 54:12, 54:15, 69:7, 69:11, 69:16, 71:16, 83:8, 83:24, 88:20, 88:23, 89:6, 90:7, 97:3, 97:5, 158:11, 158:16,

169:20, 169:24, 199:5, 252:17
**Witness** [5] - 33:7, 44:17, 46:6, 82:25, 86:11
**witness** [51] - 8:1, 8:5, 9:16, 9:17, 16:8, 32:5, 32:14, 32:24, 79:20, 80:8, 81:19, 81:25, 83:16, 86:6, 90:9, 91:25, 95:4, 96:23, 118:4, 118:12, 121:17, 122:13, 123:5, 123:16, 124:6, 124:22, 124:23, 126:1, 127:13, 127:18, 127:24, 128:3, 128:4, 137:2, 142:8, 142:10, 142:14, 152:18, 154:20, 165:17, 170:14, 189:2, 195:15, 199:6, 206:22, 225:4, 233:21, 239:5, 246:5, 252:24
**witness's** [2] - 56:10, 234:13
**WITNESSES** [1] - 3:2
**witnesses** [20] - 7:19, 8:6, 9:19, 9:20, 21:19, 90:17, 90:18, 94:20, 129:6, 169:17, 170:4, 206:15, 206:25, 207:3, 207:9, 207:12, 207:14, 209:5
**woke** [1] - 219:14
**wooded** [2] - 174:11, 178:23
**woods** [6] - 41:19, 41:20, 41:21, 42:7, 178:3, 178:23
**word** [10] - 8:7, 8:8, 8:9, 8:18, 44:14, 50:6, 122:13, 122:15, 218:6, 239:12
**words** [6] - 86:18, 90:19, 203:25, 205:24, 211:11, 248:23
**worried** [1] - 213:9
**worry** [1] - 144:12
**worse** [1] - 6:22
**wound** [1] - 212:5
**wounds** [8] - 85:6, 229:3, 229:5, 229:7,

229:8, 229:11, 229:16, 244:21
**write** [1] - 67:9
**writing** [1] - 23:16
**written** [1] - 228:21
**wrote** [1] - 220:3

## X

**Xeroxed** [1] - 95:20

## Y

**yard** [1] - 41:23
**Yard** [2] - 110:2, 110:3
**year** [14] - 25:6, 53:14, 72:7, 98:15, 100:19, 102:7, 102:8, 106:4, 119:11, 119:14, 120:5, 134:4, 196:1, 235:5
**years** [26] - 4:15, 32:21, 84:14, 84:15, 98:4, 102:10, 102:11, 102:12, 102:13, 102:22, 105:24, 107:14, 107:15, 107:24, 118:18, 118:21, 118:25, 119:12, 177:17, 177:18, 195:24, 222:24, 223:1, 223:13, 242:17
**yell** [2] - 214:10
**yesterday** [6] - 6:23, 7:13, 17:4, 19:25, 22:8, 28:17
**York** [2] - 116:14, 120:23
**young** [2] - 85:5, 86:20
**yourself** [2] - 215:24, 216:20

## Z

**zero** [1] - 55:15