UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
BRIDZETTE LANE,              :
                            :
         Plaintiff,         :   Docket No.: CA 12-514
                            :
     vs.                    :        Washington, DC
                            :      10:28 a.m., Tuesday
DISTRICT OF COLUMBIA, et    :        October 14, 2014
al,                         :
                            :
         Defendants.        :
_____X
```

REPORTER'S OFFICIAL TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE CHRISTOPHER R. COOPER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

  For the Plaintiff:       BILLY L. PONDS, ESQ.
                           KENNETH D. BYNUM, ESQ.
                           Ponds Law Firm
                           1250 24th Street, NW
                           Suite 300
                           Washington, DC 20037
                           (202) 333-2922


  For the Defendants:      KERSLYN D. FEATHERSTONE, ESQ.
                           ROBERT DeBERARDINIS, JR., ESQ.
                           Office of the Attorney General
                           441 4th Street, NW
                           Washington, DC 20001
                           (202) 724-6600


  Court Reporter:          CHANTAL M. GENEUS, CRR, RMR, CRC
                           Certified Realtime Reporter
                           Registered Merit Reporter
                           Certified Realtime Captioner
                           United States District Court
                           333 Constitution Avenue, NW
                           Washington, DC 20001


Proceedings reported by machine shorthand. Transcript
produced by computer-aided transcription.

```
1              P R O C E E D I N G S
2              (Whereupon, at 10:28 a.m. the proceedings
3          commenced and the following ensued:)
4              THE COURTROOM DEPUTY:  Criminal Case Number
5     12-514, Bridzette Lane versus District of Columbia, et
6     al.
7              Counsel, would you please come forward and
8     identify yourself for the record.
9              MR. BYNUM:  May it please the Court.  Good
10    morning, Your Honor.  Ken Bynum on behalf of
11    Miss Lane.
12             MR. PONDS:  Good morning, Your Honor.  May
13    it please the Court, Billy L. Ponds on behalf of
14    Miss Lane.
15             THE COURT:  Mr. Ponds, how are you?
16             MR. PONDS:  Very well, Your Honor.
17             MS. FEATHERSTONE:  Good morning, Your Honor.
18    Kerslyn Featherstone and Robert DeBerardinis on behalf
19    of the District of Columbia.
20             THE COURT:  Ms. Featherstone, how are you?
21             Mr. DeBerardinis, how are you?
22             MR. DeBERARDINIS:  Good morning, Your Honor.
23             THE COURT:  We have a good number of people
24    in the courtroom this morning.  What I had planned to
25    do is start with the qualified immunity issue, which,
```

1    as you all know, involves evidence that has been

2    submitted to me under seal pursuant to a protective

3    order.  So I think we need to clear the courtroom for

4    the presentation of that evidence.

5              Is that correct?  Any objection to that?

6              MR. DeBERARDINIS:  They would be covered by

7    the protective order, Your Honor.

8              THE COURT:  And who --

9              MR. DeBERARDINIS:  They are all DC

10   employees.

11             THE COURT:  All DC employees?

12             MR. DeBERARDINIS:  From our office.

13             THE COURT:  I see.

14             Any objection to that?

15             MR. BYNUM:  No objection, Your Honor.  Ken

16   Bynum, for the record, from my office -- who probably

17   should be sitting on this side -- along with Joanna

18   from Mr. Ponds' office, are here.  They are involved

19   in this matter.  I think they are covered by the

20   protective order.

21             THE COURT:  Okay.  With no objection, we

22   will move forward.

23             Before we get there, I want to do a little

24   housekeeping.

25             Mr. Bynum, Mr. Ponds, I just want to be

1   clear on which counts remain on the table.  There may

2   be some confusion between the parties as to what

3   counts remain viable and which ones do not.

4           By my count, the remaining counts are 3 and

5   4, Fourth Amendment claims against Mr. Leo and the

6   District; Count 9, the assault against Leo and the

7   District; Count 10, battery against Leo and the

8   District; Count 15, false arrest, Leo and the

9   District; Count 16, negligent infliction of emotional

10  distress, Leo and the District; Count 19, negligent

11  hiring, training, and supervision on the part of DC;

12  and 20, negligence on the part of DC and Leo.

13          There seems still to be a dispute as to

14  Counts 1 and 2, the wrongful death and the survival

15  action under the wrongful death count.  Are you still

16  proceeding on those or not?

17          MR. BYNUM:  Yes, Your Honor.  According to

18  Judge Howell's order of March 8, 2013, I believe the

19  wrongful death and the survival action continue, at

20  least we're prepared to go forward with them.  I would

21  defer to her order.

22          Secondly -- and I was going to advise the

23  Court of this.  In the first footnote of our

24  opposition, we make reference to what counts remain

25  and what counts do not.  We inadvertently omitted, we

1    are still going forward on the punitive damages claim,

2    which we have argued that's the last argument in our

3    brief.  And I wanted -- I was going to bring that to

4    the Court's attention anyway this morning.  But we

5    will defer to her order.  But I believe the wrongful

6    death and the survival action under DC Code are

7    ongoing matters.

8         THE COURT:  Okay.  Now, the government

9    suggests that given Miss Lane's acknowledgement that

10   she is not proceeding in an individual capacity, that

11   the wrongful death and, I believe, the survival act

12   claims fail as a matter of law.  And I'm not sure you

13   responded to that argument, if I understand you

14   correctly.

15        MS. FEATHERSTONE:  That's correct, Your

16   Honor.

17        MR. BYNUM:  Well, Your Honor, we believe

18   that she is the statutory agent to bring the claim and

19   that every -- all the pain and suffering, the medical

20   and funeral bills related to the wrongful death

21   claims, are attendant to that.  So if we misspoke and

22   said she was not bringing it in her individual claim,

23   we never meant to say she was not bringing it as the

24   representative of the estate, which she's been

25   qualified to do.  So those -- to that extent, those

1    claims are viable.  They are statutory claims.

2             THE COURT:  So Ms. Featherstone, I guess the

3    question is whether a wrongful death claim can be

4    brought in a representative capacity.

5             MS. FEATHERSTONE:  Mr. DeBerardinis will

6    handle that question, Your Honor.

7             THE COURT:  Thank you.

8             MR. DeBERARDINIS:  Your Honor, survival

9    action simply is an enabling act.  It's not a separate

10   count.  It's no different than Section 1983.

11            THE COURT:  Okay.

12            MR. DeBERARDINIS:  As to the wrongful death,

13   there was some confusion here, but she is entitled to

14   bring a wrongful death per se.  We have some arguments

15   as to why it fails as a matter of law but not as a

16   matter of pleading.

17            THE COURT:  And those are addressed in your

18   briefs?

19            MR. DeBERARDINIS:  Yes, Your Honor.

20            THE COURT:  Okay.  Very well.

21            There's also the matter of the Fifth

22   Amendment claims.  It's not clear to me whether those

23   have been conceded by the plaintiff's failure to

24   respond to them in the opposition brief.

25            Mr. Bynum.

```
1              MR. BYNUM:  Yes, Your Honor.

2              Your Honor, they are encompassed in our

3    argument, in our Fourth Amendment arguments.  The

4    Fourth and Fifth Amendment claims, which Judge Howell

5    addressed in the motion to dismiss -- the Fifth

6    Amendment claim is an alternative pleading involving

7    the same set of facts, and I believe that any argument

8    we make under the Fourth Amendment claim is relevant

9    to the Fifth Amendment claim, because it deals with

10   any conduct intended to injure in some way by the

11   police as unjustifiable by any government interest.

12             So we have to show that it's conscious

13   shocking, nonetheless, but I think it's covered by all

14   the arguments we make in the Fourth Amendment claim.

15   And that was dealt with by Judge Howell.  And she

16   cited this Robinson case here in this court, U.S.

17   District Court, *Robinson versus DC*, 736 Fed.

18   Supplement 2d at 254 (2010), where a plaintiff, making

19   a Fourth Amendment claim, has probably alleged a Fifth

20   Amendment claim as an alternative theory to a Fourth

21   Amendment claim for a person who was killed by a DC

22   police officer.  So they are encompassed in there,

23   Your Honor.

24             THE COURT:  Ms. Featherstone.

25             MS. FEATHERSTONE:  Your Honor, the District
```

1    makes specific arguments regarding plaintiff's failure

2    on the Fifth Amendment claim subsequently and

3    procedurally.  The fact that Judge Howell allowed it

4    to go forward in discovery doesn't mean that they

5    still have preserved the arguments.  They still had to

6    respond to the arguments made by counsel -- excuse me,

7    by defendants, and they didn't do so.  So they

8    conceded that.  So that's what our position is on the

9    Fifth Amendment claim, Your Honor.

10            THE COURT:  Okay.  I understand.

11            I just want to make sure what's on my plate

12   and what's off.

13            Why don't we move to the qualified immunity

14   issue.  It's your motion, so I will hear you.

15            MS. FEATHERSTONE:  Thank you, Your Honor.

16   May it please the Court.  Your Honor, in this case,

17   there are very few facts that the Court needs to

18   consider with respect to whether or not Officer Leo is

19   entitled to qualified immunity.

20            What we have here is a case where four

21   officers in plain clothes on routine patrol see

22   Mr. Briscoe, asked him if he has a weapon.  They did

23   not receive a response.  He runs away.  And two

24   officers jump out of the car to begin a foot chase;

25   two officers remain in the car and continue to follow

1   him in the vehicle.

2           Moments later Mr. Briscoe is shot with what

3   was believed to be an armed -- a gun in his hand.  And

4   the question the Court needs to consider here is

5   whether or not his -- meaning Officer Leo's -- actions

6   were reasonable, objectively reasonable, given the

7   totality of the circumstances.  And we believe that

8   answer is yes here.

9           The plaintiff's expert has basically stated

10  in his testimony that there was nothing wrong with any

11  of the actions taken by any of the police officers

12  leading up to the actual shot being made.

13          Mr. Bradley stated that there was nothing

14  wrong with the initial contact the officers had with

15  Mr. Briscoe; there was nothing wrong with them facing

16  Mr. Briscoe, and there was nothing wrong with

17  Mr. Briscoe -- I'm sorry.  Those two things.  It was

18  the shooting of Mr. Briscoe that's at issue here.

19          We have submitted, and opposed counsel has

20  as well, a video of the incident that happened to be

21  captured by the crime television camera that was

22  posted on -- right at the corner of Stanton Road and

23  Elvans Road.  And what it captured is Mr. Briscoe

24  running across the street as he left the apartment,

25  the Forest Ridge apartment complex down the street, to

1  ultimately where he was shot.

2           And what I want to do is draw the Court's

3  attention to a few things on that video, if I may,

4  Your Honor.

5           THE COURT:  Before you start --

6           MS. FEATHERSTONE:  Yes, Your Honor.

7           THE COURT:  -- tell me, this is a mounted

8  closed circuit video camera?

9           MS. FEATHERSTONE:  It is, Your Honor.

10          THE COURT:  And it spans back and forth

11  randomly?

12          MS. FEATHERSTONE:  Yes, Your Honor.

13          THE COURT:  And it just so happened to catch

14  the relevant event?

15          MS. FEATHERSTONE:  It did, Your Honor.

16          THE COURT:  When did the video come to the

17  attention of the government?

18          MS. FEATHERSTONE:  Immediately.  The

19  video -- the camera is always there, because it's a

20  crime camera that was posted in the neighborhood

21  specifically.  So during the investigation, the video

22  was made known.  They knew the video -- I mean, the

23  police department knew the video was there.

24          THE COURT:  Had they viewed the video before

25  they interviewed Officer Leo as part of their

1   investigation initially?

2               MS. FEATHERSTONE:  I don't know if the --

3   no, because the initial interviews took place on the

4   scene with -- the internal affairs arrived on the

5   scene and met each of the officers immediately.  Then

6   subsequently there was an investigation opened.

7               THE COURT:  How long did it take internal

8   affairs to obtain a copy?

9               MS. FEATHERSTONE:  That, Your Honor, I don't

10  have a specific knowledge of.  I know that at some

11  point during the investigation it did come to their

12  attention, and they did observe the video.

13              THE COURT:  And then they asked Mr. Leo

14  about the video in his second interview?

15              MS. FEATHERSTONE:  They did.  Because

16  there's a general order that prohibits officers

17  shooting from moving vehicles, and that would have

18  been a violation of the general order had he done so.

19  And so they went over the video with him as a result

20  of that violation -- potential violation and concluded

21  that he had not violated the general order.

22              THE COURT:  Is that the only potential

23  violation that they investigated, the fact that the

24  vehicle was moving or not?

25              MS. FEATHERSTONE:  No, Your Honor.  The

1    initial investigation had to do with the actual

2    shooting itself.  The one additional issue that could

3    have been raised as part of that was the fact that the

4    vehicle was moving when the shot was made.  And so

5    they --

6              THE COURT:  But are you telling me that the

7    only reason they showed him the video was to determine

8    whether or not the car was still moving or not?

9              MS. FEATHERSTONE:  That was a -- based on

10   the interview that was recorded between the

11   investigator and Officer Leo, that was the focus of

12   their concern with respect to the video.

13             I'm not gonna say that was the only reason

14   why they showed it to him, but that appeared to be one

15   of the questions that they wanted to have further

16   answers to in conducting the investigation.

17             THE COURT:  Okay.

18             MS. FEATHERSTONE:  What I'm showing the

19   Court, Your Honor, is the black and white slowed

20   version, which is the 90 percent, so it moves at --

21             THE COURT:  Before we get there, there was

22   some discussion at the last hearing that we had

23   regarding a second video.  Do you recall that?

24             MS. FEATHERSTONE:  I do, Your Honor.

25             THE COURT:  Okay.  Could you tell me how

1    this video that you're about to show me compares with

2    any other videos that may be part of the evidence?

3           MS. FEATHERSTONE:  We turned over the

4    circuit television for the day, for a longer period of

5    time.  And so what this is, is the FBI actually took

6    the video, the full captured video for the day or for

7    that portion of the day, and just narrowed it down to

8    the very specific events.  So they were provided a

9    copy.  It's just the full day.  It's just spanning

10   back and forth pretty much all day.

11          THE COURT:  Okay.  But there's no other --

12   there's no video from a different camera --

13          MS. FEATHERSTONE:  No.

14          THE COURT:  -- than the one that's in the

15   record?

16          MS. FEATHERSTONE:  No, Your Honor.

17          THE COURT:  Okay. So there's no video from

18   the car or otherwise?

19          MS. FEATHERSTONE:  No, Your Honor.

20          THE COURT:  Sorry.

21          (Whereupon, at 10:43 a.m. the video was

22          played.)

23          MS. FEATHERSTONE:  Mr. Briscoe is now

24   entering the scene, Your Honor.  I want to stop.  Here

25   is the first hint that the Court can see of what

1    Officer Leo believed to be a gun in his hand.  It

2    wasn't until he was in the street that Officer Leo

3    testified, which is part of the record, that he saw

4    him initially holding his waistband and then pulling

5    out what appeared to be a gun in his hand.

6              Again, here, Your Honor, the Court can see,

7    again, that is what Officer Leo saw in Mr. Briscoe's

8    hand.  Again, he believed that to be a gun in his

9    hand.

10             THE COURT:  Hold on.  How do we know that

11   Officer Leo has turned the corner by this point and is

12   observing the defendant in this particular position?

13             MS. FEATHERSTONE:  When you say turn the

14   corner, Your Honor, you mean come out of the complex?

15             THE COURT:  Yes.

16             MS. FEATHERSTONE:  Officer Leo testified to

17   this, Your Honor.  It's in the record based on his

18   testimony that he saw Mr. Briscoe with a weapon in his

19   hand as he's crossing the street.  You are not able to

20   see the vehicle and the car, but that was his

21   testimony -- I mean, sorry, in the frame.

22             And, again, Your Honor, this stays in his

23   hand the entire time that he's running.

24             There's a portion of the video the Court's

25   gonna see that he goes under a tree, which we can't

1     see what he's doing there, but Officer Leo's testimony

2     is that at some point here, Your Honor, we can't

3     really see what's going on with Mr. Briscoe.  As you

4     can see, it's dark.  It's shaded by the trees.  But

5     Officer Leo saw him look back.  We're talking about in

6     a very quick pace of events that are occurring.

7             We don't know what Officer Leo believed he

8     saw.  He saw a man running with a gun.  He also saw --

9     noted his two fellow officers had by this time jumped

10    out of the vehicle, and he also knew that there was a

11    citizen -- as the Court will see in just a moment, I'm

12    going to show you, there's a citizen walking towards

13    the series of events as they are occurring.

14            And it's in the top left-hand corner as the

15    camera pans in.  When it pans over, you'll see over

16    here, there's a citizen that's walking.  In which

17    plaintiff's, in their opposition, stated there were no

18    citizens near the vicinity of the incidents as they

19    were occurring.

20            So what we have here, Your Honor, is an

21    individual who is asked if he had a weapon.  Rather

22    than give a response to the officers, he ran.

23    Initially, he's seen holding his pants and then what

24    appears to be a weapon now in his hand.

25            We know that two officers have exited out of

1   the vehicle that are running behind him.  No one can

2   speculate in this courtroom, Your Honor, about what

3   Mr. Briscoe would have done.  Whether he would have

4   continued to run, stop, turn around and shoot, we

5   don't know.  We know he's armed.  He's running.

6   There's two officers out of the car, and there's a

7   citizen that's walking straight ahead towards the

8   officer and Mr. Briscoe on the other side of the

9   street.

10          And those are really the facts that the

11  Court has to consider.  And that's what Officer Leo

12  had to consider that day, Your Honor.

13          THE COURT:  So the government's position is,

14  and Officer Leo testified to the FIT, that he observed

15  Mr. Briscoe turning his torso and facing them and

16  pulling the gun up.  That occurred while he was

17  obscured under the tree in the video, or did that take

18  place at some point later?

19          MS. FEATHERSTONE:  No, Your Honor.  Officer

20  Leo did testify that he believed Mr. Briscoe turned

21  and faced him with the gun as he turned into the

22  driveway.

23          THE COURT:  As he turned into the driveway.

24  Does the video depict that?

25          MS. FEATHERSTONE:  The video does not depict

1   that, Your Honor.

2            THE COURT:  Did Leo ever say that he turned

3   and faced earlier than that?

4            MS. FEATHERSTONE:  No.  He did say that he

5   looked back, but he did not say that he turned and

6   faced the gun towards him.

7            And while we're looking at this, Your Honor,

8   after the fact and we're seeing it on the video, we're

9   showing it in slowed motion, these are a series of

10  events that occurred very rapidly, less than a minute

11  and a half between when he initially encountered

12  Mr. Briscoe and the shooting itself.  And so when

13  things are happening in a very fast-paced way, it's

14  possible that the officer can misconstrue and

15  something specifically happens.  So the fact that

16  Mr. Briscoe is armed, is running -- or appeared to be

17  armed by Mr. Leo; he's running, the officers are out

18  of the car, and he is looking back with a weapon in

19  his hand.  That all, in itself, made Officer Leo take

20  action here.  And I think that that's objectively

21  reasonable given those circumstances.

22            Now, the fact that he said something

23  differently in his interview about when he saw

24  Mr. Briscoe turn and face the gun towards him, he

25  never changed his story.  He never said, oh, no, I was

1  wrong.  It didn't happen then, because that's when he

2  reasonably believed it had happened.

3          THE COURT:  Now, Officer Torres testified

4  that he did not believe there was any threat posed at

5  the time of the shooting.  Is that correct?

6          MS. FEATHERSTONE:  To him.

7          THE COURT:  To him.  So if he didn't believe

8  that there was a reasonable threat posed, why wouldn't

9  a reasonable juror -- why couldn't a reasonable juror

10  conclude that there was no reasonable threat posed?

11          MS. FEATHERSTONE:  Well, Your Honor, the

12  Court -- the officers can't sit around and confer

13  about whether or not a person is a threat.  We're

14  looking at it from different angles.  We're not

15  talking about a case where all the officers are

16  together in the same -- or seeing the same thing.

17          THE COURT:  No, but if there's one officer

18  in the front passenger seat and another one in the

19  rear seat, and one believes that force is necessary

20  and another officer does not believe that force is

21  necessary, doesn't that create a question of fact for

22  purposes of summary judgment?

23          MS. FEATHERSTONE:  No, Your Honor.  Those

24  are subjective views.  I think what the Court needs to

25  look at is from an objectively reasonable officer.

1    Just because one officer believes that force is

2    necessary, one may not.  That's the same way when the

3    courts look at dog shooting cases where an officer,

4    who may be 7 foot, 6'5", 300 pounds, he's faced with a

5    Cane Corso dog, he may not shoot the dog, or he may

6    have other experience with dogs that would not lead

7    him to shoot.  Where if you have a 5'2", 100-pound

8    officer faced with the same dog, then that may be

9    reasonable under those circumstances.

10            The plaintiff used the *Larson* court as part

11   of their opposition.  The *Larson* court does say that

12   you have to look at the totality of the circumstances

13   in that given case, and it's based on the person who

14   took the action whether an objectively reasonable

15   officer would have done the same thing.

16            Leo and Torres were not in the same

17   position.  One was in the back seat, one was in the

18   front seat.  Leo -- and Officer Torres still said that

19   he was armed.

20            THE COURT: Okay.

21            MS. FEATHERSTONE:  I think that's important,

22   Your Honor.  I think that's important to know that

23   looking at it objectively whether Officer Torres would

24   have taken action or not doesn't mean that Officer

25   Leo's actions were not objectively reasonable from an

1    objectively reasonable officer.

2            THE COURT:  Okay.  What other evidence in

3    the record is there as to whether Mr. Briscoe was

4    armed or not both prior to the chase and at the scene?

5            MS. FEATHERSTONE:  When determining

6    qualified immunity?  Does the Court just want to know

7    information, or for qualified immunity purposes?

8            THE COURT:  No.  For purposes of summary

9    judgment I think it's relevant as to what other

10   evidence in the record there is of him being armed

11   other than the video.  If I conclude that the video is

12   inconclusive on that point, what other evidence is

13   there as to whether or not he was armed?

14           MS. FEATHERSTONE:  Well, we actually have

15   the weapon that was found.  And while plaintiffs have

16   attempted to create a dispute of fact by offering

17   testimony of a witness who says the officers went into

18   the woods and brought -- and planted the gun and

19   brought it out, you have Mr. Briscoe's statements that

20   he made to Officer Sheehan, which we provided in the

21   affidavit, because Officer Sheehan is the one who

22   responded to Mr. Briscoe and basically sat there with

23   him until the ambulance responded.

24           And his statement was, you guys shot me.

25   It's not even real.  I should have never run.  And him

1    saying, it's not even real, those words coupled with

2    the fact that there was a BB gun that was found on the

3    scene, which also looked like a real gun, was not made

4    by a real gun maker.

5            Even if the Court set the light in the light

6    most favorable to the plaintiff, it can't be refuted

7    by Mr. Briscoe's own words that were spoken to one of

8    the officers on the scene, who basically stayed with

9    him until the ambulance arrived, that was his first

10   statements made to the officer.

11           THE COURT:  Okay.

12           Mr. Bynum, do you want to address the

13   qualified immunity issue?

14           MR. BYNUM:  Yes, sir.  May it please the

15   Court.

16           THE COURT:  Yes.

17           MR. BYNUM:  Yes.  And I will address that

18   issue, Your Honor.  Mr. Ponds will handle the *Monell*

19   issue and related common law claims.

20           Miss Anapol, who is seated to the left

21   behind me, will be assisting me with the video

22   presentation.

23           Your Honor, viewing the evidence in the

24   light most favorable to the nonmoving party, what we

25   have here is an eighteen-year-old, who suffered from

1    ADD.  April 26, 2011, about 2:22 in the afternoon --

2             THE COURT:  Where is the ADD document that's

3    in the record?  I missed that.

4             MR. BYNUM:  There is the testimony of

5    Mrs. Lane in her deposition.

6             THE COURT:  Okay.

7             MR. BYNUM:  Mr. Briscoe was on his cell

8    phone in front of the apartment complex minding his

9    own business when four undercover plainclothes

10   officers in an unmarked car approached him without

11   probable cause.

12            One asked him:  Hey, buddy, have you got a

13   gun?  To which he replied, no.  Two officers jump out.

14   He runs, which I believe is a reasonable reaction.

15            Now, it's interesting, Your Honor, the two

16   officers who jumped out, Katz and Sheehan, follow him

17   on foot and had an unobstructed view of him.  Neither

18   one of them testified he had a gun.

19            As a matter of fact, as Katz, who is the

20   lead officer on foot, was running after him, up

21   into -- out of the apartment complex and the left on

22   Elvans Road, testified in detail -- and I'm going to

23   show you his testimony in a minute -- that he did not

24   see a gun.

25            Now, and there were --

1          THE COURT:  Did either officer observe him

2     in the -- while he was crossing the street, the video

3     Miss Featherstone highlighted?

4          MR. BYNUM:  Yes.  Officers Katz and Sheehan

5     followed him on foot and followed him all the way to

6     the driveway.  They were overtaken by the unmarked car

7     on the way, but they were on foot in front.  They had

8     a head start.

9          Mr. Briscoe, as you'll see in a minute,

10     takes a turn.  It's interesting to note that two --

11     the eyewitnesses, Dominic Derricotte and LaTonya Boyd,

12     who are husband and wife, they are at the mouth of the

13     apartment complex in the driveway.  They stop because

14     of the come motion.  They see the young man in front

15     of him -- if front of them, the car eight to ten feet

16     away, right in front of them, no gun in his hand.

17          Now, Carlotta Inman, another lay witness who

18     saw basically the entire incident, also said no gun.

19     She was deposed as well.

20          Now, Mr. Briscoe came into the view of the

21     camera, which is used for law enforcement purposes,

22     and the video shows Mr. Briscoe running.

23          To respond to a question that you had, Your

24     Honor, it was two days after when Detective Ruckman of

25     the fifth unit took the second statement of Officer

1    Torres and, in his view, to clear up some gaps.

2    That's what he asked about, because there's some

3    question about what he had.

4              And in a question that was there -- and this

5    is in part of the record -- when you guys first

6    approached Mr. Briscoe in the vehicle, do you recall

7    seeing whether or not he had a weapon or describe what

8    you saw, if anything?

9              The answer by Officer Torres in the back

10   seat said, no, all I saw I believe was him talking on

11   his cell phone.

12             Now, Your Honor -- the only lay witness, who

13   was interrogated by the police, a Rashida McNeil,

14   there's an audio tape of her, described everything she

15   saw and saw this young man running, pulling his pants

16   up the whole time and saying, at the end of the

17   tape -- you know, then he shot him; that's messed up.

18             Interestingly, the officer, Detective

19   Ruckman, never asked Miss McNeil whether or not Mr. --

20   the victim had a gun.

21             Now, the tape will show Mr. Briscoe sitting

22   in an unmarked car approaching him from behind.  When

23   asked in deposition, there's no testimony of any

24   lights in the car, no sirens, nothing.  Torres, in the

25   back seat, does not recall Officer Leo, the driver,

1    saying anything to Mr. Briscoe while they were

2    traveling behind him.

3            Leo says there's a threat of harm when he

4    pointed the gun.  That's when he felt that there was

5    threat of imminent harm at the driveway.

6            We know the --

7            THE COURT:  I'm sorry.

8            MR. BYNUM:  I'm sorry.

9            THE COURT:  When did he make that statement,

10   at his initial FIT interview or in his deposition?

11           MR. BYNUM:  Both.  He says it in the FIT and

12   then specifically -- the last question I asked him in

13   his deposition was to the effect -- and I'll get to it

14   in a second -- would it be fair to say that there --

15   that you -- the only time he pointed a gun at you was

16   at the mouth of the driveway?  Yes.

17           Leo's car is ten, fifteen feet away from

18   Briscoe at the time of the shooting.  Mr. Briscoe shot

19   two times by Mr. Leo.  We know from testimony of

20   Officer Sheehan and both of the experts, Key and

21   Bradley, that this bullet travels about 900 feet per

22   second.  So we know that between ten and fifteen

23   feet -- this is Leo's testimony -- the shot was fired,

24   got from the discharge to the back of Mr. Briscoe

25   between 10-900s and 15-900s of a second.

1          Now, it's important for the Court to know,

2   forensically, where these shots took place.

3          And Miss Anapol, could you go to Pages 2 to

4   14.

5          Your Honor, the Court will see now, the

6   gunshot wounds on the top of the trousers on the left

7   side of Mr. Briscoe -- keep going, please.  And I

8   point -- I have a pointer pointed toward the -- one of

9   the shots described in the autopsy report as gunshot

10  B.

11         Please continue.

12         And you have better pictures of it there.

13         Continue, please.

14         All right.  Another picture of it.

15         Please continue.  Okay.

16         Now you have gunshot wound A described in

17  the autopsy is in the left back area of his shirt.

18         Please continue.

19         And you see where I'm pointing at where that

20  shot went in.  So you see now, Your Honor, where both

21  shots went into Mr. Leo.

22         Now, one issue, I think --

23         THE COURT:  I think you mean Mr. Briscoe.

24         MR. BYNUM:  Mr. Briscoe.  I'm sorry, Your

25  Honor.

1          One of the things that I think is important

2     is that in the FIT report where they are describing

3     what happened, they describe gunshot B in the left

4     buttocks area of Mr. Briscoe being -- had a trajectory

5     of -- from the back and upward slightly to the right

6     consistent with him running.  This is in the FIT

7     report, Your Honor.

8          So if I could demonstrate.  If he's running,

9     and his left leg is up, and he's shot as is described,

10    he's running away, and so there's a forensic evidence

11    of that.

12         His body is turned over by the police, and

13    he's handcuffed.  He's obviously bleeding.  And this

14    is additional forensic evidence that goes to the

15    totality of the circumstances here.  Mr. Briscoe was

16    shot at 2:22 and 44 seconds.

17         Now, if you go to slide 55, please.

18         Slide 55 -- and we're -- it's going to take

19    us a second to get there.  But slide 55, Your Honor,

20    are the cell phone records kept by Miss Lane,

21    Mr. Briscoe's mother.  She had a family plan.  She had

22    all of the records of all of her children on one

23    thing.  And on Page 55, Your Honor, you're gonna see

24    the cell phone record of Mr. Briscoe for that day.  At

25    the bottom, the last call, tragically, is at 2:22.

1              And if you go to the next page, Page 56.

2              I enlarged it for the Court.  You'll see

3    that the phone call started at 2:22 and went for three

4    minutes.  That brings the phone call that was in place

5    from 2:22 to 2:25 showing, forensically, that

6    Mr. Briscoe was still on a phone conversation when he

7    got shot, which leads us to believe, reasonably, or a

8    jury to at least consider, that what Torres said was

9    that -- not only in his statements but also in his

10   deposition, that when he first saw Mr. Briscoe, he was

11   on the telephone.  That is what was in his hand.

12             And there's no evidence, because I asked in

13   deposition, that Mr. Torres, Officer Torres,

14   communicated any of that to Officer Leo.

15             THE COURT:  Right.  Why is it mutually

16   exclusive?  Couldn't a reasonable juror conclude that

17   he had both a cell phone in his hand or in his pocket

18   and a gun in the other hand or the other pocket, the

19   gun that was found on the scene when he was shot?

20             MR. BYNUM:  Potentially, but the evidence

21   shows in the depositions that there's no evidence of

22   him shuffling in and out of his pocket.  Because those

23   questions were asked, because I had the same concern.

24   So there's no evidence of him exchanging it.

25             All the officers, Katz and Sheehan,

1    specifically, said that he was running fast.  He was

2    making it out of there and had -- you know, it's

3    reasonable to believe that he had no opportunity to

4    take the cell phone, put it in his pocket, and take

5    the gun out.

6              Now, I asked the question of Miss Lane

7    during her deposition, during my opportunity, and I

8    asked, is your son left-handed or right-handed?  She

9    said right-handed.  So more likely than not, Your

10   Honor, the gun -- excuse me -- that cell phone is in

11   his right hand, and there's no evidence from anybody

12   that he's doing an exchange of hands.  The object's in

13   his hand as he's running.

14             THE COURT:  How do you explain the BB gun

15   found on the scene?

16             MR. BYNUM:  Well, one, we believe it was not

17   Mr. Briscoe's for lots of reasons.  One, there was a

18   witness, who our investigator found within a week or

19   two saying that he saw the police go get the gun out

20   of the woods and put it there.

21             Secondly, the gun is broken in three

22   places -- pieces, two sides of the grip, about

23   eight -- I think eleven to fifteen feet away from

24   Mr. Briscoe, and the body of the gun is found in the

25   gravel.

1          Now, Your Honor, there are sidewalks, and

2     there's asphalt there.  And if this -- and I think

3     it's reasonable to assume that if this gun somehow

4     came out of Mr. Briscoe's hands and landed in gravel,

5     that it wouldn't splatter the way it has -- it did in

6     this case that they wanted to depict.

7          In addition, Your Honor, forensically --

8          THE COURT:  So your theory is that the

9     police went into the woods and retrieved a broken BB

10    gun and distributed it, the pieces, around where the

11    crime scene was?

12         MR. BYNUM:  Either that or they had a gun in

13    their -- in their van, or whatever, that they placed

14    there.

15         And let me tell you why I looked into this

16    very deeply.  We found in discovery, because we asked

17    them, about the forensic evidence on the gun that was

18    found, this BB gun.

19         I asked the officers first.  I said, what

20    kind of day was this?  What was the weather?  It was

21    hot.  He was running.  It was a sweat -- it was a

22    situation that would cause, based upon the stress and

23    the weather conditions, him to sweat.  There was no

24    DNA taken on him, who was in custody that whole time

25    after he was shot, and no DNA taken from the gun.

1    Secondly, there were no palm prints or fingerprints

2    taken from the gun, which is a metal object where palm

3    prints and fingerprints are routinely lifted.

4            And, specifically, Your Honor, the police,

5    in their investigation, took fingerprints of the car,

6    the black car.  So they could have taken fingerprints

7    or palm prints or tested for DNA.  They did nothing,

8    Your Honor, which leads me to believe, forensically,

9    that they didn't because they knew they could not

10   attribute the gun to him.

11           And, again, there are witnesses -- I'm

12   sorry.

13           THE COURT:  Okay.

14           MR. BYNUM:  Okay.  There are witnesses who

15   said that this gun was got -- was obtained by the

16   police and placed there.

17           THE COURT:  I'm sorry.  There are witnesses

18   who testified that the gun was placed there?

19           MR. BYNUM:  This is what we have --

20           THE COURT:  Who said that?

21           MR. BYNUM:  A witness.  His name escapes me

22   right now, but the witness who our investigator found

23   within a week or two said that, clear as a bell.

24   We've given those statements over.

25           THE COURT:  Is it cited in the record?

1          MR. BYNUM:  No, it is not.  It is cited in

2     the record in the testimony of our expert; however, as

3     we progressed in discovery in this case, I don't know

4     how to say it, Your Honor, other than there are people

5     on Elvans Road who are afraid to come forward.  That's

6     all I can tell you.

7          THE COURT:  I can't consider it if you

8     haven't filed it.

9          MR. BYNUM:  I know that, but there is

10    evidence from the investigation that that took place.

11    There's a statement to that effect that we have turned

12    over to the defense.

13          Now, a few other things regarding the facts.

14          THE COURT:  So in order for the proverbial

15    reasonable juror to conclude that there was no gun or

16    that Mr. Briscoe did not possess a gun or that Mr. Leo

17    didn't perceive him to have a gun, they had to accept

18    your theory that the evidence was planted on the scene

19    on Elvans Road.

20          MR. BYNUM:  I think they could accept the

21    theory.  I don't think they have to, because even if

22    he had a gun -- and I'm not conceding that, but

23    assuming for purposes of argument that he had some gun

24    on him, this is not -- not unlike *Tennessee versus*

25    *Garner,* Your Honor.  This is the plain felon, posed no

1   threat to the police at all.  I mean, the videotape is

2   the best evidence of what occurred here.  Because as

3   we get into the videotape in a minute, you're going to

4   see that in contrast to what Officer Leo says and what

5   Officer Torres says, there's no way that he posed a

6   threat to them, even if he had a gun.  Again, I'm not

7   conceding that.

8         THE COURT:  That's a different argument.

9   That's an argument, frankly, that I'm more interested

10  in.

11        MR. PONDS:  Your Honor, could I have the

12  Court's indulgence?

13        THE COURT: Sure.

14        (Pause.)

15        MR. PONDS:  Thank you, Your Honor.

16        MR. BYNUM:  Thank you.

17        Your Honor, with respect to the gun, the

18  evidence taken in deposition shows that Officer Katz

19  did some things improperly.  Even Officer Coker, the

20  crime scene search officer, says he never should have

21  taken pictures; he never should have secured the

22  scene.

23        And the second videotape that we have

24  doesn't show anything.  It just shows -- it doesn't

25  even show the shooting.  It shows officers milling

1    around afterwards, minutes -- several minutes after

2    this whole shooting took place.  So we don't have any

3    direct evidence of it.  But these people have

4    relationships, Your Honor.

5              THE COURT:  Who are "these people"?

6              MR. BYNUM:  The GRU officers.  They are all

7    very good friends.  They are all recruited by the same

8    officer.  And there's no evidence of what they did

9    afterwards, because -- it's interesting to note, Your

10   Honor, on almost every crime scene, they'll take DNA;

11   they'll take fingerprints; they'll take palm prints.

12   They took none, none.  And we believe, our theory is,

13   a reasonable juror could believe they took none,

14   because had they done so, the palm prints and the

15   fingerprints and even, potentially, DNA would be that

16   of the police department.

17             So that evidence is in equipoise as to whose

18   gun it was at all, and we think that's an issue that

19   the jury can decide.

20             Again, these are tightly -- it's a tightly

21   knit unit.

22             Now, a few things.  And Mr. Ponds will get

23   into this in more detail, but the Court knows the GRU

24   mandate is to interdict guns in the District of

25   Columbia.  They are specialized.  They require

1    specialized training.  They were reinstated in 2007.

2    The chief of police testified that these gentlemen --

3    or ladies and gentlemen are going to have specialized

4    training.

5              And we found out that -- and I walked every

6    one of these officers through the training, from the

7    department, the employees, the police academy, all the

8    all the way to the GRU.  None of them had any

9    specialized training before they went to the GRU,

10   none.

11             This was verified by their training records

12   and the 30(b)(6) witness that was -- testified.

13             Now, here's the question, Your Honor:  Is

14   the conduct of Officer Leo excused because of his --

15   because he can employ qualified immunity?  It's not.

16             *Saucier* is one of the leading cases talking

17   about qualified immunity.  And so there are really two

18   prongs.  You can take them either way you wish.  One,

19   the officer violated a known constitutional right,

20   that is, excessive force, which is the Fourth

21   Amendment claim.  And if it's conscious shocking, it

22   rolls over to the Fifth Amendment claim.

23             We believe every time you shoot somebody,

24   the cases back us up on this, saying there's a

25   violation of the Fourth Amendment and arguably the

```
1    Fifth Amendment, as we discussed.

2              The second question is whether the right was

3    clearly established and would a reasonable police

4    officer have done the same thing, that is shot

5    Mr. Briscoe in the back two times from ten, fifteen

6    feet away?  The question is, was this a fair ruling

7    that the shooting was unconstitutional?

8              There are lots of facts.  The most recent

9    case --

10             THE COURT:  I've read the cases, and I'm

11   clear on whether or not there was an established

12   constitutional right or not.

13             What I'd like for you to address is, let's

14   assume that Officer Leo reasonably believed that

15   Mr. Briscoe had a weapon.  Okay.  Now, is there still

16   a question of fact, for summary judgment purposes, as

17   to whether he exercised -- whether his conduct was

18   objectively reasonable?

19             MR. BYNUM:  Yes.

20             THE COURT:  And tell me why there is a

21   question of fact assuming -- assuming the officer

22   thought he had a gun.

23             MR. BYNUM:  Even if he thought he had a gun,

24   Your Honor, there's no evidence that this gun was --

25   that he was any threat at all to Mr. -- Officer Leo.
```

1    I asked Officer Leo on the last question, basically,

2    when the threat was perceived.  He said when they got

3    to the driveway.  That's when I perceived -- when he

4    perceived a threat.

5             In going to the tape, Your Honor, you'll see

6    that -- and there's no vagary about this.  The video

7    is pretty clear on this, as clear as can be, that when

8    we got to the tape of him getting to the parking

9    lot -- excuse me -- the driveway area, there's no

10   way -- and it's not seen that Mr. Briscoe pointed a

11   gun at anybody.  No way.  It's just not there.

12            And if we could go to the videotape?  Thank

13   you, Michelle.

14            So that's the one thing.  That's what he

15   said, he perceived the threat of imminent boldly harm.

16   That's when he said he felt he was justified.  The

17   videotape shows Mr. Briscoe turning so sharply to the

18   right and running away that there was -- that a

19   reasonable juror could believe there was no threat.

20            In addition to that, Officer Torres, in the

21   back seat of the car, said in his deposition that

22   Mr. Briscoe got to the mouth of the driveway, stopped,

23   stopped, pointed a gun, and that's why -- that gave

24   rise to the threat of imminent bodily harm.

25            The video shows nothing like that occurred.

1          THE COURT:  That was Torres' testimony?

2          MR. BYNUM:  Torres' testimony.  And I have

3    it here --

4          THE COURT:  I thought Torres testified that

5    he did not perceive a threat, that Torres did not

6    perceive a threat.

7          MR. BYNUM:  Well, Torres went back and

8    forth.  Torres actually is the only officer who said

9    he saw Mr. Briscoe with a gun in the parking lot when

10   he stopped him.

11          He also said, when I asked him, he just kept

12   saying it was a threat; it was a threat; it was a

13   threat.

14          So the two officers that were closest to

15   what occurred, Your Honor, said the threat occurred

16   when he pointed the gun.  Again, Torres said he

17   stopped and pointed the gun.

18          And the video, which I hope is coming up...

19   we had it working earlier, so hopefully we can get it

20   remedied.

21          Your indulgence, Your Honor.

22          THE COURT:  No problem.

23          (Pause.)

24          MR. BYNUM:  Thank you for your indulgence,

25   Your Honor.  We had some technical problems.  I think

1    we're getting it back.

2              THE COURT:  No problem.  It's not on our

3    end, is it?

4              MR. BYNUM:  I don't know.  It was working

5    before.

6              THE COURT:  There you go.

7              MR. BYNUM:  Well, let's start with this,

8    first, Your Honor.  This is the statement of Officer

9    Leo, I believe.  Right?  Okay.

10             He was deposed.  I asked him:  "And just

11   getting over -- going over the statements this

12   afternoon, you're saying that when Mr. Briscoe's gun

13   was pointed, I believe you said at your direction, did

14   that occur at the mouth of the driveway where he was

15   ultimately stopped?

16             "Yes."

17             That is when Officer Leo perceived the

18   threat.  That's when the gun was pointed at him.

19   Otherwise, he's a fleeing fellow just like *Tennessee*

20   *versus Garner*, which the Supreme Court has said the

21   officer are -- the statute says you can shoot a

22   fleeing felon, armed or not, are unconstitutional.  So

23   that's when Officer Leo perceived the threat at the

24   mouth of the driveway.

25             Could I continue?  Okay.

1           And these are Officer Torres' statements,

2   again, regarding the threat: "Question.  All right,

3   now, just so I get this mental picture of what you

4   saw, was it a seat Mr. Briscoe -- you said he was

5   standing still when he got shot.  Is that correct?

6           "Correct.

7           "Question.  So he was standing still, and

8   somehow his -- he was facing -- his head was facing

9   the police car?

10          "Answer.  At least I could say that, yeah.

11          "Question.  Okay.

12          "Answer.  His face was definitely facing the

13  police car.

14          "Question.  Okay.  At the time he was shot?

15          "Answer.  At the time he was shot."

16          He goes on to say:  "Okay.

17          "Question.  So if you are ten to twelve feet

18  away, and he's facing you, and he didn't have his back

19  towards you at the time he was shot, how do you

20  explain him getting shot in the back twice?"

21          There was an objection.  I said, "You can

22  now tell us."

23          His answer was, "Sir, I don't know.  All due

24  respect, I did not shoot him."

25          And I went on to say:  "I know.  But I know

1    you didn't shoot him, and I'm not accusing you of

2    that, but my question is, if you say he was standing

3    still at the time that the shots were fired, that his

4    face was facing you and he was running toward the

5    direction west on Elvans Road, and Officer Leo had

6    drawn even with him, how do you explain him getting

7    shot in the back twice?

8            "Answer.  I don't know."

9            Lastly, Your Honor, Officer Katz, who is the

10   first officer running behind Mr. Briscoe, plain view,

11   could see him.

12           "Question.  Now, when you first saw

13   Mr. Briscoe, did you observe any kind of bulge on his

14   waist?

15           "Answer.  I did not."

16           And he was one of the jump out officers,

17   Your Honor.

18           "Question.  Did you ever, during the whole

19   time you saw Mr. Briscoe running, observe a bulge in

20   his waist?

21           "Answer.  I never saw a bulge."

22           "Question.  Did you observe anything in

23   either one of his hands at any time while he was

24   running?

25           There's an objection.  I said -- he was told

1   to answer.

2            The answer was no.

3            Then I asked him the last set of questions:

4   "Did he come to a complete stop before he was shot?

5            "Answer.  I thought that he was.

6            "Question.  Have you seen anything that

7   alters your view of whether or not he came to a stop

8   before he was shot?

9            "Answer.  When I saw the video, I saw that

10   he did not come to a complete stop.

11            "Could you tell us from the video whether or

12   not he slowed down?

13            "To me it looked like he slowed down.  It

14   looks like there is something going on with his left

15   foot when he slows down.

16            "Question.  Do you agree with me that this

17   happened fairly quickly?

18            "Yes, super quick.

19            "Question.  And did you see Mr. Briscoe

20   point anything, gun or otherwise, at Officer Leo's

21   unmarked car?

22            "Answer.  No.

23            "Then there came a time when Officer Leo's

24   unmarked vehicle became parallel to Mr. Briscoe?

25            "Answer.  Yes.

1          "Question.  Was that approximately -- give

2     me a framework.

3          "Answer.  There's that house on the right

4     hand side.  There's a driveway if you look at the

5     house on the left in the area, parallel to the

6     driveway.

7          "Question.  Now, that is where

8     Mr. Briscoe -- Mr. Leo's unmarked car caught up with

9     Mr. Briscoe?

10         "Answer.  Yes.

11         "Adjacent to the driveway?

12         "Yes."

13         Your Honor, the officer on foot never saw

14    Mr. Briscoe coming, ever.  He never saw him more or

15    less point anything at the direction of the police.

16         If there's going to be a threat that a

17    reasonable officer can understand, that's when it

18    takes place, when there's a pointing, when there's

19    imminent threat of boldly harm.  That's reasonable.

20         There's no evidence from these officers, and

21    quite frankly, Officer Torres' testimony, that he

22    stopped --

23         You can take it down, Michelle.

24         That he stops and pointing a gun and facing

25    him and got shot in the back twice in a nano second is

1    a question for the jury to decide whether or not that

2    took place.

3            So we can go to the tape this time.  Let's

4    try it again.

5            THE COURT:  While she's doing that, let me

6    ask a question.

7            MR. BYNUM:  Sure.

8            THE COURT:  I understand Officer Leo

9    testified that he perceived a threat at the mouth of

10   the driveway, correct?

11           MR. BYNUM:  Yes, sir.

12           THE COURT:  But he also testified, as

13   Miss Featherstone pointed out, that he observed the

14   gun in his hand while he was crossing the street,

15   which took place much earlier?

16           MR. BYNUM:  Yes, that's their view.

17           THE COURT:  If that testimony is credited,

18   okay, why didn't the threat materialize there if, A,

19   there are two officers on foot right behind him; B, a

20   pedestrian on the sidewalk in front of him; and, C,

21   two officers in the car pursuing him, why did not a

22   threat exist at that instance, when he sees the gun?

23           MR. BYNUM:  Because, first, there's no

24   factual basis for the allegation.

25           THE COURT:  Well, there's Leo's testimony.

1          MR. BYNUM:  You're right.  There's Leo's

2     testimony of that.  But if the Court recalls the

3     video, when Mr. Briscoe came around the corner, you

4     couldn't even see where the unmarked car was.  So we

5     have no idea what his vantage point was.  That's the

6     first thing.  So I think that calls that into

7     question.

8          Secondly, Officers Sheehan and Katz, who are

9     behind the -- Mr. Briscoe, never perceived a threat,

10    and they are the ones behind him.  Had they done so,

11    Your Honor, I think the testimony would have been

12    their guns were out; they were prepared to shoot and

13    stop, because that's what their training is supposed

14    to be.  So there's no evidence -- no credible evidence

15    there was a threat.

16         The only one who testifies to it is the one

17    who did the shooting.  And I think because there is a

18    flux in the evidence, that's a question of fact for a

19    reasonable jury to decide.

20         The Court's familiar with the cases.  Under

21    the second prong, we -- these cases go on the totality

22    of the circumstances.  And unlike -- not unlike the

23    *Tolan* case where *Tolan's* son survived and could

24    testify about it, the Supreme Court made it very

25    clear, we're going to -- when there's testimony like

1    that about a dispute about whether or not there was a

2    threat, we're gonna let the jury decide.  And that's

3    what they did in *Tolan*.  *Tolan* survived.

4              Mr. Briscoe didn't, but we have the

5    testimony from the videotape of what occurred.  And

6    I'm --

7              THE COURT:  Hopefully.

8              MR. BYNUM:  Yeah, exactly.  Because, Your

9    Honor, I'm sure the Court has seen the tape.  There's

10   just absolutely no evidence that -- I'll put it this

11   way, if there is any evidence, it's in dispute about

12   whether or not, one, Mr. Briscoe stopped and pointed a

13   gun at the police at the mouth of the driveway.

14   There's a huge dispute about that.

15             There's a huge dispute about whether or not

16   Officer Leo could have perceived a threat based upon

17   what we see in the videotape.

18             And as the defense said, well, the videotape

19   doesn't show everything.  It's the best we have.  And

20   I think at this point in the proceedings, the Court

21   can -- can decide there are lots of facts in dispute

22   and that a reasonable juror can believe -- should be

23   able to consider that.

24             The last point I want to make, if we can't

25   get this tape up, is the Court should let the jury

1    consider the forensic evidence as well.  We're looking

2    at 10-900s of a second.  And there's no way I believe,

3    Your Honor -- I'm not a scientist, but there's no way

4    that a jury should not be able to consider that.  If

5    there's evidence that he was stopped and facing the

6    police, and 10-900s of a second, or even giving the

7    benefit of the doubt, 15-900s of a second, he's shot

8    with the leg up once in the back as he's running away.

9    He has to be the fastest man in creation to be a able

10   to look at a police officer, point at gun at him, and

11   15-900s of a second be shot in the back twice.

12              I guess we are not going to be able to get

13   it up.  If we can prevail, Mr. Ponds will bring that

14   to the Court's attention.  Mr. Ponds and I will

15   address the issues of --

16              THE COURT:  Before we get there,

17   Miss Featherstone, is there anything you want to

18   quickly address?

19              MS. FEATHERSTONE:  Yes, Your Honor, briefly.

20              Your Honor, the video has a unique

21   perspective here, because it allows the Court to see

22   events that were unfolding that day.  But it also has

23   a dangerous aspect to it.  This is hindsight, which is

24   what we're not supposed to do in these types of cases,

25   is look at things in hindsight, how it could have been

1    different.

2           And one of the things that the plaintiff has

3    constantly gone back and forth on, about whether there

4    was a gun, whether there wasn't a gun, whether there

5    was a cell phone versus a gun, there's witnesses that

6    say he had absolutely nothing in his hand, and there's

7    witnesses that say they saw him on the cell phone so

8    it had to be a cell phone in his hand.  But none of

9    those facts are really relevant here as to what

10   Officer Leo reasonably believed and what he saw as the

11   events were unfolding in less than a minute and a half

12   of time from the initial contact to the actual

13   shooting.

14          There's the question about whether or not he

15   actually turned and faced the gun at Officer Leo.  But

16   the Court posed a very important question, which I

17   thought summed up the District's argument or Officer

18   Leo's argument here, is that the threat is when the

19   weapon is in his hand.  Mr. Briscoe has a gun in his

20   hand --

21          THE COURT:  That's not necessarily true.  He

22   can have a gun in his hand, and if he's running from

23   the police, that does not necessarily mean there's a

24   threat, correct?

25          MS. FEATHERSTONE:  No, Your Honor.  I don't

1    agree with that, Your Honor, because the officer can

2    perceive a threat with the weapon drawn.

3              Now, there are many reasons why

4    Mr. Briscoe --

5              THE COURT:  He can perceive it, but the

6    question is whether or not that's objectively

7    reasonable or not.  And if the suspect is running

8    away, pumping his arms, even if he has a gun, a

9    reasonable juror could conclude that it is not

10   objectively reasonable for an officer to shoot him in

11   the back, right?

12             MS. FEATHERSTONE:  Your Honor, running away

13   is, again, a statement that the plaintiffs have used.

14   He was running with a gun.  It's a man running with a

15   gun.

16             THE COURT:  Was he running towards someone?

17             MS. FEATHERSTONE:  We don't know where he

18   was running.  He was running.

19             THE COURT:  You're saying he wasn't running

20   away from the SUV that was chasing him?

21             MS. FEATHERSTONE:  Well, he ran from the

22   officers when he was standing in the parking lot, yes.

23             THE COURT:  So he was running away from the

24   police?

25             MS. FEATHERSTONE:  Yes, he was running away

1    from the police.  I thought the Court was suggesting

2    he was running to a specific place.  That's what I

3    want to clarify for the record.  There's no evidence

4    of where he was going.  He was just running with the

5    weapon in his hand, which is what is seen on the

6    video.  And that's what Officer Leo believed.

7           Now, the plaintiff has trial testimony back

8    to Torres, Katz, and Sheehan.  Torres and Katz were

9    overtaken by Mr. Briscoe.  They had to move out of the

10   way for the vehicle to pass.  So they lost footing

11   there.  So when you asked at the very beginning of

12   plaintiff's argument whether or not Officers Katz and

13   Sheehan had the same vantage point of what was seen in

14   the video, the answer is no, because they were further

15   behind, because the van had overtaken them.

16          As the Court saw in the video how quickly

17   after we saw it in 90 percent, but I could show it in

18   original footage how quickly the van comes out into

19   the scene of the video camera after Mr. Briscoe is

20   seen running.  It's Officer Leo's testimony that he

21   didn't see anything in his hand until he got into the

22   streets.  He actually testified that when he was in

23   the parking lot, it was the officers on the passenger

24   side that made contact with Mr. Briscoe.  He was just

25   the driver, so he wasn't really focusing on

1    Mr. Briscoe.  And it wasn't until Mr. Briscoe took

2    flight that Officer Leo then became engaged with

3    Mr. Briscoe and he saw him holding his waistband.

4            Now, the reason why the plaintiffs -- there

5    was testimony taken of Miss Inman, who testified that

6    the officers had to go over and to plant the gun, but

7    it didn't make it to the record, because she had a lot

8    of testimony that was kind of all over the place.

9            But there is testimony here that, if the

10   Court is going to consider, there was a gun in

11   Mr. Briscoe's hand.

12           Now, the plaintiff said that there were no

13   fingerprints taken because it was a plastic weapon.

14   When it hit the ground, it splattered into pieces.  It

15   was made to look like a real Walther, W-A-L-T-H-E-R,

16   but it was not.  It was a plastic version of it that

17   splattered to the ground when it hit, and that's why

18   it was found in pieces.

19           None of that is relevant, because Officer

20   Leo reasonably believed he had the gun in his hand

21   when he made the shot.  And as the record shows, there

22   was a citizen on the street.  There were officers on

23   foot behind him.  And it doesn't have to be the actual

24   threat to the officer.  It doesn't have to be that he

25   is being personally threatened, and no one else, for

1    him to take flight.  In fact, the *Larson* Court says --

2              THE COURT:  Let's stop there.  Because as I

3    read Leo's deposition testimony, he says that he

4    believed that he was in danger and that his fellow

5    officers were in danger.  Is that correct?

6              MS. FEATHERSTONE:  Yes, Your Honor.

7              THE COURT:  Does he say anything about the

8    general public --

9              MS. FEATHERSTONE:  I can double check the

10   testimony.

11             THE COURT:  -- or any third parties?

12             MS. FEATHERSTONE:  I'm sorry?

13             THE COURT:  Or any third parties?

14             MS. FEATHERSTONE:  He does not.

15             THE COURT:  Because you mention the person

16   on the street.  But as I read it, I'm not sure that

17   Leo's position is that he shot him because he feared

18   for any member of the public.

19             MS. FEATHERSTONE:  I only mention that

20   because Plaintiff's counsel in their opposition says

21   emphatically that there were no citizens around, that

22   there was no one else that could have been in danger,

23   so we wanted to make sure that the video -- the Court

24   was clear there was a citizen in the street to refute

25   the position made by the defense.

1          THE COURT:  I understand.

2          MS. FEATHERSTONE:  Your Honor, one of the

3    things the plaintiff fails to realize, the officers

4    don't have to wait until some negative action happens

5    before they take action.  And that's why we believe

6    that the Court can say that a gun in the hand of a

7    person that's running, whether he's running away, does

8    not mean that he doesn't pose a threat.  He doesn't

9    have to shoot or turn and shoot before they realize

10   there's a threat there.  The fact that he's running

11   when he started, he didn't have a gun in his hand,

12   according to the officer who took shot, Officer Leo

13   here, but he saw a weapon emerge in his hand.  So you

14   go from nothing in your hand to a gun in your hand,

15   and all this happened in a very quick moment, Your

16   Honor.

17         THE COURT:  Okay.  I think I've had enough.

18   Let's move on to municipal liability.

19         MS. FEATHERSTONE:  Your Honor,

20   Mr. DeBerardinis is going to handle that portion for

21   the District.  Thank you.

22         THE COURT:  Sure.  That's fine.

23         MR. DeBERARDINIS:  Good morning, again, Your

24   Honor.

25         THE COURT:  Good morning.  No videos, huh?

1          MR. DeBERARDINIS:  Your Honor, in a

2     nutshell, the District's position is that given the

3     extremely high standard of fault that is required by

4     the relevant Supreme Court cases and the evidence in

5     this case, plaintiff's case simply misses the mark by

6     a very wide margin here, Your Honor.

7          And if we start out with the framework that

8     the Court must scrutinize plaintiff's evidence in, it

9     is a stringent standard of fault.  And as the

10    oft-quoted quotation from Justice O'Connor in the

11    *Canton* case, plaintiff's burden here is proof of a

12    background of events and circumstances, the policy and

13    action is the functional equivalent of a decision to

14    violate constitutional rights.  And this is in sharp

15    contrast to unintentional negligent oversight.

16          THE COURT: Understood.

17          MR. DeBERARDINIS:  Looking at plaintiff's

18    evidence here, the usual -- the usual way plaintiffs

19    need to prove a constitutional violation on the part

20    of the municipality is to show a pattern of similar

21    incidents.

22          THE COURT:  Okay.  That's the usual way.

23    But is that required?  Is it necessary?

24          MR. DeBERARDINIS:  Well, it's interesting,

25    Your Honor.  The second way of proof through -- it's

1    so obvious, you should have done something ahead of

2    time.

3              THE COURT: The need for training is so

4    obvious --

5              MR. DeBERARDINIS:  Yes.  It's interesting,

6    because the majority -- that is the law right now, but

7    it's dubious, so we're going to concede that theory,

8    because the majority in the *Connick* v. Thompson case

9    says, you know, that is -- that was merely a

10   hypothetical that we -- that we mentioned in a

11   footnote, and it is a possible exception to the

12   pattern of violations as an alternative way of proof.

13             But -- so the vitality of that theory is

14   suspect, but even assuming that that is the state of

15   the law here --

16             THE COURT:  Right, because the *Parker* case

17   did not involve prior incidents involving --

18             MR. DeBERARDINIS:  That's correct.

19             THE COURT:  -- jurisdictional arrests,

20   correct?

21             MR. DeBERARDINIS:  Right.  Now, certainly

22   vitality of the *Parker* case is very much open to

23   question, Your Honor, given that it was issued prior

24   to the *Canton* case.

25             And if the Court -- if we really analyze

1    what's going on in *Parker*, where the Court says, well,

2    you know, the individual was allowed to go back to

3    work when he wasn't physically fit, and he wasn't

4    provided physical fitness training, and that shows

5    there was deliberate indifference, that sounds an

6    awful lot like negligence, Your Honor.  And the

7    District would submit that *Parker* would not stand

8    today, given subsequent cases of the Supreme Court in

9    *City of Canton* and *Connick*.

10            THE COURT:  Okay.

11            MR. DeBERARDINIS:  Let's look at what we

12   have here, Your Honor.

13            In -- looking at *Connick*.  In *Connick*, the

14   failure that they should have known about it just by

15   the fact that -- without having prior notice, was that

16   they needed to train District attorneys in bringing

17   it.  And there was evidence that there was -- that

18   these officers -- that these attorneys actually needed

19   such training.  But the Court found that given the

20   fact that lawyers received training in criminal

21   procedure and law school, and they took an oath, and

22   have CLE training, that the municipality was not on

23   notice.

24            Similarly, in this case, the District of

25   Columbia provides a great deal of training in use of

1   deadly force.  This is not a situation where -- in the

2   hypothetical posed in *Canton*, where they say, look, if

3   you provide -- if you hire individuals and arm them

4   with guns, they have no way of knowing what the

5   constitutional parameters of the use of force are.

6           And so it's obvious in that hypothetical

7   that, perhaps, that's a constitutional violation,

8   because you should have been aware of that.  Because

9   it really -- it cries out for further training.

10          Here, we have an officer who was confronted

11  with a gun, and he utilized deadly force.  From the

12  District of Columbia's perspective, he had years of

13  twice yearly training in the use of deadly force.

14  There was no -- there's absolutely nothing on the

15  record to indicate that somehow it cried out that he

16  needed further training to deal with this particular

17  situation.

18          THE COURT:  Well, the plaintiff's expert

19  testified and issued a report at least concluding that

20  additional training was required and called for, and

21  he cites a number of types of training and sources of

22  training that these officers should have been doing.

23  Why isn't that sufficient to create a question of fact

24  as to whether the need for training was so obvious

25  that it was disregarded by the District?

1          MR. DeBERARDINIS:  Because what he's talking

2    about there is negligence.  And I was gonna get to

3    that in discussion of the negligence count.  But from

4    this perspective of the District of Columbia, perhaps,

5    for this portion of the argument, perhaps further

6    training was necessary.  But the issue was -- the

7    issue for this Court to determine is whether the lack

8    of that training is the functional equivalent of a

9    decision to violate constitutional rights that it was

10   so obvious.

11          And if we look at that expert's testimony,

12   he's extremely vague as to the deficiencies in the

13   District's training program.  He never testifies, for

14   example, as to why the training that the officer

15   received as to the use of deadly force ill-equipped

16   him to deal with the situation at hand.  The record is

17   absolutely devoid as to that evidence, Your Honor.

18          And as a result, this Court cannot make that

19   leap and say that this cry -- this situation cried out

20   for training.  Otherwise, it's crystal clear that a

21   situation like this was going to arise.

22          Given the training from the use of deadly

23   force, the Court simply can't reach that conclusion.

24   And especially -- and *Connick* makes it clear, Your

25   Honor.

1            THE COURT:  This was a specialized unit,

2    correct?

3            MR. DeBERARDINIS:  As a specialized unit

4    differed, for example, and a specialized unit dealing

5    with hostage situation or dealing with the mentally

6    ill.  In dealing with this gun situation, they are

7    similarly situated to any one of their colleagues on

8    the street who are similarly confronted with a man

9    with a gun.

10           And there's -- and that's where plaintiff's

11   case really fails, Your Honor.  They don't distinguish

12   what this officer was confronted with with what any

13   other officer in the District of Columbia could be

14   confronted with.  This is not a special, for example,

15   hostage situation where you have to have special

16   training in dealing with people who kidnap people and

17   take hostages or you need special training in dealing

18   with the mentally ill.

19           This case cannot be distinguished from any

20   other deadly force case.  The officer -- whether it

21   was -- whether it was correct for the officer to use

22   deadly force or incorrect for him to use deadly force,

23   the analysis is no different than any other cases the

24   Court may have.  And that's why on the second -- the

25   second method for proving constitutional violation

1    simply fails on its own weight, Your Honor.

2              THE COURT:  All right.  Discuss briefly the

3    pattern and practice.

4              MR. BYNUM:  Pattern and practice, prior

5    incident, Your Honor?  Number one, there's absolutely

6    no evidence in this case that any member of the GRU

7    unit ever improperly used deadly force.  And the prior

8    incidents have to be similar.

9              And as a matter of fact, in *Connick*, they

10   say the violations pattern, civil violation, has to be

11   similar, but they probably should have used -- given

12   their ruling, they probably should have used the term

13   "quite similar."  Because in that case, the plaintiff

14   sought to bring in prior Brady violations that did not

15   involve scientific evidence.  And the Court said no.

16   No.  No, prior Brady violations are too broad a stroke

17   here.  You need to bring in Brady violations involving

18   scientific evidence.  And that's why the Court didn't

19   find a pattern of practice.

20             Here's -- here, there's no prior evidence of

21   any officer using deadly force improperly.

22             THE COURT:  Let me interrupt you.  I was

23   somewhat confused by the briefing on this.  There

24   seems to be a dispute over the number of prior

25   complaints that were lodged either to the officer,

```
1    police complaints or to internal affairs.  You all say

2    it's fifteen; plaintiff said it's twenty-five.  What

3    its --

4              MR. DeBERARDINIS:  I believe plaintiff's

5    brief is a typo, Your Honor, given the exhibit which

6    we have submitted to the Court, which is not in

7    dispute.

8              THE COURT:  Okay.

9              Mr. Ponds, is that correct?

10             MR. PONDS:  Your Honor, we'll concede it's

11   fifteen.

12             THE COURT:  Is it fifteen?  Okay.

13             MR. PONDS:  Yes.

14             THE COURT:  Per your briefing,

15   Mr. DeBerardinis, eighteen of those fifteen involved

16   nondeadly force?

17             MR. DeBERARDINIS:  None of them involved

18   deadly force.

19             THE COURT: None of them involved deadly

20   force?

21             MR. DeBERARDINIS:  None of them involved

22   deadly force.  None of the lawsuits the plaintiff

23   relies on involved deadly force.

24             But even if we looked beyond deadly force of

25   those fifteen, Your Honor, the office of police --
```

1          THE COURT:  How many involved shootings --

2          MR. DeBERARDINIS:  None.

3          THE COURT:  -- whether a person died or not?

4          MR. DeBERARDINIS:  Of those complaints,

5    none.

6          THE COURT:  Okay.  Go ahead.

7          MR. DeBERARDINIS:  Even -- even if we

8    descend down the food chain, so to speak, and move

9    down to any violation of the use of force, regardless

10   of whether it was deadly force -- we don't think the

11   Court should do that.  But even if it does, the Office

12   of Police Complaints, out of those fifteen, eight of

13   which the Court -- the office -- the independent

14   Office of Police Complaints did not make a finding

15   that there was excessive use of force.

16          And of the seven remaining that MPD

17   investigated, only one was found involved excessive

18   use of force.  And as we cited in our brief, Your

19   Honor, mere allegations of excessive use of force

20   pattern, pattern and practice, do not suffice.

21          Plaintiff has the obligation of coming

22   forward and presenting evidence that actually, there

23   was -- that this excessive force did occur either by

24   affidavit of an alleged victim or somebody -- there

25   has to be some evidence that there's more than

1  complaints.

2          THE COURT:  Was there a complaint in this

3  case?

4          MR. DeBERARDINIS:  Was there what, Your

5  Honor?

6          THE COURT:  Was there a complaint in this

7  case?

8          MR. DeBERARDINIS:  I'm not sure what the

9  Court means by that question.

10          THE COURT:  Did someone complain to either

11  internal affairs or Office of Police Complaints

12  regarding the use of excessive force in this case?

13          MR. DeBERARDINIS:  I don't believe so, Your

14  Honor.  I don't believe so.

15          THE COURT:  Internal affairs investigated,

16  correct?

17          MR. DeBERARDINIS:  Yes, because there's use

18  of force not because there's a complaint.

19          THE COURT:  And what was its finding?

20          MR. DeBERARDINIS:  The finding was -- the

21  finding was that the officer may have violated an

22  office order by shooting from the car.  That was it.

23          THE COURT:  Because the car was moving and

24  not stopped?

25          MR. DeBERARDINIS:  No.  Short of -- they're

1    supposed to avoid shooting from the car, period.

2    Although even -- I may be wrong.  I may be wrong on

3    that.  But in this case, if -- if the police did --

4    there may have been a technical violation.  But if the

5    police officer correctly perceived the use for deadly

6    force, the fact that they are moving or inside the car

7    is of no moment.

8         THE COURT:  So there is no finding of use of

9    excessive deadly force in this case?

10        MR. DeBERARDINIS:  No, Your Honor.  But we

11   would submit that it's of no moment, because it's not

12   a prior -- it doesn't notify the District of prior

13   incidents.

14        THE COURT:  But you're arguing that the

15   Court should place some weight on the fact that

16   internal affairs only sustained one out of eight

17   cases, correct?

18        MR. DeBERARDINIS:  That's correct, Your

19   Honor.

20        THE COURT:  And so whether or not internal

21   affairs, in its ultimate decision, comports with what

22   the Court viewed on the video seems to be relevant on

23   the question?

24        MR. DeBERARDINIS:  Well, plaintiff has the

25   burden -- if I might use nonlegal jargon, has the

1    burden of proving those investigations, those prior

2    investigations, was a bunch of baloney.  That's

3    plaintiff's burden.  Plaintiff has the burden of

4    showing prior notice, and there's no evidence of prior

5    notice.

6            I should inform the Court that the ruling of

7    the shooting was justified within the department of

8    policy.  That was the ruling of the --

9            THE COURT:  I'm sorry.  One more time?

10           MR. DeBERARDINIS:  It was justified.  The

11   shooting was justified within departmental policy.

12           THE COURT:  Okay.

13           MR. DeBERARDINIS:  Your Honor, plaintiff

14   also makes much of a one-sentence statement of Chief

15   Lanier that's contained in five single-spaced pages of

16   testimony that somehow Chief Lanier created a policy

17   of inaction because she had notified the city council

18   that these officers were going to receive some sort of

19   additional training.  But that statement is so vague

20   that we don't know what Chief Lanier meant by that.

21   It's in the context of gun control in the District of

22   Columbia.

23           THE COURT:  Right.  Whether or not that

24   statement creates some policy of training -- I agree

25   with you, I don't believe it does -- isn't it

1  nonetheless evidence that the need for additional

2  training was self-evident, at least to the chief of

3  police?

4          MR. DEBERARDINIS:  We don't know what kind

5  of training.

6          THE COURT:  Well, what kind of training did

7  she mean?  She meant some training.

8          MR. DeBERARDINIS:  Well, that's correct.  We

9  don't know what kind of training she means.

10  Therefore, here again, the plaintiffs have the burden

11  here, Your Honor.

12          If, for example, years ago, decades ago, the

13  city had a problem with the use of deadly force, and

14  you would have -- you would have had chiefs of police

15  testifying that we need additional training, that

16  we're going to do so, and if the District had not done

17  so, then that would be something -- that would be for

18  a subsequent lawsuit.

19          THE COURT:  Is there any evidence in the

20  record as to why the GRU was disbanded back in the

21  '90s, or whenever it disbanded the first time?

22          MR. DeBERARDINIS:  No, Your Honor.  There is

23  absolutely no proof, evidence, for example, that it

24  was disbanded because too many people were getting

25  shot.  I mean, that would be very -- that might be

1    very telling evidence.

2            THE COURT:  Yes, it would.

3            MR. DeBERARDINIS:  It would be.  But there

4    is no evidence in the record here, Your Honor.  We

5    don't know -- we simply don't know why it was

6    disbanded.  Could have been economics, could have been

7    that they were absorbed into other units.  MPD

8    shuffles the deck a lot and functions -- might go from

9    one unit to another, but the functions don't change.

10           THE COURT:  Is there anything in the chief's

11   statement that would suggest why the unit was

12   disbanded or re -- or start afresh?

13           MR. DeBERARDINIS:  No.  Her testimony deals

14   with gun control in the District of Columbia.

15           THE COURT:  Mr. Ponds.

16           MR. PONDS:  May it please the Court.  Billy

17   Ponds on behalf of plaintiff.  To answer the question

18   the Court posed to Mr. DeBerardinis as to why the GRU

19   was disbanded, we attempted to get that information,

20   but we were precluded by the previous trial Judge to

21   only going back five years.  We were only permitted to

22   go back from 2011 to 2006.  So by court ordered we

23   were denied the opportunity to obtain that

24   information.  We do believe it does exist.

25           THE COURT:  Let's stop there.  As I

1    understand it, the prior order, it was discovery into

2    prior incidents of excessive force or other violations

3    by members of the GRU.  I did not understand that to

4    limit you to discovery on the reasons, the policy

5    reasons, for the disbandment of the unit.

6         MR. PONDS:  We interpreted it as such, Your

7    Honor.  We believe it was disbanded because of

8    misconduct, and that would fall into the category of

9    the Court's orders.  We may have misinterpreted, but

10   that was our reading of the order.

11        Your Honor, on behalf of the plaintiff, we

12   adamantly disagree with the position of the District

13   in terms of the issue of whether or not the District

14   is liable pursuant to municipality liability.

15        We would submit in this case that Chief

16   Lanier's statement -- she appeared before the city

17   council on October the 1st, 2008, and she was giving

18   testimony specific to Bill 17-843, firearms control.

19   And while the plaintiff submits it believes that Chief

20   Lanier, in her role as the chief of the police of the

21   Metropolitan Police Department, as the chief

22   policymaker, was expressing to the city council and

23   the local law makers that this would be her policy,

24   even if the Court rejects the argument that this was

25   the express policy that she was communicating to the

1   city council, we would still submit to the Court that

2   she was on notice, and she was putting the city

3   council on notice that these officers, who are going

4   to be part of the GRU unit, which was a specialized

5   unit, which has been testified to by the District's

6   30(b)(6) officer that it is a specialized unit.  And

7   her exact words to the city council was that in

8   November of 2007, I reinstated the Gun Recovery Unit

9   staffed with officers with enhanced training on

10  identifying and recovering illegal guns.

11          THE COURT:  Okay.  Let's say that was the

12  policy.  How does -- that doesn't mean, does it, that

13  the failure to follow through on the policy was

14  deliberate indifference to a risk of constitutional

15  violation as opposed to some other risk?

16          MR. PONDS:  Well, Your Honor, we would

17  submit to the Court -- Court's indulgence.

18          (Pause.)

19          MR. PONDS:  We would submit to the Court

20  that that inaction that she -- as an expert in terms

21  of Metropolitan Police Department procedures,

22  administration, and she's entrusted with this duty,

23  she makes a decision in terms of how these units are

24  trained, what units are disbanded, units are

25  reactivated.  And we would submit to the Court that

1    the inaction on her part triggers a policy or a

2    custom.  The question then becomes whether or not the

3    failure to follow through on that policy or custom, as

4    she's articulated, triggers deliberate indifference.

5            THE COURT:  Right.  It could have been

6    budgetary.  It could have been neglect.  It could have

7    been, you know, any number of things other than

8    deliberate indifference.  What in the record shows

9    that -- tends to show it was a deliberate policy not

10   to follow through on the training that she referred

11   to?

12           MR. PONDS:  That is correct, Your Honor.

13   And we would submit to the Court that given some of

14   the -- because we would submit similar actions that

15   were being submitted by officers in terms of -- for

16   example, the Terrance Moore case.  The Terrance Moore

17   case, as the Court's read in the briefs, is that --

18   was a situation where officer -- Sergeant Sloane, one

19   of the supervisors in the GRU, as well as Officer

20   Katz, pursued Mr. Moore into a building.  And once in

21   that building, there was -- the officers alleged

22   Mr. Moore not only pointed the gun at them, but

23   specifically, Sergeant Sloane indicated that

24   Mr. Moore, while three feet away from him, fired the

25   gun twice.  As a result of that, Officer Sloane and

1    Officer Katz returned fire.

2           Now, we're fully aware of what has happened

3    subsequently in terms of Mr. Moore's case.  Mr. Moore

4    negotiated a plea offer and the proper facts being

5    negotiated, and he subsequently, at his plea, admitted

6    that he aimed the gun at the officers.

7           But what we do know from the forensic

8    evidence in this case, specifically in the *Moore* case,

9    is that the weapon that Mr. Moore had in his

10   possession that Sergeant Sloane said that he had fired

11   three feet away from him was totally inoperable.  So

12   what we know from that is one of the supervisors in

13   the GRU unit was not truthful in his testimony or in

14   his statement in terms of what occurred in there. And

15   we would submit that was consistent with the culture

16   within the GRU, of the GRU unit, in terms of if

17   there's a belief the shooting was bad to create a

18   cover story to suggest it happened a different way,

19   which also ties what -- we would submit to the Court

20   what happened also in this case.

21          And also, just to supplement Mr. Bynum's

22   submission to the Court, there was a witness, Carlotta

23   Inman, who testified in her deposition as part of the

24   exhibits in this case.  And she was a witness who said

25   she saw the police officers go in the woods and

1    subsequently bring out this item that was subsequently

2    identified as the BB gun.  So that is in the record.

3            As well as the testimony from Officer Katz,

4    who said that after the shooting, he went into the

5    trunk of his vehicle to take out a camera to

6    photograph the area when he fully was aware that that

7    was something that was against protocol.  Because

8    Officer Cocker, the crime scene technician, has

9    testified that Officer Katz should have done that.  So

10   that is just to supplement Mr. Bynum's arguments to

11   the Court.

12           We also would submit, Your Honor, that when

13   Chief Lanier put everyone on notice that the GRU unit

14   was going to have this enhanced training specifically

15   as to identifying illegal guns, that she put the city

16   council on notice, she put officers on notice, and she

17   also put the public on notice that we're going to have

18   these officers in this highly dangerous situation not

19   only for themselves, but as well for citizens of the

20   District of Columbia, that they would have enhanced

21   training in terms of weapon identification.  And that

22   did not occur.

23           And we would submit to the Court that had

24   that training occurred, Officer Leo would have been in

25   a better position to be able to make a distinction

1    between a handgun versus a weapon.

2            Also, as --

3            THE COURT:  Counsel, you're argument is not

4    in the record.  I have to confine myself to what's in

5    the record.  And what's in the record is the testimony

6    of Mr. Bradley, right --

7            MR. PONDS:  That is correct.

8            THE COURT:  -- your expert?

9            And if I hear Mr. Bradley correctly, what he

10    says is, I've had experience in these sorts of

11    interdiction, gun interdiction activities, although he

12    wasn't a member of GRU.  Right?  And I received

13    additional training, training provided -- and there's

14    training readily available from other federal

15    agencies.  And he mentioned a couple of them, strong

16    side, weak side, and project achilles, but there's no

17    further explanation on the record as to what those

18    training courses would have provided.  And he says if

19    Officer Leo had had that training, he would have -- he

20    would not have overreacted.  So that's all I have to

21    look at.

22            So my question is, is there anything else in

23    the record that would show what this additional

24    training would actually have entailed?  How is it any

25    different than twice yearly based on training than all

1    officers receive?  And third, how would it have made a

2    difference?

3            MR. PONDS:  To answer the Court's question,

4    there is evidence in the record in terms of

5    Mr. Bradley's testimony.  Mr. Bradley talked about

6    some of the areas that the Court talked about.  He

7    talks about in terms of specifically the

8    cross-training with the FBI, the Drug Enforcement

9    Administration, as well as the ATF, and other State

10   agencies with the State of Maryland and the State of

11   Virginia.

12           He also talked about that in these

13   trainings, because he had received the training

14   because he was assigned to a unit that went against --

15   that specialized in the apprehension of heavily armed

16   individuals similar to the GRU.  And what he talked

17   about was that in that training, that they would have

18   received the training, for example, to communicate in

19   terms of observations, which becomes very important --

20           THE COURT:  Where does it say that?

21           MR. PONDS:  That's in his deposition.

22   Because he talks specifically about the failure of

23   Officer Torres to communicate with the fact that

24   Officer Torres had seen a cell phone in Mr. Briscoe's

25   hands.  That would have been important, as his

1    deposition points out, that it would have lowered any

2    perceived threat by Officer Leo had that information

3    been --

4              THE COURT:  But if I accept that Officer Leo

5    believed that Briscoe had a gun, how would

6    communication about a cell phone have affected his

7    information once they got to the alley?

8              MR. PONDS:  Well, I think it's helpful in

9    this sense, that -- Bradley doesn't say this directly,

10   but I think you can infer it from his testimony when

11   you talk about communication between the officers and

12   relaying information, because in this scenario what we

13   know is that Officer Leo was driving the vehicle.  So

14   part of his focus was driving the vehicle.

15             THE COURT:  Okay.

16             MR. PONDS:  Officer Torres was in a vantage

17   point where he could keep his entire observations on

18   Mr. Briscoe.  It would have been important, as pointed

19   out in Mr. Bradley's deposition, that for Torres to

20   transmit this information to Officer Leo, and if he

21   had that information, it would have lowered any type

22   of -- it would have worked as a lowering of

23   expectations from Officer Leo as to any perceived

24   threat as he attempted to drive the vehicle and also

25   observe Mr. Briscoe.

1          THE COURT:  Did Mr. Bradley testify that in

2     the baseline training officers have told them not to

3     communicate or are not told to talk to each other in

4     this particular instance?

5          MR. PONDS:  I don't believe he went that

6     far.

7          THE COURT:  So there's nothing to compare

8     what he says should have happened by way of

9     communication with what officers are trained to do in

10    the course of their duties?

11         MR. PONDS:  That is correct.  But also, what

12    he says is that he took the position that the enhanced

13    training would have been directly dealing,

14    specifically, to train up the recognition of weapons,

15    how to act under these stressful situations, which was

16    also testified to by Agent James King, who was with

17    the internal affairs division, who not only

18    investigated the Moore case, but he also was a part of

19    the investigation in this case.

20         Agent King was confronted with the situation

21    with Sergeant Sloane as to why he didn't take any

22    further action against Sergeant Sloane.  And his

23    response was that, well, when officers are in

24    stressful situations, they perceive things

25    differently.  And that's the same thing that

1   Mr. Bradley was talking about in his deposition, that

2   he believed that based on his expert opinion, it was

3   his opinion that James -- that Officer Leo overreacted

4   to the situation.  And had he received the similar

5   training that Mr. Bradley had received, that he would

6   have overreacted to the situation.

7           We take that -- take his testimony and

8   couple it with officer -- Agent King's testimony that

9   officers see things -- perceive things differently in

10  stressful situations, that it was certainly that this

11  training, we would submit to this Court, would have

12  prevented this incident from occurring.

13          THE COURT:  Okay.  I understand.

14          Can you address one point in your -- related

15  to your false arrest claim?

16          MR. PONDS:  Yes, Your Honor.

17          THE COURT:  Is that you or --

18          MR. PONDS:  I would proceed with that,

19  Judge.

20          THE COURT:  Okay.  When, in your view, did

21  the arrest take place?  I mean, in order for there to

22  be a false arrest, there has to be an arrest, correct?

23          MR. PONDS:  Correct.

24          THE COURT:  When was Mr. Briscoe placed

25  under arrest in your view?

1          MR. PONDS:  In my view, this is taking a

2    conservative view, I think at the time Mr. Briscoe was

3    shot, at that point.  I think that's a very

4    conservative perspective on my part.  On plaintiff's

5    point, I think the point that he was shot, and even

6    accepting the facts as defendants are putting forth

7    that this was a classic BB gun that broke in three

8    places, that it's certainly -- and given the wounds

9    that he had, and that they could see he had been shot

10   in the back and the blood was coming out the front, so

11   obviously, it was an in-and-out shot, that it was

12   totally unjustified for them to place him under

13   arrest.  Because once they were able to arrive and

14   look at him, and they were able to determine there

15   wasn't even a barrel in this BB gun, it was totally

16   unjustifiable to handcuff him; therefore, detain him.

17          THE COURT:  So it was the cuffing after he

18   had been shot that constituted the arrest?

19          MR. PONDS:  I would suggest it was the

20   shooting itself, certainly, once the handcuffs are

21   placed on Mr. Briscoe.

22          THE COURT:  Okay.  Because your expert

23   testified, if I understand correctly, that it was

24   proper to cuff him as a security precaution, which is

25   inconsistent with an argument that he was under

1    arrest.

2         MR. PONDS:  Let me just make a slight

3    distinction.  Once the handcuffs were -- they could

4    have checked -- they could have placed the

5    handcuffs -- arguably, they could have placed the

6    handcuffs on him just to check to make sure he didn't

7    have any weapons.  Once that was done, and they

8    recognized this was not a weapon, therefore, there was

9    no crime, there was no need, as this young man laid on

10   the ground, to continue to have him handcuffed.

11   Because it's my understanding of the facts in this

12   case and all the witnesses that's testified that are

13   part of the exhibits, that he wasn't handcuffed until

14   the ambulance arrived.

15        THE COURT:  Does the government want to

16   respond briefly on the municipal liability point?

17        MR. PONDS:  Your Honor, can I just make a

18   few more points on that?

19        THE COURT:  Sure.

20        MR. PONDS:  Thank you, Judge.  Your Honor,

21   the other point I want to make on the municipal

22   liability is that there are other units -- and this is

23   on the record as testified by Metropolitan Police

24   Officer Richard Erlich, who was a 30(b)(6) witness,

25   who testified -- he testified that GRU is a

1   specialized training unit.  He also testified that the

2   emergency response team, the ERT team, which is the

3   SWAT team for the District, is also a specialized

4   unit, and they receive specialized training.  And he

5   testified they use a facility in Prince George's

6   County to conduct their training, he also testified

7   that the crime scene technicians in the District of

8   Columbia is a specialized unit, and they receive

9   specialized training.  And that officers in drug

10  recognition is also a specialized unit, and they

11  receive specialized training as well as some other

12  units.

13          Given that the categories -- the District's

14  witnesses categorize the GRU as a specialized unit,

15  and they didn't receive any training when all the

16  other training was available for all the divisions, we

17  would submit to the Court that was also deliberate

18  indifference.

19          THE COURT:  Is there any evidence in the

20  record -- I did not see it -- that would provide a

21  basis for comparison between excessive force

22  complaints against GRU members versus excessive force

23  complaints against the department at large?

24          MR. PONDS:  We made that request, and

25  Mr. Bynum can speak more on that, but I think Judge

1    Howell limit our request just to the GRU units.  That

2    is my understanding.

3             And also as to the complaint in this case,

4    we believe that, as it came out during the deposition

5    of James --

6             THE COURT:  I'm sorry.  Aren't the -- aren't

7    complaints made to the Office of Police Complaints,

8    aren't those public records?

9             MR. PONDS:  I'm not quite certain, Judge.  I

10   can't answer that question.

11            THE COURT:  Okay.

12            MR. PONDS:  But talking about the

13   complaints, particularly the points that got to the

14   internal affairs division, and there were a number

15   that went -- I believe, seven out of the eighteen

16   reached the level of the internal affairs division.

17   What's important for the Court to recognize, that

18   James King, one of the agents in the internal affairs

19   division, was a very good friend of Sergeant Sloane,

20   who is one of the supervisors in the GRU unit.

21            Sergeant Sloane and Agent King went to Penn

22   State together, Penn State University.  They were, in

23   fact, roommates for a year at Penn State University.

24   It was James King who investigated Sergeant Sloane and

25   Officer Katz in the Terrance Moore matter.  And it was

1   also James King who was also part of the investigation

2   in this case.  And we believe because there was this

3   ongoing conflict that there was never -- that any

4   investigation or any conclusion that was rendered in

5   an investigation was never gonna be fair, because it

6   was this ongoing conflict because of Mr. King and

7   Mr. Sloane.  And, therefore, we believe that the

8   results in this case are a bit skewed because of this

9   ongoing conflict.  So we would submit that that was

10  very important.

11          The Court has all the information in the

12  Reginald Jones case involving Mr. Jones, also an

13  officer of the GRU.

14          So in conclusion, in terms of our position

15  that the District is liable pursuant to 1983 because

16  of lack of training and supervision as well as a

17  pattern, we would submit to the Court that Chief

18  Lanier set the standard of care in terms of the

19  training of the GRU units, and she breached that

20  despite continuous complaints about people in this

21  unit, and therefore, we would submit to the Court that

22  the Court should find that we've carried our burden in

23  terms of --

24          THE COURT:  One last question.  The

25  government suggests that your expert has testified

1  that there was no pattern of excessive force.  Is that

2  correct?

3           MR. PONDS:  I would not agree with that.

4           THE COURT:  Okay.  What did he say?

5           MR. PONDS:  Because what he did, he talked

6  about -- he talked about the situations with Officer

7  Katz, the six shootings, three of humans, three of

8  dogs.  He also talked about the Terrance Moore case.

9  He talked about James King's involvement.  There were

10 some other incidents that were not -- that he didn't

11 have knowledge of at the time of his deposition, but

12 it's my understanding that was amended as part of his

13 admitted report.

14          THE COURT:  Okay.  Thank you.

15          Let's take a five-minute break for the

16 benefit of the court reporter and the Court.

17          (Whereupon, a recess was taken at 12:15 p.m.

18          and at 12:21 p.m. the following ensued:)

19          THE COURT:  Okay.  We were back on the

20 record.

21          Mr. DeBerardinis, I want to give you one

22 last bite at the apple on the training issue before we

23 move on.

24          MR. DeBERARDINIS:  Thank you, Your Honor.

25 And I'll be brief.  We've been here a long time this

1   morning.

2          The District does, however, feel constrained

3   to discuss, Your Honor, this notion that somehow

4   plaintiff was handcuffed in the litigation of this

5   case.  The day after the initial conference in this

6   case, plaintiff could have done a deposition notice of

7   Chief Lanier, could have done a 30(b)(6) notice.

8          THE COURT:  You mean handcuffed in the

9   figurative sense?

10          MR. DeBERARDINIS:  Yes, in the figurative

11   sense.  Yes, figurative sense.  They didn't do any of

12   that.  They cannot come in here now and say, we would

13   like to do that, Your Honor, but we didn't have the

14   opportunity, is -- I'm going to use the word --

15   preposterous.

16          Along those same lines, Your Honor,

17   plaintiff chose from the very beginning of this case

18   to focus on the activities of the GRU unit.  Their

19   initial interrogatories and requests for documents did

20   not make any request regarding MPD as a whole in the

21   use of force.

22          Perhaps, in retrospect, they could have or

23   they should have in order to compare whether GRU

24   complaints were somehow disproportionate, but they

25   failed to do that.  If there's any handcuffing here,

1    Your Honor, they handcuffed themselves.

2            Also, Your Honor, we trust the Court is

3    going to decide this on the record, this notion of --

4    there's a culture of lying within MPD, and they all

5    help one another to cover up.  That's not part of this

6    case, Your Honor.  There's no indication.  Counsel's

7    subjective views of the Metropolitan Police Department

8    are of no moment in this case, Your Honor.

9            But more importantly, Your Honor, to some

10   degree we segue into negligent -- the common law

11   negligent training count here, because it does overlap

12   to some extent.

13           And the Court -- the Court really hit on

14   something in one of the questions to counsel, in that

15   plaintiff's expert was testifying as to his knowledge

16   of the training received by individuals of the

17   Metropolitan Police Department twenty years ago.  To

18   read his deposition transcript in his reports, there's

19   absolutely no indication that he reviewed one training

20   manual or one course curriculum that's contemporary.

21   And the Court spotted that, and there's no -- for all

22   we know, what the FBI offers today, if they offer such

23   a -- we don't even know whether cross-training will be

24   available to the Metropolitan Police Department today.

25           The expert may have done it twenty years

1  ago.  Who knows what's available today.  We absolutely

2  don't.

3          And as far as negligent training goes, we

4  have no idea whether such additional training is the

5  procedure employed by the municipalities.

6          Are there GRU units in other jurisdictions?

7  If so, do they require additional training, or do they

8  rely upon their traditional training in the use of

9  force?  We have no idea.

10          And just as importantly, Your Honor,

11  plaintiff -- rather than doing cross-analysis,

12  plaintiff tends to stick labels, well, the unit's not

13  any special unit.  BCD are denominated special units.

14  They get special training; therefore, A, needs

15  additional training.  But you have to look at the

16  function, what's going on here, Your Honor.

17          Crime scene people need additional training.

18  Of course, DUI people need training in administering

19  those tests, and a SWAT team needs additional

20  training.  But what these officers were doing, they

21  were focusing on guns.  This was not some special

22  additional law enforcement activity.

23          THE COURT:  Well, you said that, but why

24  wouldn't it be reasonable to infer that a unit that is

25  expected to come into contact with armed felons every

1    day would require some additional training over and

2    above what an average patrol officer in Ward 5 of

3    Washington, DC, would receive?

4              MR. DeBERARDINIS:  Because the Court has to

5    make the leap that it cannot do on this record that

6    the training that they'd already received is adequate

7    for the circumstance.

8              THE COURT:  Well, that's a slightly

9    different issue, but it would not be revolutionary to

10   conclude that some additional training might be

11   necessary.  Whether they've shown causation --

12             MR. DeBERARDINIS:  Exactly.

13             THE COURT:  -- those are different

14   questions.

15             MR. DeBERARDINIS:  That's another problem,

16   causation problem.  We would submit the expert's

17   testimony is so vague.  He talks about more robust

18   training, and he talks about training in some kind of

19   vague areas.  But what he fails to do is what's

20   required under the common law of the District of

21   Columbia as neglect training.  He needs to establish a

22   very specific measuring tool so the jury could

23   measure -- look at the conduct of the District of

24   Columbia and determine that something was wrong,

25   compare it to another standard, and then establish a

1    proximate cause and then establish that, indeed, it's

2    a standard of care.

3            We would submit, we believe we've covered

4    this pretty amply in our papers, that plaintiff has

5    failed on every -- on every one of these prongs, Your

6    Honor.

7            THE COURT:  I think I've heard enough.  I'm

8    going to reserve on the municipal liability issue, and

9    I'll get something in writing to you all probably this

10   week -- okay? -- as well as on the other counts.

11           With respect to qualified immunity, I'm

12   going to deny the District's summary judgment motion

13   as to the plaintiff's constitutional and common law

14   assault and battery claim against Officer Leo.

15   Interpreting the evidence, including the video, in the

16   light most favorable to the plaintiff, the Court finds

17   that there's a genuine question of fact as to whether

18   Officer Leo's conduct was objectively reasonable.  In

19   other words, the Court finds that a reasonable juror

20   could conclude from the video and the other evidence

21   in the record that neither Officer Leo or his fellow

22   officers nor any member of the public was facing a

23   threat of serious harm when Officer Leo fatally shot

24   Mr. Briscoe.

25           While a reasonable juror could conclude that

1    Mr. Briscoe was armed with what Officer Leo may have

2    thought was a real gun but that turned out to be a BB

3    gun, the same juror could also conclude that Briscoe

4    was simply attempting to evade the officers and did

5    not pose harm to them when he was shot.

6           And, obviously, Mr. Briscoe had a recognized

7    constitutional right to be free from the use of

8    unreasonable force, unreasonable deadly force, by the

9    police at his time of death.  So that's my ruling on

10   that issue.

11          We will get something to you on municipal

12   liability as to the District and the other counts of

13   the complaint.

14          What are our next steps?  Are you prepared

15   to talk about trial date pending the Court's ruling on

16   the other issues?

17          MS. FEATHERSTONE:  Does the Court have a

18   month in mind that it's looking for trials, Your

19   Honor?

20          THE COURT:  Early December.

21          MS. FEATHERSTONE:  May we approach, Your

22   Honor?

23          THE COURT:  Sure.

24          (Counsel approached the bench and the

25          following ensued:)

1          MR. DeBERARDINIS:  Your Honor, I'm

2     recovering from serious surgery in November.  I will

3     be back in early December, if all goes well.  I'm

4     going to ask the indulgence of the Court.  Given the

5     seriousness of the case, it's not one that we can pass

6     off to another counsel easily.  So we would ask that

7     we look at the very earliest January dates, Your

8     Honor.

9          THE COURT:  Any objection?

10          MR. BYNUM:  No objection to that.  We're

11     both available in early January.

12          THE COURT:  You are going to settle this

13     case?

14          MR. BYNUM:  I think as I mentioned last time

15     we were here, the District was not going to consider

16     this until this motion.  So the question -- we've

17     always been prepared to settle the case.  It's up to

18     the District if they want to engage in settlement

19     negotiations.

20          THE COURT:  Would mediation facilitate that?

21          MR. BYNUM:  It might.  We've always been

22     open to that.

23          MS. FEATHERSTONE:  We would not be opposed

24     to mediation.  Would the Court be sending it to a

25     mediator or a magistrate judge at this point?

```
1              THE COURT:  I would suggest a magistrate

2    judge might be more appropriate.

3              MS. FEATHERSTONE:  May we have a moment to

4    confer on that, Your Honor?

5              THE COURT:  Sure.

6              MR. BYNUM:  Your indulgence, Your Honor.

7              (Discussion held off the record.)

8              MR. BYNUM:  Can all four of us talk first

9    before we address the Court?

10             MS. FEATHERSTONE:  Yes.

11             MR. BYNUM:  Excuse me, Your Honor.

12             (Discussion held off the record.)

13             MS. FEATHERSTONE:  Your Honor, the parties

14   have discussed it.  We may be amenable to having a

15   private mediator, but we can't make that decision

16   today, because it does require expending District

17   funds.  We have to get prior approval.  I think the

18   plaintiffs would like to do private mediation.  We

19   were fine with mediation in front of Magistrate Judge

20   Kay, but understanding the seriousness and complexity,

21   we want a private mediator judge.

22             THE COURT:  You don't need a referral from

23   me to do that?

24             MR. BYNUM:  No, but we would like a control

25   date to find out what we're going to do.
```

1          MS. FEATHERSTONE:  Right.

2          THE COURT:  Thirty days?

3          MS. FEATHERSTONE:  Very well, Your Honor,

4     yes.

5          THE COURT:  And we'll set a mid-January

6     trial date?

7          MS. FEATHERSTONE:  Okay.

8          THE COURT:  Good luck.

9          MR. DeBERARDINIS:  Thank you.  I plan to be

10    here for a good long time, Your Honor.

11         MS. FEATHERSTONE:  Thank you, Your Honor.

12         THE COURT:  We're adjourned.

13         MR. BYNUM:  Thank you, Judge.

14         (Whereupon, at 12:36 p.m. the proceedings

15         concluded.)

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3        I, Chantal M. Geneus, a Certified Realtime

4   Reporter, Registered Merit Reporter, and Certified

5   Realtime Captioner of the United States District Court

6   for the District of Columbia, do hereby certify that I

7   stenographically reported the proceedings in the

8   matter of CA 12-514, *Bridzette Lane versus District of*

9   *Columbia, et al.*, on Tuesday, October 14, 2014, in the

10  United States District Court for the District of

11  Columbia, before the Honorable Christopher R. Cooper,

12  United States District Judge.

13       I further certify that the Page Numbers 1 through

14  92 constitute the official transcript of the

15  proceedings as transcribed by me from my stenographic

16  notes to the within typewritten matter.

17       In witness whereof, I have affixed my signature

18  on December 5, 2016.

19

20

21                          _*Chantal M. Geneus*_
                         Chantal M. Geneus, CRR, RMR, CRC
22                         Official Court Reporter

23

24

25